IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

WILLI... *RECEIVED*
... WALSH. CLERK

FEB 11   8 41 AM '91

Un...
CIVIL ACTION,   TES
COURT

IN RE:

DONALD J. TRUMP CASINO
SECURITIES LITIGATION

MDL DOCKET NO. 864

This Document Relates to:
Taj Mahal Litigation

CLASS ACTION

**FILED**

CONSOLIDATED AMENDED COMPLAINT          FEB 1 1 1991

At 8:30_____ M

Plaintiffs, by and through their attorneys, hereby

complain against defendants Donald J. Trump ("Donald"), Robert S.

Trump ("Robert") Harvey S. Freeman ("Freeman"), The Trump

Organization, Inc. ("Trump Organization"), Trump Taj Mahal Funding,

Inc. ("Taj Funding"), Trump Taj Mahal, Inc. ("Taj Inc."), Trump Taj

Mahal Associates Limited Partnership ("Taj Associates"), and

Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), as

follows:

## JURISDICTION AND VENUE

1.    This  Court  has  jurisdiction  over  this  action

pursuant to 28 U.S.C. § 1331; Section 22 of the Securities Act of

1933, as amended (the "Securities Act") 15 U.S.C. § 77v; Section

27 of the Securities Exchange Act of 1934, as amended (the

"Exchange Act"), 15 U.S.C. § 78aa; and principles of pendent

jurisdiction.

2.    Venue is proper in this judicial district because many of the acts and injuries alleged herein occurred within this district and many of the defendants have principal places of business within this district.

3.    In connection with the acts and conduct alleged herein, the defendants, directly or indirectly, used the mails, instrumentalities of interstate commerce, and/or the facilities of national securities markets, including the American Stock Exchange ("AMEX") where the securities at issue herein were traded.

## PARTIES

4.    Plaintiffs, Joanne Gollomp, Susan Cagan, Eric Cagan, David E. Dougherty, Jean Curcio, Robert and Helen Kloss, Fred Glosser, Herman Krangel, Sidney Kaufman, and Jerome Schwartz, are holders of 14% First Mortgage Bonds, Series A, due 1998, of Taj Funding (the "Taj Bonds"), having purchased such bonds during the Class Period as hereinafter alleged and presently holding such bonds.

5.    Donald is a resident of the State of New York with his principal place of business at 725 Fifth Avenue, New York, New York 10022.    Donald also maintains a business address at 1000 Boardwalk, Atlantic City, New Jersey 08401.    Donald is the sole general partner of Taj Associates.

2

6.     Robert is a resident of the State of New York with his principal place of business at 725 Fifth Avenue, New York, New York 10022.   Robert is the brother of Donald.

7.     Freeman is a resident of the State of New York with his principal place of business at 725 Fifth Avenue, New York, New York 10022.

8.     Taj Associates is a New Jersey limited partnership with its principal place of business at 1000 Boardwalk, Atlantic City, New Jersey 08401.   Taj Associates was formed by Donald on or about June 23, 1988, to acquire, construct, own, and operate Trump Taj Mahal Hotel & Casino, located at 1000 Boardwalk, Atlantic City, New Jersey 08401.

9.     Taj Funding is a New Jersey corporation with its principal place of business at 1000 Boardwalk, Atlantic City, New Jersey 08401.   Taj Funding was formed by Donald on or about June 3, 1988, to finance the completion and operation of the Taj Mahal through the issuance of securities.   Taj Funding conducts no business of its own.

10.   Taj Inc. is a New Jersey corporation with its principal place of business at 1000 Boardwalk, Atlantic City, New

3

Jersey 08401. Taj Inc. was formed by Donald on or about June 3, 1988, and is the corporate general partner of Taj Associates.

11.   Trump Organization is a New York corporation with its principal place of business at 725 Fifth Avenue, New York, New York 10022.

12.   Merrill Lynch is a Delaware corporation with its principal place of business at 250 Vesey Street, New York, New York. Merrill Lynch was the underwriter of the public offering of Taj Bonds as described below.

### CLASS ALLEGATIONS

13.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a) on behalf of all persons, other than defendants and their affiliates, directors, officers, and members of their immediate families, who: (a) purchased Taj Bonds on or after November 22, 1988 (the "Purchaser Class"), or (b) owned Taj Bonds as of this date and their successors in interest who are being or will be deprived of their interest in the Taj Bonds by reason of a proposed prepackaged Plan of Reorganization under the Bankruptcy Code to be filed by or on behalf of the Taj Mahal entities which fails adequately to protect or compensate the holders of the Taj Bonds and provides no adequate compensation for

4

those members of the Purchaser Class who sold the Taj Bonds at a loss (the "Holder Class").

14.     The Classes of persons described above are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiffs at the present time, Taj Funding has approximately $675 million of bonds outstanding.  It is believed that hundreds of persons purchased the Taj Bonds or presently hold them.   The exact number of class members can be readily determined from the books and records of Taj Funding or its respective transfer agent.

15.     Plaintiffs' claims are typical of the claims of the Classes because plaintiffs and all other Class members sustained damages which arise out of defendants' willful conduct in violation of federal and state laws as complained of herein and/or will be damaged if the proposed exchange offer takes place.

16.     Plaintiffs will fairly and adequately protect the interest of the Classes.    Plaintiffs have retained competent counsel experienced in the prosecution of Class Actions under the federal securities laws and otherwise.

17.     Questions of law and fact common to the members of the Classes predominate over any questions affecting only

individual members of the Classes. Among the predominating common questions of law and fact are the following:

(a) whether the federal securities laws were violated by the defendants;

(b) whether the Registration Statement identified below and other documents issued and or disseminated publicly by the defendants contained misstatements of material fact or omitted or failed to state material facts concerning the business, operations, or financial condition of Donald, Trump Organization, Taj Associates, Taj Funding, and/or Taj Inc.;

(c) whether the individual defendants, or any one or more of them, made statements or disseminated information that contained misstatements of material fact or omitted or failed to state material facts concerning the business, operations, or financial condition of Donald, Trump Organization, Taj Associates, Taj Funding, and/or Taj Inc.;

(d) whether the defendants acted willfully, recklessly, or negligently in misstating and/or omitting to state material facts, or in aiding or abetting the making of such misstatements or omissions;

6

(e)   whether the defendants have failed to abide by the terms and conditions specified on the Taj Bonds and/or in other documents issued or disseminated publicly by the defendants in connection with such securities;

(f)   whether the defendants have engaged in unfair and deceptive trade practices and/or false advertising; and

(g)   whether the members of the Classes have sustained damages and, if so, the proper measure of damages.

18.   A Class Action is superior to other available methods for the fair and efficient adjudication of this controversy.

## RELATIONSHIPS AMONG DEFENDANTS

19.   At all times relevant hereto, Donald has owned, directly or by virtue of his 100% ownership of Taj Inc., all of the issued and outstanding stock of Taj Funding. At all times relevant hereto, Donald has been Chairman, President and Treasurer of Taj Funding.

20.   At all times relevant hereto, Donald has owned, directly or by virtue of his 100% ownership of Taj Inc., all of the partnership interests of Taj Associates.

7

21. By reason of his beneficial ownership of all of the partnership interests thereof, Donald is a controlling person of Taj Associates within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act and exercised the power to cause, and did cause such entity to engage in the unlawful conduct complained of herein. Donald is sued in his individual capacity and as a controlling person of Taj Associates.

22. By reason of his beneficial ownership of all of the stock thereof and his position as director and senior officer, Donald is a controlling person of Taj Funding within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act and exercised the power to cause, and did cause such entity to engage in the unlawful conduct complained of herein. Donald is sued in his individual capacity and as a controlling person of Taj Funding.

23. The affairs of Taj Associates are entrusted to an Executive Committee comprised of the following individual defendants:

(a) Donald - Chief Operating Officer, President and Treasurer;

8

(b)    Robert - Chief Operating Officer and Secretary;

and

(c)    Freeman - Executive Vice President.

24.    By reason of their positions on the Executive Committee, Robert and Freeman are controlling persons of Taj Associates and Taj Funding within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act.    Robert and Freeman are each sued in their individual capacities and as controlling persons of Taj Associates and Taj Funding.

25.    Taj Associates, Taj Funding, Taj Inc. and Trump Organization, and their affiliates are subject to regulation by the New Jersey Casino Control Commission ("CCC"), which authorizes the establishment of casinos in Atlantic City, provides for licensing, regulation, and taxation of casinos, and created the CCC and the Division of Gaming Enforcement.    These bodies administer the Casino Control Act.    In general, the provisions of the Casino Control Act concern the ability, character, and financial stability and integrity of casino operators, their officers, directors, employees, and others financially interested in a casino; the nature and suitability of hotel/casino facilities, operating methods, and conditions; and financial accounting practices.    In this regard, if the Taj Mahal entities, or the two other casinos controlled by Donald -- Trump's Castle and Trump Plaza -- fail to

9

meet obligations under their debt securities, the casino licenses for Donald, Taj Associates, Taj Funding, Taj Inc., and Trump Organization could be revoked.

## FACTUAL BACKGROUND

26. On or about June 23, 1988, Taj Funding registered the Taj Bonds with the Securities and Exchange Commission ("SEC") by filing a Form S-1 Registration Statement and Prospectus (the "Taj Bond Prospectus") in accordance with Section 12(b) of the Securities Act, 15 U.S.C. § 77$\underline{l}$(b). In Amendment No. 4 to the Taj Bond Prospectus, defendants stated, "Donald J. Trump has advised the Partnership and the Company that he has sufficient financial resources to perform his obligations under the Trump Completion Guaranty. He has further advised the Partnership and the Company that his net worth, determined in accordance with generally accepted accounting principles applicable to personal financial statements, is at least $500,000,000."

27. The Taj Bond Prospectus was declared effective on November 10, 1988. The Taj Bonds, in an aggregate principal amount of $675 million, were issued on November 22, 1988, at the stated principal amount and were sold to the public and on the AMEX following the issuance of the bonds on November 22, 1988.

10

28. Through the issuance of the Taj Bonds, Taj Funding raised gross proceeds in the amount of $675 million, which were immediately loaned by Taj Funding to Taj Associates. To evidence the loan, Taj Associates issued to Taj Funding a promissory note ("Note") in the aggregate principal amount of $675 million, which Note is secured by a Mortgage on the Taj Mahal and ancillary properties ("Mortgage"). The Note and Mortgage were assigned by Taj Funding to Bankers Trust Company, as Trustee under the Taj Bond Indenture, for the benefit of holders of Taj Bonds.

29. Taj Mahal is comprised of a 42-story hotel and a contiguous low-rise structure, together occupying 17 acres of land, constituting the largest casino/hotel complex in Atlantic City, New Jersey. Taj Mahal contains approximately 1,250 guest rooms; 155,000 square feet of meeting, ballroom, convention, and exhibition space; a 120,000 square foot casino; a variety of restaurants, cocktail lounges, entertainment areas, and shops; and parking for approximately 4,600 cars and bus transportation facilities.

30. According to the Prospectus and other marketing material relating to the Taj Bonds, the completion costs of the Taj Mahal, including the payment of interest on the Bonds for 15 months, was estimated at $805 million. This financing was to come from three sources: (a) the Taj Bonds (whose face value was $675 million); (b) Donald's capital contribution, of $75 million; and

11

(c) other investments and a personal credit line provided by Donald in the amount of $25 million.

31. The Taj Mahal needs to earn approximately $1,300,000 per day to service all of the debt of Taj Funding and to otherwise cover its costs of doing business. Donald has repeatedly and falsely proclaimed to the investing public that a daily win of that size could be achieved on a continuing basis and that, by implication, the holders of the Taj Bonds could be satisfied. For example, in March, 1990, Marvin Roffman, then a casino analyst for January Montgomery Scott, predicted that the Taj Mahal could not generate enough revenues to do so, Donald emphatically denied the prediction, called Roffman a "totally mediocre guy with no talent," and demanded that he be fired.

32. In Management's Discussion and Analysis of Financial Condition and Results of Operations of the Partnership and the Company, which must be prepared in accordance with the requirements of Item 303 of Regulation S-K promulgated by the SEC, the Prospectus stated:

> After the completion and opening of Taj Mahal, the Partnership will rely on cash generated from the Taj Mahal's operations to service its debt and provide for anticipated capital requirements. The Partnership believes that funds generated from the operation of the Taj Mahal will be sufficient to cover all of its debt service

12

(interest and principal). [Emphasis
added.]


33. The above statement was false and misleading in at
least the following respects:

(a) the Prospectus failed to disclose that the Taj
Mahal would require an unprecedented "casino win" of approximately
$1.3 million per day on a continuing basis to meet its enormous
debtload. Further, the Prospectus failed to disclose that as
early as May 1987, a leading analyst of the casino industry, and
others, had warned Donald that the "numbers did not add up" and
that there was little or no chance that the Taj Mahal could meet
its debt service;

(b) the Prospectus omitted to state that a "casino
win" of approximately $1.3 million per day was approximately five
times the average casino win for other casinos in Atlantic City
for the period ended December 31, 1987;

(c) there was no reasonable basis for the
statement in the Prospectus that Taj Associates believed it could
generate sufficient funds to cover the debt service;

(d) the Prospectus omitted and failed sufficiently
to warn investors of the high likelihood that the debt service

13

required to keep Taj Mahal operating would put it in financial jeopardy;

(e) the Prospectus omitted to state, as required by Item 303 of Regulation S-K, that there existed "known ... uncertainties" regarding whether operation of the Taj Mahal would generate sufficient funds to cover all of its debt service; and

(f) the Prospectus failed to disclose that defendants had no basis to make any statement or representation about the amount of funds generated by the operation of the Taj Mahal or the sufficiency of those funds to service the Taj Bonds.

34. The Prospectus also failed to disclose that Donald had embarked upon a course of conduct of personally guaranteeing hundreds of millions of dollars in bank loans for properties other than the Taj Mahal. These personal guaranties ultimately included $135 million on the Trump Shuttle, $125 million on the Plaza Hotel in New York, $60 million on a construction loan for the Trump Palace condominiums in New York, over $100 million on a personal loan from Bankers Trust, $10 million on a loan from Boston Safe Deposit & Trust Co. to buy Donald's yacht and various personal lines of credit. Donald is also understood to have personally guaranteed a $75 million loan to First Fidelity Bancorp on the Taj Mahal. Indeed, not only was this course of conduct of personal guarantees not disclosed in the Prospectus, but it is contrary to

14

Donald's repeated representations to the investing public that he never used his own money to purchase his properties. These omissions in the Prospectus were material because the existence of such guarantees made Donald's financial condition precarious, thereby decreasing the likelihood that he would have sufficient cash and resources to satisfy obligations benefitting members of the Purchaser Class, including but not limited to Donald's $25 million contingent line of credit. Donald's guarantee of a $75 million loan on the Taj Mahal also indicated greater leverage on the Taj Mahal than investors and the Purchaser Class were led to expect from the Prospectus. As a result of the existence of these guarantees, the Taj Bonds entailed a higher degree of risk than was disclosed in the Prospectus. Further, the statement in the Prospectus that Donald's personal net worth was at least $500,000,000 was false and misleading, was based upon artificially inflated appraisals, and his financial statements as referred to in paragraph 26 hereof were not prepared in accordance with generally accepted accounting principles.

35. Donald's precarious financial condition, as described in the preceding paragraph, created the undisclosed risk that Donald's financial empire would unravel or deteriorate precipitously (as a result of Donald's personal guarantees and obligations in unrelated transactions) to the grave harm of plaintiffs and the other members of the Classes. The success of the Taj Mahal depended on the strength of Donald's name, financial

15

position, personal liquidity, and business reputation, as well as his ability to provide the funds which he had personally committed. The Prospectus failed to disclose that if Donald's name, financial position, personal liquidity and business reputation were tarnished or devalued, then, among other reasons, the Taj Mahal would not be able to achieve its projected revenues and earnings due to grave marketing problems (e.g. the glamour and aura of success of the Taj Mahal would be greatly diminished) and pervasive operational problems (e.g. the Taj Mahal would be unable to pay its vendors to hire and retain top quality management, its operating performance impeded by the need to focus on debt management, etc.).

36. The Prospectus also failed to disclose that construction and operation of the Taj Mahal involved an excessive, unwarranted, and unprecedented debt component relative to total capitalization. Out of the $805 million total projected cost for acquisition, construction, initial financing and related costs, no more than $75 million (or only nine percent) represented capital contributions. The Prospectus failed to disclose that no other Atlantic City casino project was so thinly capitalized and, therefore, so vulnerable to downturns in the industry and economic downturns generally.

37. The Prospectus stated, without adequate basis, that the appraised value of the Taj Mahal as of its opening date in

16

late 1989 or early 1990 was $1.1 billion. This appraisal was based primarily on "the capitalization of income approach," even though at the time of the Prospectus it was impossible to make any reasonable estimate of the Taj Mahal's future income.

38. The Prospectus stated:

> The Partnership believes that the opening of the Taj Mahal in the proximity of the Showboat and Resorts Casino Hotel will attract an increased volume of patrons to the vicinity of the Taj Mahal.

This statement omitted to address the fact that drawing gambling dollars from one casino to another would fail to materially increase the casino win for Taj Mahal on average. In fact, it would cost more money to attract gamblers from one casino to another than would be earned by any increase in business, thereby not increasing the casino win, but rather decreasing it. The failure to disclose the unlikelihood of drawing away business from a competitor in sufficient amount to produce a casino win at the Taj Mahal sufficient to service its debt was material and, in light of the circumstances under which the above statement was made, was materially misleading. The above statement was also materially misleading, because it failed to disclose the material fact that the opening of the Taj Mahal in the proximity of the Showboat, Trump Castle, Trump Plaza, and Resorts Casino Hotel would materially increase the risk that either the Castle, the

17

Plaza or the Taj Mahal would fail or be unable to service its debt. Such failure or inability to service debt would tarnish Donald's name and business reputation, which could cause the Taj Mahal to suffer serious decline in revenues and earnings due to grave marketing problems (e.g. the glamour and aura of success of the Taj Mahal would be greatly diminished) and pervasive operational problems (e.g. the Taj Mahal would be unable to pay its vendors, hire and retain top quality management, its operating performance impeded by the need to focus on debt management, etc.).

39. The Prospectus also omitted to disclose the likely effect of the already weakened economy in the Northeast and the potential for competition from casinos located in Las Vegas, Nevada, principally the Mirage, then under construction. The Prospectus in general de-emphasized the business risks involved in operating the Taj Mahal.

40. The Taj Mahal was opened for business in April 1990.

41. During the period prior to and following the issuance of the Taj Bonds, Donald made numerous public statements trumpeting his financial strength and resources, all of which were intended to and did create a perception in the investing community

18

that Donald and his financial empire were healthy and prospering, including the following:

(a)  In the November 27, 1989, issue of Business Week, Donald bragged that the Taj Mahal was "going to be a tremendous success";

(b)  On April 8, 1990, Donald told the New York Times, "I hate to put it publicly, because then it's sort of a guarantee. But if you want me to say it, the answer is absolutely 'Yes'" when asked if he would back the Taj Bonds with his own assets;

(c)  In April, 1990, Donald told The Wall Street Journal he wanted to become the "king of cash";

(d)  In the May 14, 1990, issue of Newsweek, Donald denied that he was experiencing any cash flow problems and bragged, "I think the people with a lot of cash -- and I have a lot of cash -- are going to be able to make beautiful deals in the next few years";

(e)  In the May 14, 1990, issue of Forbes magazine, Donald estimated his net worth to be "four or five billion dollars";

(f) On June 4, 1990, The Wall Street Journal reported: "Mr. Trump was so adamant in denying the existence of any financial troubles that he threatened to sue the newspaper if it reported that he had cash flow problems"; and

(g) At a public press conference on June 7, 1990, one of defendants' agents, Edward Tracy, assured the media and the public that the debt service on the Taj Bonds could be met and that Donald's casinos, including the Taj Mahal, were generating an "avalanche" of cash.

42. The statements described above were false and misleading in that at the time they were made defendants knew or recklessly disregarded that Donald's net worth was not as high as stated, that defendants lacked the ability to raise or generate sufficient funds to maintain Donald's financial empire, and that defendants did not have the ability to service the Taj Bonds.

43. Beginning in June, 1990, Trump Organization, of which Taj Associates and Taj Funding are a part, began to acknowledge to its lenders severe financial difficulties which were revealed and well-documented thereafter in numerous sources of public information such as the national print media and television networks.

44. As more accurate information about defendants' true financial condition and inability to make debt payments on the Taj Bonds came to light, the market prices of Taj Bonds fell from their previously artificially maintained levels.

45. In August, 1990, Donald and Trump Organization entered into a work-out agreement with the major lenders to Trump Organization which placed severe restraints and limitations upon Donald's financial dealings and the day-to-day operations of Trump Organization and its various subsidiaries and affiliates.

46. As part of the financial restructuring of Trump Organization during the summer of 1990, Donald announced a plan to exchange the Taj Bonds for shares of common stock in Taj Funding ("Taj Stock").

47. The announcement was made pursuant to a plan and scheme entered into some time prior to such date (the exact date which is not known to plaintiffs), through which defendants intended, inter alia, to reduce the long-term debt of Taj Funding in order that Donald might retain most of the control of and equity in Taj Funding and, indirectly, the Taj Mahal.

48. In furtherance of their plan and scheme, defendants have proposed a Plan of Reorganization pursuant to a so-called "pre-packaged bankruptcy" without adequately protecting or

21

compensating the holders of the Taj Bonds and without adequately compensating those who sold the Taj Bonds at a loss.

## COUNT I

### VIOLATIONS OF SECTIONS 11, 12(a) and 15 OF THE SECURITIES ACT

49. Paragraphs 1 through 48 are incorporated by reference as if set forth herein at length.

50. At the time the Registration Statement and Prospectus became effective, they contained untrue statements of material facts and omitted to state material facts required to be stated therein which were necessary to make the statements therein not misleading, as set forth above, in violation of Sections 11 and 12(2) of the Securities Act.

51. Plaintiffs and the other members of the Purchaser Class were damaged as a proximate result of defendants' violations of Sections 11 and 12 of the Securities Act.

52. Pursuant to Sections 11 and 12 of the Securities Act, plaintiffs and the other members of the Purchaser Class are entitled to recover damages jointly, severally, or individually from defendants as follows:

22

(a) Taj Funding and Taj Associates, the issuers and registrants of the Taj Bonds;

(b) Donald, as the signatory to the Registration Statement and as a controlling person of the issuer within the meaning of Section 15 of the Securities Act.

(c) Merrill Lynch, as underwriter of the Bond Offering within the meaning of the Securities Act; and

(d) the other defendants, as controlling persons of the issuer within the meaning of Sections 15 of the Securities Act.

53. None of the defendants named in this Complaint made a reasonable investigation and none possessed reasonable grounds for belief concerning the accuracy of the Registration Statement and Prospectus' or the misstatements and omissions therefrom.

54. Neither plaintiffs at the time of their respective purchases, knew, or by the exercise of reasonable care, could have known, of the aforesaid misstatements and omissions.

55. This action was commenced within one year from the time when the plaintiffs discovered or should have discovered the

23

misstatements and omissions alleged herein, and within three years
of the effective date of the initial public offering of Taj Bonds.

56.  By reason of the foregoing, defendants herein have
violated Sections 11 and 12 of the Securities Act and are liable
to the plaintiffs and the members of the Purchaser Class.

57.  Plaintiffs and the Class, to the extent they not
already disposed of them, hereby tender their Taj Bonds in
exchange for the consideration paid by them.

## COUNT II

### VIOLATION OF SECTIONS 10(b) and 20(b) OF
### THE EXCHANGE ACT and RULE 10b-5

58.  Paragraphs 1 through 57 above are incorporated by
reference as if set forth herein at length.

59.  Pursuant to Section 10(b) of the Exchange Act,
plaintiffs and the other members of the Purchaser Class are
entitled to receive damages jointly, severally, or individually
from defendants as follows:

(a)  all  defendants  as  direct  participants,
conspirators, and aiders and abettors in the fraudulent scheme
alleged; and

24

(b) Donald, Robert, Freeman, Trump Organization and Taj Inc. as controlling persons of the issuer within the meaning of Sections 10(b) and 20(c) of the Exchange Act.

60. Defendants caused or permitted Taj Funding to issue and disseminate the Prospectus and other statements (written and oral) to the investing public.

61. The purpose and effect of the dissemination of the aforesaid information was to manipulate unlawfully the prices of Taj Bonds in violation of Section 10(b) of the Exchange Act and Rule 10b-5 of the SEC promulgated thereunder. As a result, plaintiffs and each member of the Purchaser Class have been, and will continue to be, damaged.

62. Defendants, acting alone or in concert, caused the dissemination of false and misleading information to be made despite the fact that their statements (written and oral) misstated material facts and omitted to state other material facts necessary to make the statements made, in light of the circumstance under which they were made, not misleading to plaintiffs and the other members of the Purchaser Class as more fully set forth above.

63. The practices and devices utilized by defendants in order to effectuate the aforesaid course of action consisted of misrepresentations by defendants in the name of Taj Funding and in their own names, knowing them to be false when made or recklessly disregarding their falsity and/or intentionally concealing or failing to disclose omitted material facts as more set forth above.

64. As a result of the foregoing activities which are in violation of Section 10(b) of the Exchange Act and Rule 10b-5, plaintiffs and the other members of the Purchaser Class have been or will be damaged in an amount which cannot presently be determined.

## COUNT III

### BREACH OF FIDUCIARY DUTY

65. Paragraphs 1 through 64 above are incorporated by reference as if set forth herein at length.

66. Donald is the only defendant in this Count, which is asserted by plaintiffs and members of the Holder Class.

26

67. Donald, by virtue of his control, directly or indirectly, of Taj Funding, owes fiduciary duties of loyalty and fairness to plaintiffs and the other members of the Holder Class.

68. Donald has forced or will force the terms and conditions of the proposed Plan of Reorganization upon plaintiffs and the other members of Holder Class in order to accomplish the financial survival and restructuring of Trump Organization and of his personal finances.

69. Donald desires to effectuate the proposed Plan of Reorganization for his own individual gain or for the benefit of other constituent parts of Trump Organization, including:

(a) the elimination of a portion of long-term debt of the Taj Mahal;

(b) compliance with the terms, conditions, and restrictions of the bank work-out arranged between Donald, Trump Organization, and their major lenders;

(c) the perpetuation of Donald's control over Trump Organization and all its constituent parts, including Taj Funding and Taj Associates; and

27

(d) the avoidance of insolvency or bankruptcy of Trump Organization and/or Donald.

70. Donald has violated his fiduciary duty owed to plaintiffs and the other members of the Holder Class by, inter alia, not appropriately evaluating the true worth of the Taj Bonds and by forcing the proposed Plan of Reorganization upon plaintiffs and the other members of the Holder Class, seeking his own gain and benefit to the exclusion of plaintiffs and the other members of the Holder Class.

71. As a result of such breaches of fiduciary duty, Donald has injured and will continue to injure plaintiffs and the other members of the Holder Class in an amount which cannot presently be determined.

72. Plaintiffs and the other members of the Holder Class will suffer irreparable harm if the proposed Plan of Reorganization is effectuated in the manner presently proposed.

## COUNT IV

### COMMON LAW FALSE ADVERTISING

73. Paragraphs 1 through 72 above are incorporated by reference as if set forth herein at length.

28

74. Defendants and others presently unknown to plaintiffs, including among others public relations and media consultants and advertising agents, acting alone or in combination on conspiracy, at all relevant times falsely portrayed a carefully created and maintained public image that Donald and his financial empire, including the Taj Mahal, were financially invincible, that Donald was the "king of cash" with net worth of several billion dollars, and that they were financially sound in all respect when, in fact, Donald and his financial empire is and was unsound, deteriorating, and otherwise not as portrayed.

75. The image described above, which was portrayed, among other means by advertisements and promotional materials for the Taj Mahal, including information disclosed to the investing public about the Taj Bonds, was intended to convey the appearance of success, opulence, strength, and stability necessary for any successful operation of the Taj Mahal.

76. Defendants intentionally, recklessly, or negligently, overstated and misrepresented the financial and operating condition and prospects of Donald and his empire, including the Taj Mahal, intending to deceive, inter alia, the investing public, including plaintiffs and the other members of the Class who were in fact deceived thereby.

29

77. Plaintiffs and the other members of the Class have been damaged by defendants' unfair competition and false advertising as described above in an amount which cannot presently be determined.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment against defendants jointly and severally as follows:

(a) declaring this action to be a Class Action;

(b) awarding plaintiffs and the other members of the Class rescission and/or such other damages, with interest, as may have been sustained;

(c) awarding to plaintiffs the costs and disbursements of this action, including a reasonable allowance for plaintiffs' counsel and experts' fees; and

(d) granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of this Action.

DATED:   February **/**, 1991

BY:

GREENFIELD & CHIMICLES

Richard D. Greenfield - RG-4046
Mark C. Rifkin - MR-0904
One Haverford Centr
Haverford, PA   191041
(215) 642-8500

WECHSLER SKIRNICK HARWOOD
  HALEBIAN & FEFFER
Stuart D. Wechsler
Robert J. Ryan
555 Madison Avenue
New York, NY   10022
(212) 935-7400

Lead Counsel for Plaintiffs
and the Classes

CARL D. POPLAR, ESQUIRE
1010 Kings Highway S.
Cherry Hill, NJ 08034
(609) 795-5800

Liaison Counsel

BARRACK, RODOS & BACINE
Gerald Jay Rodos
Suite 2100
1845 Walnut Street
Philadelphia, PA   19103
(215) 963-0600

BERGER & MONTAGUE
Stanley R. Wolfe
1622 Locust Street
Philadelphia, PA   19103
(215) 875-3000



ZWERLING, SCHACHTER & ZWERLING
Robert S. Schachter
800 Third Avenue
New York, NY 10017
(212) 223-3900

Executive Committee of
Plaintiffs' Counsel


GARWIN BRONZAFT
  GERSTEIN & FISHER
Bruce E. Gerstein
1501 Broadway, 14th Floor
New York, NY 10036


MARTIN VAN de WALLE
  GUARINO & DONOHUE
Charles V. Van de Walle
17 Barstow Road
Great Neck, New York 11021


JOSEPH J. TABACCO, JR.
555 Madison Avenue
New York, NY 10022


LAW OFFICES OF JOSEPH H. WEISS
Joseph H. Weiss
319 Fifth Avenue
New York, NY 10016


COHAN & ECKHAUS
Michael A. Cohan
21 Ernston Road
P.O. Box 200
Parlin, NJ 08859


SPECTER LAW OFFICES, P.C.
Howard A. Specter
2230 Grant Building
Pittsburgh, PA 15219


ROBERT B. MATUSOFF, ESQUIRE
3133 Burnett Avenue
Cincinnati, OH 45229

Counsel for Plaintiffs

32

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE:

CIVIL ACTION

DONALD J. TRUMP CASINO
SECURITIES LITIGATION

MDL DOCKET NO. 864

This Document Relates to:
Taj Mahal Litigation

CLASS ACTION

## CERTIFICATE OF SERVICE

This is to certify that on this 8th day of February, 1991, a
true and correct copy of the foregoing was served upon counsel
listed in the attached service list as noted.

Mark C. Rifkin, Esquire