# TRUMP TAJ MAHAL FUNDING, INC.
# TRUMP TAJ MAHAL ASSOCIATES

June 5, 1991

To the Holders of the 14% First Mortgage
Bonds. Series A, Due 1998 of
Trump Taj Mahal Funding, Inc. (the "Old Bonds")

### General

Enclosed is the Prospectus and Solicitation of Plan Acceptances (the "Prospectus") of Trump Taj Mahal Funding, Inc. (the "Company") and Trump Taj Mahal Associates (the "Partnership", and together with the Company, the "Solicitors"), and the Ballot and Master Ballot. The enclosed set forth the terms and conditions upon which the Solicitors are soliciting acceptances of a prepackaged plan of reorganization of the Solicitors and certain related entities to be filed under chapter 11 of the United States Bankruptcy Code (the "Plan"). Please read the Prospectus carefully before voting. Only holders of record of Old Bonds as of the close of business on June 4, 1991 (the "Voting Record Date") are entitled to vote.

Your vote to "ACCEPT" the Plan will permit the Solicitors to restructure their debt as effectively and quickly as possible. The Solicitors have no viable non-bankruptcy alternative available. If the requisite number of acceptances are not received by July 15, 1991, the Solicitors may be forced to seek relief under chapter 11 of the Bankruptcy Code other than pursuant to the Plan. The Solicitors believe that a restructuring other than pursuant to the Plan would result in further delays and increased costs in connection with their debt restructuring. The Solicitors believe that the Plan reflects the best possible arrangement for you. If the Plan is not approved, the Solicitors believe that the value of your investment will deteriorate.

**THE MEMBERS OF THE STEERING COMMITTEE, WHICH HOLD APPROXIMATELY $243,000,000 IN PRINCIPAL AMOUNT OF OLD BONDS, REPRESENTING APPROXIMATELY 36% OF THE OUTSTANDING OLD BONDS, INTEND TO VOTE FOR THE PLAN AND RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

The Steering Committee consists of an informal, unofficial group of ten institutions formed in an effort to engage in orderly negotiations with the Partnership. The Steering Committee has informed the Solicitors that in the opinion of the Steering Committee there is no legal relationship among the members of the Steering Committee or between the Steering Committee and other holders of the Old Bonds. The Steering Committee, and its legal and financial advisors, do not purport to represent, in any capacity, other holders of the Old Bonds, and expressly disclaim any fiduciary, agency or other obligation or responsibility to other holders of the Old Bonds. All information contained in this Prospectus relating to the Solicitors and the Plan was prepared and furnished by the the Solicitors. The Steering Committee, and its legal and financial advisors, disclaim any responsibility for the accuracy, completeness, nature, and form of presentation of such information.

Each holder of the Old Bonds on the close of business on July 11, 1991 (the "Prefiling Payment Record Date") will be paid on the day before the Plan is filed, per $1,000 principal amount of Old Bonds, $1.33 plus $.27483 per day for the period from April 1, 1991 through the day before the Plan is filed (the "Prefiling Payment"); provided, however, that if the Partnership has insufficient cash to make the Prefiling Payment in full on the day before the Plan is filed, the unpaid portion (the "Bond Carryforward Amount") will be paid on the Effective Date to the holders of Old Bonds on the date that is five business days before the Effective Date (the "Exchange Record Date").

**New Bonds and Stock**

Each holder of an Old Bond on the Exchange Record Date will receive the following on the Effective Date:

| In exchange for each | Each Holder will receive |
|---|---|
| $1,000 principal amount of Old Bonds | —One Unit consisting of $1,000 principal amount of the Company's 11.35% Mortgage Bonds, Series A, due 1999 (a "New Bond"), together with one share of Taj Mahal Holding Corp.'s ("Holding") Class B Redeemable Common Stock (the "Class B Stock"), |
| | —The cash proceeds attributable to any fractional Units to which such holder would otherwise be entitled arising from the sale of Units by the Partnership on or after the Effective Date (as explained below), |
| | —Two shares of Holding's Class A Common Stock (the "Class A Stock"), |
| | —$.27483 per day for the period from the date the Plan is filed to the day before the Effective Date plus, for the period from April 1, 1991 to the day before the Effective Date, up to $.02653 per day (the "Variable Amount"), to the extent excess cash is available on the Effective Date (the "Bond Cash Payment"), and |
| | —The Bond Carryforward Amount. |

New Bonds will be exchanged for Old Bonds on the basis of $1,070 principal amount of New Bonds, plus Units (the "Additional Bond Amount") consisting of New Bonds in principal amount of $.057897 per day (less the Variable Amount paid on the Effective Date) and one share of Class B Stock (for each $1,000 principal amount of New Bonds resulting from such exchange) for the period from and including April 1, 1991 through and including the day before the Effective Date, for each $1,000 principal amount of Old Bonds. New Bonds, however, are only issuable on the Effective Date in integral multiples of $1,000. Consequently, any and all fractional Units that would otherwise result from the exchange will be cumulated and sold and the proceeds distributed pro rata to the holders of Old Bonds otherwise entitled to receive fractional Units.

Assuming that the Plan is filed on July 16, 1991 and the Effective Date of the Plan is October 15, 1991 (of which there can be no assurances), a holder of $1,000 principal amount of Old Bonds on both the Prefiling Payment Record Date and the Exchange Record Date would receive one Unit, two shares of Class A Stock, up to $60.70 in cash, plus the cash proceeds attributable to the sale of such holder's fractional Units.

The New Bonds will bear interest at 11.35% per annum from the date of issuance. Cash interest will be payable semi-annually on each November 15 and May 15, commencing November 15, 1991 (except as noted below), at the rate of 9.375% per annum. On each May 15, commencing May 15, 1992, there will be an additional payment of interest payable in cash, to the extent available, or in New Bonds and Class B Stock if cash is not available or required to be paid, to increase the interest paid to 11.35% per annum. The maturity of the New Bonds will be extended from November 15, 1998 to November 15, 1999. If the Effective Date occurs after November 15, 1991, the Bond Cash Payment accrued to such date and the Bond Carryforward Amount will be distributed on November 15, 1991 to the holders of record of Old Bonds as of the close of business on November 8, 1991. Under such circumstances, the Bond Cash Payment would continue to accrue until the Effective Date and the first interest payment date on the New Bonds would be May 15, 1992.

**Corporate Governance**

The Class A Stock and Class B Stock will be issued by Holding, which will beneficially own 50% of the Partnership through its ownership of all the outstanding stock of TM/GP Corporation ("TM/GP") and one-half of the outstanding stock of The Trump Taj Mahal Corporation ("Trump Corp."), both of which will be general partners of the Partnership. The holders of the Old Bonds will receive substantially all the economic interest in Holding (and, indirectly, its interest in the Partnership) through ownership of the Class A Stock. Such holders will also be entitled to elect at least four

directors of Holding and, indirectly, of TM/GP, through ownership of the Class B Stock. See Prospectus "Summary—Pro Forma Ownership Structure."

Commencing with the first annual meeting of stockholders of Holding, the Class B Stock, voting as a class, will elect four of the nine directors of Holding. The five remaining directors of Holding will be elected by Donald J. Trump, the holder of the Class C Stock. The initial Class B Directors will be nominated by the Steering Committee. The Amended and Restated Certificates of Incorporation of Holding and TM/GP require them to have identical Boards of Directors. The Board of Directors of TM/GP will be responsible for the management of the Partnership. Upon the occurrence of certain events, including the failure of the Partnership to achieve certain cash flow targets (unless such failure was due to a *force majeure* event), a payment default on the New Bonds, or the acceleration of any long-term debt of the Partnership, two of the five Class C Directors must resign and a majority of the Class B Directors will designate two additional Class B Directors to fill the vacancies created by such resignation.

During such time as a majority of the Board of Directors of TM/GP consists of five Class C Directors, the affirmative vote of a majority of the Class B Directors is required to approve certain actions, including: transactions with affiliates; the appointment or removal of the three most senior officers of TM/GP; the issuance, redemption, exchange or modification of any indebtedness of the Partnership, except certain indebtedness permitted by the Indenture; adoption of a budget for the Partnership; engagement in business outside the ordinary course of business of owning and operating the Taj Mahal; the merger, sale, or disposition of assets of the Partnership or TM/GP outside the ordinary course of business or for consideration of $10,000,000 or more; the filing of a petition under the Bankruptcy Code (which must be approved by all Class B Directors); amendment or modification of the Amended Partnership Agreement or the Amended and Restated Certificates of Incorporation or Amended and Restated By-Laws of TM/GP or Holding or certain provisions of the Indenture; any action with respect to the Company; certain capital expenditures; or modification of the Partnership's credit policy with patrons. In addition, certain actions require the prior approval of the holders of a majority of the outstanding Class B Stock. Such actions include: certain borrowings by the Partnership; certain capital expenditures; certain sales of assets of the Partnership; the merger or other combination of the Partnership with any other entity; the amendment of the Partnership Agreement or the Amended and Restated Certificate of Incorporation or Amended and Restated By-Laws of TM/GP; and the adoption of certain anti-takeover defenses.

The Class A Stock has virtually no voting rights so long as the New Bonds are outstanding. After the New Bonds have been retired, the Class A Stock will be entitled to one vote per share on all matters and will vote together with the Class C Stock as a single class, with cumulative voting for the election of directors of Holding.

Generally, neither Donald J. Trump, nor any person acting in concert with him, may acquire Class A Stock before the New Bonds are retired, except pursuant to a tender offer for all the Class A Stock. All Class B Stock acquired by Donald J. Trump, and those acting in concert with him, will be automatically voted in the same proportion as Class B Stock held by persons other than Donald J. Trump and those acting in concert with him.

**Possible Additional Payment**

If all of the New Bonds have been paid, redeemed or cancelled, the Partnership, at the election of TTMI, may pay to the holders of the New Bonds a sum that has been calculated to afford them a yield of approximately 14% on the Old Bonds. Upon such payment, the indirect beneficial ownership interest in the Partnership of the holders of the Class A Stock could be reduced to a minimum of 20%.

**YOUR VOTE IS VITAL, NO MATTER WHAT THE SIZE OF YOUR BOND HOLDINGS. YOU MUST SUBMIT A BALLOT (OR MASTER BALLOT) TO HAVE YOUR VOTE COUNTED.**

The transactions described in this Prospectus have been negotiated extensively with the Steering Committee and its financial and legal advisors, as well as with other significant bondholders. It represents the culmination of months of effort to restructure the Taj Mahal. **YOU ARE URGED TO VOTE "FOR" THE PLAN.**

The Solicitors' ability to seek confirmation of the Plan depends upon, among other things, certain minimum levels of acceptance thereof, as more particularly set forth in the Prospectus. SUCH MINIMUM LEVELS OF ACCEPTANCE MAKE IT EXTREMELY IMPORTANT THAT HOLD-ERS WHO WISH TO VOTE ON THE PLAN EXERCISE SPECIAL CARE TO ENSURE THAT THEIR BALLOT (OR MASTER BALLOT REFLECTING THEIR VOTE) IS PROPERLY COMPLETED AND SUBMITTED TO THE BALLOT AGENT BEFORE 5:00 P.M., NEW YORK CITY TIME, ON JULY 15, 1991.

If you have any questions concerning the Plan, Ballot or Master Ballot, you are encouraged to call the Information Agent, First Bank National Association at (612)-223-7050.

Very truly yours,

TRUMP TAJ MAHAL FUNDING, INC.
TRUMP TAJ MAHAL ASSOCIATES

If the Requisite Acceptances are obtained, the Debtors currently intend to commence a case under chapter 11 of the Code and to use the Acceptances received to obtain confirmation of the Plan. In addition, the Company and the Partnership reserve the right to use Acceptances to seek confirmation of a plan of reorganization under any other circumstance permitted by law, including the filing of an involuntary bankruptcy petition against any of the Debtors.

The Company and the Partnership (the "Solicitors") reserve the right to cancel or modify this Solicitation or the Plan, subject, in the case of modifications, to the approval of the Steering Committee. See "The Plan— Committee Modification and Revocation of the Plan." THE MEMBERS OF THE STEERING COMMITTEE, WHICH HOLD APPROXIMATELY $243,000,000 PRINCIPAL AMOUNT OF OLD BONDS, REPRESENT- ING APPROXIMATELY 36% OF THE OUTSTANDING OLD BONDS, INTEND TO VOTE FOR THE PLAN AND RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN. The Steering Committee consists of an informal, unofficial group of ten institutions formed in an effort to engage in orderly negotiations with the Partnership. The Steering Committee has informed the Solicitors that in the opinion of the Steering Committee there is no legal relationship among members of the Steering Committee or between the Steering Committee and other holders of the Old Bonds. The Steering Committee, and its legal and financial advisors, do not purport to represent, in any capacity, other holders of the Old Bonds, and expressly disclaim any fiduciary, agency or other obligation or responsibility to other holders of the Old Bonds. All information contained in this Prospectus relating to the Debtors and the Plan was prepared and furnished by the Debtors. The Steering Committee, and its legal and financial advisors, disclaim any responsibility for the accuracy, completeness, nature and form of presentation of such information. See "Background of the Solicitation" for a list of the members of the Steering Committee.

---

THE SECURITIES OFFERED HEREBY AND THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

---

THE NEW JERSEY CASINO CONTROL COMMISSION HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

---

THIS PROSPECTUS HAS NOT BEEN APPROVED BY ANY BANKRUPTCY COURT WITH RESPECT TO ADEQUACY OF INFORMATION. HOWEVER, IF A REORGANIZATION CASE IS SUBSEQUENTLY COMMENCED AND AN ORDER FOR RELIEF IS ENTERED, THE COMPANY AND THE PARTNERSHIP MAY PROMPTLY SEEK AN ORDER OF SUCH BANKRUPTCY COURT THAT THE SOLICITATION OF ACCEPTANCES TO THE PLAN BY MEANS OF THIS PROSPECTUS WAS IN COMPLIANCE WITH SECTION 1126(b) OF THE CODE.

---

The Solicitation will expire at 5:00 p.m., New York City time, on July 15, 1991, unless extended by the Solicitors to a date not later than August 30, 1991 (the "Expiration Date"). The record date (the "Voting Record Date") for purposes of determining which holders of Old Bonds are eligible to vote on the Plan is the close of business on June 4, 1991.

Ballots may be revoked, subject to the procedures described herein, at any time until the earlier of (i) the Expiration Date or (ii) the commencement by the Debtors of a reorganization case. After the commencement of such a case, Ballots may be revoked only with the approval of the Bankruptcy Court.

The Solicitors are soliciting Ballots and Master Ballots. Master Ballots may be used by record holders of Old Bonds who are not beneficial holders and may be completed by each record holder to reflect the votes of the beneficial owners that hold through such record holder. Alternatively, a record holder of Old Bonds may execute a separate Ballot for each beneficial holder that holds through it and forward such Ballots to the beneficial holders to be completed by them and returned to the Ballot Agent.

See "Risk Factors" for a discussion of risk factors that should be considered in connection with the Plan.

No appraisal rights are available to holders of Old Bonds in connection with the Plan.

Donald J. Trump, his affiliates, family members or the Partnership may purchase Old Bonds in the open market at any time without further disclosure. As of the date hereof, such persons do not own any Old Bonds.

This Prospectus is first being mailed to holders of the Old Bonds on or about June 6, 1991.

**The date of this Prospectus is June 5, 1991**

## AVAILABLE INFORMATION

The Company, the Partnership and Holding (collectively, the "Registrants") have filed with the office of the Securities and Exchange Commission (the "SEC") in Washington, D.C., a Registration Statement on Form S-4 under the Securities Act of 1933, as amended (the "Securities Act") with respect to the securities offered hereby. This Prospectus does not contain all of the information set forth in the Registration Statement, certain portions of which have been omitted as permitted by the rules and regulations of the SEC. For further information pertaining to the securities offered hereby and to the Registrants, reference is made to the Registration Statement, including the exhibits filed as a part thereof. Statements contained herein concerning the provisions of any document are not necessarily complete and, in each instance, reference is made to the copy of such document filed as an exhibit to the Registration Statement. Each such statement is qualified in its entirety by such reference.

The Company is subject to the informational reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and accordingly files reports and other information with the SEC. After the issuance of the Common Stock, it is anticipated that Holding will also become subject to such informational requirements. Reports, proxy statements and other information of the Company or Holding filed with the SEC are available for inspection and copying at the public reference facilities maintained by the SEC at Room 1024, 450 Fifth Street, N.W., Judiciary Plaza, Washington, D.C. 20549 and at certain regional offices of the SEC located at Room 3190, Kluczynski Federal Building, 230 South Dearborn Street, Chicago, Illinois 60604 and Room 1400, 75 Park Place, New York, New York 10007. Copies of such material can be obtained from the Public Reference Section of the SEC, 450 Fifth Street, N.W., Judiciary Plaza, Washington, D.C. 20549 at prescribed rates. Such material with respect to the Company can also be inspected and copied at the offices of the American Stock Exchange, 86 Trinity Place, New York, New York 10006.

## SUMMARY

*The following summary is qualified in its entirety by the more detailed information and financial statements included elsewhere in this Prospectus. Certain capitalized terms used herein are defined in the "Glossary" or the "Description of New Bonds—Certain Definitions" included elsewhere in this Prospectus.*

### The Registrants

The Company was incorporated under the laws of the State of New Jersey on June 3, 1988 and is beneficially owned by Donald J. Trump. The Company was formed for the sole purpose of issuing the Old Bonds and lending the proceeds thereof to the Partnership. In connection with the Plan, the Company will become wholly owned by the Partnership. See "The Company."

The Partnership was formed as a limited partnership under the laws of the State of New Jersey on June 23, 1988 to acquire, complete the construction of and operate the Trump Taj Mahal Casino-Resort (the "Taj Mahal"). In return for the proceeds of the Old Bonds, the Partnership issued the Partnership Note to the Company and directly guaranteed the payment of the principal of, premium, if any, and interest on the Old Bonds (the "Guaranty"). The Plan provides that the Partnership Note and Guaranty will be amended (respectively, the "Note" and "Amended Guaranty") to reflect the terms of the New Bonds. See "The Partnership."

Certain changes in the structure of the Partnership either have occurred or will occur on or before the Effective Date of the Plan. These changes include: conversion of the Partnership from a limited partnership to a general partnership; the admission of TM/GP and Trump Corp. as Partners of the Partnership; the withdrawal of Donald J. Trump as a Partner of the Partnership; and various changes to the allocation of profit and loss among the Partners of the Partnership. Generally, these changes reorganize the Partnership so that one-half of the equity thereof would inure to the benefit of the holders of Old Bonds as of the Effective Date and one-half to Donald J. Trump. A further purpose was to create a mechanism for allocating the governance of the affairs of the Partnership between Donald J. Trump on the one hand and representatives of holders of Old Bonds on the other hand. These objectives have been or will be accomplished through the creation of TM GP as the entity through which holders of Old Bonds will derive their equity interest in the Partnership (by means of holding the Class A Stock of Holding, the parent corporation of TM/GP) and the creation of two classes of directors of Holding and TM/GP, some of whom are selected by Donald J. Trump and some of whom are selected by the holders of New Bonds through their ownership of the Class B Stock. See the diagrams included elsewhere in this Summary for a description of the relationship of the Registrants and related entities before and after consummation of the Plan. The initial Class B Directors will be nominated by the Steering Committee.

Holding was incorporated under the laws of the State of Delaware on December 18, 1990. The Class A Stock and Class B Stock will, upon consummation of the Plan, be issued to the holders of the Old Bonds, and the Class C Stock will be issued to Donald J. Trump. Holding was formed for the purpose of acquiring the Equity Interest and contributing it to TM/GP, owning all of the capital stock of TM/GP and owning 50% of the capital stock of Trump Corp., which will own .01% of the equity of the Partnership. The Amended and Restated Certificate of Incorporation of Holding will prohibit it from engaging in any activity other than owning the capital stock of TM/GP and Trump Corp. and all activities incident thereto. See "Holding."

TM/GP was incorporated under the laws of the State of New Jersey on March 1, 1991. TM/GP was formed for the purpose of holding the Equity Interest and acting as the managing general partner of the Partnership. Upon confirmation of the Plan, the Amended and Restated Certificate of Incorporation of TM/GP will prohibit it from engaging in any business other than holding the Equity Interest and acting as managing general partner of the Partnership. Holding was interposed between TM/GP and the holders of Old Bonds and Donald J. Trump because TM/GP could, under certain circumstances, be deemed to be a casino licensee, and in such event each of its shareholders would individually be

3

required to be qualified under the Casino Control Act. The holding company structure alleviates this concern. See "TM/GP."

## Purposes and Effects of the Plan

Since the Partnership opened the Taj Mahal on April 2, 1990, cash generated from operations has been insufficient to cover its fixed charges. The Partnership believes that this liquidity problem is attributable, in part, to an overall deterioration in the Atlantic City gaming market, as indicated by reduced rates of casino revenue growth for the industry for the last two years as compared to prior years. An economic recession in the Northeast, and lower than anticipated revenues at the Taj Mahal also contributed to the Partnership's liquidity problem. In addition, the Partnership's liquidity problem was aggravated by its high level of indebtedness which, even at historical levels of operations, it has been unable to service. See "Risk Factors—Competition and Declining Rate of Growth." Excessive casino gaming capacity in Atlantic City has also contributed to the Partnership's liquidity problem. The Partnership does not know to what extent these adverse industry and economic trends will continue. Also contributing to the Partnership's liquidity problem were increased construction costs of the Taj Mahal, attributable to unanticipated cost overruns and project enhancements designed to improve the overall project, combined with a delay in the opening date of the Taj Mahal. As a result of the Partnership's liquidity problem, the Company failed to make its $47,250,000 interest payments on the Old Bonds on November 15, 1990 and May 15, 1991. In light of its current financial condition and existing borrowing restrictions, unless the Plan is consummated, the Partnership does not anticipate being able to obtain any additional funds to alleviate its liquidity problem.

The purpose of the Plan is to alleviate the Partnership's liquidity problem by reducing and deferring its annual debt service requirements. Such reduction will be accomplished through a lowering of the current interest rate on the Partnership's long-term indebtedness and, in the case of the New Bonds, the deferral of the due date of a portion of accrued interest thereon through the issuance of additional Units in lieu of a portion of the cash interest. The Solicitors believe that the effect of the Plan will enable the Solicitors, upon confirmation of the Plan, to meet their future debt service requirements and to afford investors the opportunity to participate in the future growth, if any, of the Partnership through ownership of the Class A Stock. See "Purposes and Effects of the Plan" and "Annex B—Financial Forecasts."

The Solicitors believe that there is no alternative to their current liquidity problem other than filing a petition under the Code. The Partnership has been unable to obtain additional financing, and the Company is restricted from amending the payment terms of the Old Bonds outside of the Code without the unanimous consent of the holders thereof. The primary purpose of soliciting Acceptances prior to the filing of a petition under the Code is to enable the Plan (a so-called "pre-packaged plan") to be confirmed as soon as possible, thereby minimizing disruption to the operations of the Taj Mahal. The Solicitors believe that confirmation of the Plan will enable them to accomplish their reorganization and emerge from a reorganization case more quickly and with less disruption to the operations of the Taj Mahal than in a reorganization case other than pursuant to the Plan. The Solicitors believe the recovery to holders of Old Bonds would be less in a non-prepackaged reorganization case than would be achieved under the Plan. This belief is based upon (i) the longer period of time that would likely be required to consummate a non-prepackaged reorganization case, (ii) the comparatively greater negative public relations impact on the operations of the Taj Mahal that could result from a prolonged reorganization case, (iii) the increased expenses of professionals and administrative costs normally associated with a non-prepackaged reorganization case, (iv) the possible loss of suppliers and patrons, (v) the negative effect on employee morale, (vi) the possibility of having to renegotiate agreements reached with the holders of certain of the Partnership's debt, and (vii) increased uncertainty regarding the status of the Solicitors' CCC licenses.

**Special Trust Account**

The Partnership, the Company and First Bank National Association, the successor trustee (the "Trustee"), under the Indenture dated November 22, 1988 by and among the Company, as Issuer, the Partnership, as Guarantor, and Bankers Trust Company, as Trustee (the "Old Indenture"), as Trust Agent, will enter into a Trust Agreement on or about the date that the Plan is filed in Bankruptcy Court. Pursuant to the Trust Agreement, the Partnership and the Company will make monthly deposits of the Pre-Effective Deposit Requirement and, if necessary, the Post-Effective Deposit Requirement to the Trust Agent in order to fund the Bond Cash Payment, the Bond Carryforward Amount, if any, the initial interest payment on the New Bonds, certain payments due NatWest and First Fidelity and the payment of fees to the advisors to the Steering Committee.

On the Effective Date, the Trust Agent will disburse from a separate trust account to the holders of Old Bonds as of the Effective Date of the Plan, the Bond Cash Payment and the Bond Carryforward Amount. If the Effective Date does not occur by November 15, 1991, a distribution will nevertheless be made in the amount of the Bond Cash Payment accrued to such date, plus the Bond Carryforward Amount. Certain payments due NatWest and First Fidelity will also be made. The Pre-Effective Deposit Requirement would continue to accrue in such event. The Post-Effective Deposit Requirement will be held for application of the interest due and payable on the New Bonds on the initial Interest Payment Date for the New Bonds.

**Plan of Reorganization**

Generally, in order for the Plan to be approved, Acceptances must be received from the holders of Claims constituting at least two-thirds of the Allowed Claims in dollar amount and more than one-half in number of the Allowed Claims in each impaired class of Claims that vote to accept or reject the Plan, and the holders of at least two-thirds in amount of the allowed Interests in each impaired class of Interests that vote to accept or reject the Plan. Because, under the Code, only those who vote to accept or reject the Plan will be counted for purposes of determining acceptance or rejection of the Plan by an impaired class of Claims or Interests, the Plan could be approved by any impaired class of Claims with the affirmative vote of significantly less than two-thirds in amount and one-half in number of the class of Claims and by any impaired class of Interests with the affirmative vote of significantly less than two-thirds in amount of the class of Interests. Even if all classes of Claims and Interests accept or are deemed to have accepted the Plan, the Plan may not be confirmed by the Bankruptcy Court. See "Risk Factors—Risk of Non-Confirmation of the Plan." In addition, confirmation of the Plan is subject to the satisfaction of certain conditions including, among other things, the approval of the CCC. See "The Plan."

Only certain classes of Claims will be impaired by the Plan and other creditors, including trade creditors, will be paid in full in accordance with their arrangements with the Partnership. No provision of the Plan affecting the treatment of Class 4 Claims (Series A Bond Claims) may be modified without either the written consent of the Steering Committee or, if the modification adversely affects the holders of Old Bonds, a resolicitation of Acceptances to the Plan. See "The Plan."

The Solicitors reserve the right to modify the terms of this Solicitation and the Plan with the consent of the Steering Committee if and to the extent that the Solicitors determine that such amendments or modifications are necessary or desirable in order to obtain the Requisite Acceptances. The Solicitors will give holders of Old Bonds notice of such modifications as may be required by applicable law. Prior to the commencement of a reorganization case under chapter 11 of the Code, the validity and the effectiveness of the notice of such modifications of the Plan would be governed by applicable non-bankruptcy law, and following commencement of a reorganization case, such modifications would be subject to the notice and approval requirements of the Code. Under the Code, such modifications may be approved by the Bankruptcy Court without resolicitation of the votes of the members of any class whose treatment is not materially and adversely affected by such modifications. In addition, the Solicitors reserve the right to use Acceptances to seek confirmation of a plan of reorganization under any other circumstances permitted by law, including the filing of an involuntary

bankruptcy petition against the Company or the Partnership. See "The Plan—Modification and Revocation of the Plan." After a reorganization case has been commenced, a holder of Old Bonds may object to the Plan on grounds that the Plan does not meet the requirements of chapter 11 of the Code.

## Risk Factors

In evaluating this Solicitation, holders of the Old Bonds should consider, among other risks, (i) the ability of the Partnership to service the New Bonds and other debt, even if the Plan is consummated, (ii) the limited operating history of the Partnership, (iii) certain interest contingencies, (iv) the extensive competition and declining rate of revenue growth in the Atlantic City casino gaming industry, (v) the uncertainty surrounding the financial forecasts contained in this Prospectus, (vi) the potential disruption of the operations of the Taj Mahal as a result of the Solicitation, (vii) the debt service requirements of and the subordination of the New Bonds to certain Senior Debt Facilities, (viii) the Partnership's ongoing capital expenditure requirements, (ix) the possible invalidation of Acceptances by the Bankruptcy Court, (x) the possibility that even if the Partnership obtains the Requisite Acceptances and, thereafter, seeks confirmation of the Plan, that the Plan would not be confirmed or that modification would not be required to the Plan that could require a resolicitation of votes, (xi) the Steering Committee's disclaimer of any fiduciary duty, (xii) certain regulatory matters, (xiii) the possible disqualification of holders of Units or Class A Stock by the CCC, (xiv) the limited public trading market for, and potential volatility of the price of, the Units and the Class A Stock and the impediments to their listing, (xv) the limitation on liability of the Partnership's general partners, (xvi) the inability of holders to realize the full value of their claims in the event of a foreclosure on the security for the New Bonds, (xvii) certain conflicts of interest confronting Donald J. Trump, (xviii) the importance of Donald J. Trump to the Taj Mahal, (xix) the possible conflicting interests of the holders of the voting stock of Holding, (xx) the potential reduction in the Equity Interest in the event that the New Bonds are paid in full or defeased and all or a portion of the 14% Payment is made, (xxi) the intention of the Partnership to self-insure, (xxii) pending litigation and risks associated therewith, (xxiii) certain federal income tax considerations, and (xxiv) the existence of certain Defaults and Events of Defaults. See "Risk Factors."

## The Solicitation

| | |
|---|---|
| Record Dates for Significant Events | The close of business on the following dates has been selected as the record date for determining the holders of record of Old Bonds entitled to vote for the Plan and to receive certain consideration: |
| | For voting on the Plan: Voting Record Date—June 4, 1991. |
| | For receiving the Prefiling Payment: Prefiling Payment Record Date—July 11, 1991. |
| | For receiving the Exchange Consideration:—Exchange Record Date—five business days before the Effective Date. |
| | For receiving distributions, if any, on November 15, 1991 (assuming the Effective Date has not yet occurred): November 8, 1991. |
| The Exchange ................... | For each $1,000 principal amount of Old Bonds, each holder of record as of the Exchange Record Date will be paid on the Exchange Date (A) one Unit, (B) the cash proceeds attributable to any fractional Units to which such holder would otherwise be entitled arising from the sale of Units by the Partnership on or after the Effective Date (as explained below), (C) two shares of Class A Stock, (D) the Bond Cash Payment, and (E) the Bond Carryforward Amount, if any. Holders of record of Old Bonds as of the close of business on July 11, 1991 shall also have received their pro rata share of the Pre-Filing Payment. New Bonds will be exchanged for Old Bonds on the basis of $1,070 principal amount of New Bonds |

6

plus the Additional Bond Amount for each $1,000 principal amount of Old Bonds. New Bonds, however, are only issuable in integral multiples of $1,000 on the Effective Date. Consequently, any and all fractional Units that would otherwise result from the exchange, will be cumulated and issued to the Partnership in an amount rounded to the nearest Unit. The Partnership will sell such Units and distribute the net cash proceeds of such sale to the persons who would otherwise be entitled to fractional Units. If the Effective Date does not occur by November 15, 1991, the Bond Cash Payment accrued to such date and the Bond Carryforward Amount, if any, will be distributed on November 15, 1991.

Conditions ..................... Confirmation of the Plan is subject to the satisfaction of certain conditions, including approval by the CCC. See "The Plan—Conditions Precedent."

Cancellation of Trump Line of Credit Note and Management Agreement and Execution of Services Agreement .............. The Plan provides that the Trump Line of Credit Note, pursuant to which Donald J. Trump advanced $25,000,000 to the Partnership, will be cancelled and the Partnership's liability thereunder will be discharged. The New Line of Credit Note will be issued by TTMI to Bankers Trust. See "Certain Transactions—Trump Line of Credit." The Construction Fee Deferral Note will be cancelled and the Partnership's liability thereunder will be discharged. The Plan further provides that the Management Agreement, dated November 22, 1988, pursuant to which an affiliate of Donald J. Trump provides management services to the Partnership in exchange for certain fees, will be terminated and all amounts due and owing thereunder will be contributed to the Partnership. See "Certain Transactions—Management Agreement." As of April 1, 1991, the Partnership entered into a Services Agreement with Donald J. Trump pursuant to which Donald J. Trump will receive an annual fee equal to the sum of (i) $500,000 and (ii) the amount by which 1½% of the Partnership's annual EBITDA less Capital Expenditures exceeds $500,000. Certain amounts payable under the Services Agreement will accrue commencing as of April 1, 1991. See "Services Agreement."

**Terms of the Amended Partnership Agreement**

Partners and Partnership Interests .. TTMI and TM/GP will each hold a 49.995% general partnership interest; and Trump Corp. will hold a .01% general partnership interest.

Managing General Partner ......... TM/GP will be charged with the full management of the Partnership's affairs. A majority of TM/GP's Board of Directors will be elected indirectly by Donald J. Trump until the occurrence of a Transition Event. See "Description of Holding Certificate of Incorporation."

Termination .................... December 31, 2030

Dilution of TM/GP's Interest ...... Under certain circumstances, MI has the right after the New Bonds are purchased, redeemed or otherwise paid in full to cause the Partnership to make the 14% Payment, and thus issue additional Partnership interests to TTMI such that, after the issuance of such additional interests, Donald J. Trump may beneficially own up to 80% of the Partnership. If any of the persons holding security interests in the capital stock of TTMI, Realty Corp. Donald J. Trump's interest in Trump

|  | Corp., TTMI's Partnership interests, one-half Trump Corp.'s Partnership Interests and the Class C Stock (collectively, the "Trump Pledged Equity") foreclose upon any of such security interests, then Holding will beneficially own 60% of the Partnership, subject to reduction to not less than 50% after the Final Payment Date under certain circumstances. In addition, upon such a foreclosure, the right of TTMI to cause the 14% Payment to be made and to receive additional Partnership interests will be terminated. See "Description of the Amended Partnership Agreement." |
|---|---|
| 14% Payment ................... | If the full 14% Payment were made on November 16, 1999, the day after the final maturity of the New Bonds, the amount of the 14% Payment per $1,000 principal amount of New Bonds retired on November 15, 1999, would be approximately $273 (assuming that the 14% Payment calculation begins on April 1, 1991). |

**Class A Stock**

| Issuer ......................... | Holding is a Delaware corporation that will have three classes of outstanding common stock. The Class A Stock will be issued initially to the holders of Old Bonds as of the Exchange Record Date and will represent an indirect equity investment in the Partnership. The Class B Stock will be issued as part of the Units to the holders of Old Bonds on the Exchange Record Date and is essentially a non-participating stock that entitles its holders to elect the Class B Directors of Holding and to approve certain other matters. The Class C Stock will be issued to Donald J. Trump and is essentially a non-participating stock that entitles its holder to elect the Class C Directors of Holding and vote on certain other matters. |
|---|---|
| Number of Shares ............... | Up to 10,000,000 authorized, 1,350,000 of which will be issued pursuant to the Plan |
| Dividends ...................... | Dividends are declarable by the Board of Directors and are payable from legally available funds. If a stock dividend, distribution or other reclassification of Class A Stock is made, an equivalent stock dividend, distribution or reclassification of Class C Stock shall be made. See "Description of Holding Certificate of Incororation—Capital Stock" and "Description of the Amended Partnership Agreement—Distributions." |
| Redemption .................... | None |
| Liquidation Rights .............. | The net proceeds of any liquidation will be payable pro rata to the holders of all classes of Common Stock to the extent of par value per share of each such class, with the balance of such liquidation proceeds payable pro rata to the holders of the Class A Stock. See "Description of Holding Certificate of Incorporation—Capital Stock." |
| Restrictions on Transfer .......... | None, except certain limitations on purchases by Donald J. Trump and persons acting in concert with him. See "Description of Holding Certificate of Incorporation—Transfer Limitations." |
| Voting Rights .................. | None, except as provided by law, so long as any New Bonds are outstanding. Thereafter, each share of Class A Stock shall be entitled to one vote per share, together with the Class C Stock voting as a single class on all matters on which the stockholders of Holding are entitled to vote, with cumulative voting for election of directors. See "Description of Holding Certificate of Incorporation—Capital Stock." |

**Class B Stock**

| | |
|---|---|
| Issuer | Holding |
| Number of Shares | Up to 860,000 |
| Dividends | None |
| Redemption | Upon redemption, or cancellation following the purchase thereof, of each $1,000 principal amount of New Bonds, Holding will redeem, at a price of $.50 per share, the share of Class B Stock issued with such New Bond. See "Description of Holding Certificate of Incorporation—Capital Stock." |
| Liquidation Rights | Par value of $.01 per share pro rata with all classes of Common Stock. |
| Restrictions on Transfer | Each share of Class B Stock will be issued with each $1,000 principal amount of New Bonds in a Unit and may not be transferred separately from such New Bond. See "Description of Holding Certificate of Incorporation—Capital Stock." |
| Election of Directors | Holders of Class B Stock to elect four of the nine directors of Holding, or six of nine directors following a Transition Event and before a Return Event. See "Description of Holding Certificate of Incorporation—Board of Directors." |
| Voting Rights | One vote per share on all matters on which the stockholders are entitled to vote, other than the election of directors by holders of Class C Stock. Certain actions by TM/GP, as well as certain actions by Holding, require the prior approval of the holders of a majority of the Class B Stock. All other matters must be approved by the holders of the Class B Stock voting as a separate class and the holders of Class C Stock voting as a separate class. See "Description of Holding Certificate of Incorporation—Capital Stock" and "—Board of Directors." |

**Class C Stock**

| | |
|---|---|
| Issuer | Holding |
| Number of Shares | Up to 10,000,000 authorized, of which 1,350,000 will be issued pursuant to the Plan |
| Dividends | No participation, except that if a stock dividend, distribution or other reclassification of Class A Stock is made, an equivalent stock dividend, distribution or reclassification of Class C Stock shall be made. |
| Redemption | None |
| Liquidation Rights | Par value of $.01 per share pro rata with all classes of Common Stock |
| Restrictions on Transfer | None |
| Election of Directors | Holders of Class C Stock to elect five of the nine directors of Holding, or three of nine directors following a Transition Event and before a Return Event. See "Description of Holding Certificate of Incorporation—Board of Directors." |
| Voting Rights | One vote per share on all matters on which stockholders are entitled to vote, other than the election of directors by holders of the Class B Stock and other than certain actions by TM/GP and Holding which require the prior approval of holders of a majority of the Class B Stock. All other matters must be approved by the holders of the Class C Stock voting as a separate class and the holders of Class B Stock voting as a separate class. After all the Class B Stock has been redeemed, the Class A Stock and Class C Stock will vote together as a single class on all matters, with cumulative voting for direc- |

tors. See "Description of Holding Certificate of Incorporation—Capital Stock" and "—Board of Directors."

**Control of Holding**

General . . . . . . . . . . . . . . . . . . . . . . .  TM/GP, the managing general partner of the Partnership, will be wholly owned by Holding. Because the persons comprising the Board of Directors of TM/GP are required to be the same persons that act as directors of Holding, it is through the selection of Directors of Holding that the ultimate management of the Partnership will be determined.

Board of Directors . . . . . . . . . . . . . .  The Board of Directors of Holding will consist of nine persons. Initially, five of such persons will be Class C Directors (selected by Donald J. Trump as the owner of the Class C Stock) and four of such persons will be Class B Directors (selected generally by the holders of the Class B Stock (i.e., the holders of New Bonds)). Under certain circumstances, known as "Transition Events," the composition of the Board of Directors will shift such that the entire Board of Directors of Holding (and therefore, of TM/GP) will be comprised of three Class C Directors and six Class B Directors. Prior to any Transition Event, certain transactions require the prior approval of the Board of Directors of TM/GP, including its Class B Directors, before they may be entered into by the Partnership. After a Transition Event, any affirmative majority vote of the Board of Directors must also include the vote of at least a majority of Class C Directors to authorize certain limited transactions that could adversely affect TTMI. See "Description of Holding Certificate of Incorporation—Board of Directors."

Transition Event . . . . . . . . . . . . . . . . .  The Steering Committee and Donald J. Trump have selected a person known as the "Neutral" to resolve disputes relating to the occurrence of a Transition Event. A "Transition Event" shall mean any one of the following events before the Final Payment Date:

(i) the failure to pay the Trustee under the Indenture any interest on, or principal of, the New Bonds or to pay the NatWest Debt when due, or the failure to make payments under the Amended Lease when due;

(ii) the breach of certain provisions of the Amended and Restated TM/GP Certificate of Incorporation requiring the approval of a majority of the Board of Directors, including a majority of the Class B Directors before certain actions may be undertaken;

(iii) the filing of a lawsuit against the Neutral or in violation of the Amended and Restated Certificate of Incorporation of TM/GP, in his capacity as Neutral, by Donald J. Trump, except for a lawsuit seeking to compel the Neutral to perform his duties in such capacity;

(iv) the written determination signed by a majority of the TM/GP Class B Directors that certain events have occurred;

(v) the written determination signed by a majority of the Class B Directors that a Cash Flow Shortfall Event has occurred and a determination by the Neutral that such Cash Flow Shortfall Event was not caused by an event of Force Majeure; or

(vi) the written determination signed by a majority of the Class B Directors, along with the determination by the Neutral that certain events have occurred.

See "Description of Holding Certificate of Incorporation—Board of Directors" and "Glossary."

10

| | |
|---|---|
| Return Event .................... | Under certain circumstances known as "Return Events" the effects of a Transition Event may be reversed, whereupon the composition of the Board of Directors of Holding (and, therefore, of TM/GP) would return to five Class C Directors and four Class B Directors. The Neutral will determine whether or not a Return Event has occurred. See "Description of Holding Certificate of Incorporation—Board of Directors" and "Glossary." |
| Class B Stockholder Approval Requirement for Certain Action .... | Prior to the Final Payment Date, the following actions by Holding must be approved by the holders of a majority of the shares of the Holding Class B Stock: (a) voting the Class B Stock of TM/GP (wholly-owned by Holding) to approve any action by TM/GP that requires the approval of the holders of its Class B Stock, see "Summary—Holding Class B Stockholder Vote Requirement for Certain Action by TM/GP"; (b) any borrowings by Holding; (c) any Capital Expenditure by Holding; (d) any sale of assets of Holding that, or series of related sales of assets that in the aggregate, exceeds $10,000,000; (e) the merger, consolidation or other combination of Holding with or into any other entity; (f) any amendment to or modification of the Amended and Restated Certificate of Incorporation or Amended and Restated By-Laws of Holding; (g) the adoption of certain anti-takeover defenses; (h) the issuance of any equity by Holding; or (i) certain affiliate transactions. |

## Control of TM/GP

| | |
|---|---|
| Board of Directors .............. | The Board of Directors of TM/GP shall have the same composition as the Board of Directors of Holding. TM/GP will be the managing general partner of the Partnership. See "Description of TM/GP Certificate of Incorporation—Board of Directors." |
| TM/GP Class B Director Vote Requirement for Certain Action .... | Prior to a Transition Event or after a Return Event, a majority of the Board of Directors of Holding and TM/GP will be Class C Directors. In order to authorize certain transactions, however, in addition to the vote of a majority of all directors, the affirmative vote of at least a majority of the TM/GP Class B Directors is required (and all of the Class B Directors with respect to items (i) and (o) below) to authorize any of the following actions before a Transition Event or after a Return Event:<br><br>(a) any transaction between the Partnership on one hand and any affiliate of the Partnership (other than TM/GP) on the other hand;<br><br>(b) any transaction between TM/GP on the one hand and any affiliate of TM/GP (other than the Partnership) on the other hand, other than the payment of indemnification, fees to directors or other dividends in accordance with TM/GP's Amended and Restated Certificate of Incorporation or Amended and Restated By-Laws;<br><br>(c) (i) any disposition of assets of the Partnership or TM/GP in any single transaction or series of transactions (A) other than in the ordinary course of business or (B) having a value greater than $10,000,000 or (ii) the granting of any lien or security interest thereon, except as permitted by the Indenture;<br><br>(d) the issuance, redemption, exchange or modification of the terms of any Indebtedness of the Partnership or equity |

11

of the Partnership or any Indebtedness or equity of TM GP, except in the case of the Partnership (i) as permitted by the Indenture (other than New Parking Financing), (ii) Refunding Indebtedness, and (iii) equity redemptions and transfers permitted by the Amended and Restated Partnership Agreement of the Partnership;

(e) the appointment or removal of the chief executive officer, the chief financial officer or the chief operating officer of the Partnership or TM/GP;

(f) the adoption of a Budget;

(g) the engagement by the Partnership or TM GP in any business not in the ordinary course of business and incident to owning and operating the Taj Mahal and activities relating thereto;

(h) the merger, consolidation or other combination of the Partnership or TM/GP with any other entity;

(i) the filing by the Partnership or TM/GP of a petition under the Code or any similar state law filing or insolvency proceeding;

(j) any amendment to or modification of the Amended Partnership Agreement, TM/GP's Amended and Restated Certificate of Incorporation or TM/GP's Amended and Restated By-Laws;

(k) the taking of any action with respect to the Company;

(l) any Capital Expenditure;

(m) any borrowing under the Working Capital Facility in excess of $5,000,000, other than borrowings used to pay or discharge liabilities to patrons in respect of gambling winnings;

(n) any modification of the policy of the Partnership with respect to the extension of credit to casino gaming patrons as filed with the CCC;

(o) any modification of a Budget;

(p) the authorization of any amendment or supplement to the Indenture without the consent of the holders of the New Bonds pursuant to the terms of the Indenture; and

(q) any modification of the terms of the Partnership's liability insurance.

The Class B Directors shall have exclusive authority, by vote of a majority of the Class B Directors, to authorize any borrowing under the Standby Letter of Credit.

TM/GP Class C Director Vote Required for Certain Action . . . . . . .

After such time as a Transition Event occurs but before a Return Event occurs, a majority of the Board of Directors of Holding and TM/GP will be Class B Directors. In order to authorize certain transactions, however, any affirmative vote of a majority of the Board of Directors, must include the vote of at least a majority of Class C Directors to: (x) authorize the issuance of any equity of TM/GP or the Partnership, unless certain conditions are satisfied, (y) modify the terms of any Indebtedness or authorize the incurrence of additional Indebtedness of TM/GP or the Partnership unless approved by a majority of the TM/GP Class B Directors or (z) authorize the sale of all or substantially all of the Partnership's assets, or a merger or consolidation of the Partnership, unless certain conditions are satisfied. See "Description of TM/GP Certificate of Incorporation."

| | |
|---|---|
| Holding Class B Stockholder Vote Requirement for Certain Action by TM/GP .................... | The following actions, among others, must be approved by the Class B Directors (who vote the Class B Stock of TM GP) and by the holders of a majority of the Class B Stock: |

(a) Certain borrowings by the Partnership;

(b) Certain Capital Expenditures;

(c) Any sale of assets of TM GP or the Partnership that, or series of related sales of assets that in the aggregate, exceeds $10,000,000;

(d) The merger, consolidation or other combination of TM/GP or the Partnership with any other entity;

(e) Any amendment to or modification of the Partnership Agreement, TM/GP's Amended and Restated Certificate of Incorporation or TM/GP's Amended and Restated By-Laws;

(f) The adoption of certain anti-takeover defenses; or

(g) Certain affiliate transactions among the Partnership, TM/GP and their respective affiliates.

See "Description of Holding Certificate of Incorporation—Class B Stockholder Approval Required."

| | |
|---|---|
| Budget ......................... | The Board of Directors of TM GP, including a majority of the TM/GP Class B Directors, will establish the annual Budget for the Partnership. In the event that the Board of Directors of TM/GP cannot agree on a Budget, the Amended and Restated Certificate of Incorporation of TM GP provides for a procedure for establishing a Budget. Among other things, the Budget is used to establish the existence of a Cash Flow Shortfall Event, the occurrence of which could constitute a Transition Event. See "Description of TM GP Certificate of Incorporation—Budget." |

## Senior Debt Facilities

It is a condition to consummation of the Plan that the Partnership obtain a $50,000,000 Senior Line of Credit, a $25,000,000 Standby Letter of Credit and a $25,000,000 Working Capital Facility (collectively, the "Senior Debt Facilities"), none of which have yet been obtained. Obligations under the Senior Debt Facilities will be secured to the extent of such obligations by certain assets of the Partnership, including the Taj Mahal, on a basis senior to the lien of the Amended Mortgage securing the New Bonds. The Senior Line of Credit may only be drawn upon if the Standby Letter of Credit is in full force and effect and the proceeds must be used solely to pay interest on the New Bonds. The Standby Letter of Credit may only be drawn upon by authorization of the TM/GP Class B Directors. Draws on the Working Capital Facility that increase the borrowings thereunder to more than $5,000,000 must be approved by a majority of the TM/GP Class B Directors, unless used to pay gambling liabilities. The Senior Debt Facilities are expected to contain covenants and restrictions customary in secured loans for highly-leveraged companies, which may be more restrictive than the terms of the Indenture. See "Management's Discussion and Analysis of Financial Condition" and "Risk Factors—Additional Senior Debt."

## Liquidation Analysis

For a description of the liquidation value of the Taj Mahal, see "The Plan—Chapter 7 Liquidation Analysis" and "—Recovery of Impaired Classes From Net Proceeds Available in a Chapter 7 Liquidation."

**Comparison of Old Bonds and New Bonds**

| | Old Bonds | New Bonds |
|---|---|---|
| Principal Amount: | $675,000,000 | Up to $860,000,000 |
| Maturity: | November 15, 1998 | November 15, 1999 |
| Interest: | 14% per annum, payable in cash. | 11.35% per annum, payable as follows: on each Interest Payment Date, commencing November 15, 1991 (or, possibly, May 15, 1992), the Company will pay in cash an amount of interest on the New Bonds outstanding on the immediately preceding Record Date at the rate of 9.375% per annum. In addition to the Mandatory Cash Interest Amount, the Company will also pay on each May 15, commencing May 15, 1992, to the holders of record of New Bonds on the immediately preceding May 1, the Additional Amount. To the extent that, on any May 15 on or after May 15, 1992, there is Excess Available Cash Flow of the Partnership for the year ended on the immediately preceding December 31 (or, in the case of the year ended December 31, 1991, Excess Available Cash Flow for the period measured from the date of issuance of the New Bonds), the Company will pay the Additional Amount in cash and the balance thereof, if any, in additional Units; provided, however, that the Second Tier Amount may be paid, at the option of the Company, in additional Units, even if Excess Available Cash Flow is available, provided that an equivalent amount of cash is used to purchase or redeem Units. Notwithstanding the foregoing, if the persons that hold a security interest in the Trump Pledged Equity foreclose on such interests, the interest rate on the New Bonds will automatically increase to 14% per annum, payable in cash, upon such event. In addition, in order to receive additional Partnership Interests so that Donald J. Trump's beneficial ownership of the Partnership is increased to up to 80%, TTMI may cause the Partnership to make all or a portion of the 14% Payment; however, if the foreclosure described in the previous sentence occurs, or if there has been a Transition Event with respect to which a Return Event has not occurred, the right |

14

| | | |
|---|---|---|
| | | of TTMI to cause the Partnership to make the 14% Payment will be extinguished. |
| Interest Payment Dates: | May 15 and November 15. | May 15 and November 15, beginning November 15, 1991 (or May 15, 1992 under certain circumstances). |
| Optional Redemption: | At any time on or after November 15, 1993, in whole or in part, at redemption prices beginning at 106.22% of principal amount and declining to 100% on November 15, 1997, together with accrued interest. | At any time, in whole or in part, at a redemption price of 100% of principal amount plus accrued interest to the date of redemption, in cash. |
| Mandatory Redemption: | Upon disqualification of the holder of Old Bonds by the CCC and failure to dispose of the Old Bonds within 30 days. | Upon disqualification of the holder of New Bonds by the CCC and failure to dispose of the New Bonds within 30 days. |
| Security: | The Old Bonds are secured by an assignment by the Company to the Trustee of (i) the Partnership Note issued by the Partnership to the Company in the principal amount of $675,000,000, payable in amounts and at times necessary to pay the principal of, premium, if any, and interest on the Old Bonds, (ii) the Mortgage on and other documents evidencing a security interest in the Taj Mahal and substantially all of the other assets of the Partnership (excluding cash and certain permitted indebtedness) and (iii) the Trump Completion Guaranty. | Same as Old Bonds, except that (i) there shall be no Trump Completion Guaranty or Trump Line of Credit, (ii) the lien of the Amended Mortgage will be subordinate to the liens securing the Senior Debt Facilities, and (iii) the lien of the Amended Mortgage will exclude certain furniture, fixtures and equipment acquired after the Effective Date which will be subject to the lien of the NatWest Loan (as well as the purchase-money lien, if any, on such property of up to 50% of the value of such property). The Partnership Note will be amended to reflect the changes to the issuance of, and the interest payable on, the New Bonds. See "The Partnership." In addition, the New Bonds will be secured by a second, subordinated lien on the Specified Parcels and the Purchase Option Assignment. |
| Partnership Guaranty: | The Guaranty issued by the Partnership is a non-recourse limited guaranty of the payment of the principal of, premium, if any, and interest on the Old Bonds. | Same as Old Bonds. The Guaranty will be amended to reflect the changes to the issuance of and the interest payable on the New Bonds. |
| Covenants: | The Old Indenture contains certain restrictive covenants which restrict, among other things, the activities of the Company and the Partnership, the incurrence of additional Debt, the creation of liens, the payment of dividends and distributions on and repurchases and redemptions of capital stock and partnership interests and other restricted payments, consolidations, mergers or sales of all or substantially all of the Partnership's assets, transactions with affiliates, investments of the Com- | Same as Old Bonds, except for amendment of the term "Restricted Payment" to permit distributions by the Partnership pursuant to the Amended Partnership Agreement for redemption of Class B Stock, and for payment of taxes, indemnification of directors and other expenses; amendment of the debt covenants to permit the incurrence of the Senior Debt Facilities and debt pursuant to any F.F&E Financing Agreement, to change the Coverage Ratio test for the incurrence of other Debt, |

15

pany and the Partnership, and waiver of stay, extension and usury laws. The Old Indenture also contains certain affirmative covenants including maintenance of existence and delivery of appraisals of collateral by the Partnership.

and to eliminate New Parking Financing for purposes other than financing the construction of New Parking Facilities or refinancing such debt; amendment of the covenant restricting liens on the Trust Estate to eliminate certain liens and to allow for liens securing debt permitted by the debt covenants; amendment of the term "Permitted Encumbrances" to include liens (senior to the lien of the Amended Mortgage) to secure borrowings under the Senior Debt Facilities and liens for the benefit of NatWest on certain after-acquired personal property; addition of a covenant limiting payments on long-term debt and amendment of the limitation on consolidations, mergers or sales of all or substantially all assets of the Partnership to make such limitation less restrictive. The Amended NatWest Agreement contains a debt incurrence test more restrictive than the Indenture. See "Amended NatWest Agreement."

**Events of Default:**

Events of Default include: (i) default in payment of interest when due for a period of 30 days; (ii) default in payment of principal when due without any grace period; (iii) default in the performance or breach of certain other covenants for 30 days after notice; (iv) admission in writing by Donald J. Trump (during the term of the Trump Completion Guaranty or until payment of the Trump Line of Credit Note), the Company or the Partnership or its subsidiaries of his or its inability to pay debts generally as they become due; (v) certain events of bankruptcy, insolvency or reorganization relating to Donald J. Trump (during the term of the Trump Completion Guaranty or the payment of the Trump Line of Credit Note), the Company, the Partnership or its subsidiaries which, if involuntary, continue for 30 days; (vi) suspension or loss of any permit resulting in a cessation of substantial portion of the operations of the Taj Mahal for more than 120 days; (vii) certain defaults by the Partnership or its subsidiaries under any Mortgage Debt and expiration of the applicable grace period without cure or

Same as Old Bonds, except (i) narrowed to delete any default resulting from a personal bankruptcy, if any, of Donald J. Trump and to eliminate the 30-day grace period relating to the failure to pay interest, when due, on the New Bonds and (ii) expanded to make the acceleration of the First Fidelity Loan an Event of Default.

|  |  |  |
|---|---|---|
|  | waiver of such default; entry of a final judgment in excess of $3,000,000 which becomes a lien against the Taj Mahal (except for a lien subordinate to the Mortgage) after 30 days; entry of a final judgment in excess of $15,000,000 not satisfied for 60 days; or entry of a final judgment of any amount not satisfied for 30 days which would impose a lien on the Taj Mahal senior to the lien of the Mortgage; (viii) entry of final judgment or decree holding the Guaranty, the Trump Completion Guaranty or any other Mortgage Document (as defined in the Old Indenture) invalid or unenforceable; (ix) an Event of Default under the Mortgage; or (x) a default under any bond, debenture or other evidence of Debt or Indebtedness (except the Guaranty, Mortgage Debt and New Parking Financing) having an amount outstanding of at least $1,000,000 without cure or waiver. |  |
| Modification of Indenture: | Amendments to the Indenture with the consent of the holders of at least a majority of the outstanding amount of Old Bonds, but requires the consent of all holders for changes with respect to (i) terms of payment of principal and interest, (ii) reduction in the percentage required for modification, (iii) the creation of liens ranking prior to or on a parity with the lien of the Mortgage, (iv) any change which would deprive a holder of the security afforded by the lien of the Mortgage or (v) changes with respect to incurrence of additional Mortgage Debt or Debt. | Same as Old Bonds except that consent of the holders of 85% of the outstanding amount of New Bonds is required for modifications with respect to clauses (iii)–(v). |

**Arrangements with Subcontractors**

Prior to effectiveness of the Plan, a nominee of the Subcontractors will purchase Old Bonds in the principal amount of $20,000,000 with funds provided by the Partnership. On the Effective Date, it is anticipated that such nominee will exchange the Old Bonds on behalf of the holders of the Subcontractors' Claims, and each Subcontractor will receive, in respect of his Claims, a distribution equal to his pro rata share of the distributions to which $20,000,000 in principal amount of Old Bonds would be entitled as Class 4 Claims. See "The Plan" and "Amended Subcontractors Agreement."

## GENERAL

| Steering Committee .............. | The Steering Committee, consisting of an informal, unofficial group of ten institutional holders of the Old Bonds which collectively hold approximately 36% in principal amount of the Old Bonds, was formed in an effort to engage in orderly negotiations with the Partnership. From November 16, 1990 |
|---|---|

until the date hereof. the Steering Committee and its advisors met regularly with the Partnership's representatives in order to review and finalize the restructuring of the Company's and the Partnership's Indebtedness. In addition. the Steering Committee's advisors met regularly. with and without the Partnership's representatives. with representatives of other large holders of the Old Bonds to attempt to explain and negotiate the transaction so that the final documentation might be acceptable to the holders of the Old Bonds. As a result of these meetings, THE MEMBERS OF THE STEERING COMMITTEE INTEND TO VOTE TO ACCEPT THE PLAN AND RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN. In addition. the Steering Committee shall nominate the four initial Class B Directors of TM/GP and Holding. The Steering Committee has conducted an extensive search for qualified candidates, and will formally make its selections prior to the confirmation hearing on the Plan. The Steering Committee has informed the Solicitors that in the opinion of the Steering Committee there is no legal relationship among the members of the Steering Committee or between the Steering Committee and other holders of the Old Bonds. The Steering Committee, and its legal and financial advisors, do not purport to represent. in any capacity, other holders of the Old Bonds. and expressly disclaim any fiduciary, agency or other obligation or responsibility to other holders of the Old Bonds. All information contained in this Prospectus relating to the Debtors and the Plan was prepared and furnished by the Debtors. The Steering Committee. and its legal and financial advisors, disclaim any responsibility for the accuracy, completeness. nature, and form of presentation of such information. See "Background of the Solicitation" for a list of the members of the Steering Committee.

General Procedures for Voting on the Plan ......................

In order to vote on the Plan. a Ballot or Master Ballot properly completed and duly executed by a current registered holder of the Old Bonds must be received by the Ballot Agent at its address set forth on the back cover of this Prospectus. **Holders of Old Bonds registered in the name of a broker, dealer, commercial bank, trust company or other nominee may vote on the Plan (i) through such nominee by completing a Ballot and returning it to such nominee, provided such nominee completes and delivers to the Ballot Agent a Master Ballot that reflects such vote or (ii) directly, by completing a Ballot that has been executed in blank by such nominee and forwarding it directly to the Ballot Agent.** See "The Solicitation." It is important that all holders of Old Bonds vote to accept or reject the Plan because. under the Code, for purposes of determining whether the Requisite Acceptances have been received, only holders who vote will be counted. While each holder should check the appropriate box, any Ballot or Master Ballot which is executed by a holder but does not indicate an acceptance or rejection of the Plan will be counted as an Acceptance of the Plan. See "The Solicitation."

Expiration Date..................

The Solicitation will expire at 5:00 P.M., New York City time, on July 15, 1991, unless extended by the Solicitors to not later than August 30, 1991.

Revocation of Ballots .............

Ballots or Master Ballots may be revoked, subject to the procedures described herein. at any time until the earlier of (i) the Expiration Date or (ii) the commencement of the Reorganization Case under the Code. After the commencement of such a case, Ballots or Master Ballots may be revoked

|  | only with the approval of the Bankruptcy Court. See "The Solicitation—Revocation Rights." |
|---|---|
| Federal Income Tax Considerations .. | For a discussion of certain federal income tax considerations see "Certain Federal Income Tax Considerations." |
| Market and Trading Bonds Information ................... | The Registrants intend to apply to list the Units on the American Stock Exchange, assuming that the eligibility requirements for such listing can be met or waived. There can be no assurances that such requirements will be met or waived and no assurances as to the liquidity of any markets that may develop, that an active market for the Units will develop, that a liquid over-the-counter market will develop for the Class A Stock, or at what prices holders of the Units or the Class A Stock would be able to sell such securities, if at all. See "Risk Factors—Absence of a Public Trading Market." |
| Financial Advisor ................ | Donaldson, Lufkin & Jenrette Securities Corporation is serving as Financial Advisor to the Solicitors in connection with the Solicitation. |
| Ballot and Information Agent ...... | First Bank National Association is serving as the Ballot Agent and the Information Agent in connection with this Solicitation. Its telephone number is (612) 223-7050. |

## CURRENT OWNERSHIP STRUCTURE OF THE PARTNERSHIP

Set forth below is a chart summarizing the current ownership structure of the Partnership and certain related entities.



## PRO FORMA OWNERSHIP STRUCTURE OF THE PARTNERSHIP

Set forth below is a chart summarizing the ownership structure of the Partnership and certain related entities as they will exist on the Effective Date.

```
*******************                    ************************
*     PUBLIC       *                   *                      *
*  SHAREHOLDERS    *                   *   DONALD J. TRUMP     *
*                  *                   *                      *
*******************                    ************************

        │                                          │
   Class A Stock          Class C Stock          100%
        │                                          │
┌────────────────┐                        ┌──────────────────┐
│  TAJ MAHAL     │                        │ TRUMP TAJ MAHAL, │
│  HOLDING CORP. │                        │      INC.        │
└────────────────┘                        └──────────────────┘

    │            50%                50%
  100%
┌────────────────┐     ┌──────────────────────┐
│    T M/G P     │     │  THE TRUMP TAJ MAHAL  │
│  CORPORATION   │     │     CORPORATION       │
└────────────────┘     └──────────────────────┘

  49.995%                   .01%              49.995%
  Managing                General            General
  General                 Partner            Partner
  Partner
                  ┌──────────────────────┐
                  │  TRUMP TAJ MAHAL     │
                  │    ASSOCIATES        │
                  └──────────────────────┘

Class B Stock
                  100%              Note
                                                    ┌──────────────┐
                                                    │   CASINO     │
                                                    │   HOTEL      │
                                                    └──────────────┘
                  ┌──────────────────────┐
                  │  TRUMP TAJ MAHAL     │
                  │   FUNDING, INC.      │
                  └──────────────────────┘

                       New
                       Bonds
                  ************************
                  *                      *
                  *     BONDHOLDERS      *
                  *                      *
                  ************************
```

## RISK FACTORS

In considering whether or not to accept the Plan, holders of Old Bonds should carefully consider all information contained in this Prospectus, including those risk factors enumerated below.

### Ability to Service Debt; Liquidity

If the Plan is not consummated, the Partnership and the Company will not be able to pay all of their indebtedness when due. The Company failed to pay the November 15, 1990 and May 15, 1991 interest payments due on the Old Bonds, thereby resulting in an Event of Default under the Old Indenture. In light of its current financial condition and existing borrowing restrictions, unless the Plan is consummated the Partnership does not anticipate being able to obtain any additional funds to alleviate its liquidity problem and would be forced to file a petition under the Code. See "Purposes and Effects of the Plan."

After implementation of the Plan, the Partnership and the Company will continue to have a high level of indebtedness. Upon consummation of the Plan, the Partnership and the Company's combined long-term indebtedness will be of a principal amount of approximately $773,350,000 (excluding any indebtedness represented by the Senior Debt Facilities), as compared to a principal amount of approximately $781,475,000 at March 31, 1991 (which includes certain long-term debt that has been reclassified as short-term debt and amounts due to Subcontractors). In addition, the Partnership's long-term indebtedness may increase over time as additional New Bonds are issued in lieu of cash interest thereon. If additional New Bonds are issued in the maximum permissible amount and none are redeemed prior to maturity, the aggregate amount of New Bonds outstanding on November 15, 1999 would be approximately $850,000,000. In addition, approximately $43,500,000 principal amount of additional indebtedness will be scheduled to mature on such date; and there can be no assurance that the Partnership will be able to generate the funds necessary to pay such amount or that it will be able to obtain, at such time, a refinancing of such indebtedness.

Based upon the Financial Forecasts included herein, the Partnership anticipates that it will be able to satisfy its on-going debt service requirements if the Plan is consummated. There can be no assurance, however, that the results contemplated by the Financial Forecasts will occur. See "Risk Factors—Financial Forecasts." If the Partnership and the Company were to experience a liquidity problem in the future, they could have difficulty obtaining funds to alleviate such a problem. In addition, the Indenture, the Amended NatWest Agreement and the Senior Debt Facilities will restrict the ability of the Partnership and the Company to incur additional indebtedness should they ever seek additional financing. See "Management's Discussion and Analysis of Financial Condition."

### Limited Operating History

The Partnership has a limited operating history and its operations are subject to the risks inherent in the establishment of a new business enterprise. The Taj Mahal commenced operations on April 2, 1990. The Taj Mahal is the largest casino/hotel complex in Atlantic City, with approximately twice the room capacity and casino space of many of the existing Atlantic City casino/hotels. Neither the Partnership nor any other Atlantic City casino/hotel operator has had experience operating a complex the size of the Taj Mahal. If the Plan is consummated, the Partnership, in order to meet its debt service requirements and pay its operating expenses and all other cash requirements, will need to generate average net revenues of approximately $38,000,000 per month (assuming historical operating margins), which amount will increase as additional New Bonds are issued in payment of the Additional Amount, which is substantially more than amounts previously generated by any other casino/hotel in Atlantic City. At present, the Partnership must generate average net revenues of approximately $50,000,000 per month (assuming historical operating margins) to pay its debt service and operating expenses. From April 2, 1990 through March 31, 1991, the Partnership averaged approximately $37,708,000 of net revenues per month. From January 1, 1991 through March 31, 1991, the Partnership averaged approximately $31,931,000 of net revenues per month. Such amounts are less than the $38,000,000 of average monthly net revenues required in order for the Partnership to meet its debt service requirements, operating expenses and other cash requirements if the Plan is implemented. The

Partnership. believes that the difference between the actual amount of monthly net revenues generated in the first quarter of 1991 and the amount of average monthly net revenues required under the Plan is due to primarily the seasonal nature of the Atlantic City casino industry in which January. February and March are historically periods of relatively lower monthly net revenues. Excluding the monthly net revenues amounts for the three months ended March 31. 1991. the Partnership averaged approximately $39,633,000 of net revenues per month from April 2. 1990 through December 31. 1991. In addition, the Partnership expects that its operating margins will improve through a combination of reduced operating expenses (primarily due to reduced staff levels) and anticipated operating efficiencies. which would enhance its ability to pay debt service.

## Interest Contingency

The Partnership intends to obtain the Senior Debt Facilities prior to the Effective Date of the Plan. One of such facilities (the $50,000,000 Senior Line of Credit) can be used. if needed, only to pay interest on the New Bonds. up to an aggregate amount of $25,000,000 net of repayments in any year. Thus, the ability to pay interest on the New Bonds will not be entirely dependent on the operations of the Partnership. so long as such credit remains available and unused. If the Senior Line of Credit is used to pay interest on the New Bonds, however, the Partnership's debt service requirement will be increased, and all amounts owed under the Senior Line of Credit will be secured by a lien senior to the lien of the Amended Mortgage. See "Risk Factors—Additional Senior Debt."

## Competition and Declining Rate of Growth

Competition in the Atlantic City casino/hotel market is intense. At present, there are twelve casino/hotels located in Atlantic City, including the Taj Mahal. all of which compete for patrons. Total Atlantic City gaming revenue has increased over the past three years, although at varying rates. Of the eleven Atlantic City casino/hotels that operated for a full year in 1990. only two reported increased gaming revenues for 1990 as compared to 1989. Management believes that the reduced rate of growth in gaming revenues in Atlantic City over the last two years as compared to prior years was principally due to the weakness in the economy throughout the Northeast. negative publicity about Atlantic City, increased competition from Nevada due to newly constructed casino/hotels and reduced air fares. See "Business—Atlantic City Market" for the actual industry statistics.

The Atlantic City casino industry has recently experienced a significant increase in room capacity and in available casino floor space. including the rooms and floor space recently made available by the opening of the Taj Mahal. The effect of such expansion is to increase competition and to reduce the rate of growth in casino win per square foot; in 1990 the industry experienced a decline in casino win per square foot of 5%.

The Partnership faces competition from cruise lines. riverboat gambling, casinos located in Nevada. Puerto Rico. The Bahamas and other locations outside the United States. from other forms of legalized gaming in New Jersey and in its surrounding states such as lotteries. horse racing, jai-alai. dog racing and other legalized gaming activities and from illegal wagering of various types. The Taj Mahal also would compete with any facilities in jurisdictions that may authorize casino gaming or other forms of wagering in the future. Legislation permitting casino gaming has been proposed, from time to time, in various states. The Taj Mahal's operations could be adversely affected by such competition, particularly if casino gaming were permitted in jurisdictions adjacent to, or elsewhere in, New Jersey. Currently, casino gaming is not allowed in other areas of New Jersey or in New York or Pennsylvania. Recently, however, the Secretary of the Interior approved a plan by the Mashantucket Pequot Indians to open a casino facility in Ledyard, Connecticut, located in the far eastern portion of such state. Such casino, the construction of which has commenced, is not expected to have a material adverse affect on the Taj Mahal.

In addition. Donald J. Trump is the beneficial owner of two other casino/hotels in Atlantic City, New Jersey. Trump's Castle Casino Resort ("Trump Castle") and Trump Plaza Hotel & Casino ("Trump Plaza"). The partnership that owns Trump Castle has been experiencing a liquidity problem for the last two years and, recently, the partnership that owns the Trump Plaza has experienced a

liquidity problem. Both of such partnerships have attributed such problem to reduced levels of casino win due to weakness in the economy in the Northeast, negative publicity about Atlantic City and increased competition from Nevada. Such partnerships have reported that they are considering various alternatives to solve their liquidity problems. The liquidity problem confronting each of the casinos owned by Donald J. Trump is not unique to Atlantic City casinos. During the last two years, one other casino/hotel filed a petition under the Code. In addition, several other Atlantic City casino/hotels have reported a current liquidity problem. The Partnership believes, however, that the consummation of the Plan will enable it to satisfy its ongoing debt service requirements. After giving effect to recent cost saving measures, the Partnership does not believe that its other operating costs are disproportionately higher than other Atlantic City casino/hotels, taking into account the size of the Taj Mahal.

### Financial Forecast

The Financial Forecast included in this Prospectus reflects the Partnership's judgment as to the expected conditions and results of operations in the forecasted periods. The ability of the Partnership to service the Note, and in turn for the Company to service the payments due under the New Bonds, will be dependent upon the success of the operations of the Taj Mahal, and such success will depend upon financial, business, competitive, regulatory and other factors affecting the Taj Mahal and the casino industry in general, as well as prevailing economic conditions, some of which are beyond the control of the Partnership. The assumptions disclosed therein are those that the Partnership believes are significant to the Financial Forecast. No representation can be made with respect to the ability to achieve the forecasted results It is likely that there will be differences between the forecasted and actual results because events and circumstances frequently do not occur as expected, and such differences may be material. Internal financial forecasts were prepared in connection with the original offering of Old Bonds. The Partnership failed to achieve the results forecasted therein. The Partnership did not engage in financial forecasting prior to such date. Operating management of the Partnership has changed since the date of such forecasts.

### Disruption of Operations

Publicity surrounding the liquidity problems of the Partnership has had an adverse effect upon the operations of the Partnership. Such publicity, has, in particular, adversely affected the Partnership's relationship with its suppliers and its ability to attract and maintain casino patrons. The Solicitation, or the commencement of a reorganization case, even in connection with the Plan, could further adversely affect the Partnership's relationships with its patrons, suppliers and employees. If such relationships are adversely affected, the Partnership's financial position could deteriorate further. This deterioration could adversely affect the Solicitors' ability to obtain the Acceptances or, if such Requisite Acceptances are obtained, to obtain confirmation of the Plan. Any disruption in the Partnership's relationships with suppliers could reduce the quality and availability of casino facilities, entertainment and promotional events, as well as guest and other patron services which could result in a loss of earnings.

### Additional Senior Debt

Obligations under the Working Capital Facility, the Senior Line of Credit and the Standby Letter of Credit will be secured to the extent of such obligations by a mortgage on the assets of the Partnership, senior to the lien of the Amended Mortgage securing the New Bonds. Such obligation, would include the payment of principal of and interest on such indebtedness, and could include other obligations thereunder, such as counsel fees. If such indebtedness is incurred, the Partnership's debt service burden would increase. Such facilities are anticipated to contain affirmative and negative covenants customary to loan documentation for highly leveraged companies, which covenants could be more restrictive than those contained in the Indenture. The New Bonds will be subordinate in right of payment to the Senior Debt Facilities and such subordination would most likely reduce the amount obtainable by holders of New Bonds should a foreclosure sale or another bankruptcy or reorganization of the Partnership occur. If the Partnership were to draw down the entire amount of funds available under the Senior Debt Facilities, the aggregate principal amount of its indebtedness would be increased by $100,000,000 (representing approximately 13% of the Partnership's principal amount of long-term

indebtedness at confirmation of the Plan), and such indebtedness, together with any accrued and unpaid interest thereon, would be senior in right of payment to the New Bonds and all other Partnership indebtedness. The Financial Forecasts contained herein in Annex B do not assume any draw down of any of the Senior Debt Facilities.

## Capital Expenditures

After the Effective Date, all capital expenditures will be provided for in the Budget as adopted by the Board of Directors of TM/GP, which prior to a Transition Event or after a Return Event must include a majority of the Class B Directors and for certain Capital Expenditures requires the approval of the Class B Stock of Holding. In the event a Budget for any year cannot be agreed upon, the Amended and Restated Certificate of Incorporation of TM/GP provides for certain levels of capital expenditures. See "Description of TM/GP Certificate of Incorporation", and "Management's Discussion and Analysis of Financial Condition."

To date, the Partnership has had to delay opening a health club, swimming pool and other amenities previously intended to be constructed. To a limited extent, this has had a negative impact on the Taj Mahal's ability to compete with other casinos in Atlantic City and with other resorts in the area. The Company and the Partnership believe that consummation of the Plan will eventually enable them to complete certain of these projects. No assurance can be given, however, that the funds for such completion will be allocated in a Budget, or that such completion will improve the profitability of the Taj Mahal's operations. It is estimated that $8,000,000 is necessary to complete these amenities, which amount has been taken into account in the Financial Forecasts contained herein in Annex B.

The Partnership currently leases certain land from Trump Taj Mahal Realty Corp. ("Realty Corp.") on which a theater building and bus terminal (the "Theater") have been partially constructed with Partnership funds. This parcel of land is subject to a right of reverter in favor of the Housing Authority of the City of Atlantic City (the "Housing Authority") if the Theater is not completed by July 1, 1991. The Partnership does not believe that it will be able to complete the Theater by such date, and although a further extension of such date will be sought, there can be no assurance that any such extension will be granted. Failure to complete the Theater by the deadline will enable the Housing Authority to exercise its right of reverter with respect to the land on which the Theater is located. The cost of completing the Theater is estimated at $20,000,000 and is included in the Financial Forecasts contained herein in Annex B. If the Housing Authority exercises its right of reverter, the Partnership's investment, to date, in the construction of the Theater, which is approximately $18,700,000, may be lost, as well as the Partnership's ability to continue leasing the property on the terms contained in its existing lease with Realty Corp. In addition, if the land on which the Theater is situated were to revert to the Housing Authority, the Partnership would be forced to arrange for alternative bus transportation facilities, which could disrupt its operations and inconvenience the patrons that arrive by bus.

If the use of the Theater is lost, the Partnership will be required to construct an alternate bus transportation center in order to effectively compete with other Atlantic City casino/hotels. Moreover, without a theater building the Partnership will be at a disadvantage to other Atlantic City casino/hotels in attracting patrons. Upon confirmation of the Plan, the allocation of funds necessary to complete the Theater will be subject to the approval of the Board of Directors of TM/GP, including a majority of the Class B Directors and the holders of the Class B Stock of Holding.

The Partnership leases the Steel Pier from Realty Corp. It is a condition of the Partnership's Coastal Area Facility Review Act ("CAFRA") Permit (which in turn is a condition of the Partnership's casino license) that the Partnership begin construction of certain improvements to the Steel Pier by October 1992, which improvements must be completed within 18 months of commencement. The estimated cost of these improvements is $30,000,000, and, upon confirmation of the Plan, the construction of these improvements will be subject to the approval of the Board of Directors of TM/GP, including a majority of its Class B Directors and the holders of the Class B Stock of Holding. No assurances can be given that such construction will be undertaken, or if undertaken, completed within the requisite time. The Partnership intends to seek a modification of the CAFRA Permit to extend the required completion date of the improvements to the Steel Pier and to reduce the scope of

such improvements, although there can be no assurance that such modifications will be granted by the New Jersey Department of Environmental Protection ("NJDEP") which administers CAFRA.

In addition, the Partnership estimates that the minimum level of capital expenditures required for the proper operation of the Taj Mahal will approximate 2% of gross revenues each year.

### Possible Invalidation of the Solicitation by the Bankruptcy Court

Section 1126(b) of the Code provides that the holder of a claim or interest who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitation, or, if such law does not apply, such acceptance was solicited after disclosure of "adequate information." This Prospectus is being presented to all holders of impaired Claims against and Interests in the Solicitors in order to satisfy the requirements of section 1126(b) of the Code.

Even if the Requisite Acceptances are received, the Bankruptcy Court may find that holders of Old Bonds have not validly accepted the Plan if the Bankruptcy Court determines that this Solicitation did not comply with the requirements of section 1126(b) of the Code. In such an event, the Company and the Partnership may seek to resolicit Acceptances, but confirmation of the Plan could be delayed and possibly jeopardized. The Company and the Partnership believe that the Solicitation complies with the requirements of section 1126(b) of the Code and that duly executed Ballots and Master Ballots will be in compliance with applicable provisions of the Code. However, there can be no assurances that the Bankruptcy Court would reach the same conclusion.

### Risk of Non-Confirmation of the Plan

Even if the Requisite Acceptances and approval of the CCC are received, the Plan may not be confirmed by the Bankruptcy Court, which sits as a court of equity and which may exercise substantial discretion. Section 1129 of the Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan not be followed by a need for further financial reorganization, and that the value of distributions to classes of dissenting creditors and equity security holders not be less than the value of distributions such creditors and shareholders would receive if the Debtors were liquidated under chapter 7 of the Code. See "The Plan—Confirmation of the Plan." There can be no assurance that the Bankruptcy Court will conclude that these tests have been met. If the Plan is filed, there can be no assurance that modifications thereof will not be required for confirmation, or that such modifications would not require a resolicitation of Acceptances. The Company and the Partnership believe that the Plan will not be followed by a need for further financial reorganization and that dissenting creditors will receive distributions at least as great as would be received following a liquidation pursuant to chapter 7 of the Code. See "Financial Forecasts" and "The Plan." However, there can be no assurances that the Bankruptcy Court would reach the same conclusion.

The confirmation and effectiveness of the Plan are also subject to certain conditions. See "The Plan—Conditions Precedent." No assurances can be given that these conditions will be satisfied or if not satisfied that the Debtors would waive such conditions.

If the Plan, or an immaterial modification thereof, were not to be confirmed, all agreements reached with the holders of Claims against and Interests in the Debtors described herein would be unenforceable and subject to renegotiation, and it is unclear what such holders would receive with respect to their Claims and Interests. If an alternative reorganization could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case it is likely that holders of Claims and Interests would receive less than they would pursuant to the Plan. See "The Plan—Liquidation Analysis."

### Steering Committee Not a Fiduciary

The Registrants have been informed by the Steering Committee that, in the opinion of the Steering Committee, it owes no fiduciary, agency or other obligation to any holder of Old Bonds. See "Background of the Solicitation" for a list of the members of the Steering Committee. Had negotiations with the Partnership commenced after the filing of a petition under the Code by the Partnership and the Company with the Bankruptcy Court, a creditors' committee comprised of certain secured creditors of the Partnership and Company could have been appointed by the Bankruptcy Court and, if it were so appointed, such committee would have owed a fiduciary obligation to the Company, the Partnership and the secured creditors of the Partnership and the Company, including the holders of Old Bonds.

### Regulatory Matters

The ownership and operation of casino/hotel facilities and related businesses in Atlantic City are the subject of strict state regulation under the New Jersey Casino Control Act and the regulations promulgated thereunder (the "Casino Control Act"). The Casino Control Act also imposes substantial restrictions on the ownership of securities of a company holding a casino license, such as the Partnership, or an intermediary or a holding company of a casino licensee. Upon the Effective Date, TM/GP will be an "intermediary company" of the Partnership, and Holding will be a "holding company" of the Partnership under the Casino Control Act. As such, they will each have to register with the CCC and obtain qualification approval by meeting essentially the same requirements as a casino licensee. See "Business—Regulation."

The Partnership and its various officers have received the licenses, permits and authorizations required to open and operate the Taj Mahal. The principal authorizations required in New Jersey in order for a casino/hotel to open and operate consist of a casino license and an operation certificate. No assurance can be given that the Partnership will receive or continue to receive all authorizations needed for the operation of the Taj Mahal and thereby be permitted, in the future, to continue to operate the Taj Mahal. Failure to maintain a casino license would have a material adverse effect on the Partnership's ability to make payments in respect of the Note or the Amended Guaranty.

On April 18, 1991, the CCC renewed the casino licenses of the Partnership and THMC through April 26, 1992, subject to the conditions that (i) by June 17, 1991, the Plan be filed with the United States Bankruptcy Court and Donald J. Trump submit to the CCC executed term sheets amending loan agreements with certain of his lender banks and (ii) at a CCC hearing to resume on that date, the licensees and Donald J. Trump demonstrate their finanical stability through April 26, 1992. The Partnership intends to seek an extension of the deadline referred to above for the filing of the Plan. No assurances can be given that any such extension will be granted or that the CCC will continue the casino licenses of the Partnership or THMC or, if continued, what conditions may be imposed and whether those conditions will be considered acceptable by the Partnership.

It is a condition to the effectiveness of the Plan that the CCC issue various approvals in connection with the Plan and the transactions described in this Prospectus.

### Potential Disqualification of Holders by the CCC

A holder of Units and/or Class A Stock may be required to qualify under the Casino Control Act and, consequently, would be subject to the qualification provisions of the Casino Control Act relating to financial sources and/or security holders. The Indenture provides that if the CCC requires that a holder of New Bonds (whether the record or beneficial owner) qualify under the Casino Control Act and if such holder does not so qualify, then such holder must dispose of his interest in the Units within 30 days after receipt of notice of such finding, or within such earlier time as the CCC may require, or the Company may redeem such New Bonds. Any such redemption by the Company shall be without any premium and at the lower of (i) the outstanding principal amount and (ii) the fair market value (as defined in the Indenture) of such New Bonds. If any holder of Units is found to be unqualified by the CCC, it is unlawful for such holder (i) to receive any interest upon the Units, (ii) to exercise, directly or through any trustee or nominee, any right conferred by the Units, or (iii) to receive any remuneration,

27

in any form from any Regulated Company (including the Partnership, the Company, TM GP, Holding or the Trustee) for services rendered or otherwise.

Pursuant to the provisions of the Casino Control Act, the Certificate of Incorporation of Holding provides that all securities of Holding are held subject to the condition that, if a holder thereof is found to be disqualified by the CCC pursuant to the provisions of the Casino Control Act, such holder shall (a) dispose of his interest in Holding; (b) not receive any dividends or interest upon any such securities; (c) not exercise, directly or through any trustee or nominee, any right conferred by such securities; and (d) not receive any remuneration in any form from the casino licensee for services rendered or otherwise.

## Trading Markets—Potential Volatility of Market Prices

The Company and Holding intend to apply for listing of the Units (i.e., the New Bonds and Class B Stock) on the American Stock Exchange, assuming that eligibility requirements for such listing can be satisfied or waived. There can be no assurances that such listing will be obtained or as to the liquidity of any markets that may develop or at what prices holders of the Units would be able to sell such securities, if at all. Factors such as quarterly fluctuations in the Partnership's financial and operating results, negative announcements by the Partnership or others, and developments affecting the Partnership, its customers or the gaming industry generally, could cause the market price of the Units to fluctuate substantially. No Old Bonds will be outstanding after the Effective Date.

The Registrants believe that the Units will meet the eligibility requirements for listing on the American Stock Exchange prior to the Effective Date of the Plan, or that a waiver of certain criteria will be obtained. The Class A Stock will not be so listed, and there can be no assurances that a liquid, over-the-counter market will develop for such security. The New Bonds will bear interest payable, in part, in additional Units. The Company intends to apply for the listing of such additional Units on the American Stock Exchange or other national securities exchange. There can be no assurances, however, that any such additional Units will be so listed or that an active trading market will develop for such Units in any event. Moreover, Units are tradeable through the facilities of national securities exchanges only in integral multiples of $1,000. Consequently, additional Units issued from time to time in non-integral multiples of $1,000 will not be tradeable through such facilities, unless and until they are cumulated into certificates representing $1,000 face value of Units. In such event, the liquidity of, and prices for, such additional Units in such odd denominations will be adversely effected.

Recently the market for "high yield" securities, such as the New Bonds, has become volatile and unpredictable, which may have an adverse effect on the liquidity of, and prices for, such securities.

## Limitation of Liability

The terms of the Plan, the New Bonds, the Indenture, the Amended Guaranty, and all related documents will continue to provide that the Partnership and the Company are liable thereunder only to the extent of the assets of the Partnership (excluding cash permitted to be distributed pursuant to the Indenture, regardless of whether such cash has been distributed) and to the extent of the interest of the Company in the Note, the Amended Guaranty and the Amended Mortgage. No other person or entity, including, but not limited to, any partner, officer, committee or committee member of the Partnership or any partner therein or of any affiliate of the Partnership, or any incorporator, officer, director or shareholder of the Company or any corporate partner of the Partnership or of any corporate affiliate of the Partnership, or any affiliate or controlling person or entity of any of the foregoing, or any agent, employee or lender of any of the foregoing, or any successor, personal representative, heir or assign of any of the foregoing, in each case past, present or as they may exist in the future, shall be liable in any respect (including, without limitation, the breach of any representation, warranty, covenant, agreement, condition or indemnification or contribution undertaking contained therein) under, in connection with, arising out of or relating to the New Bonds or any instrument, agreement or document, or any other agreement, document, certificate, instrument or statement (oral or written) related thereto, executed or to be executed, delivered or to be delivered, or made to be made, or any

omission made or to be made, in connection with any of the foregoing or any of the transactions contemplated in any such agreement, document, certificate, instrument or statement.

## Security for the New Bonds

The New Bonds will be secured by the Amended Mortgage on, and other documents evidencing a security interest in, the Taj Mahal and virtually all of the other assets of the Partnership (other than cash and certain assets securing the NatWest Loan, as the same is to be amended upon confirmation of the Plan). If an Event of Default (as defined in the Indenture) occurs with respect to the New Bonds, there can be no assurance that a foreclosure on the Amended Mortgage would produce proceeds in an amount which would be sufficient to pay the principal of, and accrued interest on, the New Bonds. See "Description of the New Bonds—Security." Moreover, the ability of the Trustee to foreclose will be further limited by the priority lien to be granted to secure the Senior Debt Facilities. The New Bonds will also be secured by a second priority mortgage lien on the Specified Parcels. Such lien will be fully subordinated to the Amended First Fidelity Loan.

In any foreclosure sale of the Taj Mahal, the purchaser would need to be licensed to operate the Taj Mahal under the Casino Control Act, and if the Trustee under the Indenture is unable to, or chooses not to, sell the Taj Mahal, such Trustee would be required to retain an entity licensed under the Casino Control Act to operate the Taj Mahal. See "Business—Gaming and Other Laws and Regulations." Because potential bidders must satisfy such requirements, the number of potential bidders in a foreclosure sale would be less than in foreclosures of other types of facilities and such requirements may delay the sale of, and may adversely affect the sales price for, the Taj Mahal. The ability to repossess and dispose of the Taj Mahal upon acceleration of the New Bonds is likely to be significantly impaired or delayed by applicable bankruptcy law if a reorganization case were to be commenced by or against the Partnership prior to the repossession or disposition of the Taj Mahal by the Trustee.

The Partnership's Amended Guaranty will also secure payment of the principal of, and interest on, the New Bonds. However, the ability of the Partnership to make payments under the Amended Guaranty will be subject to the same factors affecting its ability to make payments on the Note. See "Risk Factors—Ability to Service Debt" and "—Limited Operating History."

## Conflicts of Interest

Donald J. Trump is the manager and beneficial owner of 100% of two Atlantic City casino hotels that compete with the Taj Mahal: Trump Castle and Trump Plaza (collectively, the "Other Trump Casinos"). Trump Plaza is located on the Boardwalk approximately 1.2 miles from the Taj Mahal, and Trump Castle is located in the Marina area of Atlantic City, approximately 1.7 miles from the Taj Mahal. Trump Plaza also leases and operates the Trump Regency Hotel, an approximately 500-room non-casino, luxury hotel located on the Boardwalk, which competes with the Taj Mahal and the Trump Castle for hotel patrons. As a result of Donald J. Trump's ownership and management of the Other Trump Casinos, a potential conflict of interest may be deemed to exist by reason of his access to information and business opportunities. Donald J. Trump, Robert S. Trump, Stephen F. Bollenbach, Harvey I. Freeman and Nicholas L. Ribis, who are members of the Executive Committee of the Partnership and who (except for Robert S. Trump) are expected to be Class C Directors of Holding and TM/GP, serve on the executive committees of the partnerships that own the Other Trump Casinos. Nicholas L. Ribis is the chief executive officer of the Taj Mahal and is also the chief executive officer of the Other Trump Casinos. The Other Trump Casinos compete directly with each other and with other Atlantic City casino/hotels, including the Taj Mahal.

The Partnership and Donald J. Trump entered into a Services Agreement as of April 1, 1991 pursuant to which Donald J. Trump has agreed to devote a substantial amount of time to the marketing, advertising and promotion of the Taj Mahal. Pursuant to the Services Agreement, in respect of any matter or matters involving employees, contractors, entertainers, celebrities, vendors, patrons, marketing programs, promotions, special events, or otherwise, Donald J. Trump will, and will agree to cause his affiliates to the best of his ability and consistent with his fiduciary obligations to the

Partnership and the Other Trump Casinos, to act fairly and in a commercially reasonable manner so that on an annual overall basis (x) no Other Trump Casino shall realize a competitive advantage over the Taj Mahal by reason of any activity, transaction or action engaged in by Donald J. Trump or his affiliates and (y) the Taj Mahal shall not be discriminated against. See "Services Agreement."

In the event that the Partnership terminates the Services Agreement, for reasons other than the death or disability of Donald J. Trump, Donald J. Trump has the right to terminate the Amended License Agreement. If the Amended License Agreement is terminated, the Partnership will have to incur significant expense in changing the name of the Taj Mahal. Although no specific procedures have been devised for resolving potential conflicts of interest confronting Donald J. Trump and the Partnership, the Partnership believes that the provisions of the Services Agreement dealing with potential conflicts of interest among the three casino/hotels owned by Donald J. Trump will minimize the effect of the potential conflicts of interest that could confront Donald J. Trump. See "Services Agreement."

### Involvement of Donald J. Trump

The involvement of Donald J. Trump in the affairs of the Partnership is believed to be extremely important to its future prospects due to his entrepreneurial skills and marquee name value. The Partnership and Donald J. Trump will enter into the Services Agreement to ensure that Donald J. Trump promotes the Taj Mahal. Under certain circumstances, such as the occurrence of a Transition Event, Donald J. Trump would have the option to terminate the Services Agreement, which action could be detrimental to the Partnership. See "Services Agreement." In addition, Donald J. Trump will pledge his direct and indirect equity interest in the Partnership and Realty Corp. to certain lenders. If a foreclosure on such interests were to occur, Donald J. Trump would no longer control the affairs of the Partnership. See "Risk Factors—Control of Holding" and "The Plan—Treatment of Claims and Interests Under the Plan."

### Control of Holding

Because of their other economic interests in the Partnership and the Company, the holders of the Class B Stock and the Class C Stock, who have voting control of Holding prior to the Final Payment Date but no economic interest, may have interests divergent from each other and from the interests of the holders of the Class A Stock, who have substantially all of the economic interest in Holding. The Class B Stock will trade, as a Unit, with the New Bonds. The Class C Stock will be held by Donald J. Trump who, through his ownership of TTMI and Trump Corp., is the beneficial owner of the 50% of the Partnership not beneficially owned by Holding.

Initially, the Board of Directors of Holding will consist of nine directors, five of whom will be elected by Donald J. Trump, the holder of the Class C Stock, and four of whom will be elected by the holders of Class B Stock. Upon the occurrence of a Transition Event, two of the Class C Directors will resign, and the then current members of the Board of Directors elected by the holders of the Class B Stock will have the right to elect the two additional Class B Directors. Upon the occurrence of a Return Event, two of the Class B Directors shall resign and the then current Class C Directors will appoint two additional Class C Directors . See "Description of Holding Certificate of Incorporation." Substantially all the economic interest in Holding will reside with the holders of the Class A Stock who, except as otherwise provided by Delaware law, have no voting rights prior to the Final Payment Date. See "Description of Holding Certificate of Incorporation." The initial Class B Directors will be appointed by the Steering Committee.

Donald J. Trump intends to pledge the Trump Pledged Equity to certain banks, as security for the repayment of loans made by such banks to various Trump controlled entities other than the Company or the Partnership. If such banks foreclose upon the Trump Pledged Equity, they would obtain voting control over TTMI and the right to elect the Class C Directors of Holding and TM/GP. Such a foreclosure would also be a Transition Event and would result in additional Partnership interests being transferred from TTMI to TM/GP so that Holding would beneficially own 60% of the Partnership interests (rather than 50%), subject to certain reductions after the Final Payment Date. Such event

would also extinguish the right of TTMI to cause the Partnership to make the 14% Payment and cause the interest rate on the New Bonds to increase to 14% per annum, payable all in cash. See "Description of New Bonds," "Description of Holding Certificate of Incorporation" and "Amended Partnership Agreement."

### Possible Dilution of TM/GP Partnership Interest

If the Company has repaid in full, or defeased, the entire outstanding principal amount of New Bonds, either at their stated maturity or at any time prior thereto, TTMI has the right to cause the Partnership to make the 14% Payment. If the 14% Payment is made in full, the Partnership will issue additional Partnership Interests to TTMI, such that after such issuance, Donald J. Trump would beneficially own 80% of the Partnership, thereby reducing the indirect ownership interest of the holders of the Class A Stock to 20% of the Partnership. The amount of the reduction of the beneficial ownership in the Partnership of the holders of Class A Stock will vary in proportion to the total amount of New Bonds with respect to which the 14% Payment is made or deemed to be made. For example, if the 14% Payment were made or deemed to be made with respect to one-half of the outstanding New Bonds, the beneficial ownership of Donald J. Trump in the Partnership would increase from 50% to 65% and the interest of Holding (and therefore, of the holders of Class A Stock) would be reduced to 35%. See "Description of Amended Partnership Agreement." The 14% Payment, which will occur only if the New Bonds are retired, redeemed, or paid in full, is permitted to be financed with Partnership borrowings without the approval of the Class B Directors.

### Insurance

The Amended Mortgage will continue to permit the Partnership to reduce its liability insurance and/or increase the deductible provision, if the amount of the insurance coverage or the deductible at such time cannot be maintained at rates determined by the Partnership to be reasonable for such coverage and if the reduced liability limit is, in the Partnership's judgment, a prudent amount, considering its cost. In such event, the Partnership would be self-insuring against liabilities previously covered by insurance, and could be at risk of being obligated to pay substantial amounts on liability claims against the Partnership.

### Pending Litigation

The Partnership, its partners, certain of its employees, certain members of its Executive Committee and the Company are involved in various legal proceedings which, if adversely decided, would have a material adverse effect on the Partnership's financial condition. Certain of such claims involve the allegation that the original acquisition by the Partnership of the assets that now constitute part of the Taj Mahal could constitute a fraudulent conveyance as against creditors of the seller of such assets. See "Business—Legal Proceedings." The settlement of such litigation and certain litigation involving securities law claims against the Solicitors and others is a condition to the effectiveness of the Plan. See "The Plan—Conditions Precedent."

### Certain Federal Income Tax Considerations

U.S. and non-U.S. holders of Old Bonds should consult their tax advisors concerning the tax implications of the Plan under applicable state, local, foreign income and other tax laws.

The exchange of Old Bonds for New Bonds will be a taxable event for exchanging holders upon which gain or loss will be recognized. The Partnership expects to take the position that the acquisition of the Equity Interest will be a tax-free transaction.

Due to the original issue discount expected in respect of the New Bonds, holders of New Bonds will be required to report interest income at a rate for Federal income tax purposes that is substantially higher than the stated interest rate and in advance of their receipt of cash interest.

Certain material Federal income tax consequences of the Plan depend upon the Partnership being treated as the issuer of the Old Bonds and New Bonds and as issuing the Equity Interest in satisfaction

of a portion of the principal of the Old Bonds and upon subsequent exchanges of the Old Bonds for the New Bonds and the holders of the New Bonds exchanging the Equity Interest for the Class A Stock and the Class B Stock. While Counsel has advised that there is substantial authority for claiming such treatment, such treatment is not certain under current law and is subject to challenge by the Internal Revenue Service (the "Service"). If the New Bonds are regarded as equity of the Partnership or the Company, there will be no deduction for interest expense in respect of the New Bonds, and double taxation would result from corporate tax being imposed on the taxable income of the Partnership or the Company, as the case may be (thus reducing net cash flow), and on amounts received by holders of New Bonds. Under such circumstances, there could be no assurances that the Partnership would have sufficient funds to satisfy all of its obligations, even if the revenues set forth in the Financial Forecasts were achieved. In the preamble to recently proposed regulations on a related subject, the Service has announced its intention to issue regulations, to be effective with respect to transactions on or after March 21, 1991, providing for the recognition of cancellation of indebtedness income by a debtor in certain non-recognition transactions, including transactions governed by Code Section 721. It is possible that such regulations, when issued, will also cause holders of the Old Bonds to have a taxable event upon the exchange of a part of the Old Bonds for the Equity Interest. The scope, content, applicability and ultimate effective date of these regulations and statutory basis for any regulations are not clear from this preamble, which itself is not a ruling or a regulation of any authority. On May 16, 1991, the Service issued Notice 91-15, 1991-22 I.R.B. 1, which states in part, "Except to the extent described above, the preamble to proposed section 1.108-2 and this notice do not affect the treatment of transactions in which debtor and creditor interests are combined. Until further guidance is issued, such transactions will be treated in accordance with current law. Thus, in general, the transfer of partnership debt to a partnership in exchange for a partnership interest is not within the scope of the preamble." Any further clarification of this matter must await the issuance of the proposed regulations. However, if these regulations referenced in the preamble, when issued, do apply to the Plan, or if the Service were successfully to challenge the Company's and the Partnership's position on these points, the Partnership could recognize substantial cancellation of indebtedness income. This income would be allocated to the existing partners of the Partnership as a Partnership item, and such partners would reduce their basis in their Partnership interests by the amount of the allocation, possibly requiring the Partnership to make a corresponding reduction in the basis of the Partnership's depreciable property resulting in a reduction in future depreciation deductions by the Partnership related to such cancellation of indebtedness income.

The principal Federal income tax issues as to which Counsel has rendered an opinion, but is unable to render an unqualified legal opinion as to, are:

1. Classification of the Old Bonds and New Bonds as debt or equity;

2. Whether the Company or the Partnership is the sole obligor on the Old Bonds and the New Bonds;

3. The treatment of the exchange of the Old Bonds for New Bonds and Partnership interests under Section 108 and Section 721 of the Code including the correct method of allocating a Holder's adjusted basis in the Old Bonds to the portion exchanged for a Partnership interest and to the portion exchanged for New Bonds;

4. The treatment of the New Bonds delivered in payment of the Additional Amount under the Proposed Treasury Regulations dealing with original issue discount;

5. The tax effect of the potential acquisition of the Additional Partnership Interest by TTMI to TTMI and TM/GP;

6. The tax effect of the potential acquisition of the Foreclosure Partnership Interest by TM/GP to the Partnership and TM/GP;

7. The tax effect of the potential acquisition of the Earned Reversionary Interest by TTMI to the Partnership and TM/GP; and

8. The applicability of certain "high yield discount obligation" rules provided under Section 163(e) and Section 163(i) of the Code.

32

Counsel believes that it is more likely than not that the New Bonds will be treated as debt of the Partnership for federal income tax purposes. In each of the other instances. Counsel believes there is substantial authority for the positions the Partnership and the Company expect to take. The substantial authority standard is less stringent than the "more likely than not" standard. The "more likely than not" standard is met when there is a greater than 50% likelihood of the position being upheld. Consequently, there is significant uncertainty as to the tax results with respect to the foregoing issues, as discussed more fully in "Certain Federal Income Tax Considerations."

### Certain Defaults and Events of Default

The Partnership and the Company have failed to comply with certain covenants contained in the Mortgage and the Old Indenture. Such defaults include the failure to pay the November 15, 1990 and May 15, 1991 installments of interest due on the Old Bonds within the 30 day grace period provided by the Old Indenture, which failure constitutes an Event of Default thereunder, and the failure to make timely payment of amounts due under the NatWest Loan, which is also an Event of Default thereunder. In addition, the Partnership and the Company failed to deliver the appraisal of the Taj Mahal due on November 22, 1990 pursuant to Section 12.15 of the Old Indenture. After an Event of Default, the Trustee or the holders of 25% of the outstanding principal amount of Old Bonds could declare the entire outstanding amount of Old Bonds, together with accrued interest thereon, to be immediately due and payable. If such an acceleration were to occur, the Partnership and the Company would not be able to pay the amounts then due and owing. Pursuant to the Old Indenture, the holders of a majority of the outstanding Old Bonds can rescind a declaration of acceleration and waive defaults and their consequences (other than certain specified defaults such as the non-payment of interest, which may only be waived by all holders entitled to such payment). Upon confirmation of the Plan, all Defaults, Events of Default and accelerations to the time of such confirmation will be forgiven, rescinded, annulled and of no force and effect.

The Partnership is also in default under the NatWest Loan, and such bank has a first priority security interest on certain furniture, fixtures and equipment of the Partnership, including certain gaming equipment essential to its operations. The NatWest Loan is proposed to be amended pursuant to the Plan and existing defaults thereunder waived. See "Amended NatWest Agreement."

Realty Corp., which is wholly owned by Donald J. Trump, is in default under certain indebtedness owed to First Fidelity Bank, National Association, New Jersey ("First Fidelity"). Such indebtedness is secured by a first mortgage on certain parcels of real property which are leased to the Partnership and, in the aggregate, are useful to the operation of the Taj Mahal. The Partnership currently utilizes the leased parcels for the arrival and departure of bus patrons, warehousing of certain assets and customer parking. The First Fidelity Loan is proposed to be amended pursuant to the Plan and existing defaults thereunder waived. See "Amended First Fidelity Agreement."

### THE COMPANY

The Company was incorporated on June 3, 1988 under the laws of the State of New Jersey. Its sole purpose was to issue, as nominee for the Partnership, the Old Bonds pursuant to the terms of the Old Indenture and to lend the proceeds thereof to the Partnership. The Company may not engage in any other business activities (including having any subsidiaries) or incur any indebtedness or expense other than the Old Bonds and nominal operating expenses (on the Effective Date the Company's Certificate of Incorporation will be amended to provide for the issuance of the New Bonds).

The Company has its principal executive offices at 1000 The Boardwalk, Atlantic City, New Jersey 08401, and its telephone number is (609) 449-5540.

### THE PARTNERSHIP

The Partnership was originally formed as a limited partnership under the laws of the State of New Jersey on June 23, 1988. The Partnership was formed to consummate the acquisition of, to complete the construction of and to operate the Taj Mahal and its ancillary properties. In return for the proceeds of the Old Bonds, the Partnership issued to the Company the Partnership Note, which has payment terms identical to the Old Bonds, and the Guaranty, which directly guarantees the payment of the principal of, premium, if any, and interest on the Old Bonds. Certain changes in the structure of the Partnership either have occurred or will occur on or before the Effective Date of the Plan. These changes include:

conversion of the Partnership from a limited partnership to a general partnership; the admission of TM/GP and Trump Corp. as partners of the Partnership; the withdrawal of Donald J. Trump as a partner of the Partnership; and various changes to the allocation of profit and loss among the partners of the Partnership. In order to more effectively consummate the transactions contemplated by the Plan, including the transfer of the Equity Interest and governance mechanisms for the Partnership, Trump Corp. was admitted and Donald J. Trump withdrew as a partner of the partnership. As all partners of the Partnership are corporations, each with limited liability, the Partnership was converted to a general partnership. Generally, these changes and others contemplated by the Amended Partnership Agreement reorganize the Partnership so that one-half of the equity will inure to the benefit of the holders of Old Bonds and one-half to Donald J. Trump. A further purpose was to create a mechanism for allocating the governance of the affairs of the Partnership between Donald J. Trump on the one hand and representatives of holders of Old Bonds on the other hand. See "Description of Amended Partnership Agreement," "Description of TM/GP Certificate of Incorporation" and "Description of Holding Certificate of Incorporation."

See the diagrams included in the Prospectus Summary for a description of the relationship of the Registrants and related entities before and after consummation of the Plan.

The Partnership has its principal executive offices at 1000 The Boardwalk, Atlantic City, New Jersey, 08401. and its telephone number is (609) 449-5540. See "The Amended Partnership Agreement."

### HOLDING

Holding was incorporated under the laws of the State of Delaware on December 18, 1990. The capital stock of Holding will be distributed to Donald J. Trump and the holders of the Old Bonds as soon as practicable after the Effective Date. Holding was formed for the purpose of acquiring the Equity Interest from the holders of the Old Bonds, and contributing it to TM/GP, and issuing the Class A Stock and Class B Stock to the holders of the Old Bonds and the Class C Stock to Donald J. Trump. The capital stock of TM/GP will be issued to Holding instead of to former bondholders and Donald J. Trump because TM/GP could, under certain circumstances, be deemed to be a casino licensee, and in such event, each of its shareholders would individually be required to be qualified under the Casino Control Act. The holding company structure alleviates this concern. The assets of Holding will consist of 100% of the outstanding common stock of TM/GP and 50% of the common stock of Trump Corp. The Amended and Restated Certificate of Incorporation of Holding prohibits it from engaging in any business other than holding such shares and performing acts incident thereto. Holding has its principal executive offices at 1000 The Boardwalk, Atlantic City, New Jersey 08401, and its telephone number is (609) 449-5540. See "Description of Holding Certificate of Incorporation."

### TM/GP

TM/GP was incorporated under the laws of the State of New Jersey on March 1, 1991. All of the capital stock of TM/GP will be owned by Holding. TM/GP was formed for the purpose of receiving the Equity Interest from Holding, and acting as managing general partner of the Partnership. The Amended and Restated Certificate of Incorporation of TM/GP prohibits it from engaging in any business other than holding the Equity Interest in, and acting as managing general partner of, the Partnership, and from issuing any class of stock other than the two classes of common stock issued to Holding. TM/GP has its principal executive offices at 1000 The Boardwalk, Atlantic City, New Jersey 08401. and its telephone number is (609) 449-5540. See "Description of TM/GP Certificate of Incorporation."

### TRUMP CORP.

Trump Corp. was incorporated under the laws of the state of Delaware on October 16, 1990. Trump Corp. was formed for the purpose of holding a general partnership interest in the Partnership. Trump Corp. is currently owned by Donald J. Trump. On the Effective Date, Donald J. Trump will contribute 50% of Trump Corp.'s common stock to Holding in return for all of the Class C Stock of Holding such that Trump Corp. will be owned 50% by Donald J. Trump and 50% by Holding. Trump Corp. has its principal executive offices at 1000 The Boardwalk, Atlantic City, New Jersey 08401, and its telephone number is (609) 449-5540.

34

## PURPOSES AND EFFECTS OF THE PLAN

Since the Partnership opened the Taj Mahal on April 2, 1990, cash generated from operations has been insufficient to cover its fixed charges. The Partnership believes that its liquidity problem is attributable, in part, to an overall deterioration in the Atlantic City gaming market, as indicated by reduced rates of casino revenue growth for the industry for the last two years as compared to prior years, aggravated by an economic recession in the Northeast, and lower than anticipated revenues at the Taj Mahal. In addition, the Partnership's liquidity problem was aggravated by its high level of indebtedness, which at historical levels of operations, it has been unable to service. Comparatively excessive casino gaming capacity in Atlantic City has also contributed to the Partnership's liquidity problem. The Partnership does not know to what extent these adverse industry and economic trends will continue. Also contributing to the Partnership's liquidity problem were increased construction costs of the Taj Mahal, attributable to unanticipated cost overruns and project enhancements designed to improve the overall project, combined with a delay in the opening date of the Taj Mahal. As a result of the Partnership's liquidity problem, the Company failed to make its $47,250,000 November 15, 1990 and May 15, 1991 interest payments on the Old Bonds. In light of its current financial condition and existing borrowing restrictions, unless the Plan (or a similar plan of reorganization) is consummated, the Partnership does not anticipate being able to obtain any additional funds to alleviate its liquidity problems. See "Risk Factors—Competition and Declining Rate of Growth" and "Management's Discussion and Analysis of Financial Condition."

The Solicitors believe that there is no alternative to their current liquidity problem other than filing a petition under the Code. The Partnership has been unable to obtain additional financing, and the Company is restricted from amending the payment terms of the Old Bonds outside of the Code without the unanimous consent of the holders thereof. The primary purpose of soliciting Acceptances prior to the filing of a petition under the Code is to enable the Plan to be confirmed as soon as possible, thereby minimizing the disruption to the operations of the Taj Mahal. The Solicitors believe that confirmation of the Plan will enable them to accomplish their reorganization and emerge from a reorganization case more quickly, and with less disruption to the operations of the Taj Mahal, than in a reorganization case other than pursuant to the Plan. The Solicitors believe the recovery to holders of Old Bonds would be less in any other reorganization than would be achieved under the Plan. This belief is based upon (i) the longer period of time that would likely be required to consummate a non-prepackaged reorganization case, (ii) the comparatively greater negative public relations impact on the operations of the Taj Mahal that could result from a prolonged reorganization case, (iii) the increased expenses of professionals and administrative costs normally associated with a non-prepackaged reorganization case, (iv) the possible loss of suppliers and patrons, (v) the negative effect on employee morale, (vi) the possibility of having to renegotiate agreements reached with the holders of certain of the Partnership's debt, and (vii) increased uncertainty regarding the Solicitors' CCC licenses.

The Partnership and the Company are currently in default under the Old Indenture and various other loan agreements, see "Risk Factors—Certain Defaults and Events of Default." If a material amount of the Partnership's indebtedness were to be accelerated, the Partnership would be unable to repay such indebtedness. Under such circumstances the Partnership believes it would have no choice but to seek relief under the Code, whether or not the Partnership has at such time obtained the Requisite Acceptances. The Partnership could also at any time become the subject of an involuntary bankruptcy petition filed by its creditors. By reducing the Partnership's debt service requirement, and avoiding a significant disruption in the operations of the Taj Mahal, the Company and the Partnership believe that the results under the Plan are superior to the results in a reorganization case without the Plan.

If the Plan is consummated, the Partnership believes that it will have sufficient cash flow for the 12 months following the Effective Date of the Plan as a result of anticipated revenue levels, cost containment measures and the restructuring envisioned by the Plan. The purpose of the Plan is to alleviate the Partnership's liquidity problem by reducing and deferring its annual debt service requirements. Such reduction will be accomplished through a lowering of the current interest rate on certain of the Partnership's long-term indebtedness, including the Old Bonds, and the deferral of the due date of a portion of accrued interest in the Old Bonds through the issuance of additional Units in

lieu of a portion of the cash interest. The effect of the proposed debt restructuring would result in an initial reduction of the annual cash interest expense on the New Bonds to approximately $68,102,000 from approximately $94,500,000 on the Old Bonds, although annual cash interest expense would be greater than $68,102,000 to the extent of Excess Available Cash Flow, if any, and may increase upon the issuance of additional New Bonds in payment of the Additional Amount to the extent New Bonds are not retired. Thus, consummation of the Plan would result, during the first year, in an approximately $26,398,000 reduction in the Partnership's interest expense. See "Annex B—Financial Forecasts." The Solicitors believe that this will enable them, upon confirmation of the Plan, to meet their future debt service requirements and afford investors the opportunity to participate in the future growth, if any, of the Partnership through ownership of the Class A Stock. No assurances, however, can be given that any of the anticipated revenue levels or operating margins contemplated by the Financial Forecast will be realized.

## THE PLAN

The following summary of the material provisions of the Plan is qualified in its entirety by reference to all of the provisions of the Plan, including the definitions therein of certain terms used below. Wherever defined terms of the Plan not otherwise defined in the Glossary are referred to, such defined terms are incorporated herein by reference. A copy of the Plan has been made an Exhibit to the Registration Statement of which this Prospectus is a part.

### Solicitation of Acceptances of the Plan

The Solicitors are soliciting Acceptances of the Plan from holders of impaired Claims and Interests under chapter 11 of the Code.

If, by the Expiration Date, the Requisite Acceptances have been received, the Debtors may elect, and currently intend, to commence the Reorganization Case by filing a petition under chapter 11 of the Code and to use the Ballots and Master Ballots solicited pursuant to this Prospectus to seek confirmation of the Plan under chapter 11 of the Code as promptly as practicable. Because, under the Code, only those who vote to accept or reject the Plan will be counted for purposes of determining acceptance or rejection of the Plan by any impaired class of Claims or Interests, the Plan could be approved by any impaired class of Claims with the affirmative vote of significantly less than 66⅔% in principal amount and 50% in number of the Claims in such class, and by any impaired class of Interests with the affirmative vote of significantly less than 66⅔% in amount of Interests in such class.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, EACH HOLDER OF OLD BONDS WILL RECEIVE THE SAME CONSIDERATION, WHETHER OR NOT SUCH HOLDER VOTED TO ACCEPT THE PLAN. MOREOVER, UPON CONFIRMATION, THE PLAN WOULD BE BINDING ON ALL CREDITORS OF THE DEBTORS REGARDLESS OF WHETHER OR NOT SUCH CREDITORS VOTED TO ACCEPT THE PLAN.

### Voting on the Plan

Under section 1126(b) of the Code, a holder of a Claim or Interest that has accepted or rejected a plan of reorganization before the commencement of a chapter 11 case will be deemed to have accepted or rejected such plan for purposes of confirmation of such plan under chapter 11 of the Code if the solicitation is in compliance with any applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation. The Debtors believe that this Prospectus complies with the requirements of section 1126(b) of the Code for purposes of soliciting acceptances or rejections of the Plan. For instructions on how to vote on the Plan, see "The Solicitation—Procedure for Voting On the Plan."

Pursuant to the Code, only classes of Claims or Interests that are "impaired" are entitled to vote on the Plan. Only Claims or Interests in the following classes are impaired under the Plan:

Class 4. Series A Bond Claims
Class 5. NatWest Claims
Class 6. First Fidelity Claims
Class 10. Subcontractors' Claims
Class 12. Trump Line of Credit Claims
Class 13. Management Agreement Claims
Class 16. Partnership Interests
Class 18. Trump Corp.'s Common Stock Interests

**All other classes of Claims and Interests are unimpaired under section 1124 of the Code and holders of Claims and Interests in these unimpaired classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Code.**

**The holders of Claims in Classes 5, 6, 10, 12 and 13 and the holders of Interests in Classes 16 and 18 have advised the Partnership that they intend to accept the Plan.**

The Solicitation of Ballots and Master Ballots to accept or reject the Plan will expire on the Expiration Date. Ballots or Master Ballots delivered may be revoked at any time prior to the earlier of (a) the commencement of the Reorganization Case and (b) the Expiration Date. Upon the commencement of the Reorganization Case, revocation may be effected only with the approval of the Bankruptcy Court. The Debtors reserve the right to amend the terms of the Plan with the consent of the Steering Committee if and to the extent the Debtors determine that such amendments or waivers are necessary or desirable to consummate the transactions contemplated by the Plan. The Debtors also reserve the right to waive certain conditions to the Effectiveness of the Plan, though some such waivers require the consent of other parties. The Debtors will give holders of Claims and Interests notice of such amendments or waivers as may be required by applicable law.

If the Debtors commence the Reorganization Case and file the Plan with the Bankruptcy Court, the Debtors will seek to obtain an order of the Bankruptcy Court finding that the Solicitation was in compliance either with the Securities Act and the Exchange Act and the rules and regulations thereunder or, if otherwise applicable, the provisions of the Code, and therefore, that holders of Claims and Interests that have accepted or rejected the Plan pursuant to the Solicitation are deemed to have accepted or rejected the Plan for purposes of confirmation of the Plan under chapter 11 of the Code. Subject to Bankruptcy Court approval, Ballots that holders execute and deliver to the Acceptance Agent without checking the box entitled "Reject the Plan" in the ballot portion thereof will be deemed to constitute Acceptances of the Plan under section 1126(b) of the Code. Unless the Bankruptcy Court subsequently determines that any Ballots may be revoked, such Ballots will remain in full force and effect until the Bankruptcy Court determines whether such Ballots are deemed to constitute Acceptances or rejections.

### Brief Explanation of Chapter 11

Chapter 11 of the Code is the principal business reorganization chapter of the Code. Under chapter 11 of the Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and stockholders. Upon filing of a petition for reorganization under chapter 11 of the Code, section 362 of the Code generally provides for an automatic stay of all attempts to collect Claims or enforce liens against a debtor or the property of a debtor that arose prior to the commencement of such debtor's reorganization case or that otherwise interfere with the debtor's property.

Confirmation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for treating Claims against, and Interests in, a debtor. A Claim or Interest is impaired under a plan of reorganization if the plan provides that such Claim or Interest will not be repaid in full or that the legal, equitable or contractual rights of the holder of such Claims or Interests are altered. A holder of an impaired Claim or Interest is entitled to vote to accept or reject a plan of reorganization if such Claim or Interest has been allowed under section 502 of the Code. Chapter 11 of the Code does not require each holder of a Claim or Interest to vote in favor of a plan of

reorganization in order for the Bankruptcy Court to confirm the plan. However, the Bankruptcy Court must find that the plan of reorganization meets a number of statutory tests before it may confirm, or approve, the plan of reorganization. Many of these tests are designed to protect the interests of holders of Claims or Interests who do not vote to accept the plan of reorganization but who will nonetheless be bound by the plan's provisions if it is confirmed by the Bankruptcy Court.

### Classification of Claims and Interests

Section 1123 of the Code provides that a plan of reorganization shall classify Claims and Interests. The Plan divides the known Claims of known creditors and the Interests of shareholders into classes and sets forth the treatment offered each class. Section 101(4) of the Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

The Debtors are required under section 1122 of the Code to classify the Claims and Interests into classes that contain Claims and Interests which are substantially similar to the other Claims and Interests in such class. The Debtors believe that they have classified all Claims and Interests in compliance with the provisions of section 1122, but once a chapter 11 case has been commenced, it is possible that a creditor or equity security holder may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, it is the present intent of the Debtors, to the extent permitted by the Code, to make such reasonable modifications of the classification under the Plan, to provide for whatever reasonable classification might be required by the Bankruptcy Court for confirmation, and to use the Acceptances received in the Solicitation for the purpose of obtaining the approval of the class or classes of which the accepting holder is ultimately deemed to be a member. Any such reclassification could adversely affect the class in which such holder was initially a member, or any other class under the Plan, by changing the composition of such class and the vote required of that class for approval of the Plan. Furthermore, a reclassification of Claims or Interests after approval of the Plan could necessitate a resolicitation of Acceptances.

### Acceptance of the Plan

As a condition to confirmation, the Code generally requires that each impaired class of Claims or Interests accept a plan of reorganization. Generally, a Claim or Interest will be "impaired" if the plan of reorganization alters the legal, equitable, or contractual rights to which the holder of such Claim or Interest was otherwise entitled. The Code defines acceptance of a plan of reorganization by a class of claims as acceptance by holders of 66⅔% in dollar amount and a majority in number of the Allowed Claims in that class, but for such purpose counts only those Claims voting to accept or reject a plan. The Code defines acceptance of a plan by a class of Interests as acceptance by holders of 66⅔% of the dollar amount of the allowed interests in that class (excluding interests held by insiders), but for this purpose, counts only those Interests voting to accept or reject the plan. Subject to Bankruptcy Court approval, Ballots or Master Ballots that holders of Claims execute and deliver to the Ballot Agent without checking the box entitled "Reject the Plan" in the ballot portion thereof will be deemed to constitute Acceptances of the Plan under section 1126(b) of the Code. Holders of Claims or Interests who fail to vote on the Plan are not counted for purposes of determining either acceptance or rejection of the Plan by any impaired class of Claims or Interests.

### Management

The executive officers of the Debtors immediately before confirmation of the Plan will continue to serve immediately after confirmation of the Plan. For certain information regarding the current executive officers of the Company and the Partnership, including their status as insiders and their compensation, see "Management." After consummation of the Plan, the Partnership will be managed

by TM/GP. The Board of Directors of TM/GP will be identical to the Board of Directors of Holding, which will be determined by the holders of the Class B Stock and Class C Stock of Holding. See "Description of the TM/GP Certificate of Incorporation" and "Description of the Holding Certificate of Incorporation." As of the date hereof, only four of the five directors to be elected by the Class C Stock have been chosen. On or before the Effective Date, the initial directors to be selected by holders of Class B Stock shall be designated by the Steering Committee. Prior to confirmation of the Plan, in accordance with section 1129(a)(5) of the Code, the Debtors will disclose (i) the identity and affiliations of any other individual, including each member of the TM/GP Board of Directors to be elected by the Class B Stock who is proposed to serve as a director, officer or voting trustee of the Debtors after confirmation of the Plan, and (ii) the identity of any other insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

### Federal Income Tax Considerations

For a discussion of certain federal income tax consequences of the Plan that should be considered by the holders of Old Bonds, see "Certain Federal Income Tax Considerations."

### Risk Factors

For a discussion of certain risk factors concerning the Plan that should be considered by holders of Claims and Interests, see "Risk Factors."

### Modification and Revocation of the Plan

With the consent of the Steering Committee representing Class 4 Claims, the Debtors may seek to amend or modify the Plan under Section 1127 of the Code at any time before the Confirmation Date. The potential impact of any such amendment or modification on the holders of Claims and Interests cannot presently be foreseen, but may include a change in the economic impact of the Plan on some or all of the classes or a change in the relative rights of such classes. If any of the terms of the Plan are amended in a manner determined by the Debtors to constitute a material change, the Debtors will promptly disclose any such amendment in a manner reasonably calculated to inform the holders of Claims adversely affected by such amendment, and the Solicitors will extend the Solicitation period for Ballots for a period the Solicitors in their discretion deem appropriate, depending upon the significance of the amendment and the manner of disclosure to holders of the Old Bonds, if the Solicitation period would otherwise expire during such period. Any such extension shall, prior to the commencement of a reorganization case by the Debtors, be in compliance with the applicable rules and regulations of the SEC including, to the extent applicable, Rule 14e-1 under the Exchange Act.

After the Confirmation Date and prior to substantial consummation of the Plan, the Debtors and any party in interest may, so long as it does not adversely affect the treatment of holders of Claims or Interests under the Plan, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan provided that prior notice of such proceedings is served in accordance with Rules 2002 and 9014.

### Withdrawal of the Plan

The Debtors reserve the right in their sole discretion not to file the Plan, or, if they file the Plan, to withdraw the Plan at any time prior to confirmation, in which case the Plan will be deemed to be null and void. In such event, nothing contained in the Plan will be deemed to constitute a waiver or release of any claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any other person.

### Confirmation of the Plan

If the Requisite Acceptances are received and the Debtors seek to implement the Plan by commencing a case under chapter 11 of the Code, the Debtors will request that the Bankruptcy Court

hold a confirmation hearing as promptly as practicable, upon such notice to parties in interest as is required by the Code and the Bankruptcy Court. Parties in interest. including all holders of Claims and Interests. will receive notice of the date and time fixed by the Bankruptcy Court for the confirmation hearing. The Bankruptcy Court will also establish procedures for the filing and service of objections to confirmation of the Plan.

In order for the Plan to be confirmed. and regardless of whether all impaired classes of Claims and Interests vote to accept the Plan. the Code requires that the Bankruptcy Court determine that the Plan complies with the requirements of section 1129 of the Code. Section 1129 requires for confirmation. among other things. that: (i) the Plan be accepted by the requisite votes of holders of impaired Claims and Interests. except to the extent that confirmation. despite dissent. is available under section 1129(b) of the Code. (ii) the Plan is feasible (that is. there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization) and (iii) the Plan meets the requirements of section 1129(a)(7) of the Code, which requires that with respect to each impaired class. each holder of a Claim or Interest either (a) accepts the Plan or (b) receives at least as much pursuant to the Plan as such holder would receive in a liquidation of the Debtors under chapter 7 of the Code.

Although the Debtors believe that the Plan will meet such tests. as well as the other requirements of section 1129 of the Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See "Risk Factors—Risk of Nonconfirmation of the Plan." Even if the Requisite Acceptances have been obtained prior to the commencement of the Reorganization Case. the Bankruptcy Court may find that the holders of Claims and Interests have not validly accepted the Plan if the Bankruptcy Court finds that this Solicitation did not comply with all of the applicable provisions of the Code. See "Risk Factors—Possible Invalidation of the Solicitation by the Bankruptcy Court." In such an event. the Bankruptcy Court may order the Debtors to resolicit Acceptances. and therefore. confirmation of the Plan would be delayed and possibly jeopardized. Although the Debtors believe that the Solicitation complies with the applicable provisions of the Code and that the Acceptances received will be accepted as votes for the Plan by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### Confirmation Without Acceptance of All Impaired Classes

The Code contains provisions for confirmation of a plan of reorganization even if the plan is not accepted by all impaired classes. as long as at least one impaired class of Claims or Interests has accepted it (excluding insider votes). These provisions for confirmation of the plan despite the non-acceptance of one or more impaired classes of Claims or Interests are set forth in section 1129(b) of the Code.

If an impaired Class of Secured Claims rejects the Plan, the Plan may still be confirmed so long as it provides for either (a) both (i) that the holders of such Claims retain the liens securing such Claims to the extent of the Allowed Amount of such Claims, and (ii) that the holder of such Claim receive deferred cash payments equal to the lessor of (y) the Allowed Amount of such Claim or (z) the value of such holder's Interest in the estate. (b) the sale of the property free and clear of the liens of such secured Claims with such liens attaching to the proceeds of the sale, or (c) the realization by the holders of such secured Claims of the indubitable equivalent of such Claims.

If an impaired Class of Unsecured Claims rejects the Plan, the Plan may still be confirmed so long as it provides (a) for each holder of a Claim included in the rejecting Class to receive or retain on account of that Claim property that has a value. as of the Effective Date. equal to the Allowed Amount of such Claim, or (b) that the holder of any Claim or Interest that is junior to the claims of such Class will not receive or retain any property at all on account of such junior Claim or Interest.

If a class of Interests rejects the Plan, the Plan may still be confirmed so long as it provides (a) for each holder of an Interest included in the rejecting class to receive or retain on account of that Interest property that has a value. as of the Effective Date. equal to the greatest of the Allowed Amount of any fixed liquidation preference to which such holder is entitled. any fixed redemption price to which such holder is entitled. or the value of such Interest. or (b) that the holder of any Interest that is junior to

the Interest of such Class will not receive or retain any property at all under the Plan on account of such junior Interest.

**The Debtors may with the consent of the Steering Committee representing the Class 4 Claims seek to apply section 1129(b) of the Code if the Plan is not accepted by all impaired Classes.**

### Summary of Distributions Under the Plan

The Debtors expect that holders of Old Bonds will receive distributions under the Plan having a value in excess of what otherwise would be available if the assets of the Debtors were liquidated under chapter 7 of the Code. See "Recovery of Impaired Classes from Net Proceeds Available in a Chapter 7 Liquidation." The following summary of distributions under the Plan does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the Plan.

### Trade Creditors

In the context of the Plan, and notwithstanding provisions of the Code that would otherwise require payment of such pre-petition Claims to be deferred until consummation of the Plan, the Partnership intends to seek the approval of the Bankruptcy Court, shortly following commencement of the Reorganization Case, to make payments in the ordinary course of business to holders of trade Claims, who, following commencement of the Reorganization Case, (i) have agreed to provide the Partnership with customary trade terms or to reinstate customary trade terms and (ii) agree that any such payments by the Partnership shall be deemed advances recoverable in cash or in further goods and services, and that such trade Claims may be reinstated if the holders of such trade Claims thereafter unreasonably refuse to continue to provide the Partnership with customary trade terms or to reinstate customary trade terms, in each case, during the Reorganization Case. There can be no assurance, however, that the Bankruptcy Court will permit an early payment to the holders of trade Claims, or, if it does not permit such early payment, that it will permit the payment of any interest when such trade Claims are eventually paid. The Partnership believes that these payments are important to preserving the value of the Taj Mahal.

### Treatment of Employees

Generally, employees are entitled to a priority claim of up to $2,000 for wages earned within 90 days of the commencement of a reorganization case. Under the terms of the Plan, the Debtors intend that salaries or wages, as the case may be, accrued paid vacation, health related benefits, severance benefits and similar employee benefits be unaffected. Employee benefit claims that accrue before the commencement of the chapter 11 case will receive unimpaired treatment under the terms of the Plan. To ensure continuity and to further accommodate the unimpaired treatment of employee benefits, the Debtors intend to seek the approval of the Bankruptcy Court, as soon as practicable following commencement of the Reorganization Case, to honor payroll checks outstanding as of the date of filing (or to issue replacement checks), to permit employees to utilize their paid vacation time which accrued prior to the commencement of the Reorganization Case (so long as they remain employees of the Debtors) and to continue paying medical benefits under the applicable health plans. Employee claims and benefits not paid or honored, as the case may be, prior to consummation of the Plan, will be paid or honored upon consummation of the Plan or as soon thereafter as such payment or other obligation becomes due or performable.

On and after the Effective Date, pursuant to section 1129(a)(13) of the Code, the Debtors will continue to pay all retiree benefits, as that term is defined in section 1114 of the Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114, at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits. The Partnership believes that these payments are important to preserving the value of the Taj Mahal.

**Treatment of Claims and Interests Under the Plan**

The following describes the Plan's classification of those Claims against and Interests in the Debtors and the treatment that the holders of Allowed Claims or Allowed Interests on the Exchange Record Date will receive for such Allowed Claims or Allowed Interests, unless such holders agree to accept less favorable treatment by settlement or otherwise:

*Class 1—Administrative Expense Claims.* Class 1 Claims consist of all Administrative Expense Claims and are not impaired. Each holder of an Allowed Class 1 Claim shall receive cash or property of a value equal to the Allowed Amount of such Claim on or within five Business Days after the first Distribution Date after the date such Claim becomes an Allowed Claim; *provided, however,* that (a) Administrative Expense Claims incurred by the Debtors in the ordinary course of business during the Reorganization Case shall be assumed by the Partnership and paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto; (b) interim payments for Fee Requests may be made in accordance with any order of the Bankruptcy Court; and (c) Allowed Claims in Class 1 based upon Fee Requests shall accrue interest at the Plan Rate on the unpaid portion thereof from the later of the Effective Date and the date such Claim becomes an Allowed Claim to the date of payment.

*Class 2—Tax Claims.* Class 2 Claims consist of all Tax Claims and are not impaired. Each holder of an Allowed Class 2 Claim shall receive cash or property of a value equal to the Allowed Amount of such Claim in full in cash (a) on or within five Business Days after the first Distribution Date after the date such Claim becomes an Allowed Claim, or (b) at the Debtors' option, within six years after the date of assessment of such Claim, with interest thereon at the Plan Rate in the case of such deferred payment.

*Class 3—Priority Claims.* Class 3 Claims consist of all Priority Claims other than Class 1 and Class 2 Claims and are not impaired. Each holder of an Allowed Class 3 Claim shall receive cash or property of a value equal to the Allowed Amount of such Claim on or within five Business Days after the first Distribution Date after the date such Claim becomes an Allowed Claim.

*Class 4—Series A Bond Claims.* Class 4 Claims consist of all Series A Bond Claims and are impaired. Each holder of an Allowed Class 4 Claim shall receive, on or within five Business Days after the first Distribution Date after the date such Claim becomes an Allowed Claim, its Pro Rata share of: (i) $722,250,000 principal amount of New Bonds, plus the amount of New Bonds included in the aggregate Additional Bond Amount; (ii) the Equity Interest; (iii) rights under the Second Realty Mortgage Assignment; (iv) rights under the Purchase Option Assignment; and (v) the aggregate Bond Carryforward Amount and the aggregate Bond Cash Payment (to the extent not theretofore paid).

*Class 5—NatWest Claims.* Class 5 Claims consist of the NatWest Claims and are impaired. The Holder of an Allowed Class 5 Claim shall receive on or within five (5) Business Days after the first Distribution Date after the date such Claim becomes an Allowed Claim (i) rights under the Second Amendment to the NatWest Loan Agreement and (ii) the NatWest Cash Payment and NatWest Carryforward Amount (to the extent not theretofore paid).

*Class 6—First Fidelity Claims.* Class 6 Claims consist of the First Fidelity Claims and are impaired. The holder of an Allowed Class 6 Claim shall receive on or within five (5) Business Days after the first Distribution Date after the date such Claim becomes an Allowed Claim (i) rights under the Amended Lease Assignment; (ii) the Limited Guaranty; (iii) rights under the Services Agreement Assignment; (iv) the Warehouse Mortgage; (v) a first lien on the Trump Pledged Equity; and (vi) the First Fidelity Cash Payment and the First Fidelity Carryforward Amount (to the extent not theretofore paid).

*Class 7—Other Secured Claims.* Class 7 Claims consist of each Secured Claim that is not included in any other Class and are not impaired. The Secured Claims consist primarily of the claims of lessors under capitalized leases. At March 31, 1991, Class 7 Claims totalled approximately $1,561,000. Consistent with Section 1124 of the Code, each holder of an Allowed Class 7 Claim shall be treated at the sole option of the applicable Reorganized Debtor, exercised on or within five Business Days after the first Distribution Date after the date such Claim becomes an Allowed Claim, pursuant to any of the following alternatives: (i) such Reorganized Debtor shall execute a written undertaking in favor of the holder of such Claim, whereby such Reorganized Debtor assumes such Claim and leaves unaltered such

holder's legal, equitable and contractural rights with respect to such Claim. or (ii) notwithstanding any contractural provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, such Reorganized Debtor shall (1) cure any such default that occurred before or after the Filing Date, other than a default of a kind specified in section 365(b)(2) of the Code, (2) reinstate the maturity of such Claim as such maturity existed before such default, (3) compensate the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractural provision or such applicable law, and (4) execute a written undertaking in favor of such holder, whereby such Reorganized Debtor assumes such Claim and, except as permitted in clauses (1), (2) and (3) hereof, does not otherwise alter the legal, equitable or contractual rights of such holder with respect to such Claim, or (iii) such Reorganized Debtor shall pay cash equal to the Allowed Amount of such holder's Class 7 Claim. Notwithstanding the foregoing, the Reorganized Debtors, at their sole discretion, may elect, at any time prior to the Confirmation Date, to distribute to the holder of a Class 7 Claim the property securing such holder's Claim, in which event such holder shall be entitled within 30 days of such election to file a proof of claim for any deficiency.

*Class 8—Unsecured Claims.* Class 8 Claims consist of all Unsecured Claims and are not impaired. The Class 8 Claims consist of all unsecured claims against the Debtors other than those specifically dealt with in another class and are comprised primarily of the claims of subcontractors who provided goods or services in the construction of the Taj Mahal who are not parties to the Subcontractors Agreement. At March 31, 1991, these claims of subcontractors totalled approximately $5,658,000. The Debtors are presently unable to quantify all the Class 8 Claims. Each holder of an Allowed Class 8 Claim shall receive cash or property of a value equal to the Allowed Amount of such holder's Class 8 Claim on or within five Business Days after the first Distribution Date after the date such Claim becomes an Allowed Claim.

*Class 9—Fraudulent Conveyance Claims.* Class 9 Claims consist of the Fraudulent Conveyance Claims and are not impaired. These claims are more fully described under "Business—Legal Proceedings—Fraudulent Conveyance Matters." The Debtors are presently unable to quantify these claims. Each holder of an Allowed Class 9 Claim shall receive cash or property of a value equal to the Allowed Amount of such holder's Class 9 Claim on or within five Business Days after the first Distribution Date after the date such Claim becomes an Allowed Claim.

*Class 10—Subcontractors' Claims.* Class 10 Claims consist of the Subcontractors' Claims and are impaired. Each holder of an Allowed Class 10 Claim shall receive its Pro Rata share of Class 4 distributions in respect of the $20,000,000 in principal amount of Old Bonds held by the Subcontractors' nominee on or within five Business Days after the first Distribution Date after the date such Claim becomes an Allowed Claim.

*Class 11—Class Action Claims.* Class 11 Claims consist of all Class Action Claims and are not impaired. These claims are more fully described under "Business—Legal Proceedings—Bondholder Litigation." The Debtors are presently unable to quantify these claims. Each holder of an Allowed Class 11 Claim shall receive cash or property of a value equal to the Allowed Amount of such holder's Class 11 Claim on or within five Business Days after the first Distribution Date after the date such Claim becomes an Allowed Claim.

*Class 12—Trump Line of Credit Claims.* Class 12 Claims consist of Trump Line of Credit Claims and are impaired. Donald J. Trump, the holder of the Trump Line of Credit Claims, will not retain any property or receive any distribution under the Plan. Pursuant to the Plan, the New Line of Credit Note will be issued to Bankers Trust, which may grant participations therein to other banks. Bankers Trust and other banks currently hold the Trump Line of Credit Note as security for certain indebtedness owed to them by Donald J. Trump.

*Class 13—Management Agreement Claims.* Class 13 Claims consist of Management Agreement Claims and are impaired. The holder of the Allowed Class 13 Claim will not retain any property or receive any distribution under the Plan.

*Class 14—Claims Based Upon Rejection of Executory Contracts.* Class 14 Claims consist of all Claims Against the Debtors resulting from the rejection of executory contracts pursuant to section 365

of the Code and are not impaired. The Debtors have not finally determined which contracts they will assume and which contracts they will reject. As a consequence, the Debtors are presently unable to quantify these claims. Each holder of an Allowed Class 14 Claim shall receive cash or property of a value equal to the Allowed Amount of such holder's Class 14 Claim on or within five Business Days after the first Distribution Date after the date such Claim becomes an Allowed Claim.

*Class 15—TTMF's Common Stock Interests.* Class 15 Interests consist of all of TTMF's Common Stock Interests and are not impaired. Each holder of an Allowed Class 15 Interest shall retain such Interest and any certificates evidencing such Interest.

*Class 16—Partnership Interests.* Class 16 Interests consist of all Partnership Interests and are impaired. Each holder of an Allowed Class 16 Interest shall retain such Interest and any certificates evidencing such Interest, and such Interest shall be reduced as a result of the issuance by the Partnership of the Equity Interest.

*Class 17—TTMI's Common Stock Interests.* Class 17 Interests consist of TTMI's Common Stock Interests and are not impaired. Each holder of an Allowed Class 17 Interest shall retain such Interest and any certificates evidencing such Interest.

*Class 18—Trump Corp.'s Common Stock Interest.* Class 18 Interests consist of Trump Corp.'s Common Stock Interests and are impaired. The holder of the Allowed Class 18 Interest shall retain one-half of such Interest and any certificates evidencing such Interest, and shall contribute the remaining one-half of such Interest to Holding in exchange for the Class C Stock.

### Feasibility and Best Interest Tests; Liquidation Value

The Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors (the "Feasibility Test"). For the Plan to meet the Feasibility Test, the Bankruptcy Court must find that the Debtors will possess the resources and working capital necessary to operate profitably and will be able to meet their obligations under the Plan.

The Solicitors believe that following confirmation of the Plan, the reduced debt service will allow them to continue to perform their obligations under the Plan and to operate their business without the need for further financial reorganizaiton. See the Financial Forecast attached to this Prospectus as Annex B. Each holder of a Claim or Interest in an impaired Class must either (i) accept the Plan or (ii) receive or retain under the Plan cash or property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Code. If necessary, the Bankruptcy Court will determine whether the cash and values of securities issued under the Plan to each Class equals or exceeds the value that would be allocated to such Class in a liquidation under chapter 7 of the Code (the "Best Interest Test").

To calculate what holders of each impaired class of Claims and Interests would receive if the Debtors were liquidated under chapter 7 of the Code, the Bankruptcy Court must determine the "liquidation value" of the Debtors, which would consist primarily of the proceeds from a forced sale of the Debtors' assets by a chapter 7 trustee. The proceeds from a chapter 7 liquidation that would be available to all Unsecured Claims would be reduced by, first, the secured Claims to the extent of the value of their collateral, by the costs and expenses of liquidation, and by other administrative expenses and costs of the chapter 7 case. Costs of liquidation under chapter 7 of the Code would include the fees of a trustee, and of counsel and other professionals (including financial advisors and accountants) retained by the trustee, asset disposition expenses, litigation costs, and claims arising from the operations of the Debtors' business during the chapter 7 case. The liquidation itself could trigger certain Priority Claims, such as Claims for severance pay, and could accelerate other priority payments that otherwise would be due in the ordinary course of business. Those Priority Claims would be paid in full out of the liquidation proceeds before the balance would be made available to pay all unsecured Claims or to make any distributions in respect of Interests.

In liquidation, distinctions among classes of Unsecured Claims are generally eliminated, although contractual subordination of certain Unsecured Claims to others is to be given effect pursuant to section 510(a) of the Code. In applying section 1129(a)(7) of the Code, the Bankruptcy Court ascertains the hypothetical recoveries in a chapter 7 liquidation to secured creditors, priority claimants, general

unsecured creditors. and Interest holders. The court then compares these hypothetical chapter 7 liquidation recoveries with the distributions offered to each class of Claims or Interests under the proposed plan of reorganization to determine if the Plan satisfies the test set forth in section 1129(a)(7) of the Code.

To the extent that confirmation of the Plan requires the valuation of the estate of the Debtors and the Claims against and Interests in the Debtors for the chapter 7 liquidation of the Debtors. funds available to pay Claims, and securities to be distributed under the Plan. the Bankruptcy Court will make those rulings. Accordingly. the following chapter 7 liquidation analysis is provided solely to disclose to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors. subject to the assumptions set forth below. There can be no assurance that such assumptions would be made or accepted by the Bankruptcy Court. However. as set forth in the following chapter 7 liquidation analysis. the Debtors believe. based on the assumptions set forth herein. that the members of each class of impaired Claims or Interests will receive more in the Plan than they would in a chapter 7 liquidation. The chapter 7 liquidation analysis was materially completed on or about February 27. 1991. The Debtors are not aware of any events subsequent to such date which would materially impact the chapter 7 liquidation analysis.

The Solicitors believe that the Plan meets the requirements of section 1129(a)(7) of the Code because each holder of a Claim or Interest impaired under the Plan will have accepted the Plan or will recover at least as much under the Plan as in a chapter 7 liquidation of the Debtors.

## Chapter 7 Liquidation Analysis

The following liquidation analysis was prepared by the Debtors in accordance with the requirements of the Bankruptcy Code. With respect to property and equipment. which are the Debtors' principal assets and which represent approximately 91% of liquidation proceeds. the Debtors consulted with its Financial Advisor but did not request or obtain a study or valuation of the property and equipment.

| | (Dollars in thousands) |
|---|---|
| Calculation of Net Proceeds Available in Chapter 7 Liquidation for Payment to Holders of All Unsecured Claims | |
| Gross proceeds from liquidation of casino. hotel and other assets . . . . . . | $423.088 (1) |
| Less chapter 7 liquidation costs—Trustee and professional fees . . . . . . . . | (11.946)(2) |
| Other administrative costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (24.900)(3) |
| Net liquidation proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $386.242 |
| Allocation to Net Liquidation Proceeds | |
| Secured claims: | |
| Claim amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $835.313 (4) |
| Net liquidation value of collateral . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $363.723 |
| Deficit on secured claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ($471.590) |
| Chapter 11 administrative claims: | |
| Claim amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 33.175 (5) |
| Net liquidation value of uncollateralized assets . . . . . . . . . . . . . . . . . . . . | 22.519 |
| Deficit on chapter 11 administrative claims . . . . . . . . . . . . . . . . . . . . . . . | ($ 10.656) |
| Net proceeds available for distribution to all priority unsecured. general unsecured and undersecured creditors . . . . . . . . . . . . . . . . . . | $ — |

The following footnotes set forth the basis for the assumptions and the methodology employed in the preceding chapter 7 liquidation analysis. The chapter 7 liquidation of all assets of the Debtors are assumed to have been commenced on October 15, 1991 and completed within one year. The liquidation values of these assets are based on the following assumptions:

Liquidation would occur under the direction of a court-appointed trustee in the context of a chapter 7 proceeding. It is further assumed that the trustee would attempt to consummate all sales
*(footnotes continued on next page)*

*(footnotes continued from previous page)*

within 12 months after his appointment and that the pressures to liquidate quickly would severely limit the likely range of potential buyers of the Debtors' assets.

Due to existing regulations of the CCC, the Partnership would be forced to discontinue casino operations upon conversion to chapter 7. The chapter 7 trustee would immediately commence proceedings to sell the facilities.

Any purchaser of the Taj Mahal in a liquidation would have to be licensed under the Casino Control Act by the CCC.

The name recognition and reputation of the properties would be tarnished by the shut down of operations and forced sale.

(1) Based on the foregoing assumptions, the Debtors have assumed that the sources of the liquidation proceeds would be as follows:

|  | Liquidation Proceeds |
| --- | --- |
| Cash | $ 22,746 |
| Accounts receivable and inventory | 15,342 |
| Property and equipment | 385,000 |
|  | $423,088 |

In determining the liquidation values of its assets, the Debtors have taken into account their internal assessment of such assets and the likely net realizable liquidation value of such assets, in light of the above assumptions as follows:

Cash—Assumed to be realized at full value.

Accounts receivable and inventory—Based on the Debtors' best estimate of the liquidation value of the individual elements comprising these balances. The Debtors estimate that they would be able to collect a significant portion of the accounts receivable (approximately 88%) but that only a small portion of the inventory balance would be recovered (approximately 18%) due to the perishable nature of food and beverage inventories and the fact that certain other inventories bear the property logo.

Property and equipment—The Debtors concluded that the highest value it could reasonably assign to all net fixed assets in the liquidation analysis, taking into consideration the numerous assumptions above, was three and a half times EBITDA for the twelve months ending July 31, 1992. This represents a discount from carrying value for the reasons set forth above.

Holders of Claims should note that determining the hypothetical proceeds from asset sales that would be realized in liquidation is an uncertain process involving numerous underlying assumptions, and there can be no assurance that the assumptions employed by management in determining the liquidation value of its assets results in an accurate estimation of such liquidation values.

(2) The fees of the chapter 7 trustee and the various professionals employed by the chapter 7 trustee (including, without limitation, attorneys, accountants, investment bankers, brokers, or other agents) is estimated at $11,900,000. This amount represents approximately 3% of the total liquidation value of the Debtors' assets.

(3) The $24,900,000 of other administrative costs represents real estate taxes, payroll costs, utilities, insurance and repairs and maintenance incurred during the liquidation period.

(4) It is assumed that the total outstanding secured debt at the commencement of the Debtors' Reorganization Case would be approximately $835,313,000 and that interest would not accrue on such debt during the time the Reorganization Case is pending. Under section 506(a) of the Code, interest accruing after the commencement of the Reorganization Case is included in an Allowed Secured Claim up to the excess of the value of the collateral securing such Claim over the principal amount of such Secured Claim. Because the value of the collateral is less than the Secured Claims,

*(footnotes continued on next page)*

*(footnotes continued from previous page)*

no interest will accrue upon the commencement of a Reorganization Case. Secured Claims are assumed to be paid to the extent of liquidation proceeds of underlying collateral, less applicable costs of liquidation (see notes 2 and 3).

(5) Chapter 11 administration claims represent costs incurred during the time the Reorganization Case is pending that remain to be paid at the time of conversion to chapter 7.

### Hypothetical Recovery of Impaired Classes from Net Proceeds Available in a Chapter 7 Liquidation

| Class | | Claim | Hypothetical Liquidation Recovery | |
|---|---|---|---|---|
| Class 4 | Series A Bond Claims | $785,249 | $340,707 | 43.4% |
| Class 5 | NatWest Claims | 48,503 | 22,442 | 46.3 |
| Class 6 | First Fidelity Claims | 10,000 | 0 | |
| Class 10 | Subcontractors' Claims | 38,400 | 0 | |
| Class 12 | Trump Line of Credit Claims | 27,188 | 0 | |
| Class 13 | Management Agreement Claims | N/A | 0 | |
| Class 16 | Partnership Interests | N/A | 0 | |
| Class 18 | Trump Corp.'s Common Stock Interests | N/A | 0 | |

## Other Provisions of the Plan

### Means for Executing the Plan

*New Securities.* On the Effective Date, the Indenture, the Amended Mortgage and the Note will be executed, the Company will issue $722,250,000 in principal amount of New Bonds and the New Bonds included in the Additional Bond Amount to holders of Allowed Claims in Class 4, and the Partnership will issue the Equity Interest to the holders of Allowed Claims in Class 4. Such holders or their nominee will transfer the Equity Interest to Holding in exchange for 1,350,000 shares of Class A Stock and 722,250 shares of Class B Stock and one share of Class B Stock for each $1,000 principal amount of the Additional Bond Amount, which shares of Class B Stock together with the New Bonds will constitute 722,250 Units, plus additional Units equal to the Additional Bond Amount. The Old Bonds and the Partnership Note will be cancelled. Holding will issue 1,350,000 shares of Class C Stock to Donald J. Trump in exchange for one-half of the issued and outstanding capital stock of Trump Corp.

*Agreements.* On the Effective Date, TM/GP, Trump Corp. and TTMI will execute the Amended Partnership Agreement; the Partnership, the Company and the Trustee shall execute the Indenture; NatWest, First Fidelity, Bankers Trust, the Trustee and the Partnership will execute the Intercreditor Agreement; the Partnership and Donald J. Trump will execute the Services Agreement and the Amended License Agreement; Donald J. Trump and First Fidelity shall execute the Services Agreement Assignment; TTMI shall execute the New Line of Credit Note; the Construction Fee Deferral Note will be cancelled and the Partnership's liability thereunder will be extinguished; the Management Agreement and all amounts due thereunder will be cancelled; NatWest and the Partnership will execute the Amended NatWest Agreement; the Partnership and Realty Corp. will execute the Amended Lease; Realty Corp. and First Fidelity will execute the Amended First Fidelity Agreement and Amended Lease Assignment; the Partnership will execute the Limited Guaranty; Realty Corp. will execute the Second Realty Mortgage and the Warehouse Mortgage; Realty Corp. and the Trustee will execute the Purchase Option and the Purchase Option Assignment; and the Partnership and First Fidelity and its affiliates shall execute the Amended and Restated First Fidelity Letters of Credit and Donald J. Trump shall execute a lien on the Trump Pledged Equity in favor of First Fidelity.

*Special Trust Account.* The Partnership, the Company and the Trustee will enter into a Trust Agreement on or about the date that the Plan is filed in bankruptcy court. Pursuant to the Trust Agreement, the Partnership and the Company will make periodic deposits of the Pre-Effective Deposit Requirement and, if necessary, the Post-Effective Deposit Requirement to the Trustee.

On the Effective Date, the Trustee will disburse from a separate trust account to the holders of Old Bonds as of the Effective Date of the Plan, the Bond Cash Payment and the Bond Carryforward Amount. If the Effective Date does not occur before November 15, 1991, a distribution will nevertheless be made in the amount of the Bond Cash Payment accrued to November 15, 1991, and the Bond Carryforward Amount and the Pre-Effective Deposit Requirement will continue to accrue. The Post-Effective Deposit Requirement will be held for application of the interest due and payable on the New Bonds on the initial interest payment date for the New Bonds, anticipated to be on or about November 15, 1991. The Trustee shall also receive monthly deposits from the Partnership to be applied to the payment of amounts owed to First Fidelity, NatWest and the fees of the financial and legal advisors to the Steering Committee.

*Purchase of Old Bonds in Respect of Subcontractor Payment.* Before the Confirmation Date, the Partnership shall provide to the nominee of the Subcontractors funds which, at the direction of the Subcontractors, shall be used to purchase $20,000,000 in principal amount of Old Bonds. The nominee of the Subcontractors shall hold such Old Bonds until the Effective Date, at which time such nominee will exchange the Old Bonds on behalf of the Subcontractors' Claims, and each such Subcontractor will receive, in respect of his Claims, a distribution equal to his pro rata share of the distributions to which $20,000,000 in principal amount of Old Bonds would be entitled as Class 4 Claims. The nominee of the Subcontractors shall transfer to the Partnership all the certificates that evidenced the $20,000,000 in principal amount of Old Bonds purchased by the nominee of the Subcontractors.

*Manner of Payments Under the Plan.* At the option of the respective Debtor, any cash payment to be made by a Debtor pursuant to the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

*Surrender of Instruments and Release of Liens.* Except as otherwise provided in the Plan, each holder of an instrument evidencing an Allowed Claim Against or Interest in the Debtors shall surrender such instrument to the Debtors and the Debtors shall distribute to the holder thereof the distributions provided for. No distribution provided for in the Plan shall be made to or on behalf of any holder of such Claim or Interest unless and until such instrument is received or the non-availability of such instrument is established to the reasonable satisfaction of the Debtors. Each Person who is to receive distributions pursuant to the Plan in complete satisfaction of a Secured Claim shall not receive such distributions until such Person executes the release of its liens (in recordable form if appropriate) and delivers the release to the Debtors. Any such holder that fails to surrender such instrument or satisfactorily explain its non-availability or execute such release of liens within one year of the Effective Date shall be deemed to have no further Claim Against or Interest in the Debtors and shall not participate in any distribution provided for in the Plan.

*Certificates of Incorporation.* Each Debtor that is a corporation will amend its certificate of incorporation to the extent necessary to comply with section 1123(a)(6) of the Code.

*Fractional Securities.* The New Bonds will be issued in denominations of $1,000 and integral multiples thereof. All fractional amounts of New Bonds otherwise issuable will be issued to the Partnership as agent for the holders of the Old Bonds and sold in the open market as soon as practicable after the Effective Date. Each holder otherwise entitled to an amount of New Bonds that is not an integral multiple of $1,000 will receive a payment in cash in lieu of such fractional principal amount equal to such holder's proportionate interest in the proceeds of sales of all such fractional amounts in the open market, net of the costs of effecting such sales.

*Waivers and Rescissions.* Except as otherwise provided in the Plan or in the Confirmation Order, Confirmation shall operate as a waiver of all Defaults and Events of Default under the Old Indenture, and as a rescission and annulment of any notices of any such Defaults or Events of Default or any acceleration that has been declared with respect to any of such Events of Default through the Effective Date.

## Disputed Claims and Interests and Reserves

*Reserves for Disputed Claims and Disputed Interests.* On or as soon as practicable after each Distribution Date, the Reorganized Debtors shall reserve for the account of each holder of a Disputed Claim or Disputed Interest, what the Reorganized Debtors estimate to be the property that would be distributable to such holder on such Distribution Date in accordance with the Plan if such Disputed

Claim or Disputed Interest were an Allowed Claim or Allowed Interest. In the event, and to the extent, such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest, the property so reserved for the holder thereof, together with any investment earnings attributable thereto, shall be distributed to such holder pursuant to the Plan. Property reserved shall be set aside, segregated and, to the extent practicable, held in interest bearing deposits or certificates of deposit of banks and trust companies having an aggregate capital and surplus in excess of $100,000,000 or such other investments as shall be consistent with section 345 of the Code, giving due regard for the Reorganized Debtors' need for such monies as Disputed Claims and Disputed Interests become Allowed Claims and Allowed Interests. Any amounts reserved for Allowed Claims or Allowed Interests in a Class after all Allowed Claims or Allowed Interests in such Class have received the distributions to which they are entitled under the Plan shall revert to the Debtors or Reorganized Debtors, as the case may be.

*Fluctuation in Value of Securities.* The market value of securities held in reserve may fluctuate. The Debtors and Reorganized Debtors do not represent or warrant that the value of any such securities will not decline after the Effective Date or otherwise assume any risk of loss that the holder of a Disputed Claim or Interest that becomes an Allowed Claim or Interest after the Effective Date may suffer by reason of any decline in value of a reserved security pending determination of the Allowed Amount of such Disputed Claim or Interest. The risk or benefit of any appreciation or depreciation in the value of any reserved securities shall be borne by the party to whom such security is ultimately distributed.

## Conditions Precedent

*Conditions to Confirmation.* The following are conditions precedent to Confirmation of the Plan: (a) receipt and continued validity of the Bank Consents; (b) receipt and continued validity of the necessary approval of the CCC; (c) agreement between the Steering Committee and the Partnership establishing the 1991 Budget for the Partnership or if agreement cannot be reached, entry of an Order establishing the 1991 Budget for the Partnership; (d) entry of the Confirmation Order in a form satisfactory to the Debtors and the Steering Committee; (e) the settlement or other resolution, of the Fraudulent Conveyance Claims for a cash payment by the Partnership of not more than $3,000,000; (f) settlement or other resolution of the Class Action Claims on terms no worse for defendants than those contained in Schedule I to the Plan, and for not more than $3,000,000 in cash from the Partnership; (g) ownership by the nominee of the Subcontractors of at least $20,000,000 in principal amount of Old Bonds; and (h) Class 4 Claims, Class 5 Claims and Class 6 Claims shall have become Allowed Claims.

*Condition to Effectiveness.* The following are conditions precedent to the occurrence of the Effective Date: (a) satisfaction or waiver of the conditions to Confirmation set forth above; (b) no court shall have entered an order staying enforcement of the Confirmation Order; (c) the Confirmation Order shall have become a Final Order; and (d) execution and delivery of (i) the Indenture (ii) the Amended Mortgage (and recording thereof), (iii) the Note, (iv) the Amended NatWest Agreement, (v) the Amended First Fidelity Agreement, (vi) the Intercreditor Agreement, (vii) the Services Agreement, (viii) the New Line of Credit Note, (ix) the Senior Line of Credit, (x) the Working Capital Facility, (xi) the Standby Letter of Credit, (xii) the Amended License Agreement, (xiii) the Amended Lease, (xiv) the Amended Lease Assignment, (xv) the Limited Guaranty, (xvi) the Second Realty Mortgage and Second Realty Mortgage Assignment, (xvii) the Purchase Option and Purchase Option Assignment, (xviii) the Amended Partnership Agreement, (xix) the Amended and Restated First Fidelity Letters of Credit, (xx) the Services Agreement Assignment, (xxi) the Warehouse Mortgage (xxii) the lien on the Trump Pledged Equity in favor of First Fidelity, (xxiii) the filing of the Holding and TM/GP Amended and Restated Certificates of Incorporation; and (xxiv) the adoption of the Holding and TM/GP Amended and Restated By-laws.

*Waiver of Conditions.* With the written consent of the Steering Committee representing Class 4 Claims, the Debtors may, but are not required to, waive at any time, without notice, without leave of or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan, any condition precedent to confirmation or effectiveness of the Plan except that the condition that the Confirmation Order shall have become a Final Order must be waived absent the unanimous consent of the Debtors, the Steering Committee, First Fidelity and NatWest. The conditions requiring the receipt of the Bank Consents, the approval of the CCC, the execution of the new agreements and that the Claims in Classes 4, 5 and 6 have become Allowed Claims may not be waived.

## Effects of Plan Confirmation

*Discharge.* Except as otherwise expressly provided in the Plan. the confirmation of the Plan shall (i) bind all holders of Claims and Interests, whether or not they accept the Plan and (ii) discharge the Debtors from any Claim and any "debt" (as that term is defined in section 101(11) of the Code) incurred before the Confirmation Date, and the Debtors' liability in respect thereof shall be extinguished completely, including. without limitation, any liability of a kind specified in section 502(g) of the Code. In addition. except as otherwise provided in the Plan. confirmation of the Plan pursuant to the Confirmation Order acts as a discharge, effective as of the Confirmation Date, as to each creditor or interest holder in respect of any direct or indirect right or Claim or Interest such creditor or interest holder had or may have had against or in the Debtor that arose at any time prior to confirmation. including, but not limited to, all principal and interest, whether accrued before, on. or after the Filing Date.

*Revesting.* On the Confirmation Date, the Debtors will be vested with all of the property of the estate free and clear of all claims. liens, encumbrances, charges and other interests of holders of Claims and Interests except as provided in the Plan. and may operate their businesses free of any restrictions imposed by the Code or by the Bankruptcy Court.

*Retention of Jurisdiction.* Notwithstanding entry of the Confirmation Order or the Effective Date having occurred, the Bankruptcy Court will retain jurisdiction (a) to determine the Allowed Amount of Disputed Claims. (b) to determine requests for payment of Claims entitled to priority under section 507(a)(1) of the Code. including compensation of and reimbursement of expenses of parties entitled thereto. (c) to resolve controversies and disputes regarding interpretation and implementation of the Plan. (d) to enter orders in aid of the Plan. including, without limitation, appropriate orders (which may include contempt or other sanctions) to protect the Debtors and Reorganized Debtors. (e) to modify the Plan or remedy any apparent defect or omission in the Plan. (f) to determine any and all applications. claims. adversary proceedings and contested or litigated matters pending on the Confirmation Date or as timely filed pursuant to the Code or an order of the Bankruptcy Court, (g) to allow, disallow. estimate. liquidate or determine any Claim (including, without limitation. Class 9 Claims) and to enter or enforce any order requiring the filing of any such Claim before a particular date, (h) to determine any and all pending applications for the rejection or disaffirmance of executory contracts or leases, or for the assignment of assumed executory contracts and leases, and to hear and determine. and if need be to liquidate. any and all Claims arising therefrom. (i) to enter a final decree closing the Reorganization Case. and (j) to determine such other matters that may arise in connection with these Chapter 11 Cases, the Plan or the Confirmation Order.

## Miscellaneous Plan Provisions

*Executory Contracts and Leases.* Subject to the requirements of section 365 of the Code. all executory contracts or unexpired leases of the Debtors that have not been rejected by order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Effective Date shall be deemed assumed by the Debtor that is a party to such contract or lease on the Effective Date. Notwithstanding the foregoing, the Series A Bondholder Expense Agreement shall be assumed by the Partnership. subject to the occurrence of the Effective Date. Except as otherwise provided for in the Plan, all payments to cure defaults that may be required by section 365(b)(1) of the Code shall be made by the Debtor that is a party to the assumed contract or lease as an Administrative Expense Claim. In the event of a dispute regarding the amount of any such payments or the ability of the obligated Debtor to provide adequate assurance of future performance, such Debtor will make any payments required by section 365(b)(1) of the Code after the entry of a Final Order resolving such dispute. Any proofs of claim with respect to Claims arising out of the rejection of contracts or leases must be filed with the Bankruptcy Court within 30 days from and after the Bankruptcy Court enters an order approving such rejection or such Claims shall be barred.

*Unclaimed Cash or Securities.* If any Person entitled to receive cash or securities under the Plan cannot be located, or has not provided the Debtors with the documents required by the Plan within two years after the Effective Date, such cash or securities and accrued interest or dividends thereon will become the property of and shall be released to the Partnership. Nothing contained in the Plan shall require any of the Debtors or Reorganized Debtors to attempt to locate any such Person.

## BACKGROUND OF THE SOLICITATION

*Bondholder Committee.* In September 1990. a large group of institutional holders of the Old Bonds informally met to discuss the financial condition of the Taj Mahal and the possibility that the Company and Partnership would need financial relief. From this group of institutions. a Steering Committee was formed consisting of ten institutional holders of the Old Bonds which collectively hold approximately 36% in principal amount of the Old Bonds. The members of the Steering Committee are Loews Corporation. Caywood Christian Capital Management. Cypress Capital Management Inc.. Executive Life Insurance Company. First Capital Holdings Corp.. OTA Inc.. Massachusetts Financial Services Company. Manufacturers Life Insurance Company. and Presidential Life Insurance Company. Each of such members intends to vote to accept the Plan.

The Steering Committee retained Rothschild Inc. ("Rothschild") as its financial advisor and Berlack. Israels & Liberman as its legal advisor. As is customary in transactions of this kind. the Company and Partnership agreed to pay the reasonable fees and expenses of these advisors for their work done on behalf of the Steering Committee.

The Partnership entered into a letter agreement. dated as of September 1. 1990. with Rothschild pursuant to which. among other things. the Partnership agreed to pay to Rothschild certain fees in consideration of Rothschild's agreement to render financial advisory services on behalf of the Steering Committee in connection with any restructuring of the Partnership's and the Company's indebtedness. As compensation for its services. the Partnership and the Company agreed to pay Rothschild $130.000 per month plus certain out-of-pocket expenses (excluding attorney's fees) during the term of the agreement. Upon the conclusion of a successful "restructuring". which for the purpose of the agreement means a completed out-of-court exchange offer for the Old Bonds or a confirmed plan of reorganization under chapter 11 of the Code. acceptances of which were solicited pursuant to section 1126(b) of the Code. the Company and the Partnership agreed to consider paying a reasonable success fee in addition to all other compensation paid to Rothschild under the agreement. In addition. the Company and the Partnership agreed to reimburse Rothschild for certain of Rothschild's reasonable out-of-pocket expenses incurred prior or subsequent to September 1. 1990 in connection with its engagement as financial advisor. Out-of-pocket expenses exclude fees and expenses of Rothschild's counsel otherwise payable by the Company or the Partnership. Through April 30, 1991. the Partnership has paid $1.170.000 to Rothschild in respect of such arrangements.

The Partnership and the Company also agreed to hold harmless Rothschild and its affiliates and each of their respective officers. directors. employees and agents to the full extent lawful. from and against any losses. claims. damages or liabilities (or actions. including shareholder actions. in respect thereof) related to or arising out of Rothschild's engagement; provided. however. that the Company and the Partnership will not be responsible for any claims. liabilities. losses. damages or expenses which are finally judicially determined to have resulted primarily from such indemnified party's willful misconduct or gross negligence.

In addition. on September 26, 1990, the Company and the Partnership executed an agreement with the law firm of Berlack, Israels & Liberman pursuant to which they agreed to pay the reasonable legal fees and expenses of such law firm in connection with such law firm's representation of the Steering Committee. As compensation for its services. the Company and the Partnership agreed to provide Berlack. Israels & Liberman with an initial retainer of $200,000 to be applied against fees and expenses to be incurred in connection with such law firm's representation of the Steering Committee. The Company and the Partnership will not. however. pay for any fees and expenses incurred for any work in connection with any claim against the Company and the Partnership. any of its or their affiliates. any of its or their advisors or any of its or their directors, officers, employees or agents, except in connection with any possible reorganization of the Company or the Partnership, any proceedings before the CCC or any actions or proceedings instituted by Steering Committee members or the Trustee relating to the validity. legality or enforceability of the Old Bonds or the Old Indenture. Through April 30, 1991. the Partnership has paid $900.000 to Berlack. Israels & Liberman in respect of such arrangements.

The Steering Committee's advisors embarked upon an extensive due diligence investigation of the Company and the Partnership and their legal and financial affairs. The primary purpose of this

investigation was to assist the advisors in understanding the historical. current and projected financial and legal status of the Company and the Partnership and to enable them to recommend to the Steering Committee an appropriate framework for a restructuring.

Following the completion of their due deligence work. the advisors reported to the Steering Committee regarding their findings and conclusions. Based thereon. the Steering Committee began meeting with representatives of the Company and the Partnership regarding a restructuring of the Old Bonds.

*Certain Communications.* On September 27, 1990, the Partnership and certain members of its management met with the Steering Committee to discuss the Taj Mahal and its prospects. At such meeting. the Partnership outlined to the Steering Committee the general terms of a restructuring of its indebtedness that it was considering. The transaction so outlined (the "September 27 Proposal") involved the following: (i) amending the Old Bond terms to provide for the payment of cash interest thereon at the rate of 5% per annum for three years and 14% per annum thereafter; (ii) changing the Interest Payment Dates on the Old Bonds to March 15 and September 15 and changing the final maturity thereof to 1997; (iii) causing an affiliate of the Partnership to issue its zero coupon convertible notes to consenting holders of Old Bonds in the face amount of $75 million (the "Convertible Notes"). The amended Old Bonds and the Convertible Notes would be subject to mandatory redemption from the Partnership's "excess cash flow" and callable by the issuer, at par. at any time with the Partnership and the Company having the right to purchase such amended Old Bonds in the open market and use the principal amount thereof to satisfy this mandatory redemption obligation. The amended Old Bonds would also be redeemable. The Convertible Notes would be convertible at the option of the holders thereof on the fifth anniversary of their issuance. unless theretofore redeemed, into a 15% preferred Partnership interest in the Partnership's affiliate. If not so converted. the Convertible Notes would bear 14% per annum payable in cash with a maturity in 2000. At the September 27, 1990 meeting. and on September 28. 1990 the Partnership was informed that the proposal was unacceptable. In such letter. counsel to the Steering Committee also apprised the Partnership of its intention to develop its own restructuring proposal.

On October 3. 1990. the Partnership received a counter-proposal from the Steering Committee. which included. among other things: (i) a partial cash payment of interest due on the Old Bonds through November 1992. with all subsequent payments to be made in cash; (ii) a non-cash payment of interest not paid in cash through the issuance of a "pay in kind" security; and (iii) the holders of Old Bonds acquiring 85% of the equity of the Partnership and having the right to elect a majority of the members of its governing body. The counter-proposal also required the Partnership to substantially alter the Subcontractors Agreement and to reschedule its bank indebtedness. In addition. Donald J. Trump was requested to cancel the amounts owed to him in respect of advances made under the Trump Line of Credit. The counter-proposal also provided that the Old Bonds be redeemed. at par. prior to maturity from "excess cash flow" and that the purchase of the Old Bonds in the open market (to satisfy such redemption obligation) be prohibited.

On October 5, 1990, Donald J. Trump and a member of the Partnership's management met with representatives of the Steering Committee to discuss the September 27 Proposal and the counter-proposal, which was rejected by the Partnership.

On October 11, 1990, a member of the Partnership's management again met with representatives of the Steering Committee and outlined a different restructuring proposal. By letter dated October 12, 1990, the Steering Committee rejected such proposal. Members of the Partnership's management and representatives of the Steering Committee met again on October 16, 1990.

On October 18, 1990, the Registrants filed a Registration Statement with the SEC outlining the terms pursuant to which they would seek the consent of the holders of the Old Bonds to the adoption of certain amendments to the Old Indenture and certain releases, waivers and annulments. Such restructuring was contingent upon the receipt of the consents of all the holders of the Old Bonds. which the Registrants believed they could not obtain.

On November 16, 1990, the Solicitors and the Steering Committee reached a non-binding framework for the restructuring of the Old Bonds (the "Framework"). From November 16 through

December 14, 1990, advisors to the Steering Committee and the Partnership met on numerous occasions to develop documentation required to implement the Framework.

In addition, from November 16, 1990 to the date hereof, the Steering Committee's advisors have met regularly, with and without the Partnership's representatives, with representatives of other large holders of the Old Bonds. The purpose of these meetings has been to attempt to explain and negotiate the transaction so that the financial documentation might be acceptable to the holders of the Old Bonds.

The Steering Committee's advisors have also spoken or met regularly with other interested holders of Old Bonds, in order to attempt to clarify or explain the proposed restructuring and to answer questions from the constituency of the holders of the Old Bonds. Towards this end, a number of telephonic and written communications with the group of institutional holders of the Old Bonds referred to above have transpired since September 1990, all for the purpose of explaining or clarifying the proposed restructuring and its timing.

On December 14, 1990, the Solicitors provided the CCC with certain of the documents in substantially final form necessary for implementation of the Framework. On such date, the Company and the Partnership also reached an agreement in principle with representatives of First Fidelity, NatWest, and the Subcontractors for the restructuring of amounts due such parties (the "December 14 Agreement"). See "The Plan," "Amended NatWest Agreement," "Amended Subcontractors Agreement" and "Amended First Fidelity Agreement." The Solicitors are soliciting Acceptances to the Plan in order to implement the terms of the agreement contemplated by the Framework and the December 14 Agreement as the same have been changed by the parties thereto.

On December 15, 1990, the Company failed to make the November 15, 1990 interest payment due on the Old Bonds within the 30 day grace period, thereby resulting in the occurrence of an Event of Default under the Old Indenture which gives the holders of the Old Bonds the right to accelerate payment of the entire principal amount of the Old Bonds upon notice from holders representing 25% of the aggregate outstanding principal amount of Old Bonds.

From December 16, 1990 through May 6, 1991, the Steering Committee, the Partnership and others met periodically to finalize the transactions contemplated by the Plan.

The Steering Committee will nominate the four initial Class B Directors to be on the board of directors of TM GP and Holding. The Steering Committee is conducting an extensive search for qualified candidates, and will formally make its selections prior to the confirmation hearing on the Plan.

The Partnership and the Company will agree to pay Rothschild and Berlack, Israels & Liberman each $1,000,000 in principal amount of Old Bonds and Greenberg Margolis, New Jersey gaming counsel to the Steering Committee, $100,000 in principal amount of Old Bonds in lieu of any other fee payable upon the conclusion of a successful restructuring as described above. If the Effective Date does not occur by September 30, 1991, such amounts shall be reduced by 25% for each full month beyond such date that the Effective Date occurs. A nominee of Rothschild, Berlack, Israels & Liberman and Greenberg Margolis will purchase, before the Effective Date, Old Bonds representing the above fees owed to such firms with funds provided by the Partnership. On the Effective Date, the nominee will be treated as the holder of Class 4 Claims and will receive, on behalf of Rothschild, Berlack, Israels & Liberman and Greenberg Margolis appropriate distributions under the Plan. In addition to the foregoing amounts, the Partnership will pay the reasonable hourly fees and disbursements of Rothschild, Berlack, Israels & Liberman and Greenberg Margolis, commencing May 1991, for services rendered by such persons.

## CAPITALIZATION OF THE PARTNERSHIP AND THE COMPANY

The following table sets forth the combined capitalization of the Partnership (excluding amounts due to affiliates other than the Trump Line of Credit) and the Company as of March 31. 1991 as well as on a pro forma basis to give effect to the transactions contemplated in the Plan. This table should be read in conjunction with Management's Discussion and Analysis of Financial Condition. the historical financial statements and the notes thereto and the Financial Forecasts appearing elsewhere herein.

### Trump Taj Mahal Associates and Trump Taj Mahal Funding, Inc.

| | March 31. 1991 | |
| --- | --- | --- |
| | Historical | Pro Forma |
| | (unaudited) | |
| | (In thousands, except share data) | |
| **Debt:** | | |
| Old Bonds | $675.000 | $ — |
| New Bonds | — | 520.700(a) |
| Furniture. fixtures and equipment term loan | 44.668 | 45.640(b) |
| Trump line of credit | 25,000 | — (c) |
| Subcontractors' note | 35.523 | — (d) |
| Other | 1.284 | 1.284 |
| Total debt | $781.475 | $567.624 |
| **Capital:** | | |
| Common stock, without par value. 2.500 shares authorized, 200 shares issued and outstanding | 20 | — |
| Partners' capital | 75.001 | 120.671(c) |
| Retained earnings (accumulated deficit) | (170.822) | 81.901(e) |
| Total capital | (95.801) | 202.570 |
| Total capitalization | $685.674 | $770.196 |

*Pro Forma Adjustments*

(a) Reflects the issuance of New Bonds in lieu of $47,250 of accrued interest as of November 15, 1990. In addition, includes a reduction in the carrying amount of the New Bonds and an increase in capital of approximately $201.600 to give effect to stating the New Bonds at estimated present values of amounts to be paid at current interest rates (18%).

(b) Reflects capitalization of accrued but unpaid interest as of November 15, 1990.

(c) Reflects contribution of Trump Line of Credit and related interest, the $10,000 construction supervisory fee and $8,410 of management fees to capital.

(d) Reflects purchase of Old Bonds of $20,000 principal amount for $12,000 in satisfaction of amounts owed to Subcontractors.

(e) Reflects reductions of debt described in (a) and (d) as well as forgiveness of accrued interest, net of related deferred state income taxes:

| | |
| --- | --- |
| Accumulated deficit as of March 31, 1991 | ($170,822) |
| Reduction in the carrying amount of New Bonds | 201,600 |
| Gain on Subcontractors' note | 23,520 |
| Forgiveness of accrued interest | 36,103 |
| Deferred state income taxes | (8,500) |
| Pro Forma retained earnings as of March 31, 1991 | $ 81.901 |

## SELECTED FINANCIAL INFORMATION FOR
## THE PARTNERSHIP AND THE COMPANY

The selected financial information of the Company and the Partnership set forth below as of and for the periods ended December 31, 1988, 1989 and 1990 has been derived from the combined financial statements of the Company and the Partnership and should be read in conjunction with those combined financial statements which are included elsewhere in this Prospectus. The selected financial information as of, and for the three months ended March 31, 1990 and 1991 have been derived from the unaudited combined financial statements of the Company and the Partnership which, in the opinion of management, include all adjustments (consisting only of normal recurring adjustments) necessary for a fair presentation of such information. The results of operations for the interim periods are not necessarily indicative of the results to be expected for an entire year.

### Trump Taj Mahal Associates
### and
### Trump Taj Mahal Funding, Inc.

| | Period From Inception To December 31, 1988 | Year Ended December 31, 1989 | Year Ended December 31, 1990 | Three Months Ended March 31, 1990 | Three Months Ended March 31, 1991 |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Net revenues .................. | $ 32 | $ 250 | $356,698 | $ 70 | $ 95,792 |
| Income (loss) from operations before depreciation, amortization and restructuring costs ...................... | (1,275) | (1,211) | 62,361 (a) | (67) | $ 12,047 (a) |
| Depreciation and amortization of property and equipment and preopening costs and restructuring costs ........... | — | — | 85,650 | — | 12,626 |
| Interest expense ............... | 6,194 (b) | 47,686 (b) | 84,918 (b) | 5,770 (b) | 26,031 |
| Net loss ...................... | ($ 2,928) | ($ 17,244) | ($124,269) | ($3,992) | ($ 26,381) |
| Ratio of earnings to fixed charges—coverage deficiency .. | $ 8,152 | $ 68,233 | $143,612 (c) | | $ 26,381 |
| Total assets ................... | $788,491 | $805,824 | $845,804 | | $841,596 |
| Total debt .................... | $675,000 | $684,479 | $781,615 | | $781,475 |
| Capital (Deficit) .............. | $ 72,093 | $ 54,849 | ($ 69,420) | | ($ 95,801) |

---

(a) Includes accrued management fees of $7,140, of which $656 was paid for the year ended December 31, 1990 and $1,926, of which none was paid for the three months ended March 31, 1991.

(b) Includes amortization of loan offering costs and is net of capitalized interest.

(c) Includes fixed charges of approximately $5,755 for the period from January 1, 1990 to April 2, 1990 (date of commencement of operations).

(d) Excludes amounts due to affiliates, other than the Trump Line of Credit.

## CAPITALIZATION OF HOLDING

The following table sets forth the capitalization of Holding as of January 23, 1991 (date of inception) and on a pro forma basis to give effect to the issuance of shares of Class A, Class B, and

Class C Stock pursuant to the Plan. This table should be read in conjunction with the audited historical financial statements and the notes thereto which are included elsewhere in this Prospectus.

| | January 23, 1991 | |
| | Historical | Pro Forma |
|---|---|---|
| Capital: | | |
| Common stock, $.01 par value; 100 shares authorized, 10 issued | $100 | $ — |
| Class A Stock; 10,000,000 shares authorized, none issued | — | 40 |
| Class B Stock; 860,000 shares authorized, none issued | — | 20 |
| Class C Stock; 10,000,000 shares authorized, none issued | — | 40 |
| | $100 | 100 |

## SELECTED FINANCIAL INFORMATION FOR HOLDING

The selected financial information of Holding set forth below as of January 23, 1991 (date of inception) has been derived from the financial statements of Holding and should be read in conjunction with those financial statements which are included elsewhere in this Prospectus.

| | January 23, 1991 |
|---|---|
| Total assets | $100 |
| Capital | 100 |

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION

### General Development of Business

The Company was incorporated under the laws of the State of New Jersey on June 3, 1988 for the sole purpose of issuing the Old Bonds and lending the proceeds thereof to the Partnership.

The Company will not engage in any other business activities (including having any subsidiaries). Because the Company has no operations, its ability to service the Old Bonds is completely dependent upon funds which it receives from the Partnership pursuant to the Partnership Note. Accordingly, the discussions in this section focus on the Partnership and its operations.

The Partnership was formed to consummate the acquisition of, to complete the construction of and to operate the Taj Mahal, a casino hotel and convention center complex located on the Boardwalk in Atlantic City, New Jersey, and its ancillary properties. The Partnership will not engage in any other business. The Taj Mahal, which is the largest casino/hotel complex in Atlantic City, consists of a 42-story hotel tower and a contiguous low-rise structure, together occupying approximately 17 acres of land.

In order to attract patrons, many Atlantic City casinos, including the Taj Mahal, provide to certain patrons free rooms, food and beverages, transportation and other amenities. These complimentary items, known as "comps," are recorded as revenue as if the recipient had paid for them, and concurrently an equal offsetting amount is recorded as a promotional allowance. Thus, while comps increase gross revenues, they have no direct effect on net revenues.

### Results of Operations For the Three Months Ended March 31, 1991

The Taj Mahal commenced operations on April 2, 1990. Accordingly, there is no comparable period to compare against the results of operations for the three month period ended March 31, 1991. Net revenues for the three month period ended March 31, 1991 totalled approximately $95,972,000.

Gaming revenues were approximately $84,298,000 and represented approximately 12.9% of the total casino win for the entire Atlantic City gaming market for such period of operations.

For the three month period ended March 31, 1991, gaming revenues consisted of approximately $40,210,000 in table game win and a slot win of approximately $44,088,000. During this period, dollars wagered on table games totalled approximately $273,266,000 and the win percentage thereon was approximately 14.7%. Dollars wagered on slot machines totalled approximately $408,048,000 and the win percentage thereon was 10.8%.

Nongaming revenues for the three months ended March 31, 1991 of approximately $25,947,000 consisted primarily of rooms, food, beverage, and entertainment revenues. Room revenue of approximately $9,182,000 was based on an average occupancy of approximately 76.8% for such three month period. Food and beverage revenue of approximately $14,351,000 was generated from 13 food and beverage outlets.

The Partnership experienced a net loss of approximately $26,381,000 for the three months ended March 31, 1991 and as of that date had a combined accumulated deficit of $170,822,000, leaving it and the Company with a total combined equity deficiency of approximately $95,801,000.

In connection with the planned debt restructuring described herein, the Partnership incurred approximately $3,530,000 of professional fees for the three months ended March 31, 1991.

### Results of Operations for the Twelve Months Ended December 31, 1990

Net revenues for the year ended December 31, 1990 totalled approximately $356,698,000. Gaming revenues were approximately $300,902,000 and represented approximately 13.3% of the total casino win for the entire Atlantic City gaming market for the nine month period of the Partnership's operations.

For the twelve month period ended December 31, 1990, gaming revenues consisted of approximately $154,048,000 in table game win and slot win of approximately $146,854,000. For this period, dollars wagered on table games totalled approximately $1,010,854,000 and the win percentage thereon was approximately 15.2%. Dollars wagered on slot machines totalled approximately $1,343,049,000 and the win percentage thereon was approximately 10.9%

Nongaming revenue of approximately $107,239,000 consisted primarily of rooms, food, beverage, and entertainment revenues. Room revenue of approximately $36,364,000 was based on an average occupancy of approximately 79.1% from April 2, 1990 through December 31, 1990, of which approximately $18,164,000 was attributable to rooms provided on a complimentary basis, representing approximately 42.2% of overall occupancy. Food and beverage revenue of approximately $59,329,000 was generated from 13 food and beverage outlets. A portion of the Partnership's non-gaming revenue is attributable to convention business. See "Business—Marketing Strategy."

The Partnership experienced a net loss of approximately $124,269,000 for the year ended December 31, 1990 and as of that date had combined accumulated deficit of approximately $144,441,000, leaving it and the Registrant with a total combined equity deficiency of approximately $69,420,000.

For the twelve month period ended December 31, 1990 the Partnership incurred general and administrative expenses of approximately $98,492,000. Such amount includes the accrual of $7,140,000 of fees due under the Management Agreement. After deducting the fees accrued pursuant to the Management Agreement, the Partnership believes its levels of general and administrative expenses are not unduly high given the size of the facility.

In connection with the Solicitation, the Partnership incurred $4,850,000 of professional fees through December 31, 1990. In addition, the Partnership has recorded a $36,153,000 adjustment to write off preopening expenses previously capitalized given their uncertain realization. The Partnership has also written off $15,875,000 of unamortized loan offering costs in view of the anticipated restructuring and has included a provision of $3,000,000 for litigation. See "Legal Proceedings."

In December, 1990, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 106, "Accounting for Post-Retirement Benefits Other Than Pensions."

Because neither the Company nor the Partnership provides such benefits to their employees, the issuance of this standard will have no impact on the Partnership's results of operations.

**Liquidity and Capital Resources**

To date, the Partnership's sources of capital have been the proceeds from the sale of $675,000,000 principal amount of the Old Bonds and the capital contribution of $75,000,000 made to the Partnership by Donald J. Trump, together with (i) earnings on a portion of the net proceeds of the Old Bonds pending utilization for construction, (ii) the proceeds of borrowings under the Trump Line of Credit in the amount of $25,000,000, which was funded by Donald J. Trump on April 30, 1990, (iii) the proceeds of borrowings under the NatWest Loan, (iv) a rescheduling of payments due the Subcontractors, and (v) since April 2, 1990, funds generated by operations.

Since the Partnership opened the Taj Mahal on April 2, 1990, cash generated from operations has been insufficient to cover its fixed charges. The Partnership believes that this liquidity problem is attributable, in part, to an overall deterioration in the Atlantic City gaming market, as indicated by reduced rates of casino revenue growth for the industry for the last two years as compared to prior years, aggravated by an economic recession in the Northeast, and lower than anticipated revenues at the Taj Mahal. In addition, the Partnership's liquidity problem was aggravated by its high level of indebtedness, which at historical levels of operations, it has been unable to service. See "Risk Factors— Competition and Declining Rate of Growth." Comparatively excessive casino gaming capacity in Atlantic City may also have contributed to the Partnership's liquidity problem. Also contributing to the Partnership's liquidity problem were increased construction costs of the Taj Mahal, attributable to unanticipated cost overruns and project enhancements designed to improve the overall project, combined with a delay in the opening date of the Taj Mahal. As a result of the Partnership's liquidity problem, the Company failed to make its $47,250,000 November 15, 1990 and May 15, 1991 interest payments on the Old Bonds. The failure to make the payment of interest due on November 15, 1990 within the 30-day grace period provided for in the Old Indenture, gave the Trustee or the holders of 25% of the principal amount of the Old Bonds the right to accelerate the outstanding principal amount of, and accrued interest on, the Old Bonds. As a result, as of March 31, 1991 and December 31, 1990 the Old Bonds have been classified as a current liability.

The Solicitors believe that there is no alternative to their current liquidity problem other than filing a petition under the Code. The Partnership has been unable to obtain additional financing, and the Company is restricted from amending the payment terms of the Old Bonds (other than in connection with a bankruptcy proceedings) without the unanimous consent of the holders thereof.

The purpose of the Plan is to alleviate the Partnership's liquidity problem by reducing its debt service requirements, including its annual cash interest expense. Such reduction will be accomplished through a lowering of the current interest rate on certain of the Partnership's long-term indebtedness including the Old Bonds and, in the case of the New Bonds, the deferral of the due date of a portion of accrued interest thereon through the issuance of additional Units in lieu of cash interest. The effect of this will enable the Solicitors, upon confirmation of the Plan, to meet their future debt service requirements and, in the case of the holders of the Old Bonds, to afford them the opportunity to participate in the future growth, if any, of the Partnership through their ownership of the Class A Stock. See "Annex B—Financial Forecast."

Unless the restructuring pursuant to the Plan is completed, cash generated by the Partnership from operations is not anticipated to be sufficient to service its debt and provide for its anticipated capital requirements. If the Plan is implemented, the Partnership, in order to meet its debt service requirements and pay its operating expenses and all other cash requirements, will need to generate average net revenues of approximately $38,000,000 per month (assuming historical operating margins), which amount will increase as additional New Bonds are issued in payment of the Additional Amount, which is substantially more than amounts previously generated by any other casino/hotel in Atlantic City. At present, the Partnership must generate average net revenues of approximately $50,000,000 per month (assuming historical operating margins) to pay its debt service and operating expenses. From April 2, 1990 through March 31, 1991, the Partnership averaged approximately $37,708,000 of net revenues per month. From January 1, 1991 through March 31, 1991, the Partnership averaged

approximately $31.931.000 of net revenues per month. Such amounts are less than the $38.000.000 of average monthly net revenues required in order for the Partnership to meet its debt service requirements. operating expenses and other cash requirements if the Plan is implemented. The Partnership, believes that the difference between the actual amount of monthly net revenues generated in the first quarter of 1991 and the amount of average monthly net revenues required under the Plan is due to primarily the seasonal nature of the Atlantic City casino industry in which January and February are historically periods of relatively lower monthly net revenues. Excluding the monthly net revenues amounts for the three months ended March 31, 1991, the Partnership averaged approximately $39,633,000 of net revenues per month from April 2, 1990 through December 31, 1991. In addition, the Partnership expects that its operating margins will improve through a combination of reduced operating expenses (primarily due to reduced staff levels) and anticipated operating efficiencies, which would enhance its ability to pay debt service.

If the Trustee or the holders of 25% or more of the outstanding principal amount of Old Bonds were to declare the Old Bonds to be immediately due and payable. as a result of the Company's failure to make the November 15, 1990 interest payment, neither the Company nor the Partnership would be able to pay such liability. The Partnership's total long-term indebtedness (excluding amounts due to affiliates) as of March 31, 1991, was approximately $756,475.000, which includes certain long-term debt that has been reclassified as short-term debt and amounts due to the Subcontractors and excludes amounts due to Affiliates. At March 31, 1991, the Company and the Partnership had combined negative working capital of approximately $882,492,000.

On November 3, 1989, the Partnership entered into a loan agreement with a bank (the "NatWest Loan") which provided financing of $50,000,000 for certain items of furniture, fixtures and equipment installed in the Taj Mahal. The NatWest Loan bears interest, which is payable monthly, at the bank's prime rate plus ½% or LIBOR plus 2%, at the Partnership's option. The Partnership failed to make the interest payments totalling approximately $2,400,000 that were due on October 1, November 1, and December 1, 1990 and January 1, February 1, and March 1, 1991. The Partnership also failed to make the November 15, 1990 and February 15, 1991 payments of principal on the NatWest Loan of $2,631,000 each. NatWest has the right to accelerate such indebtedness upon notice to the Partnership and, therefore, the NatWest Loan has been classified as a current liability. As part of the Plan, the NatWest Loan will be modified. See "Amendment to NatWest Loan."

First Fidelity Bank, New Jersey ("First Fidelity") has made certain loans to finance the acquisition of automobiles by the Partnership and has issued letter of credit for the account of the Partnership. Pursuant to the Plan, the automobile loans will be unimpaired in the manner afforded other secured claims and the reimbursement obligations of the Partnership under the letters of credit will be assumed by the Partnership and First Fidelity's claims thereunder will be unaltered. Pursuant to the Plan, First Fidelity purposes to modify a loan made to an affiliate of the Partnership. See "Amended First Fidelity Loan Agreement."

On September 6, 1990, the Partnership entered into an agreement (the "Subcontractors Agreement") with certain subcontractors who provided goods and services in connection with the construction of the Taj Mahal (the "Subcontractors"). On December 14, 1990, such agreement was modified and, as so modified, the Partnership and the Subcontractors agreed to settle certain claims of the Subcontractors, assuming that the Plan is confirmed. In exchange for releasing their claims, it is contemplated that the Subcontractors will ultimately be entitled to receive $20,000,000 aggregate principal amount of Old Bonds to be acquired by the Partnership during the Reorganization Case with cash from operations. See "The Plan—Conditions Precedent." The Subcontractors' Note has been classified as a current liability as a result of the Partnership's failure to make the interest payments on the NatWest Loan which failure is a default under the Subcontractor Agreement.

The Partnership is required to pay a management fee (the "Management Fee") to Trump Hotel Management Corp. ("THMC") pursuant to a Management Agreement between the Partnership and THMC, dated November 22, 1988 (the "Management Agreement"). Management Fees of approximately $9,066,000 have accrued through from April 2, 1990 through March 31, 1991 of which $656,000 had been paid. Management Fees of approximately $1,926,000 had accrued from January 1, 1991 through March 31, 1991, none of which has been paid. In addition to the Management Fee, the

Partnership owes THMC a $10,000,000 fee for providing certain construction supervisory services pertaining to the Taj Mahal. This fee is evidenced by the Construction Fee Deferral Note which has been endorsed by THMC to First Fidelity as additional collateral on its loan to Donald J. Trump and his affiliates. The Plan provides that the Management Agreement will terminate and, upon confirmation of the Plan by the Bankruptcy Court, all amounts due THMC under the Management Agreement including the Construction Fee Deferral Note will be cancelled. See "The Plan," "Certain Transactions" and "The Services Agreement."

On April 30, 1990, the Partnership borrowed $25,000,000 under the Trump Line of Credit. Such borrowing accrues interest at the prime rate. The Partnership neither maintains nor has sought any other external line of credit facility. In connection with the Plan, the Partnership's note in respect of the Trump Line of Credit will be cancelled and the Partnership's liability thereunder will be extinguished and a new line of credit note in the same aggregate amount will be executed by TTMI and issued to Bankers Trust.

The Old Indenture prohibits the payment of the Management Fee for any period if payment of interest on, or principal of, the Old Bonds for the corresponding period have not been made. The Old Indenture also restricts the Partnership from repaying amounts owed under the Trump Line of Credit so long as the Old Bonds are in default.

It is a condition to consummation of the Plan that the Partnership obtain the Senior Debt Facilities comprised of a $50,000,000 Senior Line of Credit, a $25,000,000 Standby Letter of Credit and a $25,000,000 Working Capital Facility, none of which have yet been obtained. Obligations under the Senior Debt Facilities will be secured to the extent of such obligations by certain assets of the Partnership, including the Taj Mahal, on a basis senior to the lien of the Amended Mortgage securing the New Bonds. The proceeds of the Senior Line of Credit, and the Standby Letter of Credit following the full utilization of the Senior Line of Credit, will be available only for purposes of paying interest on the New Bonds. The Senior Debt Facilities are expected to contain covenants and restrictions customary in secured loans for highly-leveraged companies, which could be more restrictive than those contained in the Indenture.

If the Plan is consummated, the Partnership believes that it will have sufficient cash flow for the next 12 months as a result of anticipated revenue levels, cost containment measures and the restructuring contained in the Plan. In addition, the effect of the proposed debt restructuring would result in an initial reduction of the annual cash interest expense on the New Bonds to $68,102,000 from $94,500,000 on the Old Bonds, although annual cash interest expense would be greater than $68,102,000 to the extent of Excess Available Cash Flow, if any, and will increase upon the issuance of additional New Bonds in payment of the Additional Amount. No assurances, however, can be given that any of the anticipated revenue levels, cost containment measures or the transactions contemplated by the Plan will be implemented.

Overall operating efficiencies are expected to improve as a result of cost control measures recently implemented. Several of the more significant measures are: reduction in the average number of full time equivalent employees from over 7,000 at opening to a current level of approximately 5,000; utility usage reduction programs; renting facilities to promoters for major sports and entertainment events rather than functioning as the promoter of these events; and eliminating certain unsuccessful marketing activities. The Partnership believes that the reduction in employees will not inhibit its ability to deliver quality service to its patrons.

In connection with the Plan, the Partnership will modify certain arrangements with First Fidelity. See "Amended First Fidelity Agreement."

It is estimated that $20,000,000 will be required to complete the Theater, $8,000,000 to complete the pool and health club facilities, reconfigure the casino floor area and install a utilities management system, and $30,000,000 to complete the Steel Pier, although the Partnership is seeking the consent of the appropriate state regulatory authorities to reduce the scope of such project. Failure to complete the Theater by July 1, 1991 will give the Housing Authority a right of reverter; in addition, it is a condition of the Partnership's CAFRA Permit, which is in turn a condition of the casino license, that the Partnership commence the renovations of the Steel Pier by October 1992 and complete those

renovations within 18 months. See "Risk Factors—Capital Expenditures" and "Business—Properties." In addition, the Partnership estimates that the minimum level of capital expenditures required for the proper operation of the Taj Mahal will approximate 2% of gross revenue each year. Such amount has been included in the Financial Forecasts contained herein in Annex B. Upon confirmation of the Plan, such sums must be provided for in the Budget if they are to be used for capital expenditures. See "Description of TM/GP Certificate of Incorporation." No assurance can be given that such provision will be made. See "Risk Factors—Capital Expenditures."

The Financial Forecasts contained herein in Annex B represent management's judgment as to the probable future financial position of the Partnership. Many of the events and circumstances upon which assumptions to the Financial Forecasts are based, however, are beyond the control of the Partnership. Therefore, the actual results achieved during the forecast period may vary from those set forth in the Financial Forecast, and the variations may be material. Unless more favorable operating margins than those forecasted are achieved, which is not anticipated, the forecasted revenues included in the Financial Forecasts should be adequate to provide for the Partnership's liquidity needs but do not otherwise provide for an appreciable margin for error in 1991 or 1992. The Partnership will obtain the Senior Debt Facilities, however, which should enable it to better respond to unanticipated variations in forecasted results. If forecasted revenues are achieved in 1993 and thereafter, the Partnership would enjoy even greater liquidity and an increased margin for error.

## BUSINESS

Because the Company has no business operations and will depend entirely upon payments on the Note in order to service the New Bonds, and Holding will conduct no business other than being the beneficial owner of Partnership interests, discussions of business operations in this section are limited to those of the Partnership.

### Atlantic City Market

The gaming industry in Atlantic City traditionally has been seasonal, with its strongest performance occurring from May through September, with December and January showing substantial decreases in activity. Revenues have been significantly higher on Fridays, Saturdays, Sundays and holidays than on other days.

The table below presents revenues and growth rates for the Atlantic City gaming industry based on gaming units, casino floor space and gaming revenues and the resulting per unit and per square foot gaming revenues and respective growth rates:

#### Atlantic City Market Statistics

| | For the Calendar Years | | | |
|---|---|---|---|---|
| | 1987(1) | 1988 | 1989(2) | 1990(3) |
| Gaming Units(4) | 19,319 | 20,176 | 19,901 | 21,692 |
| Growth in Gaming Units | | 4.4% | (1.4)% | 9.0% |
| Casino Floor Space(4) | 653,088 | 675,691 | 668,571 | 739,876 |
| Growth in Casino Floor Space | | 3.5% | (1.1)% | 10.7% |
| Gaming Revenues ($ in thousands)(5) | 2,495,564 | 2,734,766 | 2,807,045 | 2,951,956 |
| Growth in Gaming Revenues | | 9.6% | 2.6% | 5.2% |
| Gaming Rev/Unit | 129,177 | 135,546 | 141,050 | 136,085 |
| Growth in Gaming Rev/Unit | | 4.9% | 4.1% | (3.5)% |
| Gaming Rev/Sq. Ft. | 3,821 | 4,047 | 4,199 | 3,990 |
| Growth in Gaming Rev/Sq. Ft. | | 5.9% | 3.8% | (5.0)% |

(1) The Showboat Hotel and Casino opened on March 1, 1987.

(2) The Atlantis ceased operation on May 22, 1989.

(3) The Taj Mahal opened on April 2, 1990.

(4) Weighted Averages.

(5) Difference between the amount wagered and the amount won by patrons.

Atlantic City is near many densely populated metropolitan areas. The primary area served by Atlantic City casino-hotels extends from Washington, D.C. to Boston and includes New York City and Philadelphia. Within this primary area, Atlantic City may be reached by automobile or bus. Principal arteries lead into Atlantic City from the metropolitan New York area, which is less than three hours away by automobile and from the Baltimore/Washington, D.C. area, which is approximately three hours away by automobile. The Atlantic City area can also be reached by air and rail transportation, although most patrons arrive by automobile or bus.

The table below sets forth certain information regarding the Atlantic City casino/hotel industry in general. The information presented was compiled from the Atlantic City Casino Association and other published industry reports, and does not, for the period prior to April 2, 1990, include data regarding the Taj Mahal. The Average Casino/Hotel Occupancy Rates includes rooms provided to patrons on a complimentary basis. The Taj Mahal has maintained an approximately 80% occupancy rate since its opening on April 2, 1990 through March 31, 1991 of which approximately 40% were rooms provided on a complimentary basis.

| Year | Number of Casino/ Hotels | Total Casino/ Hotel Revenues (In thousands) | Average Casino/ Hotel Occupancy Rates |
|------|------|------|------|
| 1987 ..................... | 12 | $2,822,315 | 84 |
| 1988 ..................... | 12 | 3,081,316 | 85 |
| 1989 ..................... | 12 | 3,127,137 | 83 |
| 1990 ..................... | 12 | 3,340,080 | 83 |

The Partnership believes that Atlantic City casino revenue has historically been adversely affected by the relatively low number of non-casino hotel rooms, and by Atlantic City's modest airport facilities and poor rail and automobile transportation infrastructure. This has resulted in most patrons traveling to Atlantic City by automobile or by bus from the Northeastern and mid-Atlantic regions of the United States (with attendant traffic congestion) and has impeded the attraction of major convention business to Atlantic City. An expansion of the Atlantic City International Airport terminal (located approximately 12 miles from Atlantic City) to handle additional airline carriers and large passenger jets has recently been completed and, together with the addition of Amtrak express rail service to Atlantic City from New York City and Philadelphia in 1989, has improved access to Atlantic City, and is expected to expand the Atlantic city casino industry's geographic patron base.

## Properties

The Taj Mahal, which opened on April 2, 1990, is the largest casino/hotel facility in Atlantic City. It includes a 120,000 square foot casino that houses approximately 165 table games such as blackjack, craps, roulette, baccarat and big six and approximately 2,900 slot machines, 1,250 guest rooms, including approximately 235 suites, nine restaurants and four lounges. The Taj Mahal consists of a 42-story hotel tower and a contiguous low-rise structure, which together occupy approximately 17 acres of land owned by the Partnership. It is bounded by the Boardwalk to the south. Maryland Avenue to the east, Pennsylvania Avenue to the west and extends to the north towards Pacific Avenue for approximately three-quarters of a city block on the western portion of the site and two-thirds of a city block on the eastern portion of the site. In addition, the Partnership currently leases from Realty Corp. land adjacent to the site of the Taj Mahal which is being used primarily for surface parking and the construction of the Theater, as well as the Steel Pier and a warehouse complex.

Within the Taj Mahal are approximately 165,000 square feet of convention and meeting rooms, including the Mark Grossinger Etess Arena (the "Etess Arena"), an approximately 80,000 square foot exhibition hall facility which can be converted into a sports and entertainment arena with seating capacity for approximately 6,000 people. The Etess Arena has been designed to accommodate boxing matches, tennis tournaments, concerts and trade shows. In addition to the Etess Arena, the Taj Mahal

convention facilities include a grand ballroom of approximately 30.000 square feet and two additional ballrooms of approximately 15,000 and 10,000 square feet.

It is anticipated that the Theater will, if completed, feature performances by musicians, singers and comedians, as well as concerts and musical revue shows of the type found in Las Vegas, Nevada. The land on which the Theater is situated is leased by the Partnership from Realty Corp. Pursuant to the original agreement with the Housing Authority, the Theater was required to have been completed by no later than July 1, 1991. The Partnership does not believe that it will be able to complete the Theater by such date, and although a further extension of such date will be sought, there can be no assurance that any such extension will be granted. Failure to complete the Theater by the deadline will enable the Housing Authority to exercise a right of reverter with respect to the land on which the Theater is located. If the Housing Authority exercises this right of reverter, the Partnership's investment, to date, in the construction of the Theater, which is approximately $18,700,000, may be lost, as well as the Partnership's ability to continue leasing the property on the terms contained in its existing lease with Realty Corp. See "Risk Factors—Capital Expenditures." The cost of completing the Theater is estimated at $20,000,000, which amount is included in the Financial Forecasts contained herein in Annex B. Such completion, however, is subject to the approval of the Board of Directors of TM/GP, including a majority of the TM/GP Class B Directors and the holders of the Class B Stock of Holding and such approval may not be obtained.

In order for the Taj Mahal to remain competitive in the Atlantic City gaming market, management believes that certain capital improvements must be made to the Taj Mahal, including the completion of the pool and health club facilities, a reconfiguration of the casino floor area and the installation of a utilities management system.

The Taj Mahal contains parking for approximately 5,200 cars of which 4,600 spaces are located in indoor parking garages and 600 spaces are located on land leased to the Partnership by Realty Corp.

The Partnership leases the Steel Pier from Realty Corp. It is a condition of the Partnership's Coastal Area Facilities Review Act ("CAFRA") Permit (which, in turn, is a condition of the Partnership's casino license) that the Partnership begin construction of certain improvements to the Steel Pier by October 1992, which improvements must be completed within 18 months of commencement. The estimated cost of these improvements is $30,000,000, and following consummation of the Plan the construction of these improvements is subject to the approval of the Board of Directors of TM/GP, including a majority of the TM/GP Class B Directors and the holders of the Class B Stock of Holding. The Partnership intends to seek a modification of its CAFRA Permit to extend the required completion date of the improvements to the Steel Pier and to reduce the scope of such improvements, although there can be no assurance that such modification will be granted by the NJDEP, the agency which administers CAFRA.

On March 29, 1990, the Partnership entered into a Lease Agreement with the City of Atlantic City pursuant to which the Partnership leases a parcel of land containing approximately 1,300 spaces for employee intercept parking at a cost of approximately $1,000,000 per year. In addition, the Partnership has expended in excess of $2,000,000 in improving the site. The permit issued by NJDEP contains several conditions, one of which requires the Partnership to find another location "off-island" for purposes of employee parking no later than two years after the Partnership commenced use of the site. Accordingly, in the absence of an extension granted by the NJDEP, the Partnership will be required to abandon this site no later than April 2, 1992.

The Partnership owns an office building (the "Terrace Building") located on South Pennsylvania Avenue, a portion of which it leases to a third party. In addition, the Partnership in April 1991 purchased for $1,700,000 certain facilities of Trump Castle which are presently used for fleet maintenance and limousine services and for office and warehouse space. See "Certain Transactions."

Each parcel of land owned by the Partnership in fee simple is encumbered by the Mortgage, and certain parcels are encumbered by other subordinate mortgages. In addition, the Partnership intends to obtain the Senior Debt Facilities which will have liens superior to the Amended Mortgage.

## Employees

The Taj Mahal has approximately 5,000 employees, of whom approximately 1,500 are covered by collective bargaining agreements. The Partnership believes that its relationships with its employees are satisfactory and that its staffing levels are sufficient to provide first rate service.

All of the Partnership's employees must be licensed or registered under the Casino Control Act. Key employees and casino employees are subject to more stringent requirements than hotel employees. Each casino key employee and casino employee must meet applicable standards pertaining to such matters as financial responsibility, good character, ability, casino training and experience, and New Jersey residency. See "Business—Gaming and Other Laws and Regulations."

## Marketing Strategy

The Partnership has designed a marketing strategy to promote the Taj Mahal as a first class casino/hotel, and also as a convention site and destination resort facility at which visitors may stay for extended periods. The Partnership believes that the Taj Mahal's ocean-front setting and decor, as well as its 1,250-room capacity and vast casino, entertainment, convention and exhibition space, including the Etess Arena, make it a highly attractive convention facility. In addition to its normal advertising, the Partnership actively promotes the Taj Mahal with various local chambers of commerce, travel agencies which specialize in convention travel, and various corporate travel departments in order to attract convention business. By promoting the facility as a convention site and destination resort facility, the Partnership believes it will be able to increase its weekday hotel occupancy levels and casino revenues, thereby partially offsetting the seasonal nature of Atlantic City casino/hotel operations. Since the opening date of the Taj Mahal, the Partnership has been able to attract convention business and expects to continue to do so in the future. As of January 31, 1991, the Partnership had confirmed hotel room reservations in respect of convention business totalling approximately 95,000 room nights before December 31, 1993. No assurance can be given, however, that significant convention business will be attracted to the Taj Mahal on a continuing basis.

The Partnership employs sales representatives in New Jersey and New York, as well as nationally and internationally, and is promoting and will promote the Taj Mahal in various advertising media, including television, radio and newspapers. In addition to complimentary services offered to high stakes wagerers, the Partnership offers, from time to time, a variety of services and promotional programs designed to increase casino volume, including bus trips to the Taj Mahal from New York City, Philadelphia and other metropolitan areas, air charter flights, entertainment, and subject to obtaining necessary approvals, gaming tournaments and promotional sweepstakes.

The Partnership plans to emphasize the Taj Mahal's slot machines in a marketing strategy that introduces a character called the "Sultan of Slots," utilizes special promotions such as double jackpots and implements a system of rewarding frequent players. The Partnership believes that this strategy, when combined with physical improvements to the Taj Mahal's slot machine areas, so as to better provide change to players and make the atmosphere more attractive, will result in increased gaming revenues from the Taj Mahal's slot machines. By these means, the Partnership hopes to overcome the lingering negative impression that was created upon the opening of the Taj Mahal by change machines that were inadequate to support the operation of the slot machines. These change machines caused delays when partrons sought change in order to play the slot machine. Additional change booths and change attendants now supplement the change machines.

## Competition

Competition in the Atlantic City casino/hotel market is intense. At present, there are twelve casino/hotels located in Atlantic City, including the Taj Mahal and the Other Trump Casinos. Some other Atlantic City casino/hotels, including Trump Castle, recently have completed expansion programs and others are in the process of completing renovation programs, including the Resorts Casino Hotel,

which is located next to the Taj Mahal. In addition, there are several sites on the Boardwalk and in the Marina area of Atlantic City on which casino/hotels could be built in the future. The Atlantic City casino industry has recently experienced a significant increase in capacity, which is generally measured by available casino floor space. The opening of the Taj Mahal brought the aggregate casino floor space currently in Atlantic City to approximately 770,000 square feet. The average Atlantic City casino win per square foot declined in calendar year 1990 as a result of the increase in casino floor space, including the opening of the Taj Mahal. The Partnership believes that such increase in casino floor space has increased competition for customers and for qualified employees.

Casinos in Atlantic City must be located in approved hotel facilities which offer dining, entertainment and other guest facilities. Competition among casino hotels is based primarily upon promotional allowances, advertising, the attractiveness of the casino area, service, quality and price of rooms, food and beverages, restaurant, convention and parking facilities and entertainment. In order to compete effectively with all other Atlantic City casino/hotels, the Partnership offers complimentary drinks, meals, room accommodations and/or travel arrangements to its preferred customers, as well as cash bonuses and other incentives pursuant to approved coupon programs.

The profitability of the Taj Mahal could be affected by its proximity to the Resorts Casino Hotel and the Showboat Hotel and Casino, each of which is owned and operated by a third party not affiliated with the Partnership or the Company. Both the Showboat Hotel and Casino and the Resorts Casino Hotel are situated on the Boardwalk next to the Taj Mahal and both are connected to the Taj Mahal by elevated pedestrian walkways.

The Partnership faces competition from cruise lines, riverboat gambling, casinos located in Nevada, Puerto Rico, The Bahamas and other locations outside the United States, from other forms of legalized gaming in New Jersey and in its surrounding states such as lotteries, horse racing, jai-alai, dog racing and other legalized gaming activities and from illegal wagering of various types. The Taj Mahal also would compete with any facilities in jurisdictions that may authorize casino gaming or other forms of wagering in the future. Legislation permitting casino gaming has been proposed, from time to time, in various states. The Taj Mahal's operations could be adversely affected by such competition, particularly if casino gaming were permitted in jurisdictions adjacent to, or elsewhere in, New Jersey. Currently, casino gaming is not allowed in other areas of New Jersey or in New York or Pennsylvania. Recently, however, the Secretary of the Interior approved a plan by the Mashantucket Pequot Indians to open a casino facility in Ledyard, Connecticut, located in the far eastern portion of such state. Such casino, the construction of which has commenced, is not expected to have a material adverse affect on the Taj Mahal.

## Gaming and Other Laws and Regulations

The following is only a summary of the applicable provisions of the Casino Control Act. It does not purport to be a full description thereof and is qualified in its entirety by reference to the Casino Control Act.

*General.* The Partnership and THMC, as the manager of the operations of the Taj Mahal pursuant to the Management Agreement, were initially issued casino licenses for one-year periods through April 26, 1991. On March 29, 1990, Donald J. Trump was qualified (to casino key employee standards including financial stability, integrity and responsibility, good character, honesty, business ability and casino experience) by the CCC as the sole beneficial owner of the Partnership and THMC. The retention of the gaming licenses held by the Partnership and THMC with respect to the Taj Mahal is dependent upon the continued qualification of Donald J. Trump.

The ownership and operation of casino/hotel facilities in Atlantic City are the subject of strict state regulation under the Casino Control Act. The CCC is empowered to regulate a wide spectrum of gaming and non-gaming related activities and to approve the form of ownership and financial structure of not only a casino licensee, but also its entity qualifiers, intermediary and holding companies.

Accordingly, the Partnership, the Company, TTMI, TM/GP, Holding and Trump Corp. are subject to the provisions of the Casino Control Act.

In general, the Casino Control Act contains detailed provisions concerning, among other things: (1) equal employment opportunities of employees of casino operators, contractors for casino facilities and others; (2) rules of games and methods of supervision of games and of selling and redeeming chips; (3) the manner of granting credit, duration of credit and enforceability of gaming debts; (4) the manufacture, distribution and sale of gaming equipment; (5) security standards, management control procedures, accounting and cash control methods and reports to gaming authorities; (6) advertising of casinos, standards for entertainment, and distribution of alcoholic beverages; and (7) the licensing and registration of employees and vendors of casino licensees.

*Operating Licenses and Approvals.* No casino/hotel facility may operate unless the appropriate licenses and approvals are obtained from the CCC, which has broad discretion with regard to the issuance, renewal, revocation and suspension of such licenses and approvals, which are non-transferable. A casino license is issued initially for a one-year period and renewable for a one-year period for the first two renewal periods. Thereafter, a casino license is renewable for a period of two years, although the CCC may reopen licensing hearings at any time, and must reopen a licensing hearing at the request of the Division. The initial casino licenses of the Partnership and THMC are effective through April 26, 1991. On August 21, 1990, the CCC reopened the initial licensing hearing of the Partnership and THMC, and on January 29, 1991, consolidated the same with the hearing for renewal of their casino license. On April 18, 1991, the CCC renewed the casino licenses of the Partnership and THMC through April 26, 1992, subject to the conditions that (i) by June 17, 1991, the Plan be filed with the United States Bankruptcy Court and Donald J. Trump submit to the CCC executed term sheets amending loan agreements with certain of his lender banks and (ii) at a CCC hearing to resume on that date, the licensees and Donald J. Trump demonstrate their financial stability through April 26, 1992. The Partnership intends to seek an extension of the deadline referred to above for the filing of the Plan. No assurances can be given, however, that any such extension will be granted or that the CCC will continue the casino licenses of the Partnership or THMC or, if continued, what conditions may be imposed and whether those conditions will be considered acceptable by the Partnership.

Each applicant for the issuance or renewal of a casino license must demonstrate for the applicable license period and by clear and convincing evidence its financial stability, integrity and responsibility, the adequacy of its financial resources to operate the casino, the suitability of the casino and related facilities and sufficient business ability and casino experience to establish the likelihood of creating and maintaining a successful, efficient casino operation, among other things. Each applicant is also required to establish the integrity of its financial sources including, but not limited to, its financial backers, investors, mortgagees and bondholders. Each entity qualifier and intermediary and holding company having an interest in the casino licensee must register with the CCC and obtain qualification approval by meeting essentially the same standards as those required of the casino licensee. As the holder of a general partnership interest equal to 49.995% of the equity of the Partnership, TM/GP has been determined to be an intermediary company of the Partnership. As the holder of all the capital stock of TM/GP, Holding has been determined to be a holding company of the Partnership.

Pursuant to the Casino Control Act and precedent, no entity may hold a casino license unless each officer, director, principal employee, and person who directly or indirectly holds any beneficial interest or ownership in the licensee, each person who in the opinion of the CCC has the ability to control or elect a majority of the board of directors of the licensee (other than a banking or other licensed lending institution which holds a mortgage or other lien acquired in the ordinary course of business), each lender, underwriter, agent or employee of the licensee or other person whom the CCC may consider appropriate, obtains qualification approval from the CCC. Qualification approval means that such person must, but for residence, individually meet the qualification requirements as a casino key employee. An entity qualifier and intermediary or holding company also is required to meet the same standards for approval as a casino licensee. However, with the concurrence of the Director of the Division, the CCC may waive compliance on the part of a publicly-traded corporation which is an entity

qualifier, intermediary or holding company as to any officer, director, lender, underwriter, agent or employee thereof, or person directly or indirectly holding a beneficial interest or ownership of the securities of such publicly-traded corporation, so long as the CCC and the Director of the Division are, and remain, satisfied that such officer, director, lender, underwriter, agent or employee is not significantly involved in the activities of the licensee, and in the case of a security holder, does not have the abililiy to control the publicly-traded corporation or elect one or more directors thereof. Since Holding will be a publicly-traded holding company, compliance by these persons with the qualification process may be waived. Persons holding five percent or more of a security in an intermediary or a holding company, or having the ability to elect one or more of the directors of such company, are presumed to have the ability to control the company and will, unless this presumption is rebutted, be required to seek qualification. A waiver by the CCC and the Director of the Division of the individual qualification requirements as to each security holder holding less than five percent of the securities of Holding must be obtained. A petition seeking a waiver as to the holders of securities of Holding was filed with the CCC on December 31, 1990. On January 29, 1991, the CCC deferred consideration of such waiver request as to the holders of Class A Stock or Class B Stock.

*Issuance, Ownership and Transfer of Securities.* The Casino Control Act imposes certain restrictions upon the issuance, ownership and transfer of securities of an entity which holds a casino license or is an entity qualifier, intermediary or holding company of a licensee (a "Regulated Company"). Upon confirmation of the Plan and completion of the transactions contemplated thereby, the Company, the Partnership, TTMI, TM/GP, Holding and Trump Corp. will each be deemed to be a Regulated Company, and instruments such as the common stock of Holding and the New Bonds evidencing a beneficial ownership or creditor interest therein including capital stock, partnership interests or bonds, will be deemed to be the securities of a Regulated Company. There are restrictions relating to the sale, assignment, transfer, pledge or other disposition of any security issued by a Regulated Company. As such, the issuance of securities by Holding has been approved by the CCC. If the CCC finds that a holder of securities issued by a Regulated Company is not qualified under the Casino Control Act, the CCC has the right to propose any remedial action it may deem appropriate. The CCC may also force divestiture by any disqualified holder of any securities issued to such holder by a Regulated Company.

In the event that certain categories of disqualified security holders fail to divest themselves of such securities, the CCC has the power to revoke or suspend the casino license affiliated with the Regulated Company which issued the securities. If any security holder is found unqualified, it is unlawful for the security holder (i) to receive any dividends or interest upon any such securities, (ii) to exercise, directly or through any trustee or nominee, any right conferred by such securities, or (iii) to receive any remuneration, in any form, from such Regulated Company for services rendered or otherwise.

*License Fees, Taxes and Investment Obligations.* The CCC is authorized to establish annual fees for the issuance and renewal of casino licenses. The issuance fee is based upon the cost of investigation and consideration of the license application and is not to be less than $200,000. The renewal fee is based upon the cost of maintaining control and regulatory activities prescribed by the Casino Control Act, and may not be less than $100,000 for a one-year casino license and $200,000 for a two-year casino license. There is also an annual license fee of $500 for each slot machine maintained for use or in use in any casino. In addition, initial work permit fees of $2.00 and annual renewal fees of $2.00 are payable for each employee. Finally, the CCC is authorized to establish by regulation annual fees, payable by the licensee or the registrant, for the issuance and renewal of licenses and registrations other than casino licenses.

Additionally, casino licensees are subject to potential assessments to fund any annual operating deficits incurred by the CCC or the Division. The Taj Mahal has been assessed $53,400 per month for the period which commenced in September 1990 and which is projected to end in June 1991 to fund an operating deficit of the CCC for its fiscal year ended June 30, 1991. Each casino licensee is also required to pay an annual tax of 8% on its gross casino revenues. For the year ended December 31, 1990, the Partnership's gross revenue tax was approximately $23,900,000, and its license, investigations, and other fees and assessments totalled approximately $4,993,000.

There is imposed an investment alternative tax on the gross casino revenues of the licensee in the amount of 2.5%. The tax imposed with respect to each calendar year is due and payable on the last day of April following the end of the calendar year. No tax is imposed on gross revenues received during the first twelve months of the operation of any casino that commenced operation after January 1, 1984. A licensee, however, is obligated to pay the investment alternative tax for a period of 25 years. Estimated payments of the investment alternative tax obligation must be made quarterly in an amount equal to 1.25% of estimated gross revenues for the preceding three month period. Investment tax credits may be obtained by making qualified investments or by the purchase of bonds issued by the CRDA. CRDA bonds may have terms as long as fifty years and bear interest at below market rates, resulting in a value lower than the face value of such CRDA bonds.

For the first ten years of a licensee's tax obligation, the licensee is entitled to an investment tax credit against the investment alternative tax in an amount equal to twice the purchase price of bonds issued to the licensee by the CRDA. After the first ten years of such tax obligation, the licensee is entitled to an investment tax credit in an amount equal to twice the purchase price of such bonds or twice the amount of a licensee's investments authorized in lieu of such investments in bonds or made in investments provided as eligible by the CRDA. After the first ten years of a licensee's investment alternative tax obligation, a licensee has the option of entering into a contract with the CRDA to have its tax credit comprised of direct investments in approved eligible projects. These direct investments may not comprise more than 50% of a licensee's eligible tax credit in any one year.

One hundred percent of the investments required during the first three years of each 25-year obligation must be made in Atlantic City; of the investments required during the remaining 22 years, the percentage to be made in Atlantic City gradually decreases to 20%, while the percentage of investment to be made in nine designated counties of southern New Jersey and 12 designated counties of northern New Jersey gradually increases to 45% and 35%, respectively.

*Violations.* If, at any time, it is determined that the Partnership, the Company, TTMI, TM GP, THMC, Holding, or Trump Corp. has violated the Casino Control Act or that any of such entities cannot meet the qualification requirements of the Casino Control Act, such entity could be subject to fines or its license could be suspended or revoked. If the Partnership's license is suspended or revoked for a period in excess of 120 days or if the CCC fails or refuses to renew such casino license, the CCC could appoint a conservator to operate and dispose of the Partnership's casino/hotel facilities. A conservator would be vested with title to the assets of the Partnership subject to valid liens and/or encumbrances. The conservator would be required to act under the general supervision of the CCC and would be charged with the duty of conserving, preserving and, if permitted, continuing the operation of the casino/hotel. During the period of any such conservatorship, the conservator may not make any distributions of net earnings without the prior approval of the CCC. The CCC may direct that all or part of such net earnings be paid to the casino revenue fund, provided, however, that a suspended or former licensee would be entitled to a fair rate of return on its investment in the casino/hotel. The CCC may also discontinue any conservatorship action and direct the conservator to take such steps as are necessary to effect an orderly transfer of the property of a former or suspended casino licensee. It would be the obligation of the conservator to continue the debt service payments on the Note, but no assurance can be given that the conservator would have sufficient funds available to do so.

*Employees.* All employees of the Taj Mahal must be licensed under the Casino Control Act or registered with the CCC, depending on the nature of the position held. Casino employees are subject to more stringent requirements than non-casino employees. Each casino employee must meet applicable standards pertaining to such matters as financial responsibility, good character, ability, casino training and experience, and New Jersey residency. Such regulations have resulted in significant competition among Atlantic City casino operators for the services of those employees who meet these requirements.

*Gaming Credit Policy.* The Taj Mahal's casino games are conducted on a credit as well as cash basis. Gaming debts arising in Atlantic City in accordance with applicable regulations are enforceable in the courts of the State of New Jersey. The extension of gaming credit is subject to regulations that detail procedures which casinos must follow when granting gaming credit and recording counter checks

which have been exchanged, redeemed, or consolidated. These regulations specify the information that casinos must obtain from prospective credit patrons and record in their credit files. They also specify the information that must be verified, how the verification procedures are to be performed, how often they are to be repeated, and who is authorized to perform them. In addition, the regulations detail which personnel are authorized to grant credit to patrons and require recording of the reasons for the granting, change or denial of a patron's credit line. Specific parameters have also been imposed for granting temporary increases to credit lines. Finally, the regulations define the procedures that must be followed if a patron's counter check is returned to a casino, as well as the information and documentation that must be recorded in the patron's credit file. The Partnership's personnel pursue collection with respect to gaming receivables by sending initial notices, follow-up notices and other communications to debtors. If receivables remain uncollected, the Partnership, in certain cases, refers collection of such receivables to attorneys, as required by the New Jersey gaming laws. There can be no assurance that New Jersey judgments with respect to gambling debts will be enforceable in all other states.

*Control Procedures.* Gaming at the Taj Mahal is conducted by trained and supervised personnel. The Partnership employs extensive security and internal controls at the Taj Mahal. Security checks are made by the Partnership to determine, among other matters, that job applicants for key positions have had no criminal history or associations. Security controls utilized by the surveillance department at the Taj Mahal include closed circuit video cameras to monitor the casino floor and money counting areas. The count of moneys from gaming also is observed daily by representatives of the CCC.

*Other Laws and Regulations.* The United States Department of the Treasury has adopted regulations pursuant to which a casino is required to file a report of each deposit, withdrawal, exchanges of currency, gambling tokens or chips, or other payments or transfers by, through, or to such casino which involves a transaction in currency of more than $10,000 per patron per gaming day. Such reports are required to be made on forms prescribed by the Secretary of the Treasury and are filed with the Commissioner of the Service. In addition, the Taj Mahal is required to maintain detailed records (including the names, addresses, social security numbers and other information with respect to its gaming customers) dealing with, among other items, the deposit and withdrawal of funds and the maintenance of a line of credit.

In the past, the Service had taken the position that gaming winnings from table games by nonresident aliens was subject to a 30% withholding tax; however, the Service subsequently adopted a practice of not collecting such tax. Recently enacted legislation exempts from tax withholding table game winnings by non-resident aliens, unless the Secretary of the Treasury determines by regulation that such collections have become administratively feasible.

The Partnership and THMC are subject to other federal, state and local regulations and, on a periodic basis, must obtain various licenses and permits, including those required to sell alcoholic beverages. The Partnership and THMC believe that they have obtained all required licenses and permits to conduct their business.

## Legal Proceedings

The Partnership, its partners, certain members of its Executive Committee, the Company, and certain of their employees are involved in various legal proceedings, some of which are described below. The Partnership and the Company have agreed to indemnify such persons and entities, including THMC, against any and all losses, claims, damages, expenses (including reasonable costs, disbursements and counsel fees) and liabilities (including amounts paid or incurred in satisfaction of settlements, judgements, fines and penalties) incurred by them in said legal proceedings. Such persons and entities are vigorously defending the allegations against them and intend to vigorously contest any future proceedings. If adversely decided, these legal proceedings could have a material adverse effect on the Partnership's results of operations and financial condition. Upon the commencement of the Reorganization Case, all proceedings pending against the Debtors will be stayed.

69

*Fraudulent Conveyance Matters.* In September 1988, a holder of certain debentures issued by Resorts International, Inc., a Delaware corporation ("RII"). filed a purported class action complaint against RII and First Interstate Trust Co. of New York in the Supreme Court of the State of New York, County of New York, in an action entitled *Kenwood Dual Fund. Ltd. v. First Interstate Trust Co. of New York and Resorts International, Inc.* The initial complaint alleged a class action on behalf of the holders of RII's 10% Subordinated Debentures due June 1, 1998 and RII's 10% Subordinated Debentures due August 1, 1999. The aggregate outstanding principal amount of these series of debentures as of November 1, 1988 was $170,000,000. The initial complaint sought, among other things, a declaratory judgment that RII was in default under the terms of each indenture under which each such series of RII debentures was issued and that the principal and accrued interest of all such RII debentures was due and owing.

Subsequently, Donald J. Trump was named as an additional defendant in this action on a fraudulent conveyance claim relating to the transfer of certain assets now constituting part of the Taj Mahal, from RII and its subsidiary to Donald J. Trump and his affiliates.

In February 1989, the plaintiff served a second amended and supplemental complaint which eliminated all allegations against First Interstate Trust Co. of New York, the trustee under the indenture under which the debentures were issued, and limited the complaint to a single cause of action alleging a fraudulent conveyance in the transfer of some or all of the property acquired by affiliates of Donald J. Trump. On June, 7, 1989, Donald J. Trump filed an answer in which he denied the material allegations of the complaint. As a result of the filing of RII's chapter 11 case referred to below, this action was stayed until the confirmation of RII's plan of reorganization in September 1990, and has been inactive since the lifting of the stay.

On September 12, 1989, holders of certain RII debentures purported to commence two separate class actions against certain defendants, including the Partnership. in the Supreme Court of the State of New York, County of New York. The first action, entitled *The George S. Kolbe Target Benefit Pension Plan, George S. Kolbe Trustee and Paul D. Fisher v. Resorts International Inc., Donald J. Trump. The Trump Hotel Corporation and Trump Taj Mahal Associates Limited Partnership,* alleges a class action on behalf of holders of Resorts International Financing, Inc.'s 16⅝% Debentures due 2004 and RII's 11⅜% Debentures due 2013. The complaint seeks, among other things, a declaration that the sale of property by Resorts International Inc. of New Jersey ("RINJ"), a subsidiary of RII, to the Partnership be adjudged fraudulent and set aside and that a receiver be appointed to take charge of the property.

The second action, entitled *Jack Shulman and Leonard J. Hanlein v. The Griffin Company, et al.,* alleges a class action on behalf of holders of RII's 11⅜% Subordinated Debentures due 2013 and RII's 10% Subordinated Debentures due 1998. The complaint seeks, among other things, to annul as a fraudulent conveyance under state and common law the conveyance of certain property, including the Taj Mahal, from RII and/or certain of its subsidiaries to the Partnership and also seeks compensatory damages.

On September 20, 1989, a third class action was commenced against certain defendants, including the Partnership, in the Supreme Court of the State of New York, County of New York. The action, entitled *D. Campbell, G. Frank, R. Frank and D. Frank Trustees v. Resorts International Inc., et al.* alleges a class action on behalf of holders of RII's 11⅜% Debentures due 2013. The complaint seeks, among other things, a declaration that the sale of certain property by RII and/or certain of its subsidiaries to the Partnership, including the Taj Mahal, be adjudged fraudulent and set aside.

On November 12, 1989, an involuntary petition was filed against RII and Resorts International Financing, Inc. for an Order for Relief under chapter 11 of the Code. On December 22, 1989, RII and Resorts International Financing Inc. consented to the entry of an Order for Relief. On that same date, Griffin Resorts, Inc. ("GRI") and Griffin Resorts Holdings. Inc. filed a voluntary petition for an Order for Relief under chapter 11 of the Code. As a result of the filing of the chapter 11 case. the actions filed in the Supreme Court of the State of New York, County of New York, have been stayed. On December 22, 1989, RII, GRI, Resorts International Financing, Inc. and Griffin Resorts Holding Inc. filed their Plan of Reorganization with the Bankruptcy Court, which Plan of Reorganization was

70

amended on April 16, 1990. The Plan of Reorganization (as amended) provides for a $5,000,000 trust fund (the "Resorts Litigation Trust") to defray the costs to prosecute litigation against the Partnership, and others, arising from the sale of the Taj Mahal and other related transactions. The Plan of Reorganization was confirmed in September 1990.

On or about May 29, 1991. RII and certain related entities, Merv Griffin, the Resorts Litigation Trust (a trust established for the benefit of certain creditors of RII in its chapter 11 reorganization case), Donald J. Trump, the Partnership and certain of its affiliates (collectively, the "Trump Parties") executed a Settlement Agreement. Pursuant to the Settlement Agreement, the Partnership will pay $3,000,000 to the Resorts Litigation Trust, and an insurance company will pay $9,000,000 to the Resorts Litigation Trust pursuant to a directors and officers insurance policy maintained by RII. In return, the Resorts Litigation Trust has executed general releases of the Trump Parties and the insurer and agreed to indemnify and hold harmless such persons from certain claims that the Resorts Litigation Trust has the sole authority to prosecute. The Resorts Litigation Trust has also agreed to hold $250,000 as a reserve against claims for such indemnification.

RII and Merv Griffin have also exchanged general releases of the Trump Parties and the Trump Parties have given a general release to the Resorts Litigation Trust. The Trump Parties will withdraw their proofs of claim in the RII chapter 11 reorganization case. Both the settlement amount and the releases will be held in escrow until certain lawsuits have been dismissed with prejudice upon motion of the Resorts Litigation Trust. The Settlement Agreement is also conditioned upon receipt of approval thereof by a majority of the holders of Resorts Litigation Trust certificates (the beneficial owners of the claims of the Resorts Litigation Trust) by July 15, 1991.

*Bondholder Litigation.* Since June 1990, various purported class actions have been commenced on behalf of the holders of the Old Bonds and the publicly traded bonds of the Other Trump Casinos.

On or about June 12, 1990, a purported class action complaint was filed against certain defendants including the Partnership and the Company, in the United States District Court for the District of New Jersey. The action, entitled *Schwartz v. Trump's Castle Funding, Inc., Trump's Castle Associates Limited Partnership, Trump Taj Mahal Funding, Inc., Trump Taj Mahal Associates Limited Partnership and Donald J. Trump*, purports to be brought on behalf of all persons who purchased the Old Bonds and/or the $13\frac{3}{4}\%$ First Mortgage Bonds, Series A-1, due 1997, or the $7\%$ First Mortgage Bonds, Series A-2, due 1999, each issued by Trump's Castle Funding, Inc. (collectively the "Castle Bonds"), on the open market between May 27, 1988 and the date of the filing of the complaint (the "Plaintiff Holders"). The complaint asserts claims for violations of Rule 10b-5 of the Exchange Act, and seeks compensatory damages in an unspecified amount, rescission, fees and disbursements.

On or about June 15, 1990, holders of the Castle Bonds and the Company's Old Bonds purported to commence a class action against certain defendants, including the Partnership, in the United States District Court for the District of New Jersey. The action, entitled *Kaufman v. Trump's Castle Funding, Inc., Trump's Castle Associates Limited Partnership, Trump Taj Mahal Funding, Inc., Trump Taj Mahal Associates Limited Partnership and Donald J. Trump*, purports to be brought on behalf of the Plaintiff Holders. The complaint asserts claims for violations of the Exchange Act, and seeks compensatory damages in an unspecified amount, rescission, fees and disbursements.

On or about August 9, 1990, a purported class action entitled *Cagan et al. v. Donald J. Trump, Robert S. Trump, Harvey I. Freeman, C. "Bucky" Willard, Trump Taj Mahal Funding, Inc., Trump Taj Mahal Associates Limited Partnership, The Trump Organization, Inc., Trump Taj Mahal Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated*, was filed in the United States District Court for the Eastern District of New York. Plaintiffs purport to represent all those who purchased Old Bonds of the Company between November 10, 1988 and June 14, 1990. The complaint alleges violations of Sections 11 and 12 of the Securities Act, and seeks compensatory damages in an unspecified amount.

On or about September 26, 1990, a purported class action entitled *Fairmont Financial Corporation et al. v. Donald J. Trump, Harvey Freeman, Robert S. Trump, The Trump Organization, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Trump Taj Mahal Funding, Inc., Trump Taj Mahal, Inc., Trump*

*Taj Mahal Assoc.'s Limited Partnership,* was filed in the United States District Court for the Southern District of New York. Plaintiff purports to represent all those who purchased Old Bonds on or after November 22, 1988, or who owned the Old Bonds as of the date the action was commenced. The complaint alleged violations of Sections 11 and 12 of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act against all defendants, and tortious interference with contractual relationships and breach of fiduciary duty against various of the individual defendants, and seeks compensatory damages in an unspecified amount.

On or about October 8, 1990, a purported class action entitled *Glosser, et al. v. Donald J. Trump, Harvey Freeman, Robert S. Trump, The Trump Organization, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Trump Taj Mahal Funding, Inc., Trump Taj Mahal, Inc., Trump Taj Mahal Assoc.'s Limited Partnership,* was filed in the United States District Court for the Southern District of New York. The complaint in this action is substantially identical to the one filed in *Fairmont.*

On or about October 12, 1990, a purported class action entitled *Kloss v. Donald J. Trump, Robert S. Trump, Harvey I. Freeman, C. Willard "Bucky" Howard, Trump Taj Mahal Funding, Inc., Trump Taj Mahal Assoc.'s Limited Partnership, The Trump Organization, Inc., Trump Taj Mahal, Inc., and Merrill Lynch, Pierce, Fenner & Smith, Incorporated,* was filed in the United States District Court for the Eastern District of New York. Plaintiffs purport to represent all those who purchased Old Bonds between November 10, 1988 and June 14, 1990. The complaint alleges violations of Sections 11 and 12 of the Securities Act, and seeks compensatory damages in an unspecified amount.

On or about September 7, 1990, the plaintiff in the *Schwartz* action filed a motion before the Judicial Panel on Multidistrict Litigation to coordinate or consolidate pretrial proceedings in, among other cases, the *Kaufman, Schwartz* and *Cagan* actions, in the United States District Court for the District of New Jersey. By Order dated December 4, 1990, the Multidistrict Panel granted that motion and transferred the *Cagan, Fairmont, Glosser* and *Kloss* cases to the United States District Court for the District of New Jersey for coordinated or consolidated proceedings with the *Schwartz* and *Kaufman* cases.

By Order dated February 14, 1991, the United States District Court for the District of New Jersey ordered, among other things, that the plaintiffs in the cases subject to the December 4, 1990 Order file an amended and consolidated complaint with respect to the Taj Mahal (and another amended and consolidated complaint with respect to Trump Castle and Trump Plaza) which would supercede the complaints filed in the individual actions. The consolidated action, and all similar litigation, if any, not known to the Registrants or commenced after the date hereof, is herein referred to as the "Bondholder Litigation."

On February 8, 1991, the plaintiffs in the consolidated action filed an amended and consolidated complaint with respect to the Taj Mahal. This complaint names as defendants Donald J. Trump, Robert S. Trump, Harvey I. Freeman, the Partnership, the Company, TTMI, The Trump Organization, and Merrill Lynch, Pierce, Fenner & Smith, and purports to be brought on behalf of those who either purchased Old Bonds or who will be deprived of interest on the Old Bonds pursuant to the Plan. The complaint alleges violations of Section 11 and 12 of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act against all defendants and breach of fiduciary duty and common law false advertising against various defendants and seeks compensatory damages in an unspecified amount. The Partnership and the Company have not yet responded to this complaint.

On or about April 23, 1991, the parties to the consolidated Bondholder Litigation relating to the Taj Mahal reached an agreement in principle pursuant to a Memorandum of Understanding. Such settlement is conditioned upon plaintiffs' confirmatory discovery, the execution of a definitive settlement agreement, court approval and confirmation of the Plan, and provides for, among other things: (1) payment of cash to the settlement class; (2) certain enhancements to the consideration to be delivered to the settlement class as part of the Plan; and (3) the issuance by TTMI to the settlement class of certain putable warrants to acquire a portion of the capital stock of TTMI from Donald J. Trump.

In addition. Merrill Lynch, Pierce. Fenner & Smith will agree to withdraw and release certain claims that it has or may have against Donald J. Trump, Robert S. Trump, Harvey I. Freeman, the Partnership, the Company, TTMI and The Trump Organization from indemnification. In exchange for such release, TTMI will issue to Merrill Lynch, Pierce. Fenner & Smith warrants of the type to be issued to the plaintiffs, except that such warrants will not contain any put feature. Consummation of the settlement is subject to (a) completion of plaintiffs confirmatory discovery, (b) execution of definitive settlement documentation, (c) dismissal of the actions with prejudice and (d) final confirmation of the Plan by the United States Bankruptcy Court.

*Other Litigation.* In September 1989. RII commenced an action against Fred Lowenschuss to recover a payment made to him of $3.800,000. On or about October 20, 1989, Lowenschuss purported to commence a counterclaim and cross-claim against the Partnership, and others, alleging that RII defaulted on its obligations under four indenture agreements and seeking the immediate payment of all principal and interest allegedly owed to him. The complaint alleges claims against the Partnership and others, for breach of fiduciary duty, violations of Sections 11 and 12 of the Securities Act and Rule 10b-5 promulgated under the Exchange Act, and a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO") arising out of the struggle for control of RII. The complaint seeks compensatory and punitive damages. RII subsequently filed a chapter 11 proceeding, and on or about January 9, 1990. RII removed the action to the bankruptcy court. On December 3, 1990, the United States District Court for the District of New Jersey, which had acquired jurisdiction over this action as a result of RII's filing of the Chapter 11 proceeding, dismissed Lowenschuss' claim with prejudice.

On or about March 21, 1991, GNLV, Corp. ("GNLV") commenced an action against certain defendants, including the Partnership, in the District Court of Clark County, Nevada. The action, entitled *GNLV, Corp. v. Donald J. Trump, The Trump Taj Mahal Corporation, Trump Taj Mahal, Inc., Trump Taj Mahal Associates, and Dennis C. Gomes,* relates to the employment of Dennis C. Gomes by the Partnership. The complaint asserts claims for tortious interference with contractual relationships by the Partnership and certain other defendants, and seeks compensatory and punitive damages in an unspecified amount, equitable relief, and costs. On April 15, 1991, a motion was filed on behalf of Trump Corp., the Partnership, and TTMI challenging the jurisdiction of the District Court of Clark County, Nevada and seeking to quash the service of process on such entities. On April 29, 1991, a similar motion was filed on behalf of Donald J. Trump. To date, the court has not ruled on these motions. On May 3, 1991, Dennis C. Gomes filed his answer to the complaint, which raised counterclaims against both GNLV and Mr. Steven A. Wynn, a third party, for damages arising out of the alleged wrongful termination of Mr. Gomes.

On March 22, 1991, the Partnership and Dennis C. Gomes commenced an action against GNLV in the Superior Court of New Jersey, Atlantic County. The action, entitled *Trump Taj Mahal Associates d/b/a Taj Mahal Hotel & Casino and Dennis C. Gomes v. GNLV, Corp.,* relates to the employment of Dennis C. Gomes by GNLV and the Partnership. The complaint seeks a decree that GNLV has no rights against Gomes or the Partnership with regard to the employment of Gomes by the Partnership. GNLV has not yet responded to this complaint.

At this juncture in the actions described above, the prospects of a favorable outcome with respect to the Partnership and the Company cannot be assessed. The Partnership and the Company intend to vigorously contest the allegations made against them.

## MANAGEMENT

Upon consummation of the Plan, the management structure of the Partnership will be changed. See "Management—Proposed Changes in Management."

All decisions affecting the business and affairs of the Partnership, including the operation of the Taj Mahal, are decided by the partners acting by and through the Executive Committee, the members of which are designated by, and may be removed by, Donald J. Trump. As currently constituted, the Executive Committee consists of Donald J. Trump, Chairman, Stephen F. Bollenbach, Robert S. Trump, Harvey I. Freeman and Nicholas L. Ribis. None of the members of the Executive Committee devotes a majority of his working time to the operations of the Partnership. Accordingly, the Executive Committee delegates responsibility for the day-to-day operation of the Taj Mahal to certain other persons. In addition, the Partnership entered into the Management Agreement on November 22, 1988, pursuant to which THMC manages the operations of the Taj Mahal.

The Partnership has an Audit Committee on which Mr. Freeman serves with two unaffiliated persons appointed thereto in accordance with the requirements of the CCC. The Audit Committee reviews certain matters of policy, purpose, responsibility and authority, and makes recommendations with respect thereto on the basis of reports to it from the Partnership's Surveillance and Internal Audit Departments, both of which report directly to the Audit Committee. The Surveillance Department is responsible for the surveillance, detection, and video-taping of unusual and illegal activities in the casino/hotel. The Internal Audit Department is responsible for the review of, reporting instances of noncompliance with, and recommending procedures to eliminate weakness in, internal controls. The Audit Committee reviews and satisfies itself as to the adequacy of the structure of the Partnership's financial organization and the proper implementation of the financial and accounting policies of the Partnership. The Audit Committee reviews with the Partnership's outside auditors the scope of the audit prior to its commencement and the results of the examination.

The sole director of the Company and Holding is Donald J. Trump. Donald J. Trump serves as Chairman of the Board, President and Treasurer of the Company and Holding. Robert S. Trump serves as Vice President and Secretary of the Company and Holding. Henry W. Hornbostel serves as Assistant Treasurer of the Company. Stephen Bollenbach serves as Vice President of Holding.

### Directors and Executive Officers

Set forth below are the names, ages, positions and offices held with the Partnership, the Company and Holding, and a brief account of the business experience during the past five years, of each member of the Executive Committee, the executive officers of the Partnership, the sole director of the Company and Holding and the executive officers of the Company and Holding.

| | Age | Position |
|---|---|---|
| Donald J. Trump .............. | 44 | Chairman of the Executive Committee of the Partnership, Chairman of the Board of Directors, President and Treasurer of the Company and of TTMI since June 1988 and of Holding since December 1990; sole director of Holding and the Company; Chairman of the executive committees of the partnerships that own Trump Castle and Trump Plaza since June 1985 and May 1986, respectively; President of The Trump Organization, which is in the business, through its affiliates and subsidiaries, of acquiring, developing and managing real estate properties for more than the past five years, and operating an airline. Director of Alexander's Inc. since 1987. Donald J. Trump is the brother of Robert S. Trump. |
| Robert S. Trump .............. | 42 | Chief Executive Officer of the Partnership from October 1989 through April 1990; Member of the Executive Committee of the Partnership and Vice President and Secretary of the Company and TTMI since June 1988; Vice President and Secretary of Holding since December 1990; Member of the executive committees of the |

74

| | Age | Position |
|---|---|---|
| | | partnerships that own Trump Castle and Trump Plaza since June 1985 and May 1986. respectively: Executive Vice President of The Trump Organization for more than the past five years. Director of Alexander's Inc. since 1987. Robert S. Trump is the brother of Donald J. Trump. |
| Harvey I. Freeman............. | 53 | Member of the Executive Committee of the Partnership since June 1988; Vice President of TTMI since June 1988; Member of the executive committees of the partnerships that own Trump Castle and Trump Plaza since June 1985 and May 1986. respectively: Executive Vice President of. and counsel to. The Trump Organization for more than the past five years. Director of Alexander's Inc. since 1987. |
| Stephen F. Bollenbach.......... | 48 | Member of the Executive Committee of the Partnership since October 1990: Chief Financial Officer of The Trump Organization since August 1990: Vice President of Holding since February 1991: member of the executive committees of the partnerships that own Trump Castle and Trump Plaza since October 1990: Senior Vice President and Chief Financial Officer of The Promus Companies Incorporated from September 1986 through August 1990: Senior Vice President—Finance and Treasurer of The Marriott Corporation from October 1982 through September 1986. |
| Dennis C. Gomes.............. | 47 | President and Chief Operating Officer of the Partnership. commencing in May 1991. subject to licensure by the CCC: President of Golden Nugget Hotel & Casino from April 1989 to March 1991: Executive Vice President. Chief Operating Officer of Dunes Casino Hotel & Country Club from January 1989 to April 1989; President of Clark Management Corporation from June 1988 to December 1988: Executive Vice President. Chief Operating Officer of Alladin Hotel & Casino from February 1987 to November 1987; Senior Vice President Casino Operations. Nevada of Hilton Hotel Corporation from April 1984 to February 1987. |
| Nicholas L. Ribis ............. | 46 | Chief Executive Officer of the Partnership since February 1991; Member of the Partnership's Executive Committee and the executive committees of the partnerships which own Trump Castle and Trump Plaza since April 1991; Senior Partner of. from 1980 to February 1991. and since February 1991. Counsel to. the law firm of Ribis. Graham & Curtin which serves as legal counsel to all of the above-named entities. |
| C. Willard "Bucky" Howard .... | 52 | Senior Vice President Casino Operations since January 1991; Executive Vice President of the Partnership from January 1990 through April 1990 and from August 1990 through January 1991; President and Chief Operating Officer of the Partnership from April 1990 to August 1990: Executive Vice President of Showboat Hotel and Casino. Atlantic City from October 1988 to January 1990; Vice President of Casino Operations of Trump Castle from May 1984 to October 1987; Vice President of Casino Operations of Tropicana Hotel & Casino, Atlantic City. from 1982 to 1984. |
| Nicholas F. Moles ............. | 37 | Senior Vice President. Law of the Partnership since January 1989; General Counsel from May 1986 to May 1988 and Vice President and General Counsel from May 1988 to December 1988 of Trump Plaza: Assistant Secretary of TTMI since January 1989; Vice President |

| | Age | Position |
|---|---|---|

| | | and General Counsel of Elsinore Shore Associates, the owner and operator of the Atlantis Casino Hotel, Atlantic City, from May 1985 to May 1986; Director and Assistant Secretary of Elsinore Finance Corporation from November 1985 to May 1986. |
| Henry W. Hornbostel .......... | 39 | Senior Vice President, Finance and Administration of the Partnership and Assistant Treasurer of the Company and TTMI since May 1990; Vice President of Finance and Administration of Bally's Grand Hotel and Casino, Atlantic City, from May 1988 to September 1989; Vice President and Treasurer of the Golden Nugget, Atlantic City, from January 1985 through May 1988; Treasurer of the Golden Nugget, Atlantic City from August 1981 to January 1985. |
| Howard Klein ................ | 52 | Senior Vice President of Marketing of the Partnership since August 1990; Vice President of Casino Marketing of Bally's Park Place, Inc. from February 1988 to August 1990; Vice President of Marketing of Caesars Atlantic City Casino/Hotel from November 1983 to February 1988. |

*Cash Compensation.* The following table sets forth the aggregate cash compensation accrued or paid during the year ended December 31, 1990, including amounts paid pursuant to the Taj Mahal Hotel & Casino Retirement Savings Plan, by the Partnership for services rendered in all capacities to the Partnership to each of the five most highly compensated executive officers of the Partnership whose cash compensation, including bonuses and deferred compensation, exceeded $60,000, and to all executive officers of the Partnership as a group. The director and certain officers of the Company, TTMI and Trump Corp. and the members of the Executive Committee of the Partnership were compensated by The Trump Organization in 1990.

| Name | Capacities in Which Served | Compensation |
|---|---|---|
| C. Willard "Bucky" Howard .... | Executive Vice President | $ 527,131 |
| Walter J. Haybert(1) ........... | President and Chief Operating Officer | 292,454 |
| Wolf Lichten ................. | Vice President of Player Development | 245,315 |
| John A. Arnesen(2) ........... | Senior Vice President Operations | 220,568 |
| I.G. Jack Davis(3) ............ | President | 207,387 |
| All executive officers of the Partnership as a group (13 persons)(4) ............... | | $1,894,798 |

(1) Mr. Haybert held the office of President and Chief Operating Officer from October 1989 to April 1990; since September 1990, Mr. Haybert has not been affiliated with the Partnership.

(2) Since October 1990, Mr. Arnesen has not been affiliated with the Partnership.

(3) Since May 1991, Mr. Davis has not been affiliated with the Partnership.

(4) Four of the thirteen executive officers were members of the Executive Committee of the Partnership and were compensated by The Trump Organization rather than by the Partnership.

*Certain Employment Agreements.* The following table sets forth the names and capacities of certain executive officers having employment agreements with the Partnership. along with the projected annual cash salaries for 1991 and termination dates as set forth in their respective employment agreements.

| Name | Capacity | Annual Salary | Termination Date |
|------|----------|---------------|------------------|
| Dennis C. Gomes | President and Chief Operating Officer | $850.000(1) | March 31. 1992 |
| C. Willard "Bucky" Howard | Executive Vice President | 350.000 | December 31. 1992 |
| Howard J. Klein | Senior Vice President—Marketing | 250.000 | August 1. 1993 |
| Nicholas L. Ribis(2) | Chief Executive Officer | 225.000(3) | January 21. 1994 |
| Henry W. Hornbostel | Senior Vice President—Finance and Administration | 175.000 | May 7. 1993 |
| Nicholas F. Moles | Senior Vice President—Law | 160,000 | December 31. 1991 |

(1) Employment commenced in May 1991. The salary figure includes a mandatory bonus of $100.000 paid each December 31st during the term of the agreement. In addition. the agreement provides that Mr. Gomes shall receive an additional bonus. which is subject to CCC approval. equal to 1% of the Registrant's Income from Operations. as defined. in excess of $130.000,000 for such year.

(2) Mr. Ribis has been chosen by the Executive Committee and the executive committees of the partnerships which own Trump Plaza and Trump Castle to oversee their Atlantic City operations.

(3) Estimated. The agreement provides that Mr. Ribis will receive $12.500 per month net of his income taxes.

*Compensation Pursuant to Plans.* Effective January 1, 1989. the Partnership established the Trump Taj Mahal Hotel & Casino Retirement Savings Plan (the "Savings Plan"). The Savings Plan is a cash-or-deferred arrangement and is intended to qualify for favorable tax treatment under Sections 401(a) and 401(k) of the I.R.C. The Savings Plan year is the calendar year. All employees of the Partnership are eligible to participate in the Savings Plan with the exception of employees who are covered by a collective bargaining agreement. unless such agreement provides for participation in the Savings Plan. Salaried and shift-rated employees eligible to participate in the Savings Plan commence participation on the Entry Date (the first day of each calendar quarter) coincident with or next following their date of hire. All other eligible employees commence participation in the Savings Plan on the Entry Date coincident with or next following their completion of three months of service with the Partnership and attainment of age 21. Participants may elect to defer receipt of up to 4% of their compensation (as defined in the Savings Plan), which the Partnership will contribute to the Savings Plan in the form of basic contributions. Participants with compensation not in excess of $50.000 may elect to defer receipt of up to an additional 11% of their compensation. and participants with compensation in excess of $50.000 may elect to defer receipt of up to an additional 6% of their compensation (provided that no more than $200.000 of compensation may be taken into account). The Partnership will contribute such additional elective deferrals to the Savings Plan in the form of supplemental contributions. The Partnership must contribute to each participant's account in each Savings Plan year. a matching contribution in an amount equal to 50% of the sum of each participant's basic contribution made for such Savings Plan. The matching contributions will be made only with respect to a maximum of 4% of the participant's salary. Participants are fully vested in the amount of basic contributions made to the Saving Plan on their behalf. Participants are 25% vested in matching contributions allocated to their account after two years of service with the Partnership. and increase their vested percentage in such amounts by 25% for each additional year of service. with full vesting in matching contributions upon completion of five years of service. Participants' accounts will be valued at least annually, and the amount of their (or their beneficiaries') benefit upon the occurrence of an event causing distribution of the participants' interest in the Savings Plan is based solely on the value of the participants' accounts at such time.