During 1990, the Partnership made or accrued the following matching vested contributions on behalf of the following executive officers: Walter J. Haybert $1,995, John A. Arnesen $1,995, and to all executive officers of the Partnership as a group (13 persons) $3,990.

*Compensation of Directors.* None of the Company's directors are employees of the Company. Members of the Audit Committee other than Mr. Freeman are paid annual fees of $20,000, plus $1,500 for each Audit Committee meeting attended, together with reimbursement of reasonable out-of-pocket expenses incurred in attending such meetings. The directors of Holding shall be compensated as follows: (i) (i) each Class B Director shall be paid a fixed fee of $60,000 per year plus an additional fee of $4,000 for each meeting of the Board of Directors attended, either in person or by telephone, provided, however, that the total fees received by any Class B Director in any single calendar year shall not exceed $90,000, unless such Class B Director attends more than 15 meetings of the Board of Directors, in which case, such Class B Director shall receive an additional $4,000 for each meeting attended subsequent to the fifteenth meeting attended; (ii) Donald J. Trump shall not be paid any fee for serving as a Class C Director; and (iii) each Class C Director other than Donald J. Trump shall be paid a fixed fee of $30,000 per year plus an additional fee of $2,000 for each meeting of the Board of Directors attended, either in person or by telephone, provided, however, that the total fees received by any Class C Director in any single calendar year shall not exceed $45,000, unless such Class C Director attends more than 15 meetings of the Board of Directors, in which case, such Class C Directors shall receive an additional $2,000 for each meeting attended subsequent to the fifteenth meeting attended. All directors shall receive reasonable expenses of attendance for each meeting attended. In addition, members of the TM/GP Audit Committee shall be compensated as follows: each member selected by the Class B Directors shall receive $2,000 per meeting attended and each member selected by the Class C Directors shall receive $1,000 per meeting attended.

## Proposed Changes in Management

Upon consummation of the Plan, the Executive Committee of the Partnership will be disbanded and the Board of Directors of TM/GP will control the affairs of the Partnership. Initially, Donald J. Trump will have the ability to elect five of the nine members of the Board of Directors of Holding (the "Class C Directors") and such persons, in turn, will elect themselves as five of the nine directors of TM/GP. Donald J. Trump currently intends to name himself and Nicholas L. Ribis, Harvey I. Freeman and Steven F. Bollenbach as four of the initial five Class C Directors of Holding and such persons will also act as directors of TM/GP. The initial Class B Directors will be nominated by the Steering Committee. Such Class B Directors are not known at this time. Following consummation of the Plan, the Class B Directors will be nominated by the Class B Directors then in office and elected annually by the holders of Class B Stock until such time as the Final Payment Date shall occur. Following the Final Payment Date all nine directors of Holding will be elected by the holders of the Class C Stock and Class A Stock voting as a single class with cumulative voting, and such directors will also serve as the directors of TM/GP. See "Description of the TM/GP Certificate of Incorporation" and "Description of the Holding Certificate of Incorporation." It is anticipated that the current executive officers of the Partnership will act as executive officers of TM/GP after the Effective Date.

Donald J. Trump and the Partnership will execute the Services Agreement pursuant to which Donald J. Trump will provide certain personal services to the Partnership. See "Services Agreement." The Management Agreement will be terminated as part of the Plan.

## CERTAIN TRANSACTIONS

### Acquisition of The Taj Mahal

*Background*

On May 27, 1988, Donald J. Trump, The Griffin Company ("Griffin Co.") and RII and certain of their respective affiliates entered into agreements pursuant to which the following transactions were effected: (i) On November 15, 1988, Donald J. Trump sold to Griffin Co. 712,650 shares of RII's Class B Common Stock at $135 per share (Donald J. Trump's original cost); (ii) On November 15, 1988, Griffin Co. acquired RII in accordance with an Agreement and Plan of Merger, dated May 27, 1988 and amended June 6, 1988, pursuant to which all stockholders of RII (other than Griffin Co. and Donald J. Trump) received $36 per share in cash and, after the merger, Griffin Co. became the sole stockholder of RII; (iii) On November 15, 1988, pursuant to the terms of two termination agreements each dated as of May 27, 1988, a services agreement between RII and The Trump Hotel Corporation, together with a license agreement, dated as of October 20, 1987, by and among RII, Donald J. Trump and The Trump Organization, Inc., were terminated in exchange for RII's payment to The Trump Hotel Corporation of $3,000,000 (representing accrued construction management fees and reimbursable expenses through March 31, 1988) and $60,689,750 (representing an agreed upon termination fee); and (iv) On November 16, 1988, RII and certain of its subsidiaries (collectively, "Resorts") sold (a) certain property (the "Property") to the Partnership, and (b) the Assigned Assets (described below) to Realty Corp. and another affiliate of Donald J. Trump (other than the Partnership), each pursuant to the Asset Purchase Agreement described below.

*Asset Purchase Agreement*

*General.* On November 16, 1988, Resorts, pursuant to the Asset Purchase Agreement, sold the Property to the Partnership and sold the Assigned Assets to Realty Corp. and another affiliate of Donald J. Trump.

*Purchase Price.* The purchase price (including acquisition expenses) for the assets acquired under the Asset Purchase Agreement (including the Assigned Assets) was $299,700,000 (consisting of $230,000,000, fixed adjustments in Resorts' favor of $43,000,000, acquisition expenses of $6,400,000 and the assumption of liabilities in the aggregate amount of approximately $20,300,000). Of the purchase price payable to Resorts under the Asset Purchase Agreement, $12,000,000 was paid to Resorts by Realty Corp. and another affiliate of Donald J. Trump (other than the Partnership) for the Assigned Assets (which amount was based upon the appraised value of such Assigned Assets) and the balance thereof was paid by the Partnership.

*The Property.* The Property purchased by the Partnership (exclusive of the Assigned Assets) included: the Taj Mahal, including the real property, comprising approximately 17 acres, on which the Taj Mahal is situated, together with all of the improvements thereon; certain additional assets related to the Taj Mahal and its operations, such as furniture, furnishings and equipment and certain deposits relating thereto; a lease or sublease, as the case may be, of certain billboards owned or leased by Resorts for up to a three and one-half year period; certain permits and contracts pertaining to the Taj Mahal's construction and planned operation; certain commitments for guest bookings, conventions, meetings, reservations and entertainment identified in the Asset Purchase Agreement; any and all guaranties, warranties and service agreements (implied or express) relating to the construction, completion, equipping, operation and/or improvement of the Taj Mahal; certain security deposits and other ancillary assets; the non-exclusive right to a copy of all computer software programs which were being used by Resorts at the time of the closing in connection with the operation of the Resorts Casino Hotel (unless prohibited by the applicable license agreement or applicable law); the Terrace Building; certain intangible property, including advertising campaigns, plans, permits, rights, licenses and the like that were owned by (or leased to) Resorts at the time of the closing and which were acquired exclusively for use in connection with the construction and opening of the Taj Mahal; and the right to use the name "Taj Mahal."

*Assigned Assets.* At the closing. the Partnership assigned to Realty Corp. and another affiliate of Donald J. Trump its right to acquire certain additional assets (the "Assigned Assets"). The Assigned Assets include the Steel Pier; certain parcels of then unimproved land located adjacent to the Taj Mahal site: five separate parcels of land on which a 32,000 square foot warehouse. a 4,000 square foot warehouse and a 2,000 square foot office building are situated: an approximately 210-foot wide strip of vacant land located between the Taj Mahal and the Showboat Hotel and Casino ("Showboat") on a portion of which the Theater is being constructed: and three helicopters and certain assets related thereto. including the temporary right to land helicopters on the Steeplechase Pier (which was destroyed by fire on December 10. 1988 and. accordingly, is no longer available for use). The Partnership presently uses certain of the Assigned Assets (consisting of vacant land for surface parking. the Steel Pier and the warehouse complex) pursuant to certain leases and licenses.

*Certain Arrangements.* Pursuant to the Asset Purchase Agreement. the Partnership and Resorts entered into the following agreements and arrangements:

*Terrace Building.* The Partnership has leased to Resorts the following portion of the Terrace Building. for a maximum period of four years: 70% through November 16, 1990. 50% through November. 16, 1991 and 25% through the expiration of the lease on November 16, 1992. The rent payable to the Partnership for such portions of the Terrace Building are in an amount equal to Resorts' pro rata share (based upon the foregoing percentages) of the Partnership's costs of maintaining. repairing and operating the Terrace Building. exclusive of capital expenditures.

*Showboat.* Resorts was a defendant in certain litigation commenced by Atlantic City Showboat. Inc. ("ACS"), the owner of the Showboat. brought in the Superior Court of New Jersey. ACS dismissed such action concurrently with the closing. In connection with this dismissal. ACS undertook certain roadway construction near the Showboat so as to permit the continuous use thereof as a public thoroughfare for automobile and pedestrian traffic including, but not limited to, patrons of the Showboat. and will dedicate such roadway to the City of Atlantic City. Resorts. the Partnership and ACS have agreed that the actual cost and expenses incurred by ACS in connection with such roadway construction and completion will be borne up to one-third by Resorts. up to one-third by the Partnership and the remainder by ACS. In conjunction with the dismissal of the Showboat litigation, and in accordance with the terms of the Asset Purchase Agreement. the Partnership has assumed certain of the obligations of Resorts relating to the Taj Mahal under a 99-year net lease entered into between RII. as lessor, and ACS. as lessee, dated as of October 26, 1983 for the land on which the Showboat was constructed. Such obligations include (i) construction of a pedestrian walkway between Showboat and the Taj Mahal. which has been completed. and (ii) maintainance and, where necessary, reconstruction of certain facilities common to Showboat and the Taj Mahal, including certain service roads and the pedestrian walkway.

*Miscellaneous.* The Partnership has agreed to complete, at its expense. and thereafter to grant appropriate easements to Resorts for the mutual use of: (i) the pedestrian bridge constructed between the Taj Mahal and the Resorts Casino Hotel (which was completed in April 1990); and (ii) certain infrastructure improvements indicated on the then existing plans for the Taj Mahal. The Partnership and Resorts have entered into an easement agreement providing for the mutual use of certain traffic lanes to the extent of each casino/hotel's then existing bus transportation plan.

For a period of five years after November 16, 1988. the Partnership has agreed not to purchase certain land located near the Resorts Casino Hotel and Resorts has agreed not to purchase certain land located near the Taj Mahal. In addition, the Partnership has agreed. for a period of three years after November 16, 1988, not to take any action delaying or opposing any applications made by Resorts for any new parking garage, unless such garage would have a material adverse impact on the operations of the Taj Mahal.

*Indemnification.* Resorts and the Partnership have agreed to indemnify each other with respect to all losses, costs and expenses reasonably incurred by the other, together with interest at the rate of 10% per annum on cash disbursements, arising from a breach by Resorts or the Partnership of any of their respective covenants, agreements or obligations contained in the Asset Purchase Agreement and expressly stated to survive the closing. Except with respect to the Partnership's interest in the Property (and Donald J. Trump's and/or his affiliates' interest in the Assigned

Assets) and Resorts' interest in the property retained by it, neither Resorts, the Partnership nor any of their respective affiliates (including Merv Griffin and Donald J. Trump) have any personal liability under the Asset Purchase Agreement. Resorts and the Partnership have waived and released the aforementioned persons from and against any loss, liability, damage or claim arising out of the Asset Purchase Agreement.

Resorts has also agreed to indemnify the Partnership with respect to the property retained by Resorts and not sold pursuant to the Asset Purchase Agreement, and the Partnership has agreed to indemnify Resorts with respect to the Property and the Assigned Assets, against any loss, cost, claim, damage, liability or expense which the Partnership or Resorts, as the case may be, may incur as a result of (i) the application of any present or future federal, state or local environmental laws, rules or regulations and (ii) any claim, demand or judgment by a third party, including any governmental authority, relating to the existence of asbestos, hazardous substances or waste on such property.

The Partnership also assumed and agreed to pay, when due, and to indemnify Resorts and hold Resorts harmless with respect to, all liabilities and obligations of Resorts arising under or relating to the Property and certain of the Assigned Assets incurred after March 31, 1988 and with respect to the other Assigned Assets after the closing.

Except for those obligations retained or assumed by Resorts pursuant to the Asset Purchase Agreement, the Partnership has further agreed to indemnify and hold Resorts harmless with respect to all liabilities in connection with any litigation, governmental proceedings and/or arbitration involving (i) the Property and certain of the Assigned Assets which arise out of any act or failure to act subsequent to March 31, 1988, and (ii) the other Assigned Assets conveyed pursuant to the Asset Purchase Agreement which arise out of any act or failure to act subsequent to the closing.

Except for those obligations assumed by the Partnership, Resorts has agreed to indemnify and hold harmless the Partnership with respect to all liabilities in connection with any litigation, governmental proceedings and/or arbitration involving (i) the Property and certain of the Assigned Assets which arise out of any act or failure to act prior to March 31, 1988, and (ii) the other Assigned Assets conveyed pursuant to the Asset Purchase Agreement which arise out of any act or failure to act prior to the closing.

In connection with the Partnership's assignment to Realty Corp. and another affiliate of Donald J. Trump of the right to purchase the Assigned Assets, such affiliates agreed to indemnify the Partnership to the extent of all amounts which the Partnership will have to indemnify Resorts under the Asset Purchase Agreement with respect to the Assigned Assets.

*Development Agreement.* The Partnership has assumed the obligations of Resorts under a Development Agreement entered into between Resorts and the Housing Authority which specifically relates to the Property and certain of the Assigned Assets, including the obligation to complete construction of the Taj Mahal. Resorts retained the obligations under the Development Agreement not related to the Property or the Assigned Assets, including any obligations to construct certain residential housing. As between Realty Corp. and the Partnership, Realty Corp. is obligated to perform those obligations under the Development Agreement that relate to the Assigned Assets.

## Summary of Transactions with Donald J. Trump and His Affiliates

The following table sets forth, the amounts due to Donald J. Trump and his Affiliates from the Partnership as of December 31, 1990, and the estimated annual payments of the Registrants to Donald J. Trump and his Affiliates following confirmation of the Plan. For a more detailed description of the Registrants' transactions with Donald J. Trump and his Affiliates, see "Certain Transactions— Trump Line of Credit," "—Management Agreement," and "—Transactions with Affiliates."

| | Amount Due and Outstanding as of March 31, 1991 | Estimated Annual Costs Upon Consummation of the Plan |
|---|---|---|
| Management Agreement | | |
|     Accrued fees(1) | $10,366,000 | N/A |
|     Construction Fee Deferral Note(1) | 10,000,000 | N/A |
| Compensation paid to Donald J. Trump | | |
|     Salary | 0 | 0 |
|     Director's fees | 0 | 0 |
|     Services Agreement(2) | N/A | $ 500,000 |
| Trump Line of Credit Note(3) | 25,000,000 | 0 |
| Realty Corp. rent(4) | 1,838,600 | 2,725,000 |
| Trump's Castle Associates Limited Partnership(4)(5) | 248,607 | 0 |
| Trump Plaza Associates | (350,626) | N/A |
| Trump Air(4) | (58,112) | N/A |
| Trump Shuttle(4)(5) | 0 | 0 |

(1) The Plan provides that no payment will be made with respect to these claims.

(2) This amount is the minimum amount payable under the Services Agreement, which also provides for an additional incentive fee, based upon the performance of the Partnership.

(3) The Plan provides that the Trump Line of Credit Note will be cancelled, and the Partnership's liability thereunder will be cancelled.

(4) Amounts due to these Affiliates will be treated as Class 8 Claims.

(5) Following confirmation of the Plan, services provided by Affiliates will be paid on an as used basis.

**Trump Line of Credit**

On April 30, 1990, Donald J. Trump loaned the Partnership, on an unsecured basis, $25,000,000, in exchange for the Partnership's note (the "Trump Line of Credit Note"). Donald J. Trump has assigned the Trump Line of Credit Note to certain banks as security for other personal indebtedness. Amounts borrowed under the Trump Line of Credit were utilized by the Partnership for working capital purposes. Except as required under the Trump Line of Credit, Donald J. Trump is not required to lend any amounts to the Partnership. The Trump Line of Credit Note will be cancelled pursuant to the Plan. See "The Plan".

*Borrowing Terms.* The Trump Line of Credit Note currently bears interest at the "prime" rate of Bankers Trust Company. Interest on such loans is payable semi-annually, but both principal and interest may be paid only to the extent permitted under the Old Indenture. Interest on the loans will accrue to the extent not paid.

*Subordination.* The loan to the Partnership pursuant to the Trump Line of Credit is subordinated to the Partnership Note and the Old Bonds.

*Termination.* The obligation of Donald J. Trump to make further advances under the Trump Line of Credit has terminated.

*Assignment to Trustee.* The Partnership's rights against Donald J. Trump under the Trump Line of Credit (other than the right to receive the funds loaned by Donald J. Trump, which were payable to the Partnership) have been assigned to the Company and the Company in turn assigned its rights to the Trustee under the Old Indenture.

*Effect of Plan.* On the Effective Date, the Trump Line of Credit Note will be cancelled and the Partnership's liability thereunder will be discharged. TTMI will execute the New Line of Credit Note payable to Bankers Trust in the same principal amount. See "The Plan."

**Management Agreement**

The following is a summary of the terms of the Management Agreement. It is qualified in its entirety by reference to the Management Agreement, a copy of which has been made an Exhibit to the Registration Statement of which this Prospectus is a part. In connection with the Plan, the Management Agreement will be cancelled.

*General.* The Partnership entered into the Management Agreement with THMC, a New Jersey corporation controlled by Donald J. Trump. In general, the Management Agreement obligates THMC, as exclusive agent for the Partnership, to manage the operations of the Taj Mahal, including all casino operations, and obligated it to perform certain construction supervisory services in connection with the completion of construction of the Taj Mahal, in exchange for certain fees, all as further described below.

*Management Fee.* In consideration for the management services of THMC, THMC was and is to be paid, semi-annually, the Management Fee equal to 1¾% of the Gross Revenues (as defined in the Management Agreement) for each fiscal year or part thereof within the term of the Management Agreement. The Old Indenture provided that the Management Fee may be paid for any six month period only after all interest and principal on the Old Bonds due during such six month period have been paid. If interest on the Old Bonds is paid for any six month period, then the Old Indenture does not prohibit the payment of the Management Fee for such period. THMC has the right to demand payment of the Management Fee under such circumstances, regardless of whether or not the Company will be able to pay interest on the Old Bonds on the next ensuing interest payment date. Through March 31, 1991 Management Fees of $10,336,000 had accrued of which $656,000 had been paid.

In addition, the Partnership is obligated to reimburse THMC, on a monthly basis, for all of the out-of-pocket expenses incurred by THMC, its officers, employees and or agents, in performing their obligations under the Management Agreement.

*Construction Fee.* In consideration for THMC providing certain construction supervisory services pertaining to the Taj Mahal, the Partnership agreed to pay THMC a fee in the amount of $10,000,000. On August 8, 1990, the Partnership executed a promissory note for $10,000,000 payable on August 8, 1995 (the "Construction Fee Deferral Note") for the payment of this fee. The Construction Fee Deferral Note has been endorsed by THMC to First Fidelity to secure the repayment of amounts owed to First Fidelity by Realty Corp and guaranteed by THMC. See "Amendment to First Fidelity Loan."

*Term.* Unless the Management Agreement is terminated at an earlier date, the term of the Management Agreement ends on the date which is seventeen years from the opening of the Taj Mahal. The term of the Management Agreement with respect to the construction and related services pertaining to any particular Future Project (as defined in the Management Agreement) is that period of time which is reasonably required for completion of such services, including the final adjustment of all contract claims after the opening of such Future Project.

*Termination.* Each of the parties to the Management Agreement has the right and option to terminate the Management Agreement on 30 days' prior written notice to the other in the event the other party causes, commits or suffers to exist with respect to it certain defined events. Upon (i) the occurrence of an Event of Default under the Mortgage and the exercise by the Trustee of certain rights of possession, or (ii) the appointment of a receiver of the Trust Estate, either THMC or the Trustee may terminate the Management Agreement.

*Termination of Management Agreement.* On the Effective Date the Partnership and THMC shall execute a Termination of Management Agreement which will provide (a) that the Management Agreement shall terminate (except that the indemnification provisions thereof shall remain in effect with respect to alleged actions or failures to act occurring on or before the Effective Date) and (b) Donald J. Trump, THMC, the Partnership and their respective directors, officers, shareholders and employees shall be released and discharged from any and all duties, obligations and liabilities under the Management Agreement except that the indemnification obligations contained therein shall survive and remain in full force and effect to the extent provided therein.

*Cancellation of Construction Fee and Accrued Management Fees.* The Termination of Management Agreement provides that THMC shall (a) deliver to the Partnership for cancellation the Construction

Fee Deferral Note, and the indebtedness evidenced thereby shall be discharged and (b) agree to release and discharge the Partnership from its obligation to pay any accrued Management Fees through such date and from any and all other amounts due THMC pursuant to the Management Agreement.

### Trump Completion Guaranty

The following is a summary of the terms of the Trump Completion Guaranty. It is qualified in its entirety by reference to the Trump Completion Guaranty, a copy of which has been filed as an exhibit to the Registration Statement of which this Prospectus is a part. The Amended Mortgage will acknowledge that the Trump Completion Guaranty is no longer in effect. See "Effect of the Plan" below.

In connection with the issuance of the Old Bonds, Donald J. Trump furnished a guaranty to the Trustee for the benefit of the holders of the Old Bonds (the "Trump Completion Guaranty"). Pursuant to the Trump Completion Guaranty, Donald J. Trump guaranteed, among other things, that on or before March 1, 1991, as such date may have been extended by reason of force majeure delays, (i) construction of the Taj Mahal would be substantially completed in accordance with the plans and specifications as the same may be amended; (ii) a temporary certificate of occupancy would be duly issued by the appropriate state or city governmental authorities and all other actions or things relative to the construction and completion of the Taj Mahal necessary for opening and operating substantially all of the gaming and hotel facilities of the Taj Mahal to the public, including compliance with all requirements relative to the construction and completion of the Taj Mahal of governmental authorities (including the CCC and the Division) which are a prerequisite to such opening and operation and to obtaining any Permits (as defined in the Mortgage) necessary for such opening and operation, shall have been accomplished and effected; (iii) the Taj Mahal would have been equipped with substantially all Tangible Personal Property (as defined in the Mortgage) necessary or desirable in connection with opening the Taj Mahal to the public and operating the Taj Mahal, in all cases consistent with the standards of other casino/hotels of comparable quality located in Atlantic City; and (iv) all costs, expenses and liabilities incurred in connection with the construction, completion and equipping of the Taj Mahal in accordance with clauses (i), (ii), and (iii) above would have been paid (or if not paid, the unpaid amount or a letter of credit for such amount shall have been deposited in an escrow account or guaranteed unconditionally by Donald J. Trump or by certain financial institutions), and the Taj Mahal would be free and clear of all liens and encumbrances, including any mechanic's liens, other than liens or encumbrances constituting Permitted Encumbrances (except Restricted Encumbrances (as defined in the Mortgage) other than leases permitted under the Mortgage).

The Trump Completion Guaranty provides that it will be deemed discharged when (a) the obligations set forth above and certain other obligations are completely performed in accordance with the terms of the Trump Completion Guaranty, (b) there has been paid to the Trustee and/or the holders of the Old Bonds all amounts owing pursuant to the Old Indenture and the Old Bonds, or (c) all of the following shall have occurred or be applicable: (i) substantially all of the Taj Mahal shall have been opened to the general public, (ii) the Taj Mahal shall be free and clear of all liens and encumbrances other than Permitted Encumbrances, (iii) all costs, expenses, and liabilities incurred in connection with the construction, completion and equipping of the Taj Mahal shall have been paid (or if not paid, the unpaid amount or a letter of credit for such amount shall have been deposited in an escrow account, or guaranteed unconditionally by Donald J. Trump or by certain financial institutions), and (iv) one of the following shall have occurred: (x) the Coverage Ratio (as defined in the Old Indenture) of the Partnership, calculated for the four prior fiscal quarters ending with the date of the then latest available quarterly statement of the Partnership is not less than 1.5, or (y) (1) there shall have been initially finished and furnished, in such manner so as to be occupiable by hotel guests, that number of guest rooms in the Taj Mahal as is necessary under applicable laws, rules and regulations to open and operate a 120,000 square foot casino, (2) a 120,000 square foot casino shall have been opened to the public and shall be operating, (3) substantially all other components of the Taj Mahal (other than the casino and the hotel rooms) as described in the Prospectus dated November 9, 1988 relating to the Old Bonds shall have been substantially completed, and (4) the Trustee shall not have had the right to

and shall not have called upon Donald J. Trump to perform any of his obligations under the Trump Completion Guaranty.

*Effect of Plan.* The terms of the Amended Mortgage include an acknowledgment that the Trump Completion Guaranty is no longer in effect. Thus the Trump Completion Guaranty will not be security for the New Bonds and the holders of the New Bonds will have no further claim against Donald J. Trump under the Trump Completion Guaranty.

## Transactions With Affiliates

The Partnership has engaged in some limited inter-company transactions with Realty Corp., Trump's Castle Associates Limited Partnership (the "Castle Partnership"), Trump Plaza Associates (the "Plaza Partnership"), Trump Crystal Tower Associates Limited Partnership (d/b/a/ Trump Regency) (the "Trump Regency"), Helicopter Air Services, Inc. (d/b/a/ Trump Air) ("Trump Air"), and Trump Shuttle, Inc. (the "Trump Shuttle"), each of which is beneficially owned by Donald J. Trump.

The Partnership currently leases from Realty Corp., land adjacent to the site of the Taj Mahal which is being used primarily for surface parking, together with the land on which the Theater is being constructed, the Steel Pier, and a warehouse complex. For the three months ended March 31, 1991, the lease charges due Realty Corp. for these facilities totalled $442,000. See "Business— Property."

Until February 1991, the Partnership utilized the print shop operations and limousine services of the Castle Partnership and until April 1991, the Partnership utilized the fleet maintenance and laundry services of the Castle Partnership and was charged based upon the the actual cost of those services. Costs incurred by the Partnership payable to the Castle Partnership for the three months ended March 31, 1991, totalled approximately $495,000, of which all but approximately $249,000 was paid or offset against amounts owed to the Partnership by the Castle Partnership.

In addition, the Partnership purchased tickets for boxing matches and leases warehouse space from the Plaza Partnership. Expenses incurred by the Partnership payable to the Plaza Partnership for the three months ended March 31, 1991 totalled approximately $1,363,000, all of which was paid or offset against amounts owed to the Partnership by the Plaza Partnership.

In April 1991 the Partnership purchased from the Castle Partnership for $1,700,000 two adjacent parcels of land on the Pleasantville-Egg Harbor Township border, constituting approximately 10 acres. The first parcel contains two buildings, certain fleet maintenance facilities, and an office building and warehouse facility, portions of which are currently leased to the Plaza Partnership. The second parcel is unimproved. The Partnership currently provides and charges fleet maintenance services to the Castle Partnership and the Plaza Partnership.

Through January 1991, Trump Air provided regularly scheduled helicopter service to the public between New York City and Atlantic City. The Partnership provided complimentary carriage to certain patrons of the Taj Mahal on Trump Air, for which Trump Air was paid by the Partnership at its prevailing ticket rates. The Partnership, for the three months ended March 31, 1991, had incurred approximately $42,000 for air travel provided by Trump Air to patrons of the Taj Mahal all of which was paid. The Partnership has a similar arrangement with the Trump Shuttle for the provision of airline services to Atlantic City on behalf of the Partnership's patrons. For the three months ended March 31, 1991, the Partnership incurred approximately $468,000 in charges from Trump Shuttle, all of which was paid.

Prior to commencing its operations, the Taj Mahal utilized the facilities of the Trump Regency Hotel located in Atlantic City for the processing and training of its employees. The Partnership was billed by Trump Regency for its costs associated with this use in the amount of approximately $481,000 of which all but approximately $141,000 had been paid at December 31, 1990. These costs were associated with the opening of the Taj Mahal, and the Partnership does not expect these costs to reoccur.

In connection with the restructuring of the indebtedness of the Partnership and the Company, including, among other things, preparation of the Plan and the Solicitation, certain employees of The

Trump Organization have provided various services to the Partnership. Through March 31. 1991. the total amount billed to the Partnership. and subsequently paid. for such services was approximately $3,530,000.

The Partnership has reserved the right. subject to the approval of a majority of the Board of Directors of TM/GP. including the Class B Directors. to combine other operations of the Other Trump Casinos and the Taj Mahal and to enter into other transactions with affiliates. subject to the terms of the Indenture and the Amended Mortgage and the rules and regulations of the CCC.

## THE SOLICITATION

### General

The Solicitors, upon the terms and subject to the conditions set forth herein. are soliciting an Acceptance of the Plan from each person who was a beneficial holder of Old Bonds on the Voting Record Date. A form of Ballot. and where appropriate a form of Master Ballot. to be used for voting to accept or reject the Plan together with a self-addressed postage-paid envelope has been provided with this Prospectus.

### Expiration Date; Extensions; Amendments

The Solicitation will expire at 5:00 p.m.. New York City time, on July 15. 1991. unless the Solicitors, in their sole discretion. extend the Solicitation to a date not later than August 30. 1991. such date and any extension thereof is referred to herein as the "Expiration Date". During any extension. all Ballots and Master Ballots previously given will remain subject to all the terms and conditions of the Solicitation. including the revocation rights specified herein.

The Solicitors expressly reserve the right. at any time or from time to time, to extend the period of time for which the Solicitation is to remain open by giving oral or written notice to the Ballot Agent of such extension. Any extension or expiration of the Solicitation will be followed as promptly as practicable by a public announcement. Without limiting the manner in which the Solicitors may choose to make the public announcement. the Solicitors will not, unless otherwise required by law. publish. advertise or otherwise communicate any such public announcement other than by making a release to the Dow Jones News Service.

The Solicitors expressly reserve the right to amend, at any time and from time to time. the terms of the Solicitation or the Plan. If the Solicitors make a material change in the terms of the Solicitation or the Plan or if they waive a material condition. the Solicitors will disseminate additional Solicitation materials and will extend the Solicitation. in each case to the extent required by law.

If any condition shall not have been satisfied or waived. the Solicitors expressly reserve the right to delay acceptance of any Ballot or Master Ballot or to terminate the Solicitation and not accept any Ballot or Master Ballot. See "The Plan—Conditions Precedent."

### Agreements Upon Furnishing Ballots

The delivery of a Ballot or Master Ballot by a holder of Old Bonds in accordance with the procedures set forth below will constitute an agreement between such holder of Old Bonds and the Solicitors in accordance with the terms and subject to the conditions set forth herein and in the Ballot or Master Ballot.

In addition, by executing and delivering a Ballot. such holder of Old Bonds shall appoint Holding as their nominee to execute the Amended Partnership Agreement on their behalf for the purpose of receiving the Equity Interest and contributing such Equity Interest to Holding in consideration for its Class A Stock and Class B Stock.

### Procedure For Voting on the Plan

The Solicitors are providing copies of this Prospectus, Ballots and, where appropriate. Master Ballots, to all holders of the Old Bonds. Holders may include brokerage firms. commercial banks, trust

companies, or other nominees. Entities that are nominal record holders only, that is entities that do not hold for their own account, must provide copies of this Prospectus and appropriate Ballots to their customers and to beneficial owners. Any beneficial owner who has not received this Prospectus and a Ballot should contact his or its brokerage firm, nominee, or the Ballot Agent.

### Beneficial Owners

Any beneficial owner holding Old Bonds in its own name can vote on the Plan by completing and signing the enclosed Ballot and returning it directly to the Ballot Agent (using the enclosed self-addressed, stamped envelope).

Any beneficial owner holding Old Bonds in "street name" through a brokerage firm, bank, trust company, or other nominee can vote on the Plan through such nominee by following these instructions:

1. Complete and sign the Ballot. Alternatively, a nominee may execute a Ballot in blank and send it to the beneficial owner, who can complete the Ballot.

2. Return the Ballot to the Ballot Agent or, if the nominee record holder is compiling a Master Ballot, to the nominee, in either case as promptly as possible. A stamped envelope addressed to the Ballot Agent or the nominee should have been enclosed for this purpose. Contact the Ballot Agent for instructions if no envelope was enclosed.

Any Ballot submitted to a nominee will not be counted until such nominee properly completes and delivers to the Ballot Agent a Master Ballot that reflects such vote.

It is important that all holders of Old Bonds vote to accept or reject the Plan because, under the Code, for purposes of determining whether the Requisite Acceptances of the holders of the Old Bonds have been received, only holders of Old Bonds who vote will be counted. Any Ballot that is executed by a holder of Old Bonds that does not indicate a rejection or acceptance of the Plan will be counted as an acceptance of the Plan.

### Brokerage Firms, Banks, and Other Nominees

A brokerage firm that is the holder of an Old Bond for a beneficial owner can vote on behalf of such beneficial owner by (i) distributing a copy of this Prospectus and a Ballot to such owner, (ii) collecting the Ballot, and (iii) completing a Master Ballot compiling the votes and other information from that Ballot and other Ballots collected, and transmitting such Master Ballot to the Ballot Agent on or before the Expiration Date. A proxy intermediary acting on behalf of a brokerage firm or bank may follow the procedures outlined in the preceding sentence to vote on behalf of such beneficial owner.

Alternatively, a nominee which is the registered holder of an Old Bond for a beneficial owner can arrange for such beneficial owner to vote by executing the appropriate Ballot and by distributing a copy of the Prospectus and such executed Ballot to such beneficial owner to be completed by such beneficial owner and returned to the Ballot Agent.

### Securities Clearing Agencies

The Solicitors expect that each of the Depository Trust Company, The Midwest Securities Trust Company, and The Philadelphia Depository Trust Company, as the nominee holder of Old Bonds, will arrange for its respective participants to vote by executing an omnibus proxy in favor of such participants. As a result of the omnibus proxy, such participant will be authorized to vote in the name of such securities clearing agencies.

### Other

If a Ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations, or others acting in a fiduciary or representative capacity, such persons should indicate such capacity when signing and, unless otherwise determined by the Solicitors, must submit proper evidence satisfactory to the Solicitors of their authority to so act.

Except as provided below, unless the Ballot being furnished is timely submitted to the Ballot Agent on or prior to the Expiration Date together with any other documents required by such Ballot, the Solicitors may, in their sole discretion, reject such Ballot as invalid and, therefore, decline to utilize it in connection with seeking confirmation of the Plan by the Bankruptcy Court. In no case should a Ballot be delivered to the Solicitors or the Financial Advisor.

**The Solicitors are not at this time requesting the delivery of, and will not accept, certificates representing Old Bonds. Promptly after the Effective Date, the Solicitors (or their agent) will furnish all holders of Old Bonds with an appropriate letter of transmittal to be used to remit Old Bonds. Information regarding such remittance procedure (together with all appropriate materials) will be distributed by the Solicitors (or their agent) after the commencement of the Reorganization Case.**

### Appointment of Holding as Agent

All holders of Old Bonds who vote to accept the Plan will be deemed to have appointed Holding as their nominee to execute the Amended Partnership Agreement for the purpose of receiving the Equity Interest and contributing such Equity Interest to Holding in consideration for the Class B Stock and Class A Stock.

### Revocation Rights

Ballots previously delivered to the Ballot Agent may be revoked at any time prior to the earlier of (a) the commencement by Debtors of the Reorganization Case and (b) the Expiration Date. After commencement of the Reorganization Case, revocation may be effected only with the approval of the Bankruptcy Court.

To be effective, a written or facsimile transmission notice of revocation must (i) be timely received by the Ballot Agent at one of its addresses specified on the back cover of this Prospectus; (ii) specify the name of the holder of the Old Bond whose vote on the Plan is being revoked; (iii) contain the description of the Old Bonds as to which a vote on the Plan is revoked; (iv) state whether the vote was by Ballot or Master Ballot and identify the date of such Ballot or Master Ballot; and (v) be signed by the holder of the Old Bonds in the same manner as the original signature on the Ballot or Master Ballot. A signed notice of revocation of a Ballot or Master Ballot is effective upon receipt by the Ballot Agent of written or facsimile transmission notice of revocation.

### Termination Upon Certain Events

Notwithstanding any provisions of the Solicitation, the Solicitors will not be required to accept any Ballot or Master Ballot and may terminate or amend the Solicitation at their option at any time on or after the date of the commencement of the Solicitation. Without limiting the foregoing, the Solicitors, at their option, may terminate, cancel, modify or amend the Solicitation described herein, if any of the following events occur:

(a) any action or proceeding is instituted, threatened or pending in or by any court or by or before any governmental authority or other regulatory or administrative agency, domestic or foreign, with respect to the Solicitation, which, in the sole judgment of the Solicitors, would or might prohibit, restrict or delay effectiveness of, or materially impair the contemplated benefits to the Solicitors of the Plan;

(b) any statute, rule or regulation shall have been proposed or enacted, or any action shall have been taken by any court or governmental authority, which would or might, in the sole judgment of the Solicitors, have any of the effects set forth in (a) above;

(c) there shall have occurred (i) any general suspension of, or limitation on prices for, trading in securities listed on the American Stock Exchange; (ii) any limitation (whether or not mandatory) by any governmental authority, or any other event which, in the sole judgment of the Solicitors, might affect the extension of credit by banks in the United States; (iii) a commencement of a war or armed hostilities or other international or national emergency directly or indirectly involving the

United States; or (iv) in the case of any of the foregoing existing on the date of this Prospectus, a material acceleration or worsening thereof;

(d) there shall have occurred any change or development involving a prospective change in or affecting the business or financial affairs of the Solicitors which, in the sole judgment of the Solicitors, would or might prohibit, restrict or delay consummation of, or materially impair the contemplated benefits of, the Plan, or otherwise result in implementation of the Plan not being in the best interests of the Solicitors; and

(e) there exists, in the sole judgment of the Solicitors, any other actual or threatened legal impediment (including a default under any agreement, indenture or other instrument or obligation to which either of the Solicitors is a party or by which either of the Solicitors is bound) to the Plan.

The foregoing provisions are for the sole benefit of the Solicitors and may be asserted by the Solicitors regardless of the circumstances giving rise to the events or may be waived by the Solicitors, in whole or in part, at any time and from time to time, in their sole discretion. Any determination by the Solicitors concerning the events described above will be final and binding upon all parties.

If any of the foregoing events occurs, the Solicitors may (i) terminate the Solicitation and refuse to accept Ballots and Master Ballots; (ii) extend the Solicitation and retain all Ballots and Master Ballots until the Expiration Date, subject, however, to the right to revoke such Ballots and Master Ballots; or (iii) delay acceptance of the Ballots and Master Ballots even though the Solicitation has expired. The Solicitors' right to delay acceptance of Ballots and Master Ballots is subject to the provisions of applicable law.

### Fees and Expenses

The expenses of soliciting Acceptances will be borne by the Partnership. The principal solicitation is being made by mail; however, additional solicitations may be made by telegraph, telephone or in person by officers and regular employees of the Solicitors and their affiliates. Arrangements may also be made with brokerage houses and other custodians, nominees and fiduciaries to forward the material regarding the Solicitation to the beneficial owners of Old Bonds.

The total cash expenditures to be incurred by the Partnership in connection with the Solicitation through the Filing Date are estimated to be approximately $250,000.

### Financial Advisor

The Solicitors have engaged Donaldson, Lufkin & Jenrette Securities Corporation (the "Financial Advisor") to advise them with respect to certain terms of the Solicitation and the financial aspects of the Plan. The Financial Advisor will not render an opinion as to the fairness of the Solicitation and the financial aspects of the Plan. The Solicitors paid the Financial Advisor fees equal to $2,000,000 for services rendered through April 10, 1991 and have agreed to pay the Financial Advisor an additional fee of $1,375,000, payable at the rate of $250,000 per month, with the unpaid portion thereof payable upon consummation of the Plan or a restructuring plan substantially similar to the Plan. The Solicitors have also agreed to reimburse the Financial Advisor for certain expenses, including the reasonable fees and disbursements of their counsel, and to indemnify the Financial Advisor against certain liabilities and expenses, including liabilities under Federal securities laws. The Steering Committee has requested that the balance of any fees to the Financial Advisor from and after the Filing Date be cancelled and that the Financial Advisor be paid on the basis of an hourly rate from and after such date. The Debtors and the Financial Advisor have not agreed to such requested terms.

The Solicitors have been advised by the Financial Advisor that it does not own beneficially any Old Bonds.

### Ballot Agent and Information Agent

First Bank National Association will act as the Ballot Agent and Information Agent in connection with the Solicitation. The Ballot Agent will receive reasonable and customary compensation for services rendered in connection with the Solicitation, will be reimbursed for reasonable out-of-pocket expenses

and will be indemnified against certain liabilities and expenses in connection therewith. including liabilities under the Federal bankruptcy laws. All deliveries, correspondence and questions sent or presented to the Ballot Agent relating to the Solicitation and the Ballot should be directed to the addresses or telephone number set forth on the back cover page of this Prospectus.

All inquiries relating to the Solicitation should be directed to the Information Agent at the address and telephone number as set forth on the back cover page of this Prospectus. The Information Agent will provide holders of Old Bonds with information regarding the Solicitation. assist holders of Old Bonds in obtaining copies of this Prospectus and respond to questions from holders of Old Bonds with respect to the Ballot. The Information Agent will receive reasonable and customary compensation for its services. will be reimbursed for reasonable out-of-pocket expenses and will be indemnified against certain liabilities and expenses in connection therewith, including liabilities under the Federal securities laws.

**Requests for information or additional copies of this Prospectus or Ballots should be directed to the Information Agent.**

## DESCRIPTION OF NEW BONDS

The following is only a summary of the terms of the New Bonds, and is qualified in its entirety by reference to the Indenture and Amended Mortgage, copies of which have been made Exhibits to the Registration Statement of which this Prospectus is a part. The terms of the New Bonds include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 as in effect on the date of the Indenture. Unless otherwise specified, references to Articles and Sections are to Articles and Sections of the Indenture. The definition of certain terms used herein are set forth in "Certain Definitions" below in this section and in the section entitled "Glossary."

### General

Up to $860,000,000 in principal amount of New Bonds will be issued under the Indenture. This authorized principal amount of the New Bonds is equal to $722,250,000 plus an amount sufficient to pay the Additional Bond Amount and a portion of the interest on the New Bonds in additional Units. The Old Bonds issued pursuant to the Old Indenture will be extinguished upon consummation of the Plan. The Indenture also authorizes the issuance of bonds of additional series, all of which will be secured on a *pari passu* basis with the New Bonds, as described below. The New Bonds have a stated maturity of November 15, 1999. The New Bonds shall bear interest from their date of issuance payable (a) on May 15 and November 15 each year, commencing November 15, 1991 (except as described below), in cash at a rate equal to the Cash Rate and (b) on May 15 each year, commencing May 15, 1992, in cash or additional Units, or a combination thereof (on a pro rata basis), at a rate equal to the Additional Rate, determined in accordance with the following: in cash to the extent of Excess Available Cash Flow for the year ended on December 31 immediately preceding such Interest Payment Date (or, in the case of the year ended December 31, 1991, Excess Available Cash Flow for the period measured from the date of issuance of the New Bonds), and the balance, if any, in a principal amount of additional New Bonds equal to such balance: *provided,* that all or part of the Second Tier Amount otherwise payable in cash pursuant to the foregoing, at the Company's option, may be paid in additional New Bonds, calculated as aforesaid, but only to the extent that, on or before such Interest Payment Date, the Company or the Guarantor has spent or committed to spend (pursuant to a binding written agreement and spent within 30 days after such Interest Payment Date) such part of the Second Tier Amount by (i) purchasing New Bonds in open market transactions or otherwise or (ii) redeeming New Bonds pursuant to the redemption provisions of the Indenture, or any combination of subclauses (i) and (ii) and, *provided* further that the New Bonds referred to in subclauses (i) and (ii) are delivered to the Trustee for cancellation. If the payment of the Additional Amount is paid in a combination of cash and additional Units, the amount of such additional Units so payable shall be increased, and the amount of cash so payable shall be accordingly decreased, to the extent necessary so that no such additional New Bonds are issued in any denomination of other than integral multiples of $1.00. Notwithstanding the foregoing, upon the occurrence of a Bank Foreclosure (A) the New Bonds shall bear interest from and including the date of the Bank Foreclosure semiannually on each Interest Payment Date, payable in cash, at a rate of 14% per annum. Interest shall be payable to holders of record at the close of business on the first day of the calendar month of each Interest Payment Date. The New Bonds will bear interest at the rate of 11.35% (or, following a Bank Foreclosure, 14%) per annum on any overdue principal and premium. Interest shall be computed on the basis of a 360-day year of twelve 30-day months. Units will not be exchangeable for additional Units, other than in integral multiples of $1,000 with respect to the additional New Bonds, except in connection with a transfer of record ownership. The New Bonds will originally be issued in denominations of $1,000 and integral multiples thereof on the Effective Date. Thereafter, New Bonds will be issuable in denominations of $1 and integral multiples thereof. The New Bonds will be secured obligations of the Company and payment will be guaranteed by the Partnership. See "Security" and "Guaranties" below in this section.

The Indenture will contain certain negative covenants, including restrictions on the Partnership's and/or the Company's ability to, among other things, (i) incur additional indebtedness not otherwise permitted, (ii) create or incur additional liens on the Trust Estate, (iii) enter into leases outside of the ordinary course of business, (iv) engage in activities other than those related to the casino business,

(v) make distributions to holders of interests in the Company and the Partnership. and (vi) consolidate. merge. and convey or transfer their property or assets.

The principal of. premium. if any. and interest on the New Bonds will be payable at the office of TMFI maintained at either the Corporate Trust Office of the Trustee or in the Borough of Manhattan. City and State of New York. At the option of the Company. interest will be paid by check mailed to each holder of New Bonds at his registered address. The New Bonds may be presented for registration of transfer and exchange at such office of the Trustee. (Section 3.07)

Monies in respect of the cash interest payable on the New Bonds on the initial interest payment date therefor will be deposited by the Company in the Trust Account from time to time. See "Summary—Special Trust Account." If the Effective Date occurs on or after November 15. 1991. the Cash Payment accrued to such date will be distributed to the holders of record of Old Bonds as of the close of business on November 8. 1991 and the initial interest payment date for the New Bonds shall be May 15. 1992. Under such circumstances. the Cash Payment would continue to accrue under the Trust Agreement until such time as the New Bonds are issued.

The holders of the New Bonds. at the sole option of TTMI. may also receive all or a portion of the 14% Payment. which will in turn increase TTMI's partnership interest. See "Description of Amended Partnership Agreement—Acquisition of Additional Partnership Interests Upon 14% Payment or Foreclosure."

## Certain Definitions

The following are summaries and extracts of certain definitions in the Indenture or the Amended Mortgage. modified for use in this Prospectus. which are referred to in this Description of the New Bonds.

"*Addition Work*" means structural expansion or additions to the Taj Mahal and its ancillary structures and facilities or capital improvements to the Taj Mahal and its ancillary structures and facilities. including (A) expansion of or additions to either the casino or the hotel after the date hereof. (B) expansion of or additions to existing ancillary facilities. either onsite or offsite. or the addition. by acquisition or construction. of ancillary facilities. either onsite or offsite. to be used in connection with the operation of the Taj Mahal and its ancillary structures and facilities (such ancillary facilities may include. without limitation. New Parking Facilities. storage structures and recreational facilities; provided. however. that any such facilities (whether fee title thereto or a leasehold estate therein) are included within the lien of the Amended Mortgage). (C) replacements of all or any portion of any of the foregoing in clauses (A) and (B) above. and (D) modifications to the structure of the Taj Mahal or such ancillary structures and facilities.

"*Additional Amount*" on any May 15 Interest Payment Date means an additional amount of interest on the New Bonds payable in cash or additional New Bonds. or a combination thereof (on a pro rata basis). equal to the difference between (i) 11.35% of the outstanding principal amount of New Bonds on the immediately preceding Record Date and (ii) the interest on the New Bonds at the Cash Rate payable on such Interest Payment Date and the interest on the New Bonds at the Cash Rate that was payable on the immediately preceding Interest Payment Date.

"*Additional Rate*" means on any May 15 Interest Payment Date the Additional Amount on such date divided by the aggregate outstanding principal amount of New Bonds on the immediately preceding Record Date.

"*Amortization*," for any period. means. as applied to any Person. the amount of the amortization of goodwill and other intangible items (other than amortization of debt discount and capitalized financing fees) that is reflected on the financial statements of such Person and its consolidated subsidiaries for such period in accordance with generally accepted accounting principles consistently applied.

"*Appraised Value*" means the value of the Taj Mahal and its ancillary structures and facilities used or to be used in connection with the operation thereof. together with all furniture. fixtures and equipment at any time contained therein. in each case owned by or leased to the Partnership and

covered by the lien of the Mortgage Documents as determined by one independent appraiser on the basis of an appraisal in conformity with the criteria set forth at §§ 12 C.F.R. 563.17-1a and 571.1b or such similar published policy or regulation as from time to time governs real estate loans by federally insured thrift institutions, provided that the value of the Taj Mahal and such ancillary structures and facilities shall not include the value of (a) any furniture, fixtures and equipment therein to the extent of the Outstanding Amount of any Debt secured by any F,F & E Financing Agreements, (b) any Excepted Property, (c) any New Parking Facility or any property on which such New Parking Facility is located to the extent of the Outstanding Amount of any Debt secured by a lien superior to the lien of the Mortgage Documents, and (d) any leasehold interest (as lessee) of the Partnership, if such leasehold interest is terminable other than by reason of the lessee's action or failure to act, prior to the stated maturity of the New Bonds. Except as otherwise expressly provided for in the Indenture, at any time that Addition Work is in process, the "Appraised Value" will be the pro forma Appraised Value giving effect to completion of such Addition Work to the extent permitted by such policy or regulation.

"*Assignment Agreement*" means the Assignment Agreement, dated as of November 22, 1988, as amended as of the date hereof, providing for the assignment of the Partnership Note and other Mortgage Documents to the Trustee by the Company, and acknowledgment thereof by the Partnership.

"*Bank Agreements*" means the Credit Agreement and the Override Agreement.

"*Bank Foreclosure*" means the exercise of any Foreclosure Right (as defined in either of the Bank Agreements) against any Trump Taj Mahal Equity by a party to either of the Bank Agreements.

"*Capitalized Lease Obligation*" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee which, in conformity with generally accepted accounting principles consistently applied, is accounted for as a capital lease on the balance sheet of such Person.

"*Cash Interest Expense*" for any period, means, as applied to any Person, the consolidated interest expense paid in cash as reflected on the consolidated financial statements of such Person (without deduction of interest income) for such period.

"*Cash Rate*" means 9.375% per annum.

"*Consolidated Net Income,*" for any period, means, as applied to any Person, the Net Income (or loss) of such Person and its Subsidiaries for such period determined on a consolidated basis in accordance with generally accepted accounting principles consistently applied, excluding (i) the portion of consolidated net income allocable to minority interests in unconsolidated subsidiaries to the extent that cash dividends or distributions have not actually been received by such Person and (ii) Net Income (or loss) of any entity combined with such Person on a "pooling of interests" basis attributable to any period prior to the date of combination.

"*Coverage Ratio,*" for any period, means, the ratio of (i) Consolidated Net Income of such Person and its consolidated Subsidiaries plus depreciation expense, Amortization, Total Interest Expense and Income Tax Expense of such person and its consolidated Subsidiaries to (ii) Total Interest Expense of such Person and its consolidated Subsidiaries plus the amount of any capitalized interest of such Person and its consolidated Subsidiaries as reflected on the consolidated financial statements of such Person for such period; provided, however, that for purposes of calculating (ii) hereof for any period, Total Interest Expense shall not include any interest expense with respect to the Amended Trump Line of Credit and, with respect to the Outstanding Amount of New Bonds during such period, shall only include the portion of interest expense paid or payable at a rate equal to the Cash Rate.

"*CRDA*" means the Casino Reinvestment Development Authority.

"*CRDA Bonds*" means those investments required by Section 144.1 of the Casino Control Act, including deposits for the purchase of bonds issued by the CRDA in lieu of the purchase of such bonds.

"*Debt*" means, as applied to any Person, any indebtedness, exclusive of deferred taxes, in respect of borrowed money (whether or not the recourse of the lender is to the whole of the assets of such Person or only to a portion thereof), or evidenced by bonds, notes, debentures or similar instruments or letters of credit, or representing the balance deferred and unpaid of the purchase price of any property, if and to the extent such indebtedness would appear as a liability upon a balance sheet of such

person prepared in accordance with generally accepted accounting principles consistently applied, and shall also include any Capitalized Lease Obligations of such Person. In no event shall "Debt" include any amounts payable under the Subordinated Limited Guaranty.

"*Excess Available Cash Flow*" means, for any period, the sum of Net Cash Flows Generated or Used In Operating Activities. plus the sum of (i) cash proceeds of any increase in long-term liabilities excluding the Senior Debt Facilities (determined in accordance with generally accepted accounting principles consistently applied), (ii) unclaimed cash under the Plan upon the distribution of such cash to the Partnership and (iii) amounts reserved for disputed claims or interests under the Plan upon a final determination that such amounts need not be paid by the Partnership upon the distribution of such funds to the Partnership, minus the sum of: (a) Required Capital Expenditures and CRDA deposits required for the purchase of CRDA Bonds or alternative CRDA investments, (b) principal repayments. purchases or defeasance of Permitted Indebtedness other than (x) the New Bonds (except New Bonds equivalent to the amount of New Bonds issued pursuant to the payment of the Additional Amount) and (y) payments with respect to the NatWest Debt from Excess Available Cash Flow to the extent permitted by Section 12.17 of the Indenture. (c) distributions by the Partnership pursuant to certain provisions of the Amended Partnership Agreement, (d) payments (to the extent not covered by insurance) made in connection with a Restoration as a result of a Casualty or Taking (as each term is defined in the Amended Mortgage) or payments in settlement of litigation (as determined by a Board Resolution of the Board of Directors of TM/GP), in each case to the extent not included in calculating GAAP Net Income. (e) amounts reserved in reasonable good faith for the future payment of Required Capital Expenditures and anticipated payments with respect to casualty losses (to the extent not covered by insurance), in each case in connection with contracts existing on the December 31 of such year (provided. if all or any part of such amounts reserved for Capital Expenditure are not actually paid by April 1 of the immediately succeeding year. they shall not be so subtracted) and provided that to the extent Excess Available Cash Flow is negative in any year, an amount equal to the lesser of (i) the amount deducted for casualty losses pursuant to this subsection (e) or (ii) the amount by which Excess Available Cash Flow is less than zero shall be deducted from any positive amount of Excess Available Cash Flow in any future year or years. (f) amounts reserved in reasonable good faith for anticipated future payments in settlement of litigation as determined by the Managing General Partner and (g) amounts reserved in reasonable good faith for Working Capital in such amount as determined by the Managing General Partner; provided. that the amount of such working capital reserve shall not exceed the sum of (i) casino and hotel cashier funds, plus (ii) the excess, if any,of $8,000,000 over amounts available under the Working Capital Facility, to the extent not included in calculating GAAP Net Income.

"*Existing Encumbrances*" has the meaning assigned to it in the Amended Mortgage.

"*F,F&E Financing Agreement*" has the meaning assigned to it in the Amended Mortgage.

"*Financing Default*" means any Event of Default under the Indenture or Amended Mortgage. any Default described in clauses (a). (e). (h) (but only with respect to any nonpayment of money) and (l) (but only with respect to any nonpayment of money) under "Events of Default and Notice Thereof" below in this section (but only after notice of such default has been given by the Trustee or the holders of the New Bonds as provided therein), and any Default described in clauses (a). (d). (e) and (l) (but only after notice of such default has been given by the Trustee or the holders of the New Bonds as provided in the Amended Mortgage) or any default described in clauses (a) and (d) under "The Amended Mortgage—*Events of Default*" below in this section.

"*First Mortgage Debt*" means. at any point in time, any Indebtedness under the Senior Debt Facilities, the Notes, any New Parking Financing and any additional Debt permitted by Section 12.04 of the Indenture, to the extent secured by a lien on all or a portion of the Trust Estate on a parity with or senior to the lien of the Amended Mortgage.

"*First Tier Amount*" on any May Interest Payment Date means the excess of (i) 10.28% of the Outstanding Amount of New Bonds on the immediately preceding Record Date over (ii) the interest on the New Bonds at the Cash Rate payable on such Interest Payment Date and the interest on the New Bonds at the Cash Rate that was payable on the immediately preceding Interest Payment Date.

"*GAAP Net Income*" with respect to any period means the net income (loss) for such period as shown in the Partnership's and Company's Combined Statement of Income (Operations) determined in accordance with generally accepted accounting principles consistently applied.

"*Income Tax Expense*," for any period, means, as applied to any Person, the provision for federal, state or local income taxes of such Person and its consolidated Subsidiaries as reflected on the consolidated financial statements for such Person for such period prepared in accordance with generally accepted accounting principles consistently applied.

"*Mortgage Debt*" means, at any point in time, any Senior Credit Borrowings, any Working Capital Borrowings, any Standby Line of Credit Borrowings, the Notes, any additional Debt permitted by the Indenture to the extent secured by a lien on the Trust Estate in accordance with the Indenture and any New Parking Financing.

"*Mortgage Documents*" means the Amended Mortgage, the Notes, and the assignments, dated as of November 22, 1988 as amended, modified or supplemented as of the Effective Date and any other security document to which either of them is a party, which is executed and delivered pursuant to or in connection with such Amended Mortgage or the Assignment Agreement; provided, however, that the term "Mortgage Document" does not include the Trump Completion Guaranty and the Trump Line of Credit.

"*NatWest Debt*" means the Debt of the Partnership to National Westminster Bank USA, which Debt is secured by a lien on certain furniture, fixtures and equipment.

"*Net Cash Flows Generated or Used In Operating Activities*" means, with respect to any period, the amount shown as Net Cash Flows Generated or Used In Operating Activities in the Partnership's and the Company's Combined Statement of Cash Flows (excluding gains or losses on the purchase of New Bonds) for such period determined in accordance with generally accepted accounting principles consistently applied.

"*Net Income*," for any period, means, as applied to any Person, the net income (loss) of such Person for such period, determined in accordance with generally accepted accounting principles consistently applied (except as provided in this definition), which shall reflect any intercompany charges of any Affiliate of such Person properly allocable to such Person under generally accepted accounting principles consistently applied, excluding from "Net Income," however, (i) any gain or loss, net of taxes, realized upon any sale, transfer or other disposition (including by way of merger or consolidation) by such Person of any property, other assets, debt or other liabilities of such Person outside of the ordinary course of business (other than any sale or disposition of obsolete or excess equipment or furniture, fixtures or equipment) and (ii) any extraordinary gain or loss, net of taxes, in each case as determined in accordance with generally accepted accounting principles consistently applied. Net Income, for any period, means, with respect to any property or asset, the historical net income (loss) of such property or asset during such period, adjusted to give effect for the effective tax rate of the Partnership for the applicable period, determined in accordance with generally accepted accounting principles consistently applied.

"*New Parking Facility*" means any facility for parking motor vehicles for the benefit of the Taj Mahal and its ancillary structures and facilities (even if the Taj Mahal and its ancillary structures and facilities is not the sole beneficiary) owned by or leased to the Partnership or any of its Subsidiaries that is not included within the plans and specifications for the Taj Mahal and its ancillary structures and facilities on the date of the Indenture, including any bridges or connections between such New Parking Facility and the Taj Mahal and its ancillary structures and facilities.

"*New Parking Financing*" means Debt with respect to any New Parking Facility that is non-recourse to the Partnership and/or its Subsidiaries and/or any assets of the Partnership and/or any of its Subsidiaries (other than any New Parking Facility) and is secured by a lien that is senior to, in parity with, or junior to, the lien of the Indenture and the Mortgage Documents assigned to the Trustee under the Assignment Agreement subject to certain conditions set forth in Section 12.05(b) of the Indenture.

"*New Parking Financing Lien*" means a lien on any New Parking Facility securing any New Parking Financing.

"*Notes*" means the Note and any other note made by the Partnership payable to the order of the Company in connection with the issuance of Additional Bonds.

"*Outstanding Amount*" of any Debt at any time means the principal amount outstanding of such Debt at such time, unless such Debt was issued at a discount, in which case the "Outstanding Amount" of such Debt means the original issue price of such Debt plus the accretion to such time of the original issue discount, determined in accordance with generally accepted accounting principles consistently applied. For the purpose of the exercise by the Trustee or the bondholders of any remedies provided for in the Indenture, the principal amount of any New Bonds due at any time shall be deemed to be the Outstanding Amount thereof.

"*Outstanding Secured Bonds*" means, as of the date of determination, (a) all New Bonds then Outstanding other than New Bonds then owned by the Company and held in its treasury and (b) all New Bonds, if any, alleged to have been destroyed, lost or stolen which have been replaced or paid as provided in the Indenture but whose ownership and enforceability by the holder thereof have been established by a court of competent jurisdiction or other competent tribunal or otherwise established to the satisfaction of the Company and the Trustee.

"*Permitted Encumbrances*" means (i) liens for taxes, assessments or governmental charges not yet due and payable or if due and payable are not delinquent to the extent that any fine, penalty, interest or cost may be added for the nonpayment thereof, (ii) Existing Encumbrances, (iii) liens created in connection with or permitted pursuant to F,F&E Financing Agreements, including those relating to the NatWest Debt, (iv) the lien of the Mortgage Documents and any rights granted as provided therein, (v) any easements and rights-of-way arising after the date of the Amended Mortgage that are granted or suffered or permitted by the Partnership in accordance with the provisions of the Amended Mortgage, (vi) Restricted Encumbrances, (vii) the lien of the Trustee under the Indenture and (viii) liens to secure indebtedness under the Senior Debt Facilities.

"*Required Capital Expenditures*" means, for any period, expenditures by the Partnership for improvements to the Taj Mahal and its ancillary structures and facilities in an aggregate amount not to exceed the sum of (a) after the Effective Date, capital expenditures approved by the Class B Directors and, if required, by the Class B Stockholders; (b) capital expenditures required in order to comply with the applicable laws, statutes, rules, regulations, directives or orders of any governmental authority having jurisdiction over the Premises (as defined in the Amended Mortgage), and capital expenditures to repair or replace casualty damage (to the extent not covered by insurance) to the Premises and (c) any other capital expenditures approved by TM/GP or by a majority of the members of the Steering Committee in the case of capital expenditures prior to the Effective Date.

"*Restricted Encumbrances*" has the meaning assigned to it in the Amended Mortgage.

"*Restricted Payment*" means, as applied to any Person, (i) any dividend or other distribution of assets, properties, cash, rights, obligations or securities paid, made, declared or authorized by such Person on or in respect of any class of such Person's capital stock or such Person's partnership interest, as the case may be, (ii) any payment by or on behalf of such Person or by any Subsidiary of such Person in connection with the redemption, purchase, retirement or other acquisition of any shares of such Person's capital stock or such Person's partnership interest, as the case may be, (iii) any advances or loans to, or guarantees of any Debt of, any other Person, by such Person and (iv) any capital contribution to, or other debt or equity investment in, an Affiliate (other than a wholly owned Subsidiary); *provided, however*, that "Restricted Payment" shall not include (a) guaranties by the Partnership of any Debt of any of the Affiliates of the Partnership if the proceeds of such Debt are borrowed by the Partnership in accordance with the terms of the Indenture, (b) in respect of the Company, the loans evidenced by the Notes, (c) any redemption of any class of capital stock or partnership interest of such Person, if such Person receives an opinion of counsel (a copy of which is delivered to the Trustee) that failure to redeem such capital stock or partnership interest would subject such Person or any of its subsidiaries to an adverse action or failure to act by a gaming authority and, in the opinion of the board of directors or general partner of such Person, such adverse action or failure to act would be likely to have a material adverse effect with respect to such Person or Subsidiary, (d) loans to employees of such Person actively involved in the operation of the Taj Mahal and its ancillary structures and facilities (other than loans to employees of up to $10,000 per employee not exceeding

$250.000 in the aggregate at any time outstanding) or the engagement of such Person in credit transactions in the operation of the Taj Mahal and its ancillary structures and facilities, if such loans or credit transactions are in the ordinary course of business. (e) distributions for taxes, operating expenses of TM/GP and Holding, and redemptions of Holding's Class B Stock made pursuant to the Amended Partnership Agreement. (f) with respect to TM/GP, distributions to Holding of amounts sufficient to allow Holding to redeem its Class B Stock and to pay all necessary expenses including director fees, insurance premiums and indemnification amounts, and (g) with respect to Holding redemption of its Class B Stock. For purposes of this definition, "capital stock" and "partnership interest" shall include warrants, rights and options to acquire shares of capital stock or partnership interests, as the case may be, and "gaming authority" shall mean any governmental agency which regulates gaming in a jurisdiction in which the person or its Subsidiary conducts gaming activities and which has jurisdiction over such person or Subsidiary.

"*Second Tier Amount*" on any May 15 Interest Payment Date means the difference between the Additional Amount on such Interest Payment Date and the First Tier Amount on such Interest Payment Date.

"*Senior Credit Borrowings*" means all amounts borrowed by the Partnership under any Senior Line of Credit Agreement.

"*Senior Debt Facilities*" means the Working Capital Facility, the Senior Line of Credit Agreement and the Standby Letter of Credit.

"*Senior Line of Credit*" means any agreement or agreements of the Partnership with banks or other financial institutions, as such may be amended, supplemented or modified from time to time, or any refinancings thereof, providing for the making of secured loans in an aggregate amount up to $50,000,000. The liens, if any, securing such Senior Line of Credit Agreement may be senior to the lien of the Amended Mortgage and the Indebtedness represented by the Notes or New Bonds may be subordinate to Indebtedness under the Senior Line of Credit Agreement on terms determined by the Partnership.

"*Services Expenses*," for any period, means the amount of expenses under the Services Agreement to which Donald J. Trump (or his designee) is entitled to reimbursement during such period.

"*Services Fee*," for any period, means the amount of the fee payable by the Partnership under the Services Agreement for such period.

"*Standby Letter of Credit*" means the $25,000,000 letter of credit issued for the benefit of the Partnership. The liens, if any, securing such letter of credit (or reimbursements therefor) may be senior to the lien of the Amended Mortgage and the Indebtedness represented by the Notes or New Bonds may be subordinate to Indebtedness under the Standby Letter of Credit on terms determined by the Partnership.

"*Standby Line of Credit Borrowings*" means all amounts advanced under the Standby Letter of Credit.

"*Subordinated Limited Guaranty*" means the instrument executed by the Partnership on the date hereof pertaining to certain contingent reimbursement arrangements with a lender to Realty Corp.

"*Subsidiary*," of any Person, means any company, a majority of the shares of the voting stock of which is owned by such Person, or by any other Subsidiary or Subsidiaries of such Person, or by such Person and/or one or more Subsidiaries of such Person; provided, however, that the Company shall not be considered a Subsidiary of the Partnership.

"*Total Interest Expense*," for any period, means, as applied to any Person, the (i) consolidated interest expense as reflected on the consolidated financial statements of such Person (without deduction of interest income) for such period, including, without limitation, the amortization of debt discounts, other than debt discounts with respect to Debt outstanding on the Effective Date, and the interest portion of any deferred payment obligation, in each case calculated in accordance with the effective interest method of accounting, and (ii) the interest component of rentals in respect of Capitalized Lease Obligations, paid, accrued and/or scheduled to be paid or accrued by such Person and its consolidated Subsidiaries during such period, determined on a consolidated basis in accordance with generally

accepted accounting principles consistently applied. For purposes of this definition. interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by the chief financial officer of such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with generally accepted accounting principles consistently applied.

"*Trump Taj Mahal Equity*" means the right, title and interest of Donald J. Trump and his Affiliates in and to the partnership interests and stock in any Person that has a right. title. and interest in and to a partnership interest pledged as of the Effective Date or at any time thereafter pursuant to the Bank Agreements.

"*Trust Estate*" means the property included in the lien of the Mortgage and any further security, all of which will be assigned as collateral security for the New Bonds.

"*Working Capital*" means, at any point in time. as applied to any Person, the excess of (i) cash (including short-term money market securities) plus marketable securities (but shall not include any assets held for sale) of such Person and its consolidated Subsidiaries over (ii) accounts payable and accrued liabilities of such Person and its consolidated Subsidiaries, all as determined in accordance with generally accepted accounting principles consistently applied.

"*Working Capital Borrowings*" means all amounts borrowed by the Partnership under any Working Capital Facility.

"*Working Capital Facility*" means any secured or unsecured facility or facilities entered into by the Partnership with banks or other financial institutions providing for the making of working capital loans to the Partnership on a revolving basis, as such agreement may be amended. supplemented or modified from time to time, or any refinancing thereof. in an aggregate principal amount up to $25,000,000. The liens, if any, securing the Working Capital Facility may be senior to the lien of the Amended Mortgage and the Indebtedness represented by the Notes or New Bonds may be subordinate to Indebtedness under the Working Capital Facility on terms determined by the Partnership.

## Security

The New Bonds are secured by an assignment to the Trustee of the Note, for the benefit of the holders of the New Bonds (Section 6.01). The Note contains interest, principal, redemption. and default terms which are virtually identical to those of the New Bonds to which it relates. The Note is secured by the Amended Mortgage. which has been assigned to the Trustee and encumbers the Partnership's interest in the Taj Mahal, any New Parking Facility or certain other facilities owned by the Partnership. any additions and improvements constructed thereon and the interest of the Partnership in furniture. furnishings. fixtures. machinery and equipment at any time forming a part thereof (other than those securing the Amended NatWest Loan). or used in connection therewith. and the other assets of the Partnership except as described below. Certain of the assets not covered by the Amended Mortgage have also been assigned to the Company pursuant to separate documents, which assignment documents have also been assigned to the Trustee as security for the New Bonds pursuant to the Assignment Agreement. The Amended Mortgage represents a first lien and security interest on the Taj Mahal and such other assets (subject to certain Superior Instruments and the Senior Debt Facilities). See "The Amended Mortgage" below in this section.

Any additional series of bonds will be secured by the assignment of additional notes issued by the Partnership ("Additional Notes") to the Company to evidence the borrowing by the Partnership of the proceeds of the sale of such additional series. Such Additional Notes will also be secured by the Amended Mortgage on a *pari passu* basis.

The Note will also be secured by a Second Mortgage on the Specified Parcels, which Second Mortgage will be assigned to the Trustee as further security for the New Bonds. The Specified Parcels will secure the First Fidelity Loan on a first priority basis. See "Amended First Fidelity Loan Agreement." Moreover, the Partnership will acquire the Purchase Option from Realty Corp. in connection with its furnishing of the limited guaranty. and such option will also be assigned to the Trustee as security for the New Bonds. See "Amended First Fidelity Loan Agreement."

Cash and Permitted Investments held by the Partnership are not included within the Collateral. In addition. certain of the Partnership's intangible assets that may be significant to its operations, such as computer software licenses, are by their terms not assignable and, accordingly, are not included in the property subject to the Amended Mortgage.

The Indenture contains certain covenants limiting the ability of the Partnership to incur Debt, including Mortgage Debt secured by liens on the Taj Mahal. Subject to certain limitations, the Indenture permits the creation of additional mortgages on the Taj Mahal, the liens of which may be equal in priority or junior to the lien of the Amended Mortgage. See "Certain Covenants of the Company and the Partnership" below in this section. The lien and security interest of the Amended Mortgage will be subordinate to the Senior Debt Facilities and may be subordinated to New Parking Financing with respect to any New Parking Facility and to security interests in furniture, fixtures and equipment acquired by the Partnership that may be granted in connection with the acquisition of such assets, provided that the Debt (other than existing Debt) does not exceed 50% of the cost of such furniture, fixtures and equipment, and certain of the Partnership's tangible personal property may be leased rather than owned. If any such security interest prohibits subordinate liens, or any such lease, in accordance with customary practices, prohibits assignments, the property in question will not be included in the property subject to the Amended Mortgage.

If there is an Event of Default under the Indenture, the Note or the Amended Mortgage, the Trustee may exercise its right to foreclose on the Trust Estate and force its sale, and the holders of New Bonds will only be entitled to receive those proceeds from such sale in excess of the amounts due and owing (a) any holder of a lien on any portion of the Trust Estate securing Debt which is senior to the lien of the Amended Mortgage, including but not limited to the Senior Debt Facilities, (b) the Trustee for its services pursuant to the terms of the Indenture, and (c) pursuant to the Partnership Agreement in respect of fees and indemnification of directors of TMGP and Holding. All holders of liens in parity with the lien of the Mortgage will have a right to share such proceeds ratably with the holders of the New Bonds. The Trustee also has the right to take possession of, construct and operate the Taj Mahal. If the Trustee takes possession of or otherwise acquires the Taj Mahal, an entity licensed under the Casino Control Act would be required to be retained in order to operate the Taj Mahal. Because potential bidders must satisfy licensing requirements, the number of potential bidders in a foreclosure sale will be less than in foreclosure of other types of facilities and such requirements may delay the sale of, and may adversely affect the sales price for, the Taj Mahal.

The Working Capital Facility, the Senior Line of Credit and the Standby Letter of Credit will be secured by a mortgage on the assets of the Partnership, senior to the lien of the Amended Mortgage securing the New Bonds. Such facilities are anticipated to contain affirmative and negative covenants customary to loan documentation for highly leveraged companies, which covenants could be more restrictive than those contained in the Indenture. The New Bonds will be subordinate in right of payment to the Senior Debt Facilities and such subordination could reduce the amount obtainable by holders of New Bonds should there occur a foreclosure sale or another bankruptcy or reorganization of the Partnership. If an Event of Default (as defined in the Indenture) occurs with respect to the New Bonds, there can be no assurance that a foreclosure on the Amended Mortgage would produce proceeds in an amount which would be sufficient to pay the principal of, and accrued interest on, the New Bonds. Moreoever, the ability of the Trustee to foreclose will be further limited by the priority liens to be granted to secure the Senior Debt Facilities. The New Bonds will also be secured by a second priority mortgage lien on the Specified Parcels. Such lien will be fully subordinated to the Amended First Fidelity Loan.

In any foreclosure sale of the Taj Mahal, the purchaser would need to be licensed to operate the Taj Mahal under the Casino Control Act, and if the Trustee under the Indenture is unable to, or chooses not to, sell the Taj Mahal, such Trustee would be required to retain an entity licensed under the Casino Control Act to operate the Taj Mahal. See "Business—Gaming and Other Laws and Regulations." Because potential bidders must satisfy such requirements, the number of potential bidders in a foreclosure sale would be less than in foreclosures of other types of facilities and such requirements may delay the sale of, and may adversely affect the sales price for, the Taj Mahal. The ability to repossess and dispose of the Taj Mahal upon acceleration of the New Bonds is likely to be

significantly impaired or delayed by applicable bankruptcy law if a reorganization case were to be commenced by or against the Partnership prior to the repossession or disposition of the Taj Mahal by the Trustee.

The Partnership's Amended Guaranty will also secure payment of the principal of. and interest on. the New Bonds. However, the ability of the Partnership to make payments under the Amended Guaranty will be subject to the same factors affecting its ability to make payments on the Note. See "Risk Factors—Ability to Service Debt."

## Guaranties

The obligations of the Company to pay the principal of, premium. if any, and interest on the New Bonds are guaranteed by the Partnership (Article 14).

## Non-Recourse

The Indenture provides that, notwithstanding anything contained in the Indenture (including the Amended Guaranty) or in any other agreement, document, certificate, instrument. statement or omission to the contrary, the Partnership and the Company are liable thereunder only to the extent of the assets of the Partnership (other than cash permitted to be distributed pursuant to Section 12.07 of the Indenture, regardless of whether such cash has been distributed) and the interest of the Company in the Note and the Amended Mortgage (and certain related documents) and no other person or entity, including, but not limited to, any partner, officer, committee or committee member of the Partnership or any partner therein or of any Partnership Affiliate of the Partnership; or any incorporator, officer, director or shareholder of the Company, or any corporate partner of the Partnership or any corporate Affiliate of the Partnership, or any Affiliate or controlling person or entity of any of the foregoing, or any agent, employee or lender of any of the foregoing, or any successor, personal representative, heir or assign of any of the foregoing, in each case past, present, or as they may exist in the future, shall be liable in any respect (including without limitation the breach of any representation, warranty. covenant, agreement, condition or indemnification or contribution undertaking contained therein) under, in connection with. arising out of, or relating to the Indenture or any other agreement, document, certificate, instrument or statement (oral or written) related to, executed or to be executed, delivered to or to be delivered, or made or to be made, or any omission made or to be made, in connection with any of the foregoing or any of the transactions contemplated in any such agreement, document, certificate, instrument or statement (Section 3.12).

## Redemption

The New Bonds are redeemable at the option of the Company, in whole or from time to time in part, at par together with accrued and unpaid interest to the date of redemption at a rate of 11.35% (or, following a Bank Foreclosure, 14%) per annum payable in cash, at any time on not less than 30 days' nor more than 60 days' notice, to each holder of New Bonds to be redeemed (Section 13.04). The Company shall adopt appropriate procedures to provide for the transmittal of any payment made by the Partnership in respect of a 14% Payment on any New Bond redeemed to the holder of the New Bond on the date of such redemption (Section 4.03).

The Indenture provides that, in the event of the redemption of less than all the outstanding New Bonds, the particular New Bonds to be redeemed will be selected by the Trustee by lot. So long as there are other outstanding New Bonds, New Bonds held by the Company, the Partnership or any Affiliate of the Partnership (including Donald J. Trump) shall not be selected for redemption by the Trustee (Section 13.03). On and after the redemption date, interest ceases to accrue on New Bonds or portions of New Bonds called for redemption (Section 13.06).

Pursuant to the Casino Control Act, the Company may redeem New Bonds at the lower of the Outstanding Amount or the fair market value held by persons that are found by the CCC not to be qualified to hold such securities and who fail to dispose of such securities within 30 days (Section 13.08).

The Company may also redeem the New Bonds at the principal amount thereof. without premium. plus accrued interest. at any time as a result of a casualty or taking as set forth in the Amended Mortgage (Section 4.03).

## Certain Covenants of the Company and the Partnership

### *Limitations on Debt of the Partnership*

The Indenture limits the amount of additional indebtedness the Partnership may incur to enhance the likelihood that the New Bonds will be repaid. The limitations on indebtedness described below are intended, however. to permit the Partnership to incur certain indebtedness. including the Senior Debt Facilities. desirable for the effective operation of the Partnership. Under certain circumstances. the incurrence of additional indebtedness requires the approval of the TM/GP Class B Directors and/or the holders of the Class B Stock of Holding. See "Description of Holding Certificate of Incorporation."

The Indenture prohibits the Partnership and its Subsidiaries from incurring or otherwise in any manner becoming liable with respect to any new Debt. unless (a) at the time of the incurrence and after giving effect to such Debt. the aggregate Outstanding Amount of Debt of the Partnership and its Subsidiaries on a consolidated basis does not exceed 80% of the Appraised Value (which Appraised Value will be increased by the purchase price. net of all Partnership expenses relating to such purchase including legal. title. accounting and recording tax expenses and commissions. of any property to be acquired with the proceeds of such Debt), and (b) the Coverage Ratio of the Partnership. calculated for the four prior fiscal quarters ending with the date of the latest available quarterly statement of the Partnership at the time of the incurrence of such Debt, adjusted to give retroactive effect to the incurrence of such Debt (and, if any of the proceeds of such Debt are being utilized for the acquisition of any property or asset. adjusted to give retroactive effect to the Net Income. if any, of such property or asset for such prior fiscal quarters) as of the beginning of such four prior fiscal quarters. is not less than 1.2; (c) either (A) prior to the incurrence of Debt. the Company shall have given notice thereof in writing. not less than 30 nor more than 60 days prior to the date on which it proposes to incur such indebtedness. to Moody's Investors Service, Inc. and Standard & Poor's Corporation (or any successor to the business of either thereof) and neither the rating accorded to the New Bonds by Moody's Investors Service. Inc. nor the rating accorded thereto by Standard & Poor's Corporation (or. in the case of either such rating. by any successor to the business of Moody's Investors Service. Inc. or Standard & Poor's Corporation, as the case may be) shall. immediately following (and giving effect to) the incurrence of such Debt. be less favorable than the rating accorded to the New Bonds by such rating agency (or such successor to the business thereof) immediately prior to (but not giving effect to) the incurrence of such indebtedness or (B) the Trustee has received a certificate from the secretary of Holding stating that such incurrence has been approved by 66 ⅔% of the Class B Stock of Holding and (d) the approvals of the directors and stockholders as and to the extent required in the certificate of incorporation of TM/GP have been obtained; provided, however, that the Partnership and its Subsidiaries. subject to the requirements of the Amended and Restated Certificates of Incorporation of TM/GP and Holding may incur without regard to the tests set forth in this covenant (i) the Note. (ii) Senior Credit Borrowings. (iii) Working Capital Borrowings, (iv) Standby Letter of Credit Borrowings, (v) Debt pursuant to any F.F&E Financing Agreement that does not exceed 50% of the value of the property purchased with the proceeds of such debt and (vi) New Parking Financing. The debt described in clauses (i), (ii). (iii) and (iv) is expected to have been incurred on the Effective Date. The Partnership does not expect debt to be incurred under clause (vi) in the foreseeable future; debt may be incurred under clause (v) as furniture, fixtures and equipment are purchased.

Notwithstanding the restrictions contained in the paragraph above, the Partnership and its subsidiaries may extend, renew, or refinance any Debt of the Partnership and/or its Subsidiaries so long as the amount incurred is otherwise permitted under the Indenture or the aggregate amount of Debt of the Partnership and its Subsidiaries is not increased thereby, the effective cost to the Partnership of the new Debt is no greater than the effective cost of the Debt being replaced. the maturity (including sinking fund payments) of the new Debt is no shorter than the Debt being replaced and not less than all of the Debt owed under any single loan agreement is being extended, renewed or continued.

Not more than 10 days before the incurrence of any Debt of the Partnership and its Subsidiaries. the Partnership must provide the Trustee with an officers' certificate which certifies. among other things. that (i) the Partnership has complied with the requirements mentioned above for the incurrence of Debt. (ii) such Debt and the holders thereof are approved to the extent necessary by the CCC and (iii) no Financing Default has occurred and is continuing. (Section 12.04)

### Limitations on Liens on the Trust Estate

In order to afford the benefits of the second priority mortgage position of the holders of the New Bonds. the Indenture limits the ability of the Partnership and the Company to create or incur additional liens on the Trust Estate. The principal objective of these limitations is. generally. to restrict the ability to create or incur liens on the Trust Estate which could diminish the interests of the holders of the New Bonds in the Trust Estate in the event of a foreclosure thereon. The covenant described below. however, allows the Partnership and the Company to create or incur certain liens to secure permitted indebtedness. The incurrence of additional liens on the Trust Estate. under certain circumstances. requires the prior approval of the TM/GP Class B Directors and the holders of the Holding Class B Stock.

The Indenture prohibits the Company, the Partnership and the Partnership's Subsidiaries from creating. incurring. suffering or permitting to be created or incurred or to exist any mortgage. lien. charge or encumbrance on or pledge of the Mortgage Documents or any of the Trust Estate. other than (a) the lien of the Mortgage Documents and the Assignment Agreement. (b) notices of intention filed by mechanics. materialmen or laborers under the New Jersey mechanics' lien law. (c) Permitted Encumbrances on the Trust Estate and (d) a lien on the Trust Estate that is junior to or on a parity with the Indenture and the Mortgage Documents that secures any indebtedness permitted to be issued by Section 12.04(a) or (b) of the Indenture. See "Limitations on Debt of the Partnership" above. The Partnership shall not be deemed to have breached such provisions by virtue of the existence of liens for Impositions (as defined in the Amended Mortgage) or mechanics' liens so long as the Partnership is in good faith contesting the validity of such liens in accordance with the provisions of the Amended Mortgage.

*New Parking Financing.* New Parking Financing may be incurred up to a maximum amount equal to the lesser of (i) $35,000,000 and (ii) the amount of costs incurred in connection with the construction. acquisition or capital improvement of the New Parking Facilities. The New Parking Financing must be non-recourse to the Partnership. its Subsidiaries and/or any assets of the Partnership and its Subsidiaries (other than any New Parking Facilities). The Partnership and its Subsidiaries may also refinance the Outstanding Amount of earlier New Parking Financing provided that the aggregate Outstanding Amount of New Parking Financing giving effect thereto will not exceed the amount of New Parking Financing permitted above. Any New Parking Financing Lien described in this paragraph may be superior to the Amended Mortgage but only with respect to any New Parking Facility. Prior to issuing such New Parking Financing, the Partnership must meet other requirements. including. (i) providing a certificate from an officer of the Company certifying that (A) all required Permits have been obtained and are in full force and effect. (B) no Financing Default has occurred and is continuing. and (C) the Partnership has complied with all conditions precedent contained in the Indenture. and (ii) the Partnership has delivered to the Trustee an opinion of counsel stating that (A) all required gaming Permits have been obtained and are in full force and effect, (B) the documents that have been or are therewith delivered to the Trustee conform with the provisions of the Indenture, and (C) that all conditions precedent contained in the Indenture have been complied with, (Section 12.05(b)).

### Limitations on Leasing

The Indenture contains a limitation on the ability of the Partnership to enter into leases outside the ordinary course of casino business, unless certain conditions are met. This covenant has the same general purpose as the Indenture restrictions on additional indebtedness and is intended to ensure that the Partnership concentrates on its casino business until such time as it has more than adequate resources to make all payments due on the New Bonds.

The Partnership may not. and may not permit its Subsidiaries to. enter into any lease of (a) land, buildings or other land improvements. (b) vessels. helicopters or planes or (c) other property (personal or otherwise) other than any such lease of a nature entered into in the ordinary course of business by a United States casino hotel. as lessee. unless no Financing Default has occurred and is continuing and the Coverage Ratio of the Partnership. calculated for the prior four fiscal quarters ending with the date of the latest available quarterly statement of the Partnership at the time of entering into such lease. adjusted to give retroactive effect to such lease (including the Net Income. if any, of any such leased land, buildings or improvements or other property for such prior four fiscal quarters) as of the beginning of such prior four fiscal quarters. is not less than 1.2. In giving retroactive effect to such lease as of the beginning of such prior four fiscal quarters. it will be assumed that the rent for such prior four fiscal quarters was the greater of the average annual rent over the term of such lease and the rent payable for the first four fiscal quarters (Section 12.16).

### Restrictions on Activities

The Indenture contains covenants restricting the activities in which the Company and the Partnership may engage. These restrictions are designed to require the Partnership to concentrate on the casino business and also protects such holders by limiting the debt which the Company may incur to that permitted by the Indenture. In addition. the Indenture prohibits the Partnership from entering into management agreements. other than the Service Agreement. in order to avoid conflicts of interest.

Until 91 days after the Final Payment Date. the Indenture limits the ability of the Partnership and its subsidiaries to engage in any business or investment activities other than those necessary or appropriate for. incident to. connected with or arising out of. developing, constructing. financing. owning and operating the Taj Mahal. Other than loans to employees actively involved in the operation of the Taj Mahal in certain limited amounts not be exceed $250.000 in the aggregate, credit transactions in the ordinary course of business of operating the Taj Mahal and as otherwise stated therein. the Partnership and its subsidiaries are also restricted from making loans to any of its affiliates or any other person except for loans permitted as described under "Limitations on Distributions and other Payments" (Section 12.06).

The Company will not conduct any business (including having any Subsidiary) and will not incur any additional Debt except pursuant to the Indenture. whatsoever. other than to collect the amounts due and owing under the Notes. to preserve its rights under the Mortgage Documents, to do or cause to be done all things necessary or appropriate to protect the Trust Estate and to preserve its rights therein, and otherwise to comply with its obligations under the Indenture and the New Bonds.

The Company. the Partnership and the Partnership's subsidiaries are prohibited from entering into any management agreement relating to the Taj Mahal other than the Services Agreement and from amending in any way the Services Agreement which increases the amount of fees payable thereunder, reduces the obligations of Donald J. Trump thereunder or otherwise adversely affects the interests of the holders of the New Bonds (Section 12.06). The Company and the Partnership are also prohibited from entering into transactions with certain related entities. except as permitted by the Certificate of Incorporation of TM/GP (Section 12.13).

### Limitations on Distributions of the Partnership and the Company

The Indenture contains a covenant limiting the distributions which may be made by the Partnership and the Company. This provision is designed to protect the holders of the New Bonds by preventing distributions to the holders of interests in the Company and the Partnership junior to the New Bonds, other than certain specified distributions, prior to the payment in full of the New Bonds.

Neither the Company nor the Partnership will at any time make any Restricted Payment (Section 12.07).

### Limitation on Payments on Long Term Debt

The Indenture restricts the Partnership and its Subsidiaries from making any principal and or interest payments on any Debt with an original term of more than one year, except in respect of (a) the Note for the interest on or the redemption, purchase or payment at maturity of any New Bonds (provided that proceeds from the sale of assets of the Partnership or any of its Subsidiaries may not be used to pay interest on the Note), (b) the Senior Debt Facilities, (c) any Debt secured by F.F&E Financing Agreement other than NatWest Debt, (d) New Parking Financing, (e) any amounts payable under the Amended Lease and (f) any other such Debt, *provided* that the aggregate payments made pursuant to clause (f) in any calendar year shall not exceed the sum of (1) $5 million and (2) 16.5% (or upon payment in full of the First Fidelity Debt, 20%) of the excess of (x) Excess Available Cash Flow, if any, for the year ended December 31 immediately preceding such calendar year over (y) the Additional Amount on the May 15 Interest Payment Date in such calendar year (Section 12.17).

## Limitations on Consolidation, Merger, and Conveyance and Transfer of Property and Assets

The Indenture contains a covenant limiting the Company's ability to consolidate, combine or merge with other entities. This is designed to protect the holders of the New Bonds by preserving the existing corporate structure of the Company, and maintaining the priority of the lien of the Amended Mortgage.

The Company may not consolidate, combine or merge with or into any other Person or permit any other Person to consolidate, combine or merge with or into the Company; the Company with respect to its assets may not convey or transfer its interest in such assets substantially as an entirety to any other Person (other than to the Trustee) or permit any other Person to convey or transfer all or substantially all of its assets, subject to liabilities other than de minimis liabilities, to the Company; and the Company may not permit any of its shareholders to transfer, convey, sell or otherwise dispose of to any other Person any shares of capital stock of the Company, except in accordance with the Certificate of Incorporation of the Managing General Partner of such shareholder; and the Company may not issue any capital stock to any Person or grant any option to any Person to acquire capital stock of the Company (Section 10.01).

The Partnership may in accordance with the Certificate of Incorporation and By-Laws of its Managing General Partner consolidate, combine or merge with or into any other Person or permit any other Person to consolidate, combine or merge with or into the Partnership; the Partnership with respect to the Trust Estate may convey or transfer its interest in the Trust Estate substantially as an entirety to any other Person or permit any other Person to convey or transfer all or substantially all of its assets which are subject to liabilities (provided such liabilities are (i) de minimis liabilities or (ii) liabilities, the obligor of which has recourse only to such assets) to the Partnership, subject to certain conditions, including the following:

(a) immediately following such transaction, (1) the Partnership (or any successor entity) will be eligible for and shall meet all relevant Legal Requirements, including holding all Permits, required for the normal operation of the business of owning and operating the Taj Mahal and (2) the Partnership (or any successor entity) will be, or be controlled by, a Person that is, or will retain to manage the Taj Mahal one or more Persons that are, experienced in the operation and management of casino-hotels.

(b) in the event the Partnership consolidates, combines or merges with or into another Person or conveys or transfers its interest in its assets or in the Trust Estate, as the case may be, substantially as an entirety to another Person, the entity which is formed by or survives such consolidation, combination or merger or the Person to which such assets or the Trust Estate are conveyed or transferred, will: (1) be organized and existing under the laws of the United States of America, any state thereof, or the District of Columbia; (2) expressly assume, by an indenture supplemental to the Indenture, executed and delivered to the Trustee, the performance and observance of every covenant, obligation, and condition of the Indenture to be performed or observed by the Partnership, including, but not limited to the Restriction on Activities covenant, provided that the supplemental indenture and all other documents executed in connection

therewith will contain a limitation of liability in the form provided in the Limitation on Liability provision of the Indenture with such Person substituted for the Partnership; and (3) expressly assume, by an instrument executed and delivered to the Trustee, the performance of every covenant, obligation and condition of the Mortgage Documents and Assignment Agreement to be performed by the Partnership, provided that the supplemental indenture and all other documents executed in connection therewith shall contain a limitation of liability in the form provided in the Limitation on Liability provision in the Indenture with such person substituted for the Partnership;

(c) immediately after giving effect to such transaction, no Financing Default will have occurred and be continuing; and

(d) such transaction will be on such terms as will not impair the lien and security and priority of the Mortgage Documents or of the Assignment Agreement and the rights and powers of the Trustee and the Holders of the New Bonds under the Indenture and under the Mortgage Documents or the Assignment Agreement.

The Indenture prohibits the Partnership from leasing the Trust Estate, the Taj Mahal, the hotel or casino portion of the Taj Mahal or any combination thereof substantially as an entirety to any person. (Section 10.04). Pursuant to the Amended Mortgage, subject to certain conditions, the Partnership may lease portions of the Trust Estate in the ordinary course of its business. Unless otherwise provided, neither the Partnership nor the Company may sell, assign, lease, hypothecate, pledge, mortgage or otherwise transfer all or any part of the assets of the Company or the Trust Estate or any interest therein. (Section 10.05).

## Additional Series of Bonds

The Company may, by supplemental indenture, issue additional series of bonds that are on a parity with the New Bonds, and any other series of bonds outstanding prior to such issuance, and that are entitled to the equal and ratable benefit and protection of the security, pledge, provisions, covenants, and agreements of the Indenture. The issuance of additional series of Bonds will only be permitted if certain conditions are fulfilled, including the following:

(a) The additional series of bonds is issued to finance (or to refinance Debt incurred to finance) structural expansion, additions or capital improvements of the Taj Mahal or its ancillary facilities, costing in excess of $10,000,000;

(b) such additional series of bonds is issued no earlier than the substantial completion of such structural expansion, additions, or capital improvements;

(c) the Outstanding Amount of such additional series of Bonds does not exceed the total project cost (including certain costs such as fees, interest and title expense) of the structural expansion, additions or capital improvements;

(d) no Financing Default has occurred and is continuing;

(e) unless the Partnership has provided the Trustee with a certificate showing pro forma compliance with the tests described in this clause prior to commencing such expansion, addition or capital improvement: (A) the aggregate Outstanding Amount of Mortgage Debt does not exceed 66⅔% of the Appraised Value (which Appraised Value will be increased by the purchase price, net of all Partnership expenses relating to such purchase, including legal, title, accounting and recording tax expenses and commissions, of any property to be acquired with the proceeds of such additional series of bonds) as of a date as close as practicable to the date of issuance of such additional series of bonds and the aggregate Outstanding Amount of Debt of the Partnership and its Subsidiaries does not exceed 80% of such Appraised Value as of such date, after giving effect to such issuance and the completion of such expansion, additions or capital improvements and (B) the Coverage Ratio of the Partnership, calculated for the four prior fiscal quarters ending with the date of the latest available quarterly statement of the Partnership at the time of the incurrence of such additional series of bonds, adjusted to give retroactive effect to the incurrence of such additional series of bonds (and, if any of the proceeds of such additional series of Bonds is being utilized for the acquisition of any property or asset adjusted to give retroactive effect to the Net Income, if

any, of such property or asset for such prior four fiscal quarters) as of the beginning of such four prior fiscal quarters, is not less than 1.5;

(f) the Trustee has been provided with the documentation required by the terms of the Indenture;

(g) all gaming permits required in connection with the operation of the Taj Mahal casino, all permits required with respect to the expansion, additions or improvements and all permits required with respect to the issuance of such additional series of bonds have been obtained and are in full force and effect;

(h) the average life (calculated in accordance with accepted financial practice) of such additional series of bonds is not less than the average remaining life of the New Bonds; and

(i) the proceeds of the issuance of additional series of bonds is simultaneously therewith loaned to the Partnership by the Company in exchange for an Additional Note, which is simultaneously assigned to the Trustee (Section 3.02(b)).

The additional series of bonds may differ from the New Bonds, and from each other, in any respect so long as such differences are permitted by the Trust Indenture Act, are not material, and are not adverse to the interests of the holders of the New Bonds. The additional series of bonds may contain provisions for (a) a sinking, amortization, improvement, or other analogous fund, (b) limiting the aggregate principal amount of the additional series of bonds, (c) exchanging bonds of such series, at the holder's option, for other bonds of the same series of the same aggregate principal amount of a different authorized denomination or denominations and (d) the authentication of bonds of such series by an authenticating agent. All bonds of the same series shall be substantially identical, except that any series may have serial maturities and different interest rates for different maturities and except as to denomination (Section 3.03).

## Events of Default and Notice Thereof

The following events are defined in the Indenture as "Events of Default": (a) failure to pay interest on any New Bond after the interest becomes due and payable and continuance of such default; (b) failure to pay the principal of (or premium, if any, on) any New Bond when such principal becomes due and payable at maturity; (c) default in the performance, or breach, of any covenant of the Company or the Partnership in the Indenture (other than a default in the performance or breach that is elsewhere hereunder specifically described), the Amended Mortgage, the Assignment Agreement or any of the Mortgage Documents that continues for a period of 30 days (or such other period specified in such other document) after specific written notice (i) to the Company by the Trustee or (ii) to the Company and the Trustee by the holders of at least 25% in Outstanding Amount of the New Bonds; (d) certain events of bankruptcy, insolvency or reorganization relating to the Company, the Partnership or any of the Partnership's Subsidiaries, which, if involuntary, continue for a period of 30 consecutive days; (e) the revocation, suspension or loss of any permit which results in the cessation of a substantial portion of the business of the Taj Mahal for a period of more than 120 consecutive days; (f) a default by the Partnership under any Mortgage Debt (other than the Notes or any New Parking Financing) and the expiration of the applicable period of grace, if any, specified in any evidences of indebtedness of such Mortgage Debt; provided that such default has not been cured or waived at any time whether before or after the occurrence of such Event of Default (provided such cure or waiver occurs prior to any declaration of acceleration of the New Bonds); (g) the existence of a final judgment of a court of competent jurisdiction (1) in an amount in excess of $3,000,000 against the Company, the Partnership or any of the Partnership's Subsidiaries or the Trust Estate, which judgment has not been satisfied or otherwise effectively stayed, in which case, not until such stay has been lifted), except in the case of any lien subordinate to the lien of the Amended Mortgage, then only after 30 days (during which execution shall not be effectively stayed) following the date on which such judgment becomes a lien against the Trust Estate or any part thereof (unless the lawsuit in question was commenced without service of process, in which case the period does not begin until 30 days after notice of such final judgment); (2) in an amount in excess of $15,000,000 against the Company, the Partnership or any of the Partnership's

Subsidiaries or the Trust Estate, which judgment has not been satisfied or otherwise provided for, for a period of 60 days (during which execution shall not be effectively stayed) following the date of such final judgment; or (3) regardless of amount, against the Company, the Partnership or any of the Partnership's Subsidiaries or the Trust Estate, which judgment has not been satisfied or otherwise provided for (which shall not be effectively stayed), if such judgment, by itself or upon recordation or other action of the judgment creditor, imposes or would impose a lien on the Trust Estate or any part thereof senior to the lien of the Amended Mortgage; (h) default in the performance, or breach, of covenants pertaining to consolidation, merger, conveyance or transfer of properties and assets; (i) the entry of a final judgment, decree or order by a court of competent jurisdiction holding the Amended Guaranty or the Amended Mortgage to be invalid or unenforceable in any material respect or the assertion by the Company, the Partnership or any of the Partnership's Subsidiaries, or any person acting on behalf of any of the foregoing in any pleading filed in such a court that the Amended Guaranty or the Amended Mortgage is invalid or unenforceable in any material respect; (j) an event of default in the Amended Mortgage has occurred and is continuing; (k) a default under any instruments of Debt of the Partnership or any of the Partnership's Subsidiaries (other than the Amended Guaranty, Mortgage Debt and any New Parking Financing), whether such Debt now exists or shall hereafter be created, in each case having an Outstanding Amount of $1,000,000 or more in the aggregate, and the expiration of the applicable period of grace, if any, specified in such instruments; *provided, however,* that if such default under such instruments shall be cured by the Partnership, or any such subsidiary, as the case may be, or be waived by the holders of such Debt, in each case as may be permitted by such instruments, then the Event of Default by reason of such default shall be deemed to have been thereupon cured (provided such cure or waiver occurs prior to any declaration of acceleration of the New Bonds); or (l) the occurrence of a default under the instruments evidencing the liens securing the indebtedness of the First Fidelity Agreement and the acceleration of such indebtedness by the holder thereof (Section 7.01).

The Indenture provides that the Trustee, within 90 days after the occurrence of a Default, will give notice thereof by mail to all holders of New Bonds, unless the Default has been cured or waived; however, in the case of a Default, other than a Default in the payment of principal of or interest on the New Bonds or another series of bonds, the Trustee may withhold such notice of such default if certain officers or executives of the Trustee in good faith determine that such withholding is in the interest of the holders of New Bonds (Section 8.02).

In case an Event of Default (other than an Event of Default described in clause (d) above) occurs and is continuing, the Trustee or the holders of not less than 25% in Outstanding Amount of the New Bonds, by notice in writing to the Company (and to the Trustee, if given by holders), may declare the principal of all the New Bonds to be due and payable immediately. Such declaration may be annulled and past defaults may be waived by the holders of a majority in Outstanding Amount of the New Bonds, upon the conditions provided in the Indenture. If an Event of Default specified above under clause (d) occurs, principal of all the New Bonds shall *ipso facto* become and be due and payable immediately without any declaration or other act on the part of the Trustee or any Bondholder (Section 7.02).

The Partnership is required to furnish to the Trustee, within 120 days after the close of each fiscal year, an officers' certificate to the effect that a review of the activities of the Partnership and its Subsidiaries and the Company has been made with a view to determine whether their obligations under the Indenture, the Amended Mortgage and the Notes have been complied with and as to whether the signers have obtained knowledge of any default in the fulfillment of any such obligation during such fiscal year. If the Partnership or the Company obtains knowledge of a default under the Indenture, it is required promptly to notify the Trustee of such default and the action it is taking and proposes to take with respect thereto (Section 12.09).

### Modifications of the Indenture

From time to time, the parties to the Indenture, without the consent of the holders of the New Bonds, may enter into one or more supplemental indentures for certain specified purposes, including, among other things, curing ambiguities, defects, or inconsistencies, creating a new series of Bonds, and

making any changes or modifications to the terms of the Indenture that do not materially adversely affect the rights of any holders (Section 11.01). Modifications, changes, and amendments to the Indenture also may be made by the parties thereto with the consent of the holders of not less than a majority of the Outstanding Amount of the Bonds of all series then outstanding; but the consent of the holders of not less than 85% of the Outstanding Amount of the Bonds of all such then outstanding will be required for any change that would permit the creation of any lien ranking prior to the lien of the Amended Mortgage, or any change which would deprive a holder of the security afforded by the lien of the Amended Mortgage or modify or waive any of the provisions of the Indenture respecting the incurrence of additional Mortgage Debt or Debt and no change in the time of payment of interest or principal, or reduction in the principal amount, interest rate, or premium, if any, payable, the Amended Guaranty, or any other modification in the terms of payment on any Bond, or any reduction in the percentage required for modification will be effective against any holder of Bonds without his consent (Section 11.02).

### Satisfaction and Discharge of Indebtedness

The Indenture will be discharged and cancelled upon payment of all the principal of and interest on the New Bonds, redemption of all the Bonds, or deposit with the Trustee of funds sufficient for such payment or redemption (Article 5).

### Gaming Laws

On August 11, 1988, the CCC issued a declaratory ruling that the initial holders of Old Bonds need not be qualified under the Casino Control Act, provided the Old Bonds were to be widely distributed and freely traded. Any holder of New Bonds, whether an initial holder of Old Bonds or a subsequent transferee, may nonetheless be required to qualify under the Casino Control Act in the sound discretion of the CCC and, consequently, would be subject to the qualification provisions of the Casino Control Act relating to financial sources and/or security holders. The Indenture provides that if the CCC requires that a holder of New Bonds (whether the record or beneficial owner) qualify under the Casino Control Act and if such holder does not so qualify, then such holder must dispose of his interest in the New Bonds within 30 days after receipt of notice of such finding, or within such earlier time as the CCC may require, or the Company may redeem such New Bonds. Any such redemption by the Company shall be without any premium and at the lower of (i) the Outstanding Amount and (ii) the fair market value (as defined in the Indenture) of such New Bonds (Section 13.08). If any holder of New Bonds is found unqualified by the CCC, it is unlawful for such holder (i) to receive any interest upon the New Bonds, (ii) to exercise, directly or through any trustee or nominee, any right conferred by the New Bonds, or (iii) to receive any remuneration, in any form from any Regulated Company (including the Partnership, the Company or the Trustee) for services rendered or otherwise (Section 4.01).

The Indenture further requires the Trustee to report the names of all record holders of the New Bonds to the Director of the Division and to the CCC promptly after the initial issuance of the New Bonds. The Indenture also requires the Trustee to provide to the Director of the Division and the CCC copies of all written communications from the Trustee to the holders of the New Bonds, notice of any default under the Indenture, certain other information concerning the Trustee's enforcement of rights under the Indenture, and other matters respecting the security for the New Bonds.

### The Amended Mortgage

#### *General*

The Notes are to be secured by the Amended Mortgage, which will be assigned to the Trustee and encumbers the Partnership's fee interest in the Taj Mahal, any New Parking Facility or certain other facilities owned by or leased to the Partnership, any additions and improvements constructed thereon and the interest of the Partnership in furniture, furnishings, fixtures, machinery and equipment at any time forming a part thereof, or used in connection therewith, and certain of the other assets of the Partnership (other than cash and Permitted Investments). Since the Company's right as mortgagee under the Amended Mortgage will be assigned to the Trustee pursuant to an instrument of assignment, all references in the Amended Mortgage to Mortgagee are referred to herein as the Trustee.

The lien of the Amended Mortgage will be subordinated to the liens securing the Working Capital Facility and the Senior Line of Credit.

### Events of Default

The following events are defined in the Amended Mortgage as "Events of Default":

(a) default in the payment of any interest upon the Notes when such interest becomes due and payable and continuance of such default for a period of 30 days; (b) default in the payment of all or any portion of the principal of, or premium, if any, on, any Note at its maturity; (c) default in the payment of all or any portion of the principal of (or premium, if any, on) any Additional Note that is payable as a result of a sinking fund payment being due under any bonds; (d) default in the payment of any other sum due under the Note or any Additional Notes or under the Amended Mortgage, and the continuance of such default for a period of 30 days after there has been given to the Partnership a written notice specifying such default and requiring it to be remedied; (e) default in the performance, or breach, of any covenant of the Partnership in the Amended Mortgage (other than a covenant, a default in the performance or breach of which is elsewhere specifically dealt with in the Amended Mortgage), and continuance of such default or breach for a period of 30 days after there has been given to the Partnership a written notice specifying such default or breach and requiring it to be remedied, unless (i) the default or breach is of such a nature that it is curable but not susceptible of being cured with due diligence within such 30-day period (for reasons other than the lack of funds), (ii) the Partnership delivers an officers' certificate to the Trustee within such 30-day period stating (A) the applicability of the provisions of clause (i) to such default or breach, (B) the Partnership's intention to remedy such default or breach with reasonable diligence and (C) the steps which the Partnership has undertaken or intends to undertake to remedy such default or breach and (iii) the Partnership delivers to the Trustee additional officers' certificates every 30 days thereafter updating the information contained in the certificate described in clause (ii), in which case such 30-day period shall be extended for such further period of time as may reasonably be required to cure the same, provided that the Partnership is then proceeding and thereafter continues to proceed to cure the same with reasonable diligence; (f) an "Event of Default", as defined in the Indenture, shall occur; (g) (i) failure to obtain a Certificate of Completion and provide a copy thereof to the Trustee at least 30 days prior to the date (including all applicable grace periods) upon which the Housing Authority has the right to exercise any right of reversion under the terms, and in accordance with the provisions, of the Development Agreement, without the giving of any further notice of an opportunity to cure, as such date may be extended from time to time pursuant to the terms and provisions of the Development Agreement; or (ii) without limiting the generality of subparagraph (i) above, failure by the Partnership, at least 30 days prior to the date (including all applicable grace periods) upon which the Housing Authority has the right to exercise any right of reversion under the terms, and in accordance with the provisions, of the Development Agreement or of any deed granted pursuant to the Development Agreement, without the giving of any further notice of an opportunity to cure, as such date may be extended from time to time pursuant to the terms and provisions of the Development Agreement, to cure any default, failure, violation or other action or inaction, which default, failure, violation or other action or inaction, if not cured, would, under the terms of the Development Agreement or of such deed, give rise to a right of reversion exercisable by the Housing Authority with respect to any portion of the Trust Estate; or (iii) without limiting the generality of clauses (i) and (ii), default by the Partnership under any of the terms of the Development Agreement (other than the terms thereof covered by the provisions of (i) and (ii) above) which shall not be fully cured or waived prior to the expiration of any grace period contained in the Development Agreement, if such default, if not timely cured, would result in an impairment of the Trustee's security, unless prior to the expiration of such grace period, the Partnership gives the Trustee an officers' certificate, an opinion of counsel and a true copy of the injunction referred to below, which certificate and opinion state that (1) a court of competent jurisdiction has issued an injunction (which is in force and effect and has not been modified or reversed on appeal) tolling or staying the expiration of the grace period set forth in the Development Agreement with respect to such default, and (2) the Trustee is named as a party in any action or proceeding involving such injunction and therefore is

entitled to notice of any modification or termination thereof; and, if such injunction is issued, then so long as such injunction remains in force and effect and the preceding provisions of this subparagraph (g)(iii) have been complied with. the grace period referred to in this subparagraph (g)(iii) shall be deemed to mean the grace period after giving effect to any such tolling or stay; (h) default by the Partnership under any of the terms of any Facility Lease (as defined in the Amended Mortgage) which shall not be fully cured or waived prior to the expiration of any grace period contained in such Facility Lease, unless prior to the expiration of said grace period, the Partnership gives the Trustee an officers' certificate, an opinion of counsel and a true copy of the injunction referred to below, which certificate and opinion shall state (A) that a court of competent jurisdiction has issued an injunction (which is in force and effect and has not been modified or reversed on appeal) tolling or staying the expiration of the grace period set forth in such Facility Lease with respect to such default, and (B) the Trustee is named as a party in any action or proceeding involving such injunction and therefore is entitled to notice of any modification or termination thereof; and, if such injunction is issued, then so long as such injunction remains in force and effect and the preceding provisions of this subparagraph (h) have been complied with, the grace period referred to in this subparagraph (h) shall be deemed to mean the grace period after giving effect to any such tolling or stay; (i) any modification, amendment or supplement of the Development Agreement without the prior written consent of the Trustee; unless the Partnership delivers to the Trustee an opinion of an independent investment banking institution of recognized national standing doing business in the Borough of Manhattan, City and State of New York, to the effect that such modification, amendment, or supplement would not result in an impairment of the Trustee's security; (j) any modification, amendment or supplement of any Superior Parking Financing Lien without the prior written consent of the Trustee, except to the extent that such modification, amendment or supplement is permitted by the Amended Mortgage; (k) default in the performance, or breach, of any of the provisions in the Amended Mortgage governing consolidation and mergers; (l) if any representation or warranty of the Partnership set forth in the Amended Mortgage or in any notice, certificate, demand or request delivered to the Trustee pursuant to the Amended Mortgage shall prove to be incorrect in any material respect as of the time when made and the facts constituting such incorrectness impair the Trustee's security and such impairment continues for a period of 30 days after there has been given to the Partnership a written notice specifying that such notice is a "Notice of Default" thereunder; (m) default by the Partnership under any of the terms of any New Parking Financing Lien which shall not be fully cured or waived within five days prior to the expiration of any grace period contained in such New Parking Facility, unless prior to the expiration of said grace period the Partnership gives the Trustee an officers' certificate, an opinion of counsel and a true copy of the injunction referred to below, which certificate and opinion shall state (A) that a court of competent jurisdiction has issued an injunction (which is in force and effect and has not been modified or reversed on appeal) tolling or staying the expiration of the grace period set forth in such Senior New Parking Mortgage with respect to such default, and (B) the Trustee is named as a party in any action or proceeding involving such injunction and therefore is entitled to notice of any modification or termination thereof; and, if such injunction is issued, then so long as such injunction remains in force and effect and the preceding provisions of this subparagraph (m) have been complied with, the grace period referred to in this subparagraph (m) shall be deemed to mean the grace period after giving effect to any such tolling or stay; (n) the acceleration of maturity of Debt with an Outstanding Amount equal to or in excess of $100,000,000, the lien of which Debt is on a parity with and not junior to the lien of the Amended Mortgage, and the delivery to the Trustee by the holder of such Debt of a notice that such holder requests that the Trustee declare the Outstanding Amount of all the Bonds to be due and payable and to exercise its rights and remedies in accordance with the provisions of the Indenture and the Mortgage Documents; or (o) the occurrence of a default under the instruments evidencing the liens securing the First Fidelity Mortgage Debt and the acceleration of such First Fidelity Mortgage Debt by the holder thereof (Section 3.01 of the Amended Mortgage).

### *No Merger; Waiver of Fiduciary Relationship*

The Amended Mortgage contains a provision that the parties thereto do not intend for the Amended Mortgage to be merged, in equity, law or otherwise, into the estates owned by the Partnership and encumbered by the Mortgage, including without limitation, the interest in the equity of redemption of the property encumbered by the Amended Mortgage, which estates may be deemed to be indirectly acquired in part by the holders of the New Bonds through their ownership of the Class B Stock of Holding. Rather, the Amended Mortgage provides that the parties intend that the Amended Mortgage shall continue to exist as a separate and distinct estate notwithstanding any union of the estate created by the Amended Mortgage in the same person or entity that owns the estates encumbered by the Amended Mortgage. Further, the parties to the Amended Mortgage have acknowledged that the rights, privileges and duties among the parties thereto and their affiliates, including without limitation the potential ability of the holders of the New Bonds indirectly to control the Partnership, are not intended and should not be interpreted to constitute, as regards the Amended Mortgage, a confidential or fiduciary relationship between the holders of the New Bonds and any other persons, including without limitation the other stockholders of Holding, the partners of the Partnership, or the Partnership itself. Nevertheless, as regards the Amended Mortgage, if and to the extent that, at law or in equity, a confidential or fiduciary relationship, or any other type of relationship, is determined to exist between the holders of the New Bonds and any other person which would either (i) reduce the rights of the holders of the New Bonds under the Amended Mortgage, (ii) prohibit or limit the ability of the holders of the New Bonds to exercise the rights afforded to them under the Amended Mortgage or (iii) compel the transfer (in any manner) of the benefits to be received by the holders of the New Bonds upon their exercise of any rights under the Amended Mortgage, then, the Amended Mortgage provides that to the extent permitted by applicable law, all such persons irrevocably waive the right or privilege to assert a claim or defense, as regards the Amended Mortgage that any such relationship exists between any of them and the holders of the New Bonds. A similar provision exists in the Amended Partnership Agreement.

### The Trustee

The Trustee is First Bank National Association, a national banking association.

The Indenture provides that, except during the continuance of an Event of Default, the Trustee will perform only such duties as are specifically set forth in the Indenture. During the existence of an Event of Default, the Trustee will exercise such of the rights and powers vested in it under the Indenture and will use the same degree of care and skill in its exercise as a prudent person would exercise under the circumstances in the conduct of such person's own affairs (Section 8.01). The Holders of a majority in Outstanding Amount of the Bonds shall have the right to direct the time, method, and place of conducting any proceeding for exercising any remedy available to the Trustee (Section 7.12). Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the Indenture at the request of any of the holders, unless they shall have offered to the Trustee security or indemnity satisfactory to it (Section 8.03).

The Indenture and provisions of the Trust Indenture Act incorporated by reference therein contain limitations on the rights of the Trustee, should it become a creditor of the Company, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claims as security or otherwise. Except under certain limited circumstances set forth in paragraphs (1), (3), (4), (5) or (6) of Section 310(b) of the Trust Indenture Act, if the Trustee becomes a creditor of the Company or the Partnership then the Trustee will be deemed to have a conflicting interest and must, within 90 days, eliminate such conflicting interest or take prompt steps to have a successor trustee appointed. The Trustee will be permitted to engage in other transactions; provided, however, that if it acquires any conflicting interest (as defined) it must eliminate such conflict or resign (Section 8.08).

### Usury Law

The Company has agreed not to claim voluntarily the benefit of any usury law against the holders of the Bonds (Section 12.12). The Company does not believe that any state would have the right to assert a usury defense on behalf of the Company.

## DESCRIPTION OF AMENDED PARTNERSHIP AGREEMENT

The following is a summary of the terms of the Amended Partnership Agreement. It is qualified in its entirety by reference to the Amended Partnership Agreement, a copy of which has been made an Exhibit to the Registration Statement of which this Prospectus is a part.

### General

The business of the Partnership is to conduct casino gaming and to carry on as owner and operator of the Taj Mahal. See "Business." Upon confirmation of the Plan, TM/GP will be admitted as the managing general partner of the Partnership. TM/GP and TTMI will each have a 49.995% Partnership Interest, and Trump Corp. will have a .01% Partnership Interest. The Partnership will terminate on December 31, 2030, unless sooner terminated.

### Management of the Partnership

TM/GP, as managing general partner, will have exclusive authority and full discretion with respect to the management of the Partnership and its business to the same extent as if it were the sole general partner of the Partnership, and no other Partner shall give any consent on any matter or take any other action as a Partner, including, without limitation, acting on behalf of or binding the Partnership, unless such consent, matter or other action shall be otherwise expressly provided for in the Amended Partnership Agreement. For a description of the parties with voting control of TM/GP, see "Description of Holding Certincate of Incorporation—Voting Stock of TM/GP."

### Capital Accounts and Allocation of Profits and Losses

The initial Capital Account of each Partner shall be determined as follows:

(a) TM/GP shall have a capital account equal to the aggregate value of the Holding Class A Stock, determined as of the first date on which such Class A Stock trades on any national securities exchange or interdealer quotation system. For these purposes, aggregate value shall mean the product of (i) the total number of Class A shares outstanding on such date and (ii) the closing price of a Class A share on such date.

(b) TTMI shall have a capital account equal to the capital account of TM/GP, as determined pursuant to (a) above.

(c) Trump Corp. shall have a capital account equal to the product of (i) 2/9999 and (ii) the capital account of TM/GP, as determined pursuant to (a) above.

Partnership losses shall be allocated to the Partners' Capital Accounts as follows: first, to those Partners with positive balances in their Capital Accounts in proportion to and to the extent of the respective positive balances of such Capital Accounts, until either the full amount of such Losses shall have been so allocated or the Capital Account balances equal zero, and second, in accordance with the Partners' Applicable Percentages.

The amount of the deduction, if any, in respect of the 14% Payments shall be allocated specially to TTMI as the sole obligation of TTMI.

The amount of any Partner nonrecourse deductions attributable to debt of the Partnership for which a Partner bears the economic risk of loss, within the meaning of Temporary Treasury Regulation Section 1.752—IT(d)(3), shall be specially allocated to such Partner.

Except as provided below, Partnership profits shall be allocated to the Partners' Capital Accounts as follows: first, to those Partners with negative balances in their Capital Accounts, in proportion to and to the extent of the respective negative balances of the Capital Accounts, until either the full amount of such Profit shall have been so allocated or the Capital Account balances of such Partners equal zero, and second, in accordance with the Partners' Applicable Percentages.

Allocation of profits and losses for tax purposes, which will not be reflected in the Partners' Capital Account, will be done, to the greatest extent practicable, in a manner consistent with the actual

allocation of profits and losses described above, and Internal Revenue Code (''I.R.C.'') sections 704(b) and (c) and the regulations promulgated thereunder.

## Distributions

Except as expressly provided for in the Amended Partnership Agreement. or at the direction of TM/GP, the Partnership is not permitted to make any distributions of cash or other property. Distributions at the direction of TM/GP shall be made in proportion and to the extent of positive Capital Account Balances, and thereafter in accordance with the Partners Applicable Percentage.

Pursuant to the Amended Partnership Agreement. the Partnership shall make distributions to each Partner for taxes in one or more payments from time to time during each year, but in no event later than March 1 of the year immediately following such year, in an aggregate cash sum equal to such Partner's Applicable Percentage of Pro Forma Taxes in respect of such year. In addition. the Partnership shall make additional distributions (or deduct from any required future payment of Pro Forma Taxes) as are necessary to reflect adjustments (including applicable interest. if any) to each Partner's portion of Pro Forma Taxes at the time such adjustments are determined.

In addition. the Amended Partnership Agreement provides for distributions to TM/GP for further distribution to Holding amounts necessary for indemnification. directors' fees. redemption of Holding's Class B Stock. and payment of all other expenses. Distributions other than for taxes shall be in proportion to and to the extent of positive Capital Account balances. and thereafter in accordance with the Partners' Applicable Percentages. Distributions to TM/GP to permit TM/GP or Holding to pay indemnification and directors' fees, for redemption of Class B Stock. and for all other expenses. shall be treated as if made to a Partner acting in a capacity other than as a Partner and shall not be treated as Partnership distributions for purposes of determining TM/GP's Capital Account.

## Additional Capital Contributions

TTMI may at any time, at its sole option. make a contribution to the Partnership for the purpose of (x) purchasing, or causing the Company to redeem. defease. pay or purchase. at any time. all or any portion of the New Bonds or (y) making any 14% Payment. To the extent of such contribution. TTMI shall have the right to cause the Partnership to use the money contributed to be used for any of the purposes set forth in the preceding sentence. For these purposes. to the extent any borrowing is treated as a Recourse Borrowing. such amount so treated shall be deemed to be a voluntary capital contribution. Upon any such contribution, the Partners' Applicable Percentages shall not be adjusted. except as otherwise contemplated by the Amended Partnership Agreement.

## Limitations on Transfers of Partnership Interests and Tag-Along Rights

Except with respect to existing pledges as exist on the Effective Date as the same may be modified, amended or restated from time to time, no Partnership Interest or any portion thereof may be sold or otherwise transferred, whether by gift, pledge or otherwise, including any transfer upon liquidation and dissolution, unless (x) the transfer and the Transferee are approved in advance by all the Partners, provided that any transfer upon or in lieu of a foreclosure of such existing pledges shall be deemed to have been approved, (y) the transfer and the Transferee are approved by the CCC and (z) the Transferee becomes a party to the Amended Partnership Agreement and assumes all of the obligations of its transferor thereunder and agrees to be bound by the terms and conditions thereof in the same manner as its transferor in each case, to the extent of the Partnership Interest transferred. In addition, no transfer of a Partnership Interest (other than the transfer of any existing pledges or transfers of any Partnership Interests upon or in lieu of the foreclosure of existing pledges) shall be effective if, in the opinion of counsel to the Partnership, such transfer, when added to the total of all other Partnership Interests transferred within the period of 12 consecutive months prior to the proposed date of transfer, would result in a termination of the Partnership under Section 708 of the I.R.C or that would cause the Partnership to be treated as a "publicly-traded partnership" under the I.R.C.

If TTMI desires to sell, pledge. or transfer all or any portion of its Partnership Interest, other than with respect to existing pledges or a transfer to a secured party or otherwise upon or in lieu of a

foreclosure by such secured party on its security interest in such Partnership Interest. it shall be a condition of any such sale or transfer that the Transferee offer to acquire (by tender offer or other means reasonably satisfactory to the TM/GP Class B Directors) that number of shares of Holding Class A Stock which corresponds to a percentage of TM/GP's Partnership Interest equal to a fraction. the numerator of which is the Partnership Interest being sold by TTMI and the denominator of which is the total Partnership Interest owned by TTMI before such sale. at the same pro rata price per percentage of Partnership Interest. Notwithstanding the preceding sentence. it shall not be a condition of any sale or purchase of a Partnership Interest by a secured party after or in connection with a foreclosure that the Transferee make the offer referred to in the preceding sentence if the proceeds obtained from the secured party's *bona fide* sale do not exceed the indebtedness owed to such secured party.

### Acquisition of Additional Partnership Interests Upon 14% Payment or Foreclosure

*14% Payment.* Unless a Transition Event or Foreclosure Event has occurred. or if a Transition Event has occurred then if a Return Event has occurred with respect to such Transition Event. TTMI has the right after the Final Payment Date to cause the Partnership to acquire such funds as are necessary to make any part or all of the 14% Payments and to cause the Partnership to make the 14% Payments. Upon making the 14% Payment, TTMI shall be deemed to have acquired on the Final Payment Date. an additional partnership interest (the "Additional Partnership Interest") such that. after giving affect to such issuance. the interest of TTMI in the Partnership will increase and that of TM/GP (and therefore. of the holders of the Class A Stock) will decrease. The Additional Partnership Interest to be so issued shall be determined as follows:

The Additional Partnership Interest equals the product of (i) 60% of the total outstanding Partnership Interests (measured after taking into account the issuance of the Additional Partnership Interest) multiplied by (ii) the sum (the "Adjustment Factor") of (a) the portion (expressed as a fraction) of the 14% Payments made with respect to all New Bonds outstanding on the Final Payment Date or previously Redeemed multiplied by a fraction. the numerator of which is the aggregate principal amount of New Bonds outstanding on the Final Payment Date or previously Redeemed and the denominator of which is the aggregate principal amount of all New Bonds issued pursuant to the Indenture whether or not outstanding. plus (b) a fraction. the numerator of which is the aggregate principal amount of New Bonds purchased (but not Redeemed) and delivered to the Company for cancellation prior to the Final Payment Date and the denominator of which is the aggregate principal amount of all New Bonds issued pursuant to the Indenture whether or not outstanding.

The 14% Payment shall be made on the Final Payment Date. in the case of New Bonds outstanding on the Final Payment Date. to the holders thereof. and in the case of New Bonds that were Redeemed before the Final Payment Date to the holders when the New Bonds were Redeemed; provided. however. if the holders of New Bonds that were redeemed cannot be identified or located by the Partnership within 90 days. then the Partnership shall pay the 14% Payment due and owing to such holders pro rata to the holders of the New Bonds on the Final Payment Date and upon such payment shall be relieved of and discharged with respect to any liability for making any 14% Payment to such holders of redeemed New Bonds and such payment to holders of New Bonds on the Final Payment Date shall be treated as if it had been made to such holder of redeemed New Bonds. If less than the full amount of the 14% Payment is made. the same percentage of the 14% Payment shall be made in respect of each New Bond outstanding on the Final Payment Date or earlier redeemed. Partnership funds available for such purpose may be used to make the 14% Payment, including Recourse Borrowings or a voluntary capital contribution by TTMI, which voluntary capital contribution shall not require the prior approval of any Partner, including TM/GP.

Upon the acquisition of the Additional Partnership Interest by TTMI. the Applicable Percentage of each of the Partners (immediately before the issuance of the Additional Partnership Interest) shall be adjusted to reflect its relative share of 100 minus the product of 60 multiplied by the Adjustment Factor to which shall be added. in the case of TTMI, the product of 60 multiplied by the Adjustment Factor. but in no event shall the Applicable Percentage of TTMI exceed 79.998% nor shall the Applicable Percentage of TM/GP be less than 19.998%. Upon such adjustment. each Partner shall have its

Applicable Percentage share of the total capital of the Partnership and such share shall be reflected in its Capital Account.

The following is a hypothetical example of the 14% Payment calculation and the corresponding adjustment to Applicable Percentages as a result.

Assumptions:

(1) $726,421,000 in principal amount of New Bonds are issued on the Effective Date.

(2) $100,000,000 principal amount of New Bonds are purchased in the open market by the Partnership over the life of the New Bonds.

(3) $150,000,000 principal amount of New Bonds are redeemed on May 15, 1996.

(4) The remaining $476,421,000 principal amount of New Bonds are redeemed on the Final Payment Date.

(5) The Partnership pays $75,000,000 to the Trustee the day after the Final Payment Date to make a portion of the 14% Payment.

(6) None of the Additional Amount is ever paid-in-kind over the life of the New Bonds.

(7) The 14% Payment calculation is assumed to begin on April 1, 1991.

Given the above assumptions, the payment required to make the full 14% Payment on the Final Payment Date is equal to $159,880,000 computed as follows: $29,745,000 attributable to the New Bonds redeemed on May 15, 1996 and $130,135,000 attributable to the New Bonds paid on the Final Payment Date. None of the total 14% Payment of $159,880,000 is attributable to the New Bonds purchased on the open market because the 14% Payment is deemed to have been made on New Bonds purchased in the open market.

In the above scenario, 46.91% of the 14% Payment is made ($75,000,000/$159,880,000) the day after the Final Payment Date, in addition to the 14% Payment deemed to have been made on the $100,000,000 of New Bonds purchased in the open market. As a result, each of the Partners Applicable Percentages will be adjusted pursuant to the formula described below. TM/GP's new Applicable Percentage will equal its relevant share (49.995%) of 100 minus the product of 60 multiplied by the Adjustment Factor, or 33.7310% (.49995 × (100 − (60 × .5422))). The Adjustment Factor is equal to the sum of (a) − (b) or:

$$\frac{75,000,000}{159,880,000} \times \frac{626,421,000}{726,421,000} - \frac{100,000,000}{726,421,000} = .5422$$

Trump Corp.'s new Applicable Percentage will equal its relevant share (.01%) of 100 minus the product of 60 multiplied by the Adjustment Factor, or .0068% (.0001 × (100 − (60 × .5422))). Finally, TTMI's new Applicable Percentage will equal its relevant share (49.995%) of 100 minus the product of 60 multiplied by the Adjustment Factor, or 33.7310% (.49995 × (100 − (60 × .5422))), to which is added the product of 60 multiplied by the Adjustment Factor, or 32.5312% (60 × .5422). Thus, TTMI's new Applicable Percentage would be 66.2622% (33.7310% + 32.5312%).

In all cases, Donald J. Trump's ownership interest in the Partnership will increase in direct proportion to New Bonds upon which the 14% Payment was deemed to have been made (either through open market repurchases or a cash payment to the Trustee).

In order for TTMI to receive additional Partnership Interests such that Donald J. Trump will indirectly have greater than 50% of the total partnership interest, the 14% Payment must be made on only $1,000 face amount of New Bonds (assuming no dispositions by Donald J. Trump of his Partnership Interest).

*Foreclosure.* Upon the occurrence of a Foreclosure Event, TTMI shall be deemed to have contributed to the Partnership and the Partnership shall be deemed to have acquired that portion of the TTMI Partnership Interest (the "Foreclosure Partnership Interest") equal to one-third of the total outstanding partnership interests then owned by TTMI. Upon the acquisition of the Foreclosure Partnership Interest by the Partnership, the Applicable Percentage of each of the Partners shall be adjusted to reflect its remaining relative share of the total Partnership Interests then outstanding, but in

no event shall the Applicable Percentage of TM/GP exceed 59.994%, nor shall the Applicable Percentage of TTMI be less than 39.996%. Upon such adjustment, each Partner shall have its Applicable Percentage share of the total capital of the Partnership, and such share shall be reflected in its Capital Account.

In the event the Partnership shall be deemed to have acquired the Foreclosure Partnership Interest, and all New Bonds outstanding on the Final Payment Date shall have been repaid in full or defeased, TTMI shall be deemed to have acquired on the Final Payment Date an additional Partnership Interest (the "Earned Reversionary Interest") equal to the product of (i) 10% of the total outstanding Partnership Interests (measured after taking into account the issuance of the Earned Reversionary Interest) and (ii) a fraction, (x) the numerator of which is the principal amount of New Bonds with respect to which interest was paid in cash at the rate of 11.35% per annum from the date of their issuance through the date of the Foreclosure Event and (y) the denominator of which is the aggregate principal amount of all New Bonds issued pursuant to the Indenture whether or not outstanding. Upon the acquisition of the Earned Reversionary Interest, the Applicable Percentage of each of the Partners (immediately before the issuance of the Reversionary Interest) shall be adjusted to reflect its relative share of 100 minus the Earned Reversionary Interest, to which shall be added, in the case of TTMI, the Earned Reversionary Interest, but in no event shall the Applicable Percentage of TTMI exceed 49.995% nor the Applicable Percentage of TM/GP be less than 49.995%. Upon such adjustment, each Partner shall have its Applicable Percentage share of the total capital of the Partnership, and such share shall be reflected in its Capital Account.

## Partnership Reports

The Partnership shall prepare or cause to be prepared, in accordance with GAAP, and shall deliver to each Partner, (i) quarterly unaudited financial statements of the Partnership including a balance sheet, a profit and loss statement and a cash flow statement for such quarter and the year to date within 45 days of the end of such quarter, certified by the chief financial officer of the Partnership showing variations from the Partnership's budget, and (ii) annual reports of the Partnership, including a balance sheet, a profit and loss statement and a cash flow statement within 90 days of the close of such year, audited by the Partnership's independent certified public accountants.

## Tax Matters Partner

TM/GP shall be the "tax matters partner" and shall, in its sole discretion, make or revoke all tax elections, resolve allocations issues, handle all tax audits, controversies and proceedings; provided, however, that any final agreement, compromise or other consensual action which results in adverse tax consequence to the Partnership or its Partners shall require the affirmative consent of at least two of the Class B Directors; except that TTMI shall have the exclusive power and authority to deal with and resolve all such issues, audits, controversies and proceedings that arise out of, or relate to, transactions, matters or events occurring on, before or in connection with the admission of TM/GP as a Partner; except that TTMI may not voluntarily elect to cause the Partnership to adjust its basis in its assets without the affirmative consent of at least two Class B Directors, unless such election or adjustment is required by law or administrative authority to avoid cancellation of indebtedness income to any Partner arising out of or in connection with the implementation of the Plan.

## Indemnification

The Partnership shall indemnify and hold harmless each Partner, its Affiliates, and all officers, directors, employees and agents of such Partner, and its Affiliates (individually, an "Indemnitee") from and against any and all losses, claims, demands, costs, damages, liabilities, joint and several, expenses of any nature (including attorneys' fees and disbursements), judgments, fines, settlements, and other amounts arising from any and all claims, demands, actions, suits, or proceedings, civil, criminal, administrative or investigative, in which the Indemnitee may be involved, or threatened to be involved, as a party or otherwise, arising out of or incidental to the business of the Partnership including without limitation liabilities under the Federal and state securities laws, regardless of whether the Indemnitee

116

continues to be a Partner, an affiliate of a Partner, or an officer, director, employee, or agent of a Partner or of an affiliate of a Partner at the time any such liability or expense is paid or incurred, so long as such indemnified person acted in good faith on behalf of the Partnership and in a manner reasonably believed by such person to be in the best interests of the Partnership, but only if such course of conduct does not constitute gross negligence or willful misconduct; provided that such indemnification or agreement to hold harmless shall be recoverable only out of assets of the Partnership and not from the Partners. The indemnification provided by the Amended Partnership Agreement shall be in addition to any other rights to which an Indemnitee may be entitled under any agreement, as a matter of law or equity, or otherwise, both as to action in the Indemnitee's capacity as a Partner, an affiliate of a Partner, or as an officer, director, employee or agent of a Partner or Affiliate of a Partner and as to any action in another capacity, and shall continue as to an Indemnitee who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of the Indemnitee. No Indemnitee shall be denied indemnification in whole or in part under the Amended Partnership Agreement by reason of the fact that the Indemnitee had an interest in the transaction with respect to which the indemnification applies if the transaction was approved by TM/GP.

## Regulation by the CCC

The Partnership and the Partners are subject to regulation by the CCC pursuant to the Casino Control Act which, by the terms of the Casino Control Act and the Amended Partnership Agreement, supercedes the express provisions of the Amended Partnership Agreement. See "Business—Gaming and Other Laws and Regulations."

If the continued holding of a Partnership Interest by any Partner will disqualify the Partnership to continue as the owner and operator of a casino licensed in the State of New Jersey under the provisions of the Casino Control Act, such Partner shall enter into such escrow, trust or similar arrangement as may be required by the CCC under the circumstances. The Amended Partnership Agreement is designed to permit the Partnership to continue, on an uninterrupted basis, as the owner and operator of a casino licenced under the provisions of the Casino Control Act.

All transfers of securities, shares and other interests in the Partnership shall be subject to the right of prior approval by the CCC, and the Partnership shall have the absolute right to repurchase, at the market price or purchase price, whichever is the lesser, any security, share or other interest in the Partnership in the event that the CCC disproves a transfer in accordance with the provisions of the Casino Control Act.

## DESCRIPTION OF TM/GP CERTIFICATE OF INCORPORATION

The following is a summary of the terms of the Amended and Restated Certificate of Incorporation of TM/GP. It is qualified in its entirety by reference to the Amended and Restated Certificate of Incorporation of TM/GP, a copy of which has been made an Exhibit to the Registration Statement of which this Prospectus is a part.

*General.* TM/GP was formed to hold a general partnership interest in, and to act as managing general partner of, the Partnership.

### Capital Stock

*Authorized.* TM/GP shall have authority to issue 200 shares of common stock, consisting of: 100 shares of Class B Common Stock, par value $.01 per share (the "TM/GP Class B Stock"); and 100 shares of Class C Common Stock, par value $.01 per share (the "TM/GP Class C Stock", and collectively with the TM/GP Class B Stock, the "TM/GP Common Stock"). Such shares shall be issued to Holding.

*Quorum and Voting.* At any meeting of the stockholders of TM/GP at which the holders of any class of stock are entitled to vote, the presence, in person or by proxy, of the holders of a majority of the outstanding shares of such class shall constitute a quorum of such class. No action may be taken at a meeting unless a quorum of each class is present, except a vote to adjourn such meeting or the election

of directors by a class provided that a quorum of such class is present. Except as otherwise required by law, the affirmative vote of a plurality of the votes cast, in person or by proxy, at a meeting of stockholders of any class at which a quorum of such class is present shall be entitled to elect directors of TM/GP representing such class. Except as described below, all other action by stockholders of TM GP shall require the affirmative vote of a majority of the shares of each class present and entitled to vote, with each class voting as a separate class.

*Dividends.* The Board of Directors shall declare and cause dividends to be paid to the holder of the TM/GP Common Stock, from time to time out of funds legally available therefor, in an amount sufficient to allow the holder of the TM/GP Common Stock to pay premiums on insurance policies that cover its directors' errors and omissions and to make indemnification payments pursuant to its Amended and Restated Certificate of Incorporation and in an amount sufficient to permit such holder to redeem its Class B Stock and pay its expenses including, without limitation, taxes. The Board of Directors of TM/GP may also cause dividends to be paid to the holder of shares of TM/GP Common Stock from time to time out of funds legally available therefor. When and as dividends are declared, they may be payable in cash, in property or in shares of TM/GP Common Stock of the same class.

*Liquidation.* In the event of any voluntary or involuntary liquidation, dissolution or winding-up of the affairs of TM/GP, the holders of the TM/GP Common Stock then outstanding shall be entitled to receive ratably, without regard to class, in accordance with the number of shares held by each holder, out of the assets of TM/GP legally available for distribution to its stockholders, all of the assets of TM/GP available for distribution to the holders of the TM/GP Common Stock.

*Stockholder Approval Required.* The following actions must be approved by all the shares of TM/GP Class B Stock (which approval is in addition to the approval required of the Board of Directors set forth below), but need not be approved by any other class of stock:

(a) Any borrowings under Section 12.04(a) of the Indenture, except for borrowings permitted by the last proviso of such section, other than New Parking Financing which, together with all other New Parking Financing, would exceed $10,000,000, or other than F,F&E Financing, which together with all other F,F&E Financing would be in excess of $10,000,000;

(b) Any Capital Expenditure by the Partnership that, or series of related Capital Expenditures that in the aggregate, exceeds $10,000,000 other than a Capital Expenditure or series of related Capital Expenditures that are financed with debt, the incurrence of which is permitted by Section 12.04 of the Indenture, or Capital Expenditures required by law;

(c) Any sale of assets of TM/GP or the Partnership that, or series of related sales of assets that in the aggregate, exceeds $10,000,000;

(d) The merger, consolidation or other combination of TM GP or the Partnership with any other entity;

(e) Any amendment to or modification of the Amended Partnership Agreement, TM/GP's Amended and Restated Certificate of Incorporation or TM/GP's Amended and Restated By-Laws;

(f) Any action of the Partnership or TM/GP to implement a rights plan in the nature of a so-called "poison pill" plan, or other reclassification, restructuring (corporate or otherwise), classification of the Board of Directors other than as provided for in the TM/GP Amended and Restated Certificate of Incorporation or action of a similar nature designed to impede a change in control of the Partnership or TM/GP;

(g) The action, if required, as set forth in part (iv)(E) of the definition of the term "Transition Event"; or

(h) Certain affiliated transactions among the Partnership, TM/GP and their respective affiliates not listed on the Schedule to the TM/GP Certificate of Incorporation, that have been approved by the TM/GP Class B Directors. The affiliate transactions referred to on such Schedule are: fleet maintenance operations of the Taj Mahal, the Other Trump Casinos or other Affiliates of Donald J. Trump; joint parking arrangements relating to patron or employee parking at the Taj Mahal and Other Trump Casinos; risk management and insurance operations of the Taj Mahal, the Other Trump Casinos or other Affiliates of Donald J. Trump; shared payroll expenses of the Taj Mahal,

the Other Trump Casinos or other Affiliates of Donald J. Trump; leases of warehouse and office space among the Taj Mahal, the Other Trump Casinos or other Affiliates of Donald J. Trump; leases, maintenance or travel arrangements pertaining to helicopter and other air travel services provided by Affiliates of Donald J. Trump; and the purchase of tickets by Affiliates of Donald J. Trump for events staged at the Other Trump Casinos.

The Amended and Restated Certificate of Incorporation of Holding provides that the foregoing vote by the holder of the TM/GP Class B Stock may only be approved by a majority (66⅔% in the case of clause (g) above) vote of the shares of Holding Class B Stock present and entitled to vote at a meeting of the holders of Holding Class B Stock. See "Description of Holding Certificate of Incorporation—Class B Stockholder Approval Required."

## Board of Directors

*General.* The number of persons comprising the entire Board of Directors of TM/GP shall be nine. Each director shall be a Qualified Person. Until such time as a Transition Event shall occur, there shall be four TM/GP Class B Directors and five TM/GP Class C Directors. At each annual meeting of stockholders, or at any duly called special meeting of stockholders, the TM/GP Class C Directors shall be elected by the holders of the TM/GP Class C Stock voting as a separate class and the TM/GP Class B Directors shall be elected by the holders of TM/GP Class B Stock voting as a separate class. The initial TM/GP Class B Directors will be nominated by the Steering Committee and subsequent TM/GP Class B Directors shall be nominated by existing TM/GP Class B Directors and shall be elected by the existing Class B Directors of Holding. See "Description of Holding Certificate of Incorporation—Board of Directors—Voting Stock of TM/GP." After the Final Payment Date, all the TM/GP Class B Directors then in office, except for one TM/GP Class B Director designated by a majority of the TM/GP Class B Directors then in office, shall resign and if they fail to resign, a majority of the TM/GP Class C Directors shall be entitled to remove such TM/GP Class B Directors then in office, without cause. Thereafter, both the TM/GP Class B Director and the TM/GP Class C Directors shall be elected by the holders of TM/GP Class C Stock.

*Effect of Transition Event and Return Event.* Except as set forth below, after a Transition Event but before a Return Event occurs, (x) there shall be six TM/GP Class B Directors and three TM/GP Class C Directors and (y) to create the vacancies on the Board of Directors such that the number of TM/GP Class B Directors is six, two TM/GP Class C Directors shall forthwith resign and the vacancies created thereby shall be filled by the vote of a majority of the TM/GP Class B Directors then in office. If the TM/GP Class C Directors fail to immediately resign, a majority of the TM/GP Class B Directors shall be entitled to remove any two TM/GP Class C Directors then in office, without cause. If after the occurrence of a Transition Event there shall occur a Return Event, then upon the occurrence of such Return Event, (x) there shall again be five TM/GP Class C Directors and four TM/GP Class B Directors and (y) two TM/GP Class B Directors shall forthwith resign and the vacancies created thereby shall be filled by the vote of a majority of the TM/GP Class C Directors then in office. If such TM/GP Class B Directors fail to immediately resign, a majority of the TM/GP Class C Directors shall be entitled to remove any two TM/GP Class B Directors then in office, without cause.

*Quorum of Directors.* Except as set forth below, at all meetings of the Board of Directors, a majority of the entire Board of Directors shall be required to constitute a quorum for the transaction of business, and, except as set forth below, the act of a majority of the entire Board of Directors shall be sufficient to constitute the act of the Board of Directors; provided, however, that prior to the Final Payment Date a quorum shall not be deemed present at any meeting of the Board of Directors unless there shall be present at least two TM/GP Class C Directors and at least two TM/GP Class B Directors; and provided, further, that if a quorum is not achieved at any two consecutive duly noticed meetings of the Board of Directors to be held at reasonable intervals because at least two directors of the same class were not present, at the next duly noticed meeting of the Board of Directors a quorum shall be deemed to have been attained if at least one director of such class is present and together with other members present constitutes a majority of the entire Board of Directors. No action may be taken at a meeting of the Board of Directors at which a quorum is not present, except a vote to adjourn such meeting or fill a vacancy on the Board of Directors.

119

*Vote Requirement For Certain Board Action.* The approval of a majority of the entire Board of Directors shall be required to authorize the following actions on behalf of TM/GP on its own behalf or in its capacity as the managing general partner of the Partnership and, until the Final Payment Date, such majority affirmative vote must include the affirmative vote of at least a majority (and in the case of the action described in items (i) and (o) below, all) of the TM/GP Class B Directors for any action authorized before a Transition Event or after a Return Event:

(a) any transaction between the Partnership on one hand and any Affiliate of the Partnership (other than TM/GP) on the other hand;

(b) any transaction between TM/GP on the one hand and any Affiliate of TM/GP (other than the Partnership) on the other hand, other than the payment of indemnification, fees to directors or other dividends in accordance with TM/GP's Amended and Restated Certificate of Incorporation or TM/GP's Amended and Restated By-Laws;

(c) (i) any disposition of assets of the Partnership or TM/GP in any single transaction or series of transactions (A) other than in the ordinary course of business or (B) having a value greater than $10,000,000 or (ii) the granting of any lien or security interest thereon, except as permitted by Section 12.05 of the Indenture;

(d) the issuance, redemption, exchange or modification of the terms of any Indebtedness or equity of the Partnership or TM/GP, except in the case of the Partnership (i) as permitted by the proviso clause at the end of Section 12.04(a) of the Indenture (other than New Parking Financing), (ii) Refunding Indebtedness and (iii) equity redemptions and transfers permitted by the Amended Partnership Agreement.

(e) the appointment or removal of the chief executive officer, the chief financial officer or the chief operating officer of the Partnership or TM/GP;

(f) the adoption of a Budget;

(g) the engagement by the Partnership or TM/GP in any business not in the ordinary course of business and incident to owning and operating the Taj Mahal and activities relating thereto;

(h) the merger, consolidation or other combination of the Partnership or TM/GP with any other entity;

(i) the filing by the Partnership or TM/GP of a petition under the Code or any similar state law filing or insolvency proceeding;

(j) any amendment to or modification of the Amended Partnership Agreement, TM/GP's Amended and Restated Certificate of Incorporation or TM/GP's Amended and Restated By-Laws;

(k) the taking of any action with respect to the Company;

(l) any Capital Expenditure;

(m) any borrowing under the Working Capital Facility in excess of $5,000,000, other than borrowings used to pay or discharge liabilities to patrons in respect of gambling winnings;

(n) any modification of the policy of the Partnership with respect to the extension of credit to casino gaming patrons as filed with the CCC;

(o) any modification of a Budget;

(p) the authorization of any amendment or supplement to the Indenture without the consent of the holders of the New Bonds, pursuant to the terms of the Indenture; and

(q) any modification of the terms of the Partnership's liability insurance.

Notwithstanding clause (d) above, the Class B Directors shall have exclusive authority, by vote of a majority of the Class B Directors, to authorize any borrowing under the Standby Letter of Credit.

The Amended and Restated Certificate of Incorporation of TM/GP also provides that notwithstanding any of the provisions contained therein, the Services Agreement and the Amended Lease may be entered into and performed by any Affiliate of Donald J. Trump that may be a party thereto.

After such time as a Transition Event occurs but before a Return Event occurs, any affirmative vote of a majority of the Board of Directors must include the vote of at least a majority of Class C Directors to (x) authorize the issuance of any equity of TM/GP or the Partnership, unless certain conditions are satisfied; (y) modify the terms of any Indebtedness or authorize the incurrence of additional Indebtedness of TM/GP or the Partnership unless approved by a majority of the TM/GP Class B Directors; or (z) authorize the sale of all or substantially all of the Partnership's assets, or a merger or consolidation of the Partnership, unless, in each such case, certain prescribed criteria are satisfied.

*Audit Committee.* The Audit Committee shall have three members. Prior to the Final Payment Date, the TM/GP Class B Directors shall have the right to appoint two TM/GP Class B Directors to the Audit Committee of the Board of Directors and the TM/GP Class C Directors shall have the right to appoint one TM/GP Class C Director to the Audit Committee of the Board of Directors. The Audit Committee shall have the rights conferred on such committee in the Amended and Restated By-laws of TM/GP.

### Budget

The Budget for Fiscal 1991 (the "1991 Budget") shall be the Budget agreed upon by the TM/GP Board of Directors for such fiscal year or, if the TM/GP Board of Directors has not agreed upon a Budget, the budget implemented pursuant to the Plan.

Thereafter, TM/GP, as managing general partner of the Partnership, shall fix the Budget for the Partnership as follows:

On or before November 15, 1991 and on or before each November 15 thereafter, the chief executive officer of TM/GP shall present a budget to the Board of Directors of TM/GP for the year commencing on the next following January 1. Such budget shall include a profit and loss statement for such year, a cash flow statement, and such other detail as the Board of Directors shall request. At the regular meeting of the TM/GP Board of Directors in December 1991 and each December thereafter, the Board of Directors shall consider the budget (including any requested modification or adjustment thereto) for approval in accordance with the procedures set forth in the TM/GP Amended and Restated Certificate of Incorporation and described below. Upon its approval by the Board of Directors the budget shall become the Budget of the Partnership for the ensuing Budget Period.

If a Budget Period (other than for Fiscal 1991) expires and a budget has not been approved by the Board of Directors of TM/GP for the period commencing upon such expiration, or if the Board of Directors does not approve a budget for the Budget Period commencing on January 1, 1992, (i) Budget R-EBITDA for the period subsequent to the Budget Period (the "New Budget Period") shall be determined retroactively after actual operating results for the New Budget Period have been reported to the CCC by all Existing Casinos and (ii) Capital Expenditures for the New Budget Period shall equal the sum of (A) the amount allocated for such purpose in the most recent Budget, (B) to the extent not otherwise provided for, Capital Expenditures contemplated in the most recent Budget to be expended in the New Budget Period, (C) Capital Expenditures required by law and (D) Capital Expenditures to repair or replace casualty damage to the Partnership's property.

Every Budget shall permit and provide for (i) the Capital Expenditures required by law; (ii) the payments of all amounts owed under the Senior Debt Facilities and under any other Indebtedness incurred in accordance with the Indenture and the TM/GP Amended and Restated Certificate of Incorporation; (iii) the payment of all amounts owed under the Services Agreement; (iv) the payment of all amounts due under the Amended Lease; (v) $5,000,000 for the payment of principal or interest on Indebtedness other than the New Bonds or securities issued as interest on the New Bonds; (vi) the use of Excess Available Cash Flow to pay interest on, redeem, purchase, defease or repay New Bonds or other Indebtedness required or permitted to be paid by the terms of the Indenture; and (vii) the payment of interest at the Cash Rate on each Interest Payment Date in the period covered by such Budget on the New Bonds outstanding on the Record Date

immediately preceding each such Interest Payment Date. In addition, every Budget shall prescribe a level of EBITDA less Capital Expenditures for the Budget Period such that 85% of EBITDA less Capital Expenditures plus the unused portion of the Senior Line of Credit must equal or exceed (x) interest on the outstanding New Bonds at the Cash Rate for such Budget Period, plus (y) $5,000,000 (or such lesser amount as is required to be paid to NatWest) and (z) payments required under the agreements listed under (ii), (iii) and (iv) above. Any Budget that does not satisfy the requirements of the preceding sentence shall be null and void and the provisions of the preceding paragraph shall control.

## Neutral

Any dispute relating to the existence of a Transition Event (a "Dispute") shall be resolved by Herbert Stern, a former Federal District Court judge, or if he is unable or unwilling to serve, a successor who shall have been selected by Herbert Stern, or if he fails to make such selection, by a majority of the Class C Directors and a majority of the Class B Directors (each of Mr. Stern or his successor is hereinafter referred to as the "Neutral").

Subject to the provisions of the TM/GP Amended and Restated Certificate of Incorporation, the Neutral shall determine fair procedures for hearing and resolving any Dispute, which procedure shall, in all cases, include at least 48 hours' notice to the other side and, if the Neutral is being asked to determine whether a Transition Event described in part (vi) of the definition thereof has occurred, a description in reasonable detail of the facts alleged to constitute such Transition Event, or if the Neutral is being asked to determine a Return Event has occurred after the declaration of a Transition Event described in parts (i), (ii), (iii) or (iv) of the definition thereof, a description in reasonable detail of the Return Event, or if the Neutral is being asked to appoint an independent nationally recognized investment banker, a suggestion for such person, and in any event a reasonable opportunity to respond and to be heard by all parties. The Neutral shall have the power to retain independent counsel or other professionals. The party asserting the existence of a Transition Event under part (vi) of the definition thereof, a Return Event or an event of Force Majeure shall have the burden of establishing its existence by clear and convincing evidence.

The Neutral's decision shall contain, in addition to his or her holding, a full statement of the facts as found. The decision of the Neutral shall be final and binding, provided, however, that any such decision may be reviewed once by a court having jurisdiction thereof solely on the grounds set forth in Sections 10 and 11 of the United States Arbitration Act, 9 U.S.C. §§ 10-11, or on the ground that no reasonable basis in fact exists to support the decision. The TM/GP Amended and Restated Certificate of Incorporation provides that neither party will seek to challenge, by injunction or otherwise, the dispute resolution procedures contained therein nor to impede or prevent the operation of the provisions of the TM/GP Amended and Restated Certificate of Incorporation.

All fees and expenses of the Neutral and other costs of the dispute resolution proceeding, including fees and expenses of counsel and other professionals and appropriate retainer amounts for the Neutral or successor Neutral, shall be borne by the Partnership.

The Partnership shall indemnify the Neutral for any and all losses suffered in correction with the performance of the Neutral's duties under the TM/GP Amended and Restated Certificate of Incorporation. Neither the Partnership, TM/GP nor any officer or director thereof may file a lawsuit or take any other action against the Neutral in his capacity as Neutral except for a lawsuit seeking to compel the Neutral to perform his duties in such capacity.

## Regulation

TM/GP, as the managing general partner of a casino licensee, has been determined to be an "intermediary company" of the Partnership and will therefore be required to meet substantially the same requirements as a casino licensee.

All transfers (as defined by the Casino Control Act) of securities (as defined by the Casino Control Act), shares and other interests in TM/GP shall be subject to the right of prior approval by the CCC; and TM/GP shall have the absolute right to repurchase at the market price or purchase price, whichever

is the lesser, any security, share or other interest in TM/GP in the event that the CCC disapproves a transfer in accordance with the provisions of the Casino Control Act.

If the continued holding of securities, shares or other interests in TM/GP by any person will disqualify TM/GP from continuing as the managing general partner of a New Jersey casino licensee, such person shall enter into such escrow, trust or similar arrangement as may be required by the CCC under the circumstances. It is the intent of the procedures set forth in the TM/GP Certificate of Incorporation to permit TM/GP to continue, on an uninterrupted basis, as the managing general partner of a New Jersey casino licensee licensed under the provisions of the Casino Control Act.

**Amendment**

TM/GP's Amended and Restated Certificate of Incorporation may only be amended, altered, changed, or repealed by the affirmative vote of the holders of a majority of the TM/GP Class B Stock and the holders of a majority of the TM/GP Class C Stock; provided however, that after the occurrence of a Transition Event but before a Return Event the holders of Class C Stock shall not be entitled to vote on any amendment thereto.

**Indemnification**

TM/GP has agreed to indemnify and reimburse any present or former "corporate agent", as defined in N.J.S.A 14A:3-5, who serves TM/GP, or any constituent corporation absorbed by TM/GP in a merger or consolidation, or any other corporation or business entity in which it has a business interest, against any reasonable and necessary expenses, counsel fees and liabilities actually incurred by them in any civil or criminal proceeding brought or threatened for acts arising out of their status as corporate agents, to the maximum extent permitted by law and in accordance with the procedures set forth in N.J.S.A. 14:3-5. Termination of any proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent shall not of itself create a presumption that such corporate agent did not meet the applicable standard of conduct for indemnification. Indemnity shall be paid in advance of the final disposition of the proceeding, provided the corporate agent undertakes to repay TM/GP if it shall be ultimately determined that he is not entitled to indemnification as provided by the TM/GP Amended and Restated Certificate of Incorporation.

**Limitation on Liability**

A director shall not be personally liable to TM/GP or its stockholders for damages for breach of any duty owed to TM/GP or its stockholders; such provision, however, does not relieve a director from liability for any breach of duty based upon an act or ommission (a) in breach of such director's duty of loyalty to TM/GP or its stockholders, (b) not in good faith or involving a knowing violation of law or (c) resulting in receipt by such director of an improper benefit.

## DESCRIPTION OF HOLDING CERTIFICATE OF INCORPORATION

The following is a summary of the terms of the Amended and Restated Certificate of Incorporation of Holding. It is qualified in its entirety by reference to the Amended and Restated Certificate of Incorporation of Holding, a copy of which has been made an Exhibit to the Registration Statement of which this Prospectus is a part.

*General.* The nature of the business to be conducted by Holding is to hold all the capital stock of TM/GP and 50% of the capital stock of Trump Corp., and all activities incident to holding such capital stock and to engage in no other business activities. As the holder of stock of corporations having partnership interests in the Partnership which owns the Taj Mahal, Holding is subject to the Casino Control Act and governed by the rules and regulations of the CCC.

**Capital Stock**

*Authorized.* Holding shall have authority to issue 21,860,000 shares of capital stock, consisting of: 10,000,000 shares of Class A Stock; 860,000 shares of Class B Stock; and 10,000,000 shares of Class C

Stock in addition to 1,000,000 shares of preferred stock. The Board of Directors has the authority, without submitting a proposal to the holders of Common Stock, to issue preferred stock in one or more series and upon such terms as may be set by the Board of Directors. Such shares, if issued, may be convertible and may rank superior to the Common Stock in the payment of dividends, liquidation rights, voting and other rights, preferences and privileges. Holding has no present plans to issue preferred stock. Each share of Class B Stock shall be attached to each $1,000 principal amount of New Bonds, whether upon original issuance of the New Bonds or pursuant to the interest payment provisions thereof, and may not be transferred separately from such principal amount of New Bonds. See "Capitalization."

*Quorum and Voting.* Before the Final Payment Date: at any meeting of the stockholders of Holding at which the holders of any class of stock are entitled to vote, the presence, in person or by proxy, of the holders of a majority of the outstanding shares of such class shall constitute a quorum of such class; no action may be taken at a meeting unless a quorum of each class entitled to vote is present, except a vote to adjourn such meeting; all stockholders votes shall be by written ballot; the affirmative vote of a plurality of the votes cast, in person or by proxy, at a meeting of stockholders of any class at which a quorum of such class is present shall be entitled to elect directors of Holding representing such class; any other action by stockholders of Holding shall require the affirmative vote of a majority of the shares of each class present and entitled to vote; the Class A Stock shall not be entitled to vote on any matter except as specifically required by statute, the approval of certain matters requires only the affirmative vote of a majority of the holders of the Class B Stock, the Class B Stock and Class C Stock shall have one vote per share on all other matters on which stockholders are entitled to vote, except for the election of directors by a particular class, and the Class B Stock shall vote as a separate class and the Class C Stock shall vote as a separate class.

After the Final Payment Date: at any meeting of the stockholders of Holding at which the holders of any class of stock entitled to vote, the presence, in person or by proxy, of the holders of a majority of the outstanding shares of Common Stock shall constitute a quorum; the Class A Stock and Class C Stock shall each be entitled to one vote per share, and shall vote together as a single class on all matters on which they are entitled to vote, and there shall be cumulative voting for the election of directors; any other action by the stockholders of Holding shall require the affirmative vote of a majority of the Common Stock present and entitled to vote; the directors of Holding shall also act as the directors of TM/GP.

*Class B Stockholder Approval Required.* Prior to the Final Payment Date, the following actions must be approved by a majority of the shares of Class B Stock present and entitled to vote at a meeting of the holders of Class B Stock at which a quorum of Class B Stock is present:

(a) Any vote of the TM/GP Class B Stock to approve any action by TM/GP that requires the approval of the holders of the TM/GP Class B Stock (except that the approval, if necessary, as set forth in part (iv) (E) of the definition of the term Transition Event must be of at least 66⅔% of the Class B Stock of Holding);

(b) Any borrowings by Holding;

(c) Any Capital Expenditure by Holding;

(d) Any sale of assets of Holding that, or series of related sales of assets that in the aggregate, exceeds $10,000,000;

(e) The merger, consolidation or other combination of Holding with or into any other entity;

(f) Any amendment to or modification of Holding's Amended and Restated Certificate of Incorporation or Amended and Restated By-Laws;

(g) Any action of Holding to implement a rights plan in the nature of a so-called "poison pill" plan, or other reclassification, restructuring (corporate or otherwise) or action of a similar nature designed to impede a change in control of Holding;

(h) The issuance of any equity by Holding; or

(i) Transactions between Holding and its affiliates approved by the Board of Directors which are not described on Schedule I of Holding's Amended and Restated Certificate of Incorporation.

The affiliate transactions referred to on such Schedule are: fleet maintenance operations of the Taj Mahal, the Other Trump Casinos or other affiliates of Donald J. Trump; joint parking arrangements relating to patron or employee parking at the Taj Mahal or the Other Trump Casinos; risk management and insurance operations of the Taj Mahal, the Other Trump Casinos or other affiliates of Donald J. Trump; shared payroll expenses of the Taj Mahal, the Other Trump Casinos or other affiliates of Donald J. Trump; leases of warehouse and office space among the Taj Mahal, the Other Trump Casinos or other affiliates of Donald J. Trump; leases, maintenance or travel arrangements pertaining to helicopter and other air travel services provided by affiliates of Donald J. Trump; and the purchase of tickets by affiliates of Donald J. Trump for events staged at the Other Trump Casinos.

*Dividends.* The Board of Directors of Holding may cause dividends to be paid to the holders of shares of Class A Stock from time to time out of funds legally available therefor. When and as dividends are declared, they may be payable in cash, in property or in shares of Common Stock of the same class. Holders of Class B Stock and Class C Stock are not entitled to the payment of dividends, except that if a distribution of Class A Stock is made, an equivalent distribution of Class C Stock shall be made.

*Certain Stockholders.* To the extent Donald J. Trump or any Person acting in concert with Donald J. Trump shall beneficially acquire any outstanding shares of Class B Stock, such Class B Stock shall be counted for the purposes of establishing a quorum and shall automatically be voted for or against a particular matter in the same proportion as all other shares of Class B Stock are voted on that matter.

*Redemption.* Holding shall redeem each outstanding share of Class B Stock at a redemption price of $.50 per share (adjusted to reflect stock splits, combinations and dividends since the original date of issuance) at such time as the principal amount of New Bond with respect to which such share was issued is redeemed, defeased or paid.

*Liquidation.* In the event of any voluntary or involuntary liquidation, dissolution or winding-up of the affairs of Holding, the holders of Class A Stock, Class B Stock and Class C Stock then outstanding shall be entitled to receive ratably, in accordance with the number of shares held by each holder, out of the assets of Holding legally available for distribution to its stockholders, $.01 per share (adjusted to reflect stock splits, combinations and dividends since the original date of issuance). After the payment in full of the amount described in the immediately preceding sentence to the holders of the Class A Stock, Class B Stock and Class C Stock, the holders of Class A Stock shall be entitled to share ratably, in accordance with the number of shares held by each such holder, in all of the remaining assets of Holding available for distribution to the holders of Common Stock, and the holders of Class B Stock and Class C Stock shall not be entitled to share in the distribution of such remaining assets.

## Board of Directors

*General.* Except as set forth below, the Board of Directors of Holding shall consist of nine directors. Each director shall be a Qualified Person. Until such time as a Transition Event shall occur, there shall be four Class B Directors and five Class C Directors. The Class C Directors shall be elected by the holders of the Class C Stock voting as a separate class and the Class B Directors shall be elected by the holders of the Class B Stock voting as a separate class. The initial Class B Directors will be nominated by the Steering Committee and subsequent Class B Directors shall be nominated by then existing Class B Directors. Until the Final Payment Date occurs, no action shall be taken by or on behalf of Holding unless such action is authorized by the affirmative vote of a majority of the directors of each class, except for the filing of a petition under chapter 11 of the Code, which filing requires the unanimous vote of the Class B Directors. The directors of Holding elected as described above shall also serve as directors of TM/GP.

Donald J. Trump currently intends to name himself and Nicholas L. Ribis, Harvey I. Freeman and Steven F. Bollenbach as four of the five Class B Directors of Holding, and such persons will also serve as directors of TM/GP.

*Effect of Transition Event and Return Event.* Except as described below, after a Transition Event but before a Return Event occurs, (a) there shall be six Class B Directors and three Class C Directors;

(b) to create the vacancies on the Board of Directors such that the number of Class B Directors is six, two Class C Directors shall forthwith resign and the vacancies created thereby shall be filled by the vote of a majority of the Class B Directors then in office and (c) the majority vote of all directors voting as a single class shall constitute the act of the Board of Directors. If after the occurrence of a Transition Event there shall occur a Return Event, then upon the occurrence of such Return Event, (x) there shall again be five Class C Directors and four Class B Directors and (y) two Class B Directors shall forthwith resign and the vacancies created thereby shall be filled by the vote of a majority of the Class C Directors then in office. If such Class B Directors or Class C Directors, as the case may be, fail to resign as aforesaid, the Class B Directors or Class C Directors, as the case may be, who have served in such capacity for the shortest period of time shall be deemed to have resigned for all purposes.

*Quorum of Directors.* Except as described below, at all meetings of the Board of Directors, a majority of the entire Board of Directors shall be required to constitute a quorum for the transaction of business; provided, however, that a quorum shall not be deemed present at any meeting of directors unless there shall be present at least two Class C Directors and at least two Class B Directors; and provided, further, that if a quorum is not achieved at any two consecutive duly noticed meetings of directors to be held at reasonable intervals because at least two directors of the same class were not present, at the next duly noticed meeting of the Board of Directors a quorum shall be deemed to have been attained if at least one director of such class is present and together with other members present constitutes a majority of the entire Board of Directors. No action may be taken at a meeting at which a quorum is not present, except to vote to adjourn such meeting or fill a vacancy on the Board of Directors.

*Final Payment Date.* After the Final Payment Date: (a) all the Class B Directors then in office, except for one Class B Director designated by a majority of the Class B Directors then in office, shall resign and if such Class B Directors fail to resign, a majority of the Class C Directors shall be entitled to remove such Class B Directors then in office, without cause. (b) the Board of Directors shall consist of nine unclassified directors who shall be elected by the holders of Class A Stock and Class C Stock voting as a single class, (c) a quorum of such Board of Directors shall be five directors, and the act of a majority of the directors present and entitled to vote at a meeting of the Board of Directors shall be sufficient to constitute the act of the Board of Directors. (d) the Audit Committee shall consist of three directors appointed by the Chairman of the Board and (e) the Board of Directors, in accordance with (c) above, shall be entitled to vote all the common stock of TM/GP for such directors of TM/GP as the Board of Directors may choose in its discretion.

*Voting Stock of TM/GP.* Subject to the provisions described above, the Class B Directors shall be entitled, by a majority vote of all the Class B Directors at a meeting attended by a majority of the Class B Directors, to exercise any and all rights and powers incident to the ownership of the TM/GP Class B Stock that Holding as owner of such stock, could exercise, including attending and voting at any meeting of the holders of the TM/GP Class B Stock on any matter on which the holder of such stock is eligible to vote, or executing a proxy to any other Person to represent Holding by attending and voting at any such meeting and the Class B Directors shall vote for themselves as the Class B Directors of TM/GP. Subject to the provisions above, the Class C Directors shall be entitled, by a majority vote of all the Class C Directors at a meeting attended by a majority of the Class C Directors, to exercise any and all rights and powers incident to the ownership of the TM/GP Class C Stock that Holding, as owner of such stock, could exercise, including attending and voting at any meeting of the holders of the TM/GP Class C Stock on any matter on which the holder of such stock is eligible to vote, or executing a proxy to any other Person to represent Holding by attending and voting at any such meeting and the Class C Directors shall vote for themselves as the Class C Directors of TM/GP.

*Audit Committee.* Subject to the above provisions, the Class B Directors shall have the right to appoint two Class B Directors to the Audit Committee and the Class C Directors shall have the right to appoint one Class C Director to the Audit Committee.

## Amendments

Holding has reserved the right to amend, alter, change or repeal any provision contained in its Amended and Restated Certificate of Incorporation, in the manner prescribed by statute, subject to the

right of the holders of the Class B Stock to approve any such amendment or modification: *provided, however,* that the Amended and Restated Certificate of Incorporation may only be amended, altered, changed, or repealed by the affirmative vote of the holders of a majority of the Class B Stock and the holders of a majority of the Class C Stock, *provided, however,* that after the occurrence of a Transition Event but before a Return Event (x) the holders of the Class C Stock shall not be entitled to vote on any amendments thereto and (y) the Class C Directors shall not be permitted to vote on any Preferred Stock Designation.

## Regulation

Holding has been determined to be a "holding company" of the Partnership under the Casino Control Act, and as such it will have to comply with substantially the same requirements as a casino licensee.

All securities of Holding are held subject to the condition that, if a holder thereof is found to be disqualified by the CCC pursuant to the provisions of the Casino Control Act, such holder shall (a) dispose of his or her interest in Holding; (b) not receive any dividends or interest upon any such securities; (c) not exercise, directly or indirectly or through any trustee or nominee, any right conferred by such securities; and (d) not receive any remuneration in any form from the casino licensee for services rendered or otherwise.

## Indemnification

Holding has agreed to indemnify to the fullest extent permitted under and in accordance with the laws of the State of Delaware any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he is or was a director, officer, incorporator, employee or agent of Holding, or is or was serving at the request of Holding as a director, officer, trustee, employee or agent of or in any other capacity with another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of Holding, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. Expenses incurred in defending a civil or criminal action, suit or proceeding shall (in the case of any action, suit or proceeding against a director of Holding) or may (in the case of any action, suit or proceeding against an officer, trustee, employee or agent) be paid by Holding in advance of the final disposition of such action, suit or proceeding as authorized by the Board of Directors upon receipt of an undertaking by or on behalf of the indemnified person to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by Holding as authorized in its Amended and Restated Certificate of Incorporation.

## Limitation on Liability

No director shall be personally liable to Holding or any stockholder for monetary damages for breach of fiduciary duty as a director, except for any matter in respect of which such director (A) shall be liable under the laws of the State of Delaware or (B) shall be liable by reason that, in addition to any and all other requirements for liability, he:

(i) shall have breached his duty of loyalty to Holding or its stockholders;

(ii) shall not have acted in good faith or, in failing to act, shall not have acted in good faith;

(iii) shall have acted in a manner involving intentional misconduct or a knowing violation of law or, in failing to act, shall have acted in a manner involving intentional misconduct or a knowing violation of law; or

(iv) shall have derived an improper personal benefit.

127

**Transfer Limitations**

Before the Final Payment Date, no Class A Stock may be beneficially acquired by Donald J. Trump or any Person acting in concert with Donald J. Trump, except to satisfy a warrant anticipated to be given by Donald J. Trump to the holders of the Class Action Claims. After the Final Payment Date, Donald J. Trump or any Person acting in concert with Donald J. Trump may purchase a percentage of the outstanding Class A Stock equal to the percentage of the 14% Payment made or deemed to have been made. In addition, Donald J. Trump or any Person acting in concert with Donald J. Trump may, at any time, purchase Class A Stock in a tender offer for all outstanding shares of Class A Stock.

## SERVICES AGREEMENT

The following is only a summary of the terms of the Services Agreement. It is qualified in its entirety by reference to the Services Agreement, a copy of which has been filed as an Exhibit to the Registration Statement of which this Prospectus is a part.

*Services to be Provided by Donald J. Trump.* As of April 1, 1991, the Partnership entered into the Services Agreement with Donald J. Trump which is subject to approval by the CCC. The Services Agreement provides that Donald J. Trump, subject to the supervision and reasonable direction of the Audit Committee of TM/GP, will provide to the Partnership, on a non-exclusive basis, marketing, advertising, promotional and other similar and related services (the "Services") with respect to the business and operations of the Taj Mahal and the Partnership, including, but not limited to, (a) meeting with and assisting the executive management of TM/GP in the development of marketing strategies for the Taj Mahal; (b) making a reasonable number of personal appearances on behalf of the Partnership; (c) meeting with and otherwise communicating with such existing or potential employees, contractors, entertainers, celebrities, vendors, patrons and others who are significant to the business and prospects of the Taj Mahal; (d) permitting the Partnership publicly to refer to, use, and/or display the name and/or likeness of Donald J. Trump in connection with any form of advertising or promotion; and (e) such other Services consistent with the Services Agreement as the Audit Committee of TM/GP shall reasonably request.

*Amount of Time to be Devoted by Trump.* The Services Agreement requires Donald J. Trump to devote a substantial amount of his time in providing the Services. Donald J. Trump shall be deemed to have devoted the requisite amount of his time to providing such services if he, or certain of his affiliates if agreed to by the Audit Committee of TM/GP, shall have (i) devoted at least one hundred ninety five (195) hours to rendering the Services (including travel time to and from the destination at which such Services are to be performed) during each calendar quarter during the term of the Services Agreement and (ii) made at least six (6) personal appearances during each such calendar quarter.

*Annual Fee.* In consideration for the services to be rendered by Donald J. Trump, the Partnership shall pay to Donald J. Trump each year an annual fee equal to the sum of (i) $500,000.00 (the "Base Fee') and (ii) the amount by which one and one-half (1½%) percent of the difference between (x) the Partnership's actual EBITDA and (y) actual capital expenditures for such year (or part thereof) exceeds the Base Fee (the "Incentive Fee" which together with the Base Fee constitutes the "Annual Fee"). The Partnership shall advance to Donald Trump $50,000 on a monthly basis to be applied toward the Incentive Fee; provided, however, that Donald J. Trump shall promptly repay the amount not earned and, if he fails to make such payment, the Partnership may set off the amount required to be repaid against any subsequent Base Fee amounts. The Incentive Fee advance will accrue from April 1, 1991, and Donald J. Trump will commence performing his obligations under the Services Agreement as of June 1, 1991.

In addition to the Annual Fee, the Partnership shall reimburse Donald J. Trump on a monthly basis for all reasonable out-of-pocket expenses up to certain aggregate amounts incurred by Donald J. Trump in performing his obligations under the Services Agreement.

*Term.* Unless sooner terminated pursuant to its terms, the Services Agreement shall commence on June 1, 1991 and shall expire on the due date of the New Bonds; provided that the Partnership shall pay Donald J. Trump the Incentive Fee from April 1, 1991.

*Termination.* Donald J. Trump shall have the right to terminate, and the Partnership shall be deemed to have terminated, the Services Agreement at any time following the occurrence of a Transition Event, and the Services Agreement shall be reinstated following a Return Event.

In addition, Donald J. Trump shall have the right to terminate, and the Partnership shall be deemed to have terminated, the Services Agreement on ten business days' written notice in the event that the other party shall commit a material breach of any of the representations, warranties, conditions, agreements or obligations contained in the Services Agreement, which breach is not cured within ten business days after receipt of such written notice, or, if such breach is of a nature that could reasonably be remedied within said ten-day period, then the failure of such party to institute and thereafter diligently prosecute to completion all steps necessary to remedy the same.

The Partnership shall be deemed to have suspended the Services Agreement and payments to Donald J. Trump thereunder if (i) Donald J. Trump is indicted by any federal, state or local governmental authority; (ii) if any governmental authority shall issue a notice, complaint or order alleging that the implementation of the Services by Donald J. Trump is in violation of any law, order, or regulation; or (iii) any judicial or administrative action or proceeding is commenced against the Partnership or the Taj Mahal which prohibits, during the pendency thereof, use of the name or likeness of Donald J. Trump in connection with the advertising and promotion of the Taj Mahal, except if such prohibitions resulted from any action or omission of the Partnership in violation of the Amended License Agreement. Suspension in any case shall continue until such time as such indictment, notice, complaint or order is complied with or such action or proceeding is dismissed, settled, vacated or teminated in favor of Donald J. Trump, the Partnership or the Taj Mahal, as the case may be; provided, however, that in the event any suspension of the Services Agreement is ultimately lifted without a termination thereof, the Services Agreement shall automatically be deemed reinstated and in full force and effect, retroactive to the date of such suspension and, in such event, the Partnership shall forthwith pay to Donald J. Trump all sums due and owing for the period of such suspension.

The Partnership shall be deemed to have terminated the Services Agreement (i) if any indictment described in the preceding paragraph results in a conviction of Donald J. Trump; (ii) if any notice, complaint, order, action or proceeding referred to in the preceding paragraph results in a final order or decision being rendered against Donald J. Trump to the effect that the rendering of the Services by Donald J. Trump is in violation of any law, ordinance or regulation, or if the Partnership is prohibited from using the name or likeness of Donald J. Trump or is required to pay compensation to any third party in connection with such use (unless Donald J. Trump shall pay such compensation); or (iii) if Donald J. Trump shall terminate the Amended License Agreement for any reason other than the Partnership's failure to perform its obligations thereunder; or (iv) there is entered an order for relief against Donald J. Trump under the Code.

In the event of any termination of the Services Agreement by Donald J. Trump or the Partnership, the Partnership shall have the right, but not the obligation, to continue to use and/or display the name and/or likeness of Donald J. Trump in accordance with the Partnership's obligations under the Amended License Agreement for a period not to exceed one year.

*Conflict of Interest.* The parties to the Services Agreement have acknowledged and agreed that Donald J. Trump intends to continue to own and operate the Other Trump Casinos (which will continue to compete with the Taj Mahal) and devote time and effort to their affairs, as well as to other business matters, and that nothing in the Services Agreement shall be construed as preventing or otherwise restricting Donald J. Trump from operating such Other Trump Casinos in a commercially reasonable manner. Subject to the foregoing, in respect of any matter or matters involving employees, contractors, entertainers, celebrities, vendors, patrons, marketing programs, promotions, special events, or otherwise, Donald J. Trump will, and will to the best of his ability and consistent with his fiduciary obligations to the Partnership and the Other Trump Casinos, cause his Affiliates to act fairly and in a commercially reasonable manner so that on an annual overall basis (x) no Other Trump Casino shall realize a competitive advantage over the Taj Mahal by reason of any activity, transaction or action engaged in by Donald J. Trump or his Affiliates and (y) the Taj Mahal will not be discriminated against. Subject to the foregoing, Donald J. Trump will not, and will to the best of his ability and consistent with his fiduciary obligations to the Partnership and the Other Trump Casinos cause his

Affiliates not to, engage in any activity which could reasonably be expected to harm or malign the Taj Mahal name or reputation.

*Indemnification of Donald J. Trump.* The Partnership has agreed to indemnify Donald J. Trump from and against any and all liabilities with respect to any license fee or tax in the nature of a licensing fee (regardless of its designation) imposed on Donald J. Trump by any governmental authority by reason of his performance of the Services excluding any such licensing fee or tax to the extent that it relates to or arises in connection with the ownership or operation of any entity or property other than the Partnership and the Taj Mahal. In addition, to the extent that Donald J. Trump shall not be fully covered by the insurance to be provided by the Partnership pursuant to the Services Agreement, the Partnership has agreed to indemnify and hold Donald J. Trump free and harmless from and against any damages, liability, cost, claim, fee, obligation or expense, including attorneys' fees and expenses, incurred in defense of any of the foregoing, arising out of or in connection with the performance of the Services; provided, however, that the obligation to indemnify and hold harmless under the Services Agreement shall not include any losses suffered by Donald J. Trump arising out of the gross negligence or willful misconduct of Donald J. Trump or any Person acting on his behalf or under his direction, or the rendering of the Services not in conformity with, or in breach of, the Services Agreement.

To the extent that the Partnership shall not be fully covered by insurance, Donald J. Trump will indemnify the Partnership and hold it harmless from and against any damage, liability, cost, claim, fee, obligation or expense, including attorneys' fees and expenses, incurred by the Partnership in defense of any of the foregoing arising out of or in connection with Donald J. Trump's gross negligence or willful misconduct or that of any of his Affiliates, arising out of or in connection with its performance of any of the Services provided by Donald J. Trump.

## AMENDED NATWEST AGREEMENT

### Background

On November 3, 1989, the Partnership entered into a loan agreement with NatWest which provided financing of $50,000,000 for certain items of furniture, fixtures and equipment installed in the Taj Mahal which loan agreement was amended on August 8, 1990.

The Partnership has failed to make monthly interest payments on the NatWest Loan since October 1, 1990. The Partnership has also failed to make the payments of principal in the amount of $2,631,000 each due on November 15, 1990, February 15, 1991 and May 15, 1991. As a result, NatWest currently has the right to demand immediate payment of the entire principal amount of the NatWest Loan, plus accrued interest, upon notice to the Partnership.

In connection with the Plan, NatWest has agreed to the restructuring of its loan pursuant to the terms of the Amended NatWest Agreement. The following is a summary of the terms of the Amended NatWest Agreement and is qualified in its entirety by reference to the Amended NatWest Agreement, a copy of which has been filed as an Exhibit to the Registration Statement of which this Prospectus is a part. Except as otherwise modified by the Amended NatWest Agreement, the terms of the NatWest Loan remain the same.

### Terms

Upon confirmation of the Plan, the principal amount will be $45,644,755 which represents the outstanding principal amount of $44,668,421 as of the date the last payment in reduction of principal was made, plus the interest accrued from the date interest was last paid through November 15, 1990. The existing requirement of quarterly repayments of principal will be eliminated. The interest rate will be changed to 9⅜% per annum from its current rate of NatWest's prime rate loan plus ½% or Libor plus 2%, chosen at the Partnership's option. The Partnership's right to convert loans of one type into loans of another type has been eliminated.

Principal and interest on the NatWest Loan are payable as follows:

(a) on the day before the Plan is filed, $66.667 plus $12.260.27 per day for the period from April 1. 1991 to the day before the Plan is filed (to the extent paid, the "Prefiling NatWest Payment"); provided, however, that if the Partnership has insufficient cash to make this payment in full, the unpaid portion (the "NatWest Carryforward Amount") will be paid on the Effective Date;

(b) on the Effective Date, an amount equal to $12,260.27 per day for the period from the day the Plan is filed through the day before the Effective Date, plus the NatWest Carryforward Amount, if any (to the extent not theretofore paid if the Effective Date is later than November 15, 1991);

(c) on the last Business Day of the first month following the Effective Date and on the last such Business Day of each month thereafter until the earlier of the last such Business Day of September 1999 or the date the NatWest Loan, together with all interest thereon, is paid in full, the sum of $416,667, to be applied first in respect of accrued interest on the NatWest Loan and thereafter, to the extent available, in reduction of the principal of the NatWest Loan (except that the first such payment shall be pro-rated on the basis of a thirty-day month using the number of days (not to exceed 30) elapsed including the date thereof and the last day of such month) provided, however, that $43,750 of this payment will be remitted by NatWest to First Fidelity and will not be available to pay interest or principal of the NatWest Loan;

(d) on May 15 of each year (if any of the principal of or interest on the NatWest Loan is then outstanding), commencing on May 15, 1992 to and including May 15, 1999, an amount (the "EACF Payment") equal to 16.5% (or, if the Amended First Fidelity Agreement shall have been paid in full on or prior to any such May 15, 20%, less $525,000 which must be paid to Bankers Trust) of Excess Available Cash Flow for the preceding calendar year in excess of the Additional Amount payable on the next succeeding May 15 (such remaining Excess Available Cash Flow, the "Remaining EACF Amount"), if any, to be applied first in reduction of then accrued but unpaid interest on and then to principal of the NatWest Loan; and

(e) on November 15, 1999 the outstanding principal of and all accrued but unpaid interest on the NatWest Loan.

### Security

The NatWest Loan is currently secured by a first priority lien on the furniture, fixtures and equipment acquired with the proceeds of the NatWest Loan. The Plan provides that NatWest will maintain its first priority lien on such property plus any after-acquired furniture, fixtures and equipment that replaces such property or of the same type; provided, however, that the NatWest lien may be subordinated to a lien to secure purchase money financing of such after-acquired property up to 50% of the value of such after-acquired property.

### Events of Default

The occurrence of any of the following events shall constitute an event of default under the Amended NatWest Agreement, which upon notice by NatWest will result in the acceleration of any and all indebtedness outstanding under such agreement: (i) failure to make any payment of principal or interest within 10 days of the date such payment is due, (ii) failure to perform or observe any covenant contained therein, (iii) failure to perform or observe any term, condition or covenant of any instrument of indebtedness to which the Partnership, the Company or Donald J. Trump is a party which results in the acceleration of such indebtedness prior to the date otherwise due, (iv) failure to pay any indebtedness in principal amount in excess of $1,000,000 when due, (v) any judgment against the Partnership, the Company or Donald J. Trump in excess of $3,000,000, or any attachment, levy or execution against any of their properties which shall remain in effect for a period of 30 days or more, (vi) the invalidation of any liens created and granted to NatWest in connection with the Amended NatWest Agreement, (vii) the expiration or revocation of any license or permit required by the Partnership to operate the Taj Mahal, (viii) Donald J. Trump shall cease to own 50% of the Partnership, or Donald J. Trump or TM/GP shall cease to control the day-to-day operations of the Taj

Mahal. and (ix) any amendment or modification of the by-laws or certificate of incorporation of Holding or TM/GP or the Amended Partnership Agreement.

## AMENDED FIRST FIDELITY AGREEMENT

### Background

On November 22, 1988, First Fidelity, Realty Corp. and Donald J. Trump, as guarantor, entered into a Time Loan and Security Agreement pursuant to which First Fidelity made a term loan to Realty Corp. in the aggregate principal amount of $75,000,000 (the "Original Loan"). Pursuant to an amendment to such Agreement, dated as of August 8, 1990, the rate of interest payable on the Original Loan was modified, the dates of payment of principal and interest were deferred and accrued interest in the amount of $1,773,750 was capitalized (the Original Loan, as modified, the "Modified Loan"). First Fidelity has also made certain loans to finance the acquisition of automobiles by the Partnership and has issued letters of credit for the account of the Partnership. Pursuant to the Plan, the automobile loans will be unimpaired in the manner afforded other secured claims and the reimbursement obligations of the Partnership under the letters of credit will be assumed by the Partnership and First Fidelity's claims thereunder will be unaltered. Pursuant to the Plan, Realty Corp., Donald J. Trump and First Fidelity will enter into the Amended First Fidelity Agreement to be effective on the Effective Date. The following is a summary of the terms of the Amended First Fidelity Agreement.

### Terms

Pursuant to the Plan, the Modified Loan will be amended (as amended, the "Realty Corp. Loan") so that interest will accrue annually at the existing rate of interest but will be paid thereon at the rate of $3,300,000 per year together with any additional amounts payable under the leases described below and the maturity will generally be the same as that of the New Bonds. Accrued but unpaid interest in any year in excess of the minimum amount of $3,300,000 will not carryforward into the succeeding year. The leases between the Partnership and Realty Corp., pursuant to which the Partnership leases the Specified Parcels from Realty Corp., will be amended (the "Amended Lease") to provide for rentals payable by the Partnership, prior to the time that the NatWest Loan is paid in full, of $2,200,000 per year, plus 3½% of the Remaining EACF Amount and, upon payment in full of the NatWest Loan, increasing to include the payments to which NatWest is otherwise entitled under the Amended NatWest Agreement ("NatWest Amount"). In addition to such rental payments (which will be Realty Corp.'s sole source for servicing its debt), additional rent of $525,000 will be remitted by NatWest to First Fidelity out of the $5,000,000 it is entitled to receive annually under the Amended NatWest Agreement and $575,000 of additional rent will be received by First Fidelity under an assignment of amounts due under the Services Agreement; provided, however, that if the $575,000 is not paid under the Services Agreement, the Partnership will nonetheless be obligated to pay such amount under the Amended Lease. The Amended Lease will be assigned to First Fidelity. The first $3,300,000 received by First Fidelity each year will be applied to the interest due on the Realty Corp. Loan. Any additional sums received and retained will be applied to reduce the amount payable by the Partnership under the Limited Guaranty (as defined below) and, under certain circumstances, the principal amount of the Realty Corp. Loan. First Fidelity has agreed to remit the first $525,000 of the 3½% Remaining EACF amount and 25% of the NatWest Amount to Bankers Trust to be applied to the payment of interest on the New Line of Credit Note. Any such amounts remitted to Bankers Trust will not reduce the principal of the Realty Corp. Loan.

First Fidelity will also be entitled to receive on the day preceding the day the Plan is filed a payment equal to $33,333 plus $9,041.10 per day for the period from April 1, 1991 to the day before the Plan is filed (the "First Fidelity Prefiling Payment"); provided, however, that if the Partnership has insufficient cash to make the First Fidelity Prefiling Payment in full on the day before the Plan is filed, the unpaid portion (the "First Fidelity Carryforward Amount") will be paid on the Effective Date. On the Effective Date, First Fidelity will receive $9,041.10 per day for the period from the Filing Date through the day before the Effective Date, plus the First Fidelity Carryforward Amount, if any (to the extent not theretofor paid if the Effective Date is later than November 15, 1991).

**Limited Guaranty**

The Plan further provides that the Partnership and First Fidelity will enter into a limited guaranty (the "Limited Guaranty") pursuant to which the Partnership will, under certain circumstances, reimburse First Fidelity for any deficiency in the amount owed to First Fidelity upon maturity of the loan, up to a maximum of $30,000,000, provided that First Fidelity first pursues its remedies against the Specified Parcels described below and provided further that the New Bonds have been paid in full.

**Security**

The Realty Corp. Loan wil be secured by a first mortgatge lien on the Specified Parcels. Pursuant to the Plan, Realty Corp. will grant a second mortgage on the Specified Parcels to the Trustee as additional security for the New Bonds. However, in accordance with an intercreditor agreement to be entered into between the Trustee and First Fidelity as of the Effective Date, the Trustee's mortgage on the Specified Parcels will be entirely passive in that the Trustee will not be permitted to foreclose on the property unless and until First Fidelity forecloses. Additionally, First Fidelity shall have absolute control of any such foreclosure.

As further security for the Realty Corp. Loan, TTMI will grant a security interest to First Fidelity in its interest in the Partnership and Trump Corp. will grant a security interest to First Fidelity in one-half of its interest in the Partnership. Furthermore, Donald J. Trump will grant a security interest, or continue existing security interests, to First Fidelity in the capital stock of TTMI and Realty Corp., and the Class C Stock to secure his obligation under a personal guaranty of all amounts due under the Amended First Fidelity Agreement.

**Remedies upon Event of Default**

In case any Event of Default shall have occurred and be continuing, First Fidelity shall have the right to accelerate payment of all amounts owing by Realty Corp. under the Amended First Fidelity Agreement, subject to certain limitations. Certain Events of Default permit First Fidelity to foreclose on the Specified Parcels and certain Events of Default permit foreclosure on the Trump Pledged Equity.

The following events constitute Events of Default under the Amended First Fidelity Agreement, the occurrence of which would permit First Fidelity to foreclose on the Specified Parcels: (i) First Fidelity shall not receive required payments when due, which shall remain unpaid for a period of 30 days; (ii) the breach of any affirmative or negative covenant of Realty Corp. or any asset-specific representation or warranty contained in the Amended First Fidelity Agreement; (iii) acceleration of the New Bonds or the Amended NatWest Loan; (iv) any further mortgage encumbrance or lien on the Specified Parcels (other than a second lien in favor of the Trustee), which is not removed within 90 days; (v) the sale, transfer or other disposition of any portion of mortgaged premises without the consent of First Fidelity for less than specified prices; (vi) a judgment shall be entered against Realty Corp. in an amount of $2,500,000 or more which is not removed, vacated or satisfied within 90 days after entry thereof, unless such judgment is being contested in good faith and is adequately secured by a bond; (vii) the dilution of the Trump Pledged Equity (in whatever manner) unless certain conditions are met; and (viii) certain events of bankruptcy pertaining to Realty Corp.

The occurrence of the following events, among others, would permit First Fidelity to foreclose on the Trump Pledged Equity: (i) First Fidelity shall not receive required payments when due and owing, which shall remain unpaid for a period of 30 days; (ii) the breach of any covenant or any asset-specific representation or warranty contained in the Amended First Fidelity Agreement; (iii) the acceleration of the indebtedness represented by the New Bonds or the NatWest Loan; (iv) certain defaults occur under the Override Agreement and certain other loan agreements to which Donald J. Trump is a party; (v) the insolvency of Donald J. Trump, TTMI, the Partnership, Realty Corp. or Trump Corp.; (vi) one year following the death of Donald J. Trump; (vii) any further encumbrance or lien is placed on the Trump Pledged Equity (other than second and third liens in favor, respectively, of certain banks); (viii) any sale, transfer or other disposition of the Trump Pledged Equity; (ix) Donald J. Trump agrees to, authorizes or votes in favor of the issuance of additional equity interests in, or a merger or

133

restructuring of, the Partnership, TTMI, Realty Corp. or Trump Corp.; (x) the amendment of the Amended Partnership Agreement or Certificates of Incorporation or By-Laws of Holding, TM/GP, TTMI, Realty Corp. or Trump Corp.; or (xi) any judgment or similar levy is entered against Donald J. Trump or Realty Corp. in amount of $5,000,000 not covered by insurance, which judgment or levy shall have continued unstayed or in effect for a period of sixty (60) consecutive days.

Recourse against the limited guaranty after any Event of Default is limited as set forth above under "Limited Guaranty."

### Covenants

Under the Amended First Fidelity Loan, Realty Corp. will agree, among other things, to (i) pay taxes and assessments when due and prior to any penalty, unless the same are being contested in good faith and satisfactory reserves are deposited into an escrow account maintained at First Fidelity; (ii) to insure premises; and (iii) to comply with all laws affecting premises, including, without limitation, zoning, use, environmental. Donald J. Trump will agree to provide First Fidelity with further assurances to perfect, preserve and protect its security interest in the Trump Equity and to maintain his CCC licenses.

## AMENDED SUBCONTRACTORS AGREEMENT

Pursuant to the Plan, the Partnership will provide funds to a nominee of the Subcontractors for the nominee to purchase $20,000,000 in principal amount of Old Bonds from time to time prior to the Confirmation Date and exchange such Old Bonds for the Subcontractors' Note and the related second mortgage on the Partnership's real property. Such exchange shall be for satisfaction in full of all outstanding claims that such Subcontractors have against the Partnership. On the Effective Date, each Subcontractor will receive in respect of his claims, his pro rata share of the Class 4 distributions in respect of the $20,000,000 in principal amount of Old Bonds held by the Subcontractor's nominee.

## MARKET FOR OLD BONDS

The Old Bonds are traded on the American Stock Exchange under the symbol "TAJ". The following table sets forth, for the periods indicated, the high and low sale prices for each $100 principal amount of Old Bonds.

**Old Bonds**

|  | High | Low |
|---|---|---|
| 1991: |  |  |
| Second quarter (through June 4, 1991) | 60 | 48 |
| First quarter | 48 | 36 |
| 1990: |  |  |
| Fourth quarter | 38 | 27 |
| Third quarter | 54 | 31½ |
| Second quarter | 90½ | 49 |
| First quarter | 86 | 76 |
| 1989: |  |  |
| Fourth quarter | 93½ | 84⅛ |
| Third quarter | 101½ | 90½ |
| Second quarter | 102 | 95⅞ |
| First quarter | 101½ | 97¼ |

The closing price of the Old Bonds on June 4, 1991, was $57¼. The Registrants intend to apply to list the Units on the American Stock Exchange pursuant to Section 12 of the Exchange Act, assuming that the eligibility requirements for such listing can be met or waived. There can be no assurances that a listing will be obtained or as to the liquidity of any markets that may develop, that an active market for the Units will develop, that a liquid over-the-counter market will develop for the Class A Stock or at what prices holders of the Units or the Class A Stock would be able to sell such securities, if at all. See "Risks Factors—Absence of a Public Trading Market."

Donald J. Trump or his affiliates or family members may purchase Old Bonds in the open market at any time without further disclosure.

## CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOLLOWING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXA-TION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF OLD BONDS IN LIGHT OF SUCH HOLDER'S PARTICULAR CIRCUMSTANCES AND INCOME TAX SITUATION. EACH HOLDER OF OLD BONDS SHOULD CONSULT SUCH HOLDER'S TAX ADVISOR AS TO THE SPECIFIC TAX CONSEQUENCES TO SUCH HOLDER OF THE DELIVERY OF A BALLOT ACCEPTING OR REJECTING THE PLAN PURSUANT TO THE SOLICITATION, INCLUDING THE APPLICATION AND EFFECT OF STATE, LOCAL, FOREIGN AND OTHER TAX LAWS.**

Willkie Farr & Gallagher, counsel to the Company ("Counsel"), has advised the Company and the Partnership in respect of the tax positions as indicated and discussed below which will be taken by the Company and the Partnership with respect to the Federal income tax consequences of the Plan. This

summary does not discuss all aspects of Federal income taxation that may be relevant to a particular holder of Old Bonds in light of its personal investment circumstances or to certain types of holders of Old Bonds subject to special treatment under the Federal income tax laws (for example, life insurance companies, tax-exempt organizations, foreign corporations and individuals who are not citizens or residents of the United States) and does not discuss any aspect of state, local or foreign taxation. The discussion with respect to exchanging holders is limited to those holders who hold the Old Bonds as "capital assets" and who will hold the New Bonds. Class A and Class B stock as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the I.R.C.

This summary is based upon laws, regulations, procedures, rulings and decisions now in effect and upon proposed regulations, all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision. Moreover, due to the lack of definitive judicial or administrative authority, substantial uncertainties exist with respect to many of the tax consequences of the Plan as discussed herein.

The principal Federal income tax issues as to which Counsel has rendered an opinion but is unable to render an unqualified legal opinion as to, are:

    1. Classification of the Old Bonds and New Bonds as debt or equity;

    2. Whether the Company or the Partnership is the sole obligor on the Old Bonds and the New Bonds;

    3. The treatment of the exchange of the Old Bonds for New Bonds and Partnership interests under Section 108 and Section 721 of the Code including the correct method of allocating a Holder's adjusted basis in the Old Bonds to the portion exchanged for a Partnership interest and to the portion exchanged for New Bonds;

    4. The treatment of the New Bonds delivered in payment of the Additional Amount under the Proposed Treasury Regulations dealing with original issue discount;

    5. The tax effect of the potential acquisition of the Additional Partnership Interest by TTMI to TTMI and TM/GP;

    6. The tax effect of the potential acquisition of the Foreclosure Partnership Interest by TM/GP to the Partnership and TM/GP;

    7. The tax effect of the potential acquisition of the the Earned Reversionary Interest by TTMI to the Partnership and TM/GP; and

    8. The applicability of certain "high yield discount obligation" rules provided under Section 163(e) and Section 163(i) of the Code.

The foregoing issues are those as to which there is significant uncertainty as to the tax results, as discussed more fully below. Counsel believes that it is more likely than not that the New Bonds will be treated as debt of the Partnership for federal income tax purposes. In each of the other above instances, Counsel believes that there is substantial authority in law for the positions which the Partnership and the Company intend to take, as described more fully below, but because of the lack of controlling decisional or regulatory authority, Counsel is unable to provide legal assurance that the probabilities are more likely than not that such positions will be upheld if they are litigated. The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts and is less stringent than the "more likely than not" standard (the standard that is met when there is a greater than 50% likelihood of the position being upheld). There is substantial authority for the tax treatment of an item only if the weight of the authority supporting the treatment is substantial in relation to the weight of the authority supporting contrary treatment, taking all relevant authorities into account. There may be substantial authority for more than one position with respect to the same item. No rulings have been or will be requested from the Service concerning any of the tax matters described herein. In addition, the Service or a court may disagree with part or all of Counsel's opinion. Finally, certain of the tax issues material to the income tax consequences of the transactions described in the Prospectus turn on questions of factual characterization that may be controverted by the Service and other issues involve areas of the tax law which due to the ambiguity or the lack of legal authority make the applicability of such law uncertain and as to which Counsel can offer limited

guidance. For these reasons, there can be no assurance that the Service will not challenge the positions taken by the Partnership, the Company, or both, with respect to any of the issues addressed herein or that a court would not sustain such a challenge.

## Classification Of The Bonds

The interrelated determinations of whether a given instrument represents debt or equity for Federal income tax purposes and, in the case of debt, whether the obligor in form will be treated as the obligor for Federal income tax purposes are inherently factual in nature and no single characteristic or factor is determinative.

There is no one factor or characteristic which can be said to be decisive in the determination of whether an obligation should be treated for Federal income tax purposes as debt or equity. *See John Kelly Co. v. Comm'r*, 326 U.S. 521, 530 (1945). Although different courts have used a number of factors to resolve the determination of whether an instrument represents debt or equity, each case must be decided on its own facts. Among the factors which various courts have used are the following: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the relative position of the contribution with respect to other creditors; (7) the intent of the parties; (8) thin or adequate capitalization; (9) identity of interest between creditor and shareholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement. *See, e.g., Selfe v. U.S.*, 778 F.2d 769, 773 n. 9 (11th Cir. 1985).

Among the factors examined in determining the identity of the true obligor for Federal income tax purposes where another party guarantees or otherwise provides credit support to the nominal obligor are the economic independence and substance of the nominal obligor and the ability of the nominal obligor to service interest and principal on the debt from its cash flows. *See Plantation Patterns v. Comm'r*, 29 T.C.M. 817 (1970), *aff'd*, 462 F.2d 712 (5th Cir. 1972), *cert. denied*, 409 U.S. 1076 (1972); Revenue Ruling 79-4, 1979-1 C.B. 150; *Selfe v. U.S.*, 778 F.2d 769 (11th Cir. 1985); *Comm'r v. Bollinger*, 108 S.Ct. 1173 (1988); *Aiken Industries Inc. v. Comm'r*, 56 T.C. 925 (1971); Revenue Ruling 84-152, 1984-2 C.B. 381; and Revenue Ruling 84-153, 1984-2 C.B. 383. Because of the arguably high debt to equity ratios, the lack of certainty regarding the ultimate payment of the Bonds, the formal issuance of the Bonds by the Company rather than the Partnership, and the lack of a written nominee or agency agreement in respect of the Old Bonds evidencing the nominee relationship that in fact and substance existed, a conclusion that the Old Bonds and New Bonds are solely the debt of the Partnership for Federal income tax purposes is not free from doubt. However, to conclude that the Company rather than the Partnership is the true debtor for Federal income tax purposes would be to disregard totally the economic substance of the transaction and would permit possible abuses by taxpayers seeking to claim a tax-free exchange of debt under the corporate recapitalization rules where no Code provision provides for tax-free exchanges of partnership debt obligations.

Based on the above factors and authorities, the identical terms of the Partnership Note and the Old Bonds before the consummation of the Plan and the identical terms of the Partnership Note and the New Bonds upon consummation of the Plan, the nominal equity capitalization of the Company, the Nominee Agreement between the Company and the Partnership and the fact that at all times the assets of the Partnership have been the ultimate and only source of payment on the Old Bonds and will continue to be the ultimate and only source of payment on the New Bonds, Counsel believes that it is more likely than not that the Old Bonds are debt and the New Bonds are solely the debt of the Partnership for Federal income tax purposes at all times relevant to the Plan and other transactions contemplated herein.

Counsel also believes that it is more likely than not that the Partnership is a general partnership for income tax purposes based in part on the position that the Old Bonds and the New Bonds are not equity interests in the Partnership.

Due to the inherently factual nature of these determinations, however, there can be no assurance that the Service will not challenge these positions or that a court would not sustain such a challenge. If the Service were to challenge successfully the Company's and the Partnership's positions, such challenge could result in the characterization of (i) the Partnership as a publicly-traded partnership, which would result in it being treated as a corporation for Federal income tax purposes and (ii) the New Bonds as preferred equity interests in the Company, or possibly the Partnership, as to which no interest deduction could be claimed. Such challenge could also affect, among other items, (i) the amount and timing of income, gain or loss recognized by exchanging holders of Old Bonds upon the exchange of Old Bonds for Equity Interests and New Bonds, (ii) the amount, timing and character of income, gain or loss to be recognized by holders of the New Bonds in the future, (iii) the amount of income recognized by the Company and/or the Partnership and/or the existing partners as a result of the exchange, and (iv) the ability of the Company and/or the Partnership to deduct interest in respect of the New Bonds and the amount of such deductions in the future. Thus, if the New Bonds are treated as solely the debt of the Company and the Partnership Note is not regarded as bearing OID, the Company's OID deductions would offset the interest received on the Partnership Note, except as limited by the "high yield" limitations discussed below at "Potential Application of High Yield Debt Obligation Rules," but the Partnership's interest deductions would be reduced, possibly increasing the tax liability, or reducing the tax losses, of the Partnership, and the holders may not have a taxable exchange upon consummation of the Plan. If the New Bonds are treated as preferred equity interests of either the Company (or the Partnership), there would be no interest deduction with regard to such interest and the amounts derived by the holders would be treated as distributions by the Company (or the Partnership) taxable as dividends to the extent of the Company's (or the Partnership's) earnings and profits and thereafter as return of capital, or as capital gain to the extent distributions exceed a holder's basis in the interest.

Except where specifically noted to the contrary, the following discussion assumes that at the time of the consummation of the Plan, the Old Bonds and the New Bonds (including the New Bonds delivered in payment of the November 15, 1990 interest payment and in payment of the Additional Amount) will be treated as debt of the Partnership for Federal income tax purposes and not as equity of the Partnership, or debt of, or equity interests in, the Company.

### Exchange Of Old Bonds For New Bonds and Partnership Interests and Partnership Interests for Class A Stock and Class B Stock

*Contribution of Part of the Old Bonds for the Equity Interest.* Although the matter is not free from doubt due to the lack of definitive authority, Counsel is of the opinion that there is substantial authority for the Company and the Partnership to take the following positions for Federal income tax purposes, that upon consummation of the Plan: (i) holders of Old Bonds will receive New Bonds and Partnership interests constituting the Equity Interest in exchange for their Old Bonds, and (ii) that each holder of Old Bonds' Partnership interest is received in a tax-free transaction under Section 721 of the I.R.C. in exchange for an amount of the principal of the Old Bond equal to the difference between the adjusted issue price of the Old Bond and the fair market value of the New Bond. A holder's adjusted basis in the Equity Interest would equal the portion of its adjusted basis in the Old Bond allocated to the Equity Interest (see "Taxable Exchange of Old Bonds for New Bonds; Basis and Holding Period, below) and the holder's ultimate share of liabilities of the Partnership, which share is then assumed by Holding (see "Exchange of Partnership Interests for Class A Stock and Class B Stock; Basis and Holding Period" below). The holding period for the Equity Interest will include the holder's holding period for the Old Bonds.

Immediately thereafter, holders will then be treated for Federal income tax purposes as having contributed their Partnership interests to Holding in exchange for shares of Class A Stock and Class B Stock in Holding. Holding will then immediately contribute the Partnership interests to TM/GP in exchange for 100% of the Common Stock in TM/GP. Except where specifically stated to the contrary, the following discussion assumes such treatment will obtain. It is possible these positions in respect of the exchange of Old Bonds for Partnership Interests will be adversely affected by regulations described below which have not yet been issued by the Service, which would have the effect of causing the receipt

of the Partnership interests by exchanging holders to be taxable. See "Tax Consequences to the Company and the Partnership—Possible New Regulations." If taxable, the adjusted basis of the Equity Interest would be based on its fair market value and the holding period would commence the day after the Exchange Date.

*Taxable Exchange of Old Bonds for New Bonds; Basis and Holding Period.* The exchange of a portion of the Old Bonds for New Bonds will be taxable to the holders. The amount of gain or loss recognized by a holder will depend on the fair market value of the New Bonds and the portion of the holder's adjusted basis in the Old Bonds allocated to the New Bonds.

The correct method of allocating an exchanging holder's basis in each of its Old Bonds to the Partnership interest and the New Bonds for the purpose of determining gain (or loss) upon the receipt of the New Bond is uncertain. One alternative, which is supported by Subchapter K basis principles based on what is contributed, would be to treat the Partnership interest as having a substituted basis equal to the excess, if any, of the basis of the Old Bond over the fair market value of the New Bond (which amount is then increased to reflect the share of Partnership liabilities) and the remainder of the basis being in the Old Bond immediately before it is exchanged for the New Bond to determine the gain or loss on the Bond exchange. A second alternative, which is supported by the Treasury Regulations promulgated under Section 61, would be to allocate the basis of the Old Bond between the Partnership interest and New Bond based upon their relative fair market values. Under this alternative, a holder will have a substituted basis in the Partnership interest equal to the product of (i) its basis in its Old Bond multiplied by (ii) the fair market value of the Partnership interest divided by the aggregate fair market value of the Partnership interest and the New Bond, plus the holder's share of Partnership liabilities. Such holder will under this alternative, recognize gain (or loss) on the exchange of New Bonds for Old Bonds equal to the amount by which the fair market value of the New Bond exceeds (or is less than) the product of (a) its basis in its Old Bond multiplied by (b) the fair market value of the New Bond divided by the aggregate fair market value of the Partnership interest and the New Bond. While there is no authority resolving the point, Counsel believes that the better view is that the first alternative should control the allocation of basis of the Old Bonds because it is consistent with a tax free exchange under Code Section 721. Such gain or loss will be capital gain or loss (subject to the market discount rules discussed below) and will be long-term capital gain or loss if the Old Bond was held by such holder for more than one year.

Each holder's initial adjusted basis for the New Bonds will be their fair market value and the holding period for the New Bonds will commence on the day after the exchange.

*Exchange of Partnership Interests For Class A Stock and Class B Stock; Basis and Holding Period.* Upon consummation of the Plan, holders of Old Bonds will be treated for Federal income tax purposes as exchanging their Old Bonds for New Bonds and Partnership interests. Immediately after the exchange, such holders of New Bonds and Partnership interests will be deemed to have contributed their Partnership interests to Holding in exchange for Class A Stock and Class B Stock simultaneously with a contribution by Donald J. Trump of 50% of the Common Stock of Trump Corp. in exchange for Class C Stock of Holding. Counsel believes this contribution will qualify for nonrecognition treatment under Section 351 of the I.R.C. so that holders of Partnership interests will not recognize gain or loss on the contribution of their interests in the Partnership for Class A and Class B Stock. Holders will have an aggregate basis in their Class A and Class B Stock equal to their basis in the contributed Partnership interests, minus the share of Partnership liabilities assumed by Holding, allocated to the Class A Stock and Class B Stock in proportion to their relative fair market values. The holding period for the Class A Stock and Class B Stock will include the holding period of the Partnership interest (derived from that of the Old Bonds). Holders will be required to notify Holding of their basis in the Partnership interest transferred to Holding in exchange for the Holding Class A Stock and Class B Stock. Such basis will affect future gain or loss recognized by TM/GP in respect to the Partnership interest.

*Accrued Interest On Old Bonds.* The Partnership and the Company intend to take the position that upon consummation of the Plan, the Partnership will pay the November 15, 1990 interest payment due on the Old Bonds to holders of Old Bonds by delivering New Bonds with an aggregate principal amount equal to the aggregate principal amount of the Old Bonds plus the November 15, 1990 interest

payment (the "Accrued Interest Amount"). Holders of Old Bonds must agree to accept the New Bonds in payment of the Accrued Interest Amount as part of the Plan. Additionally, the Partnership and the Company intend to take the position that payment of a principal amount of New Bonds equal to $.057897 per day for the period from and including April 1, 1991 through and including the Effective Date (the "Additional Bond Amount") for each $1,000 principal amount of Old Bonds held by a holder should be treated as additional accrued and unpaid interest on the Old Bonds for the period from November 15, 1990 to the Effective Date. Accordingly, an exchanging holder of Old Bonds using the cash method of accounting for Federal income tax purposes will recognize interest income to the extent of the fair market value of the portion of the New Bond received in payment of the Accrued Interest Amount and the Additional Bond Amount. A holder of Old Bonds using the accrual method of accounting for Federal income tax purposes will not recognize interest income upon receipt of the New Bonds as such holder will have already accrued and recognized the Accrued Interest Amount and will accrue and recognize the Additional Bond Amount for its taxable year which includes the Effective Date. A holder who has not continued to accrue interest since November 15, 1990 will recognize interest income to the extent of the fair market value of the New Bonds attributable to the Additional Bond Amount. The amount of such holder's gain or loss on the exchange of the Old Bonds will be determined as described above. Counsel is of the opinion that such treatment will result to holders.

### Original Issue Discount On New Bonds and New Bonds Delivered in Payment of the Additional Amount

*General.* Holders of New Bonds will also be required to accrue a significant amount of original issue discount over the term of the New Bonds based in part on the difference between their fair market value on issuance and the face amount due at maturity. As a result, the amount of reportable interest income will exceed the amount of cash interest received. The Service has proposed regulations dealing with the inclusion of original issue discount ("OID") in income by holders of debt instruments (the "Proposed Regulations"). The Proposed Regulations are ambiguous and inconsistent in certain respects. As a result, the proper treatment of payments on the New Bonds and the New Bonds delivered in payment of the Additional Amount under these Proposed Regulations is uncertain. The positions described below are subject to change due to the promulgation of final regulations, upon further clarification from the Service or otherwise. No assurance can be given that the Service will agree with the interpretations of the Proposed Regulations discussed below or that the final Treasury Regulations will not differ materially from the Proposed Regulations. Holders of New Bonds are urged to consult their own tax advisors concerning the application of the Proposed Regulations or subsequent versions thereof to the New Bonds and the New Bonds delivered in payment of the Additional Amount.

*Stated Redemption Price At Maturity.* Generally, a debt instrument will be issued with OID if the "stated redemption price at maturity" of such debt instrument exceeds its "issue price" by more than a statutory *de minimis* amount. An instrument's stated redemption price at maturity includes all payments required to be made over the term of the instrument other than payments of "qualified periodic interest," defined as any one of a series of payments equal to the product of the outstanding principal balance of a debt instrument and a single fixed rate of interest required to be made at fixed, periodic intervals of one year or less. Upon consummation of the Plan, interest on the New Bonds will be paid commencing November 15, 1991, after which time interest will be paid on the New Bonds on May 15 and November 15 of each year until maturity. All interest payments on the New Bonds will be made partly in cash and partly through delivering additional New Bonds. Assuming the New Bonds are issued on or before November 15, 1991, the minimum cash interest on the New Bonds will constitute qualified periodic interest and will not be included in the New Bonds' stated redemption price at maturity, although the amount of all non-cash payments during the term will be so included. All fixed payments to be made at various times will be taken into account in computing the yield to maturity of the New Bonds. Therefore, under the rules discussed below, the amount of interest required to be reported by holders of New Bonds as interest for tax purposes will substantially exceed the periodic cash payments received.

The Proposed Regulations do not expressly address the proper treatment of debt instruments, such as the New Bonds and the New Bonds delivered in payment of the Additional Amount (which is the excess of the fixed rate of 11.35% over the Annual Mandatory Cash Interest Amount) that provide for the payment of interest in additional debt instruments. Although the law is uncertain, Counsel believes it is reasonable and consistent with the current practice of others for the Company and the Partnership to take the position that for the purpose of applying the Proposed Regulations to the New Bonds, each New Bond and all additional New Bonds issued with respect to such New Bond comprise a single debt instrument. On this basis, the stated redemption price at maturity of each New Bond will be the sum of all payments with respect to such New Bond, including all payments with respect to the New Bonds issued thereunder except for payments treated as qualified periodic interest payments. There can be no assurances that the Service will not challenge such position or that a court would not sustain such a challenge. The alternative position would be to treat each issuance of additional New Bonds as a separate class of bonds which has a different issue price and amount of OID from the New Bonds.

*Issue Price of New Bonds.* Where a debt instrument is issued in exchange for property and the debt instrument is part of an issue which trades on an established securities market, under the Proposed Regulations its issue price generally will be its fair market value as determined as of the first date after the issue date that the debt instrument is traded on an established securities market. Accordingly, the issue price of a New Bond should be equal to the fair market value of the New Bond, as determined by its trading price as of the first date after the issue date that the New Bond is traded on an established securities market. The stated redemption price at maturity of the New Bond, as discussed above, will exceed such issue price because, among other reasons, interest on the New Bonds will be paid in part by the delivery of additional New Bonds. Therefore, the New Bonds will be deemed to be issued with OID in the amount of the excess of such New Bonds' stated redemption price at maturity (calculated under the rules discussed above) over the fair market value of the New Bonds as determined by their initial trading price immediately after the exchange.

*Issue Price of New Bonds Delivered in Payment of the Additional Amount.* As noted above in "Stated Redemption Price At Maturity," the Proposed Regulations do not expressly address the proper treatment of a debt instrument such as a New Bond delivered in payment of the Additional Amount. One approach discussed above would be to treat the New Bonds delivered in payment of the Additional Amount and all amounts payable thereunder as included in the stated redemption price at maturity of the underlying New Bonds. An alternative approach would be to treat such additional New Bonds as contingent interest payments on the underlying New Bonds, includible in income by holders of New Bonds upon receipt in an amount equal to the fair market value of such additional New Bonds. The Company and the Partnership intend to take the position that the New Bonds delivered in payment of the Additional Amount and all amounts payable thereunder are included in the stated redemption price at maturity of the underlying New Bonds. Under the Company's and Partnership's intended treatment, the adjusted issue price (and the basis) of each New Bond will be allocated between the New Bond and the additional New Bonds issued with respect to such New Bond on the basis of the relative principal amounts of each instrument. Although Counsel believes that this approach is reasonable for the reasons discussed above, in the absence of express authority there can be no assurance that the Service will not challenge such treatment.

*Investment Unit Considerations.* Upon confirmation of the Plan, holders of Old Bonds will receive New Bonds issued by the Company and a Partnership interest in the Partnership in exchange for their Old Bonds (which Partnership interest is then contributed to Holding for Class A and Class B Stock). The Company and the Partnership will take the position that either the Partnership interest issued in satisfaction of a portion of each Old Bond and each New Bond issued in exchange for such Old Bond do not in the aggregate constitute an investment unit, as that term is defined under I.R.C. Section 1273(c)(2), and, therefore, that the aggregate issue price for such investment unit need not be allocated between the New Bond and the Partnership interest, or that the issue price of the Partnership interest determined as part of an investment unit is relevant only for purposes of determining the issue price of a debt instrument so issued.

Whether the investment unit rule applies or not, as discussed in "Issue Price Of New Bonds," the issue price of the New Bonds will be their fair market value as of the first date after their issue date that the New Bonds are traded on an established securities market.

The "issue price" of the Partnership interest and the relevance thereof, if any in this circumstance, are less than clear under current law. The "investment unit" provisions of Proposed Regulation §1.1273-2 do not state what the issue price of the property other than the debt instrument is where the new debt is publicly traded but the other property is not traded. Moreover, neither I.R.C. Section 1273 nor the Proposed Regulations address the circumstances where the other property is obtained by a contribution to the capital of a partnership subject to the rules of I.R.C. Section 721 and the substituted basis rules of I.R.C. Section 722. While there is no direct authority clarifying the interplay of these rules and their application to the receipt of the New Bonds, Counsel believes the Partnership and the Company have substantial authority for the positions that a New Bond will have an issue price as described above in "Issue Price of New Bonds" and that a Partnership interest issued to a holder of Old Bonds will have an initial adjusted basis equal to the holder's adjusted basis in that portion of the adjusted basis of the Old Bond exchanged therefore as described above in "Taxable Exchange of Old Bonds for New Bonds; Basis and Holding Period," plus such holder's allocable share of Partnership liabilities.

*Holder's Treatment of OID on the New Bonds and New Bonds Delivered in Payment of the Additional Amount.* The OID rules require that a constant rate of interest for a New Bond (the "yield to maturity") be determined, based on semi-annual compounding of interest. The amount of OID to be accrued by the holder of a New Bond is then calculated for each six-month period (an "accrual period") from the date of issuance until the stated maturity date by applying the yield to maturity first to the issue price of the New Bond for the initial accrual period, and then to its "adjusted issue price" (the initial issue price plus accrued OID included in prior periods) for each subsequent accrual period and subtracting the sum of any qualified periodic interest payments received by a holder of the New Bond during the accrual period. Although the matter is not free from doubt, in accordance with the treatment described in "Stated Redemption Price At Maturity," above, Counsel believes the yield to maturity of the New Bonds will be computed as if each New Bond and each additional New Bond delivered with respect thereto comprise a single debt instrument. The amount of OID determined under this procedure for an accrual period is then allocated ratably to each day within the accrual period (the "daily portion") and the holder of the New Bond is required to report as gross income the sum of the daily portions for the number of days during the taxable year in which he is a holder. Once so included, however, no further income need be reported by the holders of New Bonds upon receipt of payment from the Company of the accrued OID, whether in the form of cash or additional New Bonds.

**The Company will cause to be reflected on the face of each New Bond the amount of the OID, the issue date and yield to maturity of the New Bond and any other information required by the Proposed Regulations. As it is unlikely that it will be possible to set forth this information on the date of issuance, the Company will cause a stickered supplement providing such information to be sent to all holders of New Bonds within 10 days of the issue date.**

*Treatment of 14% Payment.* Although the matter is not free from doubt, Counsel believes there is substantial authority, based solely on the Proposed Regulations, for the Company and the Partnership to take the position that in the event that the Partnership pays all and any portion of the 14% Payment, such payment will be treated for Federal income tax purposes as a contingent payment under Proposed Regulation §1.1275-4(e) to the extent such payment is made with respect to outstanding New Bonds. Therefore, under currently Proposed Regulations (which may be changed in the future) the 14% Payment will be treated entirely as an interest payment includable in income by holders of outstanding New Bonds and deductible by the Partnership in the taxable year in which it becomes fixed, which in general will be the taxable year in which the 14% Payment is paid. To the extent all or any portion of the 14% Payment is made to holders of New Bonds which have been previously redeemed at par by the Partnership, the amount of the 14% Payment received by a holder with respect to a redeemed New Bond may be treated as an additional payment in redemption of the New Bond, and will either increase the gain or decrease the loss recognized by such holder by reason of the redemption, or, less likely, as contingent interest. See "Sale, Exchange or Redemption of New Bonds and New Bonds Delivered In

Payment Of The Additional Amount." It is possible that the Service may seek to recharacterize the 14% Payment as a payment other than interest by the Partnership and as a payment by Holding to the holders of Class B Stock. Depending upon such treatment. holders of the Class B Stock could recognize either ordinary income or capital gain or loss. See "Sale. Exchange or Redemption of Class A or Class B Stock".

## Treatment of Acquisition of Additional Partnership Interest by TTMI

The Partnership Agreement allows TTMI. under certain circumstances. either by voluntary contribution or by causing the Partnership to obtain a recourse borrowing to cause the Partnership to pay to the holders of New Bonds all or a portion of the 14% Payment. In such case, TTMI shall acquire an additional partnership interest (the "Additional Partnership Interest") equal to the product of (i) 60% of the total outstanding partnership interests (measured after taking into account the issuance of the Additional Partnership Interest), multiplied by (ii) the sum (the "Adjustment Factor") of (a) the portion (expressed as a fraction) of the 14% Payments made with respect to all New Bonds outstanding on the Final Payment Date or previously Redeemed multiplied by a fraction. the numerator of which is the aggregate principal amount of New Bonds outstanding on the Final Payment Date or previously Redeemed and the denominator of which is the aggregate principal amount of all New Bonds issued pursuant to the Indenture whether or not outstanding. plus (b) a fraction. the numerator of which is the aggregate principal amount of New Bonds purchased (but not Redeemed) and delivered to the Company for cancellation prior to the Final Payment Date and the denominator of which is the aggregate principal amount of all New Bonds issued pursuant to the Indenture whether or not outstanding. Upon the acquisition of the Additional Partnership Interest by TTMI, the Applicable Percentage of each of the Partners (immediately before the issuance of the Additional Partnership Interest) shall be adjusted to reflect their relative share of 100 minus the product of 60 multiplied by the Adjustment Factor to which shall be added, in the case of TTMI. the product of 60 multiplied by the Adjustment Factor. With respect to Partners whose Applicable Percentage is reduced (TM/GP and Trump Corp.). their shares of the liabilities of the Partnership will be reduced proportionately and accordingly. each such Partner will be treated for Federal income tax purposes as receiving a deemed cash distribution in an amount equal to the reduction in such Partner's share of Partnership liabilities. This deemed cash distribution will reduce the basis of each such Partner in its Partnership interest. and result in taxable gain being recognized to the extent required by Code Section 751 and otherwise to the extent the distribution exceeds such basis.

## Tax Treatment In The Event of Foreclosure Upon Certain Security Interests

*Further Contingent Interest.* In the event the creditors that hold a security interest in the capital stock of TTMI and Trump Corp. foreclose on such interest. the interest rate on the New Bonds will increase to 14% per annum, payable in cash. Under currently Proposed Regulations (which may be changed in the future). the increase in interest will be treated for Federal income tax purposes as a contingent payment of interest includable in income upon receipt by holders of outstanding New Bonds and deductible by the Partnership in the taxable year in which it becomes fixed.

*Increase In TM/GP's Partnership Interest.* In addition, in the event of foreclosure by such creditors. TTMI's Partnership interest will be reduced by a redemption of part of its interest (the "Foreclosure Partnership Interest") and TM/GP's interest will be increased as a result of the redemption such that TM/GP will own up to 59.994% of the Partnership.

While the matter is not free from doubt, the Partnership expects to treat the reduction of TTMI's interest as a non-taxable distribution in partial liquidation of its interest (to the extent of basis therein), except to the extent required by Section 751 of the Code, which does not result in income to TM/GP. However, it is possible that TTMI would be treated as having sold a portion of its Partnership interest to TM/GP for an amount equal to the greater of (i) the value of the Foreclosure Partnership Interest or (ii) the share of Partnership liabilities allocable to the Foreclosure Partnership Interest, and that TTMI will recognize gain (or loss) equal to the difference between its basis in the transferred Partnership interest and the greater of the value thereof or the amount of Partnership liabilities assumed by TM/GP and that TM/GP would be treated as receiving income equal to the value received over the debt

assumed. In such event, TTMI will claim a deduction in an amount equal to the net fair market value of the Partnership interest so acquired by TM/GP. TM/GP will increase its basis in its Partnership interest by the additional amount of Partnership liabilities assumed and the amount, if any, taken into income.

### Acquisition of Earned Reversionary Interest by TTMI Upon Foreclosure and Maturity of Bonds

In the event the Partnership shall have acquired the Foreclosure Partnership Interest as described above, and all New Bonds which are outstanding on the Final Payment Date are paid and retired, TTMI shall acquire an additional Partnership interest (the "Earned Reversionary Interest") equal to the product of (i) 10% of the total outstanding Partnership interests (measured after taking into account the issuance of the Earned Reversionary Interest) and (ii) a fraction, (x) the numerator of which is the principal amount of New Bonds with respect to which interest has been paid in cash at the rate of 11.35% per annum from the date of their issuance through the date of the Foreclosure Event and (y) the denominator of which is the aggregate principal amount of all New Bonds issued pursuant to the Indenture whether or not then outstanding. Upon the acquisition of the Earned Reversionary Interest by TTMI, the Applicable Percentage of each of the Partners (immediately before the issuance of the Earned Reversionary Interest) shall be adjusted to reflect their relative share of 100 minus the Earned Reversionary Interest, to which shall be added in the case of TTMI, the Earned Reversionary Interest. With respect to Partners whose Applicable Percentage is reduced, their shares of the liabilities of the Partnership will be reduced proportionately and accordingly, each such Partner will be treated for Federal income tax purposes as receiving a deemed cash distribution in an amount equal to the reduction in such Partner's share of Partnership liabilities. This deemed cash distribution will reduce the basis of each such Partner in its Partnership interest, and result in taxable gain being recognized to the extent required by Code Section 751 and otherwise to the extent the distribution exceeds such basis.

### Market Discount On New Bonds

The I.R.C. generally requires holders of "market discount bonds," as defined below, to treat as ordinary income any gain realized on the disposition of such bonds to the extent of the market discount accrued during the holder's period of ownership. The accrued market discount generally equals a ratable portion of the amount of the bond's market discount, based on the number of days the taxpayer has held the bond at the time of such disposition, as a percentage of the number of days from the date the taxpayer acquired the bond to its date of maturity. A "market discount bond" is a debt obligation purchased at a market discount, subject to a statutory de minimis exception. For this purpose, a purchase at a market discount includes a purchase at or after the original issue at a price below the stated redemption price at maturity. Therefore, holders who purchased Old Bonds after the original date of their issuance for a purchase price which is less than their stated redemption price at maturity may realize ordinary income upon the exchange of the Old Bonds for New Bonds and Partnership interests. These market discount rules will also apply to subsequent purchasers of New Bonds.

### Sale, Exchange Or Redemption Of New Bonds and New Bonds Delivered In Payment Of The Additional Amount

In general, subject to the market discount rules discussed above, the sale, exchange or redemption of the New Bonds (including New Bonds delivered in payment of the Additional Amount) will result in capital gain or loss equal to the difference between the amount realized and the holder's adjusted tax basis in the New Bonds immediately before such sale, exchange or redemption. For a discussion of the determination of a holder's initial tax basis in the New Bonds and New Bonds delivered in payment of the Additional Amount, see "Exchange Of Old Bonds For New Bonds and Partnership Interests," above.

In addition, under the position which the Company and Partnership will take with respect to the tax treatment of the New Bonds delivered in payment of the Additional Amount, the sale or disposition of such New Bonds by a holder thereof will be treated for purposes of the OID rules as a partial pro rata disposition of the underlying New Bond. Accordingly, each New Bond delivered in payment of the Additional Amount will have an amount of OID associated with it that bears the same relation to the

OID of the underlying New Bond as the stated principal amount of the New Bond delivered in payment of the Additional Amount bears to the stated principal amount of the underlying New Bond. See "Original Issue Discount Of New Bonds and New Bonds Delivered in Payment of the Additional Amount; Issue Price of New Bonds Delivered in Payment of the Additional Amount." above.

## Sale, Exchange or Redemption of Class A or Class B Stock

Immediately after the exchange of Old Bonds for New Bonds and Partnership interests, the holders thereof will contribute the Partnership interests for shares of Class A and Class B Stock in Holding. The subsequent sale, exchange or redemption of the Class A or Class B Stock by a holder will result in gain or loss equal to the difference between the amount realized and the holder's adjusted tax basis in the Class A or Class B Stock. Such gain or loss would be long term capital gain or loss if the Class A or Class B Stock was held as a capital asset by such holder for more than one year, except that pursuant to I.R.C. Section 108(e)(7)(E) it is possible that gain on the disposition of the Class A and Class B Stock by a holder and on the disposition of the Partnership interest by TM/GP will be recaptured as ordinary income to the extent of prior bad debt deductions or ordinary losses claimed for tax purposes in respect of the Old Bonds. Under certain circumstances, either all or a portion of the proceeds of a redemption of shares of Class A or Class B Stock could be taxable to holders as a dividend. For a discussion of the determination of a holder's initial tax basis in the Class A and Class B Stock, see "Exchange of Old Bonds for New Bonds and Partnership Interests; Exchange of Partnership Interests for Class A and Class B Stock; Basis and Holding Period."

## Tax Consequences to the Company and the Partnership

*Recognition of COI Income By the Partnership.* Generally, a taxpayer recognizes cancellation of indebtedness ("COI") income upon satisfaction of its outstanding indebtedness for less than its principal amount. In the case of a debt for debt exchange such as that effected by the Plan, the amount of COI income is, in general, the excess of the adjusted issue price of the indebtedness satisfied over the sum of the issue price of the new indebtedness of the issuer and the fair market value of any other property issued therefor. However, based on Section 721 of the Code, the legislative history for the Bankruptcy Tax Act of 1980, analagous but non-controlling case law and non-authoritative private letter rulings issued by the Service to other taxpayers, in Counsel's opinion there is substantial authority for the Company and the Partnership to take the position that the Partnership interests were issued by the Partnership in exchange for the portion of the Old Bonds equal to the difference between the adjusted issue price of the Old Bonds and the fair market value of the New Bonds (less the portion thereof attributable to the Accrued Interest Amount), and that the Partnership and the existing partners will not recognize any COI income by reason of the exchange. There can be no assurance that the Service will not challenge this position, or that a court would not uphold such a challenge.

*Possible New Regulations.* The Service recently issued proposed regulations under Section 108(e)(4) dealing with acquisitions of debt by persons related to the issuer, effective for transactions occurring on or after March 21, 1991. In the preamble to these regulations, the Service announced its intention to issue regulations, to be effective as of March 21, 1991, providing for the recognition of income in certain non-recognition transactions, including those governed by Section 721 of the Code. The scope, content, applicability, ultimate effective date of the regulations and statutory basis for, and validity of, any such regulations are far from clear from this preamble, which itself is not a ruling or a regulation of any authority. On May 16, 1991, the Service issued Notice 91-15, 1991-22 I.R.B. 1, which states in part, "Except to the extent described above, the preamble to proposed section 1.108-2 and this notice do not affect the treatment of transactions in which debtor and creditor interests are combined. Until further guidance is issued, such transactions will be treated in accordance with current law. Thus, in general, the transfer of partnership debt to a partnership in exchange for a partnership interest is not within the scope of the preamble." Any further clarification of this matter must await the issuance of the proposed regulations. However, it is possible that these regulations when issued will have the effect of causing the Partnership to be treated as acquiring the Old Bonds and satisfying the Old Bonds to the extent of the fair market value of the Partnership interests and New Bonds issued to the holders, which could result in the recognition of substantial COI income by the Partnership. It is also possible that such

regulations will cause a holder of an Old Bonds to have a taxable event upon the exchange of a portion of the Old Bond for the Partnership Interest. In the event the Service were successful in challenging the Partnership or the Company on their position or the proposed regulations when issued are applicable to the exchange of a portion of the Old Bonds for the Partnership interest, the Partnership and the current partners could recognize substantial COI income upon confirmation of the Plan because the adjusted issue price of the Old Bonds may substantially exceed the sum of the issue price of the New Bonds and the fair market value of the Partnership interests, but for the exception discussed below.

*Exception to COI Recognition.* In general, Section 108 of the I.R.C. provides an exception to the recognition of COI income for taxpayers who are insolvent (to the extent of the insolvency) or who are debtors in a bankruptcy proceeding under Title 11 of the Bankruptcy Code at the time of the debt discharge. Instead of recognizing COI income, such taxpayers must reduce certain tax attributes such as net operating losses and carryovers, investment tax credit carryovers, capital losses and carryovers, the basis of depreciable and nondepreciable property of the taxpayer and foreign tax credit carryovers in that order to the extent of the debt discharged unless the taxpayer elects to reduce its basis in depreciable property first. In the case of a partnership, the rules of exclusion and reduction of tax attributes are applied at the partner, and not the partnership level. An insolvent or bankrupt partner must reduce its basis in its partnership interest as a tax attribute under these rules. In such case, although not certain it is possible under future regulations to be issued that the partnership may have to make a corresponding reduction in the basis of partnership property attributable to such partner's interest in the partnership.

Therefore, if the Service were to challenge successfully the position of the Company and the Partnership, the Partnership would recognize the COI income caused by the debt discharge effected by the Plan, which COI income will be allocated to the current partners of the Partnership. The treatment of such income and the availability of any exclusion would depend upon the individual circumstances of each partner. Because the partners of the Partnership prior to the exchange will be debtors under Title 11 of the Bankruptcy Code at the time of the debt discharge to the Partnership, such partners would reduce their basis in their Partnership interests and, if required by law, the Partnership will elect to reduce the depreciable basis of the Partnership property if necessary to avoid recognizing COI to the Partnership and its partners, thus decreasing future depreciation deductions of the Partnership which could be used to offset operating income of the Partnership in future years. Because neither the holders nor TM/GP will be a partner prior to the exchange, neither the holders nor TM/GP would be allocated any COI income generated by the exchange.

## Potential Application of High Yield Debt Obligation Rules

Certain rules provided in Sections 163(e) and 163(i) of the I.R.C. limit in certain instances the ability of a corporate issuer to deduct OID with respect to its "applicable high yield debt obligations." These rules are inapplicable, however, to partnerships and S Corporations. Accordingly, if the Company's and Partnership's position that the Partnership is the sole obligor of the New Bonds is respected, the ability of the Partnership to deduct amounts attributable to OID on the New Bonds and New Bonds delivered in payment of the Additional Amount should not be limited.

## Backup Withholding

Under the backup withholding rules, a holder exchanging an Old Bond for a New Bond and Partnership interest may be subject to backup withholding at the rate of 20% with respect to reportable payments of dividends, interest, or OID accrued with respect to, or the proceeds of a sale, exchange or redemption of the New Bond or shares of Class A or Class B Stock unless the holder is (a) a corporation or comes within certain other exempt categories and when required demonstrates that fact, or (b) provides a correct taxpayer identification number, certifies as to no loss of exemption from backup withholding and otherwise complies with applicable requirements of the backup withholding rules. Amounts paid as backup withholding do not constitute an additional tax and would be allowable as a credit against the holder's Federal income tax liability.

**Information Return Filing Requirements**

Pursuant to Treasury Regulation §1.351-3. each holder must provide certain information concerning the contribution of the Partnership interest to Holding as part of his Federal income tax return for the taxable year in which the exchange is consummated. It is the responsibility of each holder of Old Bonds to provide the required information.

The Partnership has a calendar year as its taxable year and files its information return on the accrual basis. The Partnership will file an information return on IRS Form 1065 and will provide information on Schedule K-1 to each person who was a partner at any time during the taxable year within 90 days following the close of its taxable year. Although each holder of Old Bonds will receive a Schedule K-1 for the taxable year of the exchange. due to the contribution of the Partnership interests to Holding. no allocations of Partnership income, gain. deductions or loss are expected to be made to an exchanging holder.

**Tax Consequences To Holders Of Subcontractors' Claims**

Under the terms of the Plan. a nominee of the holders of Subcontractors' Claims will purchase. prior to the Effective Date of the Plan. Old Bonds in the principal amount of $20,000,000 with funds provided by the Partnership, which funds shall be paid as a settlement payment for the benefit of the holders of Subcontractor's Claims. On the Effective Date. the nominee will exchange the Old Bonds on behalf of the holders of Subcontractors' Claims. and each such holder will receive its pro rata share of the distributions under the Plan in respect of the $20,000,000 in principal amount of the Old Bonds held by the nominee.

The tax consequences of the Plan to holders of Subcontractors' Claims will depend upon the method of accounting used by each such holder for Federal income tax purposes. A cash method holder will recognize ordinary income equal to its pro rata share of the funds provided to the nominee by the Partnership. An accrual method holder will have a basis in its Subcontractors' Claim equal to the amount it previously accrued as income, minus the amount of any loss deduction previously taken on its Federal income tax return. Therefore. an accrual method holder will recognize gain or loss as a result of the consummation of the Plan equal to the amount by which its pro rata share of the funds provided to the nominee of the Subcontractors by the Partnership and used to buy Old Bonds exceeds (or is less than) its basis in its Subcontractors' Claim.

A holder of a Subcontractors' Claim will have a basis in its Old Bonds equal to its pro rata share of the cash provided to the nominee by the Partnership and used to buy Old Bonds. The Federal income tax consequences to a holder of a Subcontractors' Claim as a result of the exchange of the Old Bonds for New Bonds. Class A Stock and Class B Stock will be as described above for holders of Old Bonds.

**Tax Shelter Registration**

An organizer of a tax shelter is required to register the tax shelter with the Service if the amount of deductions and 350% of the credits that are potentially allowable to any investor as of the close of any of the first five years ending after the date on which such investment is offered for sale exceeds twice the investors' investment base (generally, money and the adjusted basis of property contributed by the investor). Under temporary Treasury Regulations published by the Service, the term "amount of deductions" is interpreted to mean the amount of gross deductions and other tax benefits potentially allowable from an investment. The gross deductions are not to be offset by any gross income to be derived or potentially to be derived from the investment.

Although the application of the temporary Regulations to the issuance of interests in the Partnership pursuant to the Plan is uncertain, the Partnership will register with the Service as a tax shelter and seek to obtain a tax shelter registration number as promptly as possible. The Partnership will furnish the registration number of the tax shelter to each Holder and to Holding and TM/GP. Each partner in the Partnership will be required to include the tax shelter registration number on a Form 8271, which Form shall be attached to the partner's income tax return for any year in which it claims any income. gain, loss, deduction or credit with respect to the Partnership.

147

THE PARTNERSHIP HAS APPLIED FOR A TAX SHELTER REGISTRATION NUMBER FOR THE PARTNERSHIP WITH THE SERVICE AND SHALL PROVIDE ALL PARTNERS WITH THE REGISTRATION NUMBER, WHICH MUST BE INCLUDED ON ALL FEDERAL RETURNS OF A PARTNER WITH RESPECT TO THE PARTNERSHIP. THE ISSUANCE OF A TAX SHELTER REGISTRATION NUMBER DOES NOT INDICATE THAT THE SERVICE HAS REVIEWED, EXAMINED OR APPROVED AN INVESTMENT IN THE PARTNERSHIP OR THE CLAIMED TAX BENEFITS.

## GLOSSARY

*Certain terms used in this Prospectus are defined below and under "Description of New Bonds—Certain Definitions."*

"Acceptance" shall mean a vote by a beneficial owner of the Old Bonds in favor of the Plan, as evidenced by a Ballot or Master Ballot executed by the record owner and return to the Acceptance Agent prior to the Expiration Date.

"Accrued Management Fees" means all management fees accrued but unpaid due Donald J. Trump pursuant to the Management Agreement.

"ACS" means Atlantic City Showboat, Inc.

"Actual Taj Market Share" shall mean for any period a percentage determined by dividing the actual R-EBITDA of the Partnership for such period by the total actual R-EBITDA of the Existing Casinos for such period.

"Addition Work" means Addition Work as defined under "Description of New Bonds—Certain Definitions" at page 92.

"Additional Amount" means Additional Amount as defined under "Description of New Bonds—Certain Definitions" at page 92.

"Additional Bond Amount" means Units consisting of New Bonds in principal amount of $.057897 per day (less the Variable Amount paid on the Effective Date), and one share of Class B Stock (for each $1,000 principal amount of New Bonds resulting from such exchange) for the period from and including April 1, 1991 through and including the day before the Effective Date for each $1,000 in principal amount of Old Bonds.

"Additional Rate" means Additional Rate as defined under "Description of New Bonds—Certain Definitions" at page 92.

"Additional Partnership Interest" means the Additional Partnership Interest transferred to TTMI on the Final Payment Date computed in accordance with the provisions stated in the section entitled "Description of Amended Partnership Agreement—Right of TTMI to Acquire an Additional Partnership Interest Upon 14% Payment or Foreclosure."

"Adjustment Factor" means Adjustment Factor as defined under "Description of Amended Partnership Agreement—Acquisition of Additional Partnership Interests upon 14% Payment or Foreclosure" at page 114.

"Administrative Expense Claim" means any Claim Against the Debtors (including a Fee Request) of a kind specified in section 503(b) of the Code arising or accruing on or after the Filing Date which is entitled to priority in accordance with section 507(a)(1) of the Code, including, without limitation, all expenses of administration.

"Affiliate" shall mean, with respect to any Person, any Person that directly or indirectly through one or more intermediaries controls or is controlled by or under common control with the specified Person or related by blood or marriage to the specified Person. Under certain circumstances, Persons in whom Donald J. Trump has a direct or indirect beneficial ownership of 10% or more of the economic interests therein shall be deemed to be Affiliates.

"Against the Debtors" means, with respect to a Claim, against one or more of the Debtors.

148

"Allowed Amount" means, with respect to a particular Claim: (a) if the holder of such Claim has not filed a proof of claim as prescribed by the Bankruptcy Court within the applicable period of limitation fixed by the Bankruptcy Court pursuant to Rule 3003, the amount of such Claim that is listed in the Schedules as being not disputed, contingent or unliquidated; (b) if the holder of such Claim has filed a proof of claim as prescribed by the Bankruptcy Court within the applicable period of limitation fixed by the Bankruptcy Court pursuant to Rule 3003: (i) the amount stated in such proof of claim, if no objection to such proof of claim has been interposed within the applicable period of limitation fixed by the Code, the Rules, the Bankruptcy Court or other applicable law; or (ii) such amount as shall be fixed by a Final Order of the Bankruptcy Court, if an objection has been interposed within the applicable period of limitation fixed by the Code, the Rules, the Bankruptcy Court or other applicable law; (c) with respect to an Administrative Expense Claim, other than a Fee Request, the amount of such Claim or such amount as shall be fixed by a Final Order of the Bankruptcy Court; or (d) with respect to a Fee Request, such amount as shall be fixed and allowed by a Final Order of the Bankruptcy Court. "Allowed Amount" shall not include any interest on a Claim which has accrued after the Filing Date, except as expressly provided for in the Plan or pursuant to a Final Order of the Bankruptcy Court. "Allowed Amount" means, with respect to a particular Interest: (a) in the case of a Debtor that is a corporation, the number of shares such Interest represents as set forth in the Debtor's records or its stock transfer agent's records, and in the case of a Debtor that is a partnership, the partnership equity interest such Interest represents as set forth in such partnership records, in either case on the Exchange Record Date, if no objection to such Interest has been interposed within the applicable period of limitation fixed by the Code, the Rules, the Bankruptcy Court or other applicable law; or (b) in the case of a Debtor that is a corporation, the number of shares such Interest represents, and in the case of a Debtor that is a partnership, the partnership equity interest such Interest represents as shall be fixed by a Final Order of the Bankruptcy Court, if an objection to such Interests has been interposed within the applicable period of limitation fixed by the Code, the Rules, the Bankruptcy Court or other applicable law.

"Allowed Claim" means any Claim (including a Fee Request) for which an Allowed Amount has been determined.

"Allowed Interest" means any Interest for which an Allowed Amount has been determined.

"Amended First Fidelity Agreement" means the Amended and Restated Time Loan and Security Agreement dated as of the Effective Date by and among Realty Corp., First Fidelity, the Partnership and Donald J. Trump.

"Amended Guaranty" means the Guaranty of the Partnership as amended to reflect the terms of the New Bonds.

"Amended Lease" means the leases, dated as of the Effective Date, between the Partnership and Realty Corp. to be assigned to First Fidelity.

"Amended Lease Assignment" means the Amended and Restated Assignment of the Amended Lease.

"Amended License Agreement" means the Amended and Restated License Agreement as of the Effective Date between the Partnership and Donald J. Trump.

"Amended Mortgage" means the Mortgage of the Taj Mahal and certain of its ancillary facilities, properties, and assets, amended to reflect the terms of the New Bonds.

"Amended NatWest Agreement" means the Second Amendment to Loan Agreement dated as of the Effective Date by and among the Partnership and NatWest.

"Amended Partnership Agreement" shall mean the Amended and Restated Partnership Agreement of the Partnership entered into between TM/GP, Trump Corp. and TTMI as of the Effective Date.

"Amortization," for any period, means, as applied to any Person, the amount of the amortization of goodwill and other intangible items (other than amortization of debt discount and capitalized financing fees) that is reflected on the financial statements of such person and its consolidated subsidiaries for such period in accordance with GAAP.

"Annual Mandatory Cash Interest Amount" means on any May 15 the sum of the Mandatory Cash Interest Amount payable on such May 15 plus the Mandatory Cash Interest Amount paid on the immediately preceding November 15 Interest Payment Date.

"Annual Fee" means the Base Fee and the Incentive Fee.

"Applicable Percentage" shall mean, with respect to Partnership Interests, initially 49.995% for TTMI, 49.995% for TM/GP and .01% for Trump Corp., subject to appropriate adjustment in accordance with the provisions of the Amended Partnership Agreement. A Transferee's Applicable Percentage shall equal the Applicable Percentage transferred to it by the transferor.

"Appraised Value" means Appraised Value as defined in "Description of New Bonds—Certain Definitions" at page 92.

"Assigned Assets" means the Specified Parcels and three helicopters and certain assets related thereto, including the temporary right to land helicopters on the Steeplechase Pier.

"Assignment Agreement" means the Assignment Agreement as defined under "Description of New Bonds—Certain Definitions" at page 93.

"Ballot Agent" shall mean the party named in this Prospectus as the ballot agent for accepting completed Ballots and Master Ballots on behalf of the Solicitors.

"Bank Agreements" means the Bank Agreements as defined under "Description of New Bonds—Certain Definitions" at page 93.

"Bank Consents" means the consents of the Persons listed on Schedule II to the Override Agreement required pursuant to the terms of such agreement, and the consents of the signatories to the Credit Agreement (other than Donald J. Trump and The Trump-Equitable Fifth-Avenue Company) required pursuant to the terms of such agreement to the transactions contemplated by the Plan.

"Bank Foreclosure" means the exercise of any Foreclosure Right (as defined in either of the Bank Agreements) against any Trump Taj Mahal Equity by a party to either of the Bank Agreements.

"Bankers Trust" means Bankers Trust Company.

"Base Fee" means the base fee of $500,000 payable to Donald J. Trump pursuant to the Services Agreement.

"Best Interest Test" means the requirement of section 1129(a)(7) of the Code that each impaired class either (a) accept the proposed plan of reorganization, or (b) receive at least as much under the proposed plan of reorganization as would be received in a liquidation.

"Bond Carryforward Amount" means $900,000, plus $185,509.42 per day in the aggregate for all Old Bonds from April 1, 1991 to the date before the Filing Date to the extent that such amount is not paid on or before the Filing Date.

"Bond Cash Payment" means the Fixed Amount plus the Variable Amount.

"Bondholder Litigation" means all litigation described in the section entitled "Business—Legal Proceedings—Bondholder Litigation" at pages 71-73, and all similar litigation, if any, not known to the Registrants or commenced after the date hereof.

"Budget" shall mean the budget approved by the Board of Directors of TM/GP for the Budget Period relating thereto, a New Budget or the 1991 Budget, as the case may be.

"Budget R-EBITDA" shall mean the amount determined by multiplying the Theoretical Taj Market Share for the New Budget Period by the total R-EBITDA of the Existing Casinos during such New Budget Period.

"Budget Period" shall mean the calendar year covered by a Budget.

"Business Day" means any day other than a Saturday, Sunday or any other day on which banks are authorized or required by law to close in New York City or the State of New Jersey.

"Capital Account," when used with respect to a Partner, shall mean an amount equal to (a) the aggregate of (i) the initial amount credited to the Capital Account of such Partner, (ii) all voluntary capital contributions to the Partnership made or deemed to be made by such Partner pursuant to the

Amended Partnership Agreement, (iii) all Profits credited to the account of such Partner and amounts allocated pursuant to certain tax adjustments, and (iv) any additional amount resulting from the acquisition of additional Partnership Interests, less (b) the aggregate of (i) all net Losses and deductions charged to the account of such Partner, (ii) all cash distributions (other than distributions for taxes, indemnification and directors' fees, and redemption of Class B Stock) and the fair value of all in-kind distributions to such Partner pursuant to the Amended Partnership Agreement, and (iii) any reduction in such amount due to the transfer of a Partnership Interest. The Capital Accounts shall be maintained in accordance with the regulations under Section 704(b) of the I.R.C. If a Partner is a Transferee, its Capital Account derived from the transferor shall initially be deemed to be the product of (x) a fraction, the numerator of which shall be the Applicable Percentage transferred to such Transferee and the denominator of which shall be the Applicable Percentage immediately prior to such transfer of the Partner making such transfer, and (y) the Capital Account of the Partner making such transfer immediately prior to such transfer. The Capital Account of a Partner transferring a partnership Interest to a Transferee shall be reduced by the amount of its Capital Account which such Transferee is initially deemed to have acquired.

"Capital Expenditure" means, in any Budget Period, the amount expended by the Partnership for capital improvements to the Taj Mahal or related facilities.

"Capitalized Lease Obligation" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such person as lessee which, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of such person.

"Cash Flow Shortfall Event" means

(i) If TM/GP, as managing general partner of the Partnership, has adopted a Budget for a Budget Period or Fiscal 1991, the failure of the Partnership's actual EBITDA less actual Capital Expenditures for such Budget Period or Fiscal 1991 to equal or exceed 85% of the difference between (x) Budget EBITDA, and (y) the Budget allowance for capital expenditures, or

(ii) If TM/GP, as managing general partner of the Partnership, has not adopted a Budget for Fiscal 1991 or a New Budget Period, the Partnership's actual R-EBITDA less actual Capital Expenditures for Fiscal 1991 or such New Budget Period is less than 85% of the Budget R-EBITDA less Budget Capital Expenditures, as set forth in the automatic budget setting provisions of the Amended and Restated TM/GP Certificate of Incorporation;

provided, however, that a Cash Flow Shortfall Event shall not be deemed to have occurred under clause (i) or (ii) above in any Budget Period commencing with the year 1992 if the Partnership's EBITDA, less Capital Expenditures for such year, equals or exceeds the amount indicated below for such year:

| Year | EBITDA Less Capital Expenditures ($ millions) |
|---|---|
| 1992 | $120 |
| 1993 | $130 |
| 1994 | $140 |
| 1995 | $150 |
| 1996 | $160 |
| 1997 | $170 |
| 1998 | $180 |
| 1999 | $190 |

"Cash Interest Expense" for any period, means, as applied to any Person, the consolidated interest expense paid in cash as reflected on the consolidated financial statements of such Person (without deduction of interest income) for such period.

"Cash Rate" means Cash Rate as defined under "Description of New Bonds—Certain Definitions" at page 93.

"Casino Control Act" means the New Jersey Casino Control Act, NJSA 5:12-1 et seq.

"Castle Bonds" means the 13¾% First Mortgage Bonds, Series A-1, due 1997, and the 7% First Mortgage Bonds, Series A-2, due 1999, each issued by Trump's Castle Funding, Inc.

"Castle Partnership" means Trump's Castle Associates Limited Partnership, a New Jersey limited partnership.

"CCC" means the New Jersey Casino Control Commission.

"Chapter 11 Cases" means, collectively, the cases under chapter 11 of the Bankruptcy Code concerning the Debtors, entitled *In re Trump Taj Mahal Funding, Inc., et al.*

"Claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"Class" means a group of Claims or Interests, consisting of Claims or Interests, as the case may be, which are substantially similar to each other within the meaning of the Code, as classified pursuant to Article II of the Plan.

"Class Action Claims" means all Claims Against the Debtors arising under or relating to any Bondholder Litigation.

"Class Action Defendant" means Donald J. Trump, Robert S. Trump, Harvey I. Freeman, C. Willard "Bucky" Howard, The Trump Organization, Trump Taj Mahal Funding, Inc., Trump Taj Mahal, Inc., Trump Taj Mahal Associates Limited Partnership, Merrill Lynch, Pierce, Fenner & Smith, Inc., and each of their respective successors in interest, assigns, heirs and executors.

"Class B Directors" means the directors of Holding elected by the holders of the Class B Stock.

"Class C Directors" means the directors of Holding elected by the holders of the Class C Stock.

"Class A Stock" means the Class A Common Stock, par value $.01 per share, of Holding.

"Class B Stock" means the Class B Redeemable Common Stock, par value $.01 per share, of Holding.

"Class C Stock" means the Class C Common Stock, par value $.01 per share, of Holding.

"Code" means the United States Bankruptcy Code 11 U.S.C. 101 et seq. and the Rules.

"COI" means cancellation of indebtedness income.

"Common Stock" means the Class A Stock, the Class B Stock and the Class C Stock, collectively.

"Company" means Trump Taj Mahal Funding, Inc., a New Jersey corporation.

"Confirmation" means the entry by the Bankruptcy Court of an Order confirming the Plan.

"Confirmation Date" means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

"Confirmation Hearing" means the hearing held before the Bankruptcy Court in which the Debtors will seek Confirmation of the Plan.

"Confirmation Order" means the Order entered by the Bankruptcy Court confirming the Plan under chapter 11 of the Code.

"Consolidated Net Income" means Consolidated Net Income as defined under "Description of New Bonds—Certain Definitions" at page 93.

"Construction Fee Deferral Note" means the Construction Fee Deferral Note dated as of August 8, 1990 executed by the Partnership, as maker, payable to the order of THMC and endorsed by THMC to First Fidelity.

"Coverage Ratio" means Coverage Ratio as defined under "Description of New Bonds—Certain Definitions" at page 93.

"CRDA" means the Casino Reinvestment Development Authority.

"CRDA Bonds" means the investments required by Section 144.1 of the Casino Control Act. including deposits for the purchase of bonds issued by the CRDA in lieu of the purchase of such bonds.

"CRDA Market Value Adjustment" means the amount recorded to reflect the Partnership's CRDA obligations (CRDA Bonds or the deposits paid towards the purchase of CRDA Bonds) at then current market interest rates. as the CRDA obligations pay interest at below market interest rates.

"Credit Agreement" means the Credit Agreement dated as of August 8. 1990 by and among Donald J. Trump. the Trump-Equitable Fifth Avenue Company, certain other signatories thereto and Bankers Trust. as agent.

"Debt" means Debt as defined under "Description of New Bonds—Certain Definitions" at page 93.

"Debtors" means the Company, the Partnership, TTMI and Trump Corp.

"December 14 Agreement" means the agreement in principle reached on December 14. 1990 between the Company and the Partnership. representatives of First Fidelity. NatWest and the Subcontractors for the restructuring of amounts due such parties.

"Default" means Default as defined in the Mortgage and the Old Indenture.

"Development Agreement" shall have the meaning ascribed to it in the section entitled "Certain Transactions—Acquisition of The Taj Mahal" at page 81.

"Dispute" means any dispute relating to the existence of a Transition Event.

"Disputed Claim" means any Claim (including a Fee Request) for which an Allowed Amount has not been determined as of (i) the Effective Date and (ii) any Distribution Date. A Claim that is the subject of a pending application. motion. complaint or any other legal proceeding seeking to disallow. subordinate or estimate such Claim shall be deemed a Disputed Claim.

"Disputed Claims/Interests Reserve" means the reserve established pursuant to Article VII of the Plan.

"Disputed Interest" means any Interest for which an Allowed Amount has not been determined as of (i) the Effective Date and (ii) any Distribution Date. An Interest that is the subject of a pending application. motion. complaint or any other legal proceeding seeking to disallow. subordinate or estimate such Interest shall be deemed a Disputed Interest.

"Distribution Date" means each of the following days: (a) the first Business Day following March 31. the first Business Day following June 30. the first Business Day following September 30. and the first Business Day following December 31. commencing on the first of such days to occur after the thirtieth (30th) day following the Effective Date. and (b) the Effective Date. Except as otherwise provided in the Plan. any payment or other distribution which the Debtors are required. by the Plan. to make to the holder of a Claim on a Distribution Date described in clause (a) above shall be deemed timely made if made on such Distribution Date or within five Business Days thereafter.

"Division" means the New Jersey Division of Gaming Enforcement.

"EACF Payment" means the EACF payment as defined under "Amended NatWest Agreement—Terms" at page 131.

"Earned Reversionary Interest" means the Partnership Interest deemed to be acquired by TTMI on the Final Payment Date if a Foreclosure Event has occurred prior to such date.

"EBITDA" means with respect to the Partnership net operating revenues. plus interest income, and other income. minus direct cash operating expenses of the Partnership other than (i) the Incentive Fee payable to Donald J. Trump under the Services Agreement and (ii) distributions to TM/GP to pay indirectly the fees and expenses of the directors of Holding.

"Effective Date" means the Business Day selected by the Debtors that is not more than three Business Days after the date each of the conditions precedent to consummation have been satisfied or waived in accordance with the Plan.

"Equity Interest" means the general partnership interest representing 49.995% of the equity of the Partnership to be issued by the Partnership to the holders of the Old Bonds on the Effective Date.

"Estimated Payment" means the Estimated Payment as described in the Amended Partnership Agreement.

"Estimated Payment Date" means the Estimated Payment Date as described in the Amended Partnership Agreement.

"Events of Default" shall have the meaning ascribed to it in the Mortgage and Old Indenture.

"Excess Available Cash Flow" means Excess Available Cash Flow as defined under "Description of New Bonds—Certain Definitions" at page 95.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exchange Consideration" means the consideration to be received by each holder of $1,000 in principal amount of Old Bonds as set forth on the cover page of the Prospectus.

"Exchange Record Date" means the Business Day that is five Business Days prior to the Effective Date.

"Executive Committee" means the Executive Committee of the Partnership.

"Existing Casinos" means the operating licensed casino hotels that existed in Atlantic City, New Jersey on January 1, 1991, including the Taj Mahal.

"Existing Encumbrances" means Existing Encumbrances as defined in the Amended Mortgage.

"Expiration Date" means 5:00 p.m., New York City time, on July 15, 1991, unless extended by the Solicitors and includes any extensions thereof.

"Face Amount" means, with respect to a particular Claim, (a) if the holder of such Claim has not filed a proof of claim with the Bankruptcy Court within the applicable period of limitation fixed by the Bankruptcy Court pursuant to Rule 3003(c)(3), the amount of such Claim that is listed in the Schedules as not disputed, contingent or unliquidated; or (b) if the holder of such Claim has filed a proof of claim with the Bankruptcy Court within the applicable period of limitation fixed by the Bankruptcy Court pursuant to Rule 3003(c)(3), the amount stated in such proof of claim; or (c) with respect to a Fee Request, the amount to which an applicant would be entitled if its application were to be granted in full.

"Feasibility Test" means the requirement of section 1129 of the Code that under a proposed plan of reorganization, there is a reasonable probability that the Debtors will be able to perform their obligations and to continue to operate the reorganized business without the need for further financial reorganization.

"Fee Request" means a request for compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331 and 503(b) of the Code in connection with an application made to the Bankruptcy Court in the Reorganization Case.

"F, F&E Financing Agreement" has the meaning assigned to it in the Amended Mortgage.

"Filing Date" means, with respect to each Debtor, the date on which the Plan is filed with the Bankruptcy Court.

"Final Order" means an order or judgment which is not the subject of a pending appeal or petition for review or rehearing, which has not been reversed, stayed, modified or amended, and respecting which the time to appeal from or to seek review or rehearing of such order shall have expired.

"Final Payment Date" means the date on which the New Bonds are retired, defeased or paid in full.

"Financial Advisor" means Donaldson, Lufkin & Jenrette Securities Corporation.

"Financing Default" means Financing Default as defined under "Description of New Bonds—Certain Definitions" at page 94.

"First Fidelity" means First Fidelity Bank, National Association, New Jersey.

"First Fidelity Carryforward Amount" means $33,333, plus $9,041.10 per day from April 1, 1991 through the day before the Filing Date, to the extent that such amount is not distributed on or before the Filing Date.

"First Fidelity Cash Payment" means $9,041.10 per day from the Filing Date through the day before the Effective Date.

"First Fidelity Claims" means the Claims Against the Debtors arising under or relating to the Construction Fee Deferral Note, the Guaranty and the assignment of leases, dated November 22, 1988 between Realty Corp. and First Fidelity.

"First Fidelity Agreement" means the Time Loan and Security Agreement dated November 22, 1988 among the Partnership, Donald J. Trump and First Fidelity, as amended as of August 8, 1990.

"First Fidelity Event of Default" means an event of default under the Amended First Fidelity Agreement.

"First Fidelity Letters of Credit" means the $110,000 Letter of Credit No. 1513/89 between the Partnership, as account party, First Fidelity, as issuer, and South Jersey Gas Company, as beneficiary, and the $4,150,000 Letter of Credit No. S13717 between the Partnership, as account party, Fidelity Bank, as issuer, and Atlantic City Electric Company, as beneficiary.

"First Mortgage Debt" means First Mortgage Debt as defined under "Description of New Bonds—Certain Definitions" at page 94.

"First Tier Amount" means First Tier Amount as defined under "Description of New Bonds—Certain Definitions" at page 94.

"Fiscal 1991" shall be the one-year period commencing on January 1, April 1, July 1, or October 1 next following the date on which the Plan is confirmed by the appropriate court order.

"Fixed Amount" means $.27483 per day per $1,000 principal amount of Old Bonds calculated from the Filing Date through the date immediately preceding the Effective Date.

"Force Majeure" means the determination by the Neutral that any of the following events has occurred, provided that, in each case, (i) such event is not caused directly or indirectly, by any act or omission of Donald J. Trump, any Person acting in concert with Donald J. Trump or that is an Affiliate of Donald J. Trump, (ii) the effect of such event is to disrupt in whole or in substantial part the operations of the Taj Mahal and (iii) such event demonstrably results in or is a demonstrable cause of the Cash Flow Shortfall Event: (a) an act of God, act of public enemy, war, armed hostilities, blockade, insurrection or riot (other than any of the foregoing that are the result of the United States' armed response to the invasion of Kuwait by Iraq in 1990), (b) labor disputes, including, without limitation, strikes, slowdowns, boycotts or labor arbitrations, (c) fire, flood, or other accident, (d) the loss or inability to obtain any utility services necessary for the operation of the Taj Mahal, (e) the suspension, termination, interruption, denial or failure of renewal of any permit, license, consent, authorization or approval essential to the operation of the Taj Mahal, (f) a general banking moratorium declared by federal or New Jersey authorities, (g) the rationing of gasoline by federal or New Jersey authorities, and (h) any other extraordinary and unforeseeable event, or series of events, of like magnitude and impact.

"Foreclosure Event" means the foreclosure by the secured parties on any Trump Pledged Equity and the expiration of 90 days after such foreclosure in which time such Partnership Interests are not reacquired by Donald J. Trump or his Affiliate by curing the default that led to the foreclosure or by acquiring such Partnership Interests in auction thereof or otherwise.

"Foreclosure Partnership Interest" means the Partnership interest transferred from TTMI to TM/GP upon the occurrence of a Foreclosure Event.

"14% Payment" means (a) with respect to the New Bonds outstanding on the Final Payment Date, beginning from the date of original issuance, the sum of the differences on each Interest Payment Date and the Final Payment Date between (i) the semiannual interest calculated on the New Bonds outstanding on such Interest Payment Date or the Final Payment Date at a semiannual rate of 6.542% and (ii) the semiannual interest calculated thereon at a semiannual rate of 5.675% after compounding each such difference semiannually at a semiannual rate of 7% to the Final Payment Date; and (b) with respect to each New Bond that was Redeemed before the Final Payment Date, beginning from the date such New Bond was issued, the sum of the differences on each Interest Payment Date and the date of Redemption of such New Bond Redeemed between (i) the semiannual interest calculated on such New

Bond at a semiannual rate of 6.542% and (ii) the semiannual interest calculated on such New Bond at a semiannual rate of 5.675% after compounding each such difference semiannually at a semiannual rate of 7% to the Final Payment Date.

"Framework" means the non-binding framework for the restructuring of the Old Bonds reached by the Company and the Steering Committee on November 16, 1990.

"Fraudulent Conveyance Claims" means all Claims Against the Debtors may be asserted by the trustee of the Resorts Litigation Trust and all similar claims whether or not asserted, including all claims arising out of the lawsuits captioned *Kenwood Dual Fund Ltd. v. First Interstate Trust Company of New York and Resorts International Inc., The George S. Kolbe Target Benefit Pension Plan et al. v. Resorts International Inc., et al., Shulman and Hanlein v. The Griffin Company et al.* and *Campbell et al. v. Resorts International Inc. et al.* and all similar Claims whether or not asserted.

"GAAP" shall mean generally accepted accounting principles consistently applied as in effect in the United States of America from time to time.

"GAAP Net Income" means GAAP Net Income as defined under "Description of New Bonds—Certain Definitions" at page 95.

"GRI" means Griffin Resorts, Inc.

"Griffin Co." means The Griffin Company.

"Guaranty" means the Partnership's guaranty of the payment of the principal of, premium, if any, and interest on the Old Bonds.

"Holding" means Taj Mahal Holding Corp., a Delaware corporation.

"Housing Authority" means the Housing Authority of the City of Atlantic City.

"Incentive Fee" means Incentive Fee as defined under "The Services Agreement—Annual Fee" at page 128.

"Income Tax Expense" means Income Tax Expense as defined under "Description of New Bonds—Certain Definitions" at page 95.

"Indebtedness" of any Person shall mean any obligation for borrowed money for which such Person is responsible or liable, directly, indirectly or contingently, as obligor, guarantor or otherwise. Indebtedness shall also include any lease of the property (whether real, personal or mixed), by such Person as lessee which, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of such Person.

"Indenture" means the Amended and Restated Indenture among the Company, as Issuer, the Partnership, as Guarantor and First Bank, as Trustee.

"Intercreditor Agreement" means the Intercreditor Agreements dated as of the Effective Date among the Partnership and certain of its creditors.

"Interest" means the right of a holder of issued and outstanding common stock or a partnership interest of the Debtors.

"Interest Payment Date" means November 15 and May 15 of each year commencing on the first such date after the Effective Date.

"I.R.C." means the Internal Revenue Code of 1986, as amended.

"LIBOR" means London Interbank Borrowing Rate.

"License Revocation" shall mean the entry of an order of the CCC that Donald J. Trump is no longer deemed to be a Qualified Person.

"Limited Guaranty" means that guaranty by and between the Partnership and First Fidelity, dated as of the Effective Date.

"Management Agreement" means the Management Agreement entered into between the Partnership and THMC dated November 22, 1988.

"Management Agreement Claims" means all Claims Against the Debtors arising under or relating to the Management Agreement.

"Management Fee" means the fee due THMC under the Management Agreement.

"Managing General Partner" means the Person named as managing general partner of the Partnership pursuant to the Partnership Agreement, and thereafter, "Managing General Partner" means such successor entity exclusively.

"Mandatory Cash Interest Amount" means on any Interest Payment Date an amount equal to the semiannual interest payment of 9.375% per annum on the New Bonds outstanding on the immediately preceding Record Date.

"Market Discount Bond" means a debt obligation purchased at a market discount, subject to a statutory de minimis exception.

"Mortgage" shall mean the mortgage of the Taj Mahal and certain of its ancillary facilities, properties, and assets, executed by the Partnership as mortgagor and the Company as mortgagee, securing the payment of the Partnership Note.

"Mortgage Debt" means Mortgage Debt as defined under "Description of New Bonds—Certain Definitions" at page 95.

"Mortgage Documents" means Mortgage Documents as defined under "Description of New Bonds—Certain Definitions" at page 95.

"NatWest" means National Westminster Bank, USA.

"NatWest Carryforward Amount" means $66,667, plus $12,260.27 per day from April 1, 1991 through the day before the Filing Date, to the extent that such amount was not paid on or before the Filing Date.

"NatWest Cash Payment" means $12,260.27 per day from the Filing Date through the day before the Effective Date.

"NatWest Claims" means the Claims Against the Debtors arising under or relating to the NatWest Loan Agreement.

"NatWest Debt" means the Debt of the Partnership to NatWest, in an aggregate principal amount of approximately $44,600,000 which Debt is secured by a first priority lien on certain furniture, fixtures and equipment.

"NatWest Loan Agreement" means the Loan Agreement between NatWest and the Partnership dated November 3, 1989, as amended on August 8, 1990.

"Net Cash Flows Generated or Used in Operating Activities" means Net Cash Flows Generated or Used in Operating Activities as defined under "Description of New Bonds—Certain Definitions" at page 95.

"Net Income," means, Net Income as defined under "Description of New Bonds—Certain Definitions" at page 95.

"Neutral" shall mean Herbert Stern, a former Federal District Court judge, or if he is unable or unwilling to serve, a successor who shall have been selected by Herbert Stern, or if he fails to make such selection, by a majority of the Class C Directors and a majority of the Class B Directors.

"New Bonds" means the Company's 11.35% Mortgage Bonds, Series A, due 1999.

"New Budget Period" shall mean the Budget Period following the existing Budget Period.

"New Line of Credit Note" shall mean the promissory note, in principal amount of $25,000,000, to be executed by TTMI, on the Effective Date, payable to Bankers Trust, with terms substantially similar to the Trump Line of Credit Note.

"NJDEP" means the New Jersey Department of Environmental Protection.

"New Parking Facility" means New Parking Facility as defined under "Description of New Bonds—Certain Definitions" at page 95.

"New Parking Financing" means New Parking Financing as defined under "Description of New Bonds—Certain Definitions" at page 95.

"New Parking Financing Lien" means New Parking Financing Lien as defined under "Description of New Bonds—Certain Definitions" at page 95.

"1991 Budget" means the Budget for Fiscal 1991.

"Note" means the Partnership Note, as amended, to reflect the terms of the New Bonds.

"Notes" means the Note, and any other note made by the Partnership payable to the Company in connection with the issuance of Additional Bonds pursuant to the Indenture.

"OID" means original issue discount.

"Old Bonds" means the Company's 14% First Mortgage Bonds, Series A, due 1998.

"Old Budget Period" shall mean the Budget Period immediately preceding the period to be covered by the New Budget that is being computed by reference to such Old Budget Period.

"Old Indenture" means the Indenture dated November 22, 1988 by and among the Company, as Issuer, the Partnership, as Guarantor, and Bankers Trust Company, as Trustee.

"Order" means an order of the Bankruptcy Court.

"Other Trump Casinos" means Trump Castle and Trump Plaza.

"Outstanding Amount" means Outstanding Amount as defined under "Description of New Bonds—Certain Definitions" at page 96.

"Outstanding Secured Bonds" means Outstanding Secured Bonds as defined under "Description of New Bonds—Certain Definitions" at page 96.

"Override Agreement" means the Override Agreement dated as of August 8, 1990 by and among Donald J. Trump, the Persons listed on Schedules I and II to such agreement and Bankers Trust, as agent.

"Partnership" means Trump Taj Mahal Associates, a New Jersey general partnership, formerly known as Trump Taj Mahal Associates Limited Partnership, a New Jersey limited partnership.

"Partnership Interest" shall mean any interest of TTMI, TM/GP or Trump Corp. or any Transferee, in the Partnership, including the right of such Partner to benefits to which it may be entitled under, and the obligations of such Partner to comply with, all the terms and provisions of the Amended Partnership Agreement.

"Partnership Note" means the $675,000,000 principal amount promissory note of the Partnership in favor of the Company with payment terms substantially similar to the payment terms of the Old Bonds.

"Permitted Encumbrances" means Permitted Encumbrances as defined under "Description of New Bonds—Certain Definitions" at page 96.

"Person" means an individual, a corporation, a partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a government, or any political subdivision thereof, or other entity.

"Person acting in concert with Donald J. Trump" means Fred Trump, Robert S. Trump, any spouse or minor child of Donald J. Trump, Robert S. Trump or Fred Trump, Harvey I. Freeman, Stephen Bollenbach, Nicholas L. Ribis or their successors or any other Person acting in concert with Donald J. Trump.

"Plaintiff Holders" means all persons who purchased the Old Bonds and/or the 13¾% First Mortgage Bonds, Series A-1, due 1997, or the 7% First Mortgage Bonds, Series A-2, each issued by Trump's Castle Funding, Inc., on the open market between May 27, 1988 and June 12, 1990.

"Plan" means the plan of reorganization of the Company, the Partnership, TTMI and Trump Corp.

"Plan Rate" means 8% per annum.

"Plan of Reorganization" means the Plan of Reorganization among RII. GRI. Resorts International Financing, Inc. and Griffin Resorts Holdings, Inc.

"Plaza Partnership" means Trump Plaza Associates, a New Jersey general partnership.

"Post-Effective Deposit Requirement" means, for any period, the sum of Net Cash Flows Generated or Used In Operating Activities, plus the sum of (i) cash proceeds of any increase in long-term liabilities excluding the Senior Debt Facilities (determined in accordance with GAAP), (ii) unclaimed cash under the Plan upon the distribution of such cash to the Partnership and (iii) amounts reserved for disputed claims or interests under the Plan upon a final determination that such amounts need not be paid by the Partnership upon the distribution of funds to the Partnership, minus the sum of: (a) Required Capital Expenditures and CRDA deposits required for the purchase of CRDA Bonds or alternative CRDA investments, (b) principal repayments, purchases or defeasance of Permitted Indebtedness other than (x) the New Bonds (except New Bonds equivalent to the amount of New Bonds issued pursuant to the payment of the Additional Amount) and (y) payments with respect to the NatWest Loan from Excess Available Cash Flow, to the extent permitted by Section 12.17 of the Indenture, (c) distributions by the Partnership pursuant to Section 11 of the Amended Partnership Agreement, (d) payments (to the extent not covered by insurance) made in connection with a Restoration as a result of a Casualty or Taking (as each term is defined in the Amended Mortgage) or payments in settlement of litigation (as determined by a Board Resolution of the Board of Directors of TM/GP), in each case to the extent not included in calculating GAAP Net Income, (e) amounts reserved in reasonable good faith for the future payment of Required Capital Expenditures and anticipated payments with respect to casualty losses (to the extent not covered by insurance), in each case in connection with contracts existing on the December 31 of such year (provided, if all or any part of such amounts reserved for Capital Expenditures are not actually paid by April 1 of the immediately succeeding year, they shall not be so subtracted) and provided that to the extent the Post-Effective Deposit Requirement is negative in any period, an amount equal to the lesser of (x) the amount deducted for casualty losses pursuant to this subsection (e), or (y) the amount by which the Post-Effective Deposit Requirement is less than zero, shall be deducted from any positive amount of Post-Effective Deposit Requirement in any future period or periods, (f) amounts reserved in reasonable good faith for anticipated future payments in settlement of litigation as determined by the Managing General Partner (with the concurrence of a majority of the Class B Directors), and (g) amounts reserved in reasonable good faith for Working Capital in such amount as determined by the Managing General Partner; *provided* that the amount of such Working Capital reserve shall not exceed the sum of (i) casino and hotel cashier funds, plus (ii) the excess, if any, of $8,000,000 over amounts available under the Working Capital Facility, to the extent not included in calculating GAAP Net Income.

"Pre-Effective Deposit Requirement" means, for any period, the sum of Net Cash Flows Generated or Used In Operating Activities, plus cash proceeds of any increase in long-term liabilities excluding the Senior Debt Facilities and excluding any debtor-in-possession financing obtained by the Partnership (determined in accordance with GAAP) plus amounts reserved but unpaid for disputed claims and interests under the Plan if a final determination has been made that such amounts need not be paid by the Partnership, minus the sum of: (a) Required Capital Expenditures and CRDA deposits required for the purchase of CRDA Bonds or alternative CRDA investments, (b) principal repayments, purchases or defeasances of indebtedness, including any Old Bonds acquired by nominees of the subcontractors or nominees of advisors to the Steering Committee in excess of $9,575,000, (c) payments (to the extent not covered by insurance) made in connection with a Restoration as a result of a Casualty or taking (as each term is defined in the Amended Mortgage) or payments in settlement of litigation (as determined by a board resolution of the Board of Directors of TM/GP), in each case to the extent not included in calculating GAAP Net Income, (d) amounts reserved in reasonable good faith for the future payment of Required Capital Expenditures and anticipated payments with respect to casualty losses other than insurance proceeds not applied to Restoration of such casualty loss, in each case in connection with contracts existing at the end of such period, (e) amounts reserved in reasonable good faith for anticipated future payments in settlement of litigation as determined by the Managing General Partner (with the concurrence of a majority of the members of the Steering Committee), and (f) amounts reserved in reasonable good faith for Working Capital in such amount as determined by the Managing General Partner; *provided* that the amount of such working capital reserve shall not exceed

the sum of (i) casino and hotel cashier funds, plus (ii) the excess, if any, of $8,000,000 over amounts available under the Working Capital Facility or similar facility, in each case to the extent not included in calculating GAAP Net Income.

"Prefiling First Fidelity Payment" means an amount equal to $33,333, plus $9,041.10 per day for the period from April 1, 1991 through the day before the Plan is filed, to the extent such amount is actually paid on or before the day the Plan is filed.

"Prefiling NatWest Payment" means an amount equal to $66,667, plus $12,260.27 per day for the period from April 1, 1991 through the day before the Plan is filed, to the extent such amount is actually paid on or before the day the Plan is filed.

"Prefiling Payment" means an aggregate of $900,000 ($1.33 per $1,000 principal amount of Old Bonds), plus an aggregate of $185,510 ($.27483 per $1,000 principal amount of Old Bonds) per day for the period from April 1, 1991 through the day before the Plan is filed to the extent such amount is actually paid on or before the day the Plan is filed.

"Prefiling Payment Record Date" means July 11, 1991.

"Prepetition" means arising or accruing before the Filing Date.

"Priority Claim" means any Claim Against the Debtors (other than an Administrative Expense Claim or Tax Claim) entitled to Priority Status.

"Priority Status" means the priority in distribution afforded to certain Claims pursuant to section 507(a) of the Code.

"Pro Forma Taxes" shall mean, for any year ("Current Year"), the greater of (A)(i) the difference between (x) the positive amount, if any, equal to the excess of the Partnership's taxable income (inclusive of all items required to be separately stated for federal income tax purposes) for all taxable years beginning on the date immediately following the effective date of the Amended Partnership Agreement and ending on December 31 of the same calendar year and thereafter for all taxable years beginning on the January 1 occurring immediately after the date of the Amended Partnership Agreement over the Partnership's taxable loss (so computed) for such period and for all such taxable years, and (y) all positive amounts determined under subparagraph (A)(i)(x) taken into account in all such prior taxable years, multiplied by (ii) the sum of the higher of (x) the highest federal income tax rate imposed on corporations or (y) the highest federal income tax rate imposed on individuals for such Current Year and, in either case, plus (8%) or (B)(i) the aggregate amount of TM/GP's and Holding's combined federal and state income tax liability for such Current Year (computed as if their only income, gain, loss or deduction for any period is or has been derived from, or related to transactions involving, the Partnership), divided by (ii) TM/GP's Applicable Percentage, as such liability is certified by TM/GP's chief financial officer or president in a certificate delivered to the Partners and the Partnership.

"Pro Rata" means, with respect to an Allowed Claim, the same proportion that the Allowed Amount of such Allowed Claim in any Class bears to the aggregate of: (i) the aggregate Allowed Amounts of all Claims of that particular Class; plus (ii) the aggregate Face Amounts of all Disputed Claims of that particular Class, as reduced from time to time as and to the extent that the Allowed Amounts, if any, of such Disputed Claims are determined.

"Property" means the Taj Mahal, including the real property, comprising approximately 17 acres, on which the Taj Mahal is situated, together with all of the improvements thereon; certain additional assets related to the Taj Mahal and its operations, such as furniture, furnishings and equipment and certain deposits relating thereto; a lease or sublease, as the case may be, of certain billboards owned or leased by Resorts for up to a three and one-half year period; certain permits and contracts pertaining to the Taj Mahal's construction and planned operation; certain commitments for guest bookings, conventions, meetings, reservations and entertainment identified in the Asset Purchase Agreement; any and all guaranties, warranties and service agreements (implied or express) relating to the construction, completion, equipping, operation and/or improvement of the Taj Mahal; certain security deposits and other ancillary assets; the non-exclusive right to a copy of all computer software programs which were being used by Resorts at the time of the Acquisition Closing in connection with the operation of the

Resorts Casino Hotel (unless prohibited by the applicable license agreement or applicable law); the plans, permits, rights, licenses and the like that were owned by (or leased to) Resorts at the time of the Acquisition Closing and which were acquired exclusively for use in connection with the construction and opening of the Taj Mahal; and the right to use the name "Taj Mahal".

"Proposed Regulations" means the proposed regulations of the Service dealing with the inclusion of OID in income by holders of debt instruments.

"Purchase Option" means the Partnership's option to purchase the real estate owned by Realty Corp. and leased to the Partnership, to be granted by Realty Corp. to the Partnership on the Effective Date.

"Purchase Option Assignment" means the assignment of the Purchase Option by the Partnership to the Trustee under the Indenture for the benefit of holders of New Bonds dated as of the Effective Date.

"Qualified Person" shall mean any natural person approved by the CCC to serve as director of TM/GP or Holding.

"R-EBITDA" of any Person for any period shall mean the line item labeled "Income (Loss) From Operations" plus (a) the line item labeled "Management Fees"; (b) the line item labeled "Depreciation and Amortization"; and (c) to the extent included in the line labeled "Other", any lease or rental payment as reported in the Statements of Income filed with the CCC.

"RAAP" means the accounting principles, including those relating to the form of presentation, required by the CCC to be used by casino hotels in Atlantic City, New Jersey in their financial reports to the CCC, consistently applied.

"Realty Corp." means Trump Taj Mahal Realty Corp., a New Jersey corporation.

"Record Date" means the November 1 or May 1 immediately preceding an Interest Payment Date.

"Recourse Borrowing" shall mean the amount of any funds borrowed by, or on behalf of, the Partnership, for which TTMI is liable or of which it acts as a guarantor, to the extent that the funds generated by such borrowings are used to make all or a part of the 14% Payment on the Final Payment Date; provided that such Recourse Borrowings shall be serviced as a Partnership obligation out of the assets and operations of the Partnership.

"Redemption" or any variation thereof, when used with respect to the New Bonds, shall mean a redemption pursuant to Article Four of the Indenture.

"Refunding Indebtedness" shall mean indebtedness to be used to redeem, pay, defease or purchase, at any time, all (but not less than all) of the then outstanding New Bonds or to make the 14% Payment.

"Registrants" means the Company, the Partnership and Holding.

"Regulated Company" means an entity which holds a casino license or is an intermediary or holding company of a casino licensee.

"Remaining EACF Amount" means Remaining EACF Amount as defined under "Amended NatWest Agreement—Terms" at page 131.

"Reorganization Case" means a case for the reorganization of any or all of the Debtors to be commenced under chapter 11 of the Code.

"Reorganized Debtor" means a Debtor on and after the Effective Date.

"Required Capital Expenditures" means Required Capital Expenditures as defined under "Description of New Bonds—Certain Definitions" at page 96.

"Requisite Acceptances" shall mean the following:

(a) Acceptances received from the holders of claims constituting at least two-thirds in dollar amount and more than one-half in number of the allowed Claims in each impaired Class of Claims that vote to accept or reject the Plan; and

(b) Acceptances received from the holders of at least two-thirds in amount of the allowed Interests in each impaired class of Interests that vote to accept or reject the Plan.

"Rescission" shall mean a rescission of all Defaults and Events of Defaults or any acceleration that has been declared with respect to any such event of default solicited from the holders of Old Bonds concurrent with the solicitation of Acceptances.

"Resorts" means RII and certain of its subsidiaries.

"Restricted Encumbrances" has the meaning assigned to it in the Amended Mortgage.

"Restricted Payment" means Restricted Payment as defined under "Description of New Bonds—Certain Definitions" at page 96.

"Return Event" means (a) a determination by the Neutral that no event described in parts (i), (ii), (iii) or (iv) of the definition of Transition Event has in fact occurred or, if the Neutral has determined or confirmed that such a Transition Event has occurred, the finding of a court that no such event has in fact occurred, or (b) in the case of a Transition Event described in subpart (iv)(B) of the definition of that term, the reacquisition of such Partnership Interests by curing the default that led to foreclosure, or by acquiring such Partnership Interests in the auction thereof or otherwise within 90 days of the foreclosure or (c) in the case of a Transition Event described in subpart (iv)(A) of the definition of that term, the reversal of such CCC order within 30 days. In determining whether one of the Transition Events described in parts (i), (ii) or (iii) of the definition thereof has occurred, the Neutral or a court, as the case may be, shall limit its determination solely to ascertaining the fact of the occurrence or nonoccurrence of the Transition Event and shall not consider any underlying causes, reasons or circumstances giving rise to, or explaining or excusing, such Transition Event.

"RII" means Resorts International, Inc., a Delaware corporation.

"RINJ" means Resorts International Inc. of New Jersey.

"RICO" means the Racketeer Influenced and Corrupt Organizations Act.

"Rothschild" means Rothschild Inc., financial advisor to the Steering Committee.

"Rules" means the Bankruptcy Rules, prescribed pursuant to 28 U.S.C. §2075, as amended from time to time.

"Savings Plan" means the Trump Taj Mahal Hotel & Casino Retirement Savings Plan.

"Schedules" means the schedules of assets and liabilities to be filed by the Debtors pursuant to section 521 of the Code, as they may be amended or supplemented from time to time in accordance with the Rules, Code or other applicable law.

"SEC" means the Securities and Exchange Commission.

"Second Realty Mortgage" means the second subordinated mortgage on the Specified Parcels to be granted by Realty Corp. to the Partnership, on the Effective Date.

"Second Realty Mortgage Assignment" means the assignment of the Second Realty Mortgage to the Trustee under the Indenture for the benefit of holders of New Bonds, dated as of the Effective Date.

"Second Tier Amount" on any Interest Payment Date means the difference between the Additional Amount on such Interest Payment Date and the First Tier Amount on such Interest Payment Date.

"Secured Claim" means any Claim Against the Debtors (other than an Administrative Expense Claim, Priority Claim or Tax Claim) to the extent such Claim constitutes a secured Claim under section 506 or 1111(b) of the Code.

"Securities Act" means the Securities Act of 1933, as amended.

"Senior Credit Borrowings" means Senior Credit Borrowings as definded under "Description of New Bonds—Certain Definitions" at page 97.

"Senior Debt Facilities" means Senior Debt Facilities as defined under "Description of New Bonds—Certain Definitions" at page 97.

"Senior Line of Credit" means Senior Line of Credit as defined under "Description of New Bonds—Certain Definitions" at page 97.

"Series A Bond Claims" means the Claims Against the Debtors arising under or relating to the Old Bonds including claims arising under or relating to the Partnership Note and Guaranty.

"Series A Bondholder Expense Agreement" means the agreement dated as of April 15, 1991 by and among TTMI, Trump Corp., the Company, the Partnership, the Steering Committee, Rothschild, Berlack, Israels & Lieberman and Greenberg Margolis.

"Service" means the Internal Revenue Service.

"Services" shall mean the services that Donald J. Trump is obligated to perform under the Services Agreement.

"Services Agreement" means the Services Agreement by and between Donald J. Trump and the Partnership, dated as of the Effective Date.

"Services Agreement Assignment" means the Services Agreement Assignment, dated as of the Effective Date, by and between Donald J. Trump and First Fidelity.

"Services Expenses," for any period, means the amount of expenses under the Services Agreement to which Donald J. Trump (or his designee) is entitled to reimbursement during such period.

"Services Fee," for any period, means the amount of the fee payable by the Partnership under the Services Agreement for such period.

"Showboat" means the Showboat Hotel and Casino.

"Showboat Lease" means the 99 year net lease entered into between RII, as lessor, and ACS, as lessee, dated as of October 26, 1983.

"Solicitors" means the Company and the Partnership.

"Specified Parcels" means all the real estate owned by Realty Corp.

"Standby Letter of Credit" means Standby Letter of Credit as defined under "Description of New Bonds—Certain Definitions" at page 97.

"Standby Line of Credit Borrowings" means Standby Line of Credit Borrowings as defined under "Description of New Bonds—Certain Definitions" at page 97.

"Stated Maturity," when used with respect to any Bond, means the date specified in such Bond as the fixed date on which the principal of such Bond is due and payable.

"Steering Committee" means the unofficial bondholders steering committee formed in September 1990 or the official committee of creditors appointed pursuant to section 110c of the Code, as the context requires.

"Subcontractors" means those certain Persons named on Exhibit B to the Subcontractors' Agreement.

"Subcontractors' Agreement" means the Agreement dated September 6, 1990 among the Persons listed on Exhibit B thereto, the Partnership, Nicholas L. Ribis, Esq. and John W. Daniels, Esq. as trustee, as amended on December 14, 1990.

"Subcontractors' Claims" means the Claims Against the Debtors arising under or relating to the Subcontractors' Agreement.

"Subsidiary" means Subsidiary as defined under "Description of New Bonds—Certain Definitions" at page 97.

"Taj Mahal" shall mean the Trump Taj Mahal Casino-Resort located in Atlantic City, New Jersey.

"Tax Claim" means any Claim Against the Debtors for taxes entitled to Priority Status held by any federal, state or local governmental unit.

"Termination of Management Agreement" means the agreement between THMC and the Partnership to be executed on the Effective Date.

"Terrace Building" means the office building located on South Pennsylvania Avenue owned by the Partnership.

"Theater" means the theater building leased by the Partnership from Realty Corp. subject to a right of reverter in favor of the Housing Authority.

"Theoretical Fair Share" shall mean for any period a fraction. the numerator of which is (x) the monthly weighted average gaming units of the Taj Mahal during such period and the denominator of which is (y) the monthly weighted average gaming units of the Existing Casinos during such period; provided. however, that any reduction in the number of gaming units at the Taj Mahal (other than the elimination of gaming units which cannot lawfully be used) shall not reduce the calculation in clause (x) of this definition.

"Theoretical Taj Market Share" shall mean the following: (x) for the 1992 Budget Period. the lesser of (i) the product of 1.05 and the Actual Taj Mahal Share for the 1991 calendar year. and (ii) the product of 0.95 and the Theoretical Fair Share of the New Budget Period: (y) for the 1993 Budget Period. the lesser of (i) the product of 1.05 and the Actual Taj Market Share for the Old Budget Period and (ii) the Theoretical Fair Share of the New Budget Period: and. (z) for the remaining Budget Periods. the lesser of (i) the Actual Taj Market Share for the Old Budget Period and (ii) the Theoretical Fair Share for the New Budget Period.

"THMC" means Trump Hotel Management Corporation. a New Jersey corporation.

"TM/GP" means TM/GP Corporation. a New Jersey corporation.

"TM/GP Class B Directors" shall mean the directors of TM/GP elected by the holders of the TM/GP Class B Stock.

"TM/GP Class C Directors" shall mean the directors of TM/GP elected by the holders of the TM/GP Class C Stock.

"TM/GP Common Stock" means the TM/GP Class B Stock and the TM/GP Class C Stock.

"Total Interest Expense" means Total Interest Expense as defined under "Description of New Bonds—Certain Definitions" at page 97.

"Transferee" shall mean each Person who pursuant to the terms of the Amended Partnership Agreement acquires a Partnership Interest from TTMI. TM/GP. or Trump Corp.. or from a Transferee of TTMI. TM/GP. or Trump Corp.

"Transition Event" shall mean any one of the following events before the Final Payment Date:

(i) the failure to pay the Trustee under the Indenture any interest on. or principal of. the New Bonds or to pay the NatWest Debt when due. or the failure to make payments under the Amended Lease when due;

(ii) the breach of the provisions of the TM/GP Amended and Restated Certificate of Incorporation requiring the approval of a majority of the Board of Directors. including a majority (or in the case of (B) below. all) of the Class B Directors before the following actions may be undertaken:

(A) the merger. consolidation or other combination of the Partnership or TM/GP with any other entity;

(B) the filing by the Partnership or TM/GP of a petition under the Code or any similar state law filing or insolvency proceeding; and

(C) any amendment to or modification of the Amended Partnership Agreement. the Amended and Restated Certificate of Incorporation or Amended and Restated By-Laws of TM/GP.

(iii) the filing of a lawsuit against the Neutral. in his capacity as Neutral. or in violation of the TM/GP Amended and Restated Certificate of Incorporation by Donald J. Trump. except for a lawsuit seeking to compel the Neutral to perform his duties in such capacity;

(iv) the written determination signed by a majority of the TM/GP Class B Directors that:

164

(A) the CCC has entered an order stating that Donald J. Trump is no longer a Qualified Person or suspending such status (a "License Revocation");

(B) the partnership interests held by TTMI and Trump Corp. have been transferred to any Person having a security interest therein upon the foreclosure of such security interest or in lieu of such foreclosure;

(C) any long-term Indebtedness of the Partnership for borrowed money has been accelerated following a default thereon and such acceleration has not been rescinded;

(D) a bankruptcy petition has been filed by or against Donald J. Trump personally and, in the case of a petition filed against Donald J. Trump, has remained unvacated for 60 days;

(E) Donald J. Trump has sold, directly or indirectly through the sale of shares of TTMI or otherwise, all or a portion of the Partnership Interest beneficially owned by him unless any one of the following conditions is satisfied: (x) Donald J. Trump remains in control (it being understood that the determination of whether Donald J. Trump remains in control shall be made by the Neutral and not the TM/GP Class B Directors) of the Partnership, and beneficially owns at least 25% of the economic equity interest in the Partnership and has sold, or concurrently sells, directly or indirectly, at least an equal percentage of the total equity interest he beneficially owned in all other casinos at the time he sold the Partnership Interest; (y) the sale of the Partnership Interest was approved by the holders of all of the TM GP Class B Stock; or (z) the Partnership shall have purchased or the Company redeemed for cash all of the then outstanding New Bonds at par plus accrued and unpaid interest to the date of purchase or redemption;

(F) the Partnership has (x) used any proceeds from borrowings under the Senior Line of Credit for any purpose other than paying interest on the New Bonds, (y) borrowed more than $25,000,000, net of repayments, under the Senior Line of Credit in any calendar year, or (z) borrowed any amount under the Senior Line of Credit at a time when the Standby Letter of Credit is not in full force and effect;

(G) breach of the provisions of the TM/GP Amended and Restated Certificate of Incorporation requiring the approval of a majority of the Board of Directors, including a majority of the Class B Directors before the following action may be undertaken:

(I) the appointment or removal of the Chief Executive Officer, the Chief Financial Officer or the Chief Operating Officer of the Partnership or TM GP;

(II) the adoption of a Budget;

(III) any Capital Expenditure; or

(IV) any modification of the policy of the Partnership with respect to the extension of credit to casino gaming patrons as filed with the CCC;

(v) the written determination signed by a majority of the Class B Directors that a Cash Flow Shortfall Event has occurred and a determination by the Neutral that such Cash Flow Shortfall Event was not caused by an event of Force Majeure, the burden of proof of which shall be on the Class C Directors; or

(vi) the written determination signed by a majority of the Class B Directors, along with the determination by the Neutral, that:

(A) Donald J. Trump or any Person acting in concert with Donald J. Trump has taken some willful action that is in violation of the Services Agreement and has had a material adverse effect upon the business of financial affairs of the Taj Mahal;

(B) Donald J. Trump has willfully breached his obligations under the Services Agreement and such breach has had a material adverse effect upon the business or financial affairs of the Taj Mahal;

(C) breach of the provisions of the TM/GP Amended and Restated Certificate of Incorporation requiring the approval of a majority of the Board of Directors, including a majority of the Class B Directors before the following actions may be undertaken:

(I) any transaction between the Partnership on one hand and any Affiliate of the Partnership (other than TM/GP) on the other hand;

(II) any transaction between TM/GP on the one hand and any Affiliate of TM/GP (other than the Partnership) on the other hand, other than the payment of indemnification, fees to directors, or dividends in accordance with TM/GP's Amended and Restated Certificate of Incorporation and Amended and Restated By-Laws;

(III) (i) any disposition of assets of the Partnership or TM/GP in any single transaction or series of transactions (A) other than in the ordinary course of business or (B) having a value greater than $10,000,000 or (ii) the granting of any lien or security interest thereon, except as permitted by Section 12.05 of the Indenture;

(IV) the issuance, redemption, exchange or modification of the terms of any Indebtedness or equity of the Partnership or any Indebtedness or equity of TM/GP, except in the case of the Partnership (i) as permitted by the proviso clause at the end of Section 12.04(a) of the Indenture (other than New Parking Financing), (ii) Refunding Indebtedness and (iii) equity redemptions and transfers permitted by the Amended Partnership Agreement;

(V) the engagement by the Partnership or TM/GP in any business not in the ordinary course of business and incident to owning and operating the Taj Mahal and activities relating thereto;

(VI) the taking of any action with respect to the Company;

(VII) any borrowing under the Working Capital Facility in excess of $5,000,000, other than borrowings used to pay or discharge liabilities to patrons in respect of gambling winnings; or

(VIII) any modification of the terms and arrangements of the Partnership's liability insurance;

(D) Donald J. Trump or any Person acting in concert with Donald J. Trump willfully and materially violates the policy of the Partnership with respect to the extension of credit to casino gaming patrons as filed with the CCC;

(E) A material breach of the Indenture provisions regarding the incurrence of additional debt; and

(F) The filing of a lawsuit against the Neutral, in his capacity as Neutral, or in violation of the TM/GP Amended and Restated Certificate of Incorporation by any Person acting in concert with Donald J. Trump or, before a Transition Event, the Partnership, except for a lawsuit seeking to compel the Neutral to perform his duties in such capacity.

"Trump Air" means Helicopter Air Services, Inc. (d/b/a/ Trump Air).

"Trump Castle" means Trump's Castle Casino Resort.

"Trump Completion Guaranty" means the guaranty of Donald J. Trump furnished to the Trustee for the benefit of the Holders of the Old Bonds guaranteeing the completion of the construction of the Taj Mahal.

"Trump Corp." means The Trump Taj Mahal Corporation, a Delaware corporation.

"Trump Corp. Common Stock" means all of the issued and outstanding shares of common stock of Trump Corp. as of the Filing Date.

"Trump Line of Credit" means the $25,000,000 advanced to the Partnership by Donald J. Trump.

"Trump Line of Credit Claims" means Claims Against the Debtors arising under the Trump Line of Credit Note.

"Trump Line of Credit Note" means the $25,000,000 Line of Credit Note, dated April 30, 1990, executed by the Partnership, as maker, to Donald J. Trump, as payee.

"Trump Plaza" means Trump Plaza Hotel and Casino.

"Trump Pledged Equity" means the interest of Donald J. Trump in the capital stock of TTMI. Realty Corp. and Trump Corp., TTMI's Partnership interests, one-half of Trump Corp.'s Partnership Interests and the Class C Stock, pledged to certain secured parties and securing certain indebtedness of Donald J. Trump.

"Trump Regency" means Trump Crystal Tower Associates Limited Partnership (d/b/a Trump Regency).

"Trump Shuttle" means Trump Shuttle, Inc.

"Trump Taj Mahal Equity" means Trump Taj Mahal Equity as defined under "Description of New Bonds—Certain Definitions" at page 98.

"Trust Estate" means Trust Estate as defined under "Description of New Bonds—Certain Definitions" at page 99.

"Trust Indenture Act" means the Trust Indenture Act of 1939.

"Trustee" means First Bank National Association and its successors.

"TTMF Common Stock" means all the issued and outstanding shares of common stock of the Company as of the Filing Date.

"TTMI" means Trump Taj Mahal, Inc., a New Jersey corporation.

"TTMI Common Stock" means all the issued and outstanding shares of common stock of TTMI as of the Filing Date.

"Unit" means $1,000 principal amount of the Company's New Bonds together with one share of Holding Class B Stock which may only be transferred as a Unit.

"Unsecured Claim" means any Claim Against the Debtors other than an Administrative Expense Claim, Priority Claim, Tax Claim, Secured Claim or other Claim classified pursuant to the Plan.

"Variable Amount" means a portion of the Bond Cash Payment up to $.02653 per day per $1,000 principal amount of Old Bonds calculated from April 1, 1991 to the date immediately preceding the Effective Date, but only to the extent that the Pre-Effective Deposit Requirement exceeds the sum of (i) the Fixed Amount, (ii) the First Fidelity Cash Payment, (iii) the NatWest Cash Payment, and (iv) the Carryforward Amount.

"Voting Record Date" means the date listed on the cover of this Prospectus as of the record date for determining which holders of Old Bonds are eligible to vote on the Plan.

"Waivers" means the waivers of all Defaults and Events of Default under the Old Indenture, solicited concurrently with the solicitation of Acceptances.

"Warehouse" means all the real property owned by Realty Corp. that was not mortgaged to secure the First Fidelity Agreement.

"Warehouse Mortgage" means the first mortgage on the Warehouse to be granted to First Fidelity on the Effective Date.

"Working Capital" means Working Capital as defined under "Description of New Bonds—Certain Definitions" at page 98.

"Working Capital Borrowings" means Working Capital Borrowings as defined under "Description of New Bonds—Certain Definitions" at page 98.

"Working Capital Facility" means Working Capital Facility as defined under "Description of New Bonds—Certain Definitions" at page 98.

## LEGAL MATTERS

Certain legal matters in connection with the securities offered hereby are being passed upon for the Registrants by Willkie Farr & Gallagher, New York, New York who will rely upon an opinion of Ribis, Graham & Curtin, Morristown, New Jersey as to matters of New Jersey law.

## EXPERTS

The audited historical financial statements and schedules included in this Prospectus and elsewhere in the Registration Statement have been audited and the financial forecast included in this Prospectus has been examined by Arthur Andersen & Co., independent public accountants, as indicated in their reports with respect thereto, and are included herein in reliance upon the authority of said firm as experts in giving said reports. Reference is made to said reports which include an explanatory paragraph that describes the matters discussed in Notes 2 and 7 to the historical financial statements.

On June 27, 1990, the Company engaged Kenneth Leventhal & Company and dismissed Arthur Andersen & Co. as its independent public accountant. On August 14, 1990, the Company engaged Arthur Andersen & Co. and dismissed Kenneth Leventhal & Company as its independent public accountant.

The decision to change accountants was recommended by the Board of Directors of the Company. There have been no disagreements with Arthur Andersen & Co. or Kenneth Leventhal & Company on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure in connection with the audits of the Company's financial statements.

The statements as to matters of law and legal conclusions concerning New Jersey gaming laws included under the captions "Risk Factors—Regulatory Matters" and "Business—Gaming and Other Laws and Regulations" have been prepared by Ribis, Graham & Curtin, gaming counsel for the Registrants, and are included herein upon their authority as experts. Nicholas L. Ribis, counsel to Ribis, Graham & Curtin, is an executive officer of the Partnership. See "Management."

ANNEX A

## DESCRIPTION OF THE OLD BONDS

The following is only a summary of the terms of the Old Bonds. and is qualified in its entirety by reference to the Old Indenture and Old Mortgage. copies of which have been made Exhibits to the Registration Statement of which this Prospectus is a part. The terms of the Old Bonds include those stated in the Old Indenture and those made part of the Old Indenture by reference to the Trust Indenture Act of 1939 as in effect on the date of the Old Indenture (the "Trust Indenture Act"). Unless otherwise specified. references to Articles and Sections are to Articles and Sections of the Old Indenture. The definition of certain terms used herein are set forth in "Certain Definitions" below in this section.

### General

The Old Bonds were issued under the Old Indenture. The Old Indenture also authorizes the issuance of bonds of additional series. all of which will be secured on a *pari passu* basis with the Old Bonds. under the circumstances described below. The Old Bonds have a stated maturity of November 15, 1998. The Old Bonds bear interest from their date of issue at the rate per annum of 14%, payable on May 15 and November 15 in each year, commencing May 15. 1989. to holders of record of such Old Bonds at the close of business on the first day of the calendar month of each such interest payment date. The Old Bonds were issued in denominations of $1,000 and integral multiples thereof. The Old Bonds are secured obligations of the Company and payment is guaranteed by the Partnership. See "Security" and "Guaranties" below in this section. The authorized principal amount of the Old Bonds is $675.000.000.

The principal of. premium, if any, and interest on the Old Bonds are payable at the office of the Trustee in New York. New York or at an office or agency of the Company in the Borough of Manhattan. City and State of New York. At the option of the Company. interest will be paid by check mailed to each holder of Old Bonds at his registered address. The Old Bonds may be presented for registration of transfer and exchange at such office of the Trustee in New York. New York. (Section 3.07)

### Certain Definitions

The following are summaries and extracts of certain definitions in the Old Indenture or the Old Mortgage. modified for use in this Prospectus. which are referred to in this Description of the Old Bonds. These terms are defined and to be used for purposes of this Annex A only.

*"Affiliate"* of any specified person means any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person. and with respect to any specified natural person. any other person having a relationship with such specified person by blood, marriage or adoption not more remote than first cousin. For purposes of this definition. "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise: and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

*"Amortization,"* for any period, means, as applied to any person, the amount of the amortization of goodwill and other intangible items (other than amortization of debt discount and capitalized financing fees) that is reflected on the financial statements of such person and its consolidated subsidiaries for such period in accordance with generally accepted accounting principles consistently applied.

*"Appraised Value"* means the value of the Taj Mahal and its ancillary facilities owned by or leased to the Partnership (including the furniture, fixtures and equipment therein) as determined by one MAI appraiser on the basis of an appraisal in conformity with the criteria set forth at §§12 C.F.R. 563.17-1a and 571.1b or such similar published policy or regulation as from time to time governs real estate loans by federally insured thrift institutions, *provided* that the value of the Taj Mahal and such ancillary

facilities shall not include the value (a) of any furniture, fixtures and equipment therein to the extent of the Outstanding Amount of any Indebtedness secured by purchase money liens on such furniture, fixtures and equipment permitted under the Old Indenture, (b) of any portion of the real property or any structure located thereon to the extent of the Outstanding Amount of any Indebtedness secured by mortgages on such property or structure, the liens of which are senior to the lien of the Old Mortgage and (c) the value of any leasehold interest (as lessee) of the Partnership if such leasehold interest is terminable other than by reason of the lessee's action or failure to act, prior to the stated maturity of the Old Bonds. At any time that any construction with respect to the Taj Mahal or such ancillary facilities is in process, the "Appraised Value" will be the pro forma Appraised Value giving effect to completion of such construction to the extent permitted by such policy or regulation.

*"Assignment Agreement"* means the Assignment Agreement providing for the assignment of the Partnership Note, the Old Mortgage and the Trump Completion Guaranty, as well as certain rights under the Trump Line of Credit, to the Trustee by the Company, and acknowledgment thereof by the Partnership.

*"Available Cash Flow"* means, for any period, the following for such period as determined in accordance with generally accepted accounting principles consistently applied (except to the extent such principles may require a reserve for expenditures listed in (c) hereof and except as provided in this definition): the Consolidated Net Income of the Partnership plus depreciation expense, Amortization, the amortization of debt discount and capitalized financing fees, the amount of discount charged on CRDA Bonds, any realization reserves on CRDA Bonds and the provision for uncollected casino receivables (net of write-offs) of the Partnership and its subsidiaries for such period on a consolidated basis, and, without duplication, less (a) the amount of accretion on CRDA Bonds and the amount deposited by the Partnership for the purchase of CRDA Bonds during such period, (b) any scheduled principal repayments by the Partnership and its subsidiaries of Debt of the Partnership and its subsidiaries in such period and (c) any expenditures by the Partnership and its subsidiaries during such period for capital improvements, additions or alterations to the Taj Mahal or ancillary facilities, including any facilities leased to the Partnership (including the amount of any interest capitalized by the Partnership and its consolidated subsidiaries for such period) (except to the extent (1) that any such expenditures are financed by Indebtedness incurred by the Partnership or any of its subsidiaries for that purpose, in which event the principal repayments of such Indebtedness during the period will be included in the amount referred to in clause (b) above, and (2) if the Partnership or any of its subsidiaries has disposed of any obsolete or excess equipment during such period, of the proceeds from such disposition up to the book value (as depreciated in accordance with generally accepted accounting principles consistently applied) of such equipment as recorded on the consolidated financial statements of the Partnership at the end of the fiscal quarter immediately prior to such disposition) or for furniture, fixtures and equipment for the Taj Mahal or its ancillary facilities (except to the extent (1) that any such expenditures are financed by Indebtedness incurred by the Partnership or any of its subsidiaries, which Indebtedness is capitalized on the consolidated financial statements of the Partnership, in which event the principal repayments of such Indebtedness during the period will be included in the amounts referred to in clause (b) above, and (2) if the Partnership or any of its subsidiaries has disposed of any furniture, fixtures or equipment during such period, of the proceeds, to the extent not included in subclause (c)(2) above, from such disposition up to the book value (as depreciated in accordance with generally accepted accounting principles consistently applied) of such furniture, fixtures or equipment as recorded on the consolidated financial statements of the Partnership at the end of the fiscal quarter immediately prior to such disposition). "Available Cash Flow," for any period, will be increased or decreased by the amount by which the account for deferred income taxes on the consolidated balance sheet of the Partnership has increased or decreased, as the case may be, from the first day of such period to the last day of such period. "Available Cash Flow", to the extent not already included in such Consolidated Net Income, also includes remaining proceeds of insurance or condemnation awards following a restoration in accordance with the Old Mortgage. "Available Cash Flow," for any period, shall be increased, to the extent not already included in such Consolidated Net Income, by any reimbursement from the lessor of any ancillary facility of the Taj Mahal leased to the Partnership pursuant to the Old Indenture for any expenditure made by the Partnership relating to such ancillary

facility that had previously been deducted from Available Cash Flow pursuant to clause (b) or (c) above.

"*Capitalized Lease Obligation*" means. of any person. any lease of any property (whether real. personal or mixed) by such person as lessee which. in conformity with generally accepted accounting principles consistently applied. is accounted for as a capital lease on the balance sheet of such person.

"*Consolidated Net Income.*" for any period. means. as applied to any person. the Net Income (or loss) of such person and its subsidiaries for such period determined on a consolidated basis in accordance with generally accepted accounting principles consistently applied excluding (i) the portion of consolidated net income allocable to minority interests in unconsolidated subsidiaries to the extent that cash dividends or distributions have not actually been received by such person and (ii) Net Income (or loss) of any entity combined with such person on a "pooling of interests" basis attributable to any period prior to the date of combination.

"*Construction Fee*" means (i) the $10,000,000 fee payable on or after the Opening Date by the Partnership for construction supervisory services relating to the construction of the Taj Mahal pursuant to the Management Agreement and (ii) the fee payable on or after substantial completion of any Future Project (as defined under "Management Agreement") by the Partnership pursuant to the Management Agreement for construction supervisory services relating to the construction of any such Future Project in an amount equal to 3% of the Construction Cost (as defined under "Management Agreement") of any such Future Project.

"*Coverage Ratio.*" for any period. means. as applied to any person. the ratio of (i) Consolidated Net Income of such person and its consolidated subsidiaries plus depreciation expense. Amortization. Total Interest Expense and Income Tax Expense of such person and its consolidated subsidiaries to (ii) Total Interest Expense of such person and its consolidated subsidiaries plus the amount of any capitalized interest of such person and its consolidated subsidiaries as reflected on the consolidated financial statements of such person for such period.

"*CRDA Bonds*" mean those investments required by Section 144.1 of the Casino Control Act. including deposits for the purchase of bonds issued by the Casino Reinvestment Development Authority in lieu of the purchase of such bonds.

"*Debt*" means. as applied to any person. at any point in time. all Indebtedness created. assumed or guaranteed by such person. including. with respect to the Partnership. any Trump Indebtedness and Trump Borrowings.

"*Financing Default*" means any Event of Default under the Old Indenture or Old Mortgage. any default in any money payments under the Old Indenture. any default as a result of an admission in writing by Donald J. Trump (only during the term of the Trump Completion Guaranty or the Trump Line of Credit. whichever is longer). the Company. the Partnership or any of the Partnership's subsidiaries of its or his inability to pay its or his debts generally as they become due or certain involuntary events of bankruptcy, insolvency or reorganization relating to Donald J. Trump (only during the term of the Trump Completion Guaranty or the Trump Line of Credit, whichever is longer) the Company. the Partnership or any of the Partnership's subsidiaries. any event described in clauses (f). (g) and (j) under "Events of Default and Notice Thereof" below in this section involving any nonpayment of money (prior to the elapse of any time period). or any event described in clause (c) under "Events of Default and Notice Thereof" below in this section (but only after notice of such default has been given by the Trustee or the Holders as provided therein), a default in the performance. or breach. of any covenant of the Old Mortgage (other than a covenant, a default in the performance or breach of which is otherwise addressed in this definition) or the impairment of the security of the Old Mortgage because any representation or warranty of the Partnership in the Old Mortgage is incorrect (but only after the notice of each such default, breach or impairment has been given by the Trustee or the Holders as provided in the Old Mortgage) or any default described in clauses (a) and (d) under "The Mortgage—*Events of Default*" below in this section.

"*Force Majeure Delay*" means any delay due to weather. fire, strikes, acts of God. inability to obtain labor or materials. governmental restrictions. enemy action. civil commotion or unavoidable casualty. or other cause beyond the reasonable control of the party to whom such delay applies.

provided, however, that any lack of funds shall not be deemed a cause beyond the reasonable control of such party, and provided further that inability to obtain labor and/or inability to obtain materials shall not be deemed a Force Majeure Delay if it would be reasonable under the circumstances (taking into account the importance and necessity of completing the Taj Mahal and its ancillary facilities at the earliest possible date) to substitute for the labor or materials not yet obtained other labor or materials then obtainable.

*"Income Tax Expense,"* for any period, means, as applied to any person, the provision for federal, state or local income taxes of such person and its consolidated subsidiaries as reflected on the consolidated financial statements for such person for such period prepared in accordance with generally accepted accounting principles consistently applied.

*"Indebtedness"* means, as applied to any person, any indebtedness, exclusive of deferred taxes, in respect of borrowed money (whether or not the recourse of the lender is to the whole of the assets of such person or only to a portion thereof), or evidenced by bonds, notes, debentures or similar instruments or letters of credit, or representing the balance deferred and unpaid of the purchase price of any property, if and to the extent such indebtedness would appear as a liability upon a balance sheet of such person prepared in accordance with generally accepted accounting principles consistently applied, and shall also include any Capitalized Lease Obligations of such person and, with respect to the Partnership, any Trump Indebtedness and Trump Borrowings.

*"Management Expenses,"* for any period, means the amount of expenses under the Management Agreement to which THMC is entitled to reimbursement during such period.

*"Management Fee,"* for any period, means the amount of the fee payable by the Partnership under the Management Agreement for such period equal to 1¾% of the gross revenues (as defined in the Management Agreement) of the Partnership.

*"Old Mortgage Debt"* means, at any point in time, the Partnership Note and any Additional Financing, any Unrestricted Financing or Trump Indebtedness to the extent secured by a lien on the Trust Estate, and any New Parking Financing.

*"Net Income,"* for any period, means, as applied to any person, the net income (loss) of such person for such period, determined in accordance with generally accepted accounting principles consistently applied (except as provided in this definition), which shall reflect any intercompany charges of any Affiliate of such person properly allocable to such person under generally accepted accounting principles consistently applied, excluding from "Net Income," however, (i) any gain or loss, net of taxes, realized upon any sale, transfer or other disposition (including by way of merger or consolidation) by such person of any property, other assets, debt or other liabilities of such person outside of the ordinary course of business (other than any sale or disposition of obsolete or excess equipment or furniture, fixtures or equipment) and (ii) any extraordinary gain or loss, net of taxes, in each case as determined in accordance with generally accepted accounting principles consistently applied. "Net Income," for any period, means, with respect to any property or asset, the historical net income (loss) of such property or asset during such period, adjusted to give effect for the effective tax rate of the Partnership for the applicable period, determined in accordance with generally accepted accounting principles consistently applied.

*"Opening Date"* means the first day on which substantially all of the Taj Mahal is open to the public for gaming business after all gaming permits required in connection with such opening have been obtained.

*"Outstanding Amount"* of any Indebtedness at any time means the principal amount outstanding of such Indebtedness at such time, unless such Indebtedness was issued at a discount, in which case the "Outstanding Amount" of such Indebtedness means the original issue price of such Indebtedness plus the accretion to such time of the original issue discount, determined in accordance with generally accepted accounting principles consistently applied.

*"Permitted Encumbrances"* means (i) liens for taxes, assessments or governmental charges which are not yet due and payable or if due and payable are not delinquent to the extent that any fine, penalty, interest or cost may be added for the nonpayment thereof, (ii) the lien created by the Old Mortgage and related documents and any rights granted therein, (iii) purchase money liens upon any

A-4

personal property purchased or leased by the Partnership. provided that the principal amount of the Indebtedness secured by such lien shall not exceed 80% of the cost to the Partnership of such property at the time of acquisition. (iv) liens on the Trust Estate or any portion thereof that are permissible under the Old Indenture as described in "Certain Covenants of the Company and the Partnership— *Limitations on Liens on the Trust Estate*." "—*New Parking Financing*" and "—*Unrestricted Financing*" below in this section. (v) the lien of the Trustee under the Old Indenture. (vi) certain leases. easements and rights-of-way permitted by and made in accordance with the terms of the Old Mortgage and (vii) the exceptions that appear in the marked-up title binder delivered to the Trustee at the closing.

"*Restricted Payment*" means. as applied to any person. (i) any dividend or other distribution of assets. properties. cash. rights. obligations or securities paid. made. declared or authorized by such person on or in respect of any class of such person's capital stock or such person's partnership interest. as the case may be. (ii) any payment by or on behalf of such person or by any subsidiary of such person in connection with the redemption. purchase. retirement or other acquisition of any shares of such person's capital stock or such person's partnership interest. as the case may be. (iii) any advances or loans to. or guaranties of any Indebtedness of. any other person by such person. (iv) any capital contribution to. or other debt or equity investment in. an Affiliate (other than a wholly owned subsidiary) and (v) with respect to the Partnership. any repayment of any Trump Indebtedness and any payment of interest on or principal of Trump Borrowings: *provided. however.* that "Restricted Payment" shall not include (a) guaranties by the Partnership of any Indebtedness of any of the Affiliates of the Partnership if the proceeds of such Indebtedness are borrowed by the Partnership in accordance with the terms of the Old Indenture. (b) in respect of the Company. the loans evidenced by the Partnership Note. (c) any redemption of any class of capital stock or partnership interest of such person. if such person receives an opinion of counsel that failure to redeem such capital stock or partnership interest would subject such person or any of its subsidiaries to an adverse action or failure to act by a Gaming Authority and. in the opinion of the board of directors or general partner of such person. such adverse action or failure to act would be likely to have a material adverse effect with respect to such person or subsidiary. (d) loans to employees of such person actively involved in the operation of the Taj Mahal or the engagement of such person in credit transactions in the operation of the Taj Mahal. if such loans or credit transactions are in the ordinary course of business and (e) the Management Fee. Construction Fee and Management Expenses which are payable only to the extent set forth under "Payment of Management and Construction Fees" below. For purposes of this definition. "capital stock" and "partnership interest" shall include warrants. rights and options to acquire shares of capital stock or partnership interests. as the case may be. and "Gaming Authority" shall mean any governmental agency which regulates gaming in a jurisdiction in which the person or its subsidiary conducts gaming activities and which has jurisdiction over such person or subsidiary.

"*Stated Rent*" means. with respect to any property. an annual rent equal to the sum of (i) the amount of interest and principal payable during such year on any Indebtedness incurred (other than by the lessee) to effect the acquisition or improvement of. or construction on. such property. provided that in the case of any lease of property that consists of all or a portion of the Steel Pier. the Partnership will not be required to pay interest on or principal of. more than $50.000.000 of Indebtedness. (ii) an amount equal to the amount required to provide the lessor with a return on its equity in such property at a rate equal to the average annual interest cost payable by the lessor on the Indebtedness incurred to construct. acquire or improve such property. and (iii) all other amounts such as. for example. real estate taxes. insurance. cost of repairs or reconstruction. which are customarily paid by a lessee under a completely net lease. In the event that the lessor under such lease shall incur additional Indebtedness and/or invest additional equity during the term of such lease to effect the further improvement of. or additional construction on. such property. the annual rent payable thereunder shall be increased in accordance with the foregoing formula.

"*Total Interest Expense.*" for any period. means. as applied to any person. the (i) consolidated interest expense as reflected on the consolidated financial statements of such person (without deduction of interest income) for such period. including. without limitation. the amortization of debt discounts and the interest portion of any deferred payment obligation. in each case calculated in accordance with the effective interest method of accounting. (ii) the interest component of rentals in respect of Capitalized Lease Obligations. paid. accrued and/or scheduled to be paid or accrued by such person and

its consolidated subsidiaries during such period and (iii) one-third of the Total Operating Lease Obligations paid. accrued and/or scheduled to be paid or accrued by such person and its consolidated subsidiaries during such period, determined on a consolidated basis in accordance with generally accepted accounting principles consistently applied. For purposes of this definition. interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by the chief financial officer of such person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with generally accepted accounting principles consistently applied.

"*Total Operating Lease Obligations*," for any period. means. as applied to any person. the aggregate amount of fixed or percentage rent (including, if any. any payments to cover interest and principal on any Debt of the lessor and. in the case of leases with Affiliates. the return on equity included within the amount of Stated Rent but excluding taxes and insurance costs and all other items of additional rent) payable by such person and its consolidated subsidiaries under leases of land. buildings. other land improvements. furniture. fixtures. equipment and other property (including amounts estimated to be payable by reason of any contingent liability for the performance of obligations of others under such leases) during such period (other than Capitalized Lease Obligations). as determined in accordance with generally accepted accounting principles consistently applied.

"*Trump Borrowings*" means all amounts borrowed by the Partnership from Donald J. Trump under the Trump Line of Credit.

"*Trump Indebtedness*" means any sums advanced or paid by Donald J. Trump pursuant to the Trump Completion Guaranty as to which Donald J. Trump is entitled to reimbursement thereunder.

"*Trust Estate*" means the property which is covered or intended to be covered by the lien of the Old Mortgage as security for the Partnership Note and pursuant to the Assignment Agreement. as collateral security for payment and performance under the Old Indenture and the Old Bonds.

"*Working Capital*" means. at any point in time. as applied to any person. the excess of (i) cash (including short-term money market securities) plus marketable securities. receivables. inventories and prepaid expenses (but shall not include any assets held for sale) of such person and its consolidated subsidiaries over (ii) accounts payable and accrued liabilities of such person and its consolidated subsidiaries. all as determined in accordance with generally accepted accounting principles consistently applied.

## Security

The Old Bonds are secured by an assignment to the Trustee. for the benefit of the Bondholders. of the Partnership Note. (Section 6.01) The Partnership Note contains interest. principal. redemption. and default terms which are virtually identical to those of the Old Bonds to which it relates. The Partnership Note is secured by the Old Mortgage. which has been assigned to the Trustee and encumbers the Partnership's interest in the Taj Mahal. any New Parking Facility or certain other facilities owned by or leased to the Partnership. any additions and improvements constructed thereon and the interest of the Partnership in furniture. furnishings. fixtures. machinery and equipment at any time forming a part thereof, or used in connection therewith. and the other assets of the Partnership except as described below. Certain of the assets covered by the Old Mortgage have also been assigned to the Company pursuant to separate documents. which assignment documents have also been assigned to the Trustee as security for the Old Bonds. The Old Mortgage represents a first lien and security interest on the Taj Mahal and such other assets (subject to certain Permitted Encumbrances). In addition, both the Partnership's rights against Donald J. Trump under the Trump Line of Credit (but not the right to any proceeds therefrom) and the Company's rights under the Trump Completion Guaranty have been assigned to the Trustee as further security for the Old Bonds. See "The Old Mortgage" below in this section.

Any additional series of bonds will be secured by the assignment of additional notes issued by the Partnership ("Additional Notes") to the Company to evidence the borrowing by the Partnership of the proceeds of the sale of such additional series. Such Additional Notes will also be secured by the Old Mortgage on a *pari passu* basis.

Cash and Permitted Investments held by the Partnership are not included within the Collateral. In addition, certain of the Partnership's intangible assets that may be significant to its operations, such as computer software licenses, are by their terms not assignable and, accordingly, are not included in the property subject to the Old Mortgage.

The Old Indenture contains certain covenants limiting the ability of the Partnership to incur Debt, including Old Mortgage Debt secured by liens on the Taj Mahal. However, the Old Indenture permits the incurrence of up to $35,000,000 of additional Debt by the Partnership in connection with the construction or acquisition of, or the making of capital improvements to, New Parking Facilities on property owned by or leased to the Partnership ("New Parking Financing") which may be secured by mortgages on such property which may be senior or junior to or on a parity with the lien of the Old Mortgage. In addition, subject to certain limitations, the Old Indenture permits the creation of additional mortgages on the Taj Mahal, the liens of which may be equal in priority or junior to the lien of the Old Mortgage. See "Certain Covenants of the Company and the Partnership" below in this section. The lien and security interest of the Old Mortgage may be subordinated to security interests in furniture, fixtures and equipment acquired by the Partnership that may be granted in connection with the acquisition of such assets, provided that the Indebtedness (other than existing Indebtedness) does not exceed 80% of the cost of such furniture, fixtures and equipment, and certain of the Partnership's tangible personal property may be leased rather than owned. If any such security interest prohibits subordinate liens, or any such lease, in accordance with customary practices, prohibits assignments, the property in question will not be included in the property subject to the Old Mortgage.

If there is an Event of Default under the Old Indenture, the Partnership Note or the Old Mortgage, the Trustee may exercise its right to foreclose on the Trust Estate and force its sale, and the holders of Old Bonds will only be entitled to receive those proceeds from such sale in excess of the amounts due and owing (a) any holder of a lien on any portion of the Trust Estate securing Indebtedness which is senior to the lien of the Old Mortgage and (b) the Trustee for its services pursuant to the terms of the Old Indenture. All holders of liens in parity with the lien of the Old Mortgage will have a right to share such proceeds ratably with the Bondholders. The Trustee also has the right to take possession of, construct and operate the Taj Mahal and to call upon Donald J. Trump under the Trump Completion Guaranty and the Trump Line of Credit. If the Trustee takes possession of or otherwise acquires the Taj Mahal, an entity licensed under the Casino Control Act would be required to be retained in order to operate the Taj Mahal. Because potential bidders must satisfy licensing requirements, the number of potential bidders in a foreclosure sale will be less than in foreclosure of other types of facilities and such requirements may delay the sale of, and may adversely affect the sales price for, the Taj Mahal.

### Guaranties

The obligations of the Company to pay the principal of, premium, if any, and interest on the Old Bonds are guaranteed by the Partnership. (Article 14)

To the extent set forth in the Trump Completion Guaranty, Donald J. Trump guaranteed the completion of the construction of the Taj Mahal.

### Non-recourse

The Old Indenture provides that, notwithstanding anything contained in the Old Indenture (including the Guaranty) or in any other agreement, document, certificate, instrument, statement or omission referred to below to the contrary, the Partnership and the Company are liable thereunder only to the extent of the assets of the Partnership (other than cash permitted to be distributed pursuant to Section 12.07 of the Old Indenture, regardless of whether such cash has been distributed) and the interest of the Company in the Partnership Note and the Old Mortgage (and certain related documents) and no other person or entity, including, but not limited to, any partner, officer, committee or committee member of the Partnership or any partner therein or of any partnership Affiliate (as defined in Rule 405 under the 1933 Act) of the Partnership, or any incorporator, officer, director or shareholder of the Company, or any corporate partner of the Partnership or any corporate Affiliate of the

Partnership. or any Affiliate or controlling person or entity of any of the foregoing. or any agent, employee or lender of any of the foregoing, or any successor, personal representative, heir or assign of any of the foregoing, in each case past, present, or as they may exist in the future, shall be liable in any respect (including without limitation the breach of any representation, warranty, covenant, agreement, condition or indemnification or contribution undertaking contained therein) under, in connection with, arising out of, or relating to the Old Indenture or any other agreement, document, certificate, instrument or statement (oral or written) related to, executed or to be executed, delivered or to be delivered, or made or to be made, or any omission made or to be made, in connection with any of the foregoing or any of the transactions contemplated in any such agreement, document, certificate, instrument or statement; *provided, however*, that this provision does not release Donald J. Trump from his obligations under the Trump Completion Guaranty and the Trump Line of Credit. The Old Indenture further provides that notwithstanding the foregoing, the Holders of the Old Bonds preserve any personal claims they may have for fraud, liabilities under the 1933 Act, and other liabilities that cannot be waived under applicable federal and state laws in connection with the purchase of the Old Bonds; *provided, however*, that such conduct shall not constitute an Event of Default under the Old Indenture, the Old Mortgage, or the Partnership Note or any document executed in conjunction therewith or otherwise related thereto. (Section 3.12)

**Optional Redemption**

The Old Bonds are redeemable at the option of the Company, in whole or from time to time in part, at any time on or after November 15, 1993, on not less than 30 days' nor more than 60 days' notice, mailed by first-class mail, postage prepaid, to each holder of Old Bonds offered hereby to be redeemed at his registered address. (Section 13.04) The Old Bonds are redeemable at the redemption prices (expressed in percentages of the principal amount) set forth below during the 12-month period beginning November 15.

| Year | Percentage |
|------|-----------|
| 1993 | 106.22% |
| 1994 | 104.67 |
| 1995 | 103.11 |
| 1996 | 101.56 |
| 1997 | 100.00 |

together, in each case, with interest, if any, accrued to the redemption date. (Section 4.03)

The Old Indenture provides that in the event of the redemption of less than all the outstanding Old Bonds, the particular Old Bonds to be redeemed will be selected by the Trustee by lot. As long as there are other outstanding Old Bonds, Old Bonds held by the Company, the Partnership or any Affiliate of the Partnership (including Donald J. Trump) shall not be selected for redemption by the Trustee. (Section 13.03) On and after the redemption date, interest ceases to accrue on Old Bonds or portions of Old Bonds called for redemption. (Section 13.06)

Pursuant to the New Jersey gaming laws, the Company may redeem Old Bonds held by persons that are found not to be qualified to hold such securities. (Section 13.08)

The Company may also redeem the Old Bonds offered hereby at the principal amount thereof, without premium, plus accrued interest, at any time as a result of a casualty or taking as set forth in the Old Mortgage. (Section 4.03)

**Certain Covenants of the Company and the Partnership**

*Limitations on Debt*

The Old Indenture prohibits the Partnership and its subsidiaries from incurring or otherwise in any manner becoming liable with respect to any Debt, unless (a) at the point in time of the incurrence of and after giving effect to such Debt, the aggregate Outstanding Amount of Debt of the Partnership and its subsidiaries on a consolidated basis does not exceed 80% of the Appraised Value (which Appraised

Value will be increased by the purchase price, net of all Partnership expenses relating to such purchase including legal, title, accounting and recording tax expenses and commissions, of any property to be acquired with the proceeds of such Debt), and (b) the Coverage Ratio of the Partnership, calculated for the four prior fiscal quarters ending with the date of the latest available quarterly statement of the Partnership at the time of the incurrence of such Debt, adjusted to give retroactive effect to the incurrence of such Debt (and, if any of the proceeds of such Debt are being utilized for the acquisition of any property or asset, adjusted to give retroactive effect to the Net Income, if any, of such property or asset for such prior fiscal quarters) as of the beginning of such four prior fiscal quarters, is not less than 1.2, except that the Partnership and its subsidiaries may, without satisfying the foregoing test, incur (i) $35,000,000 in aggregate amount of New Parking Financing, (ii) $50,000,000 of Unrestricted Financing (as described below), (iii) the Partnership Note, (iv) any Trump Indebtedness and Trump Borrowings and (v) Debt secured by purchase money liens upon personal property as otherwise permitted by the Old Indenture.

Subject to certain restrictions, the Partnership and its subsidiaries may, without meeting the above tests, extend, renew, or refinance any Debt of the Partnership and its subsidiaries (other than Trump Indebtedness and Trump Borrowings which may be repaid only in accordance with the terms of the Old Indenture) so long as the aggregate amount of Debt of the Partnership and its subsidiaries is not increased thereby.

The Partnership must provide the Trustee with an officers' certificate prior to the incurrence of any Debt which certifies, among other things, that the Partnership has complied with the requirements mentioned above for the incurrence of Debt and that no Financing Default has occurred and is continuing. If such additional Debt constitutes Old Mortgage Debt, prior to incurring such Debt certain other requirements must be met by the Partnership. See "Limitations on Liens on the Trust Estate" below in this section. (Section 12.04)

Any Trump Indebtedness and Trump Borrowings will rank subordinate to the prior payment in full of all obligations of the Partnership then due and owing on the Partnership Note, the Old Mortgage and the Old Bonds (collectively, the "Senior Indebtedness"). Accordingly, under the Old Indenture, upon (i) any distribution of assets of the Partnership upon any dissolution, winding up, liquidation or reorganization of the Partnership, whether in bankruptcy, insolvency, reorganization or receivership proceedings or upon an assignment for the benefit of creditors or any other marshalling of the assets and liabilities of the Partnership or otherwise or (ii) any acceleration of the maturity of the Senior Indebtedness by lapse of time, acceleration or otherwise, the holders of the Senior Indebtedness will be entitled to receive payment in full before Donald J. Trump will be entitled to receive any payment on the Trump Indebtedness and Trump Borrowings. If in any of the situations referred to in clauses (i) or (ii) above, a payment is made to Donald J. Trump before the obligations under the Senior Indebtedness have been paid in full, the payment to Donald J. Trump must be held in trust for the benefit of, and shall be paid over to the holders of, Senior Indebtedness.

In addition, the Partnership may repay the Trump Indebtedness and Trump Borrowings only in the manner and to the extent provided in "Limitations on Distributions and Other Payments" in this section.

### Limitations on Liens on the Trust Estate

*General Requirements.* The Old Indenture prohibits the Company, the Partnership and the Partnership's subsidiaries from creating, incurring, suffering or permitting to be created or incurred or to exist any lien, mortgage, charge or encumbrance on or pledge of the Old Mortgage, the Partnership Note or any of the Trust Estate, other than (a) the lien created by the Old Mortgage, the Assignment Agreement and related documents, (b) notices of intention filed by mechanics, materialmen or laborers under the New Jersey mechanic's lien law, and (c) the Permitted Encumbrances on the Trust Estate which term includes (i) liens for additional Old Mortgage Debt as set forth below and under "Unrestricted Financing" and "New Parking Financing" and (ii) liens for Trump Indebtedness, provided that such liens for Trump Indebtedness are junior to the lien of the Old Mortgage and provided that the holders of such Trump Indebtedness liens agree that such liens cannot be foreclosed except upon foreclosure by the Trustee of the Old Mortgage.