The Partnership and its subsidiaries may issue Debt secured by additional liens on the Trust Estate that are junior to or on a parity with the lien of the Old Mortgage ("Additional Financing") if (i) the requirements for issuance of Debt are satisfied (see "Limitations on Debt" above in this section), (ii) the aggregate Outstanding Amount of Old Mortgage Debt (including all outstanding Notes and giving effect to such additional Old Mortgage Debt) does not exceed 66⅔% of the Appraised Value (which Appraised Value will give effect to the completion of any construction for which the proceeds of such Old Mortgage Debt are to be utilized and will be increased by the purchase price, net of all Partnership expenses relating to such purchase, including legal, title, accounting and recording tax expenses and commissions, of any property to be acquired with the proceeds of such Old Mortgage Debt) (80% of such Appraised Value if the lien of such additional Old Mortgage Debt is junior to that of the Old Mortgage) and (iii) the Coverage Ratio of the Partnership, calculated for the prior four fiscal quarters ending with the date of the latest available quarterly statement of the Partnership at the time of the incurrence of such Old Mortgage Debt, adjusted to give retroactive effect to the incurrence of such Old Mortgage Debt (and, if any of the proceeds of such Old Mortgage Debt are being utilized for the acquisition of any property or asset, adjusted to give retroactive effect to the Net Income, if any, of any such property or asset for such prior four fiscal quarters) as of the beginning of such prior four fiscal quarters, is not less than 1.5.

Prior to the issuance of Additional Financing, the Old Indenture requires, among other things, that: (i) such Additional Financing, the instruments creating such additional liens and the holders thereof must be approved to the extent necessary by the Casino Control Commission: (ii) the instruments creating such additional liens must contain a provision limiting the rights of the holders thereof to take possession of, operate, or manage all or any portion of the Taj Mahal unless such holder or its designee or agent has all necessary legal qualifications, including all licenses, to do so and is otherwise experienced in the operation of casino/hotels: (iii) no Financing Default has occurred and is continuing: and (iv) certain documentation required by the terms of the Old Indenture has been obtained. The proceeds of such Additional Financing may be utilized by the Partnership and its subsidiaries (A) to finance structural expansion, additions or capital improvements to the Taj Mahal and its ancillary facilities, (B) to refinance Indebtedness incurred to complete such expansions, additions or improvements described in clause (A) above, or (C) for any other purpose. (Section 12.5)

*Construction Financing.* If the proceeds of the Additional Financing are to be utilized to finance structural expansion, additions or capital improvements to the Taj Mahal and/or its ancillary facilities (including any leasehold interest), prior to issuing such Additional Financing, the Partnership, in addition to meeting the general requirements set forth above, must deliver evidence to the Trustee:

(1) that all gaming permits required in connection with the operation of the Taj Mahal casino and all permits required to commence such construction and to issue such Additional Financing have been obtained and are in full force;

(2) that the additional incurrence of Debt will raise sufficient funds together with other funds available to the Partnership to complete the proposed construction work;

(3) that the Outstanding Amount of the Additional Financing issued will not exceed the anticipated total project cost (including certain costs such as fees, interest and title expenses) of such expansion, additions or improvements;

(4) that the holder(s) of such Additional Financing, or the lead lender(s) under participation agreements with respect to such Additional Financing are institutional lenders experienced in real estate lending or acquisitions and have gross assets of at least $500,000,000 as determined by its most recent audited financial statements, unless Donald J. Trump is the holder or lender and the lien is junior to that of the Old Mortgage;

(5) that the Partnership has obtained a commitment for permanent mortgage financing (in accordance with the terms of the Old Indenture), a letter of credit, or other financing sufficient for, and for the purpose of, the full repayment of such Additional Financing upon the completion of the construction; and

(6) that such Additional Financing is secured by a lien on all, and not less than all, of the Trust Estate and on no other property other than the Trust Estate.

The Partnership need not meet the tests for Appraised Value or Coverage Ratio described above for the incurrence of Debt to finance structural expansion, additions or capital improvements if the Partnership obtains an irrevocable commitment from Donald J. Trump or a nationally recognized financial institution having a combined capital and surplus of at least $100,000,000 as determined by its most recent audited financial statements and whose debt is rated "A" (or such similar equivalent rating) or higher by Moody's Investors Service, Inc. or Standard & Poor's Corporation, to supply, upon an acceleration of the Bonds, funds to the Partnership as additional capital in an amount sufficient to cause such Appraised Value and Coverage Ratio tests to be satisfied, such commitment to be released (even if such construction financing has been refinanced) only if both such tests are met at any time following substantial completion of such expansion, additions or improvements.

*Refinancing of Indebtedness for Construction.* If the proceeds of the Additional Financing are to be utilized to refinance Debt incurred to complete any expansion, additions or improvements to the Taj Mahal and its ancillary facilities (including any leasehold improvements), prior to issuing such Additional Financing, the Partnership, in addition to meeting the general requirements set forth above, must deliver evidence to the Trustee:

(1) that all gaming permits required in connection with the operation of the Taj Mahal casino and all permits required with respect to the expansion, additions or improvements and the issuance of such Additional Financing have been obtained and are in full force and effect;

(2) that such Additional Financing is issued only after the substantial completion of the expansion, additions or improvements;

(3) that the holder(s) of such Additional Financing, or the lead lender(s) under participation agreements with respect to such Additional Financing are institutional lenders experienced in real estate lending or acquisitions and have gross assets of at least $500,000,000 as determined by its most recent audited financial statements, unless the lien is junior to that of the Old Mortgage;

(4) that the Outstanding Amount of Additional Financing issued does not exceed the total project cost (including certain costs such as fees, interest and title expenses) of the expansion, additions or improvements; and

(5) that the average life (calculated in accordance with accepted financial practice) of such Additional Financing is not less than the average remaining life of the Old Bonds.

The tests for Appraised Value or Coverage Ratio described above are not required to be satisfied if (a) the Additional Financing is being used to refinance earlier Additional Financing undertaken to finance such expansion, additions or improvements (except if the lien of such construction financing is junior to the lien of the Old Mortgage, then only if the lien of such new Additional Financing Lien will be junior to the lien of the Old Mortgage) or (b) the Partnership, prior to commencing such expansion, addition or improvement, provided the Trustee with a certificate showing compliance of the incurrence of such financing by the Partnership and its subsidiaries with the Appraised Value and the Coverage Ratio tests required to be satisfied to incur Additional Financing which is *pari passu* with the lien of the Old Mortgage.

*Financing for Working Capital.* If the proceeds of the Additional Financing are to be utilized for any purpose other than any expansion, additions or improvements to the Taj Mahal and its ancillary facilities (including any leasehold improvements), prior to issuing such Additional Financing, the Partnership, in addition to meeting the general requirements set forth above, must deliver evidence to the Trustee:

(1) that the holder(s) of such Additional Financing, or the lead lender(s) under participation agreements with respect to such Additional Financing must be institutional lenders experienced in real estate lending or acquisitions and having gross assets of at least $500,000,000 as determined by its most recent audited financial statements, unless the lien is junior to that of the Old Mortgage;

(2) that all gaming permits required in connection with the operation of the Taj Mahal casino and all permits required with respect to the issuance of such Additional Financing have been obtained and are in full force and effect; and

(3) that, except if the lien of such Additional Financing will be junior to that of the Old Mortgage, the average life (calculated in accordance with accepted financial practice) of such Additional Financing is not less than the average remaining life of the Old Bonds.

The Partnership may refinance existing Additional Financing if the average life of such new Additional Financing is not less than the shorter of the average life remaining of such earlier Additional Financing and the average remaining life of the Old Bonds without satisfying the Coverage Ratio and Appraised Value tests set forth above for the issuance of Additional Financing. The Partnership may also incur additional Old Mortgage Debt through the issuance of additional series of Bonds under the Old Indenture. See "Additional Series of Bonds." The instruments entered into by the Partnership with respect to additional Old Mortgage Debt are required to contain certain provisions intended to protect the interest of the Trustee in the Trust Estate.

Reference is made to Section 12.05 of the Old Indenture for a complete description of this requirement and the other limitations on the incurrence of additional liens by the Partnership.

### New Parking Financing

New Parking Financing may be incurred up to a maximum amount equal to the lesser of (i) $35,000,000 and (ii) the amount of costs incurred in connection with the construction, acquisition or capital improvement of the facilities on the New Parking Facilities. The New Parking Financing must be non-recourse to the Partnership, its subsidiaries and/or any assets of the Partnership and its subsidiaries (other than any New Parking Facilities). The Partnership and its subsidiaries may also refinance the Outstanding Amount of earlier New Parking Financing provided that the aggregate Outstanding Amount of New Parking Financing giving effect thereto will not exceed the amount of New Parking Financing permitted above. If the total outstanding Old Mortgage Debt secured by liens on the New Parking Facilities is at any time less than the maximum amount of additional Old Mortgage Debt secured by liens on such New Parking Facilities which had been outstanding at any time prior thereto, the Partnership may incur additional Old Mortgage Debt secured by liens on such New Parking Facilities up to such maximum amount without limitation as to the use of the proceeds of such borrowing. Accordingly, the Partnership may be able to maintain up to $35,000,000 of such New Parking Financing at all times, even following payment of all or part of the principal amount of any Old Mortgage Debt incurred in connection with the construction, acquisition or capital improvement of such New Parking Facilities. Any New Parking Financing described in this paragraph may be superior to the Old Mortgage but only with respect to any New Parking Facility. Prior to issuing such New Parking Financing, the Partnership must meet other requirements similar to those required to issue Additional Financing, except that the Partnership need not meet the tests relating to Appraised Value and Coverage Ratio and there is no restriction on the average life of such New Parking Financing. See "Limitations on Liens on the Trust Estate" above in this section. (Section 12.05(c))

### Unrestricted Financing

The Partnership and its subsidiaries may incur up to an aggregate of $50,000,000 of additional Debt, which Debt may be secured by a lien that is junior to the lien of the Old Mortgage or may be unsecured ("Unrestricted Financing"). Conditions similar to those required to be met prior to the incurrence of Additional Financing need to be met prior to the incurrence of any Unrestricted Financing except the Appraised Value and Coverage Ratio tests, and, in addition, there are no restrictions on the average life of such Unrestricted Financing. See "Limitations on Liens on the Trust Estate" above in this section. The proceeds from the issuance of any Unrestricted Financing may be utilized for any purpose other than Restricted Payments. (Section 12.18). Amounts owed under the Subcontractors' Agreement constitute Unrestricted Financing under the Old Indenture.

### Limitations on Leasing

The Partnership may not, and may not permit its subsidiaries to, enter into any lease of (a) land, buildings or other land improvements, (b) planes, helicopters or vessels or (c) other property (personal or otherwise) other than any such lease of a nature entered into in the ordinary course of business by a

United States casino/hotel. as lessee, unless no Financing Default has occurred and is continuing and the Coverage Ratio of the Partnership. calculated for the prior four fiscal quarters ending with the date of the latest available quarterly statement of the Partnership at the time of entering into such lease. adjusted to give retroactive effect to such lease (including the Net Income. if any. of any such land. buildings or improvements or other property for such prior four fiscal quarters) as of the beginning of such prior four fiscal quarters, is not less than 1.2. Notwithstanding the preceding sentence. the Partnership may enter into any lease providing for the leasing to the Partnership of (a) on or after the Opening Date. the facility known as the "Steel Pier" and/or any restaurant constructed thereon and (b) on or after the Opening Date, any parking area or facility primarily utilized or to be utilized by patrons of the Taj Mahal and any casino/hotels adjacent to the Taj Mahal and (c) at any time after the date of the Old Indenture. the 210 foot strip, the 3.7 Acre Parcel and a specified warehouse located in Atlantic City. In giving retroactive effect to such lease as of the beginning of such prior four fiscal quarters. it will be assumed that the rent for such prior four fiscal quarters was the greater of the average annual rent over the term of such lease and the rent payable for the first four fiscal quarters. (Section 12.21)

### Limitations on Activities

The Old Indenture limits the ability of the Partnership and its subsidiaries to engage in any business or investment activities other than those necessary or appropriate for. incident to. in connection with or arising out of. developing. constructing. financing. owning and operating the Taj Mahal. Other than loans to employees. credit transactions in the ordinary course of business of operating a casino/hotel and as otherwise stated herein. the Partnership and its subsidiaries are also restricted from making loans to any of its Affiliates or any other person except for loans permitted as described under "Limitations on Distributions and other Payments" provided that such loans are. in the opinion of the Partnership and in the written opinion of a nationally recognized investment banking firm selected by the Partnership. fair to the Partnership from a financial point of view. (Section 12.06)

The Company will not conduct any business (including having any subsidiary) and will not incur any additional Indebtedness except pursuant to the Old Indenture. whatsoever, other than to collect the amounts due and owing under the Partnership Note, to preserve its rights under the Partnership Note. the Old Mortgage. the Trump Line of Credit and the Trump Completion Guaranty. to do or cause to be done all things necessary or appropriate to protect the Trust Estate and to preserve its rights therein. and otherwise to comply with its obligations under the Old Indenture and the Old Bonds.

The Company. the Partnership and the Partnership's subsidiaries are prohibited from entering into any management agreement relating to the Taj Mahal other than the Management Agreement and from amending in any way the Management Agreement which increases the amount of fees payable thereunder. reduces the obligations of THMC thereunder or otherwise adversely affects the interests of the Holders of the Old Bonds. (Section 12.06)

### Limitations on Distributions and other Payments

The Partnership will not. and will cause its subsidiaries not to. directly or indirectly. make any Restricted Payment, except (i) with respect to the Available Cash Flow for the first four full fiscal quarters subsequent to the fiscal quarter in which the Opening Date occurs, the Partnership may make one Restricted Payment after (and not on or prior to) such four full fiscal quarters of (a) 100% of such Available Cash Flow if the Coverage Ratio of the Partnership for such four full fiscal quarters is greater than or equal to 1.5 or (b) 50% of such Available Cash Flow if the Coverage Ratio of the Partnership for such four fiscal quarters is not less than 1.0 but is less than 1.5 or (c) 0% of such Available Cash Flow in all other instances, and (ii) with respect to the Available Cash Flow for each succeeding fiscal quarter after such first four full fiscal quarters, the Partnership may make one Restricted Payment after each such succeeding fiscal quarter of (A) 100% of all Available Cash Flow for such fiscal quarter if the Coverage Ratio of the Partnership for the four prior fiscal quarters (including such fiscal quarter) is greater than or equal to 1.5, (B) 50% of such Available Cash Flow for such fiscal quarter if the Coverage Ratio of the Partnership for the four prior fiscal quarters (including such fiscal quarter) is not less than 1.0 but is less than or equal to 1.5, or (C) 0% of such Available Cash Flow in all other instances.

However, if the Partnership incurs indebtedness to Donald J. Trump under the Trump Line of Credit or Donald J. Trump advances up to $25,000,000 to the Partnership, in discharge of an obligation arising as a result of certain bankruptcy events related to the Partnership, the Partnership may also make a Restricted Payment, in addition to any Restricted Payment made in any fiscal quarter as set forth under clause (i)(b) or (ii)(B) above, in the amount of up to 50% of Available Cash Flow for such four prior fiscal quarters (1) to first pay interest due and payable on any Trump Borrowings or a return on such advances pursuant to the Trump Completion Guaranty (not to exceed a rate equal to Bankers Trust Company's prime rate on such advances per annum) and a return of such advances (not to exceed $25,000,000), if the Coverage Ratio of the Partnership for the four prior fiscal quarters is greater than or equal to 1.0 but less than 1.5 or (2) to the extent such Available Cash Flow is not fully utilized in clause (1), to repay principal on any Trump Borrowings if such Coverage Ratio is greater than or equal to 1.2 but less than 1.5.

The Partnership may also make one Restricted Payment in each fiscal quarter after the Opening Date equal to the excess of (1) all Available Cash Flow from the Opening Date to the end of the most recently completed fiscal quarter (treated as one accounting period) minus the amount of all Restricted Payments of Available Cash Flow previously made by the Partnership over (2) $67,500,000, provided that (aa) the Coverage Ratio of the Partnership for the most recently completed four fiscal quarters is not less than 1.5, (bb) the Partnership will have Working Capital immediately after the Restricted Payment of at least $67,500,000, and (cc) the Partnership will have cash (and short-term marketable securities) immediately after the Restricted Payment of at least $67,500,000.

As a condition to receiving any Restricted Payment of Available Cash Flow from the Partnership, any person who receives such Restricted Payment shall agree in writing that if at the end of any fiscal year of the Partnership the Coverage Ratio is less than 1.0 for such fiscal year, such person shall return to the Partnership all Restricted Payments made by the Partnership to such person during such fiscal year.

All Restricted Payments are governed by the above limitations. All Restricted Payments shall first be applied to any outstanding Trump Indebtedness or interest on or principal of Trump Borrowings or the return of any advances made pursuant to the Trump Completion Guaranty. Notwithstanding the foregoing, the Partnership may not make any Restricted Payments at any time that any Financing Default has occurred and is continuing.

The Company may not make any Restricted Payment at any time. (Section 12.07)

### Lease of Properties

Subject to the limitations described in "Limitations on Leasing" above in this section, at the option of Donald J. Trump or an Affiliate of the Partnership or Donald J. Trump, the Partnership may lease at not more than the Stated Rent from Donald J. Trump or such Affiliate subject to certain other terms, any real property and improvements which are expected by Donald J. Trump or such Affiliate to be utilized primarily either by patrons of the Taj Mahal and any casino/hotels adjacent to the Taj Mahal or otherwise in connection with the operation of the Taj Mahal. However, the affiliate of Donald J. Trump that will own the Steel Pier will lease to the Partnership the restaurant to be constructed on the Steel Pier with the proceeds of the Old Bonds. The Affiliate of Donald J. Trump that will own the 3.7 Acre Parcel and the 210 foot strip to be improved with the proceeds of the Old Bonds for use as parking facilities for the Taj Mahal will also lease such parcels to the Partnership. The lease of the restaurant will have an annual rent of $1 plus all other amounts such as real estate taxes, insurance, cost of repairs or reconstruction, which are customarily paid by a lessee under a completely net lease. The lease of the 3.7 Acre Parcel and 210 foot strip will have an annual rent equal to the Stated Rent. All of such leases will have a term not less than one year after the latest stated maturity of the Old Bonds (subject to the next sentence). Upon the sale of any such leased property by Donald J. Trump or such Affiliate, as the case may be, the lease of such property (other than the restaurant on the Steel Pier if the Partnership expends prior to the Opening Date in excess of $10,000,000 for the cost of its construction and other than the 3.7 Acre Parcel and the 210 foot strip if the Partnership expends prior to the Opening Date in excess of $10,000,000 in the aggregate for improvements thereon) may be terminable by the purchaser thereof, Donald J. Trump or such Affiliate or the Partnership, provided

that prior to such termination Donald J. Trump or such Affiliate pays to the Partnership the aggregate amount of any expenditures incurred by the Partnership for capital improvements to such property (net of amortization and/or depreciation on such capital expenditures to the date of such sale as determined by generally accepted accounting principles consistently applied). Neither Donald J. Trump nor such Affiliate intends to sell any such leased property or, consequently, to terminate any such leases. (Section 12.17)

### Limitations on Consolidation, Merger, and Conveyance and Transfer of Property and Assets

Except as provided below, the Company may not consolidate, combine or merge with or into any other person or permit any other person to consolidate, combine or merge with or into the Company; the Company with respect to its assets may not convey or transfer its interest in such assets substantially as an entirety to any other person (other than to the Trustee) or permit any other person to convey or transfer all or substantially all of its assets, subject to liabilities other than de minimis liabilities, to the Company; and the Company may not permit any of its shareholders to transfer, convey, sell or otherwise dispose of to any other person any shares of capital stock of the Company; and the Company may not issue any capital stock to any person or grant any option to any person to acquire capital stock of the Company.

Except as provided below, the Partnership may not consolidate, combine or merge with or into any other person or permit any other person to consolidate, combine or merge with or into the Partnership; the Partnership with respect to the Trust Estate may not convey or transfer its interest in the Trust Estate substantially as an entirety to any other person or permit any other person to convey or transfer all or substantially all of its assets which are subject to liabilities (unless such liabilities are (i) de minimis liabilities or (ii) liabilities, the obligor of which has recourse only to such assets) to the Partnership; and the Partnership may not permit any of its partners to transfer, convey, sell, or otherwise dispose of, to any other person any partnership interest in the Partnership; and the Partnership shall not admit any additional partners to the Partnership or grant any option to any person to acquire any partnership interest in the Partnership.

The Partnership may engage in any one or more of the above-enumerated transactions on or after the Opening Date if the following conditions, as applicable, are satisfied with respect to each such transaction: (i) after any such transaction the successor entity holds all permits required for operation of the business of, and the successor entity is controlled by a person or entity (or has retained a person or entity which is) experienced in, operating casino/hotels; (ii) if such surviving entity is not the Partnership, the entity formed by such transaction is duly organized and existing under Federal or state law and expressly assumes pursuant to the provisions of the Old Indenture, by a supplemental indenture, the punctual payment of all outstanding Old Bonds and the performance of every covenant and condition of the Old Indenture which binds the Partnership and expressly assumes pursuant to the provisions of the Old Indenture, by an instrument executed and delivered to the Trustee, the performance of every covenant and obligation of the Old Mortgage, Partnership Note and Old Assignment Agreement to be performed by the Partnership; and (iii) immediately after giving effect to such transaction, no Financing Default shall have occurred and be continuing. Any such transaction also must be on such terms as shall not impair the lien and security of the Old Mortgage and the Old Indenture and the rights and powers of the Trustee and holders of the Old Bonds thereunder. Immediately following such transaction, unless the transaction involves the Partnership and an Affiliate of the Partnership having no assets and no liabilities and having conducted no prior business, exclusively, or unless such transaction is the admission as a new partner of the Partnership of, or the transfer of a partnership interest in the Partnership to, an Affiliate of the Partnership, the Partnership or its successor entity are required to meet the financial tests (without giving effect to certain exceptions therein) both for incurrence of one dollar of additional Debt (see "Certain Covenants of the Company and the Partnership—Limitations on Debt" above in this section) and for the issuance of one dollar of Additional Bonds (see "Additional Series of Bonds" below in this section). Such tests need not be met for admissions of limited partners to the Partnership or transfers of any limited partnership interests in the Partnership (a) until the aggregate interests in the Partnership represented by all persons admitted as limited partners or to whom limited partnership interests are transferred after the date hereof is at

least 49% of the total equity interest in the Partnership (without giving effect to transfers to Affiliates of Donald J. Trump) or (b) to the extent such persons admitted as limited partners or to whom limited partnership interests are transferred are Affiliates of Donald J. Trump.

All of the outstanding stock of the Company may be transferred on or after Opening Date to an entity that is an Affiliate of the Partnership after giving effect to such transfer if (a) after any such transfer the Company and such entity holds all permits required for operation of the business of the Company, (b) such entity is duly organized and existing under Federal or state law and (c) immediately after giving effect to such transfer, no Financing Default shall have occurred and be continuing. (Section 10.01)

The Old Indenture prohibits the Partnership from leasing Trust Estate, the Taj Mahal, the hotel or casino portion of the Taj Mahal or any combination thereof substantially as an entirety to any person. (Section 10.04) Pursuant to the Old Mortgage, subject to certain conditions, the Partnership may lease portions of the Trust Estate in the ordinary course of its business. Unless otherwise provided, neither the Partnership nor the Company may sell, assign, lease, hypothecate, pledge, mortgage or otherwise transfer all or any part of the assets of the Company or the Trust Estate or any interest therein. (Section 10.05)

## Payment of Management and Construction Fees

The Old Indenture restricts the Partnership from paying any Management Fee under the Management Agreement except semi-annually on or after the business day after payment of interest on the Old Bonds has been paid in addition to any principal payments due on such semi-annual payment date and any due and unpaid interest and principal accrued to date. The Construction Fee, equal to 3% of the Construction Cost of any Future Project, may not be paid until any such Future Project is substantially completed. The Old Indenture does not, however, restrict the Partnership from reimbursing THMC for the amount of Management Expenses. In no event, however, may any amount be paid by either the Partnership or any of its subsidiaries, indirectly or directly, in respect of any fee or expenses described above if a Financing Default has occurred and is continuing. (Section 12.20)

## Additional Series of Bonds

After the Opening Date, the Company may, by supplemental indenture, issue additional series of Bonds that are on a parity with the Old Bonds, and any other series of Bonds outstanding prior to such issuance, and that are entitled to the equal and ratable benefit and protection of the security, pledge, provisions, covenants, and agreements of the Old Indenture. The issuance of additional series of Bonds will only be permitted if the following conditions are met:

(a) the additional series of Bonds is issued to finance (or to refinance Indebtedness incurred to finance) structural expansion, additions or capital improvements of the Taj Mahal or its ancillary facilities, costing in excess of $10,000,000;

(b) such additional series of Bonds is issued no earlier than the substantial completion of such structural expansion, additions, or capital improvements;

(c) the Outstanding Amount of such additional series of Bonds issued does not exceed the total project cost (including certain costs such as fees, interest and title expense) of the structural expansion, additions or capital improvements;

(d) no Financing Default has occurred and is continuing;

(e) unless the additional series of Bonds is being issued to refinance Additional Financing undertaken to finance such expansion, additions or capital improvements, the lien of which is *pari passu* with the lien of the Old Mortgage, or unless the Partnership provided the Trustee with a certificate showing pro forma compliance with the tests described in this clause prior to commencing such expansion, addition or capital improvement, (A) the aggregate Outstanding Amount of Old Mortgage Debt does not exceed 66⅔% of the Appraised Value (which Appraised Value will be increased by the purchase price, net of all Partnership expenses relating to such purchase, including legal, title, accounting and recording tax expenses and commissions, of any

property to be acquired with the proceeds of such additional series of Bonds) as of a date as close as practicable to the date of issuance of such additional series of Bonds and the aggregate Outstanding Amount of Debt of the Partnership and its subsidiaries does not exceed 80% of such Appraised Value as of such date, after giving effect to such issuance and the completion of such expansion, additions or capital improvements and (B) the Coverage Ratio of the Partnership, calculated for the four prior fiscal quarters ending with the date of the latest available quarterly statement of the Partnership at the time of the incurrence of such additional series of Bonds, adjusted to give retroactive effect to the incurrence of such additional series of Bonds (and, if any of the proceeds of such additional series of Bonds is being utilized for the acquisition of any property or asset adjusted to give retroactive effect to the Net Income, if any, of such property or asset for such prior four fiscal quarters) as of the beginning of such four prior fiscal quarters, is not less than 1.5;

(f) the Trustee has been provided with the documentation required by the terms of the Old Indenture;

(g) all gaming permits required in connection with the operation of the Taj Mahal casino, all permits required with respect to the expansion, additions or improvements and all permits required with respect to the issuance of such additional series of Bonds have been obtained and are in full force and effect;

(h) the average life (calculated in accordance with accepted financial practice) of such additional series of Bonds is not less than the average remaining life of the Old Bonds; and

(i) the proceeds of the issuance of additional series of Bonds is simultaneously therewith loaned to the Partnership by the Company in exchange for an Additional Note, which is simultaneously assigned to the Trustee. (Section 3.02(b))

The additional series of Bonds may differ from the Old Bonds, and from each other, in any respect so long as such differences are permitted by the Trust Indenture Act, are not material, and are not adverse to the interests of the holders of the Old Bonds. The additional series of Bonds may contain provisions for (a) a sinking, amortization, improvement, or other analogous fund, (b) limiting the aggregate principal amount of the additional series of Bonds, (c) exchanging Bonds of such series, at the holder's option, for Bonds of the same series of the same aggregate principal amount of a different authorized denomination or denominations and (d) the authentication of Bonds of such series by an authenticating agent. All Bonds of the same series shall be substantially identical, except that any series may have serial maturities and different interest rates for different maturities and except as to denomination. (Section 3.03)

### Events of Default and Notice Thereof

The following events are defined in the Old Indenture as "Events of Default": (a) failure to pay interest on any Series A Bond after the interest becomes due and payable and continuance of such default (the deposit with the Trustee of funds sufficient to make such interest payments in full being deemed to cure any such default) for a period of 30 days; (b) failure to pay all or any portion of the principal of any Series A Bond when such principal becomes due and payable at maturity without any grace period; (c) default in the performance, or breach, of any covenant of the Company, Donald J. Trump or the Partnership in the Old Indenture (other than a default in the performance or breach that is elsewhere hereunder specifically dealt with), the Old Mortgage, the Partnership Note, the Trump Line of Credit, the Trump Completion Guaranty or the Old Assignment Agreement that continues for a period of 30 days (or such other period specified in such other document) after notice (i) to the Company by the Trustee or (ii) to the Company and the Trustee by the Holders of at least 25% in Outstanding Amount of the outstanding Old Bonds; (d) certain events of bankruptcy, insolvency or reorganization relating to Donald J. Trump (only during the term of the Trump Completion Guaranty or the Trump Line of Credit, whichever is longer), the Company, the Partnership or any of the Partnership's subsidiaries, which, if involuntary, continue for a period of 30 consecutive days; (e) the revocation, suspension or loss of any permit which results in the cessation of a substantial portion of the business of the Taj Mahal for a period of more than 120 consecutive days; (f) any default under any Old

Mortgage Debt (other than the Partnership Note or any New Parking Financing) and the expiration of the applicable period of grace, if any, specified in any evidences of indebtedness of such Old Mortgage Debt; provided that such default has not been cured or waived at any time whether before or after the occurrence of such Event of Default (provided such cure or waiver occurs prior to any declaration of acceleration of the Old Bonds); (g) the existence of a final judgment of a court of competent jurisdiction in an amount in excess of $3,000,000 against the Company, the Partnership or any of the Partnership's subsidiaries or the Trust Estate, which judgment has not been satisfied or otherwise provided for and such judgment becomes a lien against the Trust Estate (unless such lien has been effectively stayed, in which case, not until such stay has been lifted), except in the case of any lien subordinate to the lien of the Old Mortgage, then only after 30 days (during which execution shall not be effectively stayed) following the date on which such judgment becomes a lien against the Trust Estate or any part thereof (except if the lawsuit in question was commenced without service of process, in which case the period does not begin until 30 days after notice of such final judgment); the existence of any unsatisfied final judgment (which has not been effectively stayed) which, by itself or upon recordation, imposes or would impose a lien prior to that of the Old Mortgage; or the existence for a period of 60 days of any final judgment unsatisfied and not otherwise provided for in an amount in excess of $15,000,000 against the Company, the Partnership or any of the Partnership's subsidiaries; (h) defaults in the performance, or breach, of covenants pertaining to consolidation, merger, conveyance or transfer of properties and assets; (i) an event of default in the Old Mortgage has occurred and is continuing; (j) a default under any instruments of Debt or Indebtedness of the Partnership or any of the Partnership's subsidiaries (other than the Guaranty, Old Mortgage Debt and any New Parking Financing), whether such Debt or Indebtedness now exists or shall hereafter be created, in each case having an Outstanding Amount of $1,000,000 or more in the aggregate, and the expiration of the applicable period of grace, if any, specified in such instruments; *provided, however,* that if such default under such instruments shall be cured by the Partnership, or any such subsidiary, as the case may be, or be waived by the holders of such Debt, in each case as may be permitted by such instruments, then the Event of Default hereunder by reason of such default shall be deemed to have been thereupon cured (provided such cure or waiver occurs prior to any declaration of acceleration of the Old Bonds); (k) an admission in writing by Donald J. Trump (only during the term of the Trump Completion Guaranty or the Trump Line of Credit, whichever is longer), the Company, the Partnership or any of the Partnership's subsidiaries, of its or his inability to pay its or his debts generally as they become due; or (l) the entry of a final judgment, decree or order by a court of competent jurisdiction holding the Guaranty, the Trump Line of Credit, the Trump Completion Guaranty or the Old Mortgage to be invalid or unenforceable in any material respect or the assertion by the Company, Donald J. Trump, the Partnership or any of the Partnership's subsidiaries, or any person acting on behalf of any of the foregoing in any pleading filed in such a court that the Guaranty, the Trump Line of Credit, the Trump Completion Guaranty or the Old Mortgage is invalid or unenforceable in any material respect. (Section 7.01)

The Old Indenture provides that the Trustee, within 90 days after the occurrence of a Default, will give notice thereof by mail to all holders of Old Bonds, unless the Default has been cured or waived; however, in the case of a Default in payment on the Old Bonds or in the payment of any sinking fund installment under another series of Bonds, the Trustee may withhold such notice if certain officers or executives of the Trustee in good faith determine that such withholding is in the interest of the holders of Old Bonds. (Section 8.02)

In case an Event of Default (other than an Event of Default specified under clauses (d) and (k) as it relates to the Partnership or the Company only) occurs and is continuing, the Trustee or the holders of not less than 25% in Outstanding Amount of the Old Bonds, by notice in writing to the Company (and to the Trustee, if given by holders), may declare the principal of all the Old Bonds to be due and payable immediately. Such declaration may be annulled and past defaults may be waived by the holders of a majority in Outstanding Amount of the Old Bonds, upon the conditions provided in the Old Indenture. If an Event of Default specified above under clause (d) or (k) as it relates to the Partnership or the Company occurs, principal of all the Old Bonds shall *ipso facto* become and be due and payable immediately without any declaration or other act on the part of the Trustee or any Bondholder. (Section 7.02)

The Partnership is required to furnish to the Trustee, within 120 days after the close of each fiscal year, an officers' certificate to the effect that a review of the activities of the Partnership and its subsidiaries and the Company has been made with a view to determine whether their obligations under the Old Indenture, the Old Mortgage, and the Partnership Note have been complied with and as to whether the signers have obtained knowledge of any default in the fulfillment of any such obligation during such fiscal year. If the Partnership or the Company obtains knowledge of a default under the Old Indenture, it is required promptly to notify the Trustee of such default and the action it is taking and proposes to take with respect thereto. (Section 12.09)

### Modifications of the Old Indenture

From time to time, the parties to the Old Indenture, without the consent of the holders of the Old Bonds, may enter into one or more supplemental indentures for certain specified purposes, including curing ambiguities, defects, or inconsistencies, creating a new series of Old Bonds, and making any changes or modifications to the terms of the Old Indenture that do not materially adversely affect the rights of any Holders. (Section 11.01) Modifications, changes, and amendments to the Old Indenture also may be made by the parties thereto with the consent of the Holders of not less than a majority of the Outstanding Amount of the Bonds of all series then outstanding; but no change in the time of payment of interest or principal, or reduction in the principal amount, interest rate, or premium, if any, payable, the Guaranty, or the Trump Line of Credit (except where such modification will not adversely affect the interests of the Bondholders), or any other modification in the terms of payment on any Bond, or any reduction in the percentage required for modification, or the creation of any lien ranking prior to or on a parity with the lien of the Old Mortgage, or any change which would deprive a holder of the security afforded by the lien of the Old Mortgage or modify or waive any of the provisions of the Old Indenture respecting the incurrence of additional Old Mortgage Debt or Debt will be effective against any holder of Bonds without his consent. (Section 11.02)

### Satisfaction and Discharge of Indebtedness

The Old Indenture will be discharged and cancelled upon payment of all the principal of and interest on the Bonds, redemption of all the Bonds, or deposit with the Trustee of funds sufficient for such payment or redemption. (Article 5)

### Gaming Laws

On August 11, 1988, the Casino Control Commission issued a declaratory ruling that the initial Holders need not be qualified under the Casino Control Act, provided the Old Bonds were to be widely distributed and freely traded. Any Holder, whether an initial Holder or a subsequent transferee, may nonetheless be required to qualify under the Casino Control Act in the sound discretion of the Casino Control Commission and, consequently, would be subject to the qualification provisions of the Casino Control Act relating to financial sources and/or security holders. The Old Indenture provides that if the Casino Control Commission requires that a Holder (whether the record or beneficial owner) qualify under the Casino Control Act and if such Holder does not so qualify, then such Holder must dispose of his interest in the Old Bonds within 30 days after receipt of notice of such finding, or within such earlier time as the Casino Control Commission may require, or the Company may redeem such Old Bonds. Any such redemption by the Company shall be without any premium and at the lower of (i) the Outstanding Amount and (ii) the fair market value (as defined in the Old Indenture) of such Old Bonds, plus accrued interest. (Section 13.08) If any Holder is found unqualified by the Casino Control Commission, it is unlawful for the Holder (i) to receive any interest upon the Old Bonds, (ii) to exercise, directly or through any trustee or nominee, any right conferred by the Old Bonds, or (iii) to receive any remuneration, in any form from any Regulated Company (including the Partnership, the Company or the Trustee) for services rendered or otherwise. (Section 4.01)

The Old Indenture further requires the Trustee to report the names of all record Holders of the Old Bonds to the Director of the Division and to the Casino Control Commission promptly after the initial issuance of the Old Bonds, and prior to the initial licensing of the Partnership and prior to the

scheduled expiration date of the Partnership's casino license. The Old Indenture also requires the Trustee to provide to the Director of the Division and the Casino Control Commission copies of all written communications from the Trustee to the Holders, notice of any default under the Old Bonds, certain other information concerning the Trustee's enforcement of rights under the Old Indenture, and other matters respecting the security for the Old Bonds.

## The Old Mortgage

### General

The Partnership Note is secured by the Old Mortgage, which has been assigned to the Trustee and encumbers the Partnership's fee interest in the Taj Mahal, any New Parking Facility or certain other facilities owned by or leased to the Partnership, any additions and improvements constructed thereon and the interest of the Partnership in furniture, furnishings, fixtures, machinery and equipment at any time forming a part thereof, or used in connection therewith, and certain of the other assets of the Partnership (other than cash and Permitted Investments). Since the Company's right as mortgagee under the Old Mortgage have been assigned to the Trustee pursuant to an instrument of assignment, all references in the Old Mortgage to mortgagee are referred to herein as the Trustee.

### Events of Default

The following events are defined in the Old Mortgage as "Events of Default":

(a) default in the payment of any interest upon the Partnership Note when such interest becomes due and payable and continuance of such default for a period of 30 days; (b) default in the payment of all or any portion of the principal of, or premium, if any, on, the Partnership Note at its maturity; (c) default in the payment of all or any portion of the principal of (or premium, if any, on) the Partnership Note or any Additional Note that is payable as a result of a sinking fund payment being due under any additional series of Bonds; (d) default in the payment of any other sum due under the Partnership Note or any Additional Notes or under the Old Mortgage, and the continuance of such default for a period of 30 days after there has been given to the Partnership a written notice specifying such default and requiring it to be remedied; (e) default in the performance, or breach, of any covenant of the Partnership in the Old Mortgage (other than a covenant, a default in the performance or breach of which is elsewhere specifically dealt with in the Old Mortgage), and continuance of such default or breach for a period of 30 days after there has been given to the Partnership a written notice specifying such default or breach and requiring it to be remedied, unless (i) the default or breach is of such a nature that it is curable but not susceptible of being cured with due diligence within such 30-day period (for reasons other than the lack of funds), (ii) the Partnership delivers an officers' certificate to the Trustee within such 30-day period stating (A) the applicability of the provisions of clause (i) to such default or breach, (B) the Partnership's intention to remedy such default or breach with reasonable diligence and (C) the steps which the Partnership has undertaken or intends to undertake to remedy such default or breach and (iii) the Partnership delivers to the Trustee additional officers' certificates every 30 days thereafter updating the information contained in the certificate described in clause (ii), in which case such 30-day period shall be extended for such further period of time as may reasonably be required to cure the same, provided that the Partnership is then proceeding and thereafter continues to proceed to cure the same with reasonable diligence; (f) an "Event of Default", as defined in the Old Indenture, shall occur; (g) (i) failure to obtain a Certificate of Completion and provide a copy thereof to the Trustee at least 30 days prior to the date (including all applicable grace periods) upon which the Housing Authority has the right to exercise any right of reversion under the terms, and in accordance with the provisions, of the Development Agreement, without the giving of any further notice of an opportunity to cure, as such date may be extended from time to time pursuant to the terms and provisions of the Development Agreement; or (ii) without limiting the generality of subparagraph (i) above, failure by the Partnership, at least 30 days prior to the date (including all applicable grace periods) upon which the Housing Authority has the right to exercise any right of reversion under the terms, and in accordance with the provisions, of the

Development Agreement or of any deed granted pursuant to the Development Agreement, without the giving of any further notice of an opportunity to cure, as such date may be extended from time to time pursuant to the terms and provisions of the Development Agreement, to cure any default, failure, violation or other action or inaction, which default, failure, violation or other action or inaction, if not cured, would, under the terms of the Development Agreement or of such deed, give rise to a right of reversion exercisable by the Housing Authority with respect to any portion of the Trust Estate; or (iii) without limiting the generality of clauses (i) and (ii), default by the Partnership under any of the terms of the Development Agreement (other than the terms thereof covered by the provisions of (i) and (ii) above) which shall not be fully cured or waived prior to the expiration of any grace period contained in the Development Agreement, if such default, if not timely cured, would result in an impairment of the Trustee's security, unless prior to the expiration of such grace period, the Partnership gives the Trustee an officers' certificate, an opinion of counsel and a true copy of the injunction referred to below, which certificate and opinion state that (1) a court of competent jurisdiction has issued an injunction (which is in force and effect and has not been modified or reversed on appeal) tolling or staying the expiration of the grace period set forth in the Development Agreement with respect to such default, and (2) the Trustee is named as a party in any action or proceeding involving such injunction and therefore is entitled to notice of any modification or termination thereof; and, if such injunction is issued, then so long as such injunction remains in force and effect and the preceding provisions of this subparagraph (g)(iii) have been complied with, the grace period referred to in this subparagraph (g)(iii) shall be deemed to mean the grace period after giving effect to any such tolling or stay: (h) default by the Partnership under any of the terms of any Facility Lease (as defined in the Old Mortgage) which shall not be fully cured or waived prior to the expiration of any grace period contained in such Facility Lease, unless prior to the expiration of said grace period, the Partnership gives the Trustee an officers' certificate, an opinion of counsel and a true copy of the injunction referred to below, which certificate and opinion shall state (A) that a court of competent jurisdiction has issued an injunction (which is in force and effect and has not been modified or reversed on appeal) tolling or staying the expiration of the grace period set forth in such Facility Lease with respect to such default, and (B) the Trustee is named as a party in any action or proceeding involving such injunction and therefore is entitled to notice of any modification or termination thereof; and, if such injunction is issued, then so long as such injunction remains in force and effect and the preceding provisions of this subparagraph (h) have been complied with, the grace period referred to in this subparagraph (h) shall be deemed to mean the grace period after giving effect to any such tolling or stay; (i) any modification, amendment or supplement of the Development Agreement without the prior written consent of the Trustee; unless the Partnership delivers to the Trustee an opinion of an independent investment banking institution of recognized national standing doing business in the Borough of Manhattan, City and State of New York, to the effect that such modification, amendment, or supplement would not result in an impairment of the Trustee's security; (j) any modification, amendment or supplement of any superior parking financing lien without the prior written consent of the Trustee, except to the extent that such modification, amendment or supplement is permitted by the Old Mortgage; (k) default in the performance, or breach, of any of the provisions governing consolidation and mergers; (l) if any representation or warranty of the Partnership set forth in the Old Mortgage or in any notice, certificate, demand or request delivered to the Trustee pursuant to this Old Mortgage shall prove to be incorrect in any material respect as of the time when made and the facts constituting such incorrectness impair the Trustee's security and such impairment continues for a period of 30 days after there has been given to the Partnership a written notice specifying that such notice is a "Notice of Default" hereunder; (m) if construction of the Taj Mahal in accordance with the Old Mortgage shall be halted for an aggregate of forty-five business days, whether or not consecutive, for reasons other than Force Majeure Delays; (n) default by the Partnership in the performance of certain of the construction covenants contained in the Old Mortgage on or before the dates by which such performance is required thereunder; (o) default by the Partnership under any of the terms of any Senior New Parking Old Mortgage which shall not be fully cured or waived within five days prior to the expiration of any grace period contained in such Senior New Parking Mortgage, unless prior to the expiration of said grace period the Partnership gives the Trustee an officers'

certificate, an opinion of counsel and a true copy of the injunction referred to below, which certificate and opinion shall state (A) that a court of competent jurisdiction has issued an injunction (which is in force and effect and has not been modified or reversed on appeal) tolling or staying the expiration of the grace period set forth in such Senior New Parking Mortgage with respect to such default, and (B) the Trustee is named as a party in any action or proceeding involving such injunction and therefore is entitled to notice of any modification or termination thereof; and, if such injunction is issued, then so long as such injunction remains in force and effect and the preceding provisions of this subparagraph (o) have been complied with, the grace period referred to in this subparagraph (o) shall be deemed to mean the grace period after giving effect to any such tolling or stay; or (p) the acceleration of maturity of Indebtedness with an Outstanding Amount equal to or in excess of $100,000,000, the lien of which Indebtedness is on a parity with and not junior to the lien of the Old Mortgage, and the delivery to the Trustee by the holder of such Indebtedness of a notice that such holder requests that the Trustee declare the Outstanding Amount of all the Bonds to be due and payable and to exercise its rights and remedies in accordance with the provisions of the Old Indenture and the Old Mortgage Documents. (Section 3.01 of the Old Mortgage)

## The Trustee

The Trustee is First Bank National Association, a Minnesota banking corporation, replacing Bankers Trust Company which announced its resignation as Trustee on August 21, 1990.

The Old Indenture provides that, except during the continuance of an Event of Default, the Trustee will perform only such duties as are specifically set forth in the Old Indenture. During the existence of an Event of Default, the Trustee will exercise such of the rights and powers vested in it under the Old Indenture and will use the same degree of care and skill in its exercise as a prudent person would exercise under the circumstances in the conduct of such person's own affairs. (Section 8.01) The holders of a majority in Outstanding Amount of the Old Bonds shall have the right to direct the time, method, and place of conducting any proceeding for exercising any remedy available to the Trustee. (Section 7.12) Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the Old Indenture at the request of any of the holders, unless they shall have offered to the Trustee security or indemnity satisfactory to it. (Section 8.03)

The Old Indenture and provisions of the Trust Indenture Act incorporated by reference therein contain limitations on the rights of the Trustee, should it become a creditor of the Company, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claims as security or otherwise. The Trustee will be permitted to engage in other transactions: *provided, however,* if it acquires any conflicting interest (as defined) it must eliminate such conflict or resign. (Section 8.08)

## Usury Law

The Company has agreed not to claim voluntarily the benefit of any usury law against the holders of the Old Bonds. (Section 12.12) The Company does not believe that any state would have the right to assert a usury defense on behalf of the Company.

# TRUMP TAJ MAHAL ASSOCIATES
## REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To Trump Taj Mahal Associates:

We have examined the accompanying forecasted condensed consolidated balance sheets of Trump Taj Mahal Associates (the "Partnership") as of October 14, 1991, December 31, 1991, December 31, 1992, December 31, 1993, December 31, 1994 and December 31, 1995, and the accompanying forecasted condensed consolidated statements of operations and cash flows for the period from October 15, 1991 through December 31, 1991 and for each of the four years in the period ending December 31, 1995 (collectively the forecasted financial statements). Our examination was made in accordance with standards for an examination of a forecast established by the American Institute of Certified Public Accountants and, accordingly, included such procedures as we considered necessary to evaluate both the assumptions used by management and the preparation and presentation of the forecast.

As discussed in the Summary of Significant Forecast Assumptions, the Partnership has experienced liquidity problems since opening and has failed to make certain principal and interest payments on its debt. As a result, the Partnership has proposed a plan of reorganization and is in the process of seeking protection under the United States Bankruptcy Code of 1978, as amended. In addition, the Partnership is a defendant to a number of legal actions, which if adversely decided, could have a material adverse effect on its results of operations and financial condition. These factors, among others, raise a substantial doubt about the Partnership's ability to continue as a going concern. The accompanying forecasted financial statements and schedules do not include any adjustments that might result should the Partnership be unable to continue as a going concern or that might be necessary had the outcome of the legal proceedings been known.

In our opinion, the accompanying forecasted financial statements are presented in conformity with guidelines for presentation of a forecast established by the American Institute of Certified Public Accountants, and the underlying assumptions provide a reasonable basis for the forecasted financial statements. However, there will usually be differences between the forecasted and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material. We have no responsibility to update this report for events and circumstances occurring after the date of this report.

Our examination of the financial forecast was made for the purpose of forming an opinion on whether the forecasted financial statements are presented in conformity with guidelines for presentation of a forecast established by the American Institute of Certified Public Accountants and whether the underlying assumptions provide a reasonable basis for the forecasted financial statements. The information presented in the forecasted schedules of selected industry gaming statistics insofar as it relates to the Partnership, long-term debt and excess available cash flow is presented for purposes of additional analysis and is not a required part of the forecasted financial statements. Such information has been subjected to procedures applied in the examination of the forecasted financial statements and, in our opinion, is fairly stated in all material respects in relation to the forecasted financial statements taken as a whole.

ARTHUR ANDERSEN & CO.

Roseland, New Jersey
June 5, 1991

# TRUMP TAJ MAHAL ASSOCIATES

## FORECASTED CONDENSED CONSOLIDATED BALANCE SHEETS

| | December 31, 1990 | Forecasted Activity Through October 14, 1991 | Forecasted October 14, 1991 Pre-Effective Date (In millions) | Recording of Plan | Forecasted October 14, 1991 Post Effective Date |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash investments ..... | $ 22.5 | $  3.6 | $ 26.1 | $ (12.0) | $ 14.1 |
| Receivables, net .............. | 18.3 | 0.6 | 18.9 | — | 18.9 |
| Inventory.................... | 4.6 | (0.9) | 3.7 | — | 3.7 |
| Prepaid expenses and other current assets .............. | 1.8 | (0.8) | 1.0 | — | 1.0 |
| Total current assets ....... | 47.2 | 2.5 | 49.7 | (12.0) | 37.7 |
| Property and equipment, net ....... | 797.8 | (17.9) | 779.9 | — | 779.9 |
| Other assets ..................... | 0.8 | 1.4 | 2.2 | — | 2.2 |
| Total assets .............. | $845.8 | $(14.0) | $831.8 | $ (12.0) | $819.8 |
| **LIABILITIES AND CAPITAL** | | | | | |
| Current liabilities: | | | | | |
| Current portion of long term debt ..................... | $720.2 | $  1.3 | $721.5 | $(719.7) | $  1.8 |
| Accounts payable and accrued liabilities .................. | 54.3 | (9.5) | 44.8 | — | 44.8 |
| Trump line of credit, management and construction fees payable ............... | 41.5 | 1.9 | 43.4 | (43.4) | — |
| Subcontractors' note .......... | 35.5 | — | 35.5 | (35.5) | — |
| Accrued interest payable ...... | 62.8 | 28.6 | 91.4 | (91.4) | — |
| Total current liabilities .... | 914.3 | 22.3 | 936.6 | (890.0) | 46.6 |
| Long term debt .................. | 0.9 | (0.5) | 0.4 | 569.2 | 569.6 |
| Deferred state income taxes ....... | — | — | — | 8.0 | 8.0 |
| Capital ......................... | (69.4) | (35.8) | (105.2) | 300.8 | 195.6 |
| Total liabilities and capital................ | $845.8 | $(14.0) | $831.8 | $ (12.0) | $819.8 |

See accompanying summary of significant forecast assumptions.

## TRUMP TAJ MAHAL ASSOCIATES
### FORECASTED CONDENSED CONSOLIDATED BALANCE SHEETS

| | As of December 31. | | | | |
|---|---|---|---|---|---|
| | **1991** | **1992** | **1993** <br> (In millions) | **1994** | **1995** |
| **ASSETS** | | | | | |
| Current Assets: | | | | | |
| Cash and cash investments ..................... | $ 18.9 | $ 29.8 | $ 50.7 | $ 66.2 | $ 78.9 |
| Receivables. net .............................. | 18.9 | 18.9 | 18.9 | 18.9 | 18.9 |
| Inventory................................... | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| Prepaid expenses and other current assets ........ | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |
| Total current assets ...................... | 42.2 | 53.1 | 74.0 | 89.5 | 102.2 |
| Property and equipment. net...................... | 773.1 | 757.4 | 741.9 | 716.4 | 691.1 |
| Other assets ................................ | 2.9 | 5.8 | 9.1 | 12.6 | 16.3 |
| Total assets ........................... | $818.2 | $816.3 | $825.0 | $818.5 | $809.6 |
| **LIABILITIES AND CAPITAL** | | | | | |
| Current Liabilities: | | | | | |
| Current portion of long term debt .............. | $ 1.7 | $ 4.6 | $ 29.0 | $ 43.6 | $ 55.2 |
| Accounts payable and accrued liabilities.......... | 44.9 | 47.0 | 50.7 | 54.6 | 57.8 |
| Accrued interest payable....................... | 11.6 | 17.6 | 17.8 | 17.4 | 17.0 |
| Total current liabilities...................... | 58.2 | 69.2 | 97.5 | 115.6 | 130.0 |
| Long term debt .................................. | 572.2 | 585.2 | 579.9 | 562.7 | 536.0 |
| Deferred state income taxes ...................... | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 |
| Capital ........................................ | 179.8 | 153.9 | 139.6 | 132.2 | 135.6 |
| Total liabilities and capital ................. | $818.2 | $816.3 | $825.0 | $818.5 | $809.6 |

See accompanying summary of significant forecast assumptions.

## TRUMP TAJ MAHAL ASSOCIATES

### FORECASTED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS

| | Period from October 15, 1991 through December 31, 1991 | Years Ending December 31, 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|
| | | (In millions) | | | |
| **Revenues:** | | | | | |
| Gaming | $ 79.1 | $471.5 | $527.8 | $561.5 | $597.5 |
| Rooms | 8.8 | 53.7 | 60.2 | 64.0 | 68.1 |
| Food and beverage | 14.9 | 95.7 | 107.1 | 114.0 | 121.3 |
| Other | 3.5 | 11.8 | 13.2 | 14.0 | 15.0 |
| Gross revenues | 106.3 | 632.7 | 708.3 | 753.5 | 801.9 |
| Less—Promotional allowances | 14.5 | 79.1 | 88.5 | 94.2 | 100.2 |
| Net revenues | 91.8 | 553.6 | 619.8 | 659.3 | 701.7 |
| **Cost and Expenses:** | | | | | |
| Gaming | 35.3 | 185.0 | 207.2 | 220.4 | 234.5 |
| Rooms | 4.8 | 24.2 | 27.1 | 28.8 | 30.7 |
| Food and beverage | 11.6 | 79.0 | 88.4 | 94.0 | 100.1 |
| Other | 27.0 | 151.7 | 167.7 | 177.8 | 188.3 |
| Total operating expenses | 78.7 | 439.9 | 490.4 | 521.0 | 553.6 |
| Operating income before depreciation and amortization | 13.1 | 113.7 | 129.4 | 138.3 | 148.1 |
| Depreciation and amortization | 7.9 | 38.4 | 39.5 | 40.6 | 41.3 |
| Operating income | 5.2 | 75.3 | 89.9 | 97.7 | 106.8 |
| Interest expense | 21.0 | 101.2 | 104.2 | 105.1 | 103.4 |
| Net income (loss) | $(15.8) | $(25.9) | $(14.3) | $ (7.4) | $ 3.4 |

See accompanying summary of significant forecast assumptions

# TRUMP TAJ MAHAL ASSOCIATES

## FORECASTED CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Period from October 15, 1991 through December 31, 1991 | Years Ending December 31, (In millions) | | | |
| --- | --- | --- | --- | --- | --- |
| | | 1992 | 1993 | 1994 | 1995 |
| **Cash Flows from Operating Activities** | | | | | |
| Net income (loss) .................... | $(15.8) | $(25.9) | $(14.3) | $ (7.4) | $ 3.4 |
| Adjustments to reconcile net income (loss) to net cash flows provided by (used in) operating activities— | | | | | |
| Depreciation and amortization ........... | 7.9 | 38.4 | 39.5 | 40.6 | 41.3 |
| Debt accretion ........................ | 2.6 | 13.1 | 15.9 | 18.5 | 21.0 |
| CRDA investment valuation allowance ... | 0.6 | 2.9 | 3.3 | 3.5 | 3.7 |
| | (4.7) | 28.5 | 44.4 | 55.2 | 69.4 |
| **Changes in Operating Assets and Liabilities** | | | | | |
| Other current assets ................... | 0.3 | — | — | — | — |
| Accounts payable and accrued expenses... | — | 2.1 | 3.7 | 3.9 | 3.2 |
| Accrued interest payable, net ........... | 11.6 | 10.5 | 8.0 | 7.5 | 7.1 |
| Net cash flows provided by (used in) operating activities ................ | 7.2 | 41.1 | 56.1 | 66.6 | 79.7 |
| **Cash Flows from Investing Activities** | | | | | |
| Purchases of property and equipment..... | (1.1) | (22.7) | (24.0) | (15.1) | (16.0) |
| Purchase of CRDA investment .......... | (1.2) | (5.8) | (6.6) | (7.0) | (7.4) |
| Net cash flows used in investing activities......................... | (2.3) | (28.5) | (30.6) | (22.1) | (23.4) |
| **Cash Flows from Financing Activities—** | | | | | |
| Repayments of borrowings .............. | (0.1) | (1.7) | (4.6) | (29.0) | (43.6) |
| Net Increase (Decrease) in Cash and Cash Investments............................ | 4.8 | 10.9 | 20.9 | 15.5 | 12.7 |
| Cash and Cash Investments Beginning of period.................... | 14.1 | 18.9 | 29.8 | 50.7 | 66.2 |
| Cash and Cash Investments End of year ........................ | $ 18.9 | $ 29.8 | $ 50.7 | $ 66.2 | $ 78.9 |

See accompanying summary of significant forecast assumptions.

# TRUMP TAJ MAHAL ASSOCIATES
## FORECASTED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
## SUMMARY OF SIGNIFICANT FORECAST ASSUMPTIONS

The financial forecast is management's estimate of the most probable condensed consolidated balance sheets as of October 14, 1991 and December 31, 1991 through 1995 and the related condensed consolidated statements of operations and cash flows for the period from October 15, 1991 through December 31, 1991 and the years ending December 31, 1992 through 1995 (the "Financial Forecast") of the Partnership. Accordingly, the Financial Forecast reflects management's judgment based on present circumstances of the most likely set of conditions and its most likely course of action. The assumptions disclosed herein are those that management believes are significant to the Financial Forecast or are key factors upon which the financial results depend. Some assumptions inevitably will not materialize, and unanticipated events and circumstances may occur subsequent to June 5, 1991, the date of this Financial Forecast. Many of these events and circumstances are out of the control of the Partnership. Therefore, the actual results achieved during the forecast period will vary from those set forth in the Financial Forecast, and the variations may be material. As discussed in the Prospectus, the Partnership is a defendant in a number of legal proceedings. If adversely decided, these could have a material adverse effect on the Financial Forecast. In addition, the Financial Forecast and Schedules do not include any adjustments that might result should the Partnership be unable to continue as a going concern. Historical financial statements for the year ended December 31, 1990 and the quarter ended March 31, 1991 included elsewhere in this Prospectus should be reviewed for additional information.

## Liquidity

As more fully discussed in this Prospectus, since the Taj Mahal opened on April 2, 1990, its cash generated from operations has been insufficient to cover its debt service. As a result of its liquidity problem, the Partnership failed to make the November 15, 1990 and May 15, 1991 interest payments on its Old Bonds (as defined below and elsewhere in this Prospectus) and interest and principal payments on other debt.

The purpose of the Plan (as defined elsewhere in this Prospectus) is to alleviate the liquidity problem by reducing and deferring the annual debt service requirements. Such reduction will be accomplished through a lowering of the current interest rate on certain long-term indebtedness and, in the case of the New Bonds (as defined elsewhere in this Prospectus) the deferral of the due date of a portion of accrued interest thereon through the issuance of additional Units (as defined below and elsewhere in this Prospectus) in lieu of cash interest. Management believes that the effect of this reduction will enable the Partnership, upon confirmation of the Plan, to meet its future debt service requirements and to afford investors the opportunity to participate in future growth, if any, through ownership of the Class A Stock of Taj Mahal Holding Corp.

The Partnership believes that its liquidity problem is attributable, in part, to an overall deterioration in the Atlantic City gaming market, as indicated by reduced rates of casino revenue growth for the industry for the last two years as compared to prior years, aggravated by an economic recession in the Northeast and lower than anticipated revenues at the Taj Mahal. Comparatively excessive casino gaming capacity in Atlantic City has also contributed to this problem. The Partnership believes that these factors will be temporary and that there has been no permanent impairment of the net carrying value of its property and equipment. Although certain measurements indicate that the net carrying value of property and equipment may not be realizable in the ordinary course of business, the estimated undiscounted sum of future cash flows, before debt service, over approximately ten years is expected to be sufficient to recover the net carrying value of such assets.

## Debt Restructuring Assumptions

In accordance with AICPA Statement of Position 90-7, "Financial Reporting By Entities in Reorganization Under the Bankruptcy Code", the New Bonds will be stated at the present value of amounts to be paid, determined at current interest rates. The current interest rate of the New Bonds

will be determined based on the trading price of the New Bonds for a specified period subsequent to issuance. Since the New Bonds will not be issued until October 15, 1991, the Partnership, based upon discussions with its financial advisor, has estimated a reasonable effective interest rate of approximately 18% for the New Bonds. The rate which is used to account for the New Bonds in the Financial Forecast should not be taken as indicative of the rate the New Bonds will yield once they are issued. Stating the debt at its approximate present value, at then current interest rates, results in an estimated reduction of approximately $201,800,000 in carrying amount of the New Bonds at October 15, 1991, the expected date of confirmation of the Plan. This gain will be offset by increased interest costs over the period of the New Bonds to accrete such bonds to their face value at maturity. The current interest rates of other borrowings approximate their stated interest rates.

The Financial Forecast includes the following assumptions relating to the proposed debt restructuring:

(a) The Partnership will continue to operate as a partnership for federal income tax purposes and the New Bonds will be classified as debt of the Partnership. Therefore, all amounts accrued or paid on the New Bonds have been reflected as interest expense.

(b) The Plan is accepted as proposed by all impaired classes of claims and interests and a bankruptcy petition is filed by July 16, 1991. The Plan becomes effective on October 15, 1991.

(c) Each holder of an Old Bond will receive, for every $1,000 principal amount of Old Bonds:

One unit consisting of approximately $1.076 principal amount of New Bonds for each $1,000 principal amount of Old Bonds, which includes accrued but unpaid interest thereon through November 15, 1990 and accrued interest from April 1, 1991 to October 14, 1991 from 10.28% to 11.35% on $722,250,000, plus one share of Class B Stock and two shares of Class A Stock for each $1,000 principal of New Bonds.

Pro rata share of 90% of cash on hand less certain accruals and deductions (approximately $900,000) as of March 31, 1991.

(d) New Bonds will have the following terms:

Maturity—November 15, 1999

Principal—$726,421,000 which includes accrued interest to November 15, 1990 and from April 1, 1991 to October 14, 1991 from 10.28% to 11.35% on $722,250,000.

Interest Rate—Nominal 11.35% (effective 18%).

Mandatory Cash Interest Rate—9.375%

Mandatory Interest Payable—November 15 and May 15; commencing November 15, 1991.

Additional Amount—The difference between the mandatory cash interest amount (9.375%) and the nominal interest rate (11.35%) which can be paid in cash or additional Units (PIK). To the extent there is Excess Available Cash Flow (as defined elsewhere in this Prospectus), up to 10.28% of interest must be paid in cash.

Payment in Kind (PIK)—Difference between cash interest paid and 11.35%.

PIK Timing—Commencing May 15, 1992 and annually thereafter.

Amortization—80% of Excess Available Cash Flow less the Additional Amount (see (e)) commencing May 15, 1992, applied to principal.

Prefiling Payment—In lieu of interest for the period November 16, 1990 through March 31, 1991, 90% of cash on hand less certain accruals and deductions (approximately $900,000) as of March 31, 1991 (as defined elsewhere in this Prospectus) will be paid immediately prior to the filing of the Plan. The balance of interest accrued during this period will be forgiven as of the Effective Date (October 15, 1991). In addition, for the period April 1, 1991 through July 15, 1991, interest will accrue at 11.35% and be payable at the cash interest rate of 9.375% on the Old Bonds plus the accrued interest as of November 15, 1990 (total principal and accrued interest of $722,250,000). The cash amount of such interest will be paid on July 15, 1991. If cash is not available on July 15, 1991 to make the required cash interest payment, the deficiency, if any, will be paid on the Effective Date which is assumed to

be October 15, 1991. In addition, additional cash interest up to .905% from April 1 to July 15, 1991 on $722,250,000 will be paid on October 15, 1991.

Cash Payment—For the period July 16, 1991 through October 14, 1991, interest will accrue at 11.35% and be payable at the cash interest rate of 10.28% on $722,250,000. Such amount will be paid on October 15, 1991.

PIK Payment—The accrued interest from 10.28% to 11.35% from April 1, 1991 to the day before the Effective Date (October 15, 1991) on $722,250,000 will be paid in additional Units on the Effective Date (October 15, 1991).

(e) NatWest loan will have the following terms:

Maturity—November 15, 1999

Principal—$45,644,755, which includes accrued interest to November 15, 1990.

Interest Rate—9.375%

Amortization—Commencing October 15, 1991, minimum annual payments of $4,475,000 per year applied to interest and balance to principal. In addition, 16.5% of Excess Available Cash Flow in excess of Additional Amount (see (e)) commencing May 15, 1992, applied to principal.

Prefiling Payment—In lieu of interest for the period November 16, 1990 through March 31, 1991, 6.67% of cash on hand less certain accruals and deductions (approximately $66,667) as of March 31, 1991 will be paid immediately prior to the filing of the Plan. The balance of interest accrued during this period will be forgiven as of the Effective Date (October 15, 1991). In addition, for the period April 1, 1991 through July 15, 1991, cash will be payable at the rate of $12,260.27 per day. Both amounts are assumed to be paid on July 15, 1991, to the extent cash is available. If cash is not available on July 15, 1991, the deficiency, if any, will be paid on October 15, 1991.

Cash Payment—For the period July 16, 1991 through October 14, 1991, cash will be payable at the rate of $12,260.27 per day. Such amount will be paid on October 15, 1991.

(f) Excess Available Cash Flow, after payment of the Additional Amount, is distributed as follows:

(i) 80% is used to retire New Bonds. Accreted value has been assumed for the redemption price;

(ii) 16.5% is used to retire the NatWest Loan; and

(iii) 3.5% is used for rental payments to Trump Taj Mahal Realty Corp.

(g) Pursuant to a Services Agreement the Partnership will pay Donald J. Trump a fee equal to the greater of (i) $500,000 per year or (ii) 1.5% of actual EBITDA, as defined, less capital expenditures.

(h) All restructuring costs have been paid prior to the confirmation date.

(i) The Partnership has agreed to make payments to certain subcontractors outside the Subcontractor Agreement and has estimated the amounts, if any, to be paid on future settlement of currently disputed claims.

(j) No cash distributions will be made to the partners during the forecasted periods.

As of the Effective Date (October 15, 1991) the Partnership will record the following Plan transactions:

(a) The $25,000,000 Trump Line of Credit, the $10,000,000 construction supervisory fee and $8,410,000 of management fees payable to Trump Hotel Management Corp. are assumed to be contributed as capital and the Management Agreement terminated.

(b) The Plan provides for the satisfaction of all outstanding claims (approximately $35,520,000) under the Subcontractors' Note by an exchange of Old Bonds. Prior to confirmation of the Plan, a nominee of the Subcontractors will purchase Old Bonds at market value in the

principal amount of $20,000,000 with funds provided by the Partnership of approximately $12,000,000. The difference between the carrying amount of the debt and the purchase price of the Old Bonds will be recorded as an extraordinary gain.

(c) The New Bonds have been restated to reflect the estimated present value of amounts to be paid at the then current interest rates. This adjustment results in an estimated $201,800,000 reduction in carrying value and an extraordinary gain.

(d) Forgiveness of approximately $40,100,000 in interest expense (see (c) and (d) in previous section), the issuance of New Bonds totaling $51,421,000 in lieu of the November 15, 1990 interest payment due on the Old Bonds and the PIK Payment on October 15, 1991 and the capitalization of the accrued interest on the NatWest loan through November 15, 1990.

(e) Recording a $8,000,000 deferred liability for New Jersey corporate business taxes relating to the above entries.

### Operating Assumptions

The Financial Forecast is based on the current and anticipated growth trends in gaming, particularly in Atlantic City; the historical performance of Atlantic City casinos; the results to date of the Taj Mahal; and the anticipated benefits of marketing programs and other measures currently being implemented at the Taj Mahal.

The Atlantic City gaming market has shown significant growth since the first casino opened in May 1978. However, the industry growth rate has slowed and the percent change in monthly net win has become more volatile in recent years.

Management believes that several factors account for the reduction in the industry growth rate. These are:

— a recession in the economy of the Northeastern United States, which is Atlantic City's most important market.

— competition from three new facilities in Southern Nevada, augmented by the increase in non-stop air service from several Northeast cities.

— a decline in the industry-wide table hold percentage.

— a sharp decline in the subsidized bus programs to Atlantic City, reflecting the recognition by several casino operators that many of such programs were not cost effective.

The Financial Forecast reflects a belief that the regional economy will remain in a recession through 1991, then begin recovering in 1992. However, Las Vegas has always shown annual growth even in recession years. Although Atlantic City has only a short operating history, it also showed growth during the 1981-1982 recession. Fluctuations in the table hold percentage are normal in the casino industry and management knows of no reason why this statistic should not return to its historical levels.

Increased competition is not expected to be a significant factor since there are no new casinos under construction in Atlantic City and no new casinos are expected to open in Atlantic City prior to 1995.

New casinos in Atlantic City have historically had a maturation cycle. In their first year of operation, new casinos typically achieve approximately 85% of their "fair share" of revenues. The penetration of new casinos has historically improved in the second and third years to approximately 100% of "fair share" in year three. "Fair share" for a particular casino is defined as the number of gaming units of that casino divided by the number of gaming units of the entire market. For example, a casino whose casino revenues represented 9% of total casino industry revenues and whose number of gaming units represented 10% of total casino industry gaming units would have achieved 90% of its casino "fair share."

Since the Taj Mahal's table games are already operating at greater than 100% of "fair share," the majority of the anticipated improvement is forecasted to occur at the slot machines. Based on reconfiguring its slot machine layout and introducing new marketing programs to stimulate

B-9

improvement, management expects to exceed its fair share of slots during 1993. For the twelve month period ended March 31, 1991, the Taj Mahal's weighted average fair share of table games was 12.4% and slots was 14.0%.

For the twelve months ended March 31, 1991, the Taj Mahal's gaming win of $385,200,000 represented approximately 13.0% of Atlantic City's gaming win for the same period. Based on the monthly weighted average number of units and casino square footage for the twelve months ended March 31, 1991, the Taj Mahal had a "fair share" of approximately 91% and 83%, respectively.

Operating expenses are forecasted based on historical operating expenses of the Taj Mahal, as well as the historical operating expenses of other Atlantic City casinos. Since opening, the Taj Mahal has generated operating income before depreciation and amortization and management fees at a rate approximating the industry average, inclusive of the high cost structure inherent in any opening period. The Financial Forecast assumes that operating margins will improve to be slightly above the 1990 industry average. Additional assumptions relating to operations are:

(a) The forecast of gaming revenues is based upon the anticipated growth in Atlantic City, the anticipated hold percentage and the Partnership's expected share of industry win. This forecasted data is shown in the accompanying schedule of Selected Industry Gaming Statistics. This data reflects that the annual growth of slot win is substantially greater than the growth of table win.

(b) Non-gaming revenues, which consist of rooms, food and beverage, theater and other miscellaneous revenues, are based on constant percentages of gaming revenues. These percentages are slightly higher than industry averages due to the characteristics of the Taj Mahal, which include more rooms and food and beverage outlets than other Atlantic City casinos.

(c) Operating expenses, including gaming, rooms, food and beverage and general and administrative are based on departmental budgets for 1991 and have been forecasted as a constant percentage of gaming, rooms, food and beverage revenues and net revenues, respectively for 1992 through 1995. The forecasted expense percentages are generally consistent with industry averages.

(d) Additional working capital requirements, if necessary, are assumed to be met out of a $25,000,000 facility made available to the Partnership at the time it emerges from the bankruptcy proceedings. In addition, the Partnership anticipates obtaining a $50,000,000 senior credit facility to pay interest costs on the New Bonds, if necessary and an additional $25,000,000 Standby Letter of Credit.

(e) The Partnership is required to make Casino Reinvestment Development Authority (CRDA) investments of 1.25% of casino revenues commencing April 1991. The Financial Forecast assumes that the Partnership will satisfy such investments through the purchase of CRDA Bonds which bear interest at below market interest rates. A valuation allowance of 50% of the principal amount of such bonds has been recorded to reflect such bonds at current interest rates.

(f) Required capital expenditures, which in 1991 includes the completion of the pool and health club facilities, reconfiguration of the casino floor area, and installation of a utilities management system, are estimated to be 2% of the Partnership's gross revenues. However, an additional $20,000,000, ($10,000,000 in 1992 and $10,000,000 in 1993) has been included and is expected to be used to complete the Theater, subject to shareholders approval.

(g) Promotional allowances are held constant at 12.5% of gross revenues.

(h) Depreciation of property is based on existing capitalized costs as well as capital expenditures made during the forecast period.

(i) Although the Partnership is not subject to Federal income taxes, it is subject to State income taxes.

## SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The Financial Forecast has been prepared on the basis of generally accepted accounting principles expected to be used in the historical financial statements covering the forecast period, which are the same as those used to prepare the historical financial statements for the year ended December 31, 1990.

**TRUMP TAJ MAHAL ASSOCIATES**

SELECTED INDUSTRY GAMING STATISTICS

|  | Actual(a) | | | | Forecast(a) | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
|  | | | | | (Dollars in millions) | | | | |
| **Tables:** | | | | | | | | | |
| Industry Growth Percentage | 7.5% | 6.5% | 0.8% | 3.1% | 2.0% | 3.0% | 4.0% | 4.0% | 4.0% |
| Industry Drop(b) | $7,141.2 | $7,607.8 | $7,668.1 | $7,903.2 | $8,076.4 | $8,318.7 | $8,651.4 | $8,997.5 | $9,357.4 |
| Industry Hold Percentage(c) | 16.3% | 16.2% | 16.0% | 15.8% | 15.8% | 15.8% | 15.8% | 15.8% | 15.8% |
| Taj Mahal Share of Industry Drop | — | — | — | 16.5%* | 16.1% | 17.2% | 17.2% | 17.2% | 17.2% |
| Taj Mahal Hold Percentage | — | — | — | 15.2%* | 15.8% | 15.8% | 15.8% | 15.8% | 15.8% |
| Taj Mahal Table Win | — | — | — | $ 154.0* | $ 205.5 | $ 226.1 | $ 235.1 | $ 244.5 | $ 254.3 |
| **Slots:** | | | | | | | | | |
| Industry Growth Percentage | 11.5% | 12.1% | 6.7% | 9.3% | 2.2% | 6.0% | 8.0% | 8.0% | 8.0% |
| Industry Slot Win | $1,318.0 | $1,478.1 | $1,576.8 | $1,724.3 | $1,763.0 | $1,868.8 | $2,018.3 | $2,179.7 | $2,354.1 |
| Taj Mahal Share of Industry Win | — | — | — | 11.2%* | 11.7% | 13.1% | 14.5% | 14.5% | 14.6% |
| Taj Mahal Slot Win | — | — | — | $ 146.9* | $ 206.5 | $ 245.4 | $ 292.7 | $ 317.0 | $ 343.2 |
| **Casino Revenue:** | | | | | | | | | |
| Taj Mahal Total Win | — | — | — | $ 300.9* | $ 412.0 | $ 471.5 | $ 527.8 | $ 561.5 | $ 597.5 |
| Taj Mahal Percentage Share of Total Industry Win | — | — | — | 13.3%* | 13.6% | 14.8% | 15.6% | 15.6% | 15.6% |

\* Calculations Based on Nine Months of Operation

(a) Information with respect to casinos other than the Taj Mahal is not covered by the Report of Independent Public Accountants.

(b) The total dollar value of chips purchased for table games (table drop).

(c) The percentage of money that a casino retains (or wins) out of the total dollar value of chips purchased at a casino (the table drop).

# TRUMP TAJ MAHAL ASSOCIATES
## FORECASTED SCHEDULE OF LONG TERM DEBT

| | October 14, 1991 Post Effective Date | As of December 31. | | | | |
|---|---|---|---|---|---|---|
| | | 1991 | 1992 | 1993 | 1994 | 1995 |
| | | | (In millions) | | | |
| **Face Amount:** | | | | | | |
| New Bonds | $726.4 | $726.4 | $729.7 | $731.8 | $704.2 | $662.8 |
| NatWest Loan | 45.6 | 45.6 | 45.4 | 45.2 | 43.8 | 39.5 |
| Other | 1.2 | 1.1 | 0.5 | 0.4 | 0.3 | 0.2 |
| Total | 773.2 | 773.1 | 775.6 | 777.4 | 748.3 | 702.5 |
| | | | | | | |
| Less Discount—New Bonds | 201.8 | 199.2 | 185.8 | 168.5 | 142.0 | 111.3 |
| | | | | | | |
| **Net Carrying Amount:** | | | | | | |
| New Bonds | 524.6 | 527.2 | 543.9 | 563.3 | 562.2 | 551.5 |
| NatWest Loan | 45.6 | 45.6 | 45.4 | 45.2 | 43.8 | 39.5 |
| Other | 1.2 | 1.1 | 0.5 | 0.4 | 0.3 | 0.2 |
| Total | 571.4 | 573.9 | 589.8 | 608.9 | 606.3 | 591.2 |
| | | | | | | |
| **Less:** | | | | | | |
| Current Maturities | 1.8 | 1.7 | 4.6 | 29.0 | 43.6 | 55.2 |
| Total Long Term Debt | $569.6 | $572.2 | $585.2 | $579.9 | $562.7 | $536.0 |

See accompanying summary of significant forecast assumptions

## TRUMP TAJ MAHAL ASSOCIATES

### FORECASTED EXCESS AVAILABLE CASH FLOW

| | Period from October 15, 1991 through December 31, 1991 | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | | 1992 | 1993 | 1994 | 1995 |
| | | (In millions) | | | |
| Cash Flows from Operating Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 7.2 | $41.1 | $56.1 | $66.6 | $79.7 |
| Less: | | | | | |
|     Capital expenditures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.1 | 22.7 | 24.0 | 15.1 | 16.0 |
|     CRDA investment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.2 | 5.8 | 6.6 | 7.0 | 7.4 |
|     Debt-repayment of principal: | | | | | |
|         NatWest Loan (mandatory) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 0.2 | 0.2 | 0.3 | 0.6 |
|         Capitalized leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.1 | 0.6 | 0.1 | 0.1 | 0.1 |
|         Redemption of New Bonds equivalent to PIK amount of New Bonds issued . . . . . . . . . | — | 0.9 | 4.3 | 7.9 | 7.5 |
| Excess Available Cash Flow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.8 | 10.9 | 20.9 | 36.2 | 48.1 |
| Less: Additional Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8.4 | 14.4 | 14.5 | 13.9 | 13.1 |
| Excess Available Cash Flow for succeeding year's distribution . . . . . . . . . . . . . . . . . . . . . . . . | $ — | $ — | $ 6.4 | $22.3 | $35.0 |

B-13

See accompanying summary of significant forecast assumptions.

*The Ballot Agent is:*
*First Bank National Association*

| *By Mail:* | *By Facsimile:* | *By Hand:* |
|---|---|---|
| Trump Taj Mahal Funding, Inc.<br>c/o First Trust National Association<br>180 East Fifth Street<br>Saint Paul, MN 55101<br>Attn: Janet Allen | 612-223-7549 | Trump Taj Mahal Funding, Inc.<br>c/o First Trust National Association<br>180 East Fifth Street<br>Saint Paul, MN 55101<br>Attn: Janet Allen |

**Information:**

Questions or requests for assistance may be directed to the Information Agent at its address and telephone number listed below. Additional copies of the Prospectus, the Ballot may be obtained from the Information Agent.

**The Information Agent is:**
**First Bank National Association**
**(612) 223-7050**

No person has been authorized to give any information or to make any representations, other than those contained in this Propsectus. If given or made, such information or representation may not be relied upon as having been authorized by any Registrant. The Company is not aware of any jurisdiction in which the making of the Solicitation is not in compliance with applicable law. If the Company becomes aware of any jurisdiction in which the making of the Solicitation would not be in compliance with applicable law, the Company will make a good faith effort to comply with such law. If, after such good faith effort, the Company cannot comply with any such law, the Solicitation will not be made to (nor will Acceptances be accepted from or on behalf of) holders of Old Bonds residing in such jurisdiction. Neither the delivery of this Prospectus nor any distribution of securities hereunder shall under any circumstances create any implication that the information contained herein is correct as of any time subsequent to the date hereof or that there has been no change in the information set forth herein or in the affairs of the Company since the date hereof.

# TRUMP TAJ MAHAL FUNDING, INC.,
# TRUMP TAJ MAHAL ASSOCIATES AND
# TAJ MAHAL HOLDING CORP.

## INDEX TO FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Reports of Independent Public Accountants: | |
|     Trump Taj Mahal Funding, Inc. | F-2 |
|     Trump Taj Mahal Funding, Inc. and Trump Taj Mahal Associates | F-3 |
| Balance Sheets of Trump Taj Mahal Funding, Inc. as of December 31, 1989 and 1990 | F-4 |
| Statements of Operations of Trump Taj Mahal Funding, Inc. for the Period from Inception (June 3, 1988) to December 31, 1988 and for the years ended December 31, 1989 and 1990 | F-5 |
| Statements of Cash Flows of Trump Taj Mahal Funding, Inc. for the period from Inception (June 3, 1988) to December 31, 1988 and for the years ended December 31, 1989 and 1990 | F-6 |
| Combined Balance Sheets of Trump Taj Mahal Funding, Inc. and Trump Taj Mahal Associates as of December 31, 1989 and 1990 | F-7 |
| Combined Statements of Operations of Trump Taj Mahal Funding, Inc. and Trump Taj Mahal Associates for the Period from Inception (June 3, 1988) to December 31, 1988 and for the years ended December 31, 1989 and 1990 | F-8 |
| Combined Statement of Capital (Deficit) of Trump Taj Mahal Funding, Inc. and Trump Taj Mahal Associates for the Period from Inception (June 3, 1988) to December 31, 1990 | F-9 |
| Combined Statements of Cash Flows of Trump Taj Mahal Funding, Inc. and Trump Taj Mahal Associates for the Period from Inception (June 3, 1988) to December 31, 1988 and for the years ended December 31, 1989 and 1990 | F-10 |
| Notes to Combined Financial Statements of Trump Taj Mahal Funding, Inc. and Trump Taj Mahal Associates | F-11 |
| Report of Independent Public Accountants: Taj Mahal Holding Corp. | F-18 |
| Balance Sheet of Taj Mahal Holding Corp. as of January 23, 1991 | F-19 |
| Notes to Balance Sheet of Taj Mahal Holding Corp. | F-20 |
| Balance Sheets of Trump Taj Mahal Funding, Inc. as of December 31, 1990 and March 31, 1991 (unaudited) | F-21 |
| Statements of Operations of Trump Taj Mahal Funding, Inc. for the three months ended March 31, 1990 and 1991 (unaudited) | F-22 |
| Statements of Cash Flows for Trump Taj Mahal Funding, Inc. for the three months ended March 31, 1990 and 1991 (unaudited) | F-23 |
| Condensed Combined Balance Sheets of Trump Taj Mahal Funding, Inc. and Trump Taj Mahal Associates as of December 31, 1990 and March 31, 1991 (unaudited) | F-24 |
| Condensed Combined Statements of Operations of Trump Taj Mahal Funding, Inc. and Trump Taj Mahal Associates for the three months ended March 31, 1990 and 1991 (unaudited) | F-25 |
| Condensed Combined Statements of Cash Flows for Trump Taj Mahal Funding, Inc. and Trump Taj Mahal Associates for the three months ended March 31, 1990 and 1991 (unaudited) | F-26 |
| Notes to financial statements (unaudited) | F-27 |

## REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To TRUMP TAJ MAHAL FUNDING, INC.:

We have audited the accompanying balance sheets of Trump Taj Mahal Funding. Inc. (a New Jersey corporation) as of December 31, 1989 and 1990, and the related statements of operations and cash flows for the period from inception (June 3, 1988) to December 31, 1988 and for the years ended December 31, 1989 and 1990. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Trump Taj Mahal Funding, Inc. as of December 31, 1989 and 1990 and the results of its operations and its cash flows for the period from inception (June 3, 1988) to December 31, 1988 and for the years ended December 31, 1989 and 1990, in conformity with generally accepted accounting principles.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the combined financial statements, the Company and Trump Taj Mahal Associates (the "Partnership") have been unable to generate sufficient cash to service their debt and have a combined working capital deficit as of December 31, 1990. As a result, the Company and the Partnership believe their only alternative is to seek protection under the United States Bankruptcy Code of 1978, as amended, and restructure the terms of their borrowings. Also, as discussed in Note 7, the Company and the Partnership are defendants in several legal proceedings. If adversely decided, these could have a material adverse effect on the Company's results of operations and financial condition. These factors, among others, raise substantial doubt about the ability of both the Company and the Partnership to continue as going concerns. The financial statements do not include any adjustments relating to the recoverability and classification of asset carrying amounts or the amount and classification of liabilities that might result should the Company and the Partnership be unable to continue as going concerns or that might be necessary had the outcome of the legal proceedings been known.

ARTHUR ANDERSEN & CO.

Roseland, New Jersey
February 20, 1991 (except with
respect to the matter discussed in
Note 7, as to which the date is
April 18, 1991)

## REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To TRUMP TAJ MAHAL FUNDING, INC. and
   TRUMP TAJ MAHAL ASSOCIATES:

We have audited the accompanying combined balance sheets of Trump Taj Mahal Funding, Inc. (a New Jersey corporation) and Trump Taj Mahal Associates (a New Jersey general partnership) as of December 31, 1989 and 1990, and the related combined statements of operations, capital and cash flows for the period from inception (June 3, 1988) to December 31, 1988 and for the years ended December 31, 1989 and 1990. These financial statements are the responsibility of the Company's and the Partnership's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Trump Taj Mahal Funding, Inc. and Trump Taj Mahal Associates as of December 31, 1989 and 1990 and the results of their operations and their cash flows for the period from inception (June 3, 1988) to December 31, 1988 and for the years ended December 31, 1989 and 1990, in conformity with generally accepted accounting principles.

The accompanying financial statements have been prepared assuming that the Company and the Partnership will continue as going concerns. As discussed in Note 2 to the combined financial statements, the Company and the Partnership have been unable to generate sufficient cash to service their debt and have a combined working capital deficit as of December 31, 1990. As a result, the Company and the Partnership believe their only alternative is to seek protection under The United States Bankruptcy Code of 1978, as amended, and restructure the terms of their borrowings. Also, as discussed in Note 7, the Company and the Partnership are defendants in several legal proceedings. If adversely decided, these could have a material adverse effect on the Company's and the Partnership's results of operations and financial condition. These factors, among others, raise substantial doubt about the ability of both the Company and the Partnership to continue as going concerns. The financial statements do not include any adjustments relating to the recoverability and classification of asset carrying amounts or the amount and classification of liabilities that might result should the Company and the Partnership be unable to continue as going concerns or that might be necessary had the outcome of the legal proceedings been known.

ARTHUR ANDERSEN & CO.

Roseland, New Jersey
February 20, 1991 (except with
   respect to the matter discussed in
   Note 7, as to which the date is
   April 18, 1991)

F-3

# TRUMP TAJ MAHAL FUNDING, INC.
## BALANCE SHEETS

| | December 31, | |
| --- | --- | --- |
| | **1989** | **1990** |
| | (Dollars in thousands) | |
| **ASSETS** | | |
| Cash ................................................................ | $ 20 | $ 20 |
| Accrued interest receivable (Notes 1 and 3) ............................ | 12,384 | 59,588 |
| Mortgage note receivable from Trump Taj Mahal Associates (Notes 1 and 3) | 675,000 | 675,000 |
| Total assets .............................................. | $687,404 | $734,608 |
| **LIABILITIES AND CAPITAL** | | |
| Accrued interest payable (Note 3) .................................... | $ 12,384 | $ 59,588 |
| 14% First Mortgage Bonds, Series A, Due 1998 (Note 3) ................. | 675,000 | 675,000 |
| Total liabilities .......................................... | 687,384 | 734,588 |
| Commitments and Contingencies (Note 7) ............................. | | |
| Capital: | | |
| Common stock, without par value, 2,500 shares authorized, 200 shares issued and outstanding ................................... | 20 | 20 |
| Retained earnings ................................................ | — | — |
| Total liabilities and capital .................................. | $687,404 | $734,608 |

The accompanying notes to combined financial statements
are an integral part of these balance sheets.

F-4

# TRUMP TAJ MAHAL FUNDING, INC.
## STATEMENTS OF OPERATIONS

|  | Period from Inception (June 3, 1988) to December 31, 1988 | Year Ended December 31, 1989 | 1990 |
|---|---|---|---|
|  |  | (Dollars in thousands) |  |
| Interest income from Trump Taj Mahal Associates ....... | $10,500 | $ 94,500 | $ 94,500 |
| Interest expense .................................... | (10,500) | (94,500) | (94,500) |
| Net income .................................... | $ — | $ — | $ — |

The accompanying notes to combined financial statements
are an integral part of these statements.

F-5

# TRUMP TAJ MAHAL FUNDING, INC.

## STATEMENTS OF CASH FLOWS

|  | Period from Inception (June 3, 1988) to December 31, 1988 | Year Ended December 31, | |
|---|---|---|---|
|  |  | 1989 (Dollars in thousands) | 1990 |
| Cash flows from operating activities: |  |  |  |
| Accrued interest receivable ... | $ (10,500) | $(1,884) | $(47,204) |
| Accrued interest payable ..... | 10,500 | 1,884 | 47,204 |
| Net cash provided from operating activities ..... | — | — | — |
| Cash flows from financing activities: |  |  |  |
| Proceeds from issuance of First Mortgage Bonds ...... | 675,000 | — | — |
| Mortgage loan to Trump Taj Mahal Associates .......... | (675,000) | — | — |
| Issuance of common stock .... | 20 | — | — |
| Net cash provided from financing activities ..... | 20 | — | — |
| Cash at beginning of period ...... | — | 20 | 20 |
| Cash at end of period .......... | $    20 | $   20 | $   20 |

The accompanying notes to combined financial statements
are an integral part of these statements.

F-6

# TRUMP TAJ MAHAL FUNDING, INC. AND
# TRUMP TAJ MAHAL ASSOCIATES
## COMBINED BALANCE SHEETS

|  | December 31, 1989 | December 31, 1990 |
|---|---|---|
|  | (Dollars in thousands) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash investments | $ 71,034 | $ 22,480 |
| Receivables, net of allowance of $6,544 for doubtful accounts | — | 18,324 |
| Inventory | 830 | 4,565 |
| Prepaid expenses and other current assets | 3,018 | 1,848 |
| Due from affiliates, net | 1,782 | — |
| Total current assets | 76,664 | 47,217 |
| Property and equipment (Notes 2, 3 and 7): | | |
| Land | 36,763 | 36,763 |
| Building | 500,606 | 625,272 |
| Furniture, fixtures and equipment | 67,073 | 144,105 |
| Leasehold improvements | 9,950 | 24,276 |
|  | 614,392 | 830,416 |
| Less: Accumulated depreciation and amortization | — | (32,595) |
|  | 614,392 | 797,821 |
| Cash investments—noncurrent | 60,095 | — |
| Deferred pre-opening expenses (Note 2) | 21,596 | — |
| Deferred loan offering costs (Note 2) | 18,434 | — |
| Other assets | 14,643 | 766 |
| Total assets | $805,824 | $845,804 |
| **LIABILITIES AND CAPITAL (DEFICIT)** | | |
| Current liabilities: | | |
| Long-term debt due currently (Note 3) | $ 1,563 | $720,175 |
| Accounts payable, including construction payables of $27,223 and $15,787 | 41,616 | 24,037 |
| Subcontractors' note payable (Note 4) | — | 35,523 |
| Trump line of credit, management and construction fees payable (Notes 2 and 5) | — | 41,484 |
| Accrued interest payable | 12,384 | 62,844 |
| Other current liabilities | 4,314 | 27,193 |
| Due to affiliates, net (Note 6) | — | 3,051 |
| Total current liabilities | 59,877 | 914,307 |
| Long-term debt (Notes 2 and 3) | 682,916 | 917 |
| Trump construction fee payable (Notes 2 and 5) | 8,182 | — |
| Commitments and contingencies (Note 7) | | |
| Capital (deficit): | | |
| Common stock without par value, 2,500 shares authorized, 200 shares issued and outstanding | 20 | 20 |
| Partners' capital | 75,001 | 75,001 |
| Accumulated deficit | (20,172) | (144,441) |
| Total capital (deficit) | 54,849 | (69,420) |
| Total liabilities and capital (deficit) | $805,824 | $845,804 |

The accompanying notes to combined financial statements
are an integral part of these statements.

# TRUMP TAJ MAHAL FUNDING, INC. AND
# TRUMP TAJ MAHAL ASSOCIATES
## COMBINED STATEMENTS OF OPERATIONS

| | Period from Inception (June 3, 1988) to December 31, 1988 | Year Ended December 31, 1989 | 1990 |
|---|---|---|---|
| | | (Dollars in thousands) | |
| **Revenues:** | | | |
| Gaming | $ — | $ — | $ 300,902 |
| Rooms | — | — | 36,364 |
| Food and beverage | — | — | 59,329 |
| Other | 32 | 250 | 11,546 |
| Gross revenues | 32 | 250 | 408,141 |
| Less—Promotional allowances (Note 1) | — | — | 51,443 |
| Net revenues | 32 | 250 | 356,698 |
| **Costs and expenses:** | | | |
| Gaming | — | — | 128,951 |
| Rooms | — | — | 18,293 |
| Food and beverage | — | — | 48,601 |
| General and administration | 1,307 | 1,461 | 98,492 |
| Depreciation and amortization | — | — | 44,647 |
| Restructuring costs and related adjustments (Note 2) | — | — | 41,003 |
| | 1,307 | 1,461 | 379,987 |
| Loss from operations | (1,275) | (1,211) | (23,289) |
| Interest income | 4,541 | 31,653 | 2,813 |
| Interest expense, net of capitalized interest of $5,224, $50,989 and $19,343 (Note 3) | (6,194) | (47,686) | (84,918) |
| Write-off of deferred loan offering costs and provision for litigation (Note 2) | — | — | (18,875) |
| Net loss | $(2,928) | $(17,244) | $(124,269) |

The accompanying notes to combined financial statements
are an integral part of these statements.

F-8

# TRUMP TAJ MAHAL FUNDING, INC. AND
# TRUMP TAJ MAHAL ASSOCIATES
## COMBINED STATEMENTS OF CAPITAL (DEFICIT)

| | Trump Taj Mahal Funding, Inc. Common Stock | | Trump Taj Mahal Associates | | |
| --- | --- | --- | --- | --- | --- |
| | Number of Shares | Amount | Partners' Capital | Accumulated Deficit | Total |
| | | | (Dollars in thousands) | | |
| Initial capital contributions . . . . . . . . . . . . . . . . | 200 | $20 | $75,001 | $ — | $ 75,021 |
| Net loss for the period from inception (June 3, 1988) to December 31, 1988 . . . . . . | — | — | — | (2,928) | (2,928) |
| Balance, December 31, 1988 . . . . . . . . . . . . . . | 200 | 20 | 75,001 | (2,928) | $ 72,093 |
| Net loss for the year ended December 31, 1989 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (17,244) | (17,244) |
| Balance, December 31, 1989 . . . . . . . . . . . . . . | 200 | 20 | 75,001 | (20,172) | 54,849 |
| Net loss for the year ended December 31, 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (124,269) | (124,269) |
| Balance, December 31, 1990 . . . . . . . . . . . . . . | 200 | $20 | $75,001 | ($144,441) | ($ 69,420) |

The accompanying notes to combined financial statements
are an integral part of this statement.

# TRUMP TAJ MAHAL FUNDING, INC. AND
# TRUMP TAJ MAHAL ASSOCIATES
## COMBINED STATEMENTS OF CASH FLOWS

| | Period from Inception (June 3, 1988) to December 31, 1988 | Year Ended December 31, 1989 | Year Ended December 31, 1990 |
|---|---|---|---|
| | | (Dollars in thousands) | |
| **Cash flows from operating activities:** | | | |
| Net loss | $ (2,928) | $ (17,244) | $(124,269) |
| Adjustments to reconcile net loss to net cash flows provided by (used in) operating activities: | | | |
| Non-cash charges: | | | |
| Adjustments to reduce the carrying value of non current assets | — | — | 52,028 |
| Depreciation and amortization | 397 | 3,950 | 47,205 |
| | (2,531) | (13,294) | (25,036) |
| Changes in operating assets and liabilities: | | | |
| Deferred preopening expenses | (1,504) | (20,092) | (26,608) |
| Receivables, net | — | — | (18,324) |
| Inventory | — | — | (3,735) |
| Other current assets | (3,667) | (1,391) | 1,170 |
| Due to affiliates, net | 909 | 5,491 | 13,135 |
| Accounts payable | — | 14,393 | (6,143) |
| Accrued interest payable | 10,500 | 1,884 | 50,460 |
| Other current liabilities | 3,703 | 611 | 22,879 |
| Net cash flows provided by (used in) operating activities | 7,410 | (12,398) | 7,798 |
| **Cash flows from financing and investing activities:** | | | |
| Purchase of property and equipment | (278,449) | (322,153) | (178,060) |
| Cash investments—noncurrent | (323,255) | 263,160 | 60,095 |
| Net cash flows used in investing activities | (601,704) | (58,993) | (117,965) |
| **Cash flows from financing activities:** | | | |
| Proceeds from borrowings | 675,000 | 9,479 | 67,354 |
| Repayment of borrowings | — | — | (5,741) |
| Issuance of common stock | 20 | — | — |
| Partners' contributions | 75,001 | — | — |
| Deferred loan offering costs | (22,781) | — | — |
| Net cash flows provided by financing activities | 727,240 | 9,479 | 61,613 |
| Net increase (decrease) in cash and cash investments | 132,946 | (61,912) | (48,554) |
| Cash and cash investments—beginning of year | — | 132,946 | 71,034 |
| Cash and cash investments—end of year | $ 132,946 | $ 71,034 | $ 22,480 |
| **Supplemental disclosure:** | | | |
| Interest paid | $ 521 | $ 92,841 | $ 51,243 |

The accompanying notes to combined financial statements
are an integral part of these statements.

# TRUMP TAJ MAHAL FUNDING, INC. AND
# TRUMP TAJ MAHAL ASSOCIATES
## NOTES TO COMBINED FINANCIAL STATEMENTS

### (1) Organization, Operations and Summary of Significant Accounting Policies

Trump Taj Mahal Associates (the "Partnership") was formed on June 23, 1988 as a New Jersey limited partnership. In December 1990, the Partnership was converted to a general partnership. The partners are Trump Taj Mahal, Inc. ("TTMI") and The Trump Taj Mahal Corporation ("Trump Corp"). The Partnership was formed for the purpose of acquiring, constructing and operating the Trump Taj Mahal Casino Resort (the "Taj Mahal"), an Atlantic City hotel, casino and convention center complex. On April 2, 1990, the Partnership opened the Taj Mahal to the public. Prior to such date, the Partnership was in the developmental stage and incurred losses amounting to approximately $24,164,000 (unaudited).

Trump Taj Mahal Funding, Inc. (the "Company") was incorporated on June 3, 1988 to serve as a financing company to raise funds through the issuance of First Mortgage Bonds (the "Bonds") as the nominee of, and to loan the gross proceeds to, the Partnership (Note 3). Since the Company has no business operations, its ability to service the Bonds is completely dependent upon funds received from the Partnership.

Donald J. Trump beneficially owns 100% of the Company and the Partnership and has pledged his total ownership interests as collateral under various debt agreements.

#### Revenue Recognition

Casino revenues consist of the net win from gaming activities, which is the difference between gaming wins and losses. Revenues from hotel and other services are recognized at the time the related service is performed.

#### Promotional Allowances

Gross revenues include the retail value of complimentary rooms, food, beverages and other services furnished to patrons. The retail value of these promotional allowances is deducted from gross revenues to arrive at net revenues. The cost of promotional allowances is charged to operations. For 1990, promotional allowances consisted of rooms ($18,146,000), food and beverage ($30,436,000) and other services ($2,861,000).

#### Income Taxes

The accompanying financial statements do not include a provision for Federal income taxes of the Partnership, since any income or losses allocated to the Partners are reportable for Federal income purposes by the Partners.

Under the New Jersey Casino Control Commission regulations, the Partnership is required to file a New Jersey corporation business tax return.

#### Deferred Pre-opening Expenses

Costs incurred in preparation of opening the Taj Mahal were deferred until opening and amortized from April through November 1990 using a three year amortization period. In December 1990, the unamortized balance was written off due to its uncertain realization (Note 2).

#### Deferred Loan Offering Costs

Underwriters' commissions and other costs incurred in connection with the offering of the Bonds were amortized from the issuance thereof through November 1990, using the effective interest method.

# TRUMP TAJ MAHAL FUNDING, INC. AND
# TRUMP TAJ MAHAL ASSOCIATES
## NOTES TO COMBINED FINANCIAL STATEMENTS—(Continued)

In December 1990, the unamortized balance was written off in view of the Partnership's and the Company's anticipated restructuring (Note 2).

### Inventories

All inventories are carried at cost on a weighted average basis.

### Property and Equipment

Property and equipment is recorded at cost and is depreciated on the straight-line method over the estimated useful lives of assets. Estimated useful lives range from three to seven years for furniture, fixtures and equipment and 40 years for buildings and building improvements. Leasehold improvements are amortized over the term of the related lease commencing in the period these assets are placed in service.

The interest expense associated with borrowings used to fund the purchase and construction of the Taj Mahal has been capitalized and is being amortized over the estimated useful life of the facility.

### Cash and Cash Investments

Cash and cash investments include hotel and casino funds, funds on deposit with banks and temporary investments having a maturity of three months or less. Cash investments—non-current, represents funds designated for the purchase of non-current assets.

### Reclassifications

Certain amounts presented in the 1988 and 1989 financial statements have been reclassified to conform to the 1990 presentation.

### (2) Proposed Restructuring of Debt and Plan of Reorganization

Since opening, the Partnership has been unable to generate sufficient cash to service its debt and as of December 31, 1990, the Company and the Partnership had a combined working capital deficit of approximately $867,090,000. As more fully described in Note 3, the Partnership has failed to make the October, November and December, 1990 interest payments totaling approximately $1,200,000 and the November 15, 1990 principal payment of $2,631,000 due on the furniture, fixtures and equipment term loan (the "Bank loan") and the $47,250,000 interest payment due on November 15, 1990 on the Bonds (Note 3). In addition, the Partnership failed to make the 1991 monthly Bank loan interest and quarterly principal payments and the Company and the Partnership do not intend to pay the $47,250,000 May 15, 1991 interest payment on the Bonds.

The Company and the Partnership are in the process of renegotiating the terms of their debt. If the proposed plan is confirmed, the Partnership would be owned 50% by Donald J. Trump and 50% by the Bondholders. If certain additional interest payments, as defined, are made upon maturity of the Bonds, Donald J. Trump's ownership would be increased up to 80%.

The proposed restructuring includes seeking protection under the United States Bankruptcy Code of 1978, as amended, and proposing certain amendments to the Bond Indenture that would result in each $1,000 of the Bonds being exchanged for $1,000 principal amount of New Mortgage Bonds ("New Bonds") and two shares of Class A Stock, and one share of Class B Stock of Taj Mahal Holding Corp. which will beneficially own 50% of the Partnership. In addition, the proposed restructuring would include the issuance of $47,250,000 of additional New Bonds in lieu of the November 15, 1990 cash interest payment, a reduction of the stated interest rate on the New Bonds from 14% to 11.35% per

## TRUMP TAJ MAHAL FUNDING, INC. AND
## TRUMP TAJ MAHAL ASSOCIATES
### NOTES TO COMBINED FINANCIAL STATEMENTS—(Continued)

annum and the issuance of additional New Bonds as payment of a portion of the interest payable on the New Bonds on the semiannual due dates through a revised maturity date of November 15, 1999.

The Partnership is also in the process of renegotiating the Bank loan (Note 3) to reduce the interest rate from prime plus ½% or LIBOR plus 2% to 9.375% and extend the maturity date to November 1999. In addition, upon confirmation of the proposed plan of reorganization, amounts owed to subcontractors (Note 4) would be settled in exchange for $20,000,000 in principal amount of the Bonds. Amounts payable to Donald J. Trump under the Trump Line of Credit Note as well as amounts due to affiliates under the Management Agreement (including the $10,000,000 construction fee (Note 5)) would be contributed to the Partnership as capital. Further, the restructuring contemplates the availability of bank lines of credit in the amount of $25,000,000 for working capital and $50,000,000 for payment of interest on the New Bonds. The Company and the Partnership believe that if these restructurings are successful, they will have sufficient liquidity and capital to maintain operations and service its debts. There can be no assurance, however, that the implementation of these amendments will occur or that the plan will be successful or if successful, the Partnership will have sufficient liquidity and capital to maintain operations and service its debt.

In connection with the restructurings described above, the Partnership has incurred and charged to operations $4,850,000 of professional fees through December 31, 1990. In addition, preopening expenses of $36,153,000 were written off. The Partnership has also written off $15,875,000 of unamortized loan offering costs and has included a provision of $3,000,000 for litigation.

In accordance with Statement of Position 90-7, "Financial Reporting By Entities In Reorganization Under the Bankruptcy Code" recently issued by the American Institute of Certified Public Accountants, upon confirmation of the proposed plan, the New Bonds and the Bank loan will be stated at present values of amounts to be paid, determined at appropriate current interest rates. It is expected that this will result in a significant gain which will be reported as an extraordinary item. This gain will be offset by increased interest costs over the period the New Bonds are outstanding to accrete such New Bonds to their face value at maturity.

The Partnership's current liquidity problem is due to a variety of factors, including an overall deterioration in the Atlantic City casino gaming market as indicated by reduced rates of casino revenue growth for the industry for the last two years as compared to prior years, aggravated by an economic recession in the Northeast, a recent significant increase in capacity in the Atlantic City gaming market and less than anticipated revenues at the Taj Mahal. Also contributing to the Partnership's liquidity problem were increased construction costs of the Taj Mahal, attributable to unanticipated cost overruns and project enhancements designed to improve the overall project, combined with a delay in the opening of the Taj Mahal. The Partnership believes that certain of these factors will be temporary and that there has been no permanent impairment of the net carrying value of its property and equipment. Although certain measurements indicated that the net carrying value of property and equipment may not be realizable in the ordinary course of business, the estimated undiscounted sum of future cash flows, before debt service, over approximately ten years is expected to be sufficient to recover the net carrying value of such assets.

The results of the limited operating history of the Partnership and its inability to generate sufficient cash to service its debt raise substantial doubt about the Company's and Partnership's ability to continue as going concerns. The accompanying financial statements do not include any adjustments relating to the recoverability and the classification of asset carrying amounts or the amount and classification of liabilities that might result should the Company and the Partnership be unable to continue as going concerns.

## TRUMP TAJ MAHAL FUNDING, INC. AND
## TRUMP TAJ MAHAL ASSOCIATES
### NOTES TO COMBINED FINANCIAL STATEMENTS—(Continued)

**(3) Long Term Debt**

Long term debt consisted of the following at December 31:

|  | 1989 | 1990 |
|---|---|---|
|  | (In thousands) | |
| First Mortgage Bonds(a) | $675,000 | $ 675,000 |
| Bank term loan(b) | 8,715 | 44,668 |
| Other(c) | 764 | 1,424 |
| Total | 684,479 | 721,092 |
| Less: Current portion | (1,563) | (720,175) |
| Long term debt | $682,916 | $     917 |

(a) On November 22, 1988, the Company issued its Bonds, at their face value of $675,000,000. The Bonds bear interest at 14%, payable semiannually on each May 15 and November 15 and the principal is due in full on November 15, 1998. The Bonds are redeemable at any time on or after November 15, 1993, at the option of the Company, in whole or in part, at a premium scaling down to par at November 15, 1997. The proceeds of the Bonds were loaned by the Company to the Partnership under terms which conform with the terms of the Indenture.

The Company failed to make its November 15, 1990 installment of interest on the Bonds on or before December 15, 1990 (the date on which the 30-day grace period for interest payments on the Bonds expired), which constituted an Event of Default under the Indenture. As a result, the Trustee under the Indenture or the holders of not less than 25% of the Bonds outstanding may declare the entire outstanding principal amount of Bonds to be due and payable immediately upon written notice to the Company. Accordingly, the Bonds have been classified as a current liability.

(b) On November 3, 1989, the Partnership entered into a loan agreement with National Westminster Bank (the "Bank") to provide financing of up to $50,000,000 for 80% of the cost of certain items of furniture, fixtures and equipment installed in the Taj Mahal. The Bank loan bears interest, which is payable monthly, at the Bank's prime rate plus ½% or LIBOR plus 2%, at the Company's option (10½% at December 31, 1990). Principal repayments are required to be made quarterly over a five year period. The Bank loan is secured by a first priority lien on the related furniture, fixtures and equipment. The Partnership has failed to make monthly interest payments approximating $400,000 that were due on October 1, 1990 and for subsequent months. The Partnership did not make the November 15, 1990 payment of principal on the Bank loan of approximately $2,631,000 nor subsequent quarterly installments in 1991. As the Bank has the right to accelerate such indebtedness upon notice to the Partnership, the Bank loan has been classified as a current liability.

(c) Comprised of obligations under capitalized equipment leases and vehicle loans from a bank bearing interest at rates between 10% and 11.3% payable monthly. Principal repayments are due in varying amounts through 1994. The loans and leases are secured by a first priority lien on the related equipment.

As described in Note 2, the Partnership is attempting to restructure the terms of its indebtedness with its creditors. No assurances can be made as to the ultimate outcome of these negotiations.

**(4) Subcontractors' Note Payable**

On September 6, 1990, the Partnership entered into an agreement with certain subcontractors who provided goods and services in connection with the construction of the Taj Mahal. Pursuant to the Subcontractors' Agreement, the Partnership and the Subcontractors settled certain claims of the Subcontractors and established a payment schedule with respect thereto. The $35,523,000 balance of

## TRUMP TAJ MAHAL FUNDING, INC. AND
## TRUMP TAJ MAHAL ASSOCIATES

### NOTES TO COMBINED FINANCIAL STATEMENTS—(Continued)

the Subcontractors' Note matures on August 15, 1995, unless sooner paid out of net cash flow, as defined. The stated interest rate is 0% in the first three years, 8% in the fourth year, and 10% in the fifth year.

The Subcontractors' Note has been classified as a current liability as a result of the Partnership's failure to make the interest payments on the Bank loan. As described in Note 2, the Partnership is in the process of restructuring this obligation.

### (5) Trump Line of Credit, Management and Construction Fees Payable

On April 30, 1990, Donald J. Trump loaned the Partnership $25,000,000 which loan accrues interest at the prime rate ("Trump Line of Credit"). Amounts payable to Trump Hotel Management Corporation ("THMC") include a $10,000,000 construction supervisory fee, payment of which has been deferred until August 9, 1995 ($8,182,000 was payable at December 31, 1989) as well as $6,484,000 payable under a management agreement. The management agreement provides for a fee based on 1¾% of gross revenues of the Partnership, as defined, which payment is subordinate to the payment of interest and principal of the Bonds. The Partnership accrued $7,140,000 of management fees in 1990, of which $656,000 was paid.

Under the proposed restructuring plan described in Note 2, amounts owed for the line of credit, management and construction fees would be contributed to the Partnership as capital. These amounts have been reflected as current liabilities as of December 31, 1990.

### (6) Transactions with Affiliates

The Partnership has engaged in certain transactions with entities that are beneficially owned by Donald J. Trump. Amounts owed to (from) these affiliates are as follows at December 31:

|  | 1989 | 1990 |
|---|---|---|
|  | (In thousands) | |
| Trump Taj Mahal Realty Corp. ("Realty")(a) | $(1,968) | $1,396 |
| Trump's Castle Associates(b) | 9 | 538 |
| Trump Plaza Associates(b) | 73 | (53) |
| Helicopter Air Services(c) | 19 | 529 |
| Trump Shuttle(c) | — | — |
| Trump Regency(d) | 85 | 141 |
| Other(e) | — | 500 |
|  | $(1,782) | $3,051 |

(a) Pursuant to various lease agreements, the Partnership accrued $1,396,000 in rent payable to Realty, for the use of certain real property adjacent to or in the vicinity of the Taj Mahal, none of which has been paid. The terms of the lease agreements extend through 2020 and provide for aggregate annual rental payments of approximately $1,500,000 (Note 7).

(b) The Partnership engages in various transactions with the two other Atlantic City hotel/casinos owned by Donald J. Trump. These transactions include the utilization of print shop operations, fleet maintenance and limousine services, certain shared payroll costs as well as complimentary services offered to customers. During 1990, the Partnership incurred approximately $2,795,000 and $511,000 of costs for these services from Trump Castle and Trump Plaza, respectively. In addition, the Partnership charged $753,000 and $674,000 to Trump Castle and Trump Plaza, respectively, for similar services.

## TRUMP TAJ MAHAL FUNDING, INC. AND
## TRUMP TAJ MAHAL ASSOCIATES
### NOTES TO COMBINED FINANCIAL STATEMENTS—(Continued)

*(footnotes continued from previous page)*

(c) Helicopter Air Services and Trump Shuttle provide aircraft charter and travel services to certain patrons of the Taj Mahal on behalf of the Partnership. During 1990, the Partnership incurred $1,523,000 and $473,000 of charges from Helicopter Air Services and Trump Shuttle, respectively.

(d) Prior to commencing its operations, the Partnership incurred $481,000 for the use of certain facilities of the Trump Regency Hotel in Atlantic City.

(e) Represents billings for services rendered by employees of The Trump Organization for services associated with the restructuring.

### (7) Commitments and Contingencies

#### *Leases and Employment Agreements*

The Partnership has entered into employment agreements with certain key employees and lease agreements for land, office and warehouse space under noncancellable operating leases expiring at various dates through 2020. At December 31, 1990, minimum commitments under these arrangements are as follows:

| | |
|---|---|
| 1991 | $ 7,400,000 |
| 1992 | 6,400,000 |
| 1993 | 3,876,000 |
| 1994 | 3,128,000 |
| 1995 | 2,466,000 |
| Thereafter | 39,652,000 |

Rent expense was $2,969,000 for the year ended December 31, 1990, including $1,396,000 payable to Realty (Note 6).

Certain leasehold improvements are situated on land leased by the Partnership from Realty. Pursuant to an agreement with the Housing Authority of the City of Atlantic City (the "Housing Authority"), these improvements, which are estimated to cost approximately $20 million to complete, are required to be finished by May 1, 1991. If this deadline is not extended, failure to complete the improvements will enable the Housing Authority to exercise a right of reverter with respect to the land on which the improvements are located. The Partnership intends to seek extensions of the required completion date. If the Housing Authority exercises its right of reverter, the investment to date in the construction of the theatre, which is approximately $18,700,000, will be lost.

The Partnership's Coastal Area Facilities Review Act ("CAFRA") Permit requires that certain improvements be made to other land parcels leased from Realty, which permit is a condition to the operation of the Taj Mahal. These improvements must be commenced by October, 1992 and must be completed within 18 months of commencement. The estimated cost of these improvements is $30 million. The Partnership intends to seek a modification of its CAFRA Permit to extend the required completion date of the improvements to the Steel Pier and to reduce the scope of such improvements.

#### *Employee Benefit Plan*

Effective January 1, 1989, the Partnership established the Taj Mahal Retirement Savings Plan (the "Plan") for its employees over 21 years of age who are not covered by a collective bargaining agreement. The Plan is structured to qualify for favorable tax treatment under Section 401(k) of the Internal Revenue Code and allows eligible participants to contribute up to 15% of their salary (certain limits apply, as defined) to the Plan with a matching Partnership contribution of 50% of such salary contribution up to 4%. The funds are invested by a Plan trustee. Partnership contributions during the years ended December 31, 1989 and 1990 were $86,000 and $556,000, respectively. Other than the

# TRUMP TAJ MAHAL FUNDING, INC. AND
# TRUMP TAJ MAHAL ASSOCIATES
## NOTES TO COMBINED FINANCIAL STATEMENTS—(Continued)

benefits provided by the Plan, the Partnership does not provide any post-retirement benefits for its employees.

### Casino License

The operation of an Atlantic City hotel and casino is subject to significant regulatory controls which affect virtually all of its operations. Under the New Jersey Casino Control Act (the "Act") the Partnership was required to obtain certain licenses prior to opening. These licenses must be renewed periodically, are not transferable, include a review of the financial stability of the Partnership and can be revoked at any time. Due to the uncertainty of any license renewal application, there can be no assurance that the license will be renewed. Upon revocation, suspension for more than 120 days, or failure to renew the casino license due to the Partnership's financial condition or for any other reason, the Act provides for the mandatory appointment of a conservator to take possession of the hotel and casino's business and property, subject to all valid liens, claims and encumbrances.

Effective April 26, 1990, the New Jersey Casino Control Commission ("CCC") issued the Partnership and THMC their initial licenses. The licenses were issued for a term of one year and must be acted upon by the CCC no later than 30 days prior to their expiration. The continued operations of the Partnership are subject to its retaining its license. On April 18, 1991, the CCC renewed the casino licenses of the Partnership and THMC through April 26, 1992, subject to the conditions that (i) by June 17, 1991, the Plan be filed with the United States Bankruptcy Court and Donald J. Trump submit to the CCC executed term sheets amending loan agreements with certain of his lender banks and (ii) at a CCC hearing to resume on that date, the licensees and Donald J. Trump demonstrate their financial stability through April 26, 1992. No assurances can be given that the CCC will continue the casino licenses of the Partnership or THMC or, if continued, what conditions may be imposed and whether those conditions will be considered acceptable by the Partnership.

### Legal Proceedings

The Partnership, its Partners, certain members of its Executive Committee, certain of its employees, the Company and Trump Hotel Management Corp. are involved in various legal proceedings. The Partnership has agreed to indemnify such entities and persons against any and all losses, claims, damages, expenses and liabilities incurred by them in said legal proceedings. Such persons and entities are vigorously defending the allegations against them and intend to vigorously contest any future proceedings. See Part I, Item 3, Legal Proceedings included elsewhere herein, for a description of the legal proceedings. If adversely decided, these legal proceedings could have a material adverse effect on the Partnership's results of operations and financial condition.

### Investment Obligation

The Act requires the Partnership to make qualified investments, as defined, in New Jersey, or pay an investment alternative tax.

Commencing twelve months after the date of opening of the Taj Mahal (which was April 2, 1990) and continuing for a period of twenty-five years thereafter, the Partnership must either obtain investment tax credits, as defined, in an amount equivalent to 1.25% of its gross casino revenues or pay an alternative tax of 2.5% of its gross casino revenues, as defined. Investment tax credits may be obtained by making qualified investments or by the purchase of bonds at below market interest rates from the Casino Reinvestment Development Authority ("CRDA"). The Partnership is required to satisfy its obligations to the CRDA on a quarterly basis.

## REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To TAJ MAHAL HOLDING CORP.:

We have audited the accompanying balance sheet of Taj Mahal Holding Corp. (a Delaware corporation) as of January 23, 1991. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statement is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statement. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statement referred to above presents fairly, in all material respects, the financial position of Taj Mahal Holding Corp. as of January 23, 1991 in conformity with generally accepted accounting principles.

ARTHUR ANDERSEN & CO.

Roseland, New Jersey
January 28, 1991

# TAJ MAHAL HOLDING CORP.

### BALANCE SHEET
#### January 23, 1991

### ASSETS

| | |
|---|---|
| Cash | $100 |
| Total assets | $100 |

### CAPITAL (Notes 1 and 2)

| | |
|---|---|
| Common stock. $.01 par value, 100 shares authorized, 10 issued and outstanding | $— |
| Paid in Capital | 100 |
| Total capital | $100 |

The accompanying notes to balance sheet are
an integral part of this balance sheet.

# TAJ MAHAL HOLDING CORP.
## NOTES TO BALANCE SHEET
### January 23, 1991

### (1) Organization

Taj Mahal Holding Corp. ("Holding") was organized on December 18, 1990 as a Delaware corporation wholly owned by Donald J. Trump. As described elsewhere in this Prospectus, Holding was formed for the purpose of consummating a plan of reorganization (the "Plan") involving Trump Taj Mahal Associates, a New Jersey general partnership which operates Trump Taj Mahal Casino Resort (the "Partnership") and Trump Taj Mahal Funding, Inc., a New Jersey corporation that raised funds for the Partnership (the "Company"). Both the Partnership and the Company are owned by Mr. Trump and affiliated entities. Holding has had no operations to date.

### (2) The Plan

Upon consummation of the Plan, the Partnership will issue to the holders of the Company's 14% First Mortgage Bonds, Series A, Due 1998 (the "Bonds"), a general partnership interest representing 49.995% of the equity of the Partnership, and such holders will in turn contribute such partnership interests to Holding. The Company will also issue New Bonds (as described elsewhere in this Prospectus) in exchange for the Bonds. The New Bonds will be part of a unit that will include a newly created Class B Redeemable Common Stock (the "Class B Stock") of Holding described below.

As part of the Plan, TM/GP Corporation, a New Jersey corporation and a wholly owned subsidiary of Holding ("TMGP") with no other assets, will receive a 49.995% partnership interest in the Partnership from Holding and will serve as the Partnership's managing general partner. Mr. Trump will also contribute to Holding a 50% ownership interest in The Trump Taj Mahal Corporation, a Delaware corporation, which owns a .01% interest in the Partnership. As a result, Holding will control a 50% ownership interest in the Partnership.

At the time of these transfers, Holding will authorize and issue 1,350,000 shares of its Class A Common Stock (the "Class A Stock") and 722,250 shares of its Class B Stock to the holders of the Bonds and 1,350,000 shares of its Class C Common Stock (the "Class C Stock") to Mr. Trump.

The holders of the Class B Stock will be entitled to elect four of the nine members of Holding's Board of Directors and Mr. Trump, as holder of the Class C Stock, will be entitled to elect the remaining five directors. The Class A Stock will have no voting rights during the time any of the Class B Stock is outstanding. However, except upon Holding's liquidation, only the Class A Stock will be entitled to distributions and dividends made by Holding. The Class B Stock must be redeemed at a price of $.50 per share value when the New Bonds, with which they were issued, are paid, redeemed or purchased and canceled.

# TRUMP TAJ MAHAL FUNDING, INC.

## BALANCE SHEETS

|  | December 31, 1990 | March 31, 1991 |
|---|---|---|
|  | (Dollars in thousands) | (Unaudited) |
| **ASSETS** | | |
| Cash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $     20 | $     20 |
| Accrued interest receivable from Trump Taj Mahal Associates . . . . | 59,588 | 83,213 |
| Mortgage note receivable from Trump Taj Mahal Associates . . . . . | 675,000 | 675,000 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $734,608 | $758,233 |
| **LIABILITIES AND CAPITAL** | | |
| Accrued interest payable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 59,588 | $ 83,213 |
| 14% first mortgage bonds, Series A. Due 1998 . . . . . . . . . . . . . . . . | 675,000 | 675,000 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 734,588 | 758,213 |
| Commitments and contingencies | | |
| Capital: | | |
| Common stock, without par value, 2,500 shares authorized, 200 shares issued and outstanding . . . . . . . . . . . . . . . . . . . . . . . | 20 | 20 |
| Retained earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — |
| Total liabilities and capital . . . . . . . . . . . . . . . . . . . . . . . . . . . | $734,608 | $758,233 |

The accompanying notes to financial statements
are an integral part of these balance sheets.

F-21

# TRUMP TAJ MAHAL FUNDING, INC.
## STATEMENTS OF OPERATIONS

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 1990 | 1991 |
|  | (Dollar in thousands) (Unaudited) | |
| Interest income from Trump Taj Mahal Associates ............... | $23.625 | $23.625 |
| Interest expense ............................................ | (23.625) | (23.625) |
| Net income ........................................... | — | — |

The accompanying notes to financial statements
are an integral part of these statements.

F-22

# TRUMP TAJ MAHAL FUNDING, INC.
## STATEMENTS OF CASH FLOWS

| | Three Months Ended March 31, | |
| | 1990 | 1991 |
| | (Dollars in thousands) (Unaudited) | |
|---|---|---|
| Cash flows from operating activities: | | |
| Increase in accrued interest receivable ...................... | $(23,579) | $(23,625) |
| Increase in accrued interest payable ........................ | 23,579 | 23,625 |
| Net change in cash ................................... | — | — |
| Cash at beginning of period ................................... | 20 | 20 |
| Cash at end of period ....................................... | $    20 | $    20 |

The accompanying notes to financial statements
are an integral part of these statements.

F-23

# TRUMP TAJ MAHAL FUNDING, INC. AND
# TRUMP TAJ MAHAL ASSOCIATES
## CONDENSED COMBINED BALANCE SHEETS

|  | December 31, 1990 | March 31, 1991 |
|---|---|---|
|  | (Dollars in thousands) | (Unaudited) |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash investments | $ 22,480 | $ 30,731 |
| Receivables, net | 18,324 | 16,435 |
| Inventory | 4,565 | 3,971 |
| Other current assets | 1,848 | 3,028 |
| Total current assets | 47,217 | 54,165 |
| Property and equipment, net | 797,821 | 786,767 |
| Other assets | 766 | 664 |
| Total assets | $845,804 | $841,596 |
| **LIABILITIES AND DEFICIT** | | |
| Current liabilities: | | |
| Long-term debt due currently | $720,175 | $720,212 |
| Accounts payable, including construction contract payables of $15,787 and $9,976 | 24,037 | 15,478 |
| Subcontractors' note payable | 35,523 | 35,523 |
| Trump line of credit, management and construction fees payable | 41,484 | 43,410 |
| Accrued interest payable | 62,844 | 88,118 |
| Due to affiliates | 3,051 | 1,678 |
| Other current liabilities | 27,193 | 32,238 |
| Total current liabilities | 914,307 | 936,657 |
| Commitments and contingencies | | |
| Long-term debt | 917 | 740 |
| Deficit | (69,420) | (95,801) |
| Total liabilities and deficit | $845,804 | $841,596 |

The accompanying notes to financial statements
are an integral part of these balance sheets.

F-24

## TRUMP TAJ MAHAL FUNDING, INC. AND
## TRUMP TAJ MAHAL ASSOCIATES
### COMBINED STATEMENTS OF OPERATIONS

|  | For the Three Months Ended March 31, | |
|  | 1990 | 1991 |
|---|---|---|
|  | (Dollars in thousands) (Unaudited) | |
| **Revenues:** | | |
| Gaming | $ — | $ 84,298 |
| Rooms | — | 9,182 |
| Food and beverage | — | 14,351 |
| Other | 70 | 2,414 |
| Gross revenues | 70 | 110,245 |
| Less—Promotional allowances | — | 14,453 |
| Net revenues | 70 | 95,792 |
| **Costs and expenses:** | | |
| Gaming | — | 40,176 |
| Rooms | — | 5,359 |
| Food and beverage | — | 11,932 |
| General and administrative | 137 | 26,278 |
| Depreciation and amortization | — | 9,096 |
| Restructuring costs | — | 3,530 |
| | 137 | 96,371 |
| Loss from operations | (67) | (579) |
| Interest income | 1,845 | 229 |
| Interest expense | (5,770) | (26,031) |
| Net loss | $ (3,992) | $(26,381) |

The accompanying notes to financial statements
are an integral part of these statements.

# TRUMP TAJ MAHAL FUNDING, INC. AND
# TRUMP TAJ MAHAL ASSOCIATES
## CONDENSED COMBINED STATEMENTS OF CASH FLOWS

|  | For the Three Months Ended March 31. | |
|---|---|---|
|  | 1990 | 1991 |
|  | (Dollars in thousands) (Unaudited) | |
| Cash flows from operating activities: |  |  |
| Net loss | $ (3.992) | $(26.381) |
| Adjustment to reconcile net loss to net cash flows provided by operating activities—depreciation and amortization | 889 | 9.096 |
|  | (3.103) | (17.285) |
| Changes in operating assets and liabilities: |  |  |
| Deferred preopening expenses | (26.035) | — |
| Receivables, net | — | 1.889 |
| Inventory | (7.750) | 594 |
| Other assets | (2.882) | (1.078) |
| Due to affiliates, net | (6.274) | 553 |
| Accounts payable | 26.015 | (2.748) |
| Accrued interest payable | 23.579 | 25.274 |
| Other current liabilities | 8.831 | 5.045 |
| Net cash flows provided by operating activities | 12.381 | 12.244 |
| Cash flows from investing activities: |  |  |
| Purchases of property and equipment, net | (124.607) | (3.853) |
| Cash investments—noncurrent | 60.095 | — |
| Net cash flows used in investing activities | (64.512) | (3.853) |
| Cash flows from financing activities: |  |  |
| Proceeds from borrowings | 42.319 | — |
| Repayments of borrowings | — | (140) |
| Net cash flows provided (used) by financing activities | 42.319 | (140) |
| Net increase (decrease) in cash and cash investments | (9.812) | 8.251 |
| Cash and cash investments—beginning of period | 71.034 | 22.480 |
| Cash and cash investments—end of period | $ 61.222 | $ 30.731 |

The accompanying notes to financial statements
are an integral part of these statements.

# TRUMP TAJ MAHAL FUNDING, INC. AND
# TRUMP TAJ MAHAL ASSOCIATES
## NOTES TO FINANCIAL STATEMENTS
(Unaudited)

**(1) Condensed Financial Statements**

The accompanying financial statements include those of Trump Taj Mahal Funding, Inc. (the "Company"). and the combined statements of the Company and Trump Taj Mahal Associates (the "Partnership"), an entity which owns and operates the Trump Taj Mahal Casino/Resort (the "Taj Mahal") in Atlantic City, New Jersey. The Company and the Partnership have common ownership. All significant intercompany balances and transactions have been eliminated in the combined condensed financial statements.

The Partnership commenced operations on April 2, 1990. Prior to this date, the Partnership was in the development stage and incurred losses amounting to approximately $24,164,000. The Company was formed for the purpose of raising funds through the issuance of 14% First Mortgage Bonds, Series A, due 1998 (the "Bonds"), the proceeds of which were loaned to the Partnership for construction of the Taj Mahal. The ability of the Company to repay the principal and interest on the Bonds is completely dependent on the operations of the Partnership.

The accompanying financial statements have been prepared by the Company and the Partnership without audit. In the opinion of the Company and the Partnership, all adjustments, consisting of only normal recurring adjustments, necessary to present fairly the financial position, results of operations and changes in cash flows for the periods presented, have been made.

The accompanying financial statements have been prepared by the Company and the Partnership pursuant to the rules and regulations of the Securities and Exchange Comission (the "SEC"). Accordingly, certain information and note disclosures normally included in financial statements prepared in conformity with generally accepted accounting principles have been condensed or omitted. These condensed financial statements should be read in conjunction with the audited financial statements and notes thereto included on pages F-4 through F-17.

The casino industry in Atlantic City is seasonal in nature; therefore, results of operations for the three month period ended March 31, 1991 are not necessarily indicative of the operating results for a full year.

**(2) Proposed Plan of Reorganization**

As more fully discussed in the audited financial statements and in Management's Discussion and Analysis of Financial Condition and Results of Operations in this Prospectus, the Partnership is currently experiencing a liquidity problem due to a variety of factors. These factors resulted in the Company's failure to make the November 15, 1990 scheduled interest payments on the Bonds, as well as scheduled interest and principal payments on its furniture, fixtures and equipment loan since October 1, 1990. As a result of the failure to make these payments, substantially all of the Company's and the Partnership's debt have been classified as current liabilities as of March 31, 1991 and December 31, 1990.

There can be no assurances that the restructuring proposal described in this Prospectus, or any other proposal, will be implemented. Until such time, if ever, as a restructuring is completed or additional borrowing is obtained, the Partnership will rely on cash generated from operations to service its debt and provide for its anticipated capital requirements.

Based on current operations, funds generated from operations will not be sufficient to cover all the Company's and the Partnership's debt service obligations, including the May 15, 1991 installment of interest payable with respect to the Bonds, and the Company does not intend to make such interest payments. As part of the Plan, the Company and the Partnership intend to seek protection under the United States Bankruptcy Code of 1978, as amended. Any such bankruptcy proceeding would not

## TRUMP TAJ MAHAL FUNDING, INC. AND
## TRUMP TAJ MAHAL ASSOCIATES

### NOTES TO FINANCIAL STATEMENTS—(Continued)
(Unaudited)

personally involve Donald J. Trump. the beneficial owner of 100% of the equity interests in the Partnership and 100% of the capital stock of the Company as a petitioner.

### (3) Casino License Renewal

The Company and the Partnership are subject to regulation and licensing by the New Jersey Casino Control Commission (the "CCC"). The Partnership's casino license must be renewed periodically. is not transferable. includes a review of the financial stability of the Partnership and can be revoked at anytime. Due to the uncertainty of any license renewal application. there can be no assurance that the license will be renewed. Upon revocation, suspension for more than 120 days. or failure to renew the casino license due to the Partnership's financial condition or for any other reason. the Casino Control Act provides for the mandatory appointment of a conservator to take possession of the hotel and casino's business and property. subject to all valid liens, claims and encumbrances.

Effective April 26, 1990. the CCC issued the Partnership its initial license. The license was issued for a term of one year. The continued operations of the Partnership are subject to its retaining its license. On April 18, 1991. the CCC renewed the casino license of the Partnership through April 26, 1992, subject to the conditions that (i) by June 17, 1991. the Plan be filed with the United States Bankruptcy Court and Donald J. Trump submit to the CCC executed term sheets amending loan agreements with certain of his lender banks and (ii) at a CCC hearing to resume on that date. the Partnership and Donald J. Trump demonstrate their financial stability through April 26, 1992. No assurances can be given that the CCC will continue the casino license of the Partnership or. if continued, what conditions may be imposed and whether those conditions will be considered acceptable by the Partnership.

### (4) Legal Proceedings

The Partnership. its partners. certain members of its Executive Committee. certain of its employees and the Company are involved in various legal proceedings. which are described under the caption "Legal Proceedings" in Part II. Item 1 of this Report. The Partnership and the Company have agreed to indemnify such persons against all fees, costs and expenses incurred by them in said legal proceedings. Such persons and entities are vigorously defending the allegations against them and intend to vigorously contest any future proceedings. If adversely decided. these legal proceedings could have a material adverse effect on the Company's and the Partnership's results of operations and financial condition.

PROSPECTUS AND SOLICITATION OF PLAN ACCEPTANCES

# TRUMP TAJ MAHAL FUNDING, INC.
# TRUMP TAJ MAHAL ASSOCIATES
# TAJ MAHAL HOLDING CORP.

Trump Taj Mahal Funding, Inc., a New Jersey corporation (the "Company"), and Trump Taj Mahal Associates, a New Jersey general partnership (the "Partnership"), upon the terms and subject to the conditions set forth herein, hereby solicit from each owner of the Company's 14% First Mortgage Bonds, Series A, Due 1998 (the "Old Bonds") as of the close of business on June 4, 1991, acceptances of a prepackaged plan of reorganization (the "Plan") of the Company, the Partnership, Trump Taj Mahal, Inc., and The Trump Taj Mahal Corporation (the "Debtors"), to be filed under chapter 11 of the United States Bankruptcy Code and the rules promulgated thereunder (the "Code"). If the Requisite Acceptances are received, each holder of the Old Bonds as of the close of business on July 11, 1991 (the "Prefiling Payment Record Date") will be paid on the day before the Plan is filed, per $1,000 in principal amount of Old Bonds, $1.33 plus $.27483 per day for the period from April 1, 1991 to the day before the Plan is filed (the "Prefiling Payment"); provided, however, that if the Partnership has insufficient cash to make the Prefiling Payment in full on the day before the Plan is anticipated to be filed, the unpaid portion (the "Bond Carryforward Amount") will be paid on the Effective Date to holders of Old Bonds on a date that is five business days before the Effective Date (the "Exchange Record Date").

In addition, the Plan provides that holders of the Old Bonds on the Exchange Record Date shall receive the following on the Effective Date (the "Exchange Consideration"):

| In exchange for each | Each Holder will receive |
|---|---|
| $1,000 principal amount of Old Bonds | —One Unit consisting of $1,000 principal amount of the Company's 11.35% Mortgage Bonds, Series A, Due 1999 (a "New Bond"), together with one share of Taj Mahal Holding Corp.'s ("Holding") Class B Redeemable Common Stock, par value $.01 per share (the "Class B Stock").<br>—The cash proceeds attributable to any fractional Units to which such holder would otherwise be entitled arising from the sale of Units by the Partnership on or after the Effective Date (as explained below).<br>—Two shares of Holding's Class A Common Stock, par value $.01 per share (the "Class A Stock").<br>—$.27483 per day for the period from the date the Plan is filed to the day before the Effective Date plus, for the period from April 1, 1991 to the day before the Effective Date, up to $.02655 per day (the "Variable Amount"), to the extent excess cash is available on the Effective Date (the "Bond Cash Payment"), and<br>—The Bond Carryforward Amount |

New Bonds will be exchanged for Old Bonds on the basis of $1,070 principal amount of New Bonds, plus Units (the "Additional Bond Amount") consisting of New Bonds in principal amount of $.057897 per day (less the Variable Amount paid on the Effective Date) and one share of Class B Stock (for each $1,000 principal amount of New Bonds resulting from such exchange) for the period from and including April 1, 1991 through and including the day before the Effective Date, for each $1,000 principal amount of Old Bonds. New Bonds issued on the Effective Date, however, are only issuable in integral multiples of $1,000. Consequently, any and all fractional Units that would otherwise result from the exchange will be cumulated and issued to the Partnership in an amount rounded to the nearest Unit. The Partnership will sell such Units at then current market prices and distribute the cash proceeds of such sale to the persons who would otherwise be entitled to fractional Units.

The New Bonds and the Class B Stock may not be transferred separately. The Class A Stock may be transferred separately.

On each November 15 and May 15 (each an "Interest Payment Date"), commencing November 15, 1991 (except as noted below), the Company will pay interest in cash to the holders of New Bonds outstanding on the immediately preceding November 1 or May 1 (each a "Record Date") at the rate of 9.375% per annum (the "Mandatory Cash Interest Amount"). The New Bonds will bear interest from the Effective Date. If the Effective Date occurs after November 15, 1991, the Bond Cash Payment accrued to such date and the Bond Carryforward Amount will be distributed on November 15, 1991 to the holders of record of Old Bonds as of the close of business on November 8, 1991. Under such circumstances, the Bond Cash Payment would continue to accrue until the Effective Date and the initial Interest Payment Date will be May 15, 1992.

In addition to the Mandatory Cash Interest Amount, the Company will also pay on each May 15, commencing May 15, 1992, to the record holders of New Bonds on the immediately preceding May 1, an additional amount (the "Additional Amount") of interest in cash or additional Units, or a combination thereof (on a pro rata basis), equal to the difference between (i) 11.35% of the outstanding principal amount of New Bonds on the immediately preceding May 1 and (ii) the sum of the Mandatory Cash Interest Amount payable on such May 15 plus the

Mandatory Cash Interest Amount paid on the immediately preceding November 15 Interest Payment Date (collectively, the "Annual Mandatory Cash Interest Amount"). To the extent that, on any May 15 on or after May 15, 1992, there is Excess Available Cash Flow of the Partnership for the year ended on the immediately preceding December 31 (or, in the case of the year ended December 31, 1991, Excess Available Cash Flow for the period measured from the date of issuance of the New Bonds), the Company will pay the Additional Amount in cash and the balance thereof, if any, in additional Units including fractional Units; provided, however, that the portion of the Additional Amount that, when combined with the Annual Mandatory Cash Interest Amount exceeds 10.28% of the aggregate outstanding principal amount of New Bonds on the preceding May 1, may be paid, at the option of the Company, in additional Units (including fractional Units) even if Excess Available Cash Flow is available provided that an equivalent amount of cash is used to purchase or redeem Units. The New Bonds will be guaranteed as to payment of principal and interest by the Partnership.

On the Effective Date, the Partnership will issue a general partnership interest representing 49.995% of the equity of the Partnership (the "Equity Interest") to the holders of the Old Bonds who will contribute the Equity Interest to Holding, which will then transfer it to TM/GP Corporation, a New Jersey corporation ("TM/GP"). TM/GP will thereafter serve as the managing general partner of the Partnership. The Equity Interest will constitute all of the assets of TM/GP, which will be wholly owned by Holding. The capital stock of Holding will consist of the Class A Stock, the Class B Stock and the Class C Common Stock, par value $.01 per share (the "Class C Stock", together with the Class A Stock and the Class B Stock, the "Common Stock."). The holders of the Old Bonds will, upon consummation of the Plan, be the owners of all of the issued and outstanding shares of the Class A Stock and the Class B Stock, and Donald J. Trump will be the owner of all of the issued and outstanding shares of the Class C Stock.

The holders of the Class B Stock shall be entitled to elect four of the nine members of the Board of Directors of Holding (the "Class B Directors"), and the holders of the Class C Stock shall be entitled to elect the remaining five members of the Board of Directors of Holding. Under certain circumstances, the composition of the Board of Directors may change to consist of six Class B Directors and three directors elected by the holders of the Class C Stock (the "Class C Directors"). See "Description of Holding Certificate of Incorporation—Board of Directors—Effects of Transition Event and Return Event." The Board of Directors of TM/GP will consist of the same members as the Board of Directors of Holding. Such persons will be responsible for the management of the Partnership. During such time as any shares of Class B Stock are outstanding, the Class A Stock will have no voting rights other than those provided by law. Except for certain matters which require the approval of only the Class B Stock, all matters requiring the approval of the stockholders of Holding must be approved by the Class B Stock and Class C Stock voting as separate classes. Other than the rights of the Class B Stock and Class C Stock to receive $.01 per share upon liquidation, the Class A Stock will be entitled to all distributions and dividends paid by Holding. Each share of Class B Stock must be redeemed (at a price of $.50 per share) when the New Bond with which it was issued as a Unit is paid, redeemed or purchased and cancelled. At such time as all the Class B Stock has been redeemed, the Class A Stock will be entitled to one vote per share on all matters on which stockholders are entitled to vote and will vote with the Class C Stock as a single class, with cumulative voting for the directors of Holding.

Immediately following the Effective Date, Donald J. Trump will beneficially own 50% of the equity of the Partnership. Upon the purchase, redemption or payment of all the New Bonds, and the receipt by the holders of the New Bonds not theretofore purchased of all or a portion of the 14% Payment, TTMI shall acquire additional partnership interests in the Partnership such that Donald J. Trump may beneficially own up to 80% of the Partnership leaving Holding with a minimum of a 20% interest in the Partnership. The effect of such payment would be to reduce the indirect ownership interest in the Partnership of the holders of the Class A Stock. The 14% Payment is permitted to be financed with Partnership borrowings without the approval of the Class B Directors or the holders of the Class B Stock.

Generally, in order for the Plan to be approved, votes in favor of the Plan ("Acceptances") must be received from the holders of Claims constituting at least two-thirds in dollar amount and more than one-half in number of the allowed Claims in each impaired class of Claims that vote to accept or reject the Plan, and from the holders of at least two-thirds in amount of the allowed Interests in each impaired class of Interests that vote to accept or reject the Plan (the "Requisite Acceptances"). Because, under the Code, only votes to accept or reject the Plan, and not abstentions, will be counted for purposes of determining acceptance or rejection of the Plan by any impaired class of Claims or Interests, the Plan could be approved by any impaired class of Claims with the affirmative vote of significantly less than two-thirds in amount and one-half in number of the class of such Claims, or by any impaired class of Interests with the affirmative vote of significantly less than two thirds in amount of the class of such Interests. Even if all classes of Claims and Interests accept or are deemed to have accepted the Plan, the Plan may not be confirmed by the Bankruptcy Court. See "Risk Factors—Risk of Non-Confirmation of the Plan." In addition, the Plan is subject to the approval of the New Jersey Casino Control Commission (the "CCC").