LAW OFFICES

# BERGER & MONTAGUE, P.C.

1622 LOCUST STREET

PHILADELPHIA, PA 19103-6365

TELEPHONE (215) 875-3000

TELECOPIER (215) 875-4604

October 1, 1991

OF COUNSEL TO
MCGEE JORDAN SHUEY GORDON
MORRIS & DONER P A
LAKE WORTH FL
MORGAN ALLMAND PENNYPACKER & DEACON
SAN JOSE CA

**VIA TELECOPIER**

WRITER'S DIRECT DIAL NUMBER
(215) 875- **3040**

**THIS DOCUMENT MAY BE DISSEMINATED ONLY TO
COUNSEL AND THE COURT -- NOT TO BE FILED WITH
THE CLERK OF THE COURT -- CONTAINS CONFIDENTIAL
INFORMATION SUBJECT TO CONFIDENTIALITY UNDERSTANDINGS**

Stuart J. Baskin, Esquire
SHEARMAN & STERLING
Citicorp Center
153 East 53rd Street
New York, NY  10022

Richard L. Posen, Esquire
WILLKIE, FARR & GALLAGHER
One Citicorp Center
153 East 53rd Street
New York, NY  10022

Re:  In re Donald Trump Casino Securities Litigation
     This Document Relates to:  Taj Mahal Litigation
     Civil Action No. 1-90-MC-919

Dear Stuart and Rick:

In accordance with Judge Simandle's suggestion at the conference on September 27, 1991, we wish to highlight some of the results of plaintiffs' discovery to date. All of this discovery was obtained subsequent to the execution of the Memorandum of Understanding, which as you know expressly conditioned the proposed settlement on the results of the confirmatory discovery. The views expressed in this letter do not necessarily reflect the views of Greenfield & Chimicles.

1. *The Falsity of the Prospectus*

As you know, the November 1988 Offering that gives rise to this litigation involved Bonds in the aggregate amount of $675,000,000, with annual interest of 14% or $94,500,000. During the course of discovery since April 1991, plaintiffs focused on the following false statements contained in the Prospectus for the Offering:

> The Partnership believes that funds generated
> from the operation of the Taj Mahal will be
> sufficient to cover all of its debt service
> (interest and principal).
>
> p.28

BERGER & MONTAGUE, P.C.

Stuart J. Baskin, Esquire
Richard L. Posen, Esquire
October 1, 1991
Page 2

> Considering three recognized methods of valuation, the cost approach, the sales comparison approach and the capitalization of income approach, AGI opined that the market value of the Taj Mahal, as if completed on December 1, 1989 in accordance with the Partnership's existing plans and specifications, and subject to the assumptions and related conditions set forth in the AGI Report, is $1,100,000,000.
>
> p.41

Plaintiffs' limited discovery to date, conducted in the summer and early fall of this year, confirms that, at the time of the issuance of the Prospectus, the foregoing statements were false and without a reasonable basis. Specifically, defendants lacked any reasonable basis for stating that the Taj Mahal's projected cash flow would cover debt service. In addition, defendants commissioned a grossly inflated appraisal. For investors, the aggregate principal amount of the Bonds was only 61% of the project's $1.1 billion appraised value on completion, creating an illusion of $425 million of excess coverage for prospective Bondholders.

2.  **The Laventhol Report**

In mid 1987, Laventhol & Horwath, then the premier financial consultant to the gaming industry, was engaged to perform an analysis (the "Laventhol Report") of projected financial results for various ownership and operational scenarios relating to the Resorts International Casino-Hotel ("RICH") and the Taj Mahal Hotel and Casino ("Taj Mahal"). At this time, both the RICH and the Taj Mahal were owned by Resorts International. Plaintiffs were unaware of either the existence or the content of the Laventhol Report prior to signing the Memorandum of Understanding.

The Laventhol Report, dated September, 1987, examined, among other things, projected cash flow from operations before management fees, reserve for replacement of fixed assets, debt service and taxes on income ("Operating Cash Flow") for the Taj Mahal under three different scenarios. These three different scenarios included one in which the RICH continued to operate but its casino was closed, a second in which Resorts operated both properties as casino-hotels, and a third in which the RICH was sold and continued to operate as a casino-hotel competitor to the Taj Mahal. This third scenario (the "Third Scenario"), in which the Taj Mahal and the RICH competed as separately-owned and -operated

BERGER & MONTAGUE, P.C.

Stuart J. Baskin, Esquire
Richard L. Posen, Esquire
October 1, 1991
Page 3

casinos, is the scenario that occurred in 1988, when Trump and his affiliates acquired the Taj Mahal, with the expressed intention of completing the Taj Mahal and then opening it as a hotel and casino, while the RICH continued to operate as a hotel and casino under Resorts' ownership. Thus, only the ownership roles were reversed between the theoretical Third Scenario, wherein Resorts would operate the Taj Mahal and a competitor the RICH, and reality, wherein Resorts continues to own and operate the RICH and a competitor owns and operates the Taj Mahal.

The Laventhol Report projected in the Third Scenario that the Taj Mahal's Operating Cash Flow (assuming the RICH would continue to operate as a casino and would thus compete with the Taj Mahal) would be as follows:

| Year | Operating Cash Flow |
|---|---|
| First Year of Operation | $ 78,496,000 |
| Second Year of Operation | $ 90,770,000 |
| Third Year of Operation | $ 105,475,000 |
| Fourth Year of Operation | $ 115,359,000 |

In computing cash flow available for debt service, it would be necessary to deduct management fees and replacement reserves from the Operating Cash Flow each year.

On the basis of the Laventhol Report, projected cash flow available for debt service for the Taj Mahal for the initial years of operation is less than cash flow required to pay the debt service on the Bonds.

The Laventhol Report contrasts starkly with the appraisal of Appraisal Group International ("AGI") that was attached as an Exhibit to the Registration Statement filed in connection with the offering of the Bonds in 1988. Since the AGI appraisal projects the cash flow of the Taj Mahal after replacement reserves and management fees, it is necessary to adjust the Laventhol Report cash flow projections to reflect replacement reserves and management fees. The AGI appraisal (at page 213) projected nearly twice the cash flow as the Laventhol Report, as adjusted:

Projected Taj Mahal Cash Flow

| | AGI | Laventhol |
|---|---|---|
| First Year of Operation | $ 117,572,000 | $ 62,496,000 |
| Second Year of Operation | 146,068,000 | 73,315,000 |
| Third Year of Operation | 157,793,000 | 86,594,000 |

BERGER & MONTAGUE, P.C.

Stuart J. Baskin, Esquire
Richard L. Posen, Esquire
October 1, 1991
Page 4

As you are aware, the adjusted Laventhol projections set forth above have thus far proven much better predictors of the Taj Mahal's actual performance than the AGI projections. To state the case another way, the AGI numbers overstated the as-completed value of the Taj Mahal and the Taj Mahal's cash flow by a factor of nearly two to one.

### 3. Merrill Lynch's Failure to Exercise Due Diligence

The deposition of David Webb, who headed Merrill Lynch's team and was responsible for due diligence in connection with the Bond Offering, demonstrates an utter failure to satisfy legal and underwriting industry standards of due diligence. Merrill Lynch's lapses are both numerous and, frankly, shocking:

A.   Despite the huge size of the Offering, Merrill Lynch took on the underwriting without convening a formal meeting of its Commitment Committee. Webb testified that he is unaware of any minutes, any notes, or any written proposals to or any findings by the Committee. Webb Tr. at 100-102. Such documents were explicitly requested of Merrill Lynch, and they were not produced.

B.   The Merrill Lynch team was inexperienced. Webb himself had never before headed an underwriting for a public offering. Webb Tr. at 7-8. Webb had never before worked as a member of a Merrill Lynch team in connection with an underwriting in the casino industry. Webb Tr. at 17. Merrill Lynch had no specialist casino department, and neither Merrill Lynch nor the underwriting team included any casino specialists. Webb Tr. at 16, 90-91.

C.   Merrill Lynch adopted AGI's cash flow projections, and used them in road show presentations, even though: a) Merrill Lynch believed a critical element of those projections -- growth of the Atlantic City market -- was unduly optimistic; and b) those projections concerned an offering at 13%, not the 14% coupon rate actually used. Webb Tr. at 74, 82-85.

D.   Webb appeared virtually ignorant of the Laventhol Report. Although he read or at least reviewed the AGI appraisal, as well as the Martin Gross Associates report, he could not recall whether during or before the Offering he ever saw or was aware of the critical Laventhol Report, or even whether he was aware at that time that Laventhol had ever performed work in connection with the Taj Mahal. Webb Tr. at 62-65. Webb's lack of knowledge about the Laventhol Report is particularly noteworthy, since even Donald Trump recalled it. Trump, whose testimony was

BERGER & MONTAGUE, P.C.

Stuart J. Baskin, Esquire
Richard L. Posen, Esquire
October 1, 1991
Page 5

limited by an inability to recall many of the events and matters about which he was questioned, conceded that prior to the dissemination of the Prospectus he had been "vaguely familiar with" the Laventhol Report. Trump Tr. at 14-15.

   E. Webb testified that Merrill Lynch undertook a wide search to discern the views of experts regarding the viability of the Taj Mahal. In this connection, Webb and his team interviewed Harold Vogel, a Merrill Lynch securities analyst with gaming industry expertise, among others. Webb Tr. at 92. Surprisingly, however, they failed to learn Vogel's true feelings about the Bond Offering -- that it was not a junk bond offering but instead a "junk junk issue . . . the lowest of the low." Roffman Tr. at 23. Merrill Lynch's due diligence also seems to have missed another prominent casino industry analyst, Marvin Roffman. Webb Tr. at 94-95 (does not know if Merrill Lynch talked to Roffman, or if Trump talked to Roffman, about the Offering). Unbeknownst to Merrill Lynch, Roffman informed the New Jersey Casino Control Commission, Robert Trump, and Donald Trump (twice) that the Taj Mahal was not a viable project. Roffman Tr. at 11-16.

   \*  \*  \*

   The foregoing, of course, is based only on initial discovery. Moreover, certain critical facts supporting plaintiffs' complaint have not been disclosed here. The foregoing is provided solely pursuant to the direction of Judge Simandle, is based solely on discovery subsequent to the execution of the Memorandum of Understanding, and does not include all relevant information obtained through discovery.

Sincerely,

Todd S. Collins

TSC/ddw

cc: Magistrate Judge Jerome B. Simandle (via overnight mail)
   All Plaintiffs' Counsel

docs/trump2404.wp