# SHEARMAN & STERLING

FAX: 212-848-5255
212-848-5252
TELEX: 668769 WUI

CITICORP CENTER
153 EAST 53RD STREET
NEW YORK, N.Y. 10022
212 848-4000

LOS ANGELES
SAN FRANCISCO
WASHINGTON, D.C.
TORONTO
LONDON
PARIS
DÜSSELDORF
TOKYO
ABU DHABI

WRITER'S DIRECT DIAL NUMBER:

(212) 848-4974

October 8, 1991

BY FEDERAL EXPRESS

The Honorable Jerome B. Simandle
United States Magistrate
United States District Court
District of New Jersey
United States Courthouse
Camden, New Jersey 08101

> In re Donald J. Trump Casino Securities Litigation
> This Document Relates to:  Taj Mahal Litigation
> Civil Action No. 1-90-MC-919

Dear Judge Simandle:

We are counsel to Merrill Lynch Pierce Fenner & Smith, Inc.

We have read Todd Collins' letter of October 1, 1991.  The manner in which it misconstrues the discovery plaintiffs took, coupled with the topics that plaintiffs deliberately chose to avoid, regrettably highlight the obvious:  the "confirmatory discovery" conducted in this case was designed to derail, not confirm, the settlement reflected in the Memorandum of Understanding.  Plaintiffs simply wasted the time and efforts of Court and counsel and have sought to scuttle a settlement fairly negotiated and relied upon.  We respectfully submit that the bondholder class, represented by actual chosen counsel, should be allowed to vote on the agreed upon settlement.

## 1.   The Prospectus

The consolidated complaint alleges in its first count that the Taj Mahal prospectus is defective.  One would

2

never discern that from the depositions plaintiffs took, for apart from having David Webb identify a single sentence (Webb Tr 28), they managed totally to ignore the prospectus.  Mr. Webb was not asked a single question concerning the page after page of risk factors, "Special Considerations" and cautionary language that permeate this prospectus.  And this cautionary language is neither boilerplate nor on unimportant issues.  Rather, it centrally warned every prospective buyer that:

- The Taj has no operating history and hence any predictions about cash flow and debt service are "completely dependent" on a variety of controllable and uncontrollable factors (Prospectus page 8)

- No one has experience operating a casino of this size and hence "no assurance can be given that, once opened, the Taj . . . will generate cash flow sufficient to provide for . . . debt service."  (Page 8)

- The Taj is not yet built and delay in construction "would have a material adverse effect" on debt service.  (Page 11)

- "Competition in Atlantic City is intense" the issuer expects a decline in 1990 of casino win per square foot, and further growth will be "restrained."  (Page 14, 33)  Hence once again, "[n]o assurance can be given with respect to either the future growth [in Atlantic City] or the ability of the Taj Mahal to attract a representative share of the market."  (Page 33)

- And with respect to the appraisals, they are simply "estimates or opinions of value," at "a future date" and cannot be relied upon either as a future sale price for the casino or "what might be realized upon liquidation" or "in a distress sale."  (Page 16, 39)

This cautionary language was hardly surprising --- after all, the bondholders were buying a 14% instrument, the highest yielding casino bond in history.

3

The law is clear that cautionary language such as in this prospectus is all that is legally required of an offering document.  Surely any litigant engaging in real confirmatory discovery, who was interested in fairly assessing the extent of omissions or misstatements in the offering document, would have inquired into the unprecedented cautionary language in this prospectus.  The avoidance of all such topics speaks volumes about the motivations and tactics underlying the confirmatory discovery undertaken in this case.

### 2.   The Laventhol Report

Plaintiffs' misunderstanding and misuse of the Laventhol report is equally transparent.

The Laventhol report on its very cover page repudiated the precise use they make of it --- it warned that it would not be reliable for use in a prospectus or public document or for consideration after September 25, 1987.  And Laventhol was wise in issuing this warning: for by the fall of 1988, when the Taj underwriting occurred, the Laventhol report was already outdated.  Indeed, as of the fall of 1988, were one to accept Laventhol's precise methodology and assumptions, but update its inaccurate factual premises to comport with actual intervening events, the analysis results in an outcome precisely contrary to that suggested in Mr. Collins' letter: even the Laventhol analysis fully supported the debt service of the Taj project.

Laventhol's analysis is not complicated.  It projected prospective total Atlantic City casino win forward from 1987 to 1989 (when the Taj was then scheduled to open), multiplied that number by a hypothetical 86% of the total Atlantic City casino win for 1989 and a hypothetical 88% of the Taj Mahal's fair share for 1990, and thereby yielded a projected casino win for those two years.  Laventhol then deducted costs and expenses, mostly fixed, to produce a cash flow estimate.

By autumn 1988, the study was already fundamentally outdated.  First, it had wrongly assumed that the casino would open by the end of 1988.  In fact, the new opening date by the time of the actual prospectus was February 15, 1990,

---

\*   "Fair share" is a casino's proportion of casino win calculated according to that casino's percentage of the total casino square footage in the relevant market (e.g., Atlantic City).

4

allowing for more than another full year of citywide revenue
growth before operations commenced.  Moreover, Laventhol
worked off 1986 actual numbers in calculating citywide
revenues.  It then projected revenue increases of 8.1% and
6.5% for 1987 and 1988, respectively.  By the fall of 1988,
these projections already were known to be wrong.  Actual
growth for 1987 was 9.6% and 10.8% for the first 6 months of
1988.  Working off of the actual revenue numbers rather than
Laventhol's erroneous estimates, and then using that firm's
methodology in all other respects, produced more than
sufficient additional revenue to service all debt.

        But that is not all.  Resorts International
commissioned the Laventhol study.  In discovery, plaintiffs
received Resorts' own internal projections as of March 24,
1988, when Resorts still owned the Taj.  For obvious reasons,
plaintiffs did not mark that exhibit or ask a single question
concerning Resorts' own projections.  For Resorts had
projected operating profit from the Taj of $186 million for
1990 and $202 million for 1991 --- at least double the cash
flow necessary to service debt, and indeed more favorable
than anything used by Trump management in the issuance and
sale of the Taj bonds.

        The fact is that plaintiffs received during
confirmatory discovery at least four sets of Taj
projections.  They never bothered to mark or use in their
depositions at least two of the available projections.  All
four had in common that, updated to actual numbers as of the
fall of 1988, each supported the financial viability of the
Taj Mahal financing.

                3.    Merrill Lynch's Due Diligence

        Plaintiffs' mischaracterization of Mr. Webb's
testimony concerning Merrill Lynch's due diligence is equally
egregious.

        David Webb testified that the Taj Mahal financing
had two characteristics:  it was part real estate project
financing and part high yield bond underwriting.  (Webb Tr.
7).  He testified that he was responsible for the firm's
relationship with Trump and, as such, headed the real estate
aspects of the deal as well as serving as team leader.  (Tr.
5-6).  He was supplemented by a large multidisciplined team
of investment bankers --- including at least two other senior
managing directors --- all either with extensive real estate
or high yield underwriting experience.  He twice described
the due diligence process as a "collaborative effort" between

5

the team members and their counsel, Fried, Frank, Harris, Shriver & Jacobsen, one of the nation's foremost financial services law firms. (Webb Tr. 6, 109).

Plaintiffs know the names of many of these bankers both from documents we provided them (e.g., Webb Exh. 1) and from Mr. Webb's testimony (Webb Tr. 12-17). Yet, in their apparent zeal to ridicule Mr. Webb as "inexperienced," they sidestepped all fair inquiry into the bankers' experience. Although he is one of the most respected real estate and project finance investment bankers in the country, they asked Mr. Webb nothing about his qualifications or experience in these areas, apart from establishing that he in fact had experience in the casino industry (Webb Tr. 17). Nor did they inquire into the experience of any of the other team members, who collectively have worked and performed diligence on scores of public offerings. The purpose of the deposition, obviously, was to studiously avoid creating any record that might establish the actual experience of the Merrill team.

The other points are similarly distorted. Plaintiffs criticize Merrill for allegedly failing to convene a "formal" meeting of the Commitment Committee. The only aspect of the meeting that was not "formal" was that it was "unscheduled." (Webb Tr. 202). The same decisionmakers, many of whom were already personally involved with the Taj transaction, appropriately discussed and approved the underwriting subject to the completion of diligence. (Webb Tr. 101-102).

Plaintiffs accuse Merrill of unjustifiably having "adopted" Trump's AGI cash flow projections during the road show presentation. That is a gross oversimplification of the actual testimony. Mr. Webb testified that Taj management utilized the AGI projections rather than even higher projections that management in fact favored. (Webb Tr. 72-71). Notably, Resorts International's projections were also higher than those prepared by AGI. Since the cash flow cushion was in all events "comfortable" (Webb Tr. 48), it was "reasonable and supportable" for Trump to utilize a mid-range set of projections during the road show. (Webb Tr. 42). But most importantly, in the prospectus itself, the issuer and Merrill employed "a much more conservative bias in our view of the market" (Webb Tr. 39) --- a fact apparent from the very face of the prospectus but again studiously avoided by plaintiffs during the deposition.

6

### 4.   The Abuse of the Discovery Process

The signed Memorandum of Understanding reflected a fair and reasonable settlement. Nothing new arose during discovery. All appraisals cited in the prospectus, and now challenged by plaintiffs, have been a matter of public record, on file with the Securities and Exchange Commission, since 1988. While plaintiffs now claim to have been "unaware" of the Laventhol report prior to signing the Memorandum of Understanding, it too has been on file at the Casino Control Commission, and a matter of public record, since 1987. And, indeed, for the reasons noted by Willkie Farr & Gallagher in their letter today, plaintiffs knew, or should have known, about the Laventhol report through even the most minor investigative efforts.

Plaintiffs, in short, are trying to walk away from a binding agreement for indefensible reasons, apparently having more to do with family agendas and personality conflicts than with anything newly discovered during the last three weeks. They should not be allowed to influence and undermine a good faith settlement process upon which the bondholders --- 70% of whom are represented by lawyers they in fact selected --- and other participants in the bankruptcy proceeding justifiably relied.

Respectfully submitted,

Stuart J. Baskin

cc: The Hon. John F. Gerry
    Richard L. Posen, Esq.
    John Barry, Esq.
    Todd Collins, Esq.
    Richard Greenfield, Esq.
    Stuart Wechsler, Esq.
    Carl Poplar, Esq.
    Robert M. Miller, Esq.