IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| In Re: RESORTS INTERNATIONAL SHAREHOLDERS LITIGATION | : CONSOLIDATED<br>: CIVIL ACTION NO. 9470<br>:<br>: STOCKHOLDERS'<br>: DERIVATIVE SUIT/<br>: CLASS ACTION |

### CONSOLIDATED AND AMENDED COMPLAINT

Plaintiffs, by their attorneys, allege, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based in part upon public documents filed with the Securities and Exchange Commission, as follows:

### PARTIES

1. (a) Plaintiffs are the owners of common stock in Resorts International, Inc. ("Resorts" or "the Company") and have owned such stock during the time period of the wrongdoing alleged herein and at present.

    (b) Plaintiffs bring this action derivatively on behalf of Resorts and as a Class Action on behalf of themselves and all those similarly situated.

2. Resorts is a corporation organized under the laws of Delaware. The Company's principal business is the ownership, development and operation of casino gaming, resort and hotel facilities in Atlantic City, New Jersey and in Paradise Island, the Bahamas. The capital structure of Resorts is comprised of

two classes of stock: Class A common, with 5,679,411 shares outstanding, and Class B common, with 752,297 shares outstanding. In every respect except for voting power, the Class A shares and the Class B shares are equal. In the event of liquidation of the Company's assets, therefore, the Class A shareholders would be entitled to over 88% of the liquidation proceeds while the Class B shareholders would receive less than 12% of such proceeds. The Class A shareholders, however, are entitled to only 1/100th of a vote per share while the Class B shareholders receive one vote per share; thus, the holders of the Class B shares control about 93% of the votes while the holders of the Class A shares control about 7%. Both the Class A and the Class B shares are traded publicly on the American Stock Exchange.

3. (a) Defendants George A. Barascillo, Jr., William Druz, Mitchell Sviridoff, Harvey I. Freeman, Robert S. Trump and Donald J. Trump (the "Director Defendants") are the directors of Resorts. Defendants Barascillo, Druz and Sviridoff have been found to be "independent" by the New Jersey Casino Control Commission (the "CCC") and serve as members of a "Special Committee" of the Board. Defendant The Trump Hotel Corporation, a party to the Services Agreement described hereafter, is 100% owned by defendant Donald J. Trump. Defendant The Trump Organization is owned in whole or in part and is controlled by defendant Donald J. Trump.

(b) The Director Defendants have participated in and/or approved the wrongful conduct hereinafter set forth with knowledge that such conduct was unlawful or grossly negligent and

-2-

constituted a breach of fiduciary duty and a waste of corporate assets. The Director Defendants are thus jointly liable, as aiders and abettors, for the wrongs committed upon Resorts.

(c) There are other persons, the identities of whom are not presently known to plaintiffs, who have conspired with or otherwise aided and abetted the defendants in the commission of the wrongdoing alleged herein.

## FACTUAL BACKGROUND

4. In October 1983, Resorts began construction on a new casino/hotel, to be larger than any other in Atlantic City, fashioned after ancient Moorish castles and known as the "Resorts Taj Mahal" (hereinafter referred to as the "Taj Mahal"). Initially, the cost of the Taj Mahal was projected to be $185 million. By 1985, that estimate had risen to $400 million. At the end of 1986, projected costs for the Taj Mahal had risen to an estimated $525 million. Current estimates range from $800 million to $945 million. The project was to have been completed by February 1988 but the timetable has been pushed back to October 1988.

5. Until April 1986, the Company had been under the control of James M. Crosby, its founder and Chairman. At the time of his death, James M. Crosby and his relatives (the "Murphy-Crosby family") controlled 585,067 shares of Class B stock, and 72% of the voting power. On March 8, 1987, Donald J. Trump ("Trump") entered into an agreement (the "Purchase

-3-

Agreement") with the Murphy-Crosby family whereby he agreed to purchase those shares at a price of $135 per share and to make a tender offer for the remaining Class B shares at the same price. On July 21, 1987, Defendant Trump purchased the Murphy-Crosby family's shares and, on November 2, 1987, he offered to purchase the remaining 167,230 Class B shares outstanding for $135 a share.

6. The Company's 1986 Annual Report dated May 4, 1987, states that "In consideration of Mr. Trump's efforts to assist the Company in obtaining financing for its Taj Mahal Casino/Hotel project currently under construction in Atlantic City, New Jersey, and in advising the Company in connection with the construction of that facility, the Company has agreed to be bound by certain sections of the [Purchase] Agreement." Thus, as early as March 8, 1987, Trump had extracted concessions from the Company in exchange for his promise that he would help to obtain financing for the Taj Mahal and would give his expert advice with regard to the construction of the project.

7. Since its organization, the business of Resorts has been managed by its officers and directors, many of whom have been, and are being, paid excessively for their services. For example, I.G. Davis, President and Chief Executive Officer of the Company, received a $400,000 salary for 1986, which was increased to $750,000 on January 1, 1987 and to $1,000,000 on July 21, 1987. Other Resorts executives are also paid excessively well, as is set forth below:

| | |
|---|---|
| Robert D. Peloquin, Executive Vice President | $375,000 |
| H. Steven Norton, Executive Vice President | 250,000 |
| Matthew B. Kearney, Vice President-Finance | 250,000 |
| John M. Donnelly, Vice President-Legal and Secretary | 175,000 |

Furthermore, each of these five executives, Davis, Peloquin, Norton, Kearney and Donnelly, has an employment agreement with the Company for a term which will not expire until July 21, 1990.

8. Despite this expensive array of management, the Company, on October 8, 1987, entered into a "Services Agreement" with defendant the Trump Hotel Corporation ("THC") subject to the approval of the Casino Control Commission ("CCC"). THC is a New Jersey corporation which is 100% owned by defendant Trump. Under the terms of the Services Agreement, Resorts, a company controlled by Trump, will be compelled to pay to THC, a company owned by Trump, 1.75% of Resorts' "Adjusted Gross Revenues" plus 15% of the Company's "Adjusted Net Income." The Services Agreement defines "Adjusted Gross Revenues" to include the revenues of the Company and its consolidated subsidiaries, interest, dividend income and other net income derived from the sale of the Company's financial assets, and proceeds from the sale of major assets. "Adjusted Net Income" is defined as including the Company's net income _plus_ depreciation expense, the 1.75% fee paid to THC, amortization of certain debt financing fees, any federal or state income or franchise taxes, and any payment to the Casino Reinvestment Development Authority charged as an expense. Gains or losses from the sales of major assets prior to July 21, 1990 are not to be included in Adjusted Net Income. In addition to the Services Agreement, the Company has

agreed to pay THC 3% of the construction costs of the Taj Mahal and any other construction projects the Company may undertake (the "construction costs agreement").

9. The terms of the Services Agreement and the construction costs agreement were approved by the Special Committee comprised of defendants Barascillo, Druz and Sviridoff. The Special Committee approved the agreements after being convinced by defendant Trump that they had no alternative because without such agreements Trump would do nothing to help with the Taj Mahal project. The approval of the Special Committee was given despite the obvious unfairness of the agreements. As David Schulte of Chilmark Partners advised the Special Committee, the agreements: 1) do not create an enforceable promise that financing will be obtained or that the Taj Mahal will be completed; 2) bind the Company whether or not Trump is alive and capable of performing the services; and 3) provide, based on management's projections, that as much as one-third to one-half of Resorts' cash flow, even assuming that the Taj Mahal is completed and operated successfully, would be paid to THC. Schulte also advised the Special Committee that on the basis of management projections, the agreements would likely cause the Company to report losses at least through 1991 and that the capitalized cost of the Services Agreement alone --- over its 10 year life --- is between $162 and $194 million, or $25 to $30 per share.

-6-

10. In 1986, Resorts had gross revenues of approximately $449 million. Under the Services Agreement, THC would have received 1.75%, or $7.8 million, of that amount. In 1986, Resorts posted a net loss of about $31 million but, under the definition in the Services Agreement, the "Adjusted Net Income" figure would have approximated $1 million. Thus, even in a year where Resorts posted a substantial net loss, Trump would have received over $8 million pursuant to the creative accounting methodology utilized in the Services Agreement. The amounts payable under the Services Agreement, however, do not begin to compare to the 3% of construction costs on the Taj Mahal (and other projects) which the Company is obligated to pay to THC. In his tender offer documents of November 2, 1987, defendant Trump states that the total budget to open the Taj Mahal is estimated at $930 million, with the Company having expended $350 million as of June 30, 1987. As of June 30, therefore, the Company had yet to expend $580 million before the Taj Mahal could open as scheduled on October 1, 1988. Assuming that the Taj Mahal can be completed for defendant Trump's $930 million estimate, 3% of the $580 million to be expended is $17.4 million. When viewed in light of Resorts' poor financial condition --- the Company is so deeply in debt that it has not been able to cover its debt service out of its operating earnings since at least 1984 --- and its very-well paid current management, these payments to THC are a gross waste of corporate assets.

11. The Services Agreement and the construction costs agreement do not obligate defendant Trump to complete the Taj

-7-

Mahal project. Those agreements do, however, obligate Trump to use his best efforts to assist Resorts in obtaining the financing needed to complete the Taj Mahal project. Indeed, the primary purpose of the agreements was to enable Resorts to complete the Taj Mahal project.

12. On December 16, 1987, the CCC reluctantly approved the Services Agreement and the construction costs agreement over the vigorous dissent of Commissioner W. David Waters. In his majority decision, Chairman Walter N. Read expressly found that "It was primarily Donald Trump's perceived ability to raise the financing necessary to complete the Taj Mahal and his construction expertise that ultimately convinced Resorts' outside board [Barascillo, Sviridoff and Druz] to ratify the agreement."

13. Defendant Trump has now twice used his supposedly "unique" ability to get the Taj Mahal project completed as a powerful bargaining chip to extract concessions from the Company. The Company agreed, back in March 1987, to be bound by certain provisions of the Purchase Agreement in exchange for Trump's promise to assist with the Taj Mahal. Then, in October 1987, Trump --- not having delivered on his earlier promises to assist with the Taj Mahal project --- again used his "unique" ability to bludgeon the Company into entering into the Services Agreement and the construction costs agreement.

14. In all respects other than voting, each share of Class A stock and Class B stock are equal. If Resorts were to pay a dividend, therefore, the Class B shares, as a group, would

-8-

receive less than 12% of that dividend payment while the Class A shares would receive over 88%. Similarly, upon sale or liquidation of Resorts, the Class A shareholders would be entitled to over 88% of any liquidation payout. The payments of Resorts to THC under the Services Agreement and the construction costs agreement, therefore, constitute an attempt by defendant Trump to change the respective rights of the Class A and Class B stock with regard to participation in the profits of Resorts. Resorts has not paid a dividend and has no plans to do so in the future. Yet, by virtue of THC's agreements with the Company, defendant Trump will obtain for himself a very handsome return while the Class A shareholders receive no such return. This is of particular concern to the Class A shareholders since Resorts has been rendered virtually insolvent as a result of the Taj Mahal project and otherwise and the Company is not in any position, for the foreseeable future, to pay out any return to the Class A shareholders.

15. Defendant Trump presently owns and operates two other gambling casinos in Atlantic City, Trump's Plaza and Trump's Castle. These casinos are in competition with the Company. Resorts presently has one casino license and, with the opening of the Taj Mahal, will have two. Under New Jersey law, no one person or entity may hold more than three casino licenses. In order to comply with New Jersey law, Trump will, upon the opening of the Taj Mahal, need to surrender one of the four licenses held by Trump's Plaza, Trump's Castle, the Resorts International Casino/Hotel and the Taj Mahal.

16. As the Chairman of the Board of Directors and the controlling stockholder of Resorts, Trump has an obligation and fiduciary duty to prefer the interests of Resorts over his own. In violation of such obligation and duty, Trump has announced that when the Taj Mahal opens, the casino at Resorts International Casino/Hotel will close.

17. During 1986, the present casino at Resorts International Casino/Hotel produced revenues of $236.4 million. Thus, defendant Trump proposes to sacrifice over $236 million of revenue for Resorts in order to maintain his own two casinos.

18. Plaintiffs, by their counsel, have demanded, in a letter dated October 16, 1987 (attached as Exhibit A), that Resorts' Board of Directors protect the interests of the Company and its public shareholders, by taking legal action to protect Trump from relinquishing one of the Company's casino licenses.

19. The rejection of such demand and the failure of the Board of Directors to pursue the claims set forth herein is unjustified and wrongful and represents a further waste of Resorts' assets.

20. Notwithstanding the fact that a demand was made, no demand on the Company's Board of Directors is necessary and such a demand is excused because such a demand would be a futile, idle and useless gesture for the following reasons:

(a) Defendant Trump has voting control of Resorts. By virtue of that control, Trump has the power to elect

all members of the Board of Directors and to replace any director. At present, one-half of the Board members are Trump designees. The Board of Directors is thus dominated and controlled by Trump.

(b) By reason of Trump's domination and control, the Board of Directors cannot, in good faith, exercise any independent business judgment as to whether to approve a resolution authorizing the filing of a suit against Trump or any of the other defendants as to the claims asserted herein;

(c) Each of the Director Defendants has directly participated (and not merely acquiesced) in at least one or more of the acts of wrongdoing alleged herein and it is unreasonable to assume that they would cause Resorts to sue themselves;

(d) The members of the Board have approved the wrongful conduct alleged herein, including the Services Agreement and the construction costs agreement, which conduct constitutes a gross waste of the Company's corporate assets; and

(e) The Company has agreed to indemnify its directors against liability for acts of misconduct and negligence occurring in their performance of their duties as directors, and the Company maintains insurance policies to cover the costs of such indemnification. Under the terms of those insurance policies, however, claims against directors which are brought by the Company and/or other directors are excluded from coverage. Resorts and its current Board of Directors are, therefore, contractually disabled from complying with any demand that they

cause Resorts to bring suit against the Director Defendants because to do so could result in the loss of insurance coverage.

21. (a) On December 21, 1987, a mere five days after the CCC approved the Services Agreement and the construction cost agreement, Defendant Trump submitted to the Special Committee a proposal to tender for all outstanding Class A shares of Resorts at a price of $15.00 per share.

(b) In the December 22, 1987 edition of <u>The Wall Street Journal</u>, Defendant Trump was quoted as saying: "Resorts can't get financing for the Taj Mahal, and I'm not going to use my own money if I own only a small part of the stock. . ." By virtue of such statements, Defendant Trump was attempting to coerce the holders of the Class A shares to tender their shares to him at an unfair and inadequate price. Furthermore, such a statement indicates that Trump is not willing to fulfill his obligations to assist the Company in obtaining financing for the Taj Mahal project and that he is trying to use --- for the <u>third</u> time --- the Company's need for such financing as leverage to purchase the Class A shares at a grossly inadequate price.

(c) In early January 1988, the Special Committee rejected Trump's $15.00 offer and found that the offer was "grossly inadequate." Trump then withdrew his offer for the Class A shares.

(d) In light of these events, the CCC has indicated that it may soon reexamine its earlier approval of the Services Agreement and the construction costs agreement.

22. The events set forth above have combined to cause the value of Resorts Class A shares to plummet. The price of Class A shares has tumbled from 62 on the day Trump took control of the Company in July 1987, to 48 1/2 on October 16 after the disclosure that the Taj Mahal would cost $800 million to complete, to 40 5/8 in the October 19 panic, to 33 on October 20 when the Services Agreement was disclosed, to 12 5/8 at the end of December after the CCC approved the Services Agreement and Trump announced his proposal to buy all of the Class A shares at $15 per share. The price of Resorts Class A shares remained depressed through January 29, 1988 as a result of, <u>inter alia</u>, the further deterioration of Resorts' financial and operating condition.

### COUNT I

(Against defendants Donald J. Trump, Robert S. Trump, Harvey I. Freeman, Mitchell Sviridoff, William Druz, and George A. Barascillo, Jr., The Trump Hotel Corporation and The Trump Organization (the "Count I defendants") for breach of fiduciary duty and waste of corporate assets).

23. Paragraphs 1 through 22 above are incorporated herein as if fully set forth.

24. The Count I defendants knowingly and willfully breached their fiduciary duties to the Company by compelling the Company to enter into the Services Agreement and construction costs agreement, more fully described in paragraphs 8 through 11

-13-

above, with THC. Payments made or to be made to THC pursuant to those agreements under the terms thereof constitute a gross waste of corporate assets and breach of fiduciary duty.

25. The Count I defendants knowingly and willfully breached their fiduciary duties to the Company by announcing that they plan to relinquish the casino license of Resorts International Casino/Hotel when the Taj Mahal is opened.

26. Plaintiffs have no adequate remedy at law.

## COUNT II

(Against defendants Donald J. Trump,
The Trump Hotel Corporation and The
Trump Organization for breach of contract.)

27. Paragraphs 1 through 26 are incorporated herein as if fully set forth.

28. Defendant Trump is making and has made no good faith effort to obtain financing for the Taj Mahal project even though he is obligated to make such an effort pursuant to the Purchase Agreement entered into on March 8, 1987 and the Services Agreement entered into on October 8, 1987. Defendant Trump's failure to make such efforts constitutes a willful breach of his and THC's contractual obligations.

29. Plaintiffs have no adequate remedy at law.

## COUNT III

(Class Action Against defendants Donald J.
Trump, The Trump Hotel Corporation and The
Trump Organization, for breach of fiduciary duty.)

30. Paragraphs 1 through 17 and 21 through 29 above are incorporated herein as if fully set forth.

31. (a) This action is brought as a Class Action under Rule 23 (b)(3) of the Delaware Chancery Court Rules.

(b) The Class consists of all holders of the common stock of Resorts on a day during the period from March 8, 1987 to February 1, 1988, other than defendants and their affiliates, officers, directors and members of their immediate families, ("the Class").

(c) As of September 1, 1987, there were at least 1,000 Class A shareholders alone of the Company. Accordingly, the Class is so numerous that joinder of all members is impracticable.

(d) Plaintiffs are members of the Class, have sustained and will sustain damages, are committed to pursuing this action, and have retained competent counsel experienced in litigation of this nature. Accordingly, plaintiffs are adequate representatives of the Class because they have the same interests as all members of the Class, their claims are typical of the claims of the members of the Class and they will fairly and adequately protect the interests of the Class.

(e) The questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class include:

(i) whether defendant Trump is acting so as to take Resorts private and to deprive the Class of the true value of their shares by scheming to tender an unfair and inadequate price for those shares, which are worth substantially more than $15 per Class A share;

(ii) whether defendant Trump has breached the fiduciary duties he owes to the Class by reason of his scheme to purchase the Class A shares at an unfair and inadequate price; and

(iii) whether defendant Trump is attempting to coerce the plaintiffs and members of the Class into tendering their shares at an unfair and inadequate price by threatening to abandon the Taj Mahal project and/or to cause Resorts to file a voluntary petition for Bankruptcy.

(f) The likelihood that individual members of the Class will prosecute separate individual action is remote due to the relatively small -- albeit substantial -- damages suffered and to be suffered by each member of the Class compared to the damages suffered by the Class as a whole and compared to the burden and expense of prosecuting litigation of this nature and magnitude. Plaintiffs anticipate no difficulties in the management of this case.

(g) For the reasons stated above, a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A. Against the Count I defendants, declaring that the Services Agreement and the construction costs agreement are unlawful and void, enjoining the performance of said agreements, and awarding to Resorts all amounts wrongfully paid pursuant to those agreements;

B. Against defendants Trump, The Trump Hotel Corporation and The Trump Organization, declaring that, upon the opening of the Taj Mahal, Trump must surrender or dispose of the casino license of one of his privately owned casinos rather than the license of the Resorts International Casino/Hotel or, in the alternative, that he be required to divest himself of his Class B shares;

C. Against defendants Trump, The Trump Hotel Corporation, and The Trump Organization entering a mandatory injunction that Trump and THC fulfill their contractual obligations to use their best efforts to obtain financing for the Taj Mahal project;

D. Against defendant Trump, preliminarily enjoining his scheme to purchase the Class A shares outstanding at an unfair and inadequate price;

E. Awarding plaintiffs the costs and expenses of this action, including reasonable attorneys' fees; and

F. Such other and further relief as may be just and proper.

Dated: February 2, 1988

GREENFIELD & CHIMICLES

*Pamela Tikellis*
Pamela S. Tikellis
One Rodney Square
P.O. Box 1035
Wilmington, Delaware  19899
(302) 656-2500

Liaison Counsel for Plaintiffs
and the Class

Of Counsel:

GREENFIELD & CHIMICLES
Richard D. Greenfield
Brenda M. Nelson
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania  19041

LEVIN FISHBEIN
SEDRAN & BERMAN
Arnold Levin
320 Walnut Street
Philadelphia, PA  19106

BALLEN, KEISER, GERTEL,
   FELDMAN & AGRE
Arthur E. Ballen
Midlantic National Bank Building
Broadway & Cooper Streets
Camden, NJ  08102

SILVERMAN & HARNES
135 East 36th Street
New York, NY  10016

ABBEY & ELLIS
212 East 39th Street
New York, NY  10016

POMERANTZ, LEVY, HAUDEK,
   BLOCK & GROSSMAN
295 Madison Avenue
New York, NY  10017

BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103

KOHN, SAVETT, KLEIN & GRAF, P.C.
2400 One Reading Center
1101 Market Street
Philadelphia, PA  10107

LEVIN, FISHBEIN, SEDRAN & BERMAN
320 Walnut Street
Philadelphia, PA  19106

WOLF, POPPER, ROSS, WOLF & JONES
845 Third Avenue
New York, NY  10022

LOWEY, DANNENBERG & KNAPP
747 Third Avenue
New York, NY  10017

RABIN & SIROTA
747 Third Avenue
New York, NY  10017

BARRACK, RODOS, & BACINE
Suite 2100
1845 Walnut Street
Philadelphia, PA 19103

GOODKIND, WECHSLER, LABATON & RUDOFF
122 East 42nd Street
New York, NY 10168

MORDECAI ROSENFELD
233 Broadway
New York, NY 10279

STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017

GARWIN, BRONZAFT, GERSTEIN & FISHER
1501 Broadway
Suite 1812
New York, NY 10036

JOSEPH H. WEISS, ESQUIRE
319 Fifth Avenue
New York, NY 10016

EUGENE A. SPECTOR & ASSOCIATES, P.C.
Suite 624
Lewis Tower Building
15th & Locust Streets
Philadelphia, PA 19102

ALAN E. BANDLER, P.C.
300 Park Avenue
New York, NY 10022

RICHARD APPLEBY, ESQUIRE
20 Broad Street
New York, NY

JOHN PHILIP McCARTHY
3600 Conshohocken Avenue
Suite 1501-A
Philadelphia, PA 19131

MILBERG, WEISS, BERSHAD, SPECTHRIE
  & LERACH
One Pennsylvania Plaza
New York, NY 10119

RUDOLPH, SEIDNER, GOLDSTEIN,
  ROCHESTIE & SALMON, P.C.
225 S. 15th Street
300 Lewis Tower Building
Philadelphia, PA 19102