## IN THE COURT OF CHANCERY IN THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| In Re: RESORTS INTERNATIONAL SHAREHOLDERS LITIGATION | Consolidated<br>Civil Action No. 9470 |
| RESORTS INTERNATIONAL, INC., derivatively by ARTHUR M. SCHWABE, LESLIE B. DANIELS and CHAPPAQUA FAMILY TRUST and ARTHUR M. SCHWABE, on behalf of himself and all others similarly situated,<br>*Plaintiffs*,<br>v.<br>THOMAS S. MURPHY and HENRY B. MURPHY AS EXECUTORS OF THE ESTATE OF JAMES M. CROSBY; I.G. DAVIS; HENRY B. MURPHY; MITCHELL SVIRIDOFF; GEORGE A. BARASCILLO, JR.; CHARLES E. MURPHY; WILLIAM DRUZ; WILLIAM M. CROSBY; JOHN F. CROSBY; ROBERT D. PELOQUIN; H. STEVEN NORTON; MATTHEW B. KEARNEY; JOHN M. DONNELLY; DONALD J. TRUMP; ROBERT S. TRUMP; HARVEY I. FREEMAN; THE TRUMP ORGANIZATION and THE TRUMP HOTEL CORPORATION,<br>*Defendants*,<br>and<br>RESORTS INTERNATIONAL, INC.,<br>*Nominal Defendant*. | Civil Action No. 9605 |

### AMENDED NOTICE OF PENDENCY OF CLASS ACTION, CLASS ACTION DETERMINATION, PROPOSED SETTLEMENT OF CLASS AND DERIVATIVE ACTIONS, SETTLEMENT HEARING AND RIGHT TO APPEAR

To: ALL RECORD HOLDERS AND BENEFICIAL OWNERS OF THE COMMON STOCK OF RESORTS INTERNATIONAL, INC. AND TO PERSONS WHO HELD SUCH STOCK ON ANY DAY DURING THE PERIOD NOVEMBER 6, 1987 TO AND INCLUDING THE DATE OF THE GRIFFIN MERGER (as defined herein) INCLUDING THE LEGAL REPRESENTATIVES, HEIRS, AND SUCCESSORS IN INTEREST, OR ASSIGNS OF ALL SUCH FOREGOING HOLDERS

### THE SETTLEMENT HEARING

This Notice to all record and beneficial owners of the common stock of Resorts International, Inc ("Resorts" or the "Company") and all persons who held such stock on any day during the period November 6, 1987 to and including the date of the Griffin Merger (as defined herein), including the legal representatives, heirs, and successors in interest, whether immediate or remote, or assigns of all such foregoing holders (except defendants and their affiliates, officers, directors and members of their immediate families) (the "Class") is given pursuant to Rule 23 and Rule 23.1 of the Rules of the Court of Chancery and pursuant to an Order of the Court of Chancery of the State of Delaware, in and for New

Castle County (the "Court") entered in the civil actions (the "Actions") (as defined below) which are more particularly described below under the heading "BACKGROUND AND DESCRIPTION OF THE ACTIONS."

*If you are the record (but not the beneficial) owner of Resorts' common stock or were such owner at any time during the period November 6, 1987 to and including the date of the Griffin Merger (as defined herein), you are directed to forward this Notice to the beneficial owner of those shares. Additional copies of this Notice will be made available to you for this purpose upon request directed to D.F. King & Co., 60 Broad Street, New York, New York 10004.*

The members of the Class have an interest in the Actions and are hereby notified that a hearing will be held before the Court in its Courtroom at the Public Building, 11th & King Streets, Wilmington, Delaware, on August 18, 1988 at 3:00 p.m. (the "Settlement Hearing"), to determine whether (i) an Amended Stipulation and Agreement of Compromise and Settlement dated July 12, 1988 (the "Amended Stipulation"), which is described under the heading "THE SETTLEMENT TERMS," and the terms and conditions of the settlement proposed in the Amended Stipulation (the "Amended Settlement"), are fair, reasonable and adequate, (ii) final judgment should be entered dismissing the Actions as to all defendants in the Actions (and related entities, including affiliates) with prejudice as against the named plaintiffs, the Company, and all members of the Class, as more particularly described below under the heading "CLASS ACTION DETERMINATION," and (iii) if the Court approves the Amended Stipulation and the Amended Settlement, and enters such final judgment, and if the attorneys for plaintiffs in the Actions apply for attorneys' fees and expenses, an application should be granted allowing payment to plaintiffs in the Actions for reasonable attorneys' fees and expenses in connection with the Actions, as more particularly described below under the heading "APPLICATION FOR ATTORNEYS' FEES AND EXPENSES."

The Court has reserved the right to adjourn the Settlement Hearing from time to time by oral announcement at such hearing or any adjournment thereof, without further notice of any kind. The Court has also reserved the right to approve the Amended Stipulation before it and the Amended Settlement, with or without modifications, to enter its final judgment dismissing the Actions as to all defendants (and related entities, including affiliates) with prejudice as against the named plaintiffs, the Company, and all members of the Class, and to order the payment of attorneys' fees and expenses, without further notice of any kind. This notice is not an expression by the Court as to the merits of any claim or defense asserted by the parties in this litigation.

## BACKGROUND AND DESCRIPTION OF THE ACTIONS

On March 8, 1987, Donald Trump entered into a Purchase Agreement (the "Purchase Agreement") with the Estate of James M. Crosby, Henry B. Murphy, the then Chairman of the Board of Directors of Resorts, Charles E. Murphy, Jr., the then Vice Chairman of the Board of Directors of Resorts, certain members of Mr. Crosby's family (collectively, the "Selling Stockholders") and Resorts, providing for, among other things, the purchase by Donald Trump from the Selling Stockholders of an aggregate of 585,067 shares of Class B common stock (the "Family Class B Shares") for a purchase price of $135 per share in cash or an aggregate purchase price of $78,984,045. The Class B shares are identical to Resorts' Class A common stock except that each Class B share entitles its holder to one hundred times the voting power of each Class A share. Each Class B share is also convertible, at its holder's election, to one Class A share. As of September 30, 1987, there were 5,679,411 Class A shares and 752,297 Class B shares outstanding. Based upon such number of shares outstanding at September 30, 1987, the holders of Class A shares are entitled to cast approximately 7% of the total number of votes entitled to be cast by all outstanding voting securities of the Company.

Donald Trump purchased the Family Class B Shares on July 21, 1987. As a result of such purchase, Donald Trump acquired beneficial ownership of approximately 77.8% of the Class B shares representing approximately 72.3% of the voting power of the outstanding voting securities of the Company.

In accordance with the terms of the Purchase Agreement, three members of the Resorts' Board of Directors (the "Board") resigned upon Donald Trump's purchase of the Family Class B Shares. By action of the three remaining directors, George A. Bariscillo, Jr., William Druz and Mitchell Sviridoff, none of

whom is either affiliated with Donald Trump or a member of Resorts' management. the vacancies were filled by Donald Trump, his brother Robert S. Trump, Executive Vice President of The Trump Organization, Inc. ("The Trump Organization"), and Harvey I. Freeman, Executive Vice President of, and Counsel to, The Trump Organization.

On October 8, 1987, Resorts filed a petition with the New Jersey Casino Control Commission (the "CCC") seeking, among other things, a declaratory ruling approving the consolidation of the hotel and related operations of the Resorts Casino Hotel, with its casino space converted to convention and exhibition space, with Resorts' Taj Mahal, a casino/hotel and convention complex under construction by Resorts in Atlantic City, New Jersey, so that the facilities can be integrated and operated with a single casino. On December 16, 1987, the CCC approved such consolidation.

Following several months of extensive negotiations between Resorts' disinterested directors and Donald Trump and his representatives, Resorts and The Trump Hotel Corporation, a New Jersey corporation wholly-owned by Donald Trump ("THC"), entered into a Comprehensive Services Agreement, dated as of October 16, 1987. In general, the Comprehensive Services Agreement obligates THC to provide a comprehensive range of financial, marketing, promotional, management, supervisory, operational, planning, construction and development services to Resorts and its operating subsidiaries in exchange for various fees including an annual fee equal to 1 3/4% of Resorts' and its operating subsidiaries' "adjusted gross revenues" (as defined in the Comprehensive Services Agreement) for each fiscal year or part thereof included in the term of the Comprehensive Services Agreement, plus 15% of Resorts' and its operating subsidiaries' "adjusted net income" (as defined in the Comprehensive Services Agreement) for each fiscal year or part thereof included in the term of the Comprehensive Services Agreement, together with reimbursement for certain expenses. In addition, for providing planning and construction management services pertaining to the Taj Mahal, Resorts agreed to pay THC an amount equal to 3% of the "construction cost" (as defined in the Comprehensive Services Agreement) of the Taj Mahal, plus certain reimbursable expenses.

After holding hearings during November and December, 1987, on December 16, 1987, the CCC approved the Comprehensive Services Agreement, as amended, but subject to the further amendment of certain of its provisions. Notwithstanding the prior approval by the CCC, and after a request for rehearing of such approval by the State of New Jersey, Department of Law & Public Safety, Division of Gaming Enforcement, THC, Resorts and certain of its subsidiaries and the Division of Gaming Enforcement entered into a stipulation on February 1, 1988, providing, among other things, that (1) THC and Donald Trump agreed to waive any management fees and interest thereon (but not the construction fee) which would otherwise have been due to THC from Resorts under the Comprehensive Services Agreement for the period from July 21, 1987 to the time when the Taj Mahal is completed and opened for casino gaming, (2) Resorts agreed not to accrue or defer on behalf of THC or Donald Trump any management fees they would otherwise have earned during the same period, and (3) Resorts and THC would amend the Comprehensive Services Agreement accordingly and the Division of Gaming Enforcement would withdraw its petition for rehearing. On February 24, 1988 the CCC approved the stipulation as part of its reapproval of the Comprehensive Services Agreement.

Pursuant to the Purchase Agreement, on November 2, 1987, Donald Trump commenced an offer to purchase the 167,230 remaining Class B shares not owned by him for a price of $135 per share (the "Class B Offer"). Upon expiration of the Class B Offer on January 11, 1988, Donald Trump purchased 127,583 Class B shares, bringing Donald Trump's ownership of the outstanding Class B shares up to 94.7%, representing 88.1% of the combined voting power of the outstanding Class A shares and Class B shares.

Following an oral proposal made at the meeting of the Board on December 21, 1987, on December 23, 1987, Donald Trump made a written merger proposal to the Board. The merger was to be accomplished by a cash tender offer for all outstanding Class A shares at a price of $15 per share, net to the seller in cash, to be followed by a merger between Resorts and a company to be created and wholly-owned by Donald Trump. In his proposal, Donald Trump explained that for some time the Company had been struggling to obtain financing for the construction, completion and opening of the Taj Mahal and that structuring appropriate financing was extremely difficult in light of the cost of the project and the

3

tremendous strain additional debt would place on the Company. Donald Trump further explained that, notwithstanding the risks associated with the Taj Mahal, prior to the events in the financial markets on October 19, 1987, which have come to be described as "Black Monday," Resorts had been confident that it would be possible for it to sell certain debt securities to finance the Taj Mahal project but, as a result of events occurring on and after such date, Resorts was presently unable to finance the Taj Mahal through the sale of public debt securities on any reasonable economic basis. Donald Trump also stated his belief that private ownership of the Company was the only alternative if the Company intended to complete the construction of and to open the Taj Mahal.

The Board appointed a special committee consisting of disinterested directors George A. Bariscillo, Jr., William Druz and Mitchell Sviridoff (the "Special Committee") to consider the fairness of the proposal. The Special Committee retained an independent financial advisor Chilmark Partners ("Chilmark") and counsel. By letter dated January 11, 1988, the Special Committee responded to Donald Trump's offer by stating, among other things, that it would not recommend to the entire Board approval of Donald Trump's proposal and that it believed the offer to be grossly inadequate.

On January 11, 1988, Donald Trump announced that based on the Special Committee's decision, he had decided to withdraw his merger proposal.

Following Resorts' entering into the Comprehensive Services Agreement with THC and its announcement of its intention to consolidate the operations of its Resorts Casino Hotel with the Taj Mahal, and following the announcement of Donald Trump's December 21, 1987 merger proposal to the Board, a number of actions were commenced in the Court of Chancery of the State of Delaware against a variety of defendants, including various past and current directors and officers of Resorts. The first action, entitled *Meridian Strategic Investments, L.P. v. Resorts International, Inc., et al.*, C.A. No. 9379, was filed on November 6, 1987. The additional actions filed were entitled *Leslie B. Daniels v. Thomas S. Murphy, et al.*, C.A. No. 9470, *Christine Rappoport et al. v. Donald J. Trump*, C.A. No. 9471, *William Steiner v. Donald J. Trump*, C.A. No. 9498, *Louis Danakis et al. v. Resorts International, Inc., et al.*, C.A. No. 9517, *Grace Buehler v. Thomas S. Murphy, et al.*, C.A. No. 9524, *Chee Kin Chow v. Resorts International, Inc., et al.*, C.A. No. 9502, *Miriam Pollock v. Resorts International, Inc., et al.*, C.A. No. 9505, *James J. McCarthy v. Donald Trump, et al.*, C.A. No. 9571, *Ronald Rebhun v. Donald J. Trump*, C.A. No. 9509, *Julien J. Studley, Inc. v. Donald J. Trump, et al.*, C.A. No. 9508, *Chee Kin Chow, et al. v. Resorts International, Inc., et al.*, C.A. No. 9563, *William A. Kass v. Donald J. Trump, et al.*, C.A. No. 9499 and *Joseph Liberman v. Resorts International, Inc., et al.*, C.A. No. 9514.

On January 27, 1988, the Court of Chancery of the State of Delaware, in and for New Castle County, issued a consolidation order. The consolidation order, together with an additional consolidation motion thereafter, provided for the consolidating for all purposes of the previously commenced separate actions under the caption *In Re Resorts International Shareholders Litigation*, Consolidated Civil Action No. 9470 (the "Consolidated Action"). The consolidation order also provided that its terms shall automatically apply to any litigation arising out of the transactions and matters complained of in the Consolidated and Amended Complaint which is instituted in the Court subsequent to the entry of the order. In accordance with the consolidation order, a Consolidated and Amended Complaint was thereafter filed which named as defendants Donald J. Trump, Robert S. Trump, Harvey I. Freeman, The Trump Organization, THC, George A. Bariscillo, Jr., William Druz and Mitchell Sviridoff. In addition, pursuant to agreement by certain of the parties, a separate shareholders derivative and class action suit entitled *Resorts International, Inc., derivatively by Arthur M. Schwabe, Leslie B. Daniels and Chappaqua Family Trust and Arthur M. Schwabe, on behalf of himself and all others similarly situated v. Thomas S. Murphy, et al.*, Civil Action No. 9605, was filed (the "Schwabe Action"), naming as defendants Thomas S. Murphy and Henry B. Murphy, as Executors of the Estate of James M. Crosby, I.G. Davis, Henry B. Murphy, Mitchell Sviridoff, George A. Bariscillo, Jr., Charles E. Murphy, William Druz, William M. Crosby, John F. Crosby, Robert D. Peloquin, H. Steven Norton, Mathew B. Kearney, John M. Donnelly, Donald J. Trump, Robert S. Trump, Harvey I. Freeman, The Trump Organization and THC, with Resorts named as a nominal defendant. (The Consolidated Action and the Schwabe Action are collectively referred to herein as the "Delaware Actions.")

4

The complaints in the Delaware Actions alleged as factual background, among other things, that:

(1) In October 1983, Resorts began construction of the Taj Mahal, a new casino hotel to be larger than any other in Atlantic City. Initially the cost of the project was estimated to be $185 million. In the Company's 1985 Annual Report, the estimate had risen to $400 million. In the Company's 1986 Annual Report, the estimate had risen to $525 million. In mid-October 1987, Resorts disclosed for the first time that its estimated construction costs had risen to $800 million. To finance the remaining costs for the Taj Mahal, Resorts would need to incur substantial debt. As of June 30, 1987, Resorts was already burdened by a long-term debt load of $550 million. As of June 30, 1987, the Company had yet to expend $580 million before the Taj Mahal could open as scheduled on October 1, 1988. Another $580 million worth of debt could have crippled the Company. The Taj Mahal project was in serious disarray and through the inept and careless management or practices of certain past and then present directors, the project had rendered the Company virtually insolvent and threatened to put the Company into bankruptcy.

(2) Until April 1986, the Company had been under the control of James M. Crosby, its founder and Chairman. On March 8, 1987, Donald Trump entered into a Purchase Agreement with Mr. Crosby's estate and certain of his relatives to purchase their Resorts Class B shares and on July 21, 1987 purchased those shares, giving Donald Trump 72% of the voting power. The Company's 1986 Annual Report, dated May 4, 1987, stated that the Company agreed to be bound by certain sections of the Purchase Agreement in consideration for Donald Trump's efforts to assist the Company in obtaining financing for the Taj Mahal project and in advising the Company in connection with the construction of that facility. Thus, as early as March 8, 1987, Donald Trump had extracted concessions from the Company in exchange for his promise he would help obtain financing for the Taj Mahal and would give his expert advice regarding its construction.

(3) Since its organization, Resorts had been managed by its officers and directors, many of whom had been and were being paid excessively for their services and were receiving excessive benefits. Despite this expensive array of management, the Company entered into a Comprehensive Services Agreement with THC, a company 100% owned by Donald Trump, under which Resorts, which is controlled by Donald Trump, would be compelled to pay THC 1.75% of Resorts' "Adjusted Gross Revenues" plus 15% of the Company's "Adjusted Net Income." In addition to the Comprehensive Services Agreement, the Company entered into a construction costs agreement under which it agreed to pay THC 3% of the construction costs of the Taj Mahal and any other construction projects the Company may undertake.

(4) Despite the obvious unfairness of these agreements, the Special Committee approved the agreements. The Special Committee was convinced by Donald Trump that they had no alternative because without such agreements, Donald Trump would not help with the Taj Mahal project. The Special Committee approved the agreements even though it was advised by its financial advisor that the agreements did not create an enforceable promise that financing would be obtained or that the Taj Mahal would be completed, the agreements bound the Company whether or not Donald Trump was alive and the agreements provided that as much as one-third to one-half of Resorts' cash flow would be paid to THC. The financial advisor also advised the Special Committee that the agreements would likely cause the Company to report losses at least through 1991 and that the capitalized cost of the Comprehensive Services Agreement alone was between $162 and $194 million over a ten year period.

(5) The CCC reluctantly approved the agreements over vigorous dissent of Commissioner W. David Waters, finding that it was primarily Donald Trump's perceived ability to raise the financing necessary to complete the Taj Mahal and his construction expertise that ultimately convinced the Special Committee to ratify the agreements.

(6) Donald Trump owns and operates two other gambling casinos in Atlantic City — Trump's Plaza — and Trump's Castle in competition with Resorts. Resorts, upon the opening of the Taj Mahal, would have two casino licenses. Under New Jersey law, no person or entity may hold more than three casino licenses. To comply with New Jersey law, Donald Trump, upon the opening of the Taj Mahal, would need to surrender one of the four licenses held by Trump's Plaza, Trump's Castle, Resorts and the Taj Mahal. Although as Chairman of the Board and controlling shareholder of Resorts, Donald Trump had an

5

obligation and fiduciary duty to prefer Resorts' interest over his own. Donald Trump had announced that when the Taj Mahal opened, the Resorts Hotel Casino would close.

(7) Five days after the CCC approved the agreements, Donald Trump submitted to the Special Committee his proposal to tender for all outstanding Class A shares of Resorts at a price of $15. In a December 22, 1987 newspaper article, Donald Trump was quoted as saying Resorts could not get financing for the Taj Mahal and that he was not going to use his own money if he owned only a small part of the stock. By virtue of such statement, Donald Trump was attempting to coerce the Class A shareholders to tender their shares at an unfair and inadequate price. Such statement also indicated that Donald Trump was not willing to fulfill his obligations to assist the Company in obtaining financing for the Taj Mahal and that he was again trying to use the Company's need for such financing as leverage to purchase the shares at a grossly inadequate price.

(8) The Special Committee rejected the $15 offer as grossly inadequate and the CCC indicated that it might reexamine its earlier approval of the agreements.

(9) These events caused the value of Resorts Class A shares to plummet and remain depressed as a result of, among other things, the further deterioration of Resorts' financial and operating conditions.

The class action claims in the Delaware Actions are brought on behalf of all persons, other than defendants and their affiliates, officers, directors and members of their immediate families, who were holders of shares of common stock of the Company on any day during the period March 8, 1987 to February 1, 1988. The class action claims allege, among other things, that:

(1) In breach of Donald Trump's fiduciary duty to the class, Donald Trump, THC and The Trump Organization acted to take Resorts private and to deprive the class of the true value of their shares by scheming to tender an unfair and inadequate price for the Class A shares which are worth substantially more than $15 per share.

(2) Donald Trump, THC and The Trump Organization attempted to coerce the members of the class to tender their shares at an unfair and inadequate price by threatening to abandon the Taj Mahal project and/or to cause Resorts to file a voluntary petition for bankruptcy.

(3) The defendants committed common law fraud by, among other things, failing to disclose in a timely fashion the true state of the Taj Mahal project.

The derivative claims in the Delaware Actions allege, among other things, that:

(1) Certain of the defendants breached their fiduciary duties and wasted corporate assets:

   (a) as a result of grossly mismanaging the Taj Mahal project;

   (b) by paying excessive salaries and benefits to officers, directors and executives of Resorts;

   (c) by compelling the Company to enter into the Comprehensive Services Agreement and construction costs agreement with THC; and

   (d) by announcing Resorts' plan to relinquish the casino license of Resorts International Casino Hotel when the Taj Mahal is opened.

(2) Donald Trump and THC had breached their contractual obligations by failing to make a good faith effort to obtain financing for the Taj Mahal project.

(3) I.G. Davis breached his fiduciary duty by trading for his own benefit on the basis of confidential, undisclosed material information acquired through his fiduciary position as President and Chief Executive Officer of the Company.

As a result, *inter alia*, of the institution and prosecution of the Delaware Actions, settlement discussions commenced, and after intensive negotiations between Donald Trump and his representatives and counsel for the plaintiffs in the Delaware Actions, on or about January 31, 1988, certain parties to the

Delaware Actions entered into an agreement in principle, embodied in a "Memorandum of Understanding," initially signed by co-lead counsel for the plaintiffs, counsel for certain substantial Resorts' shareholders not parties to the litigation and counsel for Donald Trump, Robert S. Trump, Harvey I. Freeman, The Trump Organization and THC. Counsel for Resorts and counsel for the members of the Special Committee executed the Memorandum of Understanding thereafter following a meeting by the Special Committee with its financial and legal advisors at which the Special Committee unanimously determined to recommend to the Board that it approve Donald Trump's merger proposal, subject to negotiation and execution of a definitive merger agreement.

The parties agreed in the Memorandum of Understanding that, at no cost to the plaintiffs or to the settlement class, the settlement class would receive the benefit of a merger proposal by Donald Trump at a price significantly above his original $15 per share merger proposal. More specifically, the Memorandum of Understanding provided that following the entering into of an agreement of merger among a newly-formed company to be owned by Donald Trump, Resorts Acquisition, Inc. ("RAI") and Resorts (the "Trump Merger Agreement"), Donald Trump would commence a tender offer for any and all of the outstanding shares of Resorts Class A common stock at a price of $22 per share, net to the seller in cash.

The terms of the Memorandum of Understanding also provided that all parties to it agreed that the terms of the merger proposal had been significantly improved over the terms originally proposed by Donald Trump in his written proposal to the Board of Directors of Resorts, dated December 23, 1987, and that the merger proposal and the settlement contemplated by the Memorandum of Understanding were fair to, and in the best interests of, Resorts' shareholders. The Memorandum of Understanding further provided that the parties would use their best efforts to enter into a stipulation and that settlement of the Delaware Actions was subject to the approval of the settlement by the Court after appropriate notice and after an opportunity to be heard at a hearing on the fairness of the proposed settlement had been provided to the shareholders of Resorts.

On February 3, 1988, the Special Committee unanimously recommended to the Board that the merger proposal be approved as in the best interests of Resorts' shareholders. The Board, by unanimous vote of all of its members present, so approved the merger proposal and determined to recommend that holders of Class A shares accept the tender offer and tender their Class A shares to Donald Trump pursuant thereto and that the Trump Merger Agreement be approved. The Trump Merger Agreement was then executed. Pursuant to the Trump Merger Agreement, a newly formed company, owned by Donald Trump, was to acquire all of the remaining outstanding shares of Resorts Class A and Class B common stock. Such an acquisition was to be accomplished by a tender offer for any and all of the outstanding shares of Resorts Class A common stock at a price of $22 per share, net to the seller in cash (the "Trump Offer") to be followed by a merger ("the Trump Merger"), as promptly as possible after the Trump Offer. As a result of the Trump Merger, each outstanding share of Class A and Class B common stock was to be cancelled and converted into the right to receive $22 per share in cash.

On or about February 13, 1988, Vice Chancellor Maurice A. Hartnett III, of the Court of Chancery of the State of Delaware in and for New Castle County issued an Order requiring that the defendants provide notice of the proposed Original Settlement and of a settlement hearing scheduled for March 18, 1988 to all record holders and beneficial owners of the common stock of Resorts and to persons who held such stock on any day during the period November 6, 1987 to and including the date of the Trump Merger.

On March 17, 1988, The Griffin Company, a corporation wholly-owned by Merv Griffin, delivered to the Board a letter containing a proposal (the "First Griffin Proposal") to acquire all of Resorts pursuant to a cash merger at $35 per Class A and Class B share, or a total consideration of $225 million. The First Griffin Proposal was conditioned upon (i) Donald Trump agreeing to vote his Class B shares in favor of such merger, as well as any other requisite approval by shareholders and the Board, and (ii) Mr. Trump causing THC to terminate the Comprehensive Services Agreement.

Donald Trump announced on March 17, 1988 that he would not sell his Class B shares or vote such Class B shares in favor of the proposed merger and that he would not cause the Comprehensive Services Agreement to be terminated. On the same day, the Special Committee determined not to consider further the First Griffin Proposal on the grounds that the proposal was highly conditional and that Donald

7

Trump's action in announcing he would not vote in favor of the proposal rendered the proposal impossible of performance.

On March 18. 1988. a hearing was held in the Court to obtain judicial approval of the Original Settlement. At the hearing. the Court heard arguments in favor of and against the proposed settlement and at the conclusion. the Court took under advisement its ruling on the Original Settlement.

Also on March 18. 1988. Donald Trump and RAI commenced a lawsuit against The Griffin Company. Merv Griffin and Fedelle Scutti in the United States District Court for the Southern District of New York (the "District Court Action"). The complaint alleges that actions by the defendants therein. particularly the First Griffin Proposal and an option agreement between The Griffin Company and Fedelle Scutti. were fraudulent. tortiously interfered with the consummation of the Trump Offer and the Trump Merger and constituted violations of sections 13(d) and 14(e) of the Securities and Exchange Act and regulations promulgated thereunder and tortious interference with contractual relations.

On March 21. 1988. The Griffin Company and Fedelle Scutti filed counterclaims in the District Court Action against Donald Trump. the other directors of Resorts. RAI and THC. The counterclaims allege. among other things. (i) that certain statements made by Donald Trump. particularly in regard to the First Griffin Proposal. the estimated cost to complete construction of the Taj Mahal project. the value of the Class A shares and the possible bankruptcy of Resorts. were false and misleading and violated Sections 14(d) and 14(e) of the Securities and Exchange Act and regulations promulgated thereunder and constituted tortious interference with the prospective business advantage of The Griffin Company; (ii) that Donald Trump's refusal to vote his Class B shares in favor of the First Griffin Proposal or to terminate the Comprehensive Services Agreement precluded holders of Class A shares from realizing the substantial benefits of the First Griffin Proposal and thereby violated his fiduciary duty to such shareholders as a majority shareholder and director; and (iii) that the Board's approval of the Trump Offer violated the directors' fiduciary duty to holders of Class A shares.

On March 22. 1988. The Griffin Company made a second proposal to the Board (the "Second Griffin Proposal"). The Second Griffin Proposal also proposed a cash merger with Resorts pursuant to which The Griffin Company would pay an aggregate consideration of $295 million which could be allocated between the Class A shares. the Class B shares owned by Donald Trump and the Class B shares owned by other shareholders as determined by the Board so long as the amount allocated by the Board to the holders of Class A shares was in excess of $35 per share. The Second Griffin Proposal was expressly conditioned upon the agreement of Donald Trump to terminate the Comprehensive Services Agreement and required the affirmative vote of Class B shares held by Donald Trump for consummation. On March 23. 1988. the Board determined not to consider further the Second Griffin Proposal. Donald Trump having announced that he would not vote in favor of the Second Griffin Proposal and that he would not terminate the Comprehensive Services Agreement.

On or about March 28. 1988. a complaint was filed in a putative class action entitled *Bernard Schneider v. Resorts International. Inc., Donald J. Trump. George A. Barascillo. Jr., William Druz and Mitchell Sviridoff* (the "Schneider Action"). the last three of whom are Resorts' three independent directors comprising the Special Committee of the Board. The action. filed in the United States District Court for the District of New Jersey. purports to be brought on behalf of all shareholders of Class A common stock. The Complaint in the Schneider Action alleges that the defendants therein violated Section 14(e) of the Securities and Exchange Act of 1934 by. *inter alia*. participating in a scheme designed to defraud the public in connection with Donald Trump's $22 per share tender offer and proposed merger. The alleged scheme included. *inter alia:* (a) various alleged misrepresentations by the defendants regarding the financial condition of Resorts and the ability to obtain financing for the Taj Mahal: (b) the execution of the Comprehensive Services Agreement: and (c) the rejection by defendants of the First and Second Griffin Proposals. The *Schneider* Complaint also alleges that Donald J. Trump. and the individual defendants in their capacity as independent directors. breached their fiduciary duties to Resorts Class A shareholders by rejecting the First and Second Griffin Proposals.

On March 30. 1988. The Griffin Company made its third proposal to acquire Resorts (the "Third Griffin Proposal") in a letter delivered to the Special Committee. The Third Griffin Proposal was an offer

8

to purchase 1,200,000 authorized but unissued treasury shares of Class B shares for $36 per share and simultaneously therewith to enter into a plan and agreement of merger pursuant to which a company controlled by The Griffin Company would be merged with and into Resorts. Pursuant to such merger, outstanding Class A shares (except shares as to which appraisal rights were perfected) would have been converted into the right to receive $36 per share in cash, and outstanding Class B shares would have remained outstanding unless converted into Class A shares prior to the merger.

Later in the day on March 30, 1988, Donald Trump announced that the Trump Offer, scheduled to expire at midnight on March 31, 1988, would terminate at that time and that he would terminate the Trump Merger Agreement.

On April 4, 1988, the Board publicly announced that it had decided not to accept the Third Griffin Proposal, but that it had determined to engage in discussions with The Griffin Company to explore whether an acceptable offer would be made. A committee (the "Joint Committee"), composed of two Trump directors and two independent directors, was formed to engage in discussions with The Griffin Company.

On April 8, 1988, representatives of The Griffin Company met with members of the Joint Committee, Chilmark, counsel to Donald Trump and counsel to the independent directors.

On April 12, 1988, The Griffin Company announced its intention to make a tender offer for 2,900,000 Class A shares at $36 per share in cash. Such tender offer was to be conditioned upon 2,900,000 Class A shares being tendered, approval by the Board of a merger between Resorts and a corporation controlled by The Griffin Company, and the issuance by Resorts of 1,200,000 Class B shares to The Griffin Company for $36 per share.

On April 13, 1988, Donald Trump, Merv Griffin and their representatives met to discuss possible resolutions of the controversies regarding ownership and control of Resorts. On April 14, an understanding in principle was reached. The understanding was that Donald Trump would sell his Class B shares to The Griffin Company, that Resorts would sell the Taj Mahal to Donald Trump and that all Resorts shareholders other than Donald Trump would receive $36 per share for their Resorts shares. Over the next several weeks, representatives of the parties met to negotiate and prepare definitive agreements based upon the April 14 understanding in principle.

On May 11, 1988, the negotiations were terminated.

On or about May 18, 1988, The Griffin Company and Donald Trump resumed negotiations. On May 27, 1988 Resorts, The Griffin Company and Griffco Acquisition Inc. ("Griffco") executed a merger agreement (as amended, the "Griffin Merger Agreement"). Such persons and Donald Trump and his affiliates entered into other agreements which were subject to, *inter alia*, Board approval and settlement of the Delaware Actions and the Schneider Action and which provide, among other things, that:

(1) The Griffin Company would make a tender offer for all outstanding Class A shares at $36 per share (as amended, the "Griffin Offer");

(2) Griffco would merge with Resorts, with the shares of remaining shareholders other than those who had perfected, and not withdrawn, rights to appraisal under Delaware law, converted into the right to receive $36 in cash per share and Resorts would become a wholly-owned subsidiary of The Griffin Company (the "Griffin Merger");

(3) The Griffin Company would purchase Donald Trump's Class B shares for $135 per share;

(4) the Comprehensive Services Agreement would be terminated and Resorts would pay to Donald Trump $3,000,000 (representing accrued construction supervisory fees and reimbursable expenses through March 31, 1988) and $60,689,750 (representing a termination fee); and

(5) the Taj Mahal project, certain helicopters and associated assets, certain real property adjacent to the site of the Taj Mahal Hotel and Casino and certain other assets related thereto would be sold to an affiliate of Donald Trump for a purchase price of $230,000,000 plus an additional

9

liquidated sum of $25,000,000 as payment for certain fixed adjustments, plus certain liabilities specifically assumed and other closing adjustments.

On June 2, 1988, the Special Committee unanimously determined that the Griffin Offer and the Griffin Merger and the transactions contemplated thereby (including without limitation, the proposed sale of certain Resorts' assets to an affiliate of Donald Trump and the termination of the Comprehensive Services Agreement) are fair to and in the best interests of Resorts and its shareholders. The Special Committee made its determination after receiving and considering the report of its financial advisor, Chilmark, which opined that the consideration to be received in the Griffin Offer by holders of Class A shares and in the Griffin Merger by holders of Class A and Class B shares is fair from a financial point of view to the Company's public shareholders. Subsequently, on June 2, 1988, the Board approved and adopted the findings and recommendations of the Special Committee, ratified execution of the Griffin Merger Agreement and recommended its adoption by the shareholders of Resorts.

On or about June 7, 1988, The Griffin Company commenced the Griffin Offer.

On or about June 16, 1988, a complaint was filed in a putative class action entitled *Charles Maurer and Tessie Wolfson v. Merv Griffin, The Griffin Company, Resorts International, Inc., Donald J. Trump, George A. Barascillo, Jr., William Druz, Mitchell Sviridoff, The Trump Organization, Inc., The Trump Hotel Organization and Trump Taj Mahal Associates Limited Partnership* (the "Maurer Action"). The action, filed in the United States District Court for the District of New Jersey, purpor     be brought on behalf of all holders of Class A common stock of Resorts International, Inc., excludir     ndants. (The Schneider Action and the Maurer Action are collectively referred to as the "New Je::., Actions." The Delaware Actions and the New Jersey Actions are collectively referred to as the "Actions.") The Complaint alleges that defendants violated Section 14(e) of the Securities and Exchange Act by failing adequately to disclose, among other things, the various negotiating positions taken and the financing proposals made by Merv Griffin and Donald Trump during the course of the discussions which culminated in the Griffin Offer and the Griffin Merger Agreement, and the full extent of the benefits Donald Trump and Merv Griffin will obtain as a result of the Griffin Merger Agreement and other related agreements. The Complaint also alleges that defendants Trump, Bariscillo, Druz and Sviridoff breached their fiduciary duties to the Class A shareholders of Resorts by approving the Griffin Merger Agreement and other related agreements without attempting to obtain for those shareholders a price higher than the $36 per share offered in the Griffin Offer.

Plaintiffs' counsel have conducted an extensive examination into the facts and law relating to the matters set forth in the complaints in the Delaware Actions and the New Jersey Actions, including matters relating to events which occurred through the date of the Griffin Merger Agreement. Plaintiffs' counsel have examined voluminous documents, including minutes of meetings of the Special Committee of Resorts and other documents relating to the Comprehensive Services Agreement between THC and Resorts, minutes concerning the closing of the Resorts Casino Hotel upon the opening of the Taj Mahal, financial analyses relating to the Taj Mahal, filings by Resorts with the CCC, internal corporate documents relating to Resorts' value and documents relating to the negotiations and litigation between Donald Trump and Merv Griffin. Plaintiffs' counsel have consulted with their own experts and with the independent financial advisor retained by the Special Committee. Plaintiffs' counsel have also engaged in an examination of the Griffin Offer and the Griffin Merger by reviewing documents in connection therewith and by consulting with the Board and others. Plaintiffs' counsel have concluded that the terms of the Amended Settlement, the Griffin Offer and the Griffin Merger are fair and in the best interests of Resorts and the shareholders of Resorts.

## CLASS ACTION DETERMINATION

The parties have stipulated and the Court has ordered that, for purposes of effectuating the terms of the Amended Stipulation, the Delaware Actions shall be consolidated and shall be maintained and proceed as a derivative action and also as a class action, by the named plaintiffs as class representatives and by their counsel as class counsel, pursuant to Rules 23(b)(1) and 23(b)(2) of the Rules of the Court

of Chancery, on behalf of a Class consisting of all record holders and beneficial owners of the common stock of Resorts on any day during the period November 6, 1987 to and including the date of the Griffin Merger (as defined herein), including the legal representatives, heirs, and successors in interest, whether immediate or remote, or assigns of such foregoing holders (except defendants and their affiliates, officers, directors and members of their immediate families).

Communications with the class representatives and their counsel may be directed *in writing* to the attention of Co-lead Counsel for the plaintiffs:

|  |  |  |
|---|---|---|
| Sidney B. Silverman, Esq. | or | Richard D. Greenfield, Esq. |
| Silverman & Harnes |  | Greenfield & Chimicles |
| 135 East 36th Street |  | One Haverford Centre |
| New York, New York 10016 |  | Haverford, Pennsylvania 19041 |

## THE SETTLEMENT TERMS

The principal terms, conditions and other matters which are part of the Amended Stipulation and the Amended Settlement which it contemplates are summarized in this and succeeding sections below. This summary should be read in conjunction with, and is qualified in its entirety by reference to, the text of the Amended Stipulation, which is on file with the Register of Chancery, Public Building, 11th & King Streets, Wilmington, Delaware 19801, and copies of which may be obtained from counsel for the Class.

As a result, among other things, of the institution of the Delaware Actions, there is presently outstanding a tender offer for the Class A shares of Resorts at a price significantly above Donald Trump's original $15 per share merger proposal. The parties agreed that, at no cost to plaintiffs or to the Class (as defined above), the Class would receive the following benefits: (1) The Griffin Company or its affiliate shall make the Griffin Offer for up to all of the outstanding shares of the Class A common stock of Resorts at a price of $36 per share, net to the seller in cash; and (2) The Griffin Company and Resorts shall effectuate the Griffin Merger in accordance with the terms and conditions set forth in the Griffin Merger Agreement.

Plaintiffs agreed to settle the Delaware Actions and the New Jersey Actions pursuant to the terms and provisions of the Amended Stipulation after considering: (1) the substantial benefits to plaintiffs and the members of the Class that are embodied in the Amended Settlement, including the significant increase in the price offered for the Class A shares over Donald Trump's original $15 per share merger proposal, and the lack of a realistic possibility of a higher offer; (2) the risks of litigation; (3) current market conditions; (4) the CCC's initial approval of the Comprehensive Services Agreement and its subsequent refusal to permit plaintiffs to intervene in its proceedings; (5) the ratification by the Special Committee and its independent financial advisor of the $22 per share Trump merger proposal as fair to Resorts' shareholders; (6) the substantial discovery conducted by plaintiffs' counsel in the Actions; (7) the likelihood that the claims alleged derivatively would not survive following the proposed merger; and (8) the conclusion of plaintiffs' counsel that the Amended Settlement is fair, reasonable and adequate and in the best interests of the members of the Class.

Defendants vigorously deny all liability with respect to any and all of the facts or claims alleged in the Delaware Actions and in the New Jersey Actions but consider it desirable that the Delaware Actions and the New Jersey Actions be settled and dismissed because such settlement and dismissal would: (1) be beneficial to all Resorts shareholders; (2) facilitate the consummation of the Griffin Merger; (3) avoid the substantial burden, expense, inconvenience and distraction of continued litigation; and (4) put the Settled Claims (as defined below) to rest.

The Amended Stipulation also provides that, if the Settlement is approved by the Court, the Delaware Actions will be dismissed on the merits as to all of the defendants in the Delaware Actions and their respective present and former officers, directors, employees, agents, attorneys, representatives, trustees,

11

financial advisors, investment bankers, affiliates (as defined in Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), associates (as defined in Rule 12b-2, promulgated pursuant to the Securities Exchange Act of 1934), parents, subsidiaries, general or limited partners or partnerships, heirs, executors, administrators, successors and assigns, and with prejudice as against the plaintiffs, the Company, and all members of the Class. The Amended Stipulation also provides for the dismissal with prejudice of the New Jersey Actions. Under the terms of the Amended Settlement, the plaintiffs, the Company, and all members of the Class will also be permanently barred and enjoined, either directly, representatively, derivatively or in any other capacity, from asserting any claims against the defendants in the Delaware Actions or in the New Jersey Actions and their respective present and former officers, directors, employees, agents, attorneys, representatives, trustees, financial advisors, investment bankers, affiliates, associates, parents, subsidiaries, general or limited partners or partnerships, heirs, executors, administrators, successors and assigns that are or could have been alleged in the Delaware Actions or in the New Jersey Actions, including those set forth in paragraphs A through QQ of the Amended Stipulation and specifically including any claim, whether arising under the federal securities laws or otherwise, which are or could have been alleged in connection with the Griffin Offer, the Griffin Merger and the transactions contemplated thereby, or in connection with the effectuation of the Amended Settlement. The Amended Settlement and the dismissal of these Actions will not preclude members of the Class who comply with Section 262 of the Delaware these Actions Law from asserting dissenters' appraisal right claims with respect to the Merger. (See "BACKGROUND AND DESCRIPTION OF THE ACTION" above.)

## APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

Plaintiffs' attorneys of record in the Actions will jointly apply to the Court for an award of attorneys' fees, including reimbursement of their actual expenses, in an amount not to exceed in the aggregate the sum of $3,250,000. Defendants will not object to such application. Such application will be made, at the option of plaintiffs' attorneys, at or subsequent to the Settlement Hearing. Subject to the consummation of the Griffin Merger and conditions set forth in this paragraph, any attorneys' fees and expenses awarded by the Court to plaintiffs' counsel after full hearing and consideration by the Court of such matters as the Court, in its discretion, shall require shall be paid one-half by Resorts and one-half by Donald Trump. Any award of attorneys' fees and/or expenses to plaintiffs' attorneys in the Actions will not diminish the payment of $36 per share to be paid to holders of Resorts' common stock in the Griffin Offer.

## CONDITIONS OF THE SETTLEMENT

The obligations of defendants under the Amended Stipulation are conditioned upon approval of the Amended Settlement by the Court. In the event any option to withdraw from the Amended Stipulation and the Settlement is exercised by any party thereto, or if the Amended Stipulation and the Amended Settlement are not approved by the Court or shall not become effective for any reason whatsoever, the Amended Stipulation, the Amended Settlement provided in the Amended Stipulation (including any modification thereto made with the consent of the parties) and any actions taken in connection therewith will be terminated and will become void and have no further force and effect, except for the obligation of Donald Trump and Resorts to pay for any expenses incurred in connection with this notice.

## RIGHT TO APPEAR

At the Settlement Hearing, any member of the Class who objects to the Amended Stipulation, the Amended Settlement, the class action determination, the judgment to be entered in the Delaware Actions, or the award of attorneys' fees and expenses to plaintiffs' counsel, or who otherwise wishes to be heard, may appear in person or by his attorney and present any evidence or argument that may be proper and relevant. However, no member of the Class, or any other person (excluding a party), shall be heard or shall be entitled to contest the approval of the terms and conditions of the Amended Settlement or (if approved) the judgment to be entered thereon, or the allowance of fees and expenses to plaintiffs'

attorneys, and no papers or briefs submitted by any member of the Class, or any other person (excluding a party), shall be received and considered, except by Order of the Court for good cause shown, unless no later than ten (10) days prior to the Settlement Hearing the following documents are served and filed in the manner provided below: (a) a notice of intention to appear; (b) a detailed statement of such person's specific objections to any matter before the Court; and (c) the grounds for such objections and any reasons why such person desires to appear and to be heard, as well as all documents and writings which such person desires this Court to consider. Such documents shall be served upon the following counsel prior to filing such documents with the Court, and then filed with the Register in Chancery, the Court of Chancery of the State of Delaware in and for New Castle County, Public Building, 11th & King Streets Wilmington, Delaware 19801:

    Pamela S. Tikellis, Esq
    Greenfield & Chimicles
    One Rodney Square
    P.O. Box 1035
    Wilmington, Delaware 19899

    Co-lead Counsel for Plaintiffs and
      Liaison Counsel in Consolidated
      Civil Action No. 9470 and Attorneys
      for Plaintiffs in Civil Action No. 9605

    A. Gilchrist Sparks III, Esq
    Morris, Nichols, Arsht & Tunnell
    1105 N. Market Street
    P.O. Box 1347
    Wilmington, Delaware 19899

    Attorneys for Defendants
      George A. Bariscillo, Jr.,
      William Druz and
      Mitchell Sviridoff

    Januar D. Bove, Esq
    Connolly, Bove, Lodge & Hutz
    1120 Market Building
    P.O. Box 2207
    Wilmington, Delaware 19899

    Attorneys for Defendants
      Thomas S. Murphy and Henry B.
      Murphy, as Executors of the
      Estate of James M. Crosby,
      Henry B. Murphy, Charles E. Murphy,
      William M. Crosby and John F. Crosby

    Robert K. Payson, Esq
    Potter Anderson & Corroon
    350 Delaware Trust Building
    P.O. Box 951
    Wilmington, Delaware 19899

    Attorneys for Defendants
      Resorts International, Inc.,
      I.G. Davis, Robert D. Peloquin,
      H. Steven Norton, Mathew B.
      Kearney and John M. Donnelly

Bruce M. Stargatt, Esq.
Young, Conaway, Stargatt & Taylor
Rodney Square North
P.O. Box 391
Wilmington, Delaware 19899

Attorneys for Defendants
Donald J. Trump, Robert S. Trump,
Harvey I. Freeman, The Trump Hotel
Corporation and The Trump Organization, Inc.

Any person other than a party who fails to object in the manner provided herein shall be deemed to have waived its objections and shall forever be barred from making any such objections in the Delaware Actions or in any other action or proceeding. Pending final determination of whether the Amended Settlement should be approved, the Court has ordered that no member of the Class may commence or prosecute any action asserting claims which have been or could have been asserted arising from or relating to any of the matters or transactions referred to in the pleadings in the Delaware Actions, the New Jersey Actions or in the Amended Stipulation.

## SCOPE OF THIS NOTICE

The foregoing description of the Settlement Hearing, the Actions, the class action determination, the terms of the Amended Settlement, and other matters described herein, does not purport to be comprehensive. Accordingly, members of the Class are referred to the documents filed with the Court in the Delaware Actions, including the Amended Stipulation, pleadings and other papers, which may be examined by you or your attorney during regular business hours of each business day at the office of the Register in Chancery, in the Public Building, 11th & King Streets, Wilmington, Delaware 19801.

Entered by Order of:

Vice Chancellor, Court of
Chancery of the State of
Delaware in and for New
Castle County

MAURICE A. HARTNETT III

Dated: July 14, 1988

14


EXHIBIT
D-1

# PROSPECTIVE FINANCIAL ANALYSES
# FOR VARIOUS OWNERSHIP AND OPERATIONAL
# SCENARIOS RELATING TO

# THE RESORTS INTERNATIONAL CASINO-HOTEL
# AND
# THE TAJ MAHAL HOTEL & CASINO

## SEPTEMBER 1987



Laventhol & Horwath
Certified Public Accountants

M0003409



**Laventhol & Horwath**
Certified Public Accountants
PRODUCTION AND COPY

1845 Walnut Street
Philadelphia, PA 19103
(215) 299-1700
Telex 83-1396
Cable: HORWINTAS

September 25, 1987

Mr. E. Steven Norton
Executive Vice President
Resorts International, Inc.
Atlantic City, New Jersey

Dear Mr. Norton:

   In accordance with our engagement letter dated July 29, 1987, we have prepared prospective analyses of cash flow from operations before management fees, reserve for replacement of fixed assets, debt service and taxes on income ("cash flow") for the Resorts International Casino-Hotel and the Taj Mahal Hotel & Casino under various assumed ownership and operational scenarios. This report presents the underlying assumptions and our findings, conclusions, recommendations and prospective analyses.

   This report is based on estimates, assumptions and other information developed from research of the market, our knowledge of the industry and our meetings with you during which we were provided certain information. The sources of information and the bases of the estimates and assumptions are stated herein. The terms of this engagement are such that we have no obligation to revise this report to reflect events or conditions which occur subsequent to the date of completion of our fieldwork, September 25, 1987. However, we are available to discuss the necessity for revision in view of changes in the economic or market factors affecting the subject properties.

M0003410

INTRODUCTION AND SCOPE

The accompanying prospective analyses of future operating results are based on estimates and assumptions developed in connection with our market analyses. However, some assumptions inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period of the prospective analyses will vary from the estimates, and the variations may be material.

In accordance with our engagement letter, we did not ascertain the legal and regulatory requirements applicable to these properties, including zoning, other state and local government regulations, permits and licenses. In addition, no effort has been made to determine the possible effect on the properties of present or future federal, state or local legislation, including any environmental or ecological matters or interpretations thereof or of future energy shortages.

Further, we have not been engaged to evaluate the effectiveness of management and we are not responsible for future marketing efforts and other management actions upon which actual results will depend.

Our report is intended solely for the information of the officers, directors and shareholders of Resorts International, Inc. and, if desired, the Casino Control Commission of New Jersey. Otherwise, neither this report nor its contents may be referred to or quoted in any registration statement, prospectus, loan or other agreement or document without our prior written consent.

*Laventhol & Horwath*

M0003411