8006E

3. Attached as Exhibit B to this Affifidavit is a true and correct copy of the Consolidated Amended Complaint in this action, filed on February 8, 1991.

Richard L. Posen

Sworn to before me this
27th day of January, 1992.

Notary Public

MARY STARR
Notary Public, State of New York
No. 30-4776638
Qualified in Nassau County
Commission Expires October 31, 1992

**PROSPECTUS**



# $675,000,000
# Trump Taj Mahal Funding, Inc.
## 14% First Mortgage Bonds, Series A, due 1998
## Guaranty of Payment by
## Trump Taj Mahal Associates Limited Partnership

The 14% First Mortgage Bonds, Series A, due 1998 (the "Bonds") are being issued by Trump Taj Mahal Funding, Inc. (the "Company") and will be secured by an assignment of a promissory note (the "Note") of Trump Taj Mahal Associates Limited Partnership (the "Partnership"), in the aggregate amount of $675,000,000, evidencing the loan to it by the Company of the gross proceeds of this offering, and a mortgage on and other documents evidencing a security interest in (the "Mortgage") the casino/hotel and convention center complex to be acquired by the Partnership from Resorts International, Inc. and certain of its subsidiaries, which is being constructed on The Boardwalk in Atlantic City, New Jersey (the "Taj Mahal"), and certain other property herein described. The Collateral for the Bonds will not include cash and Permitted Investments of the Partnership, including any proceeds from the sale of the Bonds held by the Partnership until expended. The Partnership expects that substantially all of the Taj Mahal will be open to the public for gaming business on or about February 15, 1990. See "Properties of the Partnership—Appraisals" for a description of appraisals of the Taj Mahal as of March 31, 1988 (as an uncompleted facility) and as of February 15, 1990 (assuming completion and opening of the Taj Mahal). The appraisals, in the opinion of the appraisers, conform with the guidelines regarding appraisal procedures set forth in regulations governing Federal savings institutions.

The Partnership will issue a guaranty of the payment of the principal of, premium, if any, and interest on the Bonds (the "Guaranty"). The Bondholders and the Company will have recourse to all of the assets of the Partnership excluding cash permitted to be distributed by the Indenture, regardless of whether such cash has been distributed. Cash is not distributable by the Partnership to its Partners unless certain coverage tests are satisfied. The Bonds, the Note, the Mortgage and the Guaranty will be non-recourse to the Partners of the Partnership, the shareholders of the Company and to all other persons and entities whatsoever (other than the Company, the Partnership and, with respect to the Trump Completion Guaranty and the Trump Line of Credit, Donald J. Trump). To the extent set forth in the Trump Completion Guaranty, Donald J. Trump will guarantee that construction of the Taj Mahal will be substantially completed in accordance with the plans and specifications therefor by March 1, 1991, subject to extension by reason of Force Majeure Delays. See "Trump Completion Guaranty and Line of Credit."

Interest on the Bonds will be payable semi-annually, commencing May 15, 1989. The Bonds are redeemable at any time on or after November 15, 1993, at the option of the Company, in whole or in part, at the prices set forth herein, together with accrued interest to the redemption date. The Bonds are not entitled to the benefit of any sinking fund.

The Partnership will use the net proceeds of this offering to repay the interim financing incurred to pay the cash portion of the purchase price of the Taj Mahal and certain other assets, including interest thereon, and, together with funds from other sources, to finance the cost of completing and opening the Taj Mahal, including funding interest on the Bonds for fifteen months from the date of issuance.

The Bonds are being sold pursuant to delayed delivery contracts and will be delivered against payment therefor at such time as certain conditions are satisfied, including those described below. In connection with the delayed delivery contracts, certain fees will be paid to the purchasers of the Bonds. See "Underwriting."

The sale of the Bonds is conditioned upon the occurrence by December 7, 1988 of the closing of the purchase by the Partnership of the Taj Mahal and certain other assets and the receipt by the Partnership of a capital contribution of $75,000,000 from Donald J. Trump.

The Bonds have been approved for listing on the American Stock Exchange, subject to official notice of issuance.

Certain capitalized terms used herein are defined in the "Glossary" or the "Description of the Bonds—Certain Definitions," included elsewhere in this Prospectus.

**See "Special Considerations" for a discussion of certain factors to be considered by potential investors.**

**THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.**

| | Price to Public | Underwriting Discount(1) | Proceeds to Company/Partnership(1)(2) |
|---|---|---|---|
| Per Bond | 100% | 3% | 97% |
| Total | $675,000,000 | $20,250,000 | $654,750,000 |

(1) See "Underwriting" for information pertaining to indemnification arrangements among the Underwriter, the Partnership and the Company against certain liabilities, including liabilities under the Securities Act of 1933, as amended.

(2) Before deducting expenses estimated at $3,650,100 payable by the Partnership. The proceeds of this offering will be immediately loaned to the Partnership by the Company. See "Use of Proceeds."

The Bonds are being offered by the Underwriter subject to certain conditions for delivery pursuant to delayed delivery contracts. The Underwriter reserves the right to withdraw, cancel, or modify such offer without notice and to reject orders in whole or in part. It is expected that delivery of the executed delayed delivery contracts will be made in New York, New York on or about November 16, 1988.

# Merrill Lynch Capital Markets

**The date of this Prospectus is November 9, 1988.**

**IN CONNECTION WITH THIS OFFERING, THE UNDERWRITER MAY OVER-ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF THE BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH TRANSACTIONS MAY BE EFFECTED ON THE AMERICAN STOCK EXCHANGE OR OTHERWISE. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.**

---

## AVAILABLE INFORMATION

The Company and the Partnership have jointly filed with the Securities and Exchange Commission (the "Commission") a Registration Statement on Form S-1 (the "Registration Statement") under the Securities Act of 1933, as amended (the "1933 Act"), with respect to the Bonds offered by this Prospectus. This Prospectus does not contain all of the information set forth in the Registration Statement, including the Exhibits thereto, to which reference is made hereby. Statements contained in the Registration Statement as to the contents of any contract or other document referred to are not necessarily complete. With respect to each such contract or other document filed as an Exhibit to the Registration Statement, reference is made to the Exhibit for a more complete description of the matter involved, and each such statement shall be deemed to be qualified in its entirety by such reference.

The Company and the Partnership may be subject to the information requirements of the Securities Exchange Act of 1934, as amended (the "1934 Act"). Filings made by the Company and the Partnership may be inspected and copied at the public reference facilities maintained by the Commission at its offices located at Room 1024, 450 Fifth Street, N.W., Washington, D.C. 20549; at the Commission's regional offices located at Room 3190, Kluczynski Federal Building, 230 South Dearborn Street, Chicago, Illinois 60604; and at Room 1100, Jacob Javits Federal Building, 26 Federal Plaza, New York, New York 10278. Copies of such material can be obtained from the Public Reference Section of the Commission, at Room 1024, 450 Fifth Street, N.W., Washington, D.C. 20549 at prescribed rates.

The Company and the Partnership will furnish the Bondholders, within 15 days after the Company or the Partnership is required to file the same with the Commission, copies of the annual reports, quarterly reports and of the information, documents and other reports which the Company or the Partnership may be required to file with the Commission pursuant to Section 13 or Section 15(d) of the 1934 Act. If the Company or the Partnership is not required to file information, documents or reports pursuant to either Section 13 or Section 15(d), then the Company and the Partnership will furnish the Bondholders (1) in accordance with the rules and regulations prescribed from time to time by the Commission, such of the supplementary and periodic information, documents and reports which may be required pursuant to Section 13 of the 1934 Act in respect of a security listed and registered on a national securities exchange as may be prescribed from time to time in such rules and regulations, and (2) financial statements for each fiscal year and quarter of each of the Company and the Partnership and its consolidated subsidiaries and a report of an independent accountant on the financial statements for each fiscal year within 15 days after such dates as the Company or the Partnership would be required to file such reports with the Commission under Section 13 or 15(d) of the 1934 Act if the Company or the Partnership had equity securities registered under the 1934 Act.

---

*All references in this Prospectus to the Taj Mahal casino/hotel and convention center complex to be acquired, constructed and operated by the Partnership in Atlantic City, New Jersey are made with the understanding that construction and operation of the Taj Mahal are subject to the supervision, regulation and licensing of the New Jersey regulatory authorities, including the New Jersey Casino Control Commission (the "Casino Control Commission"). The Casino Control Commission has the authority to determine whether and under what circumstances the Taj Mahal may be opened and operated.*

---

**THE NEW JERSEY CASINO CONTROL COMMISSION HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.**

## PROSPECTUS SUMMARY

*This summary is qualified in its entirety by the more detailed information appearing elsewhere in this Prospectus. Certain capitalized terms used herein are defined in the "Glossary" or the "Description of the Bonds—Certain Definitions," included elsewhere in this Prospectus.*

### The Company

The Company was incorporated under the laws of the State of New Jersey on June 3, 1988, and is owned by Donald J. Trump and Trump Taj Mahal, Inc. ("Trump Inc."), a New Jersey corporation incorporated on June 3, 1988, of which Donald J. Trump is the sole shareholder. The Company was formed solely to raise funds through the issuance and sale of the Bonds for the benefit of the Partnership. The Company currently has its principal executive offices c/o Trump Hotel Management Corp., The Boardwalk and Pennsylvania Avenue, Atlantic City, New Jersey 08404, and its telephone number is (609) 340-6200.

### The Partnership

The Partnership was formed as a limited partnership under the laws of the State of New Jersey on June 23, 1988 to consummate the acquisition of the casino/hotel and convention center complex now under construction in Atlantic City, known as the "Taj Mahal," and related assets from Resorts International, Inc. ("RII") and certain of its subsidiaries (collectively, "Resorts"), and thereafter to complete the construction of and operate the Taj Mahal. Donald J. Trump and Trump Inc. are the general partners (the "General Partners"), and Donald J. Trump is the sole limited partner, of the Partnership (the General Partners and the limited partner, and their respective heirs, personal representatives, successors and/or assigns being collectively referred to as the "Partners"). Upon completion, the Taj Mahal will be the largest casino/hotel facility in Atlantic City. The Partnership expects to open substantially all of the Taj Mahal to the public for gaming business on or about February 15, 1990. The proceeds of this offering will be loaned immediately by the Company to the Partnership, which will pay the expenses of this offering. The Partnership currently has its principal executive offices c/o Trump Hotel Management Corp., The Boardwalk and Pennsylvania Avenue, Atlantic City, New Jersey 08404, and its telephone number is (609) 340-6200.

### The Acquisition

Pursuant to an Asset Purchase Agreement, dated as of May 27, 1988, as amended (the "Asset Purchase Agreement"), between Resorts and the Partnership, the Partnership has agreed to purchase from Resorts the Taj Mahal, certain real property adjacent to or in the vicinity of the site of the Taj Mahal and certain other assets for an aggregate purchase price of $300,100,000 (including the payment of closing adjustments estimated to be $17,100,000 and acquisition expenses of approximately $10,000,000). The right to acquire certain of such assets (not including the Taj Mahal) has been assigned to two affiliates of Donald J. Trump. Such assigned assets have an appraised value of approximately $12,000,000 and such amount of the total purchase price payable to Resorts will be paid directly by such affiliates. See "The Acquisition—Asset Purchase Agreement—*Assigned Assets.*"

The Partnership will pay the purchase price for the assets it acquires (estimated to be approximately $288,100,000, including acquisition expenses and estimated closing adjustments) (the "Purchase Price") through borrowings from First Fidelity Bank, National Association, New Jersey ("First Fidelity"), Bankers Trust Company and Donald J. Trump in the aggregate amount of approximately $267,400,000, which borrowings will be repaid from a portion of the proceeds of the Bonds. The balance of the purchase price will be paid by the Partnership through the assumption of approximately $20,700,000 of liabilities. See "The Financing," "Use of Proceeds," and "Combined Pro Forma Balance Sheet."

This offering is conditioned upon the occurrence of the Acquisition Closing and the receipt by the Partnership of a capital contribution of $75,000,000 from Donald J. Trump. The Acquisition Closing is anticipated to occur in November 1988.

### Special Considerations

There are special considerations associated with an investment in the Bonds. These special considerations include, among others, the ability of the Partnership to service its debt; the validity of the security of the Bonds; the possible effect of applicable fraudulent conveyance statutes; the risks regarding completing and opening the Taj Mahal; the terms of the Trump Completion Guaranty; potential conflicts of interest; competition; limitation of liability; management of the Taj Mahal; certain regulatory matters, including matters affecting ownership of the Bonds; absence of a public market for the Bonds; the maintenance of insurance; and the appraisals of the Taj Mahal.

### Use of Proceeds

The proceeds of this offering will be loaned immediately by the Company to the Partnership, which will pay the expenses of this offering. The Partnership will, in turn, issue the Note to the Company, which will provide for payments at the times and in the amounts sufficient to pay the debt service on the Bonds. The net proceeds of the Bonds, estimated at $651,100,000, will be used substantially as follows: (i) to repay the interim financing incurred in financing the cash portion of the cost of the acquisition of the Taj Mahal and certain other assets, including interest thereon; (ii) together with funds from other sources, to finance the cost of completing and opening the Taj Mahal; and (iii) to fund interest on the Bonds for a period of fifteen months from the date of issuance. See "Use of Proceeds."

### The Offering

| | |
|---|---|
| Issue | $675,000,000 principal amount of 14% First Mortgage Bonds, Series A, due 1998. See "Description of the Bonds." |
| Maturity | November 15, 1998. |
| Payment of Interest | November 15 and May 15, commencing May 15, 1989. |
| Optional Redemption | Redeemable at any time on or after November 15, 1993, at the option of the Company, in whole or in part, at the redemption prices set forth herein, together with accrued interest to the redemption date. |
| Security | The Bonds will be secured by an assignment by the Company to Bankers Trust Company, as trustee for the holders of the Bonds (the "Trustee"), of (i) the Note issued by the Partnership to the Company in the principal amount of $675,000,000, payable in amounts and at times necessary to pay the principal of, premium, if any, and interest on the Bonds, (ii) the Mortgage on and other documents evidencing a security interest in the Taj Mahal and substantially all of the other assets of the Partnership (other than cash and Permitted Investments of the Partnership, including any proceeds from the sale of the Bonds held by the Partnership until expended) and (iii) the Trump Completion Guaranty. The Partnership may incur additional Debt which may be secured by mortgages junior to or on a parity with (or senior to, in the case of Debt incurred for the construction, acquisition and/or improvement of any New Parking Facility) the lien of the Mortgage under certain circumstances as described below. See "Description of the Bonds—The Mortgage" and "Properties of the Partnership—Appraisals." |

| | |
|---|---|
| Partnership Guaranty | The Guaranty of the Partnership will be a guaranty of the payment of the principal of, premium, if any, and interest on the Bonds. |
| Limitation of Liability | The Bonds, the Note, the Mortgage and the Guaranty will be non-recourse to the Partners of the Partnership and to the shareholders of the Company, including Donald J. Trump, and to all other persons and entities whatsoever (other than the Company and the Partnership and, under the Trump Completion Guaranty and the Trump Line of Credit, Donald J. Trump). Upon an Event of Default, holders of Bonds will have recourse to all the assets of the Partnership, excluding cash which may be distributed pursuant to the Indenture (regardless of whether such cash has been distributed), and the interest of the Company in the Note and the Mortgage, which will be secured by the Partnership's assets described above. The Indenture prohibits the Partnership from distributing cash to its Partners unless certain coverage tests are met. See "Special Considerations—Limitation of Liability." |
| Trump Completion Guaranty | To the extent set forth in the Trump Completion Guaranty, Donald J. Trump will covenant, agree and guarantee that the construction of the Taj Mahal will be substantially completed by March 1, 1991, subject to extension by reason of Force Majeure Delays, in accordance with the plans and specifications therefor. Donald J. Trump will also guarantee that the Partnership (or the then owner or operator of the Taj Mahal) will have Working Capital (as defined) on the Opening Date of $10,000,000 in cash and/or marketable securities, exclusive of the proceeds of any Unrestricted Financing, but only if the Trustee calls upon Donald J. Trump to perform any of his other obligations under the Trump Completion Guaranty. Donald J. Trump will also deliver a guaranty to the Housing Authority (the "Housing Authority Guaranty") relating to the construction of the Taj Mahal. See "Trump Completion Guaranty and Line of Credit—Trump Completion Guaranty." |
| Trump Line of Credit | In addition to the Trump Completion Guaranty, Donald J. Trump has agreed to loan to the Partnership, on an unsecured subordinated basis, up to $25,000,000 (the "Trump Line of Credit") upon the happening of the following events: (i) a Financing Default (as defined) occurs; (ii) certain Events of Default under the Indenture or Mortgage occur; (iii) an event occurs that allows the Partnership to call upon Donald J. Trump to perform under the Trump Completion Guaranty; or (iv) Working Capital (exclusive of proceeds of Unrestricted Financing) of the Partnership is at any time less than $10,000,000. Interest and principal on any such loans will be payable provided the Partnership meets certain coverage tests. The Trump Line of Credit will terminate when the Opening Date has occurred, all costs and expenses incurred in completing construction of the Taj Mahal have been paid or provided for and the Partnership's Working Capital (exclusive of the proceeds of any Unrestricted Financing) is at least $10,000,000 in cash and/or marketable securities. |

| | |
|---|---|
| | See "Trump Completion Guaranty and Line of Credit—Trump Line of Credit." |
| Certain Covenants of the Partnership ........... | The Bonds will be issued pursuant to an indenture among the Company, as issuer, the Partnership, as guarantor, and the Trustee (the "Indenture"). The Indenture contains certain covenants with respect to the Partnership which, among other things, prohibit the Partnership from (i) incurring additional secured or unsecured Debt, unless at the point in time of the incurrence of and giving effect to such Debt, the aggregate Outstanding Amount of Debt of the Partnership does not exceed 80% of the Appraised Value, and the Coverage Ratio, calculated for the four prior fiscal quarters of the Partnership, is not less than 1.2; (ii) incurring additional Mortgage Debt, unless such Mortgage Debt is *pari passu* or junior to the lien of the Mortgage and at the point in time of the incurrence of and giving effect to such Mortgage Debt, the aggregate Outstanding Amount of Mortgage Debt of the Partnership does not exceed 66⅔% of the Appraised Value (80% if the lien of the Mortgage Debt is junior to the lien of the Mortgage) and the Coverage Ratio, calculated for the four prior fiscal quarters of the Partnership, is not less than 1.5; and (iii) making certain distributions. The Partnership may, however, without complying with the above tests, incur (a) up to an aggregate of $50,000,000 of additional Debt, which may be unsecured or secured by a lien that is junior to the lien of the Mortgage, (b) Debt for New Parking Facilities up to an aggregate of $35,000,000 and (c) certain other Debt. See "Description of the Bonds—Certain Covenants of the Company and the Partnership." |
| Management Agreement ............................... | The Partnership will enter into a management agreement (the "Management Agreement") with Trump Hotel Management Corp. ("THC"), a New Jersey corporation controlled by Donald J. Trump. Under the Management Agreement, THC will be required to manage and operate the Taj Mahal, including all casino operations, and perform certain construction supervisory services in connection with the construction of the Taj Mahal in exchange for certain fees. Pursuant to the Management Agreement, the Partnership will agree to pay THC (i) a construction supervisory fee relating to the construction of the Taj Mahal in the amount of $10,000,000, which amount will be payable within ten days after (but not prior to) the Opening Date, and (ii) a construction supervisory fee relating to the Partnership's construction of future projects, the Construction Cost of which exceeds $10,000,000, in the amount of 3% of such Construction Cost, which amounts will be payable within ten days after the substantial completion of any such future project. In addition, THC will receive a Management Fee equal to 1¾% of the Gross Revenues of the Partnership for each fiscal year or part thereof within the term of the Management Agreement. The Management Fee will be payable for any six-month period only after all interest and principal on the Bonds due during such six-month period have been paid. The Management Agreement is conditioned upon the approval of the Casino Control Commission. See "Management Agreement." |
| Listing ............................................................ | The Bonds have been approved for listing on the American Stock Exchange, subject to official notice of issuance. |

**Summary Historical and Pro Forma Financial Information**

The following tables set forth certain combined balance sheet data of the Partnership and the Company and balance sheet data of the Company as of October 31, 1988 and as adjusted to give effect to (i) the Partnership's acquisition of the Property (which term includes the Taj Mahal but excludes the Assigned Assets being acquired from Resorts by affiliates of the Partnership) under the Asset Purchase Agreement and the proposed interim financing required to fund the acquisition and (ii) a capital contribution to the Partnership, the sale of the Bonds and the use of a portion of the proceeds of the Bonds for the repayment of such interim financing and advances from affiliates. The data as of October 31, 1988 has been derived from the pro forma and audited historical balance sheets of the Partnership and the Company contained elsewhere in this Prospectus. The Taj Mahal, which the Partnership will acquire, is a partially constructed facility and it is anticipated that it will be completed with the proceeds from this offering (including earnings thereon), the capital contribution from Donald J. Trump and amounts available under the Trump Line of Credit. Operating data has been omitted since operations have not yet commenced.

**TRUMP TAJ MAHAL ASSOCIATES LIMITED PARTNERSHIP**
**AND**
**TRUMP TAJ MAHAL FUNDING, INC.**

| | October 31, 1988 | | |
|---|---|---|---|
| | Actual | As Adjusted(1) | As Adjusted(2) |
| | | (unaudited) (in thousands) | (unaudited) |
| COMBINED BALANCE SHEET DATA: | | | |
| Working Capital | $(6,460) | $(22,160) | $437,860 |
| Total Assets | 7,651 | 290,751 | 770,721 |
| Long Term Debt | 1,130 | 268,530 | 675,000 |
| Partners' Capital and Shareholders' Equity | 21 | 21 | 75,021 |

**TRUMP TAJ MAHAL FUNDING, INC.**

| | October 31, 1988 | | |
|---|---|---|---|
| | Actual | As Adjusted(1) | As Adjusted(2) |
| | | (unaudited) (in thousands) | (unaudited) |
| BALANCE SHEET DATA: | | | |
| Working Capital | $ 20 | $ 20 | $ 20 |
| Total Assets | 20 | 20 | 675,020 |
| Long Term Debt | — | — | 675,000 |
| Shareholders' Equity | 20 | 20 | 20 |

(1) Adjusted to give effect to (i) the Partnership's interim borrowings of $125,000,000 from First Fidelity, $125,000,000 from Bankers Trust Company and approximately $17,400,000 from Donald J. Trump and the assumption by the Partnership of approximately $20,700,000 of liabilities and (ii) the acquisition of the Property pursuant to the Asset Purchase Agreement.

(2) Adjusted to give effect to (i) the sale of the Bonds by the Company and the loan of the proceeds thereof to the Partnership and (ii) a capital contribution to the Partnership of $75,000,000 by Donald J. Trump, the sale of the Bonds and the use by the Partnership of a portion of the proceeds of the Bonds for the repayment of the interim financing incurred by the Partnership to pay the cash portion of the cost of the acquisition and the repayment of all advances from affiliates. The Partnership expects to pay approximately $600,000 of interest on the interim financing, which amount has not been reflected in the amounts stated above.

## SPECIAL CONSIDERATIONS

*Before making a decision to purchase any of the Bonds, prospective purchasers should consider carefully the following factors, among others set forth in this Prospectus, which could materially adversely affect (i) the operations of the Partnership and its ability to make necessary payments to the Company to meet the debt service requirements of the Bonds and (ii) the security for the Bonds.*

**Ability of the Partnership to Service Debt**

Upon consummation of the offering of the Bonds, the Partnership will have outstanding indebtedness in the aggregate principal amount of $675,000,000, all of which will be evidenced by the Note issued by the Partnership to the Company in respect of the Bonds. The first two interest payment dates on the Bonds will occur prior to the expected opening of the Taj Mahal and a portion of the net proceeds of this offering is intended to be used (although no funds will be segregated for such purpose) to make such interest payments. Although a portion of the net proceeds also is intended to fund one half of the third interest payment, which is expected to occur approximately three months after the opening of the Taj Mahal, the ability of the Company to make the third interest payment on the Bonds will depend, in part, on the Partnership's ability to open the Taj Mahal prior to the third interest payment date (May 15, 1990) and to generate sufficient operating results between the Opening Date and May 15, 1990. The casino business in Atlantic City, New Jersey has a seasonal nature of which summer is the peak season. The anticipated opening date of the Taj Mahal is on or about February 15, 1990. Since the third interest payment date on the Bonds occurs before the summer season, the Partnership will not have the benefit of receiving peak season cash flow prior to the third interest payment date, which could adversely affect its ability to pay interest on the Bonds.

The sole business of the Partnership will be to acquire, construct and operate the Taj Mahal and its ancillary facilities. The Taj Mahal has not been completed and, accordingly, has no operating history. The Partnership, therefore, has no history of earnings and its operations will be subject to all of the risks inherent in the establishment of a new business enterprise. Accordingly, the ability of the Partnership to service its debt to the Company is completely dependent upon the success of that operation and such success will depend upon financial, business, competitive, regulatory and other factors affecting the Taj Mahal and the casino industry in general, as well as prevailing economic conditions. See "Capitalization" and "Business of the Partnership."

The Taj Mahal will be the largest casino/hotel complex in Atlantic City, with approximately twice the room capacity and casino space of many of the existing casino/hotels in Atlantic City. Neither the Partnership nor any other casino/hotel operator has had experience operating a complex the size of the Taj Mahal in Atlantic City. Consequently, no assurance can be given that, once opened, the Taj Mahal will be profitable or that it will generate cash flow sufficient to provide for the payment of the debt service on the Note and/or any future borrowings by the Partnership.

If the Taj Mahal does not generate sufficient cash flow to pay the debt service on the Note or other indebtedness of the Partnership, the Partnership may have to borrow additional moneys to provide for such payment. The ability of the Partnership to obtain additional financing will be restricted by the terms of the Indenture. See "Description of the Bonds—Certain Covenants of the Company and the Partnership."

**Security for the Bonds**

The Bonds will be secured by an assignment by the Company to the Trustee of (a) the Note to be issued by the Partnership to the Company in the principal amount of $675,000,000, which will require payments at such times and in such amounts as are sufficient to pay the principal of, premium, if any, and interest on the Bonds, (b) the Mortgage on the Taj Mahal and certain other assets related thereto, constituting substantially all of the assets of the Partnership (other than cash and Permitted Investments, including any proceeds from the sale of the Bonds held by the Partnership until expended, which initially will constitute a substantial portion of the assets of the Partnership) (collectively, the "Collateral") and (c) the Trump Completion Guaranty.

The Trump Organization has obtained two appraisals for the Property as of March 31, 1988 which value the uncompleted Taj Mahal and its ancillary facilities and assets at $226,000,000 and $230,000,000,

respectively. See "Properties of the Partnership—Appraisals." As stated above, cash and Permitted Investments held by the Partnership are not included within the Collateral but are assets of the Partnership. If an Event of Default occurs prior to completion of the Taj Mahal, upon foreclosure and sale of the Collateral, there would not be sufficient proceeds to pay the principal of, and accrued interest on, the Bonds. The Bondholders would have an unsecured claim against the Partnership for any deficiency, which claim would rank *pari passu* with any other senior creditors of the Partnership. Accordingly, the only practical remedy of the Bondholders during this period would be enforcement of the Trump Completion Guaranty pursuant to which Donald J. Trump has agreed to substantially complete construction of the Taj Mahal by March 1, 1991, which date is subject to extension by reason of Force Majeure Delays. In addition, if an Event of Default occurs with respect to the Bonds after completion of the Taj Mahal, there can be no assurance that the liquidation of the Collateral would produce proceeds in an amount which would be sufficient to pay the principal of, and accrued interest on, the Bonds. See "Description of the Bonds—Security" and "—Non-recourse."

In any foreclosure sale of the Taj Mahal, the purchaser would need to be licensed to operate the Taj Mahal under the New Jersey Casino Control Act and the regulations promulgated thereunder (the "Casino Control Act"), and if the Trustee is unable to, or chooses not to, sell the Taj Mahal, the Trustee would be required to retain an entity licensed under the Casino Control Act in order to operate the Taj Mahal. Any such foreclosure sale (prior to the issuance of a certificate of completion by the Housing Authority) also would be subject to the provisions of the Development Agreement. See "Risks Regarding Completing and Opening the Taj Mahal—*Consequences of Delay*" below in this section and "Properties of the Partnership—Assumption Agreement." Because potential bidders must satisfy such requirements, the number of potential bidders in a foreclosure sale would be less than in foreclosures of other types of facilities and such requirements may delay the sale of, and may adversely affect the sales price for, the Taj Mahal. The ability to repossess and dispose of the Collateral upon acceleration of the Bonds is likely to be significantly impaired or delayed by applicable bankruptcy law if a bankruptcy case were to be commenced by or against the Partnership prior to the repossession or disposition of the Collateral by the Trustee or the Bondholders.

Under the terms of the Indenture, the Partnership may lease certain property and improvements from Donald J. Trump and his affiliates and any such leasehold interest would be included within the Collateral. If any such lease is terminated prior to the maturity of the Bonds, such lease would no longer be included within the Collateral. Prior to such termination, however, the lessor would be required to reimburse the Partnership for the amount of any capital expenditures (net of amortization or depreciation, as the case may be, on such capital expenditures) made by it for the benefit of such leased property. See "Description of the Bonds—Lease of Properties."

The Guaranty will also secure the Bonds. The ability of the Partnership to pay under the Guaranty will be subject to the same factors affecting its ability to pay on the Note issued by the Partnership to the Company in the principal amount of $675,000,000. See "Ability of the Partnership to Service Debt" above in this section.

**Fraudulent Conveyance**

The sale of the Property (including the Taj Mahal) to the Partnership by Resorts International, Inc. of New Jersey, a New Jersey corporation wholly owned by RII ("RINJ"), could constitute a "fraudulent conveyance" if a court in a lawsuit by an unpaid creditor or representative of creditors of RINJ, such as a trustee in bankruptcy or RINJ as a debtor in possession, were to find, under applicable federal or state fraudulent conveyance law, that (A) RINJ sold such Property with intent to hinder, delay or defraud its creditors or (B)(i) RINJ received less than reasonably equivalent value or fair consideration for such Property from the purchasers thereof *and* (ii) RINJ (a) at the time of the Acquisition Closing, was insolvent, (b) was rendered insolvent by reason of the sale, (c) was engaged in a business or transaction for which the assets remaining with RINJ constituted unreasonably small capital or (d) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature. The Partnership believes that RINJ is not selling the Property to the Partnership with intent to hinder, delay or defraud its creditors.

Under applicable federal and state law, RINJ generally would be considered insolvent if the present fair saleable value of RINJ's assets is less than the amount that will be required to pay its probable liability on its existing debts as they become absolute and matured, or if the sum of RINJ's debts (including any contingent liabilities) is greater than the fair value of all of RINJ's properties. Virtually all of RINJ's liabilities consist of intercompany obligations to Resorts. Prior to the sale of the Property, the balance sheet of RINJ will reflect, after giving effect to the write-down of the value of the Property to its appraised value, that the aggregate amount of RINJ's liabilities exceeds the present fair saleable value of its assets or the fair value of all of its properties. After giving effect to the sale of the Property, the balance sheet of RINJ will reflect that the aggregate amount of RINJ's liabilities exceeds the value of its assets. In each case, whether or not a court would determine that the present fair saleable value of RINJ's assets is greater than the amount that will be required to pay its probable liability on its existing debts as they become absolute and matured or whether the fair value of its properties is greater than the sum of its debts will depend upon (a) whether such court characterizes some or all of the outstanding intercompany obligations of RINJ to Resorts as equity or debt and (b) such court's determination as to the value of the Property. The Partnership believes that at the time of the Acquisition Closing RINJ will have sufficient capital to carry on its business and will be able to pay its debts as they mature. The Partnership's conclusions as to the sufficiency of RINJ's capital to carry on its business and RINJ's ability to pay its debts as they mature are based, in part, on (A) the occurrence of a merger between RII and RINJ which is contemplated to occur shortly after the sale of the Property, and (B) the obligation of the Partnership and the purchasers of the Assigned Assets to assume certain obligations relating to the Property and the Assigned Assets. The determination of solvency, sufficiency of capital and ability to pay debts as they mature will depend upon an analysis of the facts and circumstances involved and no assurance can be given as to what standards a court would apply in making such determinations or what conclusions it would reach.

The Partnership believes that the approximately $279,587,000 of consideration to be paid by the Partnership to Resorts for the Property is reasonably equivalent value or fair consideration, notwithstanding the expenditure by RINJ of approximately $511,000,000 (including approximately $405,655,000 of acquisition and construction costs) with respect to construction and acquisition of the Property as of March 31, 1988. The Partnership's belief is supported by the fact that the purchase price for the Property was determined after arm's-length negotiations with Griffin Co., which has no affiliations with Donald J. Trump. See "The Acquisition." Such basis has been confirmed by two appraisals of the Property which value the Property as of March 31, 1988 at $226,000,000 and $230,000,000, respectively. See "Properties of the Partnership—Appraisals." No assurances can be given, however, that a court would determine that such negotiations were arm's length or would apply the same valuation standards and methodologies used by the appraisers or accept the values assigned to the Property by the appraisers as determinative of the value of the Property.

If a court were to determine that the sale of the Property by RINJ constitutes a fraudulent conveyance under applicable federal and state fraudulent conveyance laws, the sale of the Property could be avoided and a creditor or representative of creditors of RINJ, such as a trustee in bankruptcy or RINJ as a debtor in possession, could recover the Property (subject to possible liens as described below) or receive from the Partnership the value of the Property for the benefit of the creditors of RINJ.

Under applicable federal and state fraudulent conveyance law, a subsequent transfer by the Partnership of an interest in the Property, such as the Mortgage, should not be set aside if the subsequent transferee of such interest (*i.e.*, the Trustee and the Bondholders) took for value, in good faith and without knowledge of the voidability of the sale of the Property to the Partnership by RINJ. If, however, the Trustee and the Bondholders, as subsequent transferees, did not take for value, in good faith and without knowledge of the voidability of the sale, the security interest granted under the Mortgage could be avoided or set aside for the benefit of the creditors of RINJ. Some courts have suggested that a subsequent transferee may have knowledge of the voidability of the sale if such transferee knew of sufficient facts that would lead a reasonable person to believe that such sale was voidable, while other courts have held that such transferee needs actual knowledge of the voidability of the sale.

Notwithstanding the possible voidability of the sale of the Property to the Partnership, if the Partnership acted in good faith, it should have a lien on the Property in an amount equal to the sum of the purchase price paid therefor plus the lesser of the actual costs of any improvements made by the

Partnership to the Property subsequent to its purchase (less realized and accrued profits) or the increase in the value of the Property as a result of such improvements. In the event the Partnership is granted such a lien or liens, the Partnership's right, title and interest in such liens and the claims secured thereby should be included in the security interest granted under the Mortgage, subject to such limitations as may be provided for under applicable bankruptcy, insolvency and other similar laws and principles of equity.

Subject to the foregoing, the Partnership believes that in a bankruptcy case or a lawsuit by creditors of RINJ the sale of the Property to the Partnership should not be held to have been made in violation of applicable federal or state fraudulent conveyance laws. Nevertheless, the determination of what constitutes reasonably equivalent value or fair consideration, good faith and without knowledge will be based upon the facts and circumstances of the transaction and no assurance can be given as to what standards a court would apply in making such determinations or that a court would determine that either the Bondholders and/or the Trustee or the Partnership acted in good faith and without knowledge or that RINJ received reasonably equivalent value or fair consideration for the Property.

In September 1988, a holder of certain RII debentures filed a purported class action complaint against RII in the Supreme Court of the State of New York, County of New York, in an action entitled *Kenwood Dual Fund, Ltd.* v. *First Interstate Trust Co. of New York and Resorts International Inc.* The complaint alleges a class action on behalf of the holders of RII's 10% Subordinated Debentures due June 1, 1998 and RII's 10% Subordinated Debentures due August 1, 1999. The aggregate outstanding principal amount of these series of debentures as of November 1, 1988 is $170 million. The complaint seeks a declaratory judgment that RII is in default under the terms of each indenture under which each such series of RII debentures was issued and that the principal and accrued interest of all such RII debentures are due and owing. RII has received an extension of the time in which to answer the complaint and intends to seek dismissal of the complaint. Some or all of the claims described above could be asserted in such litigation.

**Risks Regarding Completing and Opening the Taj Mahal**

*General.* The Partnership believes that construction of the Taj Mahal will be substantially completed, and substantially all of the facility will open to the public for gaming business, on or about February 15, 1990. The opening is contingent upon coordinating, among other things, the timely completion of construction, the concurrent installation of all furniture, fixtures and equipment, the hiring and training of sufficient personnel and the receipt of all regulatory licenses, permits and authorizations. Donald J. Trump will guarantee, pursuant to the Trump Completion Guaranty, that construction of the Taj Mahal will be substantially completed by March 1, 1991, subject to extension by reason of Force Majeure Delays, in accordance with the plans and specifications therefor. See "Business of the Partnership" and "Trump Completion Guaranty and Line of Credit—Trump Completion Guaranty."

*Possible Causes of Delay.* Unforeseen construction, equipping or staffing problems or difficulties in obtaining all of the requisite licenses, permits and authorizations from regulatory authorities could delay the opening of the Taj Mahal. Major construction projects entail significant risks, including shortages of materials or skilled labor, work stoppages, weather interference and unanticipated cost increases. Given these risks, there is no assurance that the construction of the Taj Mahal will be completed on time or at the budgeted amount. See "*Consequences of Delay*" below in this section and "The Financing."

The opening of the Taj Mahal requires the receipt of a substantial number of approvals from the Casino Control Commission and other regulatory authorities. Virtually all aspects of the physical construction, design and operational features of the facility must be approved, and all of the Partnership's prospective Taj Mahal employees must be licensed, by the Casino Control Commission. The scope of the remaining approvals required to open the facility is extensive and the failure to obtain such approvals could delay or prevent the opening of the Taj Mahal.

*Consequences of Delay.* In the event that the Taj Mahal is not substantially completed and opened by February 15, 1990, the Project Cost could increase significantly. See "The Financing." A substantial delay in opening the Taj Mahal would have a material adverse effect on the Partnership's ability to meet its interest payments on the Bonds. See "Ability of the Partnership to Service Debt" above in this section.

Approximately 8.5 acres of Taj Mahal's approximately 17-acre site is comprised of a parcel of land (the "Development Site Parcel") acquired by RINJ from the Housing Authority on October 3, 1983, pursuant to a development agreement, dated October 22, 1976 (as amended, the "Development Agreement"), between RII and the Housing Authority. In connection with the Asset Purchase Agreement, RINJ will convey the Development Site Parcel to the Partnership. If that portion of the Taj Mahal that is situated on the Development Site Parcel is not completed by the date specified in (ii) of the following paragraph, title to the Development Site Parcel could, after six months' written notice by the Housing Authority at any time after the required completion date (as it may be extended by specified events of *force majeure*), revest in the Housing Authority.

The Housing Authority has, among other things, (i) approved the conveyance of the Development Site Parcel to the Partnership, subject to the obligations that pertain to such parcel (consisting of obligations to complete construction of the Taj Mahal by a certain date and to refrain from transferring the Development Site Parcel before completion of construction and the other obligations described in the next paragraph which, if not complied with, might result in the revesting of title to the Housing Authority), (ii) extended the date by which the Taj Mahal must be completed to August 3, 1990, and, if the Bonds are issued and Donald J. Trump delivers the Housing Authority Guaranty, to extend the completion date further to March 1, 1991 (in either event, subject to extension by reason of specified events of *force majeure*), (iii) approved certain transactions contemplated by the Merger Agreement and Stock Sale Agreement, (iv) approved the Mortgage as a mortgage authorized under the Development Agreement, and (v) amended the Development Agreement to provide that the proceeds of the Mortgage may be expended in the manner described in "Use of Proceeds" herein. Such approvals, however, are conditioned on the consummation of the Merger and related transactions. As consideration for these approvals, Donald J. Trump will deliver at such time to the Housing Authority the Housing Authority Guaranty. See "Trump Completion Guaranty and Line of Credit—Trump Completion Guaranty—*Housing Authority Guaranty*" and "Properties of the Partnership—Assumption Agreement."

The deed to the Development Site Parcel will contain other provisions that could also result in a revesting of title to the Development Site Parcel in the Housing Authority if any of the following events occur prior to the issuance of a certificate of completion by the Housing Authority as to the construction of the Taj Mahal: (i) the failure to pay real estate taxes or assessments on the Development Site Parcel when due, or permitting unauthorized liens or encumbrances to attach to such property and failing to satisfy or discharge such liens or encumbrances within sixty days after written demand by the Housing Authority to make such payment or discharge such encumbrances; (ii) the conveyance of the Development Site Parcel, except to a permitted mortgagee; (iii) the failure to prosecute diligently construction of the Taj Mahal; or (iv) the transfer of more than 10% of the equity interest in the owner of the Taj Mahal. Moreover, the Partnership will execute an Assumption Agreement with the Housing Authority whereby the Partnership will assume the obligations of RII set forth in the Development Agreement with respect to the Development Site Parcel. See "Properties of the Partnership—Assumption Agreement." The Assumption Agreement will provide that no action taken or omitted to be taken by Resorts or, with respect to any portion of the property subject to the Development Agreement constituting an Assigned Asset, by the owner thereof, will affect the rights or obligations of the Partnership with respect to the Development Site Parcel.

If title to the Development Site Parcel revests in the Housing Authority, the Housing Authority would be obligated to use its best efforts to sell the Development Site Parcel to a qualified, responsible entity, as determined by the Housing Authority. Any subsequent purchaser would be required to assume the obligation of completing the construction of the Taj Mahal, either in accordance with the current plans or alternative plans approved by the Housing Authority. Any such purchaser would take title to the Development Site Parcel only, subject to all existing, authorized mortgages thereon, including the Mortgage. Any proceeds of such a sale would be required to be paid first, to reimburse the Housing Authority for all costs and expenses incurred by it in connection with taking possession of, managing and reselling the Development Site Parcel, as reduced by any income derived by it from its management, and, second, to reimburse the owner for all costs expended in connection with the acquisition of the

Development Site Parcel and the construction of the improvements thereon (with the balance, if any, to the Housing Authority).

Failure to open the Taj Mahal by March 1, 1990, subject to extension by reason of Force Majeure Delays but no later than March 1, 1991, will constitute an Event of Default under the Mortgage. Donald J. Trump has agreed, pursuant to the Trump Completion Guaranty and the Housing Authority Guaranty, to complete construction of the Taj Mahal by March 1, 1991, subject to extension by reason of Force Majeure Delays. See "Trump Completion Guaranty and Line of Credit—Trump Completion Guaranty."

**Trump Completion Guaranty**

To the extent set forth in the Trump Completion Guaranty, Donald J. Trump will covenant, agree and guarantee that the construction of the Taj Mahal will be substantially completed by March 1, 1991, subject to extension by reason of Force Majeure Delays, in accordance with the plans and specifications therefor. If Donald J. Trump fails to perform under the Trump Completion Guaranty, the only remedies of the Bondholders will be to seek specific performance by Donald J. Trump of his obligations under the Trump Completion Guaranty and/or monetary damages from Donald J. Trump, except that Donald J. Trump will be liable for monetary damages only for the following: (i) the payment of all costs and expenses paid or incurred by or on behalf of the Trustee in connection with the construction, equipping and completion of the Taj Mahal, as described in "Trump Completion Guaranty and Line of Credit—Trump Completion Guaranty," and any amounts required to deliver the Taj Mahal free and clear of all liens and encumbrances, including any mechanics' liens, other than liens or encumbrances constituting Permitted Encumbrances (except Restricted Encumbrances (as defined in the Mortgage) other than leases permitted by the Mortgage), together with interest on all such amounts at the rate payable under the Bonds offered hereby; (ii) the payment of any amounts necessary so that the Partnership (or the then owner or operator of the Taj Mahal) has on the Opening Date $10,000,000 of Working Capital in cash and/or marketable securities (exclusive of any proceeds of Unrestricted Financing and after giving effect to an accrual (if not theretofore paid) for the $10,000,000 construction supervisory fee payable by the Partnership to THC under the Management Agreement), but such payment is required only if the Trustee calls upon Donald J. Trump to perform any of his other obligations under the Trump Completion Guaranty; (iii) the payment of all reasonable costs and expenses incurred by the Trustee to enforce successfully in whole or in part the Trump Completion Guaranty, together with interest thereon at the rate payable under the Bonds offered hereby; and (iv) the payment of an amount equal to $25,000,000 less the aggregate of any amounts theretofore loaned by Donald J. Trump to the Partnership under the Trump Line of Credit, if there has occurred any of certain events of bankruptcy, insolvency or reorganization relating to the Partnership. In no event will Donald J. Trump be liable under the Trump Completion Guaranty for any punitive or consequential damages (including loss of profits). In addition, Donald J. Trump will not, under any circumstances, be obligated under the Trump Completion Guaranty or the Trump Line of Credit to pay the principal of, premium, if any, or interest on the Bonds or the Note. See "Trump Completion Guaranty and Line of Credit."

Donald J. Trump will also deliver the Housing Authority Guaranty relating to the construction of the Taj Mahal. See "Trump Completion Guaranty and Line of Credit—Trump Completion Guaranty—*Housing Authority Guaranty.*"

**Potential Conflicts of Interest**

Donald J. Trump is the manager and beneficial owner of 100% of two competing Atlantic City casino/hotels, Trump Castle Hotel & Casino and Trump Plaza Hotel and Casino (the "Trump Casinos"), in which the Partnership has no interest. One of the Trump Casinos is located on the Boardwalk, approximately 1.2 miles from the Taj Mahal, and the other is located in the Marina area of Atlantic City, approximately 1.7 miles from the Taj Mahal. Donald J. Trump owns 100% of THC, which will enter into the Management Agreement with the Partnership. See "Management Agreement." As a result of Donald J. Trump's ownership and management of the Trump Casinos and ownership of THC, a potential conflict of interest may be deemed to exist by reason of access to information, business opportunities or otherwise. Donald J. Trump, Robert S. Trump, Harvey I. Freeman and Stephen F. Hyde, members of the executive committee of the Partnership (the "Executive Committee"), serve on the executive committees of the partnerships which own the Trump Casinos. In addition, Mr. Hyde also serves as the chief executive officer

of the Trump Casinos. The Trump Casinos compete directly with each other and with other Atlantic City casino/hotels and will compete with the Taj Mahal for casino, hotel and restaurant customers and for convention business.

**Competition**

Competition in the Atlantic City casino/hotel market is intense. At present, there are twelve casino/hotels in Atlantic City, including Trump Castle Hotel & Casino (which is currently undergoing an expansion program) and Trump Plaza Hotel and Casino (which is currently undergoing an extensive refurbishment and renovation program). See "Potential Conflicts of Interest" above. Some Atlantic City casino/hotels recently have completed renovations or are in the process of expanding and improving their facilities. In September 1988, a casino/hotel added 30,000 square feet to its casino floor space and 507 rooms to its hotel capacity. Moreover, another casino/hotel has begun constructing a new hotel tower with approximately 800 rooms, which is scheduled to open in 1989 and which will permit the casino/hotel to add up to 60,000 square feet to its casino floor space. Preliminary plans have been announced for the construction of a new casino/hotel which, if constructed, is expected to open by 1991 and to have approximately 60,000 square feet of casino floor space. Preliminary plans also exist for the construction of two additional casino/hotels, each with approximately 600 hotel rooms and 60,000 square feet of casino floor space, neither of which, if constructed, is expected to open before 1992. In addition, both the Resorts Casino Hotel, which is expected to be renovated, and the Showboat Casino and Hotel ("Showboat") are situated next to the Taj Mahal and will each be connected to the Taj Mahal by an elevated pedestrian walkway. The Partnership believes that, based upon historical trends, casino win per square foot of casino space will decline in 1990 as a result of a projected increase in casino floor space, including the opening of the Taj Mahal.

**Limitation of Liability**

The Bonds, the Note, the Indenture, the Guaranty and related documents provide that the Partnership and the Company are liable thereunder only to the extent of the assets of the Partnership (other than cash permitted to be distributed pursuant to the Indenture, regardless of whether such cash has been distributed) and the interest of the Company in the Note and the Mortgage, which are secured by such Partnership assets, and no other person or entity, including, but not limited to, any partner, officer, committee or committee member of the Partnership or any partner therein or of any affiliate (as defined in Rule 405 under the 1933 Act) of the Partnership, or any incorporator, officer, director or shareholder of the Company, or any corporate partner of the Partnership or of any corporate affiliate of the Partnership, or any affiliate or controlling person or entity of any of the foregoing, or any agent, employee or lender of any of the foregoing, or any successor, personal representative, heir or assign of any of the foregoing, in each case past, present or as they may exist in the future, shall be liable in any respect (including, without limitation, the breach of any representation, warranty, covenant, agreement, condition or indemnification or contribution undertaking contained therein) under, in connection with, arising out of or relating to such instrument, agreement or document, or any other agreement, document, certificate, instrument or statement (oral or written), related to, executed or to be executed, delivered or to be delivered, or made or to be made, or any omission made or to be made, in connection with any of the foregoing or any of the transactions contemplated in any such agreement, document, certificate, instrument or statement; provided, however, that this provision will not release Donald J. Trump from his obligations under the Trump Completion Guaranty and the Trump Line of Credit. Notwithstanding the foregoing, the Bondholders preserve any personal claims they may have for fraud, liabilities under the 1933 Act and other liabilities that cannot be waived under applicable Federal and state laws against such persons and entities in connection with the purchase of the Bonds; provided, however, that such conduct shall not constitute an Event of Default under the Indenture, the Mortgage, the Note or any document executed in conjunction therewith or otherwise related thereto.

**Management of the Taj Mahal**

THC will act as the exclusive manager of the Taj Mahal. THC, in addition to the Partnership, will be dependent upon Donald J. Trump, upon other members of the Executive Committee of the Partnership and upon a number of key employees of the Partnership, who have had experience in managing and

operating casinos and hotels, for the operation of the Taj Mahal. None of the members of the Executive Committee plans to devote a majority of his working time to the operations of the Taj Mahal.

At present the Partnership has no employees. Prior to the opening of the Taj Mahal, the Partnership will need to hire employees to staff the hotel and casino operations of the Taj Mahal. Although the Partnership believes that it will be able to hire the necessary qualified employees prior to such opening, no assurances can be given that it will be able to do so. See "Business of the Partnership—Employees." The Asset Purchase Agreement restricts the Partnership from further soliciting the "managerial employees" of Resorts. See "The Acquisition—Asset Purchase Agreement—*Certain Arrangements—Miscellaneous.*"

**Regulatory Matters**

The Taj Mahal will be owned and operated by the Partnership. The Partnership and its various officers have not yet received the licenses, permits and authorizations required to open and operate the Taj Mahal and, due to the broad discretion exercisable by the New Jersey regulatory authorities, may never be so licensed, although the Partnership has no reason to believe that it will not be able to obtain such licenses, permits or authorizations. The principal authorizations required in New Jersey in order for a casino/hotel to open and operate consist of a casino license and an operation certificate. A casino license and an operation certificate are not issued by the New Jersey regulatory authorities until immediately prior to the intended opening of a casino/hotel and the issuance thereof may be conditioned upon, among other things, the alteration of the facility prior thereto, which may, in turn, increase construction costs and delay commencement of commercial operations. A temporary certificate of occupancy and other state and local facility-related approvals also are necessary. In addition, after a casino/hotel has opened, its activities continue to be subject to the jurisdiction of the New Jersey regulatory authorities.

A casino license is issued for a term of one year and must be renewed annually by action of the Casino Control Commission for the first two renewal periods succeeding the initial issuance of a casino license. Thereafter, a casino license may be renewed, at the discretion of the Casino Control Commission, for a period of one year or two years (followed by two-year renewal periods), although the Casino Control Commission may reopen licensing hearings at any time. A license is not transferable and may be conditioned, revoked or suspended, at any time, upon proper action by the Casino Control Commission. The Casino Control Act also requires an operation certificate which, in effect, has a term coextensive with that of a casino license. No assurance can be given that, even if the Partnership receives all authorizations needed for the opening of the Taj Mahal, it will be permitted in the future to continue to operate the Taj Mahal. Failure to obtain and thereafter maintain a casino license would have a material adverse effect on the Partnership's ability to pay the principal of, premium, if any, and interest on the Note or, pursuant to the Guaranty, the Bonds.

The Casino Control Act provides for the mandatory appointment of a conservator to operate a casino/hotel facility if a casino license is revoked or not renewed. In addition, if a casino license is suspended for a period in excess of 120 days, it is within the discretion of the Casino Control Commission to appoint a conservator. If a conservator is appointed, the suspended or former licensee is entitled to a "fair return on net earnings, if any, during the period of conservatorship," taking into consideration what amounts to a fair rate of return in the casino or hotel industry. The conservator is vested with the title of all of the property of the former or suspended licensee relating to the casino/hotel, subject to any and all valid liens, claims and encumbrances. The conservator is vested with broad authority to conduct the business of a former or suspended licensee, but that power is subject to the provisions and restrictions in all existing credit documents. It would be the obligation of the conservator to continue the debt service payments on the Note from the Partnership to the Company, but no assurance can be given that the conservator would have sufficient funds available to do so. See "Regulatory Matters Affecting Ownership of Bonds" below in this section and "Business of the Partnership—Gaming Regulations."

THC is required to hold a plenary casino license in order to perform casino management services under the Management Agreement. See "Management Agreement." Officers, directors and various other individuals associated with THC will have to seek qualification from the Casino Control Commission. Due to the broad discretion exercisable by the New Jersey regulatory authorities, it is possible that THC and its officers, directors and associated individuals may never be so licensed, although the Partnership has no reason to believe that such licenses will not be obtained.

**Regulatory Matters Affecting Ownership of Bonds**

All officers, directors and persons who directly or indirectly hold any beneficial interest, ownership or control in the Company may have to seek qualification from the Casino Control Commission. Lenders, underwriters, agents and employees of the Company and any other person whom the Casino Control Commission deems appropriate also may have to seek qualification from the Casino Control Commission. Generally, Bondholders will not be required to qualify if the Bonds are freely traded and widely held. Any such decision to require qualification is within the sound discretion of the Casino Control Commission. If a beneficial owner of Bonds, by virtue of his ownership interest, is required to qualify and is not found qualified by the Casino Control Commission such owner must dispose of such Bonds or the Company may redeem such Bonds. Any such redemption by the Company would be without any premium and at the lower of (i) the Outstanding Amount and (ii) the fair market value (as defined in the Indenture) of the Bonds, plus accrued interest. If any Bondholder is found unqualified by the Casino Control Commission, it is unlawful for such Bondholder (i) to receive any interest on the Bonds (other than as part of the redemption price), (ii) to exercise, directly or through any trustee or nominee, any right conferred by the Bonds, or (iii) to receive any remuneration, in any form, from any Regulated Company (including the Partnership, the Company, and the Trustee) for services rendered or otherwise. See "Business of the Partnership—Gaming Regulations" and "Description of the Bonds—Gaming Laws." While the certificates representing the Bonds will include a statement to this effect, such certificates will not contain any legend restricting resale.

**Absence of Public Market**

The Bonds will be newly issued securities with no established trading market. It is expected that the Bonds will be sold to a limited number of investors. The Company has been advised that Merrill Lynch, Pierce, Fenner & Smith Incorporated intends to make a market in the Bonds, although it is not obligated to do so, after the consummation of this offering. No assurance can be given, however, that a trading market for the Bonds will develop or, once developed, will continue, or as to the liquidity of any such trading market for the Bonds.

**Insurance**

The Partnership is required to maintain insurance against any physical loss or damage to the Property by reason of casualty or other risks in an amount (i) initially, not less than $350,000,000, such amount to be increased dollar for dollar at such times as funds are expended to construct the Taj Mahal and (ii) from and after the substantial completion of the Taj Mahal, not less than the amount of any outstanding principal amount of the Bonds and any other indebtedness of the Partnership which is *pari passu* or senior to the Bonds. The Partnership intends to maintain policies of liability insurance covering the Taj Mahal and its ancillary facilities with a maximum limit of $100,000,000 and with a deductible or self-retention provision of up to $500,000. The Mortgage permits the Partnership to reduce its liability insurance and/or increase the deductible provisions at any time, if the amount of the insurance coverage or the deductible at such time cannot be maintained at rates determined by the Partnership to be reasonable for such coverage and if the reduced liability limit is, in the Partnership's judgment, a prudent amount, considering its cost. In such event, the Partnership would be self-insuring against liabilities previously covered by insurance, and could be at risk of being obligated to pay substantial amounts on liability claims against the Partnership.

**Appraisals**

In connection with the acquisition of the Property and the offering of the Bonds, The Trump Organization obtained appraisals from Appraisal Group International ("AGI") and Martin Gross Associates ("MGA"), independent MAI appraisers, reflecting the current market value of the Property, including the Taj Mahal, as of March 31, 1988, both of which took into account the expenditures by Resorts as of March 31, 1988 of approximately $511,000,000 to acquire and partially construct the Taj Mahal (including amounts expended for land acquisition costs, furnishings and equipment, interest and property taxes). The AGI report relating to the Property, dated August 8, 1988 (the "AGI Current Appraisal"), states that such current market value is $230,000,000. The MGA report relating to the Property, dated August 15, 1988 (the "MGA Current Appraisal"), states that such current value is $226,000,000. The Trump Organization also obtained a report from AGI, dated August 9, 1988 (the

"AGI Report"), which states that the appraised market value of the Property, as of December 1, 1989, on the assumption, among other things, that the Taj Mahal is fully completed and open to the public as an operating casino/hotel on or about December 1, 1989, is $1,100,000,000. MGA and AGI advised the Partnership that the change of the estimated Opening Date from December 1, 1989 to February 15, 1990 would not affect the values reflected in the MGA Current Appraisal, the AGI Current Appraisal and the AGI Report and all information and conclusions shown in such reports remain valid.

In the opinion of the appraisers, the appraisals, which are subject to certain assumptions and qualifications, were prepared in conformity with the guidelines regarding appraisal procedures set forth in regulations governing Federal savings institutions. The Indenture will require the Company to provide an updated appraisal of the Property on the same basis as the AGI Report at least as frequently as every 24 months. No assurance can be given, however, that the Bonds will qualify as "real estate loans" within the meaning of the regulations governing savings institutions or that the appraisals or the updated appraisals will be "sufficiently current" at any time to provide the underlying support for the Bonds to qualify at such time as real estate loans. The failure to qualify as "real estate loans" could affect the market for the Bonds adversely by limiting the ability of savings institutions to invest in the Bonds as "real estate loans."

Appraisals are estimates or opinions of value and cannot be relied upon as precise measures of value or worth. In addition, the appraisal contained in the AGI Report is an estimate of the market value of the Taj Mahal at a future date. The amount that the Partnership might realize from the sale of the Property may be more or less than its appraised market value, depending on its then current and anticipated uses, and zoning, financial, economic, market and other conditions that may affect a property's value. Moreover, the appraised market value does not reflect what might be realized upon liquidation of the Taj Mahal or the sale of the Taj Mahal in a distress sale.

## THE COMPANY

The Company was incorporated on June 3, 1988 under the laws of the State of New Jersey and has had no prior operations. Its sole purpose is to issue the Bonds pursuant to the terms of the Indenture and to lend the proceeds of the offering to the Partnership. The Company will neither engage in any other business activities (including having any subsidiaries) nor incur any indebtedness or expense other than the Bonds and nominal operating expenses. Because the Company has had no operations, its ability to service the Bonds is completely dependent upon funds which it receives from the Partnership pursuant to the Note from the Partnership to the Company. See "Management's Discussion and Analysis of Financial Condition and Results of Operations of the Partnership and the Company" and "Business of the Partnership." Accordingly, the discussions throughout this Prospectus focus on the Partnership and its operations. Donald J. Trump and Trump Inc. each currently owns 50% of the outstanding shares of common stock of the Company. Trump Inc. was incorporated on June 3, 1988. Therefore, Donald J. Trump, through his direct ownership and as the sole shareholder of Trump Inc., also is currently the beneficial owner of 100% of the outstanding shares of the common stock of the Company. The Company currently has its principal executive offices c/o Trump Hotel Management Corp., The Boardwalk and Pennsylvania Avenue, Atlantic City, New Jersey 08404, and its telephone number is (609) 340-6200.

## THE PARTNERSHIP

The Partnership was formed to consummate the acquisition of, to complete the construction of and to operate the Taj Mahal and its ancillary properties. See "The Acquisition." The Partnership will not engage in any other business. The Taj Mahal, when completed, will consist of a 42-story hotel tower and a contiguous low-rise structure, together occupying approximately 17 acres of land, which, when completed and opened, will constitute the largest casino/hotel complex in Atlantic City, New Jersey. At present, the Partnership expects to open substantially all of the Taj Mahal on or about February 15, 1990, subject to obtaining all necessary regulatory approvals. See "Business of the Partnership."

The Partnership is a New Jersey limited partnership of which Donald J. Trump and Trump Inc. are the General Partners, and Donald J. Trump is the sole limited partner. Through his general partnership and limited partnership interests, Donald J. Trump is the beneficial owner of 100% of the equity interests in the Partnership. The Partnership was formed on June 23, 1988 and currently has its principal executive offices c/o Trump Hotel Management Corp., The Boardwalk and Pennsylvania Avenue, Atlantic City, New Jersey 08404, and its telephone number is (609) 340-6200. The Partnership does not have any subsidiaries.

## THE ACQUISITION

**Background**

Donald J. Trump currently owns 712,650 shares (the "Trump B Shares") of the issued and outstanding Class B Common Stock, par value $1.00 per share, of RII (the "Class B Shares"), or approximately 94.7% of the Class B Shares, representing approximately 88.1% of the total voting power of the outstanding Class A Common Stock, par value $1.00 per share (the "Class A Shares"), and Class B Shares (collectively, the "Shares") of RII. Donald J. Trump, Robert S. Trump and Harvey I. Freeman currently are directors of RII. On May 27, 1988, Donald J. Trump, The Griffin Company, a Connecticut corporation wholly-owned by Merv Griffin ("Griffin Co."), and RII and certain of their respective affiliates entered into one or more agreements (effective as of June 2, 1987) providing generally for the following transactions:

(i) the sale by Donald J. Trump to Griffin Co. of the Trump B Shares at $135.00 per Class B Share (Donald J. Trump's original cost) pursuant to the terms of a Stock Sale Agreement, dated as of May 27, 1988, between Donald J. Trump and Griffin Co. (the "Stock Sale Agreement");

(ii) the acquisition of RII, in accordance with an Agreement and Plan of Merger (the "Merger Agreement"), dated as of May 27, 1988 and amended as of June 6, 1988, among RII, Griffin Co. and a Griffin Co. subsidiary, pursuant to which all stockholders of RII (other than Griffin Co. and Donald J. Trump) will receive $36.00 per Share in cash, either pursuant to a cash tender offer or merger, and, after the merger, Griffin Co. will become the sole stockholder of RII;

(iii) the termination of the Comprehensive Services Agreement between RII and The Trump Hotel Corporation, a New Jersey corporation wholly owned by Donald J. Trump ("Trump Hotel Corporation"), dated October 16, 1987 (the "Services Agreement"), pursuant to which RII will pay Trump Hotel Corporation $3,000,000 (representing accrued construction management fees and reimbursable expenses through March 31, 1988) and $60,689,750 (representing an agreed upon termination fee), together with the termination of the License Agreement, dated as of October 20, 1987, between RII, Donald J. Trump and The Trump Organization, Inc., pursuant to the terms of two termination agreements, each dated as of May 27, 1988 (collectively, the "Termination Agreements"); and

(iv) the sale, as described below, by Resorts to the Partnership of the Property (including the Taj Mahal), and the sale by Resorts to two affiliates of Donald J. Trump (other than the Partnership) of the Assigned Assets, each pursuant to the Asset Purchase Agreement.

The consummation of the foregoing transactions is conditioned upon, among other things, the consummation of a merger (the "Merger"), pursuant to which all stockholders of RII (other than Griffin Co. and Donald J. Trump) will receive $36.00 per share, net to the seller in cash, and RII will become a wholly-owned subsidiary of Griffin Co. At a special meeting of the stockholders of RII held on August 30, 1988, the stockholders of RII approved the Merger Agreement. The Merger is conditioned upon receipt of various approvals or consents of governmental agencies, all of which (except for the approval of the gaming authorities of the Bahamas) have been obtained, and it is anticipated that the Merger will occur in November 1988. The Acquisition Closing is anticipated to occur on the day following the Merger. The offering of the Bonds as described herein is conditioned upon the Acquisition Closing taking place.

**Asset Purchase Agreement**

*General.* On May 27, 1988, the Partnership entered into the Asset Purchase Agreement, which has been amended from time to time, with Resorts which provides for the sale by Resorts to the Partnership of the Taj Mahal and certain other assets described below. The right to acquire certain of such assets, as described more fully below, has been assigned by the Partnership to two affiliates of Donald J. Trump.

*Purchase Price.* The purchase price (including acquisition expenses) for the assets to be acquired under the Asset Purchase Agreement as amended to date (including the Assigned Assets) is $300,100,000 (consisting of $230,000,000, fixed adjustments in Resorts' favor of $43,000,000, certain estimated additional closing adjustments of approximately $17,100,000 and estimated acquisition expenses of $10,000,000). See "Combined Pro Forma Balance Sheet." Of the purchase price payable to Resorts under the Asset Purchase Agreement $12,000,000 will be paid to Resorts by affiliates of Donald J. Trump (other than the Partnership) in respect of the Assigned Assets (which amount is based upon the appraised value of such assets) and the balance thereof (estimated to be approximately $288,100,000) will be paid by the Partnership. The Purchase Price of $288,100,000 will be paid by payment of an aggregate cash amount of $267,400,000 and through the assumption of certain estimated liabilities in the aggregate amount of $20,700,000. Closing adjustments payable by the Partnership include, among other things, certain expenses and costs incurred by Resorts after the Cut-Off Date, including expenses and costs incurred in connection with the construction of the Taj Mahal (including employee costs) after such date to the Acquisition Closing and the settlement of certain litigation to which Resorts and Donald J. Trump, among others, are parties. See "Legal Proceedings" below in this section.

*The Property.* The assets to be purchased by the Partnership under the Asset Purchase Agreement (collectively, the "Property"), exclusive of the Assigned Assets described below, include: the Taj Mahal complex, including the real property, comprising approximately 17 acres, on which the Taj Mahal is situated, together with all of the improvements thereon; certain additional assets related to the Taj Mahal and its operations, such as furniture, furnishings and equipment and certain deposits relating thereto; a lease or sublease, as the case may be, of ten of the billboards owned or leased by Resorts for up to a three and one-half year period; certain permits and contracts pertaining to the Taj Mahal's construction and planned operation; certain commitments for guest bookings, conventions, meetings, reservations and entertainment identified in the Asset Purchase Agreement or obtained by Resorts in accordance therewith prior to the Acquisition Closing; any and all guaranties, warranties and service agreements (implied or express) relating to the construction, completion, equipping, operation or improvement of the Taj Mahal; certain security deposits and other ancillary assets; the non-exclusive right to a copy of all computer software programs presently being used by Resorts in connection with the operation of the Resorts Casino Hotel (unless prohibited by the applicable license agreement or applicable law); the Terrace Building; certain intangible property, including advertising campaigns, plans, permits, rights, licenses and the like that are presently owned by (or leased to) Resorts and which have been acquired exclusively for use in connection with the construction and opening of the Taj Mahal; and the right to use the name "Taj Mahal."

The appraised value of the Property as of March 31, 1988, was estimated by two separate appraisers to be $226,000,000 and $230,000,000, respectively. See "Properties of the Partnership—Appraisals."

*Assigned Assets.* Pursuant to the Asset Purchase Agreement, the Partnership has the right to acquire certain additional assets (the "Assigned Assets"), which right has been assigned to affiliates of Donald J. Trump. The Assigned Assets include the Steel Pier (a 1,000-foot pier adjacent to the Taj Mahal that extends over the Atlantic Ocean); a 3.7 Acre Parcel (which parcel Resorts has the right to acquire from the Housing Authority); five separate parcels of land on which a 32,000 square foot warehouse, a 4,000 square foot warehouse and a 2,000 square foot office building are situated; an approximately 210 foot wide strip of vacant land located between the Taj Mahal and Showboat (the "210 foot strip"); and three helicopters and certain assets related thereto, including the temporary right to land helicopters on the Steeplechase Pier. The Partnership anticipates that certain of the Assigned Assets (consisting of vacant land for surface parking and the restaurant to be constructed on the Steel Pier, in each such case to be constructed or

improved with a portion of the proceeds of this offering, and a warehouse) will be leased to the Partnership. See "Description of the Bonds—Lease of Properties." The remaining Assigned Assets, including the helicopters and related assets, will be utilized by the owner thereof in the ordinary course of business.

At March 31, 1988, the appraised value of the Assigned Assets was estimated to be approximately $12,000,000. See "Properties of the Partnership—Appraisals."

*Leasing of Assigned Assets.* The Partnership may, under certain circumstances, lease property, including the Assigned Assets, from Donald J. Trump or his Affiliates. See "Properties of the Partnership —Lease of Property."

*Certain Arrangements.* Pursuant to the Asset Purchase Agreement, the Partnership and Resorts will enter into the following agreements and arrangements, all of which are conditioned upon the Acquisition Closing taking place:

*Parking Arrangements.* The Partnership has agreed to lease to Resorts 1,000 undesignated spaces in a self-parking garage which is currently under construction and which will be acquired by the Partnership pursuant to the Asset Purchase Agreement (the "Hotel Parking"), for a period of three years (subject to earlier termination at the option of Resorts) commencing on the date the Hotel Parking facility is open to the public. Resorts will pay a monthly rental to the Partnership of $50,000, $75,000 and $100,000 for each of such three years, respectively, subject to certain adjustments.

Subject to certain conditions, the Partnership will have the option to use, for a period of three years, commencing no later than the Opening Date, 50% of Resorts' employee parking spaces located on certain vacant land in Atlantic City, New Jersey (the "Employee Parking"), but only so long as such space is used by Resorts for the purpose of providing parking for its employees. The Partnership will be obligated to pay, on a monthly basis, 50% of the costs required for the maintenance, repair and operation of the Employee Parking, exclusive of capital expenditures.

*Terrace Building.* The Partnership has agreed to lease to Resorts the following portion of the office building known as the "Terrace Building" to be acquired by the Partnership (the "Terrace Building"), for a maximum period of four years: (1) 70% for the first two years following the Acquisition Closing; (2) 50% for the third year following the Acquisition Closing; and (3) 25% for the fourth year following such Acquisition Closing. The rent payable to the Partnership for such portions of the Terrace Building will be equal to Resorts' pro rata share (based upon the foregoing percentages) of the Partnership's costs of maintaining, repairing and operating the Terrace Building, exclusive of capital expenditures.

*Showboat.* Resorts is a defendant in certain litigation commenced by Atlantic City Showboat, Inc. ("ACS"), the owner of the Showboat, brought in the Superior Court of New Jersey. ACS has agreed to the dismissal of such action, effective with the Acquisition Closing. See "The Acquisition—Legal Proceedings." In connection with the foregoing, Resorts has agreed to allow ACS to undertake certain roadway construction near the Showboat so as to permit the continuous use thereof as a public thoroughfare for automobile and pedestrian traffic including, but not limited to, patrons of the Showboat, and to immediately thereafter dedicate such roadway to the City of Atlantic City. Resorts, the Partnership and ACS have agreed that the actual costs and expenses incurred by ACS in connection with such roadway construction and completion will be borne up to one-third by Resorts, up to one-third by the Partnership and the remainder by ACS. Funds sufficient to provide for the Partnership's share of such construction have been included in the Project Cost. In conjunction with the dismissal of the Showboat litigation, and in accordance with the terms of the Asset Purchase Agreement, the Partnership has assumed the obligations of Resorts under the Showboat Lease related to the Taj Mahal. Such obligations include the obligations to (i) construct a pedestrian walkway between Showboat and the Taj Mahal (which will span the 210 foot strip), to be completed no later than ten days prior to the opening of the Taj Mahal, and (ii) maintain and, where necessary, reconstruct certain facilities common to Showboat and the Taj Mahal, such facilities to include certain service roads and the proposed pedestrian walkway. The Partnership has also agreed with ACS to complete construction of the Taj Mahal by March 1, 1991.

*Control of Resorts and the Partnership.* Resorts has agreed that it will be wholly owned and controlled by Griffin Co., that the Resorts Casino Hotel will be owned, controlled and managed exclusively by Resorts and Griffin Co., and that Griffin Co. will be wholly owned and controlled by Merv Griffin, for a period of at least one year from the effective time of the Merger, subject to certain exceptions for regulatory and other matters.

The Partnership has agreed that it will be wholly owned, controlled and managed by Donald J. Trump and that the Taj Mahal will be owned, controlled and managed by the Partnership and/or Donald J. Trump for a period of at least one year from the effective time of the Merger, subject to certain exceptions for regulatory and other matters.

*Miscellaneous.* With respect to the "managerial employees" of either Resorts or the Partnership and the Trump Casinos (other than thirty managerial employees of Resorts which the Partnership had the right to solicit for employment), each party has agreed to refrain from soliciting the others' managerial employees for a period of one year after the Opening Date.

The Partnership has agreed to complete, at its expense, and thereafter to grant appropriate easements to Resorts for the mutual use of: (i) the pedestrian bridge currently under construction between the Taj Mahal and the Resorts Casino Hotel; and (ii) all infrastructure improvements presently indicated on the existing plans for the Taj Mahal. The Partnership and Resorts have agreed to enter into an easement agreement providing for the mutual use of the Taj Mahal's bus lanes to the extent of the Taj Mahal's existing bus transportation plan.

For a period of five years after the Acquisition Closing, the Partnership has agreed not to purchase certain land located near the Resorts Casino Hotel and Resorts has agreed not to purchase certain land located near the Taj Mahal. In addition, the Partnership has agreed, for a period of three years after the Acquisition Closing, not to take any action delaying or opposing any applications made by Resorts for any new parking garage, unless such garage would have a material adverse impact on the operation of the Taj Mahal.

*Indemnification.* Resorts and the Partnership have agreed to indemnify each other with respect to all losses, costs and expenses reasonably incurred by the other, together with interest at the rate of 10% per annum on cash disbursements, arising from a breach by Resorts or the Partnership of any of their respective covenants, agreements or obligations contained in the Asset Purchase Agreement and expressly stated to survive the Acquisition Closing. Except with respect to the Partnership's interest in the Property (and Donald J. Trump's or his affiliates' interest in the Assigned Assets) and Resorts' interest in the property retained by it, neither Resorts, the Partnership nor any of their respective affiliates (including Merv Griffin and Donald J. Trump) have any personal liability under the Asset Purchase Agreement. Resorts and the Partnership have waived and released the aforementioned persons from and against any loss, liability, damage or claim arising out of the Asset Purchase Agreement.

Resorts has also agreed to indemnify the Partnership with respect to the property retained by Resorts and not sold pursuant to the Asset Purchase Agreement, and the Partnership has agreed to indemnify Resorts with respect to the Property and the Assigned Assets, against any loss, cost, claim, damage, liability or expense which the Partnership or Resorts, as the case may be, may incur as a result of (i) the application of any present or future federal, state or local environmental laws, rules or regulations and (ii) any claim, demand or judgment by a third party, including any governmental authority, relating to the existence of asbestos, hazardous substances or waste on such property. Resorts has received from the New Jersey Department of Environmental Protection a nonapplicability determination under the New Jersey Environmental Cleanup Responsibility Act with respect to its properties and the properties to be sold pursuant to the Asset Purchase Agreement (including the Taj Mahal).

The Partnership has assumed and agreed to pay, when due, and to indemnify Resorts and hold Resorts harmless with respect to, all liabilities and obligations of Resorts arising under or relating to the Property and certain of the Assigned Assets incurred after the Cut-Off Date and, with respect to the other Assigned Assets, after the Acquisition Closing. To the extent that the Partnership receives adjustments to

the Purchase Price at the Acquisition Closing by reason of its assumption of certain liabilities of Resorts, such as amounts due to contractors, the Partnership and Donald J. Trump have each agreed to indemnify Resorts with respect to such liabilities.

Except for those obligations retained or assumed by Resorts pursuant to the Asset Purchase Agreement, the Partnership has further agreed to indemnify and hold Resorts harmless with respect to all liabilities in connection with any litigation, governmental proceedings and/or arbitration involving (i) the Property and certain of the Assigned Assets which arise out of any act or failure to act subsequent to the Cut-off Date, and (ii) the other Assigned Assets to be conveyed pursuant to the Asset Purchase Agreement which arise out of any act or failure to act subsequent to the Acquisition Closing.

Except for those obligations assumed by the Partnership, Resorts has agreed to indemnify and hold harmless the Partnership with respect to all liabilities in connection with any litigation, governmental proceedings and/or arbitration involving (i) the Property and certain of the Assigned Assets which arise out of any act or failure to act prior to the Cut-off Date, and (ii) the other Assigned Assets to be conveyed pursuant to the Asset Purchase Agreement which arise out of any act or failure to act prior to the Acquisition Closing.

In connection with the arrangements to assign the Assigned Assets to two affiliates of Donald J. Trump, such affiliates will agree to indemnify the Partnership to the extent of all amounts which the Partnership will have to indemnify Resorts under the Asset Purchase Agreement with respect to the Assigned Assets.

*Development Agreement.* The Partnership has agreed to assume the obligations under the Development Agreement which specifically relate to the Property and the Assigned Assets, including the obligation to complete construction of the Taj Mahal. See "Special Considerations—Risks Regarding Completing and Opening the Taj Mahal," "Properties of the Partnership—Assumption Agreement" and "Trump Completion Guaranty and Line of Credit—Trump Completion Guaranty—*Housing Authority Guaranty*." Resorts will retain the obligations under the Development Agreement not related to the Property or the Assigned Assets, including any obligations to construct certain residential housing. As between the affiliate of Donald J. Trump and the Partnership, such affiliate will be obligated to perform those obligations under the Development Agreement that relate to the Assigned Assets.

*Closing Conditions.* The Acquisition Closing is subject to certain conditions precedent, including, the receipt of various governmental and regulatory approvals, substantially all of which have been heretofore obtained. The Acquisition Closing is anticipated to occur in November 1988. The offering of Bonds is conditioned upon the occurrence of the Acquisition Closing.

**Legal Proceedings**

*U.S. District Court Action—Griffin.* On March 17, 1988, Griffin Co. announced an offer to acquire RII. The offer was subject to a number of conditions, including Donald J. Trump's agreement to vote his Trump B Shares in favor of the proposed merger. On March 18, 1988, Donald J. Trump and a company wholly owned by Donald J. Trump commenced an action in the United States District Court for the Southern District of New York (88 Civ. 1870) (the "New York Action") against Griffin Co., Merv Griffin and F.V. Scutti, charging the defendants with violation of the federal securities laws, fraud and tortious interference with the contractual relations of Donald J. Trump with RII. On March 21, 1988, Griffin Co. and F.V. Scutti filed a counterclaim in the New York Action against Donald J. Trump, a company wholly owned by him, the directors of RII and Trump Hotel Corporation, alleging, among other things, breach of fiduciary duties and violations of Federal and state law by certain defendants. Donald J. Trump and Griffin Co. have agreed to dismiss the New York Action with prejudice prior to or concurrent with the closing under the Stock Sale Agreement.

*Delaware Shareholders' Litigation.* On January 27, 1988, the Court of Chancery of the State of Delaware, New Castle County, issued an order consolidating a number of separate shareholder class

actions and derivative lawsuits against a number of defendants, including RII, Donald J. Trump and certain other former and present officers and directors of RII, alleging, among other things, a breach of fiduciary duty, and waste of corporate assets, and common law fraud by certain defendants (collectively, the "Delaware Actions"). Donald J. Trump and Griffin Co. have agreed, as a condition to the closing under the Stock Sale Agreement, that the Delaware Actions shall have been settled on terms satisfactory to both. On or about July 12, 1988, the parties to the Delaware Actions and certain other litigation, presented to the Delaware Chancery Court for its approval a settlement agreement that provides for the settlement, and dismissal with prejudice, of the Delaware Actions. The Court held a hearing on the proposed settlement on August 18, 1988 and, on or about, September 7, 1988, issued an opinion approving the proposed settlement, subject to certain modifications. On or about September 28, 1988, the Court entered an Order and Final Judgment implementing the September 7 opinion. Various persons have subsequently appealed the Order and Final Judgment. The Partnership cannot assess the likelihood of the Order and Final Judgment being reversed or modified on appeal but does not believe that any such reversal and modification would have a materially adverse effect on the Partnership. The Partnership is not a party to the Delaware Actions and therefore would not be liable for any amount granted, if any, under such Actions.

*Showboat Litigation.* On March 8, 1988, ACS, which operates the Showboat, filed a complaint in the Superior Court of New Jersey against the Housing Authority and RII as defendants. The complaint generally alleged that the Housing Authority had failed to implement, or had improperly altered or amended, an urban renewal plan related to the 33-acre parcel in Atlantic City bordering on the Boardwalk between Connecticut and New Jersey Avenues, commonly known as the Uptown Urban Renewal Tract (the "Development Site"). The Development Site includes the Development Site Parcel. It specifically alleged that the February 16, 1988 amendment to the Development Agreement which, among other things, extended the date by which RII must complete the Taj Mahal to August 3, 1989, constituted an improper alteration of the urban renewal plan and that the effect of such amendment was arbitrarily to provide RII with an option to acquire additional parcels of the Development Site for inadequate consideration, all in contravention of the urban renewal plan. ACS further alleged that it had been damaged by the amendment to the Development Agreement in its capacity as lessee under the Showboat Lease and sought a judgment (i) declaring the amendment (and resolutions adopting same) to be invalid and void, (ii) terminating all or a portion of the Development Agreement and (iii) requiring the Housing Authority to develop a plan for traffic circulation providing ingress and egress to the Showboat through Delaware Avenue. ACS has agreed to the dismissal of such action, effective with the Acquisition Closing. See "The Acquisition—Asset Purchase Agreement—*Showboat.*"

## THE FINANCING

Approximately $805,000,000 will be required to (i) fund amounts needed to complete construction of and open the Taj Mahal, which includes interest on the Bonds for a period of 15 months from the date of issuance ("Project Cost"), (ii) repay all indebtedness incurred in financing the cost of and to pay certain assumed liabilities with respect to, the acquisition of the Property from Resorts pursuant to the Asset Purchase Agreement, and (iii) pay related expenses expected to be incurred in connection with such acquisition and the sale of the Bonds. The Partnership believes that it will be able to complete construction and open substantially all of the Taj Mahal on or about February 15, 1990. See "Special Considerations—Risks Regarding Completing and Opening the Taj Mahal." Although the Partnership believes that the assumptions underlying its current budget are reasonable and that the actual costs will reasonably approximate such budget, the final costs to construct and open the Taj Mahal cannot be determined precisely until the Taj Mahal has been completed and opened.

**Sources of Funds**

| | |
|---|---|
| Gross proceeds of the Bonds | $675,000,000(1) |
| Capital contribution | 75,000,000(2) |
| Other sources | 55,000,000(3) |
| Total | $805,000,000 |

(1) Initially, the Partnership intends to obtain funds to pay the cash portion of the Purchase Price through loans from First Fidelity, Bankers Trust Company and Donald J. Trump in the aggregate principal amount of approximately $267,400,000. The principal of, together with interest and fees (estimated to be $600,000 and $1,250,000, respectively) on, such borrowings will be repaid from the net proceeds of the sale of the Bonds and any mortgages on the Property will be discharged upon repayment. See "Use of Proceeds."

(2) To be contributed to the Partnership by Donald J. Trump upon issuance of the Bonds.

(3) Until utilized for construction, the net proceeds of the Bonds will be invested in Permitted Investments. It is anticipated that the amounts shown above, together with the earnings on such funds, pending utilization for construction, and advances under the Trump Line of Credit, will be sufficient to complete construction of and open the Taj Mahal (including the payment of all liabilities assumed by the Partnership in the acquisition of the Property from Resorts). Under certain circumstances, Donald J. Trump will be required to make loans of up to an aggregate of $25,000,000 to the Partnership under the Trump Line of Credit. See "Trump Completion Guaranty and Line of Credit—Trump Line of Credit." The Partnership may also, under certain circumstances, incur certain additional indebtedness. See "Business of the Partnership—Taj Mahal—*General*" and "Description of the Bonds—Certain Covenants of the Company and the Partnership—*Limitations on Investments*" and "—*Unrestricted Financing.*"

**Uses of Funds**

| | |
|---|---|
| Acquisition cost | $278,100,000(1)(2) |
| Acquisition expenses | 10,000,000(2) |
| Expenses of the offering | 23,900,000(2) |
| Project Cost | 493,000,000(2)(3) |
| Total | $805,000,000 |

(1) The amount stated above is the estimated amount needed to finance the acquisition of the Property and includes certain estimated adjustments to the Purchase Price, including all estimated costs expected to have been incurred by Resorts after the Cut-Off Date in connection with the ownership, construction and development of the Taj Mahal. The Purchase Price of $288,100,000 (which consists of the acquisition cost and acquisition expenses) will be paid by payment of $267,400,000 in cash and the assumption of approximately $20,700,000 of liabilities. See "Properties of the Partnership—Appraisals" for information concerning expenditures by Resorts on the Taj Mahal.

(2) These amounts are estimated. Acquisition expenses include a $1,250,000 commitment fee payable in connection with the Bank Financing and certain other expenses, including legal and accounting fees, and payment of $1,625,000 of expenses in connection with the settlement of the Delaware Actions. Expenses of the offering include the Underwriter's discount and commitment fees payable on the delayed delivery contracts.

(3) Consists of (i) $118,125,000 of interest on the Bonds for a period of 15 months from the date of issuance and (ii) $374,875,000 of other costs, including construction costs (including certain off-site roadway improvements), pre-opening expenses (such as payroll, advertising and promotional expenditures to be incurred prior to opening), a working capital and contingency reserve, property taxes for the period prior to the opening of the Taj Mahal, the $10,000,000 construction supervisory fee payable by the Partnership to THC on or after the Opening Date and interest (estimated to be approximately $600,000) payable on the interim financing.

## USE OF PROCEEDS

The proceeds of this offering will be loaned immediately by the Company to the Partnership, which will pay the expenses of this offering. The Partnership will, in turn, issue the Note to the Company, which will provide for payments at the times and in the amounts sufficient to pay the debt service on the Bonds. The net proceeds of the Bonds, estimated to be $651,100,000 after payment of the Underwriter's discount and expenses of the offering, will be used substantially as follows:

| | |
|---|---|
| (a) To repay the interim financing incurred in financing the cash portion of the cost of the acquisition of the Property | $267,400,000(1) |
| (b) To finance a portion of the cost of completing and opening the Taj Mahal | $265,575,000(2) |
| (c) To fund interest on the Bonds for a period of 15 months from issuance | $118,125,000 |
| Total | $651,100,000 |

(1) Initially, the Partnership intends to obtain funds to pay the cash portion of the Purchase Price (including acquisition expenses) through the Bank Financing (described below) and a loan from Donald J. Trump, in the aggregate principal amount of $267,400,000.

(2) The estimated total cost to complete construction and open the Taj Mahal on or about February 15, 1990 is approximately $374,875,000. Of such cost, $265,575,000 will be obtained from a portion of the proceeds of the Bonds, $75,000,000 will be obtained from a capital contribution to the Partnership by Donald J. Trump and $34,300,000 will be obtained from anticipated earnings on the net proceeds of the Bonds and the Trump Line of Credit. In addition, the Partnership will assume liabilities of approximately $20,700,000. See "The Financing." The amount stated above excludes interest on the Bonds but includes $600,000 of interest estimated to be incurred on the interim financing referred to in Note 1 above.

Until utilized as aforesaid, the net proceeds of the Bonds will be invested in Permitted Investments. See "Description of the Bonds—Certain Covenants of the Company and the Partnership—*Limitations on Investments.*"

The Partnership is negotiating with First Fidelity to provide up to $125,000,000 to the Partnership (the "First Fidelity Financing"). Such indebtedness will be evidenced by the Partnership's secured time note in the principal amount of $125,000,000, bearing interest, payable monthly, at a rate of interest per annum equal to First Fidelity's "base rate," plus 1%, and will mature 120 days from the date of the loan. The loan will be secured by a first mortgage on the Property and will be personally guaranteed by Donald J. Trump. First Fidelity's "base rate" (currently 10%) is the rate of interest established by it, from time to time, to be charged to its most creditworthy customers. The Partnership has also obtained a commitment to obtain up to $125,000,000 from Bankers Trust Company (the "Bankers Trust Financing," together with the First Fidelity Financing, the "Bank Financing"). Such indebtedness will be evidenced by the Partnership's second secured time note in the principal amount of $125,000,000 bearing interest at a rate of interest per annum equal to the rate of interest announced from time to time by Bankers Trust Company as its "prime rate," (currently 10%), plus 1% and will mature 120 days from the date of the loan. The Bankers Trust Financing will be secured by a second mortgage lien on the Property and will be personally guaranteed by Donald J. Trump. Fees payable in connection with the Bank Financing are estimated to be $1,250,000. The Partnership expects to pay approximately $600,000 of interest on the interim financing. The Partnership will use the Bank Financing, together with a loan of approximately $17,400,000 from Donald J. Trump bearing interest at the same rate as the Bankers Trust Financing, to finance the acquisition of the Property.

## CAPITALIZATION

The following tables set forth the combined capitalization of the Partnership and the Company and the capitalization of the Company as of October 31, 1988 and as adjusted to give effect to (i) the Partnership's acquisition of the Property (which term includes the Taj Mahal but excludes the Assigned Assets being acquired from Resorts by affiliates of the Partnership) under the Asset Purchase Agreement, and the proposed interim financing required to fund the acquisition and (ii) a capital contribution to the Partnership, the sale of the Bonds and the use of a portion of the proceeds of the Bonds for the repayment of such interim financing and advances from affiliates. These tables should be read in conjunction with the pro forma and audited historical balance sheets and the notes thereto appearing elsewhere herein. See "Combined Pro Forma Balance Sheet."

### TRUMP TAJ MAHAL ASSOCIATES LIMITED PARTNERSHIP AND TRUMP TAJ MAHAL FUNDING, INC.

| | October 31, 1988 | | |
|---|---|---|---|
| | Actual | As Adjusted(1) | As Adjusted(2) |
| | | (unaudited) (in thousands) | (unaudited) |
| Long Term Debt: | | | |
| Advances from Affiliates | $1,130 | $ 1,130 | — |
| Interim borrowings | — | 267,400 | — |
| 14% First Mortgage Bonds, Series A, due 1998 offered hereby | — | — | $675,000 |
| Partners' Capital and Shareholders' Equity: | | | |
| Partners' Capital | 1 | 1 | 75,001 |
| Common stock, without par value, 2,500 shares authorized, 200 shares issued and outstanding | 20 | 20 | 20 |
| Total Partners' Capital and Shareholders' Equity | 21 | 21 | 75,021 |
| Total Capitalization | $1,151 | $268,551 | $750,021 |

### TRUMP TAJ MAHAL FUNDING, INC.

| | October 31, 1988 | | |
|---|---|---|---|
| | Actual | As Adjusted(1) | As Adjusted(2) |
| | | (unaudited) (in thousands) | (unaudited) |
| Long Term Debt: | | | |
| 14% First Mortgage Bonds, Series A, due 1998 offered hereby | — | — | $675,000 |
| Shareholders' Equity: | | | |
| Common stock, without par value, 2,500 shares authorized, 200 shares issued and outstanding | $ 20 | $ 20 | 20 |
| Total Shareholders' Equity | 20 | 20 | 20 |
| Total Capitalization | $ 20 | $ 20 | $675,020 |

(1) Adjusted to give effect to (i) the Partnership's interim borrowings of $125,000,000 from First Fidelity, $125,000,000 from Bankers Trust Company and approximately $17,400,000 from Donald J. Trump and (ii) the acquisition of the Property pursuant to the Asset Purchase Agreement.

(2) Adjusted to give effect to (i) the sale of the Bonds by the Company and the loan of the proceeds thereof to the Partnership and (ii) a capital contribution to the Partnership of $75,000,000 by Donald J. Trump, the sale of the Bonds and the use by the Partnership of a portion of the proceeds of the Bonds for the repayment of all the interim financing incurred by the Partnership to pay the cash portion of the cost of the acquisition and the repayment of all advances from affiliates. The Partnership expects to pay approximately $600,000 of interest on the interim financing, which amount has not been reflected in the amounts stated above.

## SELECTED HISTORICAL AND PRO FORMA FINANCIAL DATA

The following tables set forth certain combined balance sheet data of the Partnership and the Company and balance sheet data of the Company as of October 31, 1988 and as adjusted to give effect to (i) the Partnership's acquisition of the Property (which term includes the Taj Mahal but excludes the Assigned Assets being acquired from Resorts by affiliates of the Partnership) under the Asset Purchase Agreement and the proposed interim financing required to fund the acquisition and (ii) a capital contribution to the Partnership, the sale of the Bonds and the use of a portion of the proceeds of the Bonds for the repayment of such interim financing and advances from affiliates. The data as of October 31, 1988 has been derived from the pro forma and audited historical balance sheets of the Partnership and the Company contained elsewhere in this Prospectus. The Taj Mahal which the Partnership will acquire is a partially constructed facility and it is anticipated that it will be completed with the proceeds from this offering (including earnings thereon), the capital contribution from Donald J. Trump and amounts available under the Trump Line of Credit. Operating data has been omitted since operations have not yet commenced.

### TRUMP TAJ MAHAL ASSOCIATES LIMITED PARTNERSHIP AND TRUMP TAJ MAHAL FUNDING, INC.

| | October 31, 1988 | | |
|---|---|---|---|
| | Actual | As Adjusted(1) | As Adjusted(2) |
| | | (unaudited) (in thousands) | (unaudited) |
| COMBINED BALANCE SHEET DATA: | | | |
| Working Capital | $(6,460) | $ (22,160) | $437,860 |
| Total Assets | 7,651 | 290,751 | 770,721 |
| Long Term Debt | 1,130 | 268,530 | 675,000 |
| Partners' Capital and Shareholders' Equity | 21 | 21 | 75,021 |

### TRUMP TAJ MAHAL FUNDING, INC.

| | October 31, 1988 | | |
|---|---|---|---|
| | Actual | As Adjusted(1) | As Adjusted(2) |
| | | (unaudited) (in thousands) | (unaudited) |
| BALANCE SHEET DATA: | | | |
| Working Capital | $ 20 | $ 20 | $ 20 |
| Total Assets | 20 | 20 | 675,020 |
| Long Term Debt | — | — | 675,000 |
| Shareholders' Equity | 20 | 20 | 20 |

(1) Adjusted to give effect to (i) the Partnership's interim borrowings of $125,000,000 from First Fidelity, $125,000,000 from Bankers Trust Company and approximately $17,400,000 from Donald J. Trump and the assumption by the Partnership of liabilities of approximately $20,700,000 and (ii) the acquisition of the Property pursuant to the Asset Purchase Agreement.

(2) Adjusted to give effect to (i) the sale of the Bonds by the Company and the loan of the proceeds thereof to the Partnership and (ii) a capital contribution to the Partnership of $75,000,000 by Donald J. Trump, the sale of the Bonds and the use by the Partnership of a portion of the proceeds of the Bonds for the repayment of the interim financing incurred by the Partnership to pay the cash portion of the cost of the acquisition and the repayment of all advances from affiliates. The Partnership expects to pay approximately $600,000 of interest on the interim financing, which amount has not been reflected in the amounts stated above.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF THE PARTNERSHIP AND THE COMPANY

### The Partnership

*Liquidity, Capital Resources and Capital Expenditures.* The Partnership was formed on June 23, 1988, for the sole purpose of acquiring, completing construction and operating the Taj Mahal in Atlantic City, New Jersey.

The Partnership estimates that it will need to borrow up to $675,000,000 (before deduction of financing costs) to acquire, complete, open and fund the initial operations of the Taj Mahal based upon current budget estimates. The Partnership expects to open the Taj Mahal on or about February 15, 1990. The Partnership anticipates that the proceeds from the sale of $675,000,000 principal amount of the Bonds and the capital contribution of $75,000,000 to be made to the Partnership by Donald J. Trump will, together with earnings on a portion of the net proceeds of the Bonds pending utilization for construction and the proceeds of borrowings under the Trump Line of Credit, provide it with sufficient funds to meet its cash requirements to acquire, complete, open and fund the initial operations of the Taj Mahal, and to pay interest on the Bonds prior to the opening of the Taj Mahal and indebtedness incurred to acquire the Property. The Partnership may also, under certain circumstances, incur additional indebtedness in addition to borrowings under the Trump Line of Credit. See "The Financing," "Business of the Partnership—Taj Mahal— *General,*" "Description of the Bonds—Certain Covenants of the Company and the Partnership—*Limitations on Investments*" and "—*Unrestricted Financing,*" and "Trump Completion Guaranty and Line of Credit—Trump Line of Credit."

A portion of the net proceeds of the Bonds is intended to be used (although no funds will be segregated for such purpose) to pay interest thereon for the first two interest payment dates and one half of the interest due on the third interest payment date. See "Special Considerations—Ability of the Partnership to Service Debt."

After the completion and opening of the Taj Mahal, the Partnership will rely on cash generated from the Taj Mahal's operations to service its debt and provide for anticipated capital requirements. The Partnership believes that funds generated from the operation of the Taj Mahal will be sufficient to cover all of its debt service (interest and principal). No assurance can be given, however, that actual operating results will meet the Partnership's expectations. See "Special Considerations—Ability of the Partnership to Service Debt" and "Special Considerations—Risks Regarding Completing and Opening the Taj Mahal —*Consequences of Delay.*"

The Partnership will pay a Management Fee to THC pursuant to the Management Agreement. The Management Fee, payable semi-annually, is equal to 1¾% of the Gross Revenues (as defined) for each fiscal year or part thereof within the term of the Management Agreement. The Management Fee will involve payments to THC which cannot be estimated with certainty at this time since the Taj Mahal has no operating history. The Indenture prohibits the payment of the Management Fee for any period if payments of interest on or principal of the Bonds for the corresponding period have not been paid. See "Description of the Bonds—Payment of Management and Construction Fees" and "Management Agreement."

*Results of Operations.* The Partnership has had no operations since its inception.

### The Company

*Liquidity and Capital Resources.* The Company was formed solely to raise funds through the issuance and sale of the Bonds for the benefit of the Partnership. As a result of the issuance of the Bonds, total debt of the Company will be approximately $675,000,000. The Bonds will be secured by the Note, in addition to the Mortgage, from the Partnership in the aggregate principal amount of $675,000,000, the terms of which will provide for payment from the Partnership at the times and in the amounts necessary to pay the principal of, premium, if any, and interest on the Bonds. The Company's ability to make such payments will depend completely upon the Partnership's ability to make payments on the Note.

*Results of Operations.* The Company has had no operations since its inception.

# COMBINED PRO FORMA BALANCE SHEET

## TRUMP TAJ MAHAL ASSOCIATES LIMITED PARTNERSHIP AND TRUMP TAJ MAHAL FUNDING, INC.

**October 31, 1988**

The following combined unaudited pro forma balance sheet has been prepared to give effect to (i) the Partnership's acquisition of the Property (which term includes the Taj Mahal but excludes the Assigned Assets being acquired from Resorts by affiliates of the Partnership) under the Asset Purchase Agreement and the proposed interim financing required to fund the acquisition and (ii) a capital contribution to the Partnership, the sale of the Bonds and the use of a portion of the proceeds of the Bonds for the repayment of such interim financing and advances from affiliates, as if such transactions had been completed on October 31, 1988. The acquisition will be recorded in accordance with the purchase method of accounting.

The combined unaudited pro forma balance sheet presented below includes the combined historical accounts of the Partnership and the Company. Both the Partnership and the Company were organized for the sole purpose of the acquisition of the Taj Mahal and the related financing, respectively. The pro forma adjustments related thereto are based upon the Purchase Price of the Property and the sale of the Bonds and use of the proceeds therefrom, which could be different from actual results. Operating data has been omitted since operations have not yet commenced.

| ASSETS | Combined Historical | Pro Forma Adjustments | As Adjusted for the Acquisition | Pro Forma Adjustments | As Adjusted for the Bond Offering |
|---|---|---|---|---|---|
| | | (unaudited) | (unaudited) (in thousands) | (unaudited) | (unaudited) |
| Cash and Short Term Investments | $ 40 | $ — | $ 40 | $ 727,050 (3)<br>(268,530)(4) | $458,560 |
| Property and Equipment | — | 288,100 (1) | 288,100 | — | 288,100 |
| Deferred Offering Costs | 2,450 | — | 2,450 | 21,450 (3) | 23,900 |
| Deferred Acquisition Costs | 5,000 | (5,000)(2) | — | — | — |
| Organization Costs | 161 | — | 161 | — | 161 |
| Total Assets | $7,651 | $283,100 | $290,751 | $ 479,970 | $770,721 |
| **LIABILITIES AND CAPITAL** | | | | | |
| Accrued Expenses | $6,500 | $ 20,700 (1)<br>(5,000)(2) | $ 22,200 | $ (1,500)(3) | $ 20,700 |
| Long Term Debt | 1,130 | 267,400 (1) | 268,530 | 675,000 (3)<br>(268,530)(4) | 675,000 |
| Partners' Capital and Shareholders' Equity: | | | | | |
| Partners' Capital | 1 | — | 1 | 75,000 (3) | 75,001 |
| Common stock, without par value, 2,500 shares authorized, 200 shares issued and outstanding | 20 | — | 20 | — | 20 |
| Total Partners' Capital and Shareholders' Equity | 21 | — | 21 | 75,000 | 75,021 |
| Total Liabilities and Capital | $7,651 | $283,100 | $290,751 | $ 479,970 | $770,721 |

The accompanying notes to combined pro forma balance sheet are an integral part of this balance sheet.

## NOTES TO COMBINED PRO FORMA BALANCE SHEET

(1) Proposed acquisition by the Partnership of the Property pursuant to the Asset Purchase Agreement, the $125,000,000 First Fidelity Financing at an interest rate per annum of 1% above the base rate of First Fidelity, the $125,000,000 Bankers Trust Financing at an interest rate per annum of 1% above the prime rate announced by Bankers Trust Company and an interim loan of approximately $17,400,000 from Donald J. Trump at an interest rate per annum of 1% above the prime rate announced by Bankers Trust Company and the assumption of approximately $20,700,000 of liabilities.* The estimated Purchase Price of the Property, including the assumption of liabilities, is comprised of the following:

| | |
|---|---|
| Purchase price of all property (including the Property and the Assigned Assets) sold pursuant to the Asset Purchase Agreement | $230,000,000 |
| Certain fixed adjustments | 43,000,000 |
| Estimated acquisition costs | 10,000,000 |
| Estimated closing adjustments | 17,100,000** |
| | 300,100,000 |
| Less the appraised value of the Assigned Assets acquired directly by two affiliates of Donald J. Trump | (12,000,000) |
| Estimated Purchase Price | $288,100,000 |

The Purchase Price will be allocated among land, building and equipment based on an appraisal.

(2) Payment and reclassification of $5,000,000 deferred acquisition costs to Property and Equipment.

(3) Proposed issuance and sale of the Bonds by the Company, for proceeds of $675,000,000, minus estimated offering costs of $23,900,000 ($2,450,000 of which was previously incurred, of which $1,500,000 was unpaid) and, a capital contribution to the Partnership of $75,000,000.

(4) Repayment of the principal of the interim financing referred to in Note (1) and repayment of advances from affiliates from a portion of the proceeds of the Bonds. The Partnership expects to pay approximately $600,000 of interest on the interim financing, which amount has not been reflected in the amounts stated above. See "The Financing."

---

* Consists of $12,100,000 of liabilities incurred prior to the Cut-Off Date which have not yet been paid and the $7,500,000 and $1,100,000 liabilities described below.

** Consists of closing adjustments in the amount of $8,500,000 (representing estimated amounts spent by Resorts with respect to the Taj Mahal since the Cut-Off Date), $1,100,000 (representing liabilities to be assumed by the Partnership for an adjustment for furniture, fixtures and equipment to be paid by the Partnership) and $7,500,000 (representing management's estimate of the amount the Partnership will be required to pay of approximately $11,000,000 of additional liabilities to be assumed by the Partnership)

## BUSINESS OF THE PARTNERSHIP

**Taj Mahal**

*General.* Pursuant to the Asset Purchase Agreement, the Partnership will acquire the Property, including all of the real property and improvements comprising the Taj Mahal, and shortly after the sale of the Bonds the Partnership will substantially increase its efforts related to the construction of the facility. See "The Acquisition." Construction of the Taj Mahal, which was commenced on October 3, 1983 by Resorts, has been slowed substantially since December 1987. The Partnership anticipates that the net proceeds from the sale of the Bonds, together with earnings on such funds pending utilization for construction, and borrowings under the Trump Line of Credit will be sufficient to complete construction of and open the Taj Mahal on or about February 15, 1990. Although the Partnership under certain circumstances may incur certain additional indebtedness, it does not currently anticipate that any further borrowings will be necessary to complete construction of and open the Taj Mahal by such date. See "The Financing."

Upon completion, the Taj Mahal will be the largest casino/hotel facility in Atlantic City. The Taj Mahal, when completed, will consist of a 42-story hotel tower and a contiguous low-rise structure, together occupying approximately 17 acres of land. The Partnership expects to open substantially all of the Taj Mahal on or about February 15, 1990. See "Special Considerations—Risks Regarding Completing and Opening the Taj Mahal." The construction and operation of the Taj Mahal are subject to the supervision, regulation and licensing of New Jersey regulatory authorities, including the Casino Control Commission. The Casino Control Commission has the authority to determine whether and under what circumstances the Taj Mahal may be opened and may operate. All plans and designs for the Taj Mahal must be approved by the Casino Control Commission and other regulatory authorities. There can be no assurance, however, that the required approvals will be obtained. See "Gaming Regulations" below in this section.

*Facilities.* The Taj Mahal will contain approximately 1,250 guest rooms, including approximately 245 suites. The low-rise structure is expected to contain approximately 155,000 square feet of meeting, ballroom, convention and exhibition space, a 120,000 square foot casino, and a variety of restaurants, cocktail lounges, entertainment areas and shops. The facility will also contain parking for approximately 4,600 cars and bus transportation facilities containing a total of approximately 25 bays and approximately 10,000 square feet of waiting and lounge areas for patrons arriving by bus. The Partnership has agreed to lease to Resorts 1,000 undesignated spaces in its Hotel Parking facility for a period of up to three years from the date such facility is opened for business. See "The Acquisition—Asset Purchase Agreement—*Certain Arrangements—Parking Arrangements.*" The Taj Mahal convention space will include an approximately 80,000 square foot exhibition hall facility (located in the low-rise structure), to be known as the "Steel Pier Arena," that can be converted into a sports and entertainment arena with seating capacity for approximately 5,200 people. The Steel Pier Arena has been designed to accommodate boxing matches, tennis tournaments, concerts and trade shows.

The 42-story hotel tower is completely enclosed and interior construction work (other than the installation of furnishings and fixtures) has been substantially completed. The low-rise structure has been erected and is partially enclosed, and interior construction work had begun before the slowdown in construction.

*The Casino.* The gaming area of the Taj Mahal will be approximately 120,000 square feet and will include approximately 3,000 slot machines, a majority of which will be quarter machines, and approximately 170 gaming tables, including black jack, dice, roulette, baccarat and Big Six. In addition, the casino will have its own restaurant and lounge areas. The low-rise structure will include ballrooms, meeting rooms, restaurants, cafes, entertainment lounges, a video game arcade and a variety of shops. A swimming pool, a sun deck, four tennis courts, a health club and other amenities will be situated on the roof-level of the low-rise structure.

*The Convention Facilities.* The Taj Mahal is designed to have sufficient convention and exhibition space, as well as guest rooms, restaurant facilities and related amenities, to serve as a headquarters hotel for large conventions. In addition to the Steel Pier Arena, the Taj Mahal convention facilities will include a Grand Ballroom facility of approximately 30,000 square feet, a Petite Ballroom of approximately 10,000 square feet and a lecture hall of approximately 3,900 square feet. The Partnership believes that the Taj

Mahal's ocean-front setting, planned decor, 120,000 square foot casino, restaurant and entertainment facilities and approximately 155,000 square feet of meeting, ballroom, convention and exhibition space, including the Steel Pier Arena, will make the complex a highly attractive convention facility. The Partnership also believes that its approximately 1,250 guest room capacity will permit the Taj Mahal to compete more effectively for convention groups that previously have not been attracted to Atlantic City due to the limited capacity of individual hotels. See "Competition" below in this section.

**Marketing Strategy**

The gaming industry in Atlantic City traditionally has been seasonal with its strongest performance occurring from May through September, while December and January show substantial decreases in activity. In addition, on a week-to-week basis, revenues are significantly higher on Fridays, Saturdays, Sundays and holidays as compared to revenues collected on weekdays. In consideration of these trends, the Partnership has designed a marketing strategy to actively promote the Taj Mahal not only as a first class casino hotel, but also as a convention site and destination resort facility at which visitors may stay for extended periods. By promoting the facility in this manner, the Partnership believes it will be able to increase its weekday hotel occupancy levels and casino revenues, offsetting the historical seasonal nature of Atlantic City casino/hotel operations. No assurance can be given, however, that significant convention business will be attracted to the Taj Mahal.

The low-rise structure is the building base and contains all common facilities. The casino area will be accessible from the Boardwalk, the hotel lobby, restaurants and the Steel Pier Arena. This area is 120,000 square feet of actual gaming area with an additional approximately 34,000 square feet for casino support functions. The overall casino scheme will be one of luxurious grandeur in an Eastern Indian motif. A variety of ethnic and specialty restaurants and lounges will be located throughout the complex in strategic locations.

As an added dimension, the Partnership also anticipates hosting boxing matches, tennis tournaments, concerts, trade shows and other popular entertainment and sporting events in its Steel Pier Arena. This 80,000 square foot exhibition hall facility will allow the Partnership to schedule, promote and accommodate such events, providing the Taj Mahal with an added ability to attract customers that most other casino/hotels in Atlantic City do not have.

The size and scope of the Taj Mahal should enable the Partnership to compete more effectively in all principal patron segments of the Atlantic City gaming markets. The Taj Mahal was designed with twelve floors of luxurious suites and rooms including an exclusive 42nd penthouse floor. These suites comprise the facility's "hotel within a hotel" designed to appeal to high-end gaming patrons by offering them a separate lounge, concierge services and complimentary food and beverage service, as well as a luxurious environment that is being designed in an attempt to create the ambience believed necessary to attract and retain this segment of the market. No assurance can be given, however, that significant high-roller business will be attracted to the Taj Mahal.

The Partnership plans to employ sales representatives in New Jersey, intends to employ a number of international sales representatives and will promote the Taj Mahal in all advertising media, including television, radio and newspapers. The Partnership intends to offer, from time to time, a variety of services and promotional programs designed to increase casino volume, including bus trips to the Taj Mahal from New York City, Philadelphia and other major metropolitan areas, air charter flights, entertainment, and, subject to obtaining necessary approvals, gaming tournaments and promotional sweepstakes.

The Partnership believes that the current state of air and rail service to Atlantic City impedes the ability to attract customers to Atlantic City from expanded geographical areas. Concerns about insufficient transportation to and from the Atlantic City area will partially be alleviated due to improvements in rail transportation. Currently, Amtrak is planning an Amtrak express train service, expected to be operational by the spring of 1989, which will provide service between Philadelphia and Atlantic City. In addition to the Amtrak line, New Jersey Transit has announced that it will begin commuter runs from Cherry Hill, New Jersey in the spring of 1989.

In addition to the implementation of the Amtrak and New Jersey Transit lines which are anticipated to have a substantial impact on the area, major plans for airport expansion are also underway. The

Partnership anticipates that it will benefit from the commencement in May 1988 of non-stop U.S. Air service from Pittsburgh to Atlantic City, in April 1988 from Baltimore via Piedmont's commuter airline service and in May 1988 between Atlantic City and Newark via Continental Airlines. Also, Pan Am Services has a long-term contract with Atlantic City to run both the International Airport at Pomona and Bader Field in Atlantic City.

**Competition**

Competition in the Atlantic City casino/hotel market is intense. At present, there are twelve casino/hotels located in Atlantic City, including Trump Castle Hotel & Casino (which is currently undergoing an expansion program) and Trump Plaza Hotel and Casino (which is currently undergoing an extensive refurbishment and renovation program). The Trump Casinos are both 100% beneficially owned by Donald J. Trump. See "Special Considerations—Potential Conflicts of Interest." Some other Atlantic City casino/hotels recently have completed renovations or are in the process of expanding and improving their facilities. Following the closing under the Asset Purchase Agreement, the Partnership anticipates that Griffin Co. will renovate the Resorts Casino Hotel, which is located next to the Taj Mahal. See "The Acquisition." In addition, there are several sites on the Boardwalk and in the Marina area of Atlantic City on which casino/hotels could be built in the future. The Atlantic City casino industry is currently experiencing a significant increase in capacity, which is generally measured by available casino floor space. Casino floor space at existing facilities was expanded by approximately 16,000 square feet during 1986. In addition, the Showboat, with 60,000 square feet of casino floor space, opened during March 1987, and in September 1988, a casino/hotel added 30,000 square feet to its casino floor space and 507 rooms to its hotel capacity, bringing the aggregate casino floor space currently in Atlantic City to approximately 695,000 square feet. Moreover, another casino/hotel has begun constructing a new hotel tower with approximately 800 rooms, which is scheduled to open in 1989 and which will permit the casino/hotel in the future to add up to 60,000 square feet to its casino floor space. Preliminary plans have been announced for the construction of a new casino/hotel, which, if constructed, is expected to open by 1991 and to have approximately 60,000 square feet of casino floor space. Preliminary plans also exist for the construction of two additional casino/hotels, each with approximately 600 hotel rooms and 60,000 square feet of casino floor space, neither of which, if constructed, is expected to open before 1992.

The Taj Mahal also would compete with any casinos in jurisdictions close to New Jersey that may authorize casino gaming in the future. Legislation permitting casino gaming has been proposed, from time to time, in various states. The Partnership also faces competition from casinos located in Nevada, Puerto Rico, the Caribbean and The Bahamas, as well as from other forms of legalized gaming in New Jersey and its surrounding states such as lotteries, horse racing, jai alai and dog racing.

Casino win (the total of all sums received from gaming operations less the total of all sums paid out as winnings) for all casino/hotels in Atlantic City increased approximately 9.6% during 1985 and approximately 6.7% during 1986 compared to the prior year, and casino win per square foot of casino space decreased slightly during the same periods. For the year ended December 31, 1987, casino win increased approximately 9.4% compared to the prior year and casino win per square foot decreased by 2.3% during the same period due to increased casino floor space. Net income for all casino/hotels in Atlantic City increased to $74,016,000 for the year ended December 31, 1987, from $55,029,000 for 1986 and $51,549,000 for 1985. For the six month period ended June 30, 1988, casino win and casino win per square foot increased by 10.8% and 11.1%, respectively, compared to the first six months of 1987. For the six month period ended June 30, 1988, the Atlantic City casino/hotels reported an aggregate net income of $9,253,000 compared with a net income of $6,421,000 during the first six months of 1987, representing an increase of 44.1%. Of the twelve Atlantic City casino/hotels, eight had a net loss and four had net income for the six month period ended June 30, 1988. The Partnership believes that, based upon historical trends, casino win per square foot of casino space will decline in 1990 as a result of a projected increase in casino floor space, including the opening of the Taj Mahal. Growth in Atlantic City casino win is expected to be restrained until further improvements to the City's transportation system and infrastructure are undertaken and completed and the number of non-casino hotel rooms and existing convention space are increased. No assurance can be given with respect to either the future growth of the Atlantic City gaming market or the ability of the Taj Mahal to attract a representative share of that market.

The profitability of the Taj Mahal could be affected by its proximity to the Resorts Casino Hotel, which is being acquired by Griffin Co., and the Showboat, which is owned and operated by an entity not affiliated with the Partnership. See "The Acquisition." The Resorts Casino Hotel has approximately 700 guest rooms, a 60,000 square-foot casino, restaurants, entertainment lounges, parking for approximately 900 cars and related amenities. In addition, the Resorts Casino Hotel will have access to 1,000 undesignated parking spaces in the Taj Mahal's Hotel Parking facility pursuant to a lease to be entered into with the Partnership. See "The Acquisition—Asset Purchase Agreement—*Certain Arrangements—Parking Arrangements*." The Showboat, which opened in March 1987, has approximately 515 guest rooms, a 60-lane bowling center and a 60,000 square-foot casino. The Showboat is situated on the Boardwalk next to the Taj Mahal. The Resorts Casino Hotel and the Showboat will each be connected physically to the Taj Mahal via an elevated walkway.

The Taj Mahal, Resorts Casino Hotel and Showboat are located at the eastern end of the Boardwalk, approximately one-half mile to one and one-half miles to the east of eight other Atlantic City casino/hotels. The effect of the concentration of the majority of the casino/hotels at the opposite end of the Boardwalk has historically been to attract the gaming patron volume to that area and away from the eastern end of the Boardwalk, where the Taj Mahal will be located. The Partnership believes that the opening of the Taj Mahal and the proximity of the Showboat and Resorts Casino Hotel will attract an increased volume of patrons to the vicinity of the Taj Mahal.

Casinos in Atlantic City must be located in approved hotel facilities which offer dining, entertainment and other guest facilities. Competition among casino/hotels is intense and is based primarily upon promotional allowances; advertising; the attractiveness of the casino area; service; quality and price of rooms, food and beverages; restaurant, convention and parking facilities; and entertainment. In order to compete effectively with all other Atlantic City casino/hotels, the Partnership intends to offer complimentary drinks, meals, room accommodations and/or travel arrangements to its preferred customers, as well as cash bonuses and other incentives pursuant to approved bus coupon programs.

Certain Atlantic City casino/hotels may be more competitive than others because of a proximity to convention or marina facilities. Trump Plaza Hotel and Casino's facilities, for example, have a direct skybridge connection and entrance into the Atlantic City convention center at which the majority of Atlantic City's large conventions are hosted at present and at which Trump Plaza Hotel and Casino has conducted special promotional events (such as professional boxing matches). Trump Castle Hotel & Casino is situated directly across the street from, and will have an elevated pedestrian walkway connecting it to, the Senator Frank S. Farley State Marina at which Trump Castle Hotel & Casino operates an approximately 600 slip marina.

Ground has been broken on the new Atlantic City convention center, which is expected to be completed by 1991. The new convention center will be located at the entrance to the Atlantic City Expressway and is anticipated to include 450,000 square feet of exhibition space, a 30,000 square foot multi-purpose ballroom, and an 1,800 space covered parking garage.

**Seasonal Factors**

The Partnership's business activities will be affected by seasonal factors. The Partnership anticipates realizing higher revenues and earnings from its operations during the second and third quarters of each year than it may realize during the first and fourth quarters. See "Marketing Strategy" above in this section.

**Employees**

The Partnership has no employees at present. The Partnership anticipates that it will require at least 5,500 employees to operate the Taj Mahal and its related facilities. The Partnership expects that it will begin actively recruiting and interviewing prospective employees so that it will be able to hire and train a sufficient number of employees to operate the Taj Mahal prior to the opening of the facility to the public. Substantially all of the Partnership's employees, except its management, security and casino gaming employees, are expected to be represented by unions. The Asset Purchase Agreement restricts the ability of the Partnership from soliciting the "managerial employees" of Resorts but does not limit the ability of

the Partnership to solicit and hire Resorts' "non-managerial employees." See "The Acquisition—Asset Purchase Agreement" and "Special Considerations—Management of the Taj Mahal."

All of the Partnership's casino employees must be licensed under the Casino Control Act. Casino employees are subject to more stringent requirements than non-casino employees, although hotel employees must also be registered with the Casino Control Commission. Each casino employee must meet applicable standards pertaining to such matters as financial responsibility, good character, ability, casino training and experience, and New Jersey residency.

**Gaming Regulations**

The ownership and operation of casino/hotel facilities in Atlantic City are the subject of pervasive state regulation under the Casino Control Act. No casino/hotel facility may operate unless various licenses and approvals are obtained from the New Jersey regulatory authorities, including the Casino Control Commission. The Casino Control Commission has broad discretion with regard to the issuance, renewal, and revocation or suspension of licenses and approvals. Casino licenses are initially issued for a one-year period and must be renewed annually for the first two renewal periods. Thereafter, a casino license may be renewed for a period of one year or two years (followed by two-year renewal periods) subject to the discretion of the Casino Control Commission, although the Casino Control Commission may reopen licensing hearings at any time. The Casino Control Commission is authorized under the Casino Control Act to adopt regulations covering a broad spectrum of gaming and gaming related activities and prescribing the methods and forms of applications for licenses. The Casino Control Act established the Division to investigate all applications for licenses, enforce the provisions of the Casino Control Act, and prosecute before the Casino Control Commission all proceedings for violations of the Casino Control Act. The Division conducts audits and continuing reviews of all casino operations.

The Casino Control Act is concerned primarily with the financial stability and character of casino operators, their employees, their security holders and others financially interested in casino operations, the nature of hotel and casino facilities, and the operating methods (including rules of games and credit-granting procedures) and financial and accounting practices used in connection with casino operations. The Casino Control Act includes detailed provisions concerning, among other things, (1) residence and equal employment opportunities of employees of casino operators, contractors for casino facilities and others; (2) rules of games and methods of supervision of games and of selling and redeeming chips; (3) the manner of granting credit, duration of credit, and enforceability of gaming debts; (4) the manufacture, distribution, and sale of gaming equipment; (5) security standards, management control procedures, accounting and cash control methods, and reports to gaming authorities; and (6) advertising of casinos, standards for entertainment, and distribution of alcoholic beverages.

The Casino Control Act provides that no applicant is eligible to hold a casino license unless certain persons (including each person who directly or indirectly holds any beneficial interest or ownership in the applicant or who, in the opinion of the Casino Control Commission, has the ability to control the applicant or who the Casino Control Commission may consider appropriate for approval or qualification) meet the qualifications pursuant to the provisions of the Casino Control Act for approval as a casino "key employee," other than the requirement that key employees be New Jersey residents. Key employees, in order to be licensed as such, must submit financial and other information to the Casino Control Commission in order to demonstrate, among other things, their financial stability, integrity, responsibility, good character, and honesty, as well as their business ability and casino experience showing the reasonable likelihood of success and efficiency in the position in question.

Every agreement to lease an approved hotel building or the land under the building and every agreement (including the Management Agreement) for the management of a casino must be in writing and filed with and specifically approved by the Casino Control Commission. Licensees are also required to furnish to the Casino Control Commission any written or unwritten agreements regarding the realty of the licensee's casino/hotel facility or any business or person doing business with or on the premises of the casino/hotel facility. Such agreements are reviewed by the Casino Control Commission on the basis of the reasonableness of their terms and the qualifications of the persons involved in the agreement with the

licensee. If the Casino Control Commission does not approve of the agreement or of the association of the licensee with the persons involved, the Casino Control Commission may require modification or termination of the agreement. In addition, many enterprises which provide goods and services to licensees must be licensed by the Casino Control Commission.

If, after an applicant is licensed, it is determined that the licensee has violated the Casino Control Act or the regulations of the Casino Control Commission, the licensee may be subject to fines or its license may be suspended or revoked in a proceeding before the Casino Control Commission. If a license is revoked, or if, in the discretion of the Casino Control Commission, the casino license or operation certificate is suspended for a period in excess of 120 days, or if the Casino Control Commission fails or refuses to renew the casino license, the Casino Control Commission will appoint a conservator to take over and control all of the property and business of the licensee which relate to the approved casino/hotel facilities.

The Casino Control Act imposes certain restrictions upon the ownership of securities issued by an entity which holds a casino license or is a holding company of a licensee (a "Regulated Company"). The Company and the Partnership will each be a Regulated Company. Among other restrictions, the sale, assignment, transfer, pledge or other disposition of any security issued by a Regulated Company is conditional and will be ineffective if subsequently disapproved by the Casino Control Commission. If the Casino Control Commission finds that a holder of a security issued by a Regulated Company is not qualified under the Casino Control Act, the Casino Control Commission has the right to propose any remedial action which it may deem appropriate. The Casino Control Commission may also force divestiture by any disqualified holder who is required to be qualified under the Casino Control Act (e.g., officers, directors, controlling stockholders, and casino key and other employees) of any securities issued to him by a Regulated Company. In the event that certain categories of controlling security holders fail to divest themselves of such securities, the Casino Control Commission has the power to revoke or suspend the casino license of the Regulated Company that issued the securities or the casino license of any affiliated Regulated Company. If any security holder is found unqualified, it is unlawful for the security holder (i) to receive any dividends or interest upon any such securities, including, in the case of a holder of a Bond, interest on such Bond, (ii) to exercise, directly or through any trustee or nominee, any right conferred by such securities, including any right conferred by the Bonds, or (iii) to receive any remuneration, in any form, from a Regulated Company (including the Partnership, the Company and the Trustee) for services rendered or otherwise. See "Description of the Bonds—Gaming Laws."

The Casino Control Commission is authorized to establish annual fees for the issuance or renewal of casino licenses. The issuance fee is based upon the cost of investigation and consideration of the license application and is not to be less than $200,000. It is anticipated that the issuance fee for the Taj Mahal will substantially exceed such minimum fee. The renewal fee is based upon the cost of maintaining control and regulatory activities prescribed by the Casino Control Act, and may not be less than $100,000 for a one-year casino license and $200,000 for a two-year casino license. There is also an annual license fee of $500 upon each slot machine maintained for use or in use in any casino. In addition, initial work permit fees of $2.00 and annual renewal fees of $2.00 are payable for each employee. Finally, the Casino Control Commission is authorized to establish by regulation annual fees, payable by the licensee or the registrant, for the issuance and renewal of registrations and licenses other than casino licenses.

Each licensed casino is required to pay an annual tax of 8% on its net casino win (casino win less provision for uncollectible accounts up to 4% of casino win). Proposed legislation, which would increase the annual tax rate to 9%, was introduced in the New Jersey legislature in July 1988. In addition, an investment alternative tax is imposed on each facility licensed as a casino in the amount of 2.5% of net casino win for any calendar year beginning after December 31, 1983. No tax is imposed, however, on the net casino win received by a licensee during the first 12 months of the operation of any casino commencing operation after January 1, 1984. Once a licensee's obligation is incurred, the obligation continues for a 25-year period.

During the 25 years of a licensee's tax obligation, the licensee is entitled to an investment tax credit against the investment alternative tax in an amount equal to twice the purchase price of bonds issued to the licensee by the CRDA or twice the amount of the licensee's investments authorized in lieu of such

investments in bonds or made in investments approved as eligible by the CRDA. A licensee must use 50% of its annual investment for the purchase of bonds issued by the CRDA. CRDA Bonds may bear interest at a below-market rate. These investments must be made, or agreements to make the investments must be executed, by the end of April following the calendar year for which the tax obligation is incurred.

One hundred percent of the investments required during the first three years of each 25-year obligation must be made in Atlantic City; of the investments required during the remaining 22 years, the percentage to be made in Atlantic City gradually decreases to 20%, while the percentage of investment to be made in 9 designated counties of southern New Jersey and 12 designated counties of northern New Jersey gradually increases to 45% and 35%, respectively.

**Other Laws and Regulations**

The Partnership is subject to other Federal, state and local regulations and, on a periodic basis, must obtain various licenses and permits, including those required to sell alcoholic beverages. The Partnership believes that it will have obtained, prior to the opening of the Taj Mahal, all required licenses and permits to conduct its business.

**Gaming Credit Policy**

The Partnership believes that it will be necessary to extend credit to selected gaming customers in order to compete with all other Atlantic City casino/hotels. The Partnership plans to have personnel in its accounting department pursue collection with respect to gaming receivables by sending initial notices, follow-up notices and other communications to debtors. If receivables remain uncollected, the Partnership intends, in certain cases, to refer collection of such receivables to attorneys, as required by the New Jersey gaming laws. All regulatory provisions relating to the issuance of credit must be complied with in order for the casino gaming debt to be legally enforceable in the State of New Jersey. There can be no assurance that New Jersey judgments with respect to gambling debts will be enforceable in all other states.

**Control Procedures**

Gaming at the Taj Mahal will be conducted by Partnership trained and supervised personnel. Prior to employment, all casino personnel must be licensed under the Casino Control Act. The Partnership intends to employ extensive security and internal controls at the Taj Mahal. Security checks will be made by the Partnership to determine, among other matters, that job applicants for key positions have had no criminal history or associations. Security controls at the Taj Mahal will include the use of closed circuit video cameras to monitor the casino floor and money counting areas. The count of moneys from gaming also will be observed daily by representatives of the Casino Control Commission.

## PROPERTIES OF THE PARTNERSHIP

**Land**

The Partnership will acquire the Taj Mahal pursuant to the Asset Purchase Agreement. See "The Acquisition—Asset Purchase Agreement." The land comprising the site upon which the Taj Mahal is located consists of approximately 17 acres, which are bounded by The Boardwalk to the south, Maryland Avenue to the east, Pennsylvania Avenue to the west and which extends to the north towards Pacific Avenue for approximately three-quarters of a city block on the western portion of the site and two-thirds of a city block on the eastern portion of the site. The Development Agreement requires that the portion of the facility located on the Development Site Parcel (which primarily consists of the hotel tower and a portion of the casino floor area) be completed by March 1, 1991. See "Assumption Agreement" below in this section. The failure to complete such construction by such completion date, or to comply with certain conditions may, after notice to the Partnership and the passage of certain cure periods, result in a reversion of title to the Development Site Parcel from the Partnership to the Housing Authority, subject to the Mortgage. See "Assumption Agreement" below and "Special Considerations—Risks Regarding Completing and Opening the Taj Mahal—*Consequences of Delay*."

**Future Mortgages**

If the Partnership elects to construct, acquire or make capital improvements to any newly acquired or leased parking facility for use primarily by the Taj Mahal ("New Parking Facility") it may place mortgages superior to the lien of the Mortgage securing an amount of up to $35,000,000, on the New Parking Facility (and on no other part of the Collateral) provided such amount is incurred in connection with such construction, acquisition or capital improvement of such New Parking Facility ("Senior New Parking Mortgage"). The Mortgage and the Indenture also permit the Senior New Parking Mortgage to be refinanced. See "Description of the Bonds—Certain Covenants of the Company and the Partnership—*New Parking Financing.*" Accordingly, the Mortgage may be subordinated to any such Senior New Parking Mortgage or refinanced mortgage.

Should the Partnership default in the payment of the indebtedness secured by the Senior New Parking Mortgage or default in the performance of any of the other obligations thereunder, and the holder of the Senior New Parking Mortgage commence a foreclosure action, the junior lien of the Mortgage covering the property which is being foreclosed upon would be extinguished, and the debt owed to the holder of such Senior New Parking Mortgage would have to be satisfied before the Bondholders would realize any proceeds from the sale of the portion of the property encumbered thereby. If the Partnership defaults in the payment of the Note or any obligation under the Mortgage, and the Trustee elects to foreclose upon the Collateral, the Trustee would receive the proceeds of the sale of the Collateral, including any New Parking Facility, subject to the rights of the holder of any Senior New Parking Mortgage, including its right to foreclose and its prior right to the proceeds relating to the sale of the New Parking Facility. The purchaser of such foreclosed property at any such foreclosure sale would take title to such property subject to any Senior New Parking Mortgage which was not foreclosed.

The provisions of the Mortgage and the Indenture permit, under certain circumstances, *pari passu* and subordinate financing to be placed on the Collateral. See "Description of the Bonds—Certain Covenants of the Company and the Partnership—*Limitations on Liens on the Trust Estate.*"

**Lease of Property**

If at any time Donald J. Trump or any Affiliate of the Partnership owns or leases any real property and improvements which is expected by Donald J. Trump or such Affiliate to be utilized primarily by patrons of the Taj Mahal and any casino/hotels adjacent to the Taj Mahal (including any Assigned Assets), Donald J. Trump or such Affiliate may, but is not required to, lease, subject to the limitations set forth under "Description of the Bonds—Certain Covenants of the Company and the Partnership—*Limitations on Leasing,*" such property and improvements to the Partnership at the Stated Rent

Any of such leases with Donald J. Trump or an Affiliate, including any lease of the Steel Pier, may be terminated at any time by the lessor upon the sale of the leased property (other than the restaurant on the Steel Pier and the property for use as parking facilities in certain circumstances) provided that upon such termination. Donald J. Trump or such Affiliate reimburses the Partnership for the amount of any capital expenditures (net of amortization and/or depreciation on such capital expenditures) made by the Partnership for the benefit of such leased property. See "Description of the Bonds—Lease of Properties."

Included within the property which could be leased to the Partnership as described above is the Steel Pier, which extends approximately 1,000 feet from the Boardwalk above the beach and ocean. The Steel Pier is connected to the Taj Mahal complex by means of a glass-enclosed elevated pedestrian walkway located above the Boardwalk, which is owned by the Partnership. Although the Steel Pier will be owned by an Affiliate of the Partnership and not included in the lien of the Mortgage, the Project Cost includes an amount to be expended by the Partnership for the construction of a restaurant thereon. In addition, as stated under "The Acquisition—Asset Purchase Agreement—*Assigned Assets,*" Affiliates of Donald J. Trump will acquire (i) the right to acquire the 3.7 Acre Parcel (which parcel Resorts currently has the right to acquire from the Housing Authority) and (ii) the 210 foot strip upon the Acquisition Closing. The Project Cost includes an amount to be expended by the Partnership for improving such property for use as parking facilities. Accordingly, such Affiliates will lease to the Partnership that portion of the Steel Pier on which such restaurant is to be constructed and the 210 foot strip and the 3.7 Acre Parcel. The rent under

such leases and the length of the terms thereof will be as described under "Description of the Bonds—Lease of Properties." Notwithstanding the initial improvements of such premises as a restaurant and as parking facilities, respectively, the Partnership will have the right to discontinue such use of such premises and to alter either or both of the same to allow a different use or uses, provided that the lease to the Partnership remains in effect. See "Description of the Bonds—Lease of Properties."

The Partnership is also able to lease from Affiliates of Donald J. Trump or third parties other property. See "Description of the Bonds—Certain Covenants of the Company and the Partnership—*Limitations on Leasing.*" The Partnership intends to lease a warehouse from an Affiliate of Donald J. Trump prior to the Opening Date of the Taj Mahal.

**Appraisals**

*General.* In connection with the acquisition of the Property and the offering of the Bonds, The Trump Organization obtained three appraisals of the Property, two of which (the AGI Current Appraisal and the MGA Current Appraisal) reflect the market value of the Property as of March 31, 1988, and a third appraisal (the AGI Report) which reflects the appraised market value of the Property on the assumption, among other things, that the Taj Mahal is fully completed and open to the public as an operating casino/hotel on or about December 1, 1989. MGA and AGI advised the Partnership that the change of the estimated Opening Date from December 1, 1989 to February 15, 1990 would not affect the values reflected in the MGA Current Appraisal, the AGI Current Appraisal and the AGI Report, respectively, and all information and conclusions shown in such reports remain valid.

In the opinion of the appraisers, the appraisals, which are subject to certain assumptions and qualifications, were prepared in conformity with the guidelines regarding appraisal procedures set forth in regulations governing Federal savings institutions. The Indenture will require the Company to provide an updated appraisal of the Collateral on the same basis as the AGI Report at least as frequently as every 24 months. No assurance can be given, however, that the Bonds will qualify as "real estate loans" within the meaning of the regulations governing Federal savings institutions or that these appraisals or the updated appraisals will be "sufficiently current" at any time to provide the underlying support for the Bonds to qualify at such time as real estate loans. The failure to qualify as "real estate loans" could affect the market for the Bonds adversely by limiting the ability of savings institutions to invest in the Bonds as "real estate loans." Appraisals are estimates or opinions of value and cannot be relied upon as precise measures of value or worth. In addition, the AGI Report is an estimate of the market value of the Taj Mahal at a future date. The amount that the Partnership might realize from the sale of the Property may be more or less than its appraised market value, depending on its then current and anticipated uses, and zoning, financial, economic, market and other conditions that may affect the Taj Mahal's value. Moreover, the appraised market value does not reflect what might be realized upon liquidation of the Taj Mahal or the sale of the Taj Mahal in a distress sale.

Copies of the AGI Report, the AGI Current Appraisal and the MGA Current Appraisal have been filed as Exhibits to the Registration Statement of which this Prospectus is a part.

*Current Appraisals.* In the course of their respective determinations of the Property's market value, as "partially completed," AGI and MGA each reviewed extensive data relating to the subject property, Atlantic City in general, the Atlantic City casino/hotel industry, improvements constructed at present and to be constructed on the site, zoning, real estate taxes and assessments and the highest and best use for such property.

*AGI Current Appraisal*

AGI opined that the market value of the Taj Mahal, as partially completed as of March 31, 1988, subject to the assumption and conditions set forth in the AGI Current Appraisal, was $230,000,000.

For purposes of the AGI Current Appraisal, market value was defined as "the most probable price in terms of money which property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming that price

is not affected by undue stimuli." The AGI Current Appraisal assumed, among other things, that (i) the legal descriptions furnished to AGI were correct, (ii) title to the property was held by the Partnership in fee simple, free and clear of all liens and encumbrances, unless specifically noted, (iii) the use of the proposed project as described in the appraisal was an allowable use under present zoning laws and is further considered its highest and best use, and (iv) information furnished by others was reliable.

Although AGI employed three recognized methods of valuation in the AGI Current Appraisal, the cost approach, the sales comparison approach and the capitalization of income approach, AGI gave primary consideration to the capitalization of income approach. According to the AGI Current Appraisal, the capitalization of income approach is a technique used to arrive at an estimate of value by capitalizing the future projected net income attributable to the appraised property by an appropriate method and discount rate as derived from a market study of similar properties and/or competitive investments. In applying the cost approach, AGI added the actual land value (estimated to be the actual acquisition cost by Resorts of approximately $36,000,000 due to restrictions on resale in the Development Agreement) to the replacement cost new of the improvements (estimated to be the approximately $511,823,000 expended as of March 31, 1988 by Resorts) and deducted therefrom the total accrued depreciation of such improvements (including a factor for economic obsolescence). The sales comparison approach values a property by obtaining information regarding sales of similar properties (consisting of one sale and a contract of sale of two partially completed facilities), extracting units of comparison, and analyzing such information by virtue of their minor differences and major similarities. AGI valued the Taj Mahal at $230,000,000 on the basis of the capitalization of income approach, between $200,000,000 and $237,000,000 on the basis of the sales comparison approach and $230,000,000 on the basis of the cost approach.

*MGA Current Appraisal*

MGA opined that the market value of the Taj Mahal, as partially completed as of March 31, 1988, subject to the assumptions and conditions set forth in the MGA Current Appraisal, was $226,000,000.

For purposes of the MGA Current Appraisal, market value was defined as "the most probable price in cash, terms equivalent to cash, or in other precisely revealed terms, for which the appraised property will sell in a competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress." The MGA Current Appraisal assumed, among other things, that (i) the areas and dimensions of the property shown in the MGA Current Appraisal were correct, (ii) the information identified in the MGA Current Appraisal as being furnished by others is reliable, (iii) responsible ownership and competent management exist, and (iv) the present zoning will remain in force, unless otherwise adjusted as stated in the MGA Current Appraisal.

Although MGA employed three recognized methods of valuation in the MGA Current Appraisal, the cost approach, the comparable sales approach and the capitalization of income approach, MGA gave primary importance to the capitalization of income approach. According to the MGA Current Appraisal, the capitalization of income approach is that process which values a property by conversion of the net operating income into a value by the capitalization process, utilizing a rate derived from the market, under the assumption that an investor will pay no more for a property than the value of the income he can expect to derive from the subject property. In applying the cost approach, MGA added the underlying land value (estimated to be the actual acquisition cost by Resorts of approximately $36,000,000 due to restrictions on resale contained in the Development Agreement) to the estimated replacement cost new or reproduction cost new of the improvements (after deducting from such replacement cost new or reproduction cost accrued depreciation, including a factor for economic and functional obsolescence, of such improvements). Such estimated replacement cost new or reproduction cost new of the improvements (before such deductions) was determined to be 45% of what MGA determined to be the total project cost of $710,452,000 (excluding the cost of the land). The sales comparison approach used by MGA involved analyzing sales of similar properties (which in this case included the sale and contract of sale considered by AGI in the AGI Current Appraisal) in order to derive an indication of the most probable selling price of the subject property. MGA valued the Taj Mahal at $226,000,000 on the basis of the capitalization of income approach, between $222,000,000 and $237,000,000 on the basis of the sales comparison approach and $228,000,000 on the basis of the cost approach.

*Opening Date Appraisal.* The Partnership also has obtained from AGI the AGI Report which contains an appraisal of the market value of the Taj Mahal as of the Opening Date. In the course of its determination of the Taj Mahal's market value, AGI reviewed extensive data relating to the subject property, Atlantic County and Atlantic City in general, the neighborhood of the site, the Atlantic City casino/hotel market, the construction site, improvements constructed at present and to be constructed on the site, zoning, real estate taxes and assessments and the highest and best use for such property. Considering three recognized methods of valuation, the cost approach, the sales comparison approach and the capitalization of income approach, AGI opined that the market value of the Taj Mahal, as if completed on December 1, 1989 in accordance with the Partnership's existing plans and specifications, and subject to the assumptions and related conditions set forth in the AGI Report, is $1,100,000,000. See *"General"* above.

For purposes of the AGI Report, market value was defined as "the most probable price in terms of money which property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably and assuming price is not affected by undue stimuli." The AGI Report assumed, among other things, that (i) the legal descriptions furnished to AGI were correct, (ii) title to the property was held by the Partnership in fee simple, free and clear of all liens and encumbrances, unless specifically noted, (iii) the use of the proposed project as described in the appraisal was an allowable use under present zoning laws and is further considered its highest and best use, and (iv) information furnished by others was reliable.

Although AGI employed three recognized methods of valuation in the AGI Report, the cost approach, the sales comparison approach and the capitalization of income approach, AGI gave primary consideration to the capitalization of income approach. According to the AGI Report, the capitalization of income approach is a technique used to arrive at an estimate of value by capitalizing the future projected net income attributable to the appraised property by an appropriate method and discount rate as derived from a market study of similar properties and/or competitive investments. In applying the cost approach, AGI added the actual land value (calculated after reviewing recent sales of similar properties) to the replacement cost new of the improvements (estimated to be the amounts expended as of March 31, 1988 by Resorts plus the estimated costs to complete the improvements and an entrepreneurial profit) after deducting the total accrued depreciation of such improvements (including a factor for economic obsolescence). The sales comparison approach values a property by obtaining information regarding sales of similar properties, extracting units of comparison, and analyzing such information by virtue of their minor differences and major similarities. AGI valued the Taj Mahal at $1,100,000,000 on the basis of the cost approach, between $970,000,000 and $1,125,000,000 on the basis of the sales comparison approach and $1,100,000,000 on the basis of the capitalization of income approach.

The appraised value of the Taj Mahal as contained in the AGI Report is based on the assumption, among others, that the Taj Mahal will be fully completed according to the plans and specifications submitted to AGI and open to the public as of December 1, 1989, and does not give any effect to any present value discount for the passage of time until opening. See *"General"* above. The appraisal is an estimate of the market value of the Taj Mahal as of a future date and there can be no assurance that the Taj Mahal could be sold at any time, in a foreclosure sale or otherwise, for an amount equal to or exceeding its then appraised value. See "Special Considerations—Security for the Bonds."

*The Appraisers.* AGI has been engaged in the real estate appraisal business for approximately 36 years, maintaining offices in New York, New Jersey and Florida and employing eight full-time appraisers. AGI has prior experience in appraising casino/hotel properties in Atlantic City (including the Resorts Casino Hotel and the Trump Casinos) and in performing appraisals in conformity with regulations governing Federal savings institutions. AGI was selected on the basis of its experience and expertise in evaluating income producing properties, including hotels and casino/hotels.

MGA has been engaged in the real estate appraisal business for approximately 21 years. MGA currently maintains its offices in New Jersey and employs full-time four appraisers and four engineers. MGA has experience in appraising a variety of commercial and industrial facilities, including hotels and one casino/hotel and has an extensive engineering and construction background.

The services performed by AGI and MGA were performed in accordance with recognized professional standards. AGI and MGA have no financial or other interest, direct or indirect, present or prospective, in the Taj Mahal, or a personal interest or bias with respect to the Partnership or any of its affiliates. AGI's and MGA's employment and compensation were in no way contingent upon the amount of the valuation or on any action or event resulting from the analysis of opinions or conclusions in, or the use of, the AGI Report, AGI Current Appraisal or the MGA Current Appraisal. In consideration for their services rendered, AGI and MGA have received a fee of $60,000 and $20,000, respectively.

**Assumption Agreement**

As a condition to the Acquisition Closing, the Partnership and the Housing Authority will, prior to the issuance of the Bonds, enter into an agreement (the "Assumption Agreement") providing for, among other things: (i) approval by the Housing Authority of the conveyance of the Development Site Parcel by RINJ to the Partnership; (ii) the assumption by the Partnership of RII's obligations under the Development Agreement that pertain solely and specifically to the Development Site Parcel (primarily, the obligation to complete construction of the Taj Mahal by a specified date and to refrain from selling the Development Site Parcel before completion of the Taj Mahal); (iii) extension of the date by which the portion of the Taj Mahal situated on the Development Site Parcel must be completed to August 3, 1990 and, if the Bonds are issued and Donald J. Trump delivers the Housing Authority Guaranty, an extension of the required completion date of the portion of the Taj Mahal situated on the Development Site Parcel to March 1, 1991; (iv) approval by the Housing Authority of the Mortgage as a mortgage authorized by the Development Agreement, such approval to be given at such time as the Partnership may request, provided that the Partnership is not in default under the Assumption Agreement at the time of any such request; and (v) approval of the use of the proceeds of the Mortgage as described in this Prospectus. By virtue of the Assumption Agreement, the Partnership will be required to pay the Housing Authority $1,000 per day for unexcused delays in the completion of the Taj Mahal beyond August 3, 1989.

The Assumption Agreement will also clarify that the Partnership will not be required to construct and/or develop any residential housing units on the Development Site Parcel, which might otherwise be required to be constructed pursuant to the Urban Renewal Plan, unless there is constructed on the land to which the Urban Renewal Plan pertains (currently, the Showboat parcel, the Development Site Parcel and certain vacant land in the vicinity of the Showboat and the Taj Mahal) in excess of 4,000 hotel rooms, in which case the Partnership would be required to construct an additional residential unit for each additional hotel room it builds which results in total hotel rooms over 4,000.

Pursuant to the Assumption Agreement, the Partnership will not have any obligations under the Development Agreement that RII was obligated to perform prior to the date of the Assumption Agreement. In addition, a default by RII, its successors or assigns, in the performance of any obligations under the Development Agreement other than those assumed by the Partnership under the Assumption Agreement, or any action taken or omitted to be taken thereunder by any of them, will not constitute a default by the Partnership under the Assumption Agreement.

Except as set forth in the next sentence with respect to the Trustee, the obligation of the Partnership assumed under the Assumption Agreement to construct and complete that portion of the Taj Mahal situated on the Development Site Parcel will be a covenant running with the land, binding on the successors of the Partnership (including any purchaser at a foreclosure sale). The Trustee, as holder of a mortgage authorized by the Development Agreement, will not be subject to the obligation to construct and complete that portion of the Taj Mahal situated on the Development Site Parcel even if the Trustee acquires the Property as a result of a foreclosure. However, if a holder of a mortgage authorized by the Development Agreement (such as the Trustee) elects (whether before or after foreclosure) to complete construction, such holder may not undertake or continue the construction or completion of that portion of the Taj Mahal situated on the Development Site Parcel without expressly assuming, by written agreement satisfactory to the Housing Authority, to complete that portion of the Taj Mahal situated on the Development Site Parcel in the manner provided in the Development Agreement.

If, subsequent to a default by the Partnership under the Development Agreement as amended by the Assumption Agreement, the Trustee either elects not to assume the obligation of the Partnership to construct and complete that portion of the Taj Mahal situated on the Development Site Parcel, or elects to

assume such obligation but fails to timely complete such construction, then, in either of such events, under the provisions of the Development Agreement the Housing Authority may, upon 60 days notice to the Trustee, pay to the Trustee all principal, interest and other amounts due by the Partnership under the Mortgage and the Note, in which event the Trustee will assign the Mortgage to the Housing Authority, or, if the Trustee has acquired title to the Property as a result of a foreclosure, the Housing Authority may pay to the Trustee (a) all principal, interest and other amounts due by the Partnership under the Mortgage and the Note (less any rentals or other income received during foreclosure proceedings), (b) all expenses of the foreclosure, (c) the net expenses of the Trustee in subsequently managing the Property, (d) the costs of any construction performed by the Trustee, and (e) an amount equal to the interest that would have accrued on the aggregate of the amounts described in (a) through (d) had such amounts been debt secured by the Mortgage, and in such event the Trustee will convey all of the Property (including the portion not subject to the Development Agreement) to the Housing Authority.

## MANAGEMENT

**General**

The Agreement of Limited Partnership, dated June 20, 1988, as amended, between Donald J. Trump, as General Partner and the sole limited partner, and Trump Inc., as the corporate General Partner (the "Partnership Agreement"), provides that all decisions affecting the business and affairs of the Partnership, including the operation of the Taj Mahal, shall be decided by the General Partners acting by and through an executive committee (the "Executive Committee"), the members of which are designated by, and may be removed by, Donald J. Trump, who is the sole beneficial owner of 100% of the equity interest of the Partnership. As currently constituted, the Executive Committee consists of Donald J. Trump, Chairman, Robert S. Trump, Harvey I. Freeman and Stephen F. Hyde. None of the members of the Executive Committee plans to devote a majority of his working time to the operations of the Partnership. Accordingly, the Executive Committee will delegate responsibility for the day-to-day operation of the Taj Mahal to certain other persons.

The Partnership also will enter into the Management Agreement pursuant to which THC will manage and operate the Taj Mahal and perform certain construction supervisory services. See "Management Agreement." The Partnership will have an Audit Committee on which Mr. Freeman will serve with two unaffiliated persons who will be appointed thereto in accordance with the requirements of the Casino Control Commission. The Audit Committee will review certain matters of policy, purpose, responsibility and authority and will make recommendations with respect thereto on the basis of reports to it from the Partnership's Surveillance and Internal Audit Departments, both of which will be established prior to the Opening Date and will report directly to the Audit Committee. The Surveillance Department will be responsible for the surveillance, detection, and video-taping of unusual and illegal activities in the casino/hotel. The Internal Audit Department will be responsible for the review of, reporting instances of noncompliance with, and recommending procedures to eliminate weakness in, internal controls. The Executive Committee will review and satisfy itself as to the adequacy of the structure of the Partnership's financial organization and the proper implementation of the financial and accounting policies of the Partnership. The Executive Committee will review with the Partnership's outside auditors the scope of the audit prior to its commencement.

The Partnership is in the process of selecting individuals who will have significant management responsibility for the day-to-day business of the Partnership and the operations of the Taj Mahal. The Partnership anticipates that the Taj Mahal will have at least 5,500 employees, of which approximately 75 will be members of management. The Partnership also expects that its payroll costs for the management employees will be commensurate with the payroll costs of other casino/hotels in Atlantic City for similar positions. In addition, the Partnership anticipates that it may enter into employment agreements with certain of its key employees and that it will provide customary pension and other benefit plans for all of its employees. See "Business of the Partnership—Employees."

The sole director of the Company is Donald J. Trump. Donald J. Trump serves as Chairman of the Board, President and Treasurer, Robert S. Trump serves as Vice President and Secretary, and Stephen F. Hyde serves as Vice President, of the Company.

Donald J. Trump serves as Chairman of the Board, President and Treasurer, Robert S. Trump serves as Vice President and Secretary and Harvey I. Freeman and Stephen F. Hyde serve as Vice Presidents of Trump Inc.

**Management**

Biographies of each member of the Executive Committee, the executive officers and sole director and beneficial shareholder of Trump Inc. and the Company are set forth below:

| | Age | Positions |
|---|---|---|
| Donald J. Trump | 42 | Chairman of the Board of Directors of RII since July 1987; Chairman of the executive committees of the partnerships that own Trump Castle Hotel & Casino and Trump Plaza Hotel and Casino since June 1985 and May 1986, respectively; President of The Trump Organization, which is in the business, through its affiliates and subsidiaries, of acquiring, developing and managing real estate properties, for more than the past five years. Director of Alexander's Inc. since 1987. Mr. Trump is the brother of Robert S. Trump. |
| Robert S. Trump | 40 | Vice Chairman of the Board of Directors of RII since July 1987; member of the executive committees of the partnerships that own Trump Castle Hotel & Casino and Trump Plaza Hotel and Casino since June 1985 and May 1986, respectively; Executive Vice President of The Trump Organization for more than the past five years. Director of Alexander's Inc. since 1987. Mr. Trump is the brother of Donald J. Trump. |
| Harvey I. Freeman | 50 | Director of RII since July 1987; member of the executive committees of the partnerships that own Trump Castle Hotel & Casino and Trump Plaza Hotel and Casino since June 1985 and May 1986, respectively; Executive Vice President of, and counsel to, The Trump Organization for more than the past five years. Director of Alexander's Inc. since 1987. |
| Stephen F. Hyde | 42 | Chief Executive Officer and member of the executive committees of the Trump Casinos since June 1988; President of Trump Plaza Hotel and Casino from May 1986 to June 1988; Executive Vice President and Chief Operating Officer of the Golden Nugget Casino Hotel in Atlantic City from July 1984 to April 1986; President of Sands Hotel and Casino in Atlantic City from March 1981 to June 1984. |

**Transactions with Affiliates**

Although the Partnership has not fully considered all the areas in which it intends to engage in any transactions with the Partners and Affiliates of the Partners, including the use of certain of the Assigned Assets, it is free to do so on terms it believes to be the same as could be obtained in third party transactions. Payments to Affiliates in connection with any such transactions are governed by the provisions of the Indenture and the Mortgage, which generally provide that such transactions be as if on an arm's-length basis and on terms comparable to those generally available in equivalent transactions with third parties. See "Management Agreement" and "Description of the Bonds—Certain Covenants of the Company and the Partnership."

The Partnership will enter into certain transactions with its Affiliates with respect to the leasing of properties. See "Properties of the Partnership—Lease of Property."

The Partnership reserves the right to combine operations and enter into transactions with Affiliates, including the Trump Casinos, subject to the terms of the Indenture and the Mortgage and subject to the approval of the Casino Control Commission. The Mortgage permits the Partnership to share facilities, operations and employees with any other hotel owned by any Affiliate of the Partnership provided that (i) such sharing of facilities is permitted by all applicable legal requirements, (ii) the terms on which such facilities are shared do not have an adverse impact in any material respect on the operations of the Taj Mahal or the financial condition of the Partnership, and (iii) the regular operation of the Taj Mahal would not be materially impaired upon the separation of such facilities.

The Partnership will acquire the Taj Mahal and other related assets from Resorts pursuant to the Asset Purchase Agreement. Donald J. Trump, Robert S. Trump and Harvey I. Freeman are, and will be until the Acquisition Closing, directors of RII. See "The Acquisition—Background."

Donald J. Trump has agreed to loan the Partnership up to $25,000,000 upon the happening of certain events pursuant to the Trump Line of Credit. Donald J. Trump will also enter into the Trump Completion Guaranty in favor of the Company. See "Trump Completion Guaranty and Line of Credit."

## DESCRIPTION OF THE BONDS

The following is only a summary of the terms of the Bonds, does not purport to be a full description thereof, and is qualified in its entirety by reference to the Indenture and Mortgage, copies of which have been filed as Exhibits to the Registration Statement of which this Prospectus is a part. The terms of the Bonds generally and the series offered hereby, in particular, include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 as in effect on the date of the Indenture (the "Trust Indenture Act"). Unless otherwise specified, references to Articles and Sections are to Articles and Sections of the Indenture. The definition of certain terms used herein are set forth in "Certain Definitions" below in this section.

### General

The Bonds being offered hereby will be issued under the Indenture among the Company, as issuer, the Partnership, as guarantor, and the Trustee. The Indenture also authorizes the issuance of Bonds of additional series, all of which will be secured on a *pari passu* basis with the Bonds being offered hereby, under the circumstances described below. The Bonds being offered hereby will have a stated maturity of November 15, 1998. The Bonds will bear interest from their date of issue at the rate per annum specified on the cover page hereto, payable on May 15 and November 15 in each year, commencing May 15, 1989, to holders of record of such Bonds at the close of business on the first day of the calendar month of each such interest payment date. The Bonds offered hereby will be issued in denominations of $1,000 and integral multiples thereof. The Bonds will be secured obligations of the Company and payment will be guaranteed by the Partnership. See "Security" and "Guaranties" below in this section. The authorized principal amount of the Bonds being offered hereby is $675,000,000.

The principal of (and premium, if any) and interest on the Bonds are payable at the office of the Trustee in New York, New York or at an office or agency of the Company in the Borough of Manhattan, City and State of New York. At the option of the Company, interest will be paid by check mailed to each holder of Bonds at his registered address. The Bonds may be presented for registration of transfer and exchange at such office of the Trustee in New York, New York. (Section 3.07)

### Certain Definitions

The following are summaries and extracts of certain definitions in the Indenture or the Mortgage, modified for use in this Prospectus, which are referred to in this Description of the Bonds.

"Affiliate" of any specified person means any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person, and with respect to any specified natural person, any other person having a relationship with such specified person by blood, marriage or adoption not more remote than first cousin. For purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Amortization," for any period, means, as applied to any person, the amount of the amortization of goodwill and other intangible items (other than amortization of debt discount and capitalized financing fees) that is reflected on the financial statements of such person and its consolidated subsidiaries for such period in accordance with generally accepted accounting principles consistently applied.

"Appraised Value" means the value of the Taj Mahal and its ancillary facilities owned by or leased to the Partnership (including the furniture, fixtures and equipment therein) as determined by one MAI appraiser on the basis of an appraisal in conformity with the criteria set forth at §§ 12 C.F.R. 563.17-1a and 571.1b or such similar published policy or regulation as from time to time governs real estate loans by federally insured thrift institutions, *provided* that the value of the Taj Mahal and such ancillary facilities shall not include the value (a) of any furniture, fixtures and equipment therein to the extent of the Outstanding Amount of any Indebtedness secured by purchase money liens on such furniture, fixtures and equipment permitted under the Indenture, (b) of any portion of the real property or any structure located

thereon to the extent of the Outstanding Amount of any Indebtedness secured by mortgages on such property or structure, the liens of which are senior to the lien of the Mortgage and (c) the value of any leasehold interest (as lessee) of the Partnership if such leasehold interest is terminable other than by reason of the lessee's action or failure to act, prior to the stated maturity of the Bonds offered hereby. At any time that any construction with respect to the Taj Mahal or such ancillary facilities is in process, the "Appraised Value" will be the pro forma Appraised Value giving effect to completion of such construction to the extent permitted by such policy or regulation.

"Assignment Agreement" means the Assignment Agreement providing for the assignment of the Notes, the Mortgage and the Trump Completion Guaranty, as well as certain rights under the Trump Line of Credit, to the Trustee by the Company, and acknowledgment thereof by the Partnership.

"Available Cash Flow" means, for any period, the following for such period as determined in accordance with generally accepted accounting principles consistently applied (except to the extent such principles may require a reserve for expenditures listed in (c) hereof and except as provided in this definition): the Consolidated Net Income of the Partnership plus depreciation expense, Amortization, the amortization of debt discount and capitalized financing fees, the amount of discount charged on CRDA Bonds, any realization reserves on CRDA Bonds and the provision for uncollected casino receivables (net of write-offs) of the Partnership and its subsidiaries for such period on a consolidated basis, and, without duplication, less (a) the amount of accretion on CRDA Bonds and the amount deposited by the Partnership for the purchase of CRDA Bonds during such period, (b) any scheduled principal repayments by the Partnership and its subsidiaries of Debt of the Partnership and its subsidiaries in such period and (c) any expenditures by the Partnership and its subsidiaries during such period for capital improvements, additions or alterations to the Taj Mahal or ancillary facilities, including any facilities leased to the Partnership (including the amount of any interest capitalized by the Partnership and its consolidated subsidiaries for such period) (except to the extent (1) that any such expenditures are financed by Indebtedness incurred by the Partnership or any of its subsidiaries for that purpose, in which event the principal repayments of such Indebtedness during the period will be included in the amount referred to in clause (b) above, and (2) if the Partnership or any of its subsidiaries has disposed of any obsolete or excess equipment during such period, of the proceeds from such disposition up to the book value (as depreciated in accordance with generally accepted accounting principles consistently applied) of such equipment as recorded on the consolidated financial statements of the Partnership at the end of the fiscal quarter immediately prior to such disposition) or for furniture, fixtures and equipment for the Taj Mahal or its ancillary facilities (except to the extent (1) that any such expenditures are financed by Indebtedness incurred by the Partnership or any of its subsidiaries, which Indebtedness is capitalized on the consolidated financial statements of the Partnership, in which event the principal repayments of such Indebtedness during the period will be included in the amounts referred to in clause (b) above, and (2) if the Partnership or any of its subsidiaries has disposed of any furniture, fixtures or equipment during such period, of the proceeds, to the extent not included in subclause (c)(2) above, from such disposition up to the book value (as depreciated in accordance with generally accepted accounting principles consistently applied) of such furniture, fixtures or equipment as recorded on the consolidated financial statements of the Partnership at the end of the fiscal quarter immediately prior to such disposition). "Available Cash Flow," for any period, will be increased or decreased by the amount by which the account for deferred income taxes on the consolidated balance sheet of the Partnership has increased or decreased, as the case may be, from the first day of such period to the last day of such period. "Available Cash Flow", to the extent not already included in such Consolidated Net Income, also includes remaining proceeds of insurance or condemnation awards following a restoration in accordance with the Mortgage. "Available Cash Flow," for any period, shall be increased, to the extent not already included in such Consolidated Net Income, by any reimbursement from the lessor of any ancillary facility of the Taj Mahal leased to the Partnership pursuant to the Indenture for any expenditure made by the Partnership relating to such ancillary facility that had previously been deducted from Available Cash Flow pursuant to clause (b) or (c) above.

"Capitalized Lease Obligation" means, of any person, any lease of any property (whether real, personal or mixed) by such person as lessee which, in conformity with generally accepted accounting principles consistently applied, is accounted for as a capital lease on the balance sheet of such person.

"Consolidated Net Income," for any period, means, as applied to any person, the Net Income (or loss) of such person and its subsidiaries for such period determined on a consolidated basis in accordance with generally accepted accounting principles consistently applied excluding (i) the portion of consolidated net income allocable to minority interests in unconsolidated subsidiaries to the extent that cash dividends or distributions have not actually been received by such person and (ii) Net Income (or loss) of any entity combined with such person on a "pooling of interests" basis attributable to any period prior to the date of combination.

"Construction Fee" means (i) the $10,000,000 fee payable on or after the Opening Date by the Partnership for construction supervisory services relating to the construction of the Taj Mahal pursuant to the Management Agreement and (ii) the fee payable on or after substantial completion of any Future Project (as defined under "Management Agreement") by the Partnership pursuant to the Management Agreement for construction supervisory services relating to the construction of any such Future Project in an amount equal to 3% of the Construction Cost (as defined under "Management Agreement") of any such Future Project.

"Coverage Ratio," for any period, means, as applied to any person, the ratio of (i) Consolidated Net Income of such person and its consolidated subsidiaries plus depreciation expense, Amortization, Total Interest Expense and Income Tax Expense of such person and its consolidated subsidiaries to (ii) Total Interest Expense of such person and its consolidated subsidiaries plus the amount of any capitalized interest of such person and its consolidated subsidiaries as reflected on the consolidated financial statements of such person for such period.

"CRDA Bonds" mean those investments required by Section 144.1 of the Casino Control Act, including deposits for the purchase of bonds issued by the Casino Reinvestment Development Authority in lieu of the purchase of such bonds.

"Debt" means, as applied to any person, at any point in time, all Indebtedness created, assumed or guaranteed by such person, including, with respect to the Partnership, any Trump Indebtedness and Trump Borrowings.

"Financing Default" means any Event of Default under the Indenture or Mortgage, any default in any money payments under the Indenture, any default as a result of an admission in writing by Donald J. Trump (only during the term of the Trump Completion Guaranty or the Trump Line of Credit, whichever is longer), the Company, the Partnership or any of the Partnership's subsidiaries of its or his inability to pay its or his debts generally as they become due or certain involuntary events of bankruptcy, insolvency or reorganization relating to Donald J. Trump (only during the term of the Trump Completion Guaranty or the Trump Line of Credit, whichever is longer), the Company, the Partnership or any of the Partnership's subsidiaries, any event described in clauses (f), (g) and (j) under "Events of Default and Notice Thereof" below in this section involving any nonpayment of money (prior to the elapse of any time period), or any event described in clause (c) under "Events of Default and Notice Thereof" below in this section (but only after notice of such default has been given by the Trustee or the Holders as provided therein), a default in the performance, or breach, of any covenant of the Mortgage (other than a covenant, a default in the performance or breach of which is otherwise addressed in this definition) or the impairment of the security of the Mortgage because any representation or warranty of the Partnership in the Mortgage is incorrect (but only after the notice of each such default, breach or impairment has been given by the Trustee or the Holders as provided in the Mortgage) or any default described in clauses (a) and (d) under "The Mortgage—*Events of Default*" below in this section.

"Force Majeure Delay" means any delay due to weather, fire, strikes, acts of God, inability to obtain labor or materials, governmental restrictions, enemy action, civil commotion or unavoidable casualty, or other cause beyond the reasonable control of the party to whom such delay applies, provided, however, that any lack of funds shall not be deemed a cause beyond the reasonable control of such party, and provided further that inability to obtain labor and/or inability to obtain materials shall not be deemed a Force Majeure Delay if it would be reasonable under the circumstances (taking into account the

importance and necessity of completing the Taj Mahal and its ancillary facilities at the earliest possible date) to substitute for the labor or materials not yet obtained other labor or materials then obtainable.

"Income Tax Expense," for any period, means, as applied to any person, the provision for federal, state or local income taxes of such person and its consolidated subsidiaries as reflected on the consolidated financial statements for such person for such period prepared in accordance with generally accepted accounting principles consistently applied.

"Indebtedness" means, as applied to any person, any indebtedness, exclusive of deferred taxes, in respect of borrowed money (whether or not the recourse of the lender is to the whole of the assets of such person or only to a portion thereof), or evidenced by bonds, notes, debentures or similar instruments or letters of credit, or representing the balance deferred and unpaid of the purchase price of any property, if and to the extent such indebtedness would appear as a liability upon a balance sheet of such person prepared in accordance with generally accepted accounting principles consistently applied, and shall also include any Capitalized Lease Obligations of such person and, with respect to the Partnership, any Trump Indebtedness and Trump Borrowings.

"Management Expenses," for any period, means the amount of expenses under the Management Agreement to which THC is entitled to reimbursement during such period.

"Management Fee," for any period, means the amount of the fee payable by the Partnership under the Management Agreement for such period equal to 1¾% of the gross revenues (as defined in the Management Agreement) of the Partnership.

"Mortgage Debt" means, at any point in time, the Notes and any Additional Financing, any Unrestricted Financing or Trump Indebtedness to the extent secured by a lien on the Trust Estate, and any New Parking Financing.

"Net Income," for any period, means, as applied to any person, the net income (loss) of such person for such period, determined in accordance with generally accepted accounting principles consistently applied (except as provided in this definition), which shall reflect any intercompany charges of any Affiliate of such person properly allocable to such person under generally accepted accounting principles consistently applied, excluding from "Net Income," however, (i) any gain or loss, net of taxes, realized upon any sale, transfer or other disposition (including by way of merger or consolidation) by such person of any property or other assets of such person outside of the ordinary course of business (other than any sale or disposition of obsolete or excess equipment or furniture, fixtures or equipment) and (ii) any extraordinary gain or loss, net of taxes, in each case as determined in accordance with generally accepted accounting principles consistently applied. "Net Income," for any period, means, with respect to any property or asset, the historical net income (loss) of such property or asset during such period, adjusted to give effect for the effective tax rate of the Partnership for the applicable period, determined in accordance with generally accepted accounting principles consistently applied.

"Opening Date" means the first day on which substantially all of the Taj Mahal is open to the public for gaming business after all gaming permits required in connection with such opening have been obtained.

"Outstanding Amount" of any Indebtedness at any time means the principal amount outstanding of such Indebtedness at such time, unless such Indebtedness was issued at a discount, in which case the "Outstanding Amount" of such Indebtedness means the original issue price of such Indebtedness plus the accretion to such time of the original issue discount, determined in accordance with generally accepted accounting principles consistently applied.

"Permitted Encumbrances" means (i) liens for taxes, assessments or governmental charges which are not yet due and payable or if due and payable are not delinquent to the extent that any fine, penalty, interest or cost may be added for the nonpayment thereof, (ii) the lien created by the Mortgage and

related documents and any rights granted therein, (iii) purchase money liens upon any personal property purchased or leased by the Partnership, provided that the principal amount of the Indebtedness secured by such lien shall not exceed 80% of the cost to the Partnership of such property at the time of acquisition, (iv) liens on the Trust Estate or any portion thereof that are permissible under the Indenture as described in "Certain Covenants of the Company and the Partnership—*Limitation on Liens on the Trust Estate,*" "—*New Parking Financing*" and "—*Unrestricted Financing*" below in this section, (v) the lien of the Trustee under the Indenture, (vi) certain leases, easements and rights-of-way permitted by and made in accordance with the terms of the Mortgage and (vii) the exceptions that appear in the marked-up title binder delivered to the Trustee at the closing.

"Restricted Payment" means, as applied to any person, (i) any dividend or other distribution of assets, properties, cash, rights, obligations or securities paid, made, declared or authorized by such person on or in respect of any class of such person's capital stock or such person's partnership interest, as the case may be, (ii) any payment by or on behalf of such person or by any subsidiary of such person in connection with the redemption, purchase, retirement or other acquisition of any shares of such person's capital stock or such person's partnership interest, as the case may be, (iii) any advances or loans to, or guaranties of any Indebtedness of, any other person by such person, (iv) any capital contribution to, or other debt or equity investment in, an Affiliate (other than a wholly-owned subsidiary) and (v) with respect to the Partnership, any repayment of any Trump Indebtedness and any payment of interest on or principal of Trump Borrowings; *provided, however,* that "Restricted Payment" shall not include (a) guaranties by the Partnership of any Indebtedness of any of the Affiliates of the Partnership if the proceeds of such Indebtedness are borrowed by the Partnership in accordance with the terms of the Indenture, (b) in respect of the Company, the loans evidenced by the Notes, (c) any redemption of any class of capital stock or partnership interest of such person, if such person receives an opinion of counsel that failure to redeem such capital stock or partnership interest would subject such person or any of its subsidiaries to an adverse action or failure to act by a Gaming Authority and, in the opinion of the board of directors or general partner of such person, such adverse action or failure to act would be likely to have a material adverse effect with respect to such person or subsidiary, (d) loans to employees of such person actively involved in the operation of the Taj Mahal or the engagement of such person in credit transactions in the operation of the Taj Mahal, if such loans or credit transactions are in the ordinary course of business and (e) the Management Fee, Construction Fee and Management Expenses which are payable only to the extent set forth under "Payment of Management and Construction Fees" below. For purposes of this definition, "capital stock" and "partnership interest" shall include warrants, rights and options to acquire shares of capital stock or partnership interests, as the case may be, and "Gaming Authority" shall mean any governmental agency which regulates gaming in a jurisdiction in which the person or its subsidiary conducts gaming activities and which has jurisdiction over such person or subsidiary.

"Stated Rent" means, with respect to any property, an annual rent equal to the sum of (i) the amount of interest and principal payable during such year on any Indebtedness incurred (other than by the lessee) to effect the acquisition or improvement of, or construction on, such property, provided that in the case of any lease of property that consists of all or a portion of the Steel Pier, the Partnership will not be required to pay interest on or principal of, more than $50,000,000 of Indebtedness, (ii) an amount equal to the amount required to provide the lessor with a return on its equity in such property at a rate equal to the average annual interest cost payable by the lessor on the Indebtedness incurred to construct, acquire or improve such property, and (iii) all other amounts such as, for example, real estate taxes, insurance, cost of repairs or reconstruction, which are customarily paid by a lessee under a completely net lease. In the event that the lessor under such lease shall incur additional Indebtedness and/or invest additional equity during the term of such lease to effect the further improvement of, or additional construction on, such property, the annual rent payable thereunder shall be increased in accordance with the foregoing formula.

"Total Interest Expense," for any period, means, as applied to any person, the (i) consolidated interest expense as reflected on the consolidated financial statements of such person (without deduction of interest income) for such period, including, without limitation, the amortization of debt discounts and the interest portion of any deferred payment obligation, in each case calculated in accordance with the effective interest method of accounting, (ii) the interest component of rentals in respect of Capitalized Lease Obligations, paid, accrued and/or scheduled to be paid or accrued by such person and its

consolidated subsidiaries during such period and (iii) one-third of the Total Operating Lease Obligations paid, accrued and/or scheduled to be paid or accrued by such person and its consolidated subsidiaries during such period, determined on a consolidated basis in accordance with generally accepted accounting principles consistently applied. For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by the chief financial officer of such person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with generally accepted accounting principles consistently applied.

"Total Operating Lease Obligations," for any period, means, as applied to any person, the aggregate amount of fixed or percentage rent (including, if any, any payments to cover interest and principal on any Debt of the lessor and, in the case of leases with Affiliates, the return on equity included within the amount of Stated Rent but excluding taxes and insurance costs and all other items of additional rent) payable by such person and its consolidated subsidiaries under leases of land, buildings, other land improvements, furniture, fixtures, equipment and other property (including amounts estimated to be payable by reason of any contingent liability for the performance of obligations of others under such leases) during such period (other than Capitalized Lease Obligations), as determined in accordance with generally accepted accounting principles consistently applied.

"Trump Borrowings" means all amounts borrowed by the Partnership from Donald J. Trump under the Trump Line of Credit.

"Trump Indebtedness" means any sums advanced or paid by Donald J. Trump pursuant to the Trump Completion Guaranty as to which Donald J. Trump is entitled to reimbursement thereunder.

"Trust Estate" means the property which is covered or intended to be covered by the lien of the Mortgage as security for the Notes and pursuant to the Assignment Agreement, as collateral security for payment and performance under the Indenture and the Bonds.

"Working Capital" means, at any point in time, as applied to any person, the excess of (i) cash (including short-term money market securities) plus marketable securities, receivables, inventories and prepaid expenses (but shall not include any assets held for sale) of such person and its consolidated subsidiaries over (ii) accounts payable and accrued liabilities of such person and its consolidated subsidiaries, all as determined in accordance with generally accepted accounting principles consistently applied.

**Security**

The Bonds offered hereby will be secured by an assignment to the Trustee, for the benefit of the Bondholders, of the Note. (Section 6.01) The Note contains interest, principal, redemption, and default terms which are virtually identical to those of the Bonds offered hereby to which it relates. The Note will be secured by the Mortgage, which will be assigned to the Trustee and will encumber the Partnership's interest in the Taj Mahal, any New Parking Facility or certain other facilities owned by or leased to the Partnership, any additions and improvements constructed thereon and the interest of the Partnership in furniture, furnishings, fixtures, machinery and equipment at any time forming a part thereof, or used in connection therewith, and the other assets of the Partnership except as described below. Certain of the assets covered by the Mortgage have also been assigned to the Company pursuant to separate documents, which assignment documents also will be assigned to the Trustee as security for the Bonds. The Mortgage will represent a first lien and security interest on the Taj Mahal and such other assets (subject to certain Permitted Encumbrances). In addition, both the Partnership's rights against Donald J. Trump under the Trump Line of Credit (but not the right to any proceeds therefrom) and the Company's rights under the Trump Completion Guaranty will be assigned to the Trustee as further security for the Bonds. See "The Mortgage" below in this section.

Any additional series of Bonds will be secured by the assignment of additional Notes issued by the Partnership to the Company to evidence the borrowing by the Partnership of the proceeds of the sale of such additional series. Such additional Notes will also be secured by the Mortgage on a *pari passu* basis.

Cash and Permitted Investments held by the Partnership are not included within the Collateral. Accordingly, initially a substantial portion of the assets of the Partnership (approximately $460,000,000) will not be included within the Collateral. In addition, certain of the Partnership's intangible assets that may be significant to its operations, such as computer software licenses, are by their terms not assignable and, accordingly, are not included in the property subject to the Mortgage.

The Indenture contains certain covenants limiting the ability of the Partnership to incur Debt, including Mortgage Debt secured by liens on the Taj Mahal. However, the Indenture permits the incurrence of up to $35,000,000 of additional Debt by the Partnership in connection with the construction or acquisition of, or the making of capital improvements to, New Parking Facilities on property owned by or leased to the Partnership ("New Parking Financing") which may be secured by mortgages on such property which may be senior or junior to or on a parity with the lien of the Mortgage. In addition, subject to certain limitations, the Indenture permits the creation of additional mortgages on the Taj Mahal, the liens of which may be equal in priority or junior to the lien of the Mortgage. See "Certain Covenants of the Company and the Partnership" below in this section and "Properties of the Partnership—Future Mortgages." The lien and security interest of the Mortgage may be subordinated to security interests in furniture, fixtures and equipment acquired by the Partnership that may be granted in connection with the acquisition of such assets, provided that the Indebtedness (other than existing Indebtedness) does not exceed 80% of the cost of such furniture, fixtures and equipment, and certain of the Partnership's tangible personal property may be leased rather than owned. If any such security interest prohibits subordinate liens, or any such lease, in accordance with customary practices, prohibits assignments, the property in question will not be included in the property subject to the Mortgage.

If there is an Event of Default under the Indenture, the Notes or the Mortgage, the Trustee may exercise its right to foreclose on the Trust Estate and force its sale, and the holders of Bonds will only be entitled to receive those proceeds from such sale in excess of the amounts due and owing (a) any holder of a lien on any portion of the Trust Estate securing Indebtedness which is senior to the lien of the Mortgage and (b) the Trustee for its services pursuant to the terms of the Indenture. All holders of liens in parity with the lien of the Mortgage will have a right to share such proceeds ratably with the Bondholders. The Trustee also has the right to take possession of, construct and operate the Taj Mahal and to call upon Donald J. Trump under the Trump Completion Guaranty and the Trump Line of Credit. See "Trump Completion Guaranty and Line of Credit." If the Trustee takes possession of or otherwise acquires the Taj Mahal, an entity licensed under the Casino Control Act would be required to be retained in order to operate the Taj Mahal. Because potential bidders must satisfy licensing requirements, the number of potential bidders in a foreclosure sale will be less than in foreclosure of other types of facilities and such requirements may delay the sale of, and may adversely affect the sales price for, the Taj Mahal. See "Business of the Partnership—Gaming Regulations" and "Special Considerations—Security for the Bonds."

### Guaranties

The obligations of the Company to pay the principal of, premium, if any, and interest on the Bonds are guaranteed by the Partnership. (Article 14)

To the extent set forth in the Trump Completion Guaranty, Donald J. Trump will guarantee the completion of the construction of the Taj Mahal by March 1, 1991, subject to extension by reason of Force Majeure Delays. See "Trump Completion Guaranty and Line of Credit—Trump Completion Guaranty" for a further description of the Trump Completion Guaranty.

### Non-recourse

The Indenture provides that, notwithstanding anything contained in the Indenture (including the Guaranty) or in any other agreement, document, certificate, instrument, statement or omission referred to

below to the contrary, the Partnership and the Company are liable thereunder only to the extent of the assets of the Partnership (other than cash permitted to be distributed pursuant to Section 12.07 of the Indenture, regardless of whether such cash has been distributed) and the interest of the Company in the Notes and the Mortgage (and certain related documents) and no other person or entity, including, but not limited to, any partner, officer, committee or committee member of the Partnership or any partner therein or of any partnership Affiliate (as defined in Rule 405 under the 1933 Act) of the Partnership, or any incorporator, officer, director or shareholder of the Company, or any corporate partner of the Partnership or any corporate Affiliate of the Partnership, or any Affiliate or controlling person or entity of any of the foregoing, or any agent, employee or lender of any of the foregoing, or any successor, personal representative, heir or assign of any of the foregoing, in each case past, present, or as they may exist in the future, shall be liable in any respect (including without limitation the breach of any representation, warranty, covenant, agreement, condition or indemnification or contribution undertaking contained therein) under, in connection with, arising out of, or relating to the Indenture or any other agreement, document, certificate, instrument or statement (oral or written) related to, executed or to be executed, delivered or to be delivered, or made or to be made, or any omission made or to be made, in connection with any of the foregoing or any of the transactions contemplated in any such agreement, document, certificate, instrument or statement; *provided, however,* that this provision does not release Donald J. Trump from his obligations under the Trump Completion Guaranty and the Trump Line of Credit. The Indenture further provides that notwithstanding the foregoing, the Bondholders preserve any personal claims they may have for fraud, liabilities under the 1933 Act, and other liabilities that cannot be waived under applicable federal and state laws in connection with the purchase of the Bonds; provided, however, that such conduct shall not constitute an Event of Default under the Indenture, the Mortgage, or the Notes or any document executed in conjunction therewith or otherwise related thereto. (Section 3.12)

**Optional Redemption**

The Bonds offered hereby are redeemable at the option of the Company, in whole or from time to time in part, at any time on or after November 15, 1993, on not less than 30 days' nor more than 60 days' notice, mailed by first-class mail, postage prepaid, to each holder of Bonds offered hereby to be redeemed at his registered address. (Section 13.04) The Bonds offered hereby are redeemable at the redemption prices (expressed in percentages of the principal amount) set forth below during the 12-month period beginning November 15,

| Year | Percentage | Year | Percentage |
|---|---|---|---|
| 1993 | 106.22% | 1996 | 101.56% |
| 1994 | 104.67 | 1997 | 100.00 |
| 1995 | 103.11 | | |

together, in each case, with interest, if any, accrued to the redemption date. (Section 4.03)

The Indenture provides that in the event of the redemption of less than all the outstanding Bonds of any series, the particular Bonds to be redeemed will be selected by the Trustee by lot. As long as there are other outstanding Bonds, Bonds held by the Company, the Partnership or any Affiliate of the Partnership (including Donald J. Trump) shall not be selected for redemption by the Trustee. (Section 13.03) On and after the redemption date, interest ceases to accrue on Bonds or portions of Bonds called for redemption. (Section 13.06)

Pursuant to the New Jersey gaming laws, the Company may redeem Bonds held by persons that are found not to be qualified to hold such securities. (Section 13.08) See "Gaming Laws" below in this section and "Business of the Partnership—Gaming Regulations."

The Company may also redeem the Bonds offered hereby at the principal amount thereof, without premium, plus accrued interest, at any time as a result of a casualty or taking as set forth in the Mortgage. (Section 4.03)

**Certain Covenants of the Company and the Partnership**

*Limitations on Debt.*

The Indenture prohibits the Partnership and its subsidiaries from incurring or otherwise in any manner becoming liable with respect to any Debt, unless (a) at the point in time of the incurrence of and after giving effect to such Debt, the aggregate Outstanding Amount of Debt of the Partnership and its subsidiaries on a consolidated basis does not exceed 80% of the Appraised Value (which Appraised Value will be increased by the purchase price, net of all Partnership expenses relating to such purchase including legal, title, accounting and recording tax expenses and commissions, of any property to be acquired with the proceeds of such Debt), and (b) the Coverage Ratio of the Partnership, calculated for the four prior fiscal quarters ending with the date of the latest available quarterly statement of the Partnership at the time of the incurrence of such Debt, adjusted to give retroactive effect to the incurrence of such Debt (and, if any of the proceeds of such Debt are being utilized for the acquisition of any property or asset, adjusted to give retroactive effect to the Net Income, if any, of such property or asset for such prior fiscal quarters) as of the beginning of such four prior fiscal quarters, is not less than 1.2, except that the Partnership and its subsidiaries may, without satisfying the foregoing test, incur (i) $35,000,000 in aggregate amount of New Parking Financing, (ii) $50,000,000 of Unrestricted Financing (as described below), (iii) the Notes, (iv) any Trump Indebtedness and Trump Borrowings and (v) Debt secured by purchase money liens upon personal property as otherwise permitted by the Indenture.

Subject to certain restrictions, the Partnership and its subsidiaries may, without meeting the above tests, extend, renew, or refinance any Debt of the Partnership and its subsidiaries (other than Trump Indebtedness and Trump Borrowings which may be repaid only in accordance with the terms of the Indenture) so long as the aggregate amount of Debt of the Partnership and its subsidiaries is not increased thereby.

The Partnership must provide the Trustee with an officers' certificate prior to the incurrence of any Debt which certifies, among other things, that the Partnership has complied with the requirements mentioned above for the incurrence of Debt and that no Financing Default has occurred and is continuing. If such additional Debt constitutes Mortgage Debt, prior to incurring such Debt certain other requirements must be met by the Partnership. See "*Limitations on Liens on the Trust Estate*" below in this section. (Section 12.04)

Any Trump Indebtedness and Trump Borrowings will rank subordinate to the prior payment in full of all obligations of the Partnership then due and owing on the Notes, the Mortgage and the Bonds (collectively, the "Senior Indebtedness"). Accordingly, under the Indenture, upon (i) any distribution of assets of the Partnership upon any dissolution, winding up, liquidation or reorganization of the Partnership, whether in bankruptcy, insolvency, reorganization or receivership proceedings or upon an assignment for the benefit of creditors or any other marshalling of the assets and liabilities of the Partnership or otherwise or (ii) any acceleration of the maturity of the Senior Indebtedness by lapse of time, acceleration or otherwise, the holders of the Senior Indebtedness will be entitled to receive payment in full before Donald J. Trump will be entitled to receive any payment on the Trump Indebtedness and Trump Borrowings. If in any of the situations referred to in clauses (i) or (ii) above, a payment is made to Donald J. Trump before the obligations under the Senior Indebtedness have been paid in full, the payment to Donald J. Trump must be held in trust for the benefit of, and shall be paid over to the holders of, Senior Indebtedness.

In addition, the Partnership may repay the Trump Indebtedness and Trump Borrowings only in the manner and to the extent provided in "*Limitations on Distributions and other Payments*" in this section.

*Limitations on Liens on the Trust Estate.*

*General Requirements.* The Indenture prohibits the Company, the Partnership and the Partnership's subsidiaries from creating, incurring, suffering or permitting to be created or incurred or to exist any lien, mortgage, charge or encumbrance on or pledge of the Mortgage, the Notes or any of the Trust Estate,

other than (a) the lien created by the Mortgage, the Assignment Agreement and related documents, (b) notices of intention filed by mechanics, materialmen or laborers under the New Jersey mechanic's lien law, and (c) the Permitted Encumbrances on the Trust Estate which term includes (i) liens for additional Mortgage Debt as set forth below and under *"Unrestricted Financing"* and *"New Parking Financing"* and (ii) liens for Trump Indebtedness, provided that such liens for Trump Indebtedness are junior to the lien of the Mortgage and provided that the holders of such Trump Indebtedness liens agree that such liens cannot be foreclosed except upon foreclosure by the Trustee of the Mortgage.

The Partnership and its subsidiaries may issue Debt secured by additional liens on the Trust Estate that are junior to or on a parity with the lien of the Mortgage ("Additional Financing") if (i) the requirements for issuance of Debt are satisfied (see *"Limitations on Debt"* above in this section), (ii) the aggregate Outstanding Amount of Mortgage Debt (including all outstanding Notes and giving effect to such additional Mortgage Debt) does not exceed 66⅔% of the Appraised Value (which Appraised Value will give effect to the completion of any construction for which the proceeds of such Mortgage Debt are to be utilized and will be increased by the purchase price, net of all Partnership expenses relating to such purchase, including legal, title, accounting and recording tax expenses and commissions, of any property to be acquired with the proceeds of such Mortgage Debt) (80% of such Appraised Value if the lien of such additional Mortgage Debt is junior to that of the Mortgage) and (iii) the Coverage Ratio of the Partnership, calculated for the prior four fiscal quarters ending with the date of the latest available quarterly statement of the Partnership at the time of the incurrence of such Mortgage Debt, adjusted to give retroactive effect to the incurrence of such Mortgage Debt (and, if any of the proceeds of such Mortgage Debt are being utilized for the acquisition of any property or asset, adjusted to give retroactive effect to the Net Income, if any, of any such property or asset for such prior four fiscal quarters) as of the beginning of such prior four fiscal quarters, is not less than 1.5.

Prior to the issuance of Additional Financing, the Indenture requires, among other things, that: (i) such Additional Financing, the instruments creating such additional liens and the holders thereof must be approved to the extent necessary by the Casino Control Commission; (ii) the instruments creating such additional liens must contain a provision limiting the rights of the holders thereof to take possession of, operate, or manage all or any portion of the Taj Mahal unless such holder or its designee or agent has all necessary legal qualifications, including all licenses, to do so and is otherwise experienced in the operation of casino/hotels; (iii) no Financing Default has occurred and is continuing; and (iv) certain documentation required by the terms of the Indenture has been obtained. The proceeds of such Additional Financing may be utilized by the Partnership and its subsidiaries (A) to finance structural expansion, additions or capital improvements to the Taj Mahal and its ancillary facilities, (B) to refinance Indebtedness incurred to complete such expansions, additions or improvements described in clause (A) above, or (C) for any other purpose. (Section 12.05)

*Construction Financing.* If the proceeds of the Additional Financing are to be utilized to finance structural expansion, additions or capital improvements to the Taj Mahal and/or its ancillary facilities (including any leasehold interest), prior to issuing such Additional Financing, the Partnership, in addition to meeting the general requirements set forth above, must deliver evidence to the Trustee:

(1) that all gaming permits required in connection with the operation of the Taj Mahal casino and all permits required to commence such construction and to issue such Additional Financing have been obtained and are in full force;

(2) that the additional incurrence of Debt will raise sufficient funds together with other funds available to the Partnership to complete the proposed construction work;

(3) that the Outstanding Amount of the Additional Financing issued will not exceed the anticipated total project cost (including certain costs such as fees, interest and title expenses) of such expansion, additions or improvements;

(4) that the holder(s) of such Additional Financing, or the lead lender(s) under participation agreements with respect to such Additional Financing are institutional lenders experienced in real

estate lending or acquisitions and have gross assets of at least $500,000,000 as determined by its most recent audited financial statement, unless Donald J. Trump is the holder or lender and the lien is junior to that of the Mortgage;

(5) that the Partnership has obtained a commitment for permanent mortgage financing (in accordance with the terms of the Indenture), a letter of credit, or other financing sufficient for, and for the purpose of, the full repayment of such Additional Financing upon the completion of the construction; and

(6) that such Additional Financing is secured by a lien on all, and not less than all, of the Trust Estate and on no other property other than the Trust Estate.

The Partnership need not meet the tests for Appraised Value or Coverage Ratio described above for the incurrence of Debt to finance structural expansion, additions or capital improvements if the Partnership obtains an irrevocable commitment from Donald J. Trump or a nationally recognized financial institution having a combined capital and surplus of at least $100,000,000 as determined by its most recent audited financial statements and whose debt is rated "A" (or such similar equivalent rating) or higher by Moody's Investors Service, Inc. or Standard & Poor's Corporation, to supply, upon an acceleration of the Bonds, funds to the Partnership as additional capital in an amount sufficient to cause such Appraised Value and Coverage Ratio tests to be satisfied, such commitment to be released (even if such construction financing has been refinanced) only if both such tests are met at any time following substantial completion of such expansion, additions or improvements.

*Refinancing of Indebtedness for Construction.* If the proceeds of the Additional Financing are to be utilized to refinance Debt incurred to complete any expansion, additions or improvements to the Taj Mahal and its ancillary facilities (including any leasehold improvements), prior to issuing such Additional Financing, the Partnership, in addition to meeting the general requirements set forth above, must deliver evidence to the Trustee:

(1) that all gaming permits required in connection with the operation of the Taj Mahal casino and all permits required with respect to the expansion, additions or improvements and the issuance of such Additional Financing have been obtained and are in full force and effect;

(2) that such Additional Financing is issued only after the substantial completion of the expansion, additions, or improvements;

(3) that the holder(s) of such Additional Financing, or the lead lender(s) under participation agreements with respect to such Additional Financing are institutional lenders experienced in real estate lending or acquisitions and have gross assets of at least $500,000,000 as determined by its most recent audited financial statements, unless the lien is junior to that of the Mortgage;

(4) that the Outstanding Amount of Additional Financing issued does not exceed the total project cost (including certain costs such as fees, interest and title expenses) of the expansion, additions or improvements; and

(5) that the average life (calculated in accordance with accepted financial practice) of such Additional Financing is not less than the average remaining life of the Bonds being offered hereby.

The tests for Appraised Value or Coverage Ratio described above are not required to be satisfied if (a) the Additional Financing is being used to refinance earlier Additional Financing undertaken to finance such expansion, additions or improvements (except if the lien of such construction financing is junior to the lien of the Mortgage, then only if the lien of such new Additional Financing Lien will be junior to the lien of the Mortgage) or (b) the Partnership prior to commencing such expansion, addition or improvement, provided the Trustee with a certificate showing compliance of the incurrence of such financing by the Partnership and its subsidiaries with the Appraised Value and the Coverage Ratio tests required to be satisfied to incur Additional Financing which is *pari passu* with the lien of the Mortgage.

*Financing for Working Capital.* If the proceeds of the Additional Financing are to be utilized for any purpose other than any expansion, additions or improvements to the Taj Mahal and its ancillary facilities (including any leasehold improvements), prior to issuing such Additional Financing, the Partnership, in addition to meeting the general requirements set forth above, must deliver evidence to the Trustee:

(1) that the holder(s) of such Additional Financing, or the lead lender(s) under participation agreements with respect to such Additional Financing must be institutional lenders experienced in real estate lending or acquisitions and having gross assets of at least $500,000,000 as determined by its most recent audited financial statements, unless the lien is junior to that of the Mortgage;

(2) that all gaming permits required in connection with the operation of the Taj Mahal casino and all permits required with respect to the issuance of such Additional Financing have been obtained and are in full force and effect; and

(3) that, except if the lien of such Additional Financing will be junior to that of the Mortgage, the average life (calculated in accordance with accepted financial practice) of such Additional Financing is not less than the average remaining life of the Bonds being offered hereby.

The Partnership may refinance existing Additional Financing if the average life of such new Additional Financing is not less than the shorter of the average life remaining of such earlier Additional Financing and the average remaining life of the Bonds offered hereby without satisfying the Coverage Ratio and Appraised Value tests set forth above for the issuance of Additional Financing. The Partnership may also incur additional Mortgage Debt through the issuance of additional series of Bonds under the Indenture. See "Additional Series of Bonds." The instruments entered into by the Partnership with respect to additional Mortgage Debt are required to contain certain provisions intended to protect the interest of the Trustee in the Trust Estate.

Reference is made to Section 12.05 of the Indenture for a complete description of this requirement and the other limitations on the incurrence of additional liens by the Partnership.

*New Parking Financing.*

New Parking Financing may be incurred up to a maximum amount equal to the lesser of (i) $35,000,000 and (ii) the amount of costs incurred in connection with the construction, acquisition or capital improvement of the facilities on the New Parking Facilities. The New Parking Financing must be non-recourse to the Partnership, its subsidiaries and/or any assets of the Partnership and its subsidiaries (other than any New Parking Facilities). The Partnership and its subsidiaries may also refinance the Outstanding Amount of earlier New Parking Financing provided that the aggregate Outstanding Amount of New Parking Financing giving effect thereto will not exceed the amount of New Parking Financing permitted above. If the total outstanding Mortgage Debt secured by liens on the New Parking Facilities is at any time less than the maximum amount of additional Mortgage Debt secured by liens on such New Parking Facilities which had been outstanding at any time prior thereto, the Partnership may incur additional Mortgage Debt secured by liens on such New Parking Facilities up to such maximum amount without limitation as to the use of the proceeds of such borrowing. Accordingly, the Partnership may be able to maintain up to $35,000,000 of such New Parking Financing at all times, even following payment of all or part of the principal amount of any Mortgage Debt incurred in connection with the construction, acquisition or capital improvement of such New Parking Facilities. Any New Parking Financing described in this paragraph may be superior to the Mortgage but only with respect to any New Parking Facility. Prior to issuing such New Parking Financing, the Partnership must meet other requirements similar to those required to issue Additional Financing, except that the Partnership need not meet the tests relating to Appraised Value and Coverage Ratio and there is no restriction on the average life of such New Parking Financing. See "*Limitations on Liens on the Trust Estate*" above in this section. (Section 12.05(c))

*Unrestricted Financing.*

The Partnership and its subsidiaries may incur up to an aggregate of $50,000,000 of additional Debt, which Debt may be secured by a lien that is junior to the lien of the Mortgage or may be unsecured

("Unrestricted Financing"). Conditions similar to those required to be met prior to the incurrence of Additional Financing need to be met prior to the incurrence of any Unrestricted Financing except the Appraised Value and Coverage Ratio tests, and, in addition, there are no restrictions on the average life of such Unrestricted Financing. See "*Limitations on Liens on the Trust Estate*" above in this section. The proceeds from the issuance of any Unrestricted Financing may be utilized for any purpose other than Restricted Payments. (Section 12.18)

*Limitations on Leasing.*

The Partnership may not, and may not permit its subsidiaries to, enter into any lease of (a) land, buildings or other land improvements, (b) planes, helicopters or vessels or (c) other property (personal or otherwise) other than any such lease of a nature entered into in the ordinary course of business by a United States casino/hotel, as lessee, unless no Financing Default has occurred and is continuing and the Coverage Ratio of the Partnership, calculated for the prior four fiscal quarters ending with the date of the latest available quarterly statement of the Partnership at the time of entering into such lease, adjusted to give retroactive effect to such lease (including the Net Income, if any, of any such land, buildings or improvements or other property for such prior four fiscal quarters) as of the beginning of such prior four fiscal quarters, is not less than 1.2. Notwithstanding the preceding sentence, the Partnership may enter into any lease providing for the leasing to the Partnership of (a) on or after the Opening Date the facility known as the "Steel Pier" and/or any restaurant constructed thereon and (b) on or after the Opening Date any parking area or facility primarily utilized or to be utilized by patrons of the Taj Mahal and any casino/hotels adjacent to the Taj Mahal and (c) at any time after the date of the Indenture, the 210 foot strip, the 3.7 Acre Parcel and a specified warehouse located in Atlantic City. In giving retroactive effect to such lease as of the beginning of such prior four fiscal quarters, it will be assumed that the rent for such prior four fiscal quarters was the greater of the average annual rent over the term of such lease and the rent payable for the first four fiscal quarters. (Section 12.21)

*Limitations on Investments.*

Until the Opening Date, the Partnership will not, and will cause its subsidiaries not to, directly or indirectly, own, purchase or otherwise acquire any capital stock or other securities of any other person or make any investments except for the following (each of the following being a "Permitted Investment"): (i) readily marketable securities issued by states or municipalities within the United States of America or agencies or subdivisions thereof rated "A" (or such similar equivalent rating) or better by Moody's Investors Services, Inc. and by Standard & Poor's Corporation and maturing in less than one year from the date of purchase; (ii) direct obligations of, or obligations unconditionally guaranteed by, the United States of America or any agency thereof maturing in less than one year from the date of purchase; (iii) commercial paper issued by any person organized and doing business under the laws of the United States of America or any state thereof rated in the highest or next highest category by Moody's Investors Services, Inc. and by Standard & Poor's Corporation and maturing in less than one year from the date of purchase; (iv) corporate bonds or debentures, rated "A" (or such similar equivalent rating) or better by Moody's Investors Services, Inc. and by Standard & Poor's Corporation and maturing in less than one year from the date of purchase; or (v) certificates of deposit which mature in less than one year from the date of purchase and are issued by any commercial bank organized and doing business under the laws of the United States of America or any state thereof which has a combined capital and surplus of at least $100,000,000 and whose debt is rated "A" (or such similar equivalent rating) or higher by Moody's Investors Services, Inc. and by Standard & Poor's Corporation.

Notwithstanding the foregoing, the Partnership may not, and will cause its subsidiaries not to, directly or indirectly, take or suffer to be taken any action or make any investment which will, as a result thereof, cause the Partnership or such subsidiary, as the case may be, to be an "investment company" as such term is defined in the Investment Company Act of 1940, as amended, or any rule or regulation promulgated thereunder or any statute, rule or regulation enacted hereafter substantially to the same effect as such Act, rule or regulation. (Section 12.16)

*Limitations on Activities.*

The Indenture limits the ability of the Partnership and its subsidiaries to engage in any business or investment activities other than those necessary or appropriate for, incident to, in connection with or arising out of, developing, constructing, financing, owning and operating the Taj Mahal. Other than loans to employees, credit transactions in the ordinary course of business of operating a casino/hotel and as otherwise stated herein, the Partnership and its subsidiaries are also restricted from making loans to any of its Affiliates or any other person except for loans permitted as described under "Limitations on Distributions and other Payments" provided that such loans are, in the opinion of the Partnership and in the written opinion of a nationally recognized investment banking firm selected by the Partnership, fair to the Partnership from a financial point of view. (Section 12.06)

The Company will not conduct any business (including having any subsidiary) and will not incur any additional Indebtedness except pursuant to the Indenture, whatsoever, other than to collect the amounts due and owing under the Notes, to preserve its rights under the Notes, the Mortgage, the Trump Line of Credit and the Trump Completion Guaranty, to do or cause to be done all things necessary or appropriate to protect the Trust Estate and to preserve its rights therein, and otherwise to comply with its obligations under the Indenture and the Bonds.

The Company, the Partnership and the Partnership's subsidiaries are prohibited from entering into any management agreement relating to the Taj Mahal other than the Management Agreement and from amending in any way the Management Agreement which increases the amount of fees payable thereunder, reduces the obligations of THC thereunder or otherwise adversely affects the interests of the Holders of the Bonds. (Section 12.06)

*Limitations on Distributions and other Payments.*

The Partnership will not, and will cause its subsidiaries not to, directly or indirectly, make any Restricted Payment, except (i) with respect to the Available Cash Flow for the first four full fiscal quarters subsequent to the fiscal quarter in which the Opening Date occurs, the Partnership may make one Restricted Payment after (and not on or prior to) such four full fiscal quarters of (a) 100% of such Available Cash Flow if the Coverage Ratio of the Partnership for such four full fiscal quarters is greater than or equal to 1.5 or (b) 50% of such Available Cash Flow if the Coverage Ratio of the Partnership for such four fiscal quarters is not less than 1.0 but is less than 1.5 or (c) 0% of such Available Cash Flow in all other instances, and (ii) with respect to the Available Cash Flow for each succeeding fiscal quarter after such first four full fiscal quarters, the Partnership may make one Restricted Payment after each such succeeding fiscal quarter of (A) 100% of all Available Cash Flow for such fiscal quarter if the Coverage Ratio of the Partnership for the four prior fiscal quarters (including such fiscal quarter) is greater than or equal to 1.5, (B) 50% of such Available Cash Flow for such fiscal quarter if the Coverage Ratio of the Partnership for the four prior fiscal quarters (including such fiscal quarter) is not less than 1.0 but is less than or equal to 1.5, or (C) 0% of such Available Cash Flow in all other instances.

However, if the Partnership incurs indebtedness to Donald J. Trump under the Trump Line of Credit or Donald J. Trump advances up to $25,000,000 to the Partnership, in discharge of an obligation arising as a result of certain bankruptcy events related to the Partnership, pursuant to paragraph (f) under "Trump Completion Guaranty and Line of Credit—Trump Completion Guaranty—*Guaranty*," the Partnership may also make a Restricted Payment, in addition to any Restricted Payment made in any fiscal quarter as set forth under clause (i)(b) or (ii)(B) above, in the amount of up to 50% of Available Cash Flow for such four prior fiscal quarters (1) to first pay interest due and payable on any Trump Borrowings or a return on such advances pursuant to the Trump Completion Guaranty (not to exceed a rate equal to Bankers Trust Company's prime rate on such advances per annum) and a return of such advances (not to exceed $25,000,000), if the Coverage Ratio of the Partnership for the four prior fiscal quarters is greater than or equal to 1.0 but less than 1.5 or (2) to the extent such Available Cash Flow is not fully utilized in clause (1), to repay principal on any Trump Borrowings if such Coverage Ratio is greater than or equal to 1.2 but less than 1.5.

The Partnership may also make one Restricted Payment in each fiscal quarter after the Opening Date equal to the excess of (1) all Available Cash Flow from the Opening Date to the end of the most recently completed fiscal quarter (treated as one accounting period) minus the amount of all Restricted Payments of Available Cash Flow previously made by the Partnership over (2) $67,500,000, provided that (aa) the Coverage Ratio of the Partnership for the most recently completed four fiscal quarters is not less than 1.5, (bb) the Partnership will have Working Capital immediately after the Restricted Payment of at least $67,500,000, and (cc) the Partnership will have cash (and short-term marketable securities) immediately after the Restricted Payment of at least $67,500,000.

As a condition to receiving any Restricted Payment of Available Cash Flow from the Partnership, any person who receives such Restricted Payment shall agree in writing that if at the end of any fiscal year of the Partnership the Coverage Ratio is less than 1.0 for such fiscal year, such person shall return to the Partnership all Restricted Payments made by the Partnership to such person during such fiscal year.

All Restricted Payments are governed by the above limitations. All Restricted Payments shall first be applied to any outstanding Trump Indebtedness or interest on or principal of Trump Borrowings or the return of any advances made pursuant to the Trump Completion Guaranty. Notwithstanding the foregoing, the Partnership may not make any Restricted Payments at any time that any Financing Default has occurred and is continuing.

The Company may not make any Restricted Payment at any time. (Section 12.07)

**Lease of Properties**

Subject to the limitations described in "*Limitations on Leasing*" above in this section, at the option of Donald J. Trump or an Affiliate of the Partnership or Donald J. Trump, the Partnership may lease at not more than the Stated Rent from Donald J. Trump or such Affiliate, subject to certain other terms, any real property and improvements which are expected by Donald J. Trump or such Affiliate to be utilized primarily either by patrons of the Taj Mahal and any casino/hotels adjacent to the Taj Mahal or otherwise in connection with the operation of the Taj Mahal. However, the Affiliate of Donald J. Trump that will own the Steel Pier will lease to the Partnership the restaurant to be constructed on the Steel Pier with the proceeds of the Bonds offered hereby. The Affiliate of Donald J. Trump that will own the 3.7 Acre Parcel and the 210 foot strip to be improved with the proceeds of the Bonds offered hereby for use as parking facilities for the Taj Mahal will also lease such parcels to the Partnership. The lease of the restaurant will have an annual rent of $1 plus all other amounts such as real estate taxes, insurance, cost of repairs or reconstruction, which are customarily paid by a lessee under a completely net lease. The lease of the 3.7 Acre Parcel and 210 foot strip will have an annual rent equal to the Stated Rent. All of such leases will have a term not less than one year after the latest stated maturity of the Bonds offered hereby (subject to the next sentence). Upon the sale of any such leased property by Donald J. Trump or such Affiliate, as the case may be, the lease of such property (other than the restaurant on the Steel Pier if the Partnership expends prior to the Opening Date in excess of $10,000,000 for the cost of its construction and other than the 3.7 Acre Parcel and the 210 foot strip if the Partnership expends prior to the Opening Date in excess of $10,000,000 in the aggregate for improvements thereon) may be terminable by the purchaser thereof, Donald J. Trump or such Affiliate or the Partnership, provided that prior to such termination Donald J. Trump or such Affiliate pays to the Partnership the aggregate amount of any expenditures incurred by the Partnership for capital improvements to such property (net of amortization and/or depreciation on such capital expenditures to the date of such sale as determined by generally accepted accounting principles consistently applied). Neither Donald J. Trump nor such Affiliate intends to sell any such leased property or, consequently, to terminate any such leases. (Section 12.17)

**Limitations on Consolidation, Merger, and Conveyance and Transfer of Property and Assets**

Except as provided below, the Company may not consolidate, combine or merge with or into any other person or permit any other person to consolidate, combine or merge with or into the Company; the Company with respect to its assets may not convey or transfer its interest in such assets substantially as an entirety to any other person (other than to the Trustee) or permit any other person to convey or transfer all or substantially all of its assets, subject to liabilities other than de minimis liabilities, to the Company; and

the Company may not permit any of its shareholders to transfer, convey, sell or otherwise dispose of to any other person any shares of capital stock of the Company; and the Company may not issue any capital stock to any person or grant any option to any person to acquire capital stock of the Company.

Except as provided below, the Partnership may not consolidate, combine or merge with or into any other person or permit any other person to consolidate, combine or merge with or into the Partnership; the Partnership with respect to the Trust Estate may not convey or transfer its interest in the Trust Estate substantially as an entirety to any other person or permit any other person to convey or transfer all or substantially all of its assets which are subject to liabilities (unless such liabilities are (i) de minimis liabilities or (ii) liabilities, the obligor of which has recourse only to such assets) to the Partnership; and the Partnership may not permit any of its partners to transfer, convey, sell, or otherwise dispose of, to any other person any partnership interest in the Partnership; and the Partnership shall not admit any additional partners to the Partnership or grant any option to any person to acquire any partnership interest in the Partnership.

The Partnership may engage in any one or more of the above-enumerated transactions on or after the Opening Date if the following conditions, as applicable, are satisfied with respect to each such transaction: (i) after any such transaction the successor entity holds all permits required for operation of the business of, and the successor entity is controlled by a person or entity (or has retained a person or entity which is) experienced in, operating casino/hotels; (ii) if such surviving entity is not the Partnership, the entity formed by such transaction is duly organized and existing under Federal or state law and expressly assumes pursuant to the provisions of the Indenture, by a supplemental indenture, the punctual payment of all outstanding Bonds and the performance of every covenant and condition of the Indenture which binds the Partnership and expressly assumes pursuant to the provisions of the Indenture, by an instrument executed and delivered to the Trustee, the performance of every covenant and obligation of the Mortgage, Notes and Assignment Agreement to be performed by the Partnership; and (iii) immediately after giving effect to such transaction, no Financing Default shall have occurred and be continuing. Any such transaction also must be on such terms as shall not impair the lien and security of the Mortgage and the Indenture and the rights and powers of the Trustee and holders of the Bonds thereunder. Immediately following such transaction, unless the transaction involves the Partnership and an Affiliate of the Partnership having no assets and no liabilities and having conducted no prior business, exclusively, or unless such transaction is the admission as a new partner of the Partnership of, or the transfer of a partnership interest in the Partnership to, an Affiliate of the Partnership, the Partnership or its successor entity are required to meet the financial tests (without giving effect to certain exceptions therein) both for incurrence of one dollar of additional Debt (see "Certain Covenants of the Company and the Partnership—*Limitations on Debt*" above in this section) and for the issuance of one dollar of additional Bonds (see "Additional Series of Bonds" below in this section). Such tests need not be met for admissions of limited partners to the Partnership or transfers of any limited partnership interests in the Partnership (a) until the aggregate interests in the Partnership represented by all persons admitted as limited partners or to whom limited partnership interests are transferred after the date hereof is at least 49% of the total equity interest in the Partnership (without giving effect to transfers to Affiliates of Donald J. Trump) or (b) to the extent such persons admitted as limited partners or to whom limited partnership interests are transferred are Affiliates of Donald J. Trump.

All of the outstanding stock of the Company may be transferred on or after the Opening Date to an entity that is an Affiliate of the Partnership after giving effect to such transfer if (a) after any such transfer the Company and such entity holds all permits required for operation of the business of the Company, (b) such entity is duly organized and existing under Federal or state law and (c) immediately after giving effect to such transfer, no Financing Default shall have occurred and be continuing. (Section 10.01)

The Indenture prohibits the Partnership from leasing the Trust Estate, the Taj Mahal, the hotel or casino portion of the Taj Mahal or any combination thereof substantially as an entirety to any person. (Section 10.04) Pursuant to the Mortgage, subject to certain conditions, the Partnership may lease portions of the Trust Estate in the ordinary course of its business. Unless otherwise provided, neither the

Partnership nor the Company may sell, assign, lease, hypothecate, pledge, mortgage or otherwise transfer all or any part of the assets of the Company or the Trust Estate or any interest therein. (Section 10.05)

**Payment of Management and Construction Fees**

The Indenture restricts the Partnership from paying any Management Fee payable to THC under the Management Agreement except semi-annually on or after the business day after payment of interest on the Bonds offered hereby has been paid in addition to any principal payments due on such semi-annual payment date and any due and unpaid interest and principal accrued to date. In addition, the $10,000,000 Construction Fee may not be paid by the Partnership until on or after the Opening Date. The Construction Fee, equal to 3% of the Construction Cost of any Future Project may not be paid until any such Future Project is substantially completed. The Indenture does not, however, restrict the Partnership from reimbursing THC for the amount of Management Expenses. In no event, however, may any amount be paid by either the Partnership or any of its subsidiaries, indirectly or directly, in respect of any fee or expenses described above if a Financing Default has occurred and is continuing. (Section 12.20)

**Additional Series of Bonds**

After the Opening Date, the Company may, by supplemental indenture, issue additional series of Bonds that are on a parity with the series of Bonds offered hereby, and any other series of Bonds outstanding prior to such issuance, and that are entitled to the equal and ratable benefit and protection of the security, pledge, provisions, covenants, and agreements of the Indenture. Such additional issuance of Bonds will only be permitted if the following conditions are met:

(a) the additional Bonds are issued to finance (or to refinance Indebtedness incurred to finance) structural expansion, additions or capital improvements of the Taj Mahal or its ancillary facilities, costing in excess of $10,000,000;

(b) such additional Bonds are issued no earlier than the substantial completion of such structural expansion, additions, or capital improvements;

(c) the Outstanding Amount of such additional Bonds issued does not exceed the total project cost (including certain costs such as fees, interest and title expenses) of the structural expansion, additions or capital improvements;

(d) no Financing Default has occurred and is continuing;

(e) unless the additional Bonds are being issued to refinance Additional Financing undertaken to finance such expansion, additions or capital improvements, the lien of which is *pari passu* with the lien of the Mortgage, or unless the Partnership provided the Trustee with a certificate showing pro forma compliance with the tests described in this clause prior to commencing such expansion, addition or capital improvement, (A) the aggregate Outstanding Amount of Mortgage Debt does not exceed 66⅔% of the Appraised Value (which Appraised Value will be increased by the purchase price, net of all Partnership expenses relating to such purchase, including legal, title, accounting and recording tax expenses and commissions, of any property to be acquired with the proceeds of such additional Bonds) as of a date as close as practicable to the date of issuance of such additional Bonds and the aggregate Outstanding Amount of Debt of the Partnership and its subsidiaries does not exceed 80% of such Appraised Value as of such date, after giving effect to such issuance and the completion of such expansion, additions or capital improvements and (B) the Coverage Ratio of the Partnership, calculated for the four prior fiscal quarters ending with the date of the latest available quarterly statement of the Partnership at the time of the incurrence of such additional Bonds, adjusted to give retroactive effect to the incurrence of such additional Bonds (and, if any of the proceeds of such additional Bonds are being utilized for the acquisition of any property or asset adjusted to give retroactive effect to the Net Income, if any, of such property or asset for such prior four fiscal quarters) as of the beginning of such four prior fiscal quarters, is not less than 1.5;

(f) the Trustee has been provided with the documentation required by the terms of the Indenture;

(g) all gaming permits required in connection with the operation of the Taj Mahal casino, all permits required with respect to the expansion, additions or improvements and all permits required with respect to the issuance of such additional Bonds have been obtained and are in full force and effect;

(h) the average life (calculated in accordance with accepted financial practice) of such additional Bonds is not less than the average remaining life of the Bonds being offered hereby; and

(i) the proceeds of the issuance of additional Bonds are simultaneously therewith loaned to the Partnership by the Company in exchange for an additional Note, which is simultaneously assigned to the Trustee. (Section 3.02(b))

The additional series of Bonds may differ from the series offered hereby, and from each other, in any respect so long as such differences are permitted by the Trust Indenture Act, are not material, and are not adverse to the interests of the holders of any series of Bonds. The Bonds of such additional series may contain provisions for (a) a sinking, amortization, improvement, or other analogous fund, (b) limiting the aggregate principal amount of the Bonds of such series, (c) exchanging Bonds of such series, at the holder's option, for Bonds of the same series of the same aggregate principal amount of a different authorized denomination or denominations and (d) the authentication of Bonds of such series by an authenticating agent. All Bonds of the same series shall be substantially identical, except that any series may have serial maturities and different interest rates for different maturities and except as to denomination. (Section 3.03)

**Events of Default and Notice Thereof**

The following events are defined in the Indenture as "Events of Default": (a) failure to pay interest on any Bond after the interest becomes due and payable and continuance of such default (the deposit with the Trustee of funds sufficient to make such interest payments in full being deemed to cure any such default) for a period of 30 days; (b) failure to pay all or any portion of the principal of any Bond (including any sinking fund installment on any Bond, if any) when such principal becomes due and payable at maturity without any grace period; (c) default in the performance, or breach, of any covenant of the Company, Donald J. Trump or the Partnership in the Indenture (other than a default in the performance or breach that is elsewhere hereunder specifically dealt with), the Mortgage, the Notes, the Trump Line of Credit, the Trump Completion Guaranty or the Assignment Agreement that continues for a period of 30 days (or such other period specified in such other document) after notice (i) to the Company by the Trustee or (ii) to the Company and the Trustee by the Holders of at least 25% in Outstanding Amount of the outstanding Bonds; (d) certain events of bankruptcy, insolvency or reorganization relating to Donald J. Trump (only during the term of the Trump Completion Guaranty or the Trump Line of Credit, whichever is longer), the Company, the Partnership or any of the Partnership's subsidiaries, which, if involuntary, continue for a period of 30 consecutive days; (e) the revocation, suspension or loss of any permit which results in the cessation of a substantial portion of the business of the Taj Mahal for a period of more than 120 consecutive days; (f) any default under any Mortgage Debt (other than the Notes or any New Parking Financing) and the expiration of the applicable period of grace, if any, specified in any evidences of indebtedness of such Mortgage Debt; provided that such default has not been cured or waived at any time whether before or after the occurrence of such Event of Default (provided such cure or waiver occurs prior to any declaration of acceleration of the Bonds); (g) the existence of a final judgment of a court of competent jurisdiction in an amount in excess of $3,000,000 against the Company, the Partnership or any of the Partnership's subsidiaries or the Trust Estate, which judgment has not been satisfied or otherwise provided for and such judgment becomes a lien against the Trust Estate (unless such lien has been effectively stayed, in which case, not until such stay has been lifted), except in the case of any lien subordinate to the lien of the Mortgage, then only after 30 days (during which execution shall not be effectively stayed) following the date on which such judgment becomes a lien against the Trust Estate or

any part thereof (except if the lawsuit in question was commenced without service of process, in which case the period does not begin until 30 days after notice of such final judgment); the existence of any unsatisfied final judgment (which has not been effectively stayed) which, by itself or upon recordation, imposes or would impose a lien prior to that of the Mortgage; or the existence for a period of 60 days of any final judgment unsatisfied and not otherwise provided for in an amount in excess of $15,000,000 against the Company, the Partnership or any of the Partnership's subsidiaries; (h) defaults in the performance, or breach, of covenants pertaining to consolidation, merger, conveyance or transfer of properties and assets; (i) an event of default in the Mortgage has occurred and is continuing; (j) a default under any instruments of Debt or Indebtedness of the Partnership or any of the Partnership's subsidiaries (other than the Guaranty, Mortgage Debt and any New Parking Financing), whether such Debt or Indebtedness now exists or shall hereafter be created, in each case having an Outstanding Amount of $1,000,000 or more in the aggregate, and the expiration of the applicable period of grace, if any, specified in such instruments; *provided, however,* that if such default under such instruments shall be cured by the Partnership, or any such subsidiary, as the case may be, or be waived by the holders of such Debt, in each case as may be permitted by such instruments, then the Event of Default hereunder by reason of such default shall be deemed to have been thereupon cured (provided such cure or waiver occurs prior to any declaration of acceleration of the Bonds); or (k) an admission in writing by Donald J. Trump (only during the term of the Trump Completion Guaranty or the Trump Line of Credit, whichever is longer), the Company, the Partnership or any of the Partnership's subsidiaries, of its or his inability to pay its or his debts generally as they become due or (l) the entry of a final judgment, decree or order by a court of competent jurisdiction holding the Guaranty, the Trump Line of Credit, the Trump Completion Guaranty or the Mortgage to be invalid or unenforceable in any material respect or the assertion by the Company, Donald J. Trump, the Partnership or any of the Partnership's subsidiaries, or any person acting on behalf of any of the foregoing in any pleading filed in such a court that the Guaranty, the Trump Completion Guaranty, the Trump Line of Credit or the Mortgage is invalid or unenforceable in any material respect. (Section 7.01)

The Indenture provides that the Trustee, within 90 days after the occurrence of a Default, will give notice thereof by mail to all holders of Bonds, unless the Default has been cured or waived; however, in the case of a Default in payment on the Bonds or in the payment of any sinking fund installment under another series of Bonds, the Trustee may withhold such notice if certain officers or executives of the Trustee in good faith determine that such withholding is in the interest of the holders of Bonds. (Section 8.02)

In case an Event of Default (other than an Event of Default specified under clauses (d) and (k) as it relates to the Partnership or the Company only) occurs and is continuing, the Trustee or the holders of not less than 25% in Outstanding Amount of the Bonds, by notice in writing to the Company (and to the Trustee, if given by holders), may declare the principal of all the Bonds to be due and payable immediately. Such declaration may be annulled and past defaults may be waived by the holders of a majority in Outstanding Amount of the Bonds, upon the conditions provided in the Indenture. If an Event of Default specified above under clause (d) or (k) as it relates to the Partnership or the Company occurs, principal of all the Bonds shall *ipso facto* become and be due and payable immediately without any declaration or other act on the part of the Trustee or any Bondholder. (Section 7.02)

The Partnership is required to furnish to the Trustee, within 120 days after the close of each fiscal year, an officers' certificate to the effect that a review of the activities of the Partnership and its subsidiaries and the Company has been made with a view to determine whether their obligations under the Indenture, the Mortgage, and the Notes have been complied with and as to whether the signers have obtained knowledge of any default in the fulfillment of any such obligation during such fiscal year. If the Partnership or the Company obtains knowledge of a default under the Indenture, it is required promptly to notify the Trustee of such default and the action it is taking and proposes to take with respect thereto. (Section 12.09)

**Modifications of the Indenture**

From time to time, the parties to the Indenture, without the consent of the holders of the Bonds, may enter into one or more supplemental indentures for certain specified purposes, including curing

ambiguities, defects, or inconsistencies, creating a new series of Bonds, and making any changes or modifications to the terms of the Indenture that do not materially adversely effect the rights of any holder. (Section 11.01) Modifications, changes, and amendments to the Indenture also may be made by the parties thereto with the consent of the holders of not less than a majority of the Outstanding Amount of the Bonds of all series then outstanding; but no change in the time of payment of interest or principal, or reduction in the principal amount, interest rate, or premium, if any, payable, the Guaranty, the Trump Completion Guaranty or the Trump Line of Credit (except where such modification will not adversely affect the interests of the Bondholders), or any other modification in the terms of payment on any Bond, or any reduction in the percentage required for modification, or the creation of any lien ranking prior to or on a parity with the lien of the Mortgage, or any change which would deprive a holder of the security afforded by the lien of the Mortgage or modify or waive any of the provisions of the Indenture respecting the incurrence of additional Mortgage Debt or Debt, will be effective against any holder of Bonds without his consent. (Section 11.02)

**Satisfaction and Discharge of Indebtedness**

The Indenture will be discharged and cancelled upon payment of all the principal of and interest on the Bonds, redemption of all the Bonds, or deposit with the Trustee of fund sufficient for such payment or redemption. (Article 5)

**Gaming Laws**

On August 11, 1988, the Casino Control Commission issued a declaratory ruling that the initial Bondholders need not be qualified under the Casino Control Act, provided the Bonds are widely distributed and freely traded. Any Bondholder, whether an initial Bondholder or a subsequent transferee, may be nonetheless required to qualify under the Casino Control Act in the sound discretion of the Casino Control Commission and consequently, would be subject to the qualification provisions of the Casino Control Act relating to financial sources and/or security holders. The Indenture provides that if the Casino Control Commission requires that a Bondholder (whether the record or beneficial owner) qualify under the Casino Control Act and if such holder does not so qualify, then such Bondholder must dispose of his interest in the Bonds within 30 days after receipt of notice of such finding, or within such earlier time as the Casino Control Commission may require, or the Company may redeem such Bonds. Any such redemption by the Company shall be without any premium and at the lower of (i) the Outstanding Amount and (ii) the fair market value (as defined in the Indenture) of such Bonds, plus accrued interest. (Section 13.08) If any Bondholder is found unqualified by the Casino Control Commission, it is unlawful for the Bondholder (i) to receive any interest upon the Bonds, (ii) to exercise, directly or through any trustee or nominee, any right conferred by the Bonds, or (iii) to receive any remuneration, in any form from any Regulated Company (including the Partnership, the Company or the Trustee) for services rendered or otherwise. (Section 4.01)

The Indenture further requires the Trustee to report the names of all record holders of the Bonds to the Director of the Division and to the Casino Control Commission promptly after the initial issuance of the Bonds, and prior to the initial licensing of the Partnership and prior to the scheduled expiration date of the Partnership's casino license. The Indenture also requires the Trustee to provide to the Director of the Division and the Casino Control Commission copies of all written communications from the Trustee to the Bondholders, notice of any default under the Bonds, certain other information concerning the Trustee's enforcement of rights under the Indenture, and other matters respecting the security for the Bonds.

**The Mortgage**

*General.*

The Notes will be secured by the Mortgage, which will be assigned to the Trustee and shall encumber the Partnership's fee interest in the Taj Mahal, any New Parking Facility or certain other facilities owned by or leased to the Partnership, any additions and improvements constructed thereon and the interest of

the Partnership in furniture, furnishings, fixtures, machinery and equipment at any time forming a part thereof, or used in connection therewith, and certain of the other assets of the Partnership (other than cash and Permitted Investments). Since the Company's right as mortgagee under the Mortgage will be assigned to the Trustee pursuant to an instrument of assignment, all references in the Mortgage to mortgagee are referred to herein as the Trustee.

*Covenants Relating to Construction.*

The Mortgage provides, among other things, that the Partnership will cause the Taj Mahal to be constructed and completed (i) in accordance with legal and insurance requirements and pursuant to, the existing plans and specifications for the Taj Mahal, as the same may be amended in accordance with the Mortgage, (ii) under the supervision of an architect and an independent construction manager, (iii) in a good and workmanlike manner and shall be prosecuted with reasonable dispatch, Force Majeure Delays excepted and (iv) in compliance with the provisions of the Development Agreement. In addition the Partnership may not implement any amendments or modifications of the plans unless certain conditions are met. The Mortgage also provides that on or before March 1, 1990 (as such date may be extended by reason of Force Majeure Delays, but in all events on or before March 1, 1991 without extension by reason of Force Majeure Delays) the Partnership will (A) obtain a temporary certificate of occupancy with respect to the Taj Mahal, (B) install in the Taj Mahal all tangible personal property reasonably necessary to enable the opening of the gaming and hotel facilities of the Taj Mahal to the public, (C) obtain all permits required and (D) open the gaming and hotel facilities of the Taj Mahal to the public. (Section 5.12 of the Mortgage)

*Events of Default.*

The following events are defined in the Mortgage as "Events of Default:"

(a) default in the payment of any interest upon the Notes when such interest becomes due and payable and continuance of such default for a period of 30 days; (b) default in the payment of all or any portion of the principal of (or premium, if any, on) the Notes at its maturity; (c) default in the payment of all or any portion of the principal of (or premium, if any, on) the Note or any additional Note that is payable as a result of a sinking fund payment being due under any Bonds; (d) default in the payment of any other sum due under the Notes or any of them or under the Mortgage, and the continuance of such default for a period of 30 days after there has been given to the Partnership a written notice specifying such default and requiring it to be remedied; (e) default in the performance, or breach, of any covenant of the Partnership in the Mortgage (other than a covenant, a default in the performance or breach of which is elsewhere specifically dealt with in the Mortgage), and continuance of such default or breach for a period of 30 days after there has been given to the Partnership a written notice specifying such default or breach and requiring it to be remedied, unless (i) the default or breach is of such a nature that it is curable but not susceptible of being cured with due diligence within such 30-day period (for reasons other than the lack of funds), (ii) the Partnership delivers an officers' certificate to the Trustee within such 30-day period stating (A) the applicability of the provisions of clause (i) to such default or breach, (B) the Partnership's intention to remedy such default or breach with reasonable diligence and (C) the steps which the Partnership has undertaken or intends to undertake to remedy such default or breach and (iii) the Partnership delivers to the Trustee additional officers' certificates every 30 days thereafter updating the information contained in the certificate described in clause (ii), in which case such 30-day period shall be extended for such further period of time as may reasonably be required to cure the same, provided that the Partnership is then proceeding and thereafter continues to proceed to cure the same with reasonable diligence; (f) an "Event of Default," as defined in the Indenture, shall occur; (g) (i) failure to obtain a Certificate of Completion and provide a copy thereof to the Trustee at least 30 days prior to the date (including all applicable grace periods) upon which the Housing Authority has the right to exercise any right of reversion under the terms, and in accordance with the provisions, of the Development Agreement, without the giving of any further notice of an opportunity to cure, as such date may be extended from time to time pursuant to the terms and provisions of the Development Agreement; or (ii) without limiting the generality of subparagraph (i) above, failure by the Partnership, at least 30 days prior to the date (including all applicable grace periods) upon which the

Housing Authority has the right to exercise any right of reversion under the terms, and in accordance with the provisions, of the Development Agreement or of any deed granted pursuant to the Development Agreement, without the giving of any further notice of an opportunity to cure, as such date may be extended from time to time pursuant to the terms and provisions of the Development Agreement, to cure any default, failure, violation or other action or inaction, which default, failure, violation or other action or inaction, if not cured, would, under the terms of the Development Agreement or of such deed, give rise to a right of reversion exercisable by the Housing Authority with respect to any portion of the Trust Estate; or (iii) without limiting the generality of clauses (i) and (ii), default by the Partnership under any of the terms of the Development Agreement (other than the terms thereof covered by the provisions of (i) and (ii) above) which shall not be fully cured or waived prior to the expiration of any grace period contained in the Development Agreement, if such default, if not timely cured, would result in an impairment of the Trustee's security, unless prior to the expiration of such grace period, the Partnership gives the Trustee an officers' certificate, an opinion of counsel and a true copy of the injunction referred to below, which certificate and opinion state that (1) a court of competent jurisdiction has issued an injunction (which is in force and effect and has not been modified or reversed on appeal) tolling or staying the expiration of the grace period set forth in the Development Agreement with respect to such default, and (2) the Trustee is named as a party in any action or proceeding involving such injunction and therefore is entitled to notice of any modification or termination thereof; and, if such injunction is issued, then so long as such injunction remains in force and effect and the preceding provisions of this subparagraph (g)(iii) have been complied with, the grace period referred to in the fourth line of this subparagraph (g)(iii) shall be deemed to mean the grace period after giving effect to any such tolling or stay; (h) default by the Partnership under any of the terms of any Facility Lease (as defined in the Mortgage) which shall not be fully cured or waived prior to the expiration of any grace period contained in such Facility Lease, unless prior to the expiration of said grace period, the Partnership gives the Trustee an officers' certificate, an opinion of counsel and a true copy of the injunction referred to below, which certificate and opinion shall state (A) that a court of competent jurisdiction has issued an injunction (which is in force and effect and has not been modified or reversed on appeal) tolling or staying the expiration of the grace period set forth in such Facility Lease with respect to such default, and (B) the Trustee is named as a party in any action or proceeding involving such injunction and therefore is entitled to notice of any modification or termination thereof; and, if such injunction is issued, then so long as such injunction remains in force and effect and the preceding provisions of this subparagraph (h) have been complied with, the grace period referred to in the third line of this subparagraph (h) shall be deemed to mean the grace period after giving effect to any such tolling or stay; (i) any modification, amendment or supplement of the Development Agreement without the prior written consent of the Trustee; unless the Partnership delivers to the Trustee an opinion of an independent investment banking institution of recognized national standing doing business in the Borough of Manhattan, City and State of New York, to the effect that such modification, amendment, or supplement would not result in an impairment of the Trustee's security; (j) any modification, amendment or supplement of any superior parking financing lien without the prior written consent of the Trustee, except to the extent that such modification, amendment or supplement is permitted by the Mortgage; (k) default in the performance, or breach, of any of the provisions governing consolidation and mergers; (l) if any representation or warranty of the Partnership set forth in the Mortgage or in any notice, certificate, demand or request delivered to the Trustee pursuant to this Mortgage shall prove to be incorrect in any material respect as of the time when made and the facts constituting such incorrectness impair the Trustee's security and such impairment continues for a period of 30 days after there has been given to the Partnership a written notice specifying that such notice is a "Notice of Default" hereunder; (m) if construction of the Taj Mahal in accordance with the Mortgage shall be halted for an aggregate of forty-five business days, whether or not consecutive, for reasons other than Force Majeure Delays; (n) default by the Partnership in the performance of certain of the construction covenants contained in the Mortgage on or before the dates by which such performance is required thereunder; (o) default by the Partnership under any of the terms of any Senior New Parking Mortgage which shall not be fully cured or waived within five days prior to the expiration of any grace period contained in such Senior New Parking Mortgage, unless prior to the expiration of said grace period the Partnership gives the Trustee an officers' certificate, an opinion of counsel and a true copy of the injunction referred to

below, which certificate and opinion shall state (A) that a court of competent jurisdiction has issued an injunction (which is in force and effect and has not been modified or reversed on appeal) tolling or staying the expiration of the grace period set forth in such Senior New Parking Mortgage with respect to such default, and (B) the Trustee is named as a party in any action or proceeding involving such injunction and therefore is entitled to notice of any modification or termination thereof; and, if such injunction is issued, then so long as such injunction remains in force and effect and the preceding provisions of this subparagraph (o) have been complied with, the grace period referred to in the third line of this subparagraph (o) shall be deemed to mean the grace period after giving effect to any such tolling or stay; or (p) the acceleration of maturity of Indebtedness with an Outstanding Amount equal to or in excess of $100,000,000.00, the lien of which Indebtedness is on a parity with and not junior to the lien of the Mortgage, and the delivery to the Trustee by the holder of such Indebtedness of a notice that such holder requests that the Trustee declare the Outstanding Amount of all the Bonds to be due and payable and to exercise its rights and remedies in accordance with the provisions of the Indenture and the Mortgage Documents. (Section 3.01 of the Mortgage)

**The Trustee**

The Trustee is Bankers Trust Company, a New York banking corporation. The Trustee currently has an ongoing banking relationship with Donald J. Trump. See "Use of Proceeds."

The Indenture provides that, except during the continuance of an Event of Default, the Trustee will perform only such duties as are specifically set forth in the Indenture. During the existence of an Event of Default, the Trustee will exercise such of the rights and powers vested in it under the Indenture and will use the same degree of care and skill in its exercise as a prudent person would exercise under the circumstances in the conduct of such person's own affairs. (Section 8.01) The holders of a majority in Outstanding Amount of the Bonds shall have the right to direct the time, method, and place of conducting any proceeding for exercising any remedy available to the Trustee. (Section 7.12) Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the Indenture at the request of any of the holders, unless they shall have offered to the Trustee security or indemnity satisfactory to it. (Section 8.03)

The Indenture and provisions of the Trust Indenture Act incorporated by reference therein contain limitations on the rights of the Trustee, should it become a creditor of the Company, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claims as security or otherwise. The Trustee will be permitted to engage in other transactions; provided, however, if it acquires any conflicting interest (as defined) it must eliminate such conflict or resign. (Section 8.08)

**Usury Law**

The Company has agreed not to claim voluntarily the benefit of any usury law against the holders of the Bonds. (Section 12.12) The Company does not believe that any state would have the right to assert a usury defense on behalf of the Company.

## TRUMP COMPLETION GUARANTY AND LINE OF CREDIT

**Biographical and Financial Information**

Donald J. Trump is the President of The Trump Organization, a preeminent U.S. real estate firm. In addition to being the developer of various residential, commercial and condominium projects, he, directly or through affiliates, has constructed and presently owns and/or manages Trump Tower, a 68-story building located on Fifth Avenue in New York City containing luxury condominium apartments, commercial office space and a six level retail atrium, Trump Parc, a luxury residential building located in New York City, Trump Castle Hotel & Casino and Trump Plaza Hotel and Casino, each located in Atlantic City and the Plaza Hotel located in New York City. Donald J. Trump also manages Trump Plaza of the Palm Beaches located in West Palm Beach, Florida and owns a 50% interest in the Grand Hyatt Hotel in New York City (which he constructed).

Donald J. Trump has advised the Partnership and the Company that he has sufficient financial resources to perform his obligations under the Trump Completion Guaranty. He has further advised the Partnership and the Company that his net worth, determined in accordance with generally accepted accounting principles applicable to personal financial statements, is at least $500,000,000. In computing such net worth, assets and liabilities are stated at their estimated current values and amounts. Depending upon the circumstances under which assets are liquidated, Donald J. Trump may or may not be able to realize the fair market value of such assets. A substantial portion of Donald J. Trump's assets consist of real property or interests in regulated enterprises, which may affect the liquidity of such assets.

**Trump Completion Guaranty**

The following is only a summary of the terms of the Trump Completion Guaranty. It does not purport to be a full description thereof and is qualified in its entirety by reference to the Trump Completion Guaranty, a copy of which has been filed as an Exhibit to the Registration Statement of which this Prospectus is a part.

*General.* All of the rights, powers and remedies of the Company under the Trump Completion Guaranty will be assigned to the Trustee and, accordingly, all references in the Trump Completion Guaranty to the Company are referred to herein as the Trustee.

*Guaranty.* Donald J. Trump will covenant, agree and guarantee to the Trustee the following (the "Guaranteed Obligations"):

(a) that construction of the Taj Mahal and its ancillary facilities shall be done in good and workmanlike manner and shall be prosecuted with reasonable dispatch, subject to Force Majeure Delays, in accordance, in all material respects, with the existing plans and specifications therefor as amended from time to time pursuant to clause (c)(i) below (collectively, the "Project");

(b) (i) that construction of the Project shall comply, in all material respects, with the Development Agreement including, without limitation, the provisions thereof that require the obtaining of all necessary approvals of amendments and modifications of the plans and specifications for the Project and (ii) that construction shall be completed as necessary for the issuance of a Certificate of Completion (as defined in the Mortgage), and a Certificate of Completion shall have been obtained not less than 30 days prior to the date (including all applicable grace periods) upon which the Housing Authority can exercise any right of reversion under the terms, and pursuant to the provisions of the Development Agreement without the giving of any further notice of an opportunity to cure and as such date may be extended from time to time in accordance with the terms and provisions of the Development Agreement (see "Special Considerations—Risks Regarding Completing the Taj Mahal—*Consequences of Delay*");

(c) that on or before March 1, 1991, as such date may be extended by reason of Force Majeure Delays, (i) construction of the Project shall be substantially completed in accordance with the existing plans and specifications as the same may be amended; provided, however, that such amendments are made in compliance with the Mortgage and do not materially adversely change the description of the Project as contained in this Prospectus; (ii) a temporary certificate of occupancy shall be duly issued by the appropriate state or city governmental authorities and all other actions or things relative to the construction and completion of the Project necessary for opening and operating substantially all of the gaming and hotel facilities of the Project to the public, including compliance with all requirements relative to the construction and completion of the Project of governmental authorities (including the Casino Control Commission and the Division) which are a prerequisite to such opening and operation and to obtaining any Permits (as defined in the Mortgage) necessary for such opening and operation, shall have been accomplished and effected, except that Donald J. Trump shall have no obligation to obtain or cause to be obtained any such Permits (other than such temporary certificate of occupancy); (iii) the Project shall have been equipped with substantially all Tangible Personal Property (as defined in the Mortgage) necessary or desirable in connection with opening the Project to the public

and operating the Project, in all cases consistent with the standards of other casino/hotels of comparable quality located in Atlantic City; and (iv) all costs, expenses and liabilities incurred in connection with the construction, completion and equipping of the Project in accordance with clauses (i), (ii) and (iii) above shall have been paid (or if not paid, the unpaid amount or a letter of credit for such amount shall have been deposited in an escrow account or guaranteed unconditionally by Donald J. Trump or by certain financial institutions), and the Project shall be free and clear of all liens and encumbrances, including any mechanic's liens, other than liens or encumbrances constituting Permitted Encumbrances (except Restricted Encumbrances (as defined in the Mortgage) other than leases permitted under the Mortgage);

(d) that any "punch list" items not yet cured, corrected, installed and completed as of the date of substantial completion of the Project and equipping thereof with substantially all Tangible Personal Property shall be duly cured, corrected, installed, completed and paid (or if not paid, the unpaid amount or a letter of credit for such amount shall have been deposited in an escrow account or guaranteed unconditionally by Donald J. Trump or by certain financial institutions), free and clear of all liens and encumbrances except as permitted under clause (c) (iv) above, with reasonable dispatch following such date; provided, however, that the foregoing Guaranteed Obligation shall terminate if for any four prior fiscal quarters the Coverage Ratio of the Partnership is at least 1.5 (for purposes of the Trump Completion Guaranty, "punch list" items being defined as all things necessary (other than things which, in the aggregate, are *de minimis*) to fully complete and equip the entire Project);

(e) that on the Opening Date, the Partnership (or the then owner or operator of the Taj Mahal) will have Working Capital of $10,000,000 in cash and/or marketable securities, exclusive of any proceeds of Unrestricted Financing and after giving effect to an accrual (if not theretofore paid) for the $10,000,000 fee payable by the Partnership to THC under the Management Agreement; provided, however, that Donald J. Trump is not obligated to fulfill this provision unless and until the Trustee has the right to, and does, call upon Donald J. Trump to perform any of his other obligations under the Trump Completion Guaranty. Any amounts advanced by Donald J. Trump hereunder will be transferred to the Trustee, and the Trustee will agree to pay such amounts to the Partnership or the then owner or operator of the Project for general partnership purposes; and

(f) that within ten (10) business days after there occurs any of certain bankruptcy, insolvency or reorganization events related to the Partnership, Donald J. Trump will transfer to the Trustee $25,000,000 in cash minus the aggregate of all amounts previously loaned by Donald J. Trump to the Partnership under the Trump Line of Credit described below, which amounts the Trustee will agree to pay to the Partnership or the then owner or operator of the Project for general partnership purposes.

*Subordination.* In the event that Donald J. Trump advances or becomes obligated to pay any sums in connection with his obligations under the Trump Completion Guaranty, such sums will be repaid to Donald J. Trump by the Partnership (other than amounts advanced under clauses (e) and/or (f) under "*Guaranty*" above) and Donald J. Trump agrees that the repayment of such sums by the Partnership will at all times be subordinate (to the extent and in the manner provided for in the Indenture as described in "Description of the Bonds—Certain Covenants of the Company and the Partnership—*Limitations on Debt*") to (a) all amounts, including principal, premium, if any, and interest and other amounts at any time owing to the Company under the Note or the obligations evidencing the Note or the Mortgage and (b) all principal of, premium, if any, and interest on the Bonds, and that Donald J. Trump will not be entitled to enforce or receive payment thereof until payment is permitted under the Indenture. See "Description of the Bonds—Certain Covenants of the Company and the Partnership—*Limitations on Distribution and other Payments*."

*Enforcement.* The Trustee, at its election, may, upon giving notice to Donald J. Trump, call upon Donald J. Trump to perform under the Trump Completion Guaranty:

(a) if the Trustee forecloses on the Mortgage and the Trustee, a designee or nominee of the Trustee, or any third party whatsoever acquires all or substantially all of the Collateral;

(b) if the Partnership defaults in the payment of any interest on the Note when such interest becomes due and payable and such default continues for a period of 30 days;

(c) if the Partnership defaults in the payment of the principal of (or premium, if any, on) the Note at its Maturity (as defined in the Mortgage);

(d) if the Partnership defaults in the payment of any other sum due under the Note or under the Mortgage, and such default continues for a period of 30 days after there has been given by the Trustee to the Partnership and to Donald J. Trump a written notice specifying such default and requiring it to be remedied;

(e) if there shall occur any one or more of the Events of Default described in clauses (d), (f), (j), (k) and (l) under "Description of the Bonds—Events of Default and Notice Thereof;"

(f) if construction of the Project is halted for an aggregate of 45 business days, whether or not consecutive, for reasons other than Force Majeure Delays;

(g) if the provisions under clause (a) under "*Guaranty*" above in this section are not complied with by the Partnership and such failure continues for a period of 30 days after there has been given by the Trustee to the Partnership and to Donald J. Trump a written notice specifying such failure and requiring it to be remedied unless all of the following shall be applicable and complied with by the Partnership (hereinafter, the "Cure Period Extension Provisions"): (x) such failure to comply is of such a nature that it is curable but not susceptible of being cured with due diligence within such 30 day period (for reasons other than the lack of funds); (y) the Partnership delivers an officer's certificate to the Trustee within such 30 day period stating (1) the applicability of the provisions of clause (x) above to such failure to comply, (2) the Partnership's intention to remedy such failure to comply with reasonable diligence and (3) the steps that the Partnership has undertaken or intends to undertake to remedy such failure to comply; and (z) the Partnership delivers to the Trustee additional officer's certificates every 30 days thereafter updating the information contained in the certificate described in clause (y) above, in which case such 30 day period shall be extended for such further period of time as may reasonably be required to cure the same, provided that the Partnership is then proceeding and thereafter continues to proceed to cure the same with reasonable diligence;

(h) if the Partnership fails to comply with any of the provisions of clause (b)(i) under "*Guaranty*" above in this section, and such failure continues for a period of 30 days after the Trustee has given to the Partnership and to Donald J. Trump a written notice specifying such failure and requiring it to be remedied, provided that such 30 day period may be extended in accordance with the Cure Period Extension Provisions described in clause (g) above;

(i) if the Partnership fails to comply with any of the provisions of clause (b) (ii) under "*Guaranty*" above in this section;

(j) if the existing plans and specifications for the Project are amended and such amendment either (A) results in a material adverse change from the description of the Project as set forth in this Prospectus or (B) was not made in compliance with the provisions of the Mortgage and, in either case, the Partnership or Donald J. Trump fails to cure the same within 30 days after there has been given by the Trustee to the Partnership and Donald J. Trump a written notice specifying the same and requiring it to be remedied, provided that such 30 day period may be extended in accordance with the Cure Period Extension Provisions described in clause (g) above;

(k) if all of the provisions of clause (c) under "*Guaranty*" above in this section are not complied with by the Partnership on or before March 1, 1990, as such date may be extended by reason of Force Majeure Delays, but no later than March 1, 1991; or

(l) if the provisions of clause (d) under *"Guaranty"* above in this section are not complied with by the Partnership and such failure continues for a period of 30 days after there has been given by the Trustee to the Partnership and to Donald J. Trump a written notice specifying such failure and requiring it to be remedied, provided that such 30 day period may be extended in accordance with the Cure Period Extension Provisions described in clause (g) above.

If, within 10 days following written notice from the Trustee calling upon Donald J. Trump to perform under the Trump Completion Guaranty, Donald J. Trump shall fail to commence the performance of his obligations under the Trump Completion Guaranty, or if at any time thereafter Donald J. Trump shall fail to perform his obligations under the Trump Completion Guaranty, then the Trustee may elect (i) to complete the construction and equipping of the Taj Mahal without releasing or otherwise affecting the liability of Donald J. Trump under the Trump Completion Guaranty; provided, however, that at any time or from time to time the Trustee may terminate such election or again make such election, by written notice to Donald J. Trump, and his liabilities and obligations thereunder shall in all such events remain in full force and effect and/or (ii) to pay and discharge any outstanding amounts, liens or encumbrances described in clause (c)(iv) under *"Guaranty"* above in this section. In the event of any such election by the Trustee, Donald J. Trump will, in addition to his other obligations under the Trump Completion Guaranty, be required to pay to the Trustee the costs and expenses (including interest on such costs and expenses at the rate of interest payable on the Bonds offered hereby) paid or incurred by the Trustee or its nominee or designee in performing and completing the construction, equipping and completion of the Project and the payment and discharge of all such amounts, liens and encumbrances in connection therewith.

*Remedies.* Under the Trump Completion Guaranty, the only remedies of the Bondholders will be to seek specific performance by Donald J. Trump of his obligations under the Trump Completion Guaranty and/or monetary damages from Donald J. Trump except that Donald J. Trump shall be liable for monetary damages only for the following: (i) the payment of all costs and expenses paid or incurred by the Trustee, its nominee or designee in performing and completing the construction, equipping and completion of the Project and the payment of all costs and expenses required to deliver the Project free and clear of all liens and encumbrances, including any mechanics' liens, other than liens or encumbrances constituting Permitted Encumbrances (except Restricted Encumbrances other than leases permitted under the Mortgage) together with interest on all such amounts at the rate payable under the Bonds offered hereby; (ii) the payment of any amounts necessary so that the Partnership (or the then owner or operator of the Taj Mahal) will have on the Opening Date $10,000,000 of cash and/or marketable securities (exclusive of any proceeds of Unrestricted Financing and after giving effect to an accrual (if not theretofore paid) for the $10,000,000 fee payable by the Partnership to THC under the Management Agreement) or if the Partnership did not have such amount on the Opening Date, to remedy such failure (but such payment is required only if the Trustee calls upon Donald J. Trump to perform any of his other obligations under the Trump Completion Guaranty; (iii) the payment of all reasonable costs and expenses incurred by the Trustee to enforce successfully in whole or in part the Trump Completion Guaranty together with interest thereon at the rate payable under the Bonds offered hereby. In no event will Donald J. Trump be liable for any punitive or consequential damages (including loss of profits); and (iv) the payment of an amount equal to $25,000,000 less the aggregate of any amounts theretofore loaned by Donald J. Trump to the Partnership under the Trump Line of Credit, if there has occurred any of certain events of bankruptcy, insolvency or reorganization relating to the Partnership. In addition, Donald J. Trump will not under any circumstances, be obligated under the Trump Completion Guaranty to pay the principal of, premium, if any, or interest on the Bonds or the Note.

*Termination.* The Trump Completion Guaranty will be discharged if (a) all of the obligations set forth under *"Guaranty"* above are completely performed in accordance with the terms of the Trump Completion Guaranty, (b) there is paid to the Trustee and/or the holders of the Bonds all amounts owing pursuant to the Indenture and the Bonds, or (c) all of the following shall have occurred or be applicable: (i) the Opening Date shall have occurred, (ii) the Taj Mahal shall be free and clear of all liens and encumbrances other than Permitted Encumbrances, (iii) all costs, expenses and liabilities incurred in connection with the construction, completion and equipping of the Project shall have been paid (or if not

paid, the unpaid amount or a letter of credit for such amount shall have been deposited in an escrow account, or guaranteed unconditionally by Donald J. Trump or by certain financial institutions), and (iv) one of the following shall have occurred: (x) the Coverage Ratio of the Partnership, calculated for the four prior fiscal quarters ending with the date of the then latest available quarterly statement of the Partnership is not less than 1.5, or (y) (1) there shall have been initially finished and furnished, in such manner so as to be occupiable by hotel guests, that number of guest rooms in the Taj Mahal as is necessary under applicable laws, rules and regulations to open and operate a 120,000 square foot casino, (2) a 120,000 square foot casino shall have been opened to the public and shall be operating, (3) substantially all other components of the Project (other than the casino and the hotel rooms) as described in this Prospectus shall have been substantially completed, and (4) the Trustee shall not have had the right to and shall not have called upon Donald J. Trump to perform any of his obligations under the Trump Completion Guaranty.

*Housing Authority Guaranty.* Donald J. Trump will guaranty to the Housing Authority pursuant to the Housing Authority Guaranty the obligations described in clauses (a), (b), (c)(i) and (c)(ii) under "*Guaranty*" above in this section. It is anticipated that the Trustee and the Housing Authority will enter into an agreement pursuant to which the Housing Authority will agree not to exercise any right or remedy under the Housing Authority Guaranty or the Development Agreement (other than its right to a revesting of title to the Development Site Parcel pursuant to the Development Agreement, its right to pay all amounts due under the Mortgage and the Notes and secure an assignment thereof, and its right, if subsequent to a foreclosure under which the Trustee has acquired title to the Property, to acquire the Property upon payment to the Trustee of all amounts due under the Mortgage and the Notes and all of the Trustee's expenses of foreclosing, constructing and managing the Property), if and for so long as the Trustee is with reasonable diligence exercising its rights or remedies against Donald J. Trump pursuant to the Trump Completion Guaranty, or its rights to take possession of, construct and operate the Property pursuant to the Mortgage.

**Trump Line of Credit**

The following is only a summary of the terms of the Trump Line of Credit. It does not purport to be a full description thereof and is qualified in its entirety by reference to the Trump Line of Credit, a copy of which has been filed as an Exhibit to the Registration Statement of which this Prospectus is a part.

*Borrowing Events.* Donald J. Trump has agreed to loan to the Partnership, on an unsecured basis, up to $25,000,000 under the Trump Line of Credit within 10 business days after the happening of any of the events listed below:

| Event | Amount of Borrowing |
|---|---|
| 1. Any Financing Default occurs and is continuing (other than an Event of Default under the Mortgage or the Indenture) | The amount needed to cure any such Financing Default |
| 2. Any Event of Default (other than certain bankruptcy, insolvency or reorganization events related to the Partnership) occurs and is continuing under the Mortgage or Indenture | $25,000,000 |
| 3. Any event occurs that allows the Partnership to call upon Donald J. Trump to perform under the Trump Completion Guaranty | $25,000,000 |
| 4. Working Capital (exclusive of any proceeds of any Unrestricted Financing and including an accrual (if not theretofore paid) for the $10,000,000 fee payable by the Partnership to THC under the Management Agreement) of the Partnership is at any time less than $10,000,000 | The amount by which Working Capital of the Partnership is less than $10,000,000 |

See "Description of the Bonds—Events of Default and Notice Thereof" and "The Mortgage—*Events of Default*" and "Trump Completion Guaranty—*Enforcement*" above in this section. Amounts borrowed under the Trump Line of Credit can be utilized by the Partnership for general partnership purposes, including construction, working capital and the payment of interest and principal on the Note. Except for as set forth above, Donald J. Trump is not required to loan any amounts to the Partnership. Donald J.

Trump may, without the occurrence of any of the events described above, lend to the Partnership an amount equal to $25,000,000 minus the aggregate of any previous loans under the Trump Line of Credit, and any such loan is accorded the same treatment under the Trump Line of Credit as a loan made upon the occurrence of any of such events.

*Borrowing Terms.* Each loan under the Trump Line of Credit will bear interest at the "prime" rate of Bankers Trust Company. Interest on such loans is payable semi-annually, but both principal and interest may be paid only to the extent described in "Description of the Bonds—Certain Covenants of the Company and the Partnership—*Limitations on Distributions and other Payments.*" Interest on the loans will accrue to the extent that it is not paid.

*Subordination.* The loans to the Partnership pursuant to the Trump Line of Credit will be subordinated to the Note and the Bonds to the same extent as indebtedness of the Partnership owed to Donald J. Trump under the Trump Completion Guaranty. See "Trump Completion Guaranty —*Subordination*" above in this section.

*Termination.* The Trump Line of Credit will terminate when (1) all interest on and principal of the Bonds has been repaid in full, or (2) the aggregate of all amounts advanced by Donald J. Trump to the Partnership pursuant to the Trump Line of Credit and the amounts advanced by Donald J. Trump under the Trump Completion Guaranty upon the happening of certain bankruptcy, insolvency and reorganization events related to the Partnership equals $25,000,000, or (3) certain bankruptcy, insolvency and reorganization events related to the Partnership occur, or (4) all of the following have occurred or are applicable: (a) the Opening Date has occurred; (b) the Property (including the Taj Mahal) is free and clear of all liens and encumbrances other than Permitted Encumbrances; (c) all costs, expenses and liabilities incurred in connection with the construction, completion and equipping of the Taj Mahal and its ancillary facilities has been paid (or if not paid, the unpaid amount or a letter of credit for such amount has been deposited in an escrow account, or guaranteed unconditionally by Donald J. Trump or by certain financial institutions); and (d) Working Capital of the Partnership (exclusive of any proceeds from any Unrestricted Financing and including an accrual (if not theretofore paid) for the $10,000,000 fee payable by the Partnership to THC under the Management Agreement) is not less than $10,000,000 on the termination date.

*Assignment to Trustee.* The Partnership's rights against Donald J. Trump under the Trump Line of Credit (other than the right to receive the funds loaned by Donald J. Trump, which are always payable to the Partnership) will be assigned to the Company and the Company in turn will assign its rights to the Trustee under the Assignment.

## MANAGEMENT AGREEMENT

The following is only a summary of the terms of the Management Agreement. It does not purport to be a full description thereof, and is qualified in its entirety by reference to the Management Agreement, a copy of which has been filed as an Exhibit to the Registration Statement of which this Prospectus is a part.

*General.* The Partnership will enter into the Management Agreement with THC, a New Jersey corporation controlled by Donald J. Trump. The Partnership believes that the terms of the Management Agreement are at least as favorable to the Partnership as those which could be obtained from an unaffiliated third party. In general, the Management Agreement obligates THC, as exclusive agent for the Partnership, to manage the operations of the Taj Mahal, including all casino operations, and to perform certain construction-supervisory services in connection with the completion of construction of the Taj Mahal, in exchange for certain fees, all as further described below.

*Responsibilities, Powers and Authority of THC, as Manager.* The Management Agreement provides that the operation of the Taj Mahal and all ancillary properties and businesses of the Partnership will be under the exclusive management and supervision of THC and, except as otherwise provided for, THC will be responsible for the proper, efficient and competitive operation of the Taj Mahal. THC will have discretion in all matters relating to the management and operation of the Taj Mahal and all such ancillary properties and/or businesses.

*Limitations on Authority of THC, as Manager.* In addition to any other limitations on the powers and authority of THC as set forth in the Management Agreement, THC has no authority to (i) sell or lease all or any part of the Taj Mahal (other than any sales or leases in the ordinary course of business), (ii) cause the Partnership to acquire any other non-related existing business entities or all or substantially all of the assets thereof, or (iii) knowingly do any other act which would violate the terms of the Indenture or Mortgage or prevent the Partnership from carrying on the business for which it has been created.

*Management Fee.* In consideration for the management services of THC to be rendered during the term of the Management Agreement, THC will be paid, semi-annually, a fee equal to 1¾% of the Gross Revenues (as defined below) for each fiscal year or part thereof within the term of the Management Agreement (the "Management Fee"). The Indenture provides that the Management Fee may be paid for any six month period only after all interest and principal on the Bonds due during such six month period have been paid. If interest on the Bonds is paid for any six month period, then the Indenture does not prohibit the payment of the Management Fee for such period. THC has the right to demand payment of the Management Fee under such circumstances, regardless of whether or not the Company will be able to pay interest on the Bonds on the next ensuing interest payment date. In addition to the Management Fee, the Partnership is obligated to reimburse THC for all of its out-of-pocket expenses and the amounts billed to THC by unaffiliated persons and/or entities for their costs and expenses incurred at the request of THC in connection with THC's performance of its management services pursuant to the Management Agreement. See "Description of the Bonds—Payment of Management and Construction Fees."

"Gross Revenues" means, for any period, the total of all revenues and receipts of every kind and nature derived from the operation of the Taj Mahal for such period, including, but not limited to, revenues (including both cash and credit transactions and, in the case of credit card transactions, before commissions and service charges) derived from the rental of rooms, stores, offices, convention, ballroom and/or exhibition or sale space of any kind; license, lease and concession fees and rentals; revenue from any and all table games and slot machines and other games; the retail value of all complimentaries given to patrons; parking receipts (unless the parking area is operated by a third party pursuant to a concession agreement or lease); food and beverage sales and wholesale and retail sales of merchandise (unless made by a third party pursuant to a concession agreement or lease); and telephone charges, vending machine sales and service charges, less the provision for doubtful accounts of the Partnership for such period; provided, however, that the term "Gross Revenues" will not include (i) federal, state or municipal taxes, such as admission, excise, sales or use taxes or similar impositions, which, during such period, are collected directly from patrons or guests or are included as part of the sales price of any goods or services, (ii) any interest income derived from the investment of funds of the Partnership during such period, and (iii) any

gain realized in connection with any sale or other disposition, during such period, of the assets of the Partnership which is not in the ordinary course of business, it being understood that the sale of any of the Partnership's financial assets will be deemed not in the ordinary course of business for the purposes of the Management Agreement.

*Planning and Construction of the Taj Mahal.* THC has agreed to consult with, advise, assist and make recommendations to the Partnership on all aspects of the planning, design, construction and/or equipping of the Taj Mahal and of all future projects involving the construction and/or equipping of additional facilities and amenities of the Partnership (specifically excluding, however, future projects related to any refurbishment and/or renovation of the Partnership's facilities and/or amenities), which may be undertaken by the Partnership after the Opening Date, provided that the estimated Construction Cost (as defined below) for each such project shall exceed $10,000,000 ("Future Project"), including, but not limited to: review of budget estimates; review of the existing plans and specifications therefor and advice and recommendations with respect to suggested revisions thereof; monitoring of the project progress schedule and periodic reports thereon to the Partnership; and advice and assistance with respect to securing any regulatory or governmental approvals and permits required to construct, open and/or operate the Taj Mahal or any such Future Project. THC also will have discretion on all matters relating to the construction, equipping and completion of the Taj Mahal or any such Future Project.

For providing the above-described construction supervisory services pertaining to the Taj Mahal, the Partnership has agreed to pay THC a fee in the amount of $10,000,000, which amount is payable within ten days after (but not prior to) the Opening Date.

For providing the above-described services pertaining to any Future Project, the Partnership has agreed to pay THC a fee equal to 3% of the Construction Cost (as defined below) of such Future Project, which amount is to be payable within ten days after (but not prior to) the completion of substantially all of such Future Project. See "Description of the Bonds—Payment of Management and Construction Fees."

"Construction Cost" of any Future Project means the total cost to the Partnership to complete, furnish, equip and open such Future Project including, but not limited to, all fees, costs and expenses incurred by either the Partnership and/or THC for the services of architects, attorneys, accountants, engineers, consultants and the like. Notwithstanding the foregoing, "Construction Cost" does not include the working capital of or attributable to such Future Project upon its opening, the fees payable to THC, the reimbursable out-of-pocket expenses incurred by THC, its officers, employees and/or agents, in performing its obligations under the Management Agreement, the cost of land and rights-of-way, or compensation for damage to such Future Project (but only to the extent such compensation is not utilized in connection with the repair and/or restoration of such Future Project), pre-opening expenses (such as payroll costs incurred in training the Future Project's employees and advertising and promotional expenses), financing fees and capitalized interest expense, and additional costs incurred solely as a result of the negligence of THC and/or its affiliates and which arise as a result of the occurrence of (i) work damaged by fire or other cause during construction, (ii) a significant amount of defective or neglected work of any contractor, (iii) prolongation of the contract time of any prime contract, (iv) acceleration of the work schedule involving services beyond normal working hours, (v) default by any contractor, and (vi) investigation, evaluation and negotiation of contractors' claims for additional time or money.

In addition, the Partnership is obligated to reimburse THC, on a monthly basis, for all of its out-of-pocket expenses incurred by THC, its officers, employees and/or agents, in performing its obligations under the Management Agreement, and the amounts billed to THC by unaffiliated persons and/or entities for their costs and/or expenses incurred at the request of THC in connection with THC's performance of its construction supervisory services under the Management Agreement. See "Description of the Bonds—Payment of Management and Construction Fees."

*Term.* The term of the Management Agreement with respect to the construction and related services pertaining to the Taj Mahal and any particular Future Project is that period of time which is reasonably required for completion of such services, including the final adjustment of all contract claims after the opening of the Taj Mahal or such Future Project, as the case may be. Unless the Management Agreement is terminated at an earlier date, the term of the Management Agreement with respect to THC's

management services and with respect to construction services pertaining to Future Projects ends on the date which is seventeen years from the Opening Date.

*Termination.* Each of the parties to the Management Agreement has the right and option to terminate the Management Agreement on 30 days' prior written notice to the other in the event the other party causes, commits or suffers to exist with respect to it any of the following (a) a material breach of any of the material terms and provisions of the Management Agreement which is not cured within 30 days after written notice thereof, or, if such breach is of such a nature that it cannot be completely remedied within the 30-day period, then the failure of such party to institute and thereafter prosecute to completion all steps necessary to remedy the same (b) the suspension of the normal business operations of the Partnership for a period in excess of 60 consecutive days pursuant to any statute, order or decree of any governmental authority having jurisdiction over the Taj Mahal, or (c) the sale or transfer by the Partnership of the Taj Mahal to any entity not affiliated with the Partnership. Upon (i) the occurrence of an Event of Default under the Mortgage and the exercise by the Trustee of certain rights of possession, or (ii) the appointment of a receiver of the Trust Estate, either THC or the Trustee may terminate the Management Agreement.

*Casino Control Act.* The Management Agreement, which may not be amended or assigned without the approval of the Casino Control Commission, is deemed to include all provisions required by the Casino Control Act and is conditioned upon the approval of the Casino Control Commission.

## CERTAIN UNITED STATES TAX CONSIDERATIONS

The following summary is a general discussion of certain of the anticipated United States Federal tax consequences of the purchase, ownership and disposition of the Bonds. The summary is based upon the provisions of the Internal Revenue Code of 1986 (the "Code") as in effect on the date hereof. This summary is not intended as tax advice, and is based on the Company's understanding of United States Federal tax law as currently interpreted. No representation is made regarding the continuation of such laws or of such interpretations, and no attempt is made to consider any applicable foreign tax laws or United States state or local tax laws.

This summary is limited to investors who will hold the Bonds as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Code. The tax consequences to any particular investor may be affected by matters not discussed below. For example, certain types of investors (including life insurance companies and tax-exempt organizations) may be subject to special rules not addressed in the summary.

Each person considering acquiring a Bond is urged to consult his own tax advisor regarding the tax consequences attendant upon the purchase, ownership and disposition of a Bond.

### Certain Federal Income Tax Consequences for United States Persons

The following discussion is addressed to United States Persons. For this purpose, a United States Person is a citizen or resident of the United States, a corporation or partnership created or organized in the United States or under the laws of the United States or of any state and an estate or trust the income of which is subject to United States Federal income taxation regardless of its source.

*Interest*

Under the Code, cash paid as interest on the Bonds will be taxable as ordinary income in accordance with the holder's method of tax accounting. It is not anticipated that the Bonds will bear original issue discount.

*Disposition of a Bond*

Subject to the market discount rules discussed below, a holder of a Bond will recognize capital gain or loss equal to the difference between (i) the sum of the amount of money plus the fair market value of any other property received upon the disposition of a Bond and (ii) the adjusted basis of the Bond for Federal income tax purposes.

Capital gain or loss recognized by a holder of a Bond upon disposition of the Bond will be long-term capital gain or loss if the Bond was held for more than one year when disposed of. Under current law,

capital gains will be taxed at the same rates as ordinary income. However, certain distinctions between capital gains and ordinary income have been retained, in particular the treatment of capital losses. Capital losses in excess of capital gains may be deducted by noncorporate taxpayers against ordinary income only to the extent of $3,000; capital losses are deductible by corporations only against capital gains.

*Market Discount and Bond Premium*

Disposition of the Bonds may be affected by the "market discount" rules of Code Sections 1276-1278. Unless contrary Treasury regulations are issued, these rules provide, in general, that if a subsequent holder of a Bond purchases it at a market discount (that is, a discount from its issue price) and thereafter recognizes gain upon a disposition, the lesser of (i) such gain or (ii) the market discount accrued during the time the holder held the Bond, will be taxed as ordinary interest income rather than as capital gain. A subsequent holder disposing of a Bond in a transaction other than a sale or exchange (for example, a gift) will be treated as realizing an amount equal to the fair market value of the Bond. If the market discount is within the *de minimis* rule of Code Section 1278(a)(2)(C), it will be considered to be zero. Market discount accrues ratably from the date the holder acquires the Bond until the date of maturity, unless the holder makes an irrevocable election to accrue interest on a constant interest rate basis. These rules also provide that a holder of a market discount bond may be required to defer the deduction of interest on indebtedness incurred to purchase or carry the Bond until the year in which the holder disposes of the Bond in a taxable transaction.

A holder may elect to include market discount in income currently, on a constant interest rate basis, in which case the market discount rules discussed above will not apply. Any market discount included in income under such an election will be added to the holder's tax basis for the Bond. The election will apply to all market discount bonds acquired by the holder on or after the first day of the first taxable year to which the election applies, and the election will apply to all subsequent taxable years, unless revoked with the permission of the Internal Revenue Service ("IRS").

If a holder's tax basis in a Bond immediately after purchase of the Bond exceeds the remaining stated redemption price at maturity of the Bond, such excess generally constitutes amortizable bond premium. The holder may elect to amortize such bond premium using a constant interest rate method over the remaining term of the Bond. Pursuant to the Technical and Miscellaneous Revenue Act of 1988, which has been passed by Congress but which has not yet been signed into law by the President of the United States, with respect to a Bond, the bond premium amortized in a taxable year will be treated as a reduction of the holder's interest income from the Bond for that year instead of as a separate deduction. Also, because a Bond may be optionally redeemed at a price in excess of its stated redemption price at maturity, special rules will apply which could result in a deferral of the amortization of some of the bond premium until later in the term of the Bond. The holder's tax basis in the Bond will be decreased by the amount of the amortized bond premium. An election to amortize bond premium applies to all taxable debt obligations then owned and thereafter acquired by the holder and may be revoked only with the permission of the IRS. If a Bond is called before maturity, a holder who purchased the Bond at a premium and who has elected to amortize bond premium will realize as an ordinary loss in the year of redemption an amount of bond premium equal to the excess of the holder's adjusted basis in the Note (as of the beginning of the year) over the amount received on redemption or (if greater) the amount payable at maturity.

**Certain Federal Tax Consequences for Foreign Persons**

The following discussion is addressed to Foreign Persons. For this purpose, a "Foreign Person" is any nonresident alien individual, foreign corporation, foreign fiduciary of a foreign estate or trust, or foreign partnership, one or more of the members of which is a Foreign Person, as such terms are defined for United States Federal tax purposes; but the term "Foreign Person" includes only such Persons for whom income or gain on the Bonds is not "effectively connected with the conduct of a trade or business within the United States" within the meaning of Section 864 of the Code. If income or gain on the Bonds is "effectively connected with the conduct of a trade or business within the United States", then the Foreign Person will be subject to tax in essentially the same manner as a United States Person, as discussed above, and in the case of a foreign corporation, may also be subject to the branch profits tax.

*Interest and Principal*

Subject to the discussion below under the heading "Backup Withholding," payment of the principal of and interest on any Bond beneficially owned by a Foreign Person will not be subject to tax in the United States, provided, with respect to interest, that the "portfolio interest" exception applies to the interest on the Bond. Under the "portfolio interest" exception to the general rules for the withholding of tax on interest paid to Foreign Persons, a Foreign Person will not be subject to United States federal income tax (or to withholding) on interest, provided that (a) such Foreign Person (1) is not a controlled foreign corporation related to the Company or the Partnership through stock ownership, (2) does not actually or constructively own 10% or more of the total combined voting power of all classes of stock of the Company entitled to vote or 10% or more of the capital or profits interest in the Partnership and (3) is not a foreign private foundation or other tax-exempt entity described in Section 1443 of the Code; and (b) the appropriate certification is provided to the Company or its paying agent, as described below.

In order to qualify for the "portfolio interest" exception, either of the following two types of certification must be provided to the Company, its paying agent or any person who would otherwise be required to withhold tax (in each case, a "Withholding Agent"): (1) a statement (an "Owner's Statement") signed under penalties of perjury by the beneficial owner of a Bond in which the owner certifies that the owner is not a United States Person and which provides the owner's name and address, or (2) a statement signed under penalties of perjury by the Financial Institution, if any, which holds a Bond on behalf of the beneficial owner in which the Financial Institution certifies that it has received the Owner's Statement from the beneficial owner. The Financial Institution must also attach a copy of the Owner's Statement to its statement. For purposes of this certification, the term "Financial Institution" means a securities clearing organization, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business and that holds a Bond on behalf of the beneficial owner of the Bond.

A Foreign Person who does not qualify for the "portfolio interest" exception would under current law generally be subject to United States withholding tax at a flat rate of 30% (or, if applicable, a lower treaty rate) on interest payments on the Bonds.

*Sale, Redemption or Other Disposition*

In general, gain realized by a Foreign Person upon the sale, redemption or other disposition of a Bond will not be subject to United States federal income tax (or to withholding) on such gain. However, a Foreign Person who is a nonresident alien individual may be subject to United States tax at a flat rate of 30% (unless exempt under an applicable treaty) if such Person is present in the United States for a total of 183 days or more during the taxable year in which the Bond is sold, redeemed or otherwise disposed of. Also a Foreign Person that has a past or present status as a personal holding company, a foreign personal holding company, a controlled foreign corporation, a passive foreign investment company, a private foundation or other tax exempt organization for United States federal income tax purposes or as a corporation that accumulates earnings to avoid United States federal income tax, may be subject to United States tax on all or a portion of the gain realized upon disposition of a Bond. See "Disposition of a Bond" above for a discussion of the determination of such gain.

*Estate Tax*

Any Bond beneficially owned by an individual who at the time of death is not a citizen or resident of the United States and who does not actually or constructively own 10% or more of the total combined voting power of all classes of stock of the Company entitled to vote or 10% or more of the capital or profits interest in the Partnership will not be included in the estate of such individual for purposes of calculating any United States federal estate tax due as a result of the death of such individual, provided that interest on such Bond would not be effectively connected with the conduct of a trade of business within the United States.

**Backup Withholding**

Under Section 3406 of the Code and the temporary Treasury regulations issued thereunder, unless an exception applies, a Withholding Agent may be required, under certain circumstances, to withhold and

remit to the United States Treasury 20% of the interest payments on the Bonds ("backup withholding"). In general, backup withholding will be required if the IRS notifies the Withholding Agent that the beneficial owner of the Bonds is subject to backup withholding or if the beneficial owner fails to provide a correct taxpayer identification number or otherwise to comply with applicable requirements of the backup withholding rules. In addition, failure to provide a correct taxpayer identification number may result in imposition of penalties by the IRS. Certain holders (including, among others, corporations and foreign individuals who comply with the certification and status requirements described above under the heading "Interest and Principal") are not subject to the backup withholding requirements.

## UNDERWRITING

Merrill Lynch, Pierce, Fenner & Smith Incorporated (the "Underwriter") has agreed, subject to the terms and conditions set forth in the Purchase Agreement by and among the Underwriter, the Company, and the Partnership (the "Purchase Agreement"), to deliver executed delayed delivery contracts between purchasers of the Bonds offered hereby and the Company and the Partnership. The Purchase Agreement provides that the Underwriter is committed to deliver executed delayed delivery contracts for all of the Bonds if any are delivered. The Underwriter has advised the Company and the Partnership that it does not intend to confirm sales in excess of 5% of the Bonds offered hereby to any account over which it exercises discretionary authority.

The Underwriter proposes to solicit offers to purchase the Bonds, pursuant to delayed delivery contracts, directly from the public at the public offering price set forth on the cover page hereof and may offer Bonds to selected dealers at such price less a concession not in excess of .25% of the principal amount per Bond. The Underwriter may allow, and such dealers may reallow, a concession not in excess of .125% of their principal amounts to other dealers. After the initial offering, the public offering price, concessions and reallowances may be changed by the Underwriter.

The Underwriter proposes to solicit offers to purchase the Bonds pursuant to delayed delivery contracts to be entered into directly between the Company, the Partnership, the Underwriter and the purchasers of the Bonds on or about November 16, 1988, or such earlier date as delayed delivery contracts for all of the Bonds have been obtained. Upon the terms and subject to the conditions of the delayed delivery contracts, the purchasers thereunder will purchase the Bonds at the public offering price set forth on the cover page of this Prospectus, on or about December 7, 1988 or such earlier date after delayed delivery contracts in respect of all of the Bonds are entered into (but in no event earlier than November 16, 1988) as shall be determined by the Company on not less than two business days prior notice to the Underwriter. The Company may elect to postpone the purchase date but not beyond December 7, 1988. Pursuant to the delayed delivery contracts, if the conditions contained therein are satisfied or are waived by the Underwriter, the purchasers will be obligated to tender payment for the Bonds against delivery thereof. However, if such conditions are not satisfied or waived by the Underwriter on or before December 7, 1988, all obligations under the delayed delivery contracts will terminate. In the event the Company determines that the Acquisition Closing will not occur prior to December 7, 1988, for any reason whatsoever, the Company may terminate the delayed delivery contracts.

Pursuant to the delayed delivery contracts, the Partnership will pay each purchaser a non-refundable fee of .25% of the aggregate principal amount of the Bonds which such purchaser has agreed to purchase, payable upon delivery of executed delayed delivery contracts for the entire aggregate principal amount of the Bonds. The Partnership will deliver to the Underwriter the sum of $1,687,500 representing the total commitment fees payable under the preceding sentence. The Underwriter will pay from such sum the pro rata non-refundable fee payable to each purchaser (including the Underwriter) who delivers a delayed delivery contract to the Company. If the closing of the sale of the Bonds has not occurred prior to November 23 or November 30 and the delayed delivery contracts are not terminated as described above, the Underwriter will pay each purchaser on each such date a non-refundable fee of .125% of the aggregate principal amount of the Bonds which such purchaser has agreed to purchase.

The Partnership will pay to the Underwriter the underwriting commissions set forth on the cover page of this Prospectus upon receipt of payment for the Bonds. After the initial public offering, the offering price and other terms may be changed.

The Company and the Partnership have agreed to indemnify the Underwriter against certain liabilities which may be incurred in connection with this offering, including liabilities under the 1933 Act.

## LEGAL MATTERS

Legal matters in connection with the securities offered hereby have been passed upon for the Company and the Partnership by Willkie Farr & Gallagher, New York, New York who will rely upon the opinion of Ribis, Graham, Verdon & Curtin, 4 Headquarters Plaza, Morristown, New Jersey 07960 as to matters of New Jersey law. Certain legal matters have been passed upon for the Underwriter by Fried, Frank, Harris, Shriver & Jacobson (a partnership including professional corporations), New York, New York.

## EXPERTS

The financial statements included in this Prospectus and elsewhere in the Registration Statement have been examined by Arthur Andersen & Co., independent public accountants, as indicated in their report with respect thereto, and are included herein in reliance upon the authority of said firm as experts in accounting and auditing in giving said report.

The statements as to matters of law and legal conclusions concerning New Jersey gaming laws included under the captions "Special Considerations—Security for the Bonds," "—Risks Regarding Completing and Opening the Taj Mahal," "—Regulatory Matters" and "—Regulatory Matters Affecting Ownership of Bonds," "Business of the Partnership," "Management—General," "Description of the Bonds—Security," and "—Gaming Laws" and "Management Agreement" have been prepared by Ribis, Graham, Verdon & Curtin, gaming counsel for the Company and the Partnership, and are included herein upon their authority as experts.

The references to AGI and MGA, and to the appraisal reports rendered by AGI and MGA, are included herein in reliance upon the authority of AGI and MGA, respectively, as experts with respect to the matters contained in their appraisal reports. Copies of the appraisal reports have been filed as Exhibits to the Registration Statement of which this Prospectus forms a part.

## GLOSSARY

Certain terms used in this Prospectus are defined below and under "Description of the Bonds—Certain Definitions."

*"Acquisition Closing"* shall mean the closing, anticipated to be in November 1988, under the Asset Purchase Agreement.

*"ACS"* shall mean Atlantic City Showboat, Inc. which operates the Showboat.

*"AGI"* shall mean Appraisal Group International, West Orange, N.J.

*"AGI Current Appraisal"* shall mean the report, dated August 8, 1988, as supplemented by letter dated November 7, 1988, prepared by AGI relating to the current market value of the Property as of March 31, 1988.

*"AGI Report"* shall mean the report, dated August 9, 1988, as supplemented by letter dated November 7, 1988, prepared by AGI relating to the market value of the Property as of February 15, 1990.

*"Asset Purchase Agreement"* shall mean the Asset Purchase Agreement, dated May 27, 1988, as amended, by and between Resorts and the Partnership, pursuant to which Resorts agreed to sell and the Partnership agreed to purchase certain assets, including the Taj Mahal.

*"Assigned Assets"*—see "The Acquisition—Asset Purchase Agreement—*Assigned Assets.*"

*"Bank Financing"* shall mean the loans to be provided by First Fidelity and Bankers Trust Company to the Partnership in the aggregate principal amount of $250,000,000, to be used to fund a portion of the Purchase Price.

*"Bondholder"* or *"Bondholders"* shall mean any person or persons who holds, directly or indirectly, any of the Bonds offered hereby.

*"Bonds"* shall mean the 14% First Mortgage Bonds, Series A, due 1998, which are offered pursuant to this Prospectus.

*"Casino Control Act"* shall mean the New Jersey Casino Control Act and the regulation promulgated thereunder.

*"Casino Control Commission"* shall mean the New Jersey Casino Control Commission.

*"Class A Shares"* shall mean RII's Class A Common Stock, par value $1.00 per share.

*"Class B Shares"* shall mean RII's Class B Common Stock, par value $1.00 per share.

*"Code"* shall mean the Internal Revenue Code of 1986, as amended.

*"Collateral"* shall mean all property securing the Bonds pursuant to the Mortgage, including the Note, as assigned to the Trustee for the benefit of the Bondholders.

*"Commission"* shall mean the Securities and Exchange Commission.

*"Company"* shall mean Trump Taj Mahal Funding, Inc.

*"CRDA"* shall mean the Casino Reinvestment Development Authority.

*"Cut-Off Date"* shall mean March 31, 1988.

*"Delaware Actions"*—see "The Acquisition—Legal Proceedings."

*"Development Agreement"* shall mean that certain Development Agreement, as amended, between RII and the Housing Authority, dated October 3, 1983, pursuant to which, among other things, RINJ acquired the Development Site Parcel.

*"Development Site Parcel"* shall mean the approximately 8.5 acres, out of the Taj Mahal's approximately 17 acre site, acquired by RINJ from the Housing Authority.

*"Division"* shall mean the New Jersey Division of Gaming Enforcement.

*"First Fidelity"* shall mean First Fidelity Bank, National Association, New Jersey.

*"General Partners"* shall mean Donald J. Trump and Trump Inc., general partners of the Partnership.

*"Griffco"* shall mean the Griffco Acquisition Corp., a Delaware corporation wholly owned by Griffin Co.

*"Griffin Co."* shall mean The Griffin Company, a Connecticut corporation wholly owned by Merv Griffin.

*"Guaranty"* shall mean the Partnership's guaranty of the obligations of the Company to pay the principal of, premium, if any, and interest on, the Bonds.

*"Housing Authority"* shall mean the Housing Authority and Urban Redevelopment Agency of the City of Atlantic City.

*"Housing Authority Guaranty"* the Guaranty of Donald J. Trump in favor of the Housing Authority relating to the construction of the Taj Mahal.

*"Indenture"* shall mean the indenture between and among the Company, as issuer of the Bonds, the Partnership, as guarantor, and the Trustee.

*"Management Agreement"* shall mean the Management Agreement between the Partnership and THC.

*"MGA"* shall mean Martin Gross Associates, West Orange, New Jersey.

*"MGA Current Appraisal"* shall mean the report, dated August 15, 1988, as supplemented by letter dated November 7, 1988, prepared by MGA relating to the market value of the Property as of March 31, 1988.

*"Merger Agreement"* shall mean the Agreement and Plan of Merger, dated May 27, 1988, and amended as of June 6, 1988, among RII, Griffin Co. and Griffco, pursuant to which Griffco will be merged into RII.

*"Mortgage"* shall mean the mortgage on, and other documents evidencing a security interest in, the Partnership's Taj Mahal and certain other assets.

*"New Parking Facility"* shall mean any proposed parking facility, to be used substantially by the Taj Mahal, which may be constructed or acquired by the Partnership.

*"New York Action"*—see "The Acquisition—Legal Proceedings."

*"1933 Act"* shall mean the Securities Act of 1933, as amended.

*"Note"* shall mean that certain note to be issued by the Partnership to the Company pursuant to the terms of the Indenture, in the principal amount of $675,000,000 which note will be secured by the Mortgage and shall be assigned by the Company to the Trustee for the benefit of the Bondholders.

*"Opening Date"* shall mean the date on which the Taj Mahal is substantially open to the public for gaming business, which is expected to be on or about February 15, 1990.

*"Partners"* shall mean Donald J. Trump and Trump Inc., the General Partners of the Partnership, and Donald J. Trump, the sole limited partner of the Partnership.

*"Partnership"* shall mean Trump Taj Mahal Associates Limited Partnership, formed on June 23, 1988 under the laws of the State of New Jersey.

*"Permitted Investments"*—see "Description of the Bonds—Certain Covenants of the Company and the Partnership—*Limitations on Investments.*"

*"Project Cost"* shall mean the currently estimated total budget, in the amount of $493,000,000, to construct, open and fund the initial operations of the Taj Mahal. The Project Cost does not include acquisition costs payable under the Asset Purchase Agreement, expenses incurred in connection therewith and expenses of the offering of the Bonds.

*"Property"* shall mean the property (real and personal) to be acquired by the Partnership pursuant to the Asset Purchase Agreement (other than the Assigned Assets). See "The Acquisition—Asset Purchase Agreement—*The Property.*"

*"Purchase Agreement"* shall mean the agreement among the Company, the Partnership and the Underwriter, pursuant to which the Underwriter has agreed, subject to the terms and conditions set forth therein, to purchase all of the Bonds.

*"Purchase Price"*—see "Prospectus Summary—The Partnership—*The Acquisition.*"

*"Registration Statement"* shall mean the Registration Statement on Form S-1 under the 1933 Act, as amended, as filed with the Commission, with respect to the Bonds offered by this Prospectus.

*"Resorts"* shall mean RII and its subsidiaries, but, as used under "The Acquisition—Asset Purchase Agreement" shall mean only RII and those of its subsidiaries that are parties to the Asset Purchase Agreement.

*"Resorts Casino Hotel"* shall mean the existing Resorts International casino/hotel complex currently owned by a wholly owned subsidiary of RII.

*"RII"* shall mean Resorts International, Inc., a Delaware corporation.

*"RINJ"* shall mean Resorts International, Inc. of New Jersey, a New Jersey corporation.

*"Services Agreement"* shall mean the Comprehensive Services Agreement, dated October 16, 1987, as amended, between RII and Trump Hotel Corporation.

*"Showboat"* shall mean the Showboat Hotel and Casino located in Atlantic City, New Jersey, and operated by ACS.

*"Showboat Lease"* shall mean the 99-year net lease entered into between RII, as lessor, and ACS, as lessee, dated as of October 26, 1983 (as amended).

*"Steel Pier"* shall mean the approximately 1,000 foot pier known as the "Steel Pier" to be acquired by an affiliate of Donald J. Trump pursuant to the Asset Purchase Agreement.

*"Steel Pier Arena"* shall mean the planned Taj Mahal 80,000 square-foot convention space and exhibition hall facility to be known as the "Steel Pier Arena."

*"Stock Sale Agreement"* shall mean that agreement, dated as of May 27, 1988, as amended, between Donald J. Trump, as seller, and Griffin Co., as purchaser, providing for the sale of all of the Trump B Shares to Griffin Co.

*"Taj Mahal"* shall mean the casino/hotel and convention center complex to be acquired, constructed, owned and operated by the Partnership on the Boardwalk in Atlantic City, New Jersey, known as the "Taj Mahal."

*"Terrace Building"* shall mean that certain office building located on a certain parcel of land commonly known at 147-153 South Pennsylvania Avenue, Atlantic City, New Jersey.

*"THC"* shall mean Trump Hotel Management Corp., a New Jersey corporation owned and controlled by Donald J. Trump.

*"The Trump Organization"* shall mean The Trump Organization and its affiliated entities.

*"3.7 Acre Parcel"* shall mean those certain lots near the Taj Mahal site which Resorts has an option to acquire from the Housing Authority and which constitute a part of the Assigned Assets.

*"Trump B Shares"* —see "The Acquisition—Background."

*"Trump Casinos"* shall mean the Trump Castle Hotel & Casino and Trump Plaza Hotel and Casino, which are both beneficially owned by Donald J. Trump.

*"Trump Completion Guaranty"* shall mean the Guaranty of Donald J. Trump in favor of the Company relating to the construction of the Taj Mahal.

*"Trump Hotel Corporation"* shall mean The Trump Hotel Corporation, a New Jersey corporation owned and controlled by Donald J. Trump.

*"Trump Inc."* shall mean Trump Taj Mahal, Inc., the corporate general partner of the Partnership.

*"Trump Line of Credit"* shall mean the line of credit in the amount of $25,000,000 to be provided to the Partnership by Donald J. Trump and which, under certain circumstances, must be drawn upon by the Partnership.

*"Trust Indenture Act"* shall mean the Trust Indenture Act of 1939, as in effect on the date of the Indenture.

*"Trustee"* shall mean Bankers Trust Company, New York, New York.

*"Underwriter"* shall mean Merrill Lynch, Pierce, Fenner & Smith Incorporated.

## INDEX TO FINANCIAL STATEMENTS


| | Page |
|---|---|
| Report of Independent Public Accountants | F-2 |
| Combined Balance Sheet of Trump Taj Mahal Associates Limited Partnership and Trump Taj Mahal Funding, Inc. as of October 31, 1988 | F-3 |
| Balance Sheet of Trump Taj Mahal Funding, Inc. as of October 31, 1988 | F-4 |
| Notes to Combined Balance Sheet of Trump Taj Mahal Associates Limited Partnership and Trump Taj Mahal Funding, Inc. | F-5 |

## REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To Trump Taj Mahal Associates Limited Partnership
and Trump Taj Mahal Funding, Inc.:

We have audited the accompanying combined balance sheet of Trump Taj Mahal Associates Limited Partnership (a New Jersey limited partnership) and Trump Taj Mahal Funding, Inc. (a New Jersey corporation) and the balance sheet of Trump Taj Mahal Funding, Inc. as of October 31, 1988. These financial statements are the responsibility of the Partnership's and the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the balance sheets referred to above present fairly in all material respects the combined financial position of Trump Taj Mahal Associates Limited Partnership and Trump Taj Mahal Funding, Inc. and the financial position of Trump Taj Mahal Funding, Inc. as of October 31, 1988 in conformity with generally accepted accounting principles.

Roseland, New Jersey
November 2, 1988

ARTHUR ANDERSEN & CO.

# TRUMP TAJ MAHAL ASSOCIATES LIMITED PARTNERSHIP AND TRUMP TAJ MAHAL FUNDING, INC.

## COMBINED BALANCE SHEET

### October 31, 1988

### ASSETS

| | |
|---|---|
| Cash | $ 40,000 |
| Deferred Acquisition Costs (Note 2) | 5,000,000 |
| Deferred Offering Costs (Note 2) | 2,450,000 |
| Organization Costs (Note 1) | 161,000 |
| Total Assets | $7,651,000 |

### LIABILITIES AND CAPITAL

| | |
|---|---|
| Accrued Expenses | $6,500,000 |
| Advances from Affiliates (Note 1) | 1,130,000 |
| Commitments and Contingencies (Notes 1, 2 and 3) | |
| Partners' Capital and Shareholders' Equity (Notes 1 and 3): | |
| Partners' capital | 1,000 |
| Common stock, without par value, 2,500 shares authorized, 200 shares issued and outstanding | 20,000 |
| Partners' Capital and Shareholders' Equity | 21,000 |
| Total Liabilities and Capital | $7,651,000 |

The accompanying notes to combined balance sheets are an integral part of this combined balance sheet.

## TRUMP TAJ MAHAL FUNDING, INC.

### BALANCE SHEET

### October 31, 1988

### ASSETS

| | |
|---|---|
| Cash | $ 20,000 |
| Total Assets | $ 20,000 |

### LIABILITIES AND SHAREHOLDERS' EQUITY

| | |
|---|---|
| Commitments and Contingencies (Note 3) | |
| Shareholders' Equity (Note 1): | |
| Common stock, without par value, 2,500 shares authorized, 200 shares issued and outstanding | $ 20,000 |
| Total Liabilities and Shareholders' Equity | $ 20,000 |

The accompanying notes to combined balance sheets are an integral part of th s balance sheet.

**TRUMP TAJ MAHAL ASSOCIATES LIMITED PARTNERSHIP AND TRUMP TAJ MAHAL FUNDING, INC.**

**NOTES TO COMBINED BALANCE SHEETS**

**October 31, 1988**

**(1) Organization and operations:**

Trump Taj Mahal Associates Limited Partnership (the "Partnership") was organized on June 23, 1988 as a New Jersey limited partnership. Donald J. Trump and Trump Taj Mahal, Inc. ("Trump Inc."), a New Jersey corporation which is owned by Mr. Trump, are the general partners and Mr. Trump is the sole limited partner (the "Partners") of the Partnership. The Partnership was formed for the sole purpose of acquiring, completing construction and operating the Taj Mahal Hotel and Casino (the "Taj Mahal") (see Note 2). Trump Inc. was incorporated on June 3, 1988 for the sole purpose of owning an interest in the Partnership and Trump Taj Mahal Funding, Inc. (the "Company"), a New Jersey corporation. It has had no other operations to date. Non-interest bearing advances of $1,130,000 were made to the Partnership from Donald J. Trump and will be repaid from the proceeds of the proposed First Mortgage Bonds (see Note 3). Organization costs will be amortized on a straight line basis over five years.

The Company was incorporated on June 3, 1988 solely to serve as a financing company to raise funds through the issuance of bonds for the benefit of the Partnership (see Note 3). The Company is wholly owned by Donald J. Trump and Trump Inc.

The Partnership and the Company are engaged in organizational activities. The Partnership and the Company have no operating history and their proposed operations are subject to all of the risks inherent in the establishment of a new business enterprise, including the success of this offering. The likelihood of the success of the Partnership must be considered in light of the problems, difficulties, complications and delays frequently encountered in connection with the formation of a new business. Accordingly, the ability of the Partnership to service its debt to the Company is completely dependent upon the success of that operation and such success will depend upon financial, business, competitive, regulatory and other factors affecting the Taj Mahal and the casino industry in general, as well as prevailing economic conditions. (See "Special Considerations" section in this Prospectus).

The operation of an Atlantic City hotel and casino is subject to significant regulatory control which affect virtually all of its operations. Under the New Jersey Casino Control Act, the Partnership is required to obtain certain licenses prior to opening which must be renewed periodically thereafter. These licenses are not transferable. Upon revocation, suspension for more than 120 days, or failure to renew the casino license, the New Jersey Casino Control Act provides for the mandatory appointment of a conservator to take possession of the hotel and casino business and property, subject to all valid liens, claims and encumbrances. Under certain circumstances, the conservator, after approval by the Casino Control Commission, shall continue the hotel and casino's business and shall pay when due from the licensee's available assets any secured debt or be subject to foreclosure by such creditors. In addition, the conservator, after approval by the Casino Control Commission and consultation with the former licensee, may sell, assign or otherwise dispose of, all of the property of the hotel and casino, subject to all valid liens, claims and encumbrances.

**(2) Purchase of the Taj Mahal:**

The Partnership has entered into an Asset Purchase Agreement (the "Agreement") with Resorts International, Inc.; ANTL, Inc.; Resorts International Airlines, Inc.; Resorts International, Inc. of New Jersey; Resorts International Hotel, Inc.; and New Pier Operating Company, Inc. (collectively, "Resorts"). Pursuant to the Agreement, as amended, the Partnership will acquire the Taj Mahal currently under construction in Atlantic City, certain furniture, fixtures and equipment used in the operation of the Taj Mahal and other assets described in the Agreement for $230,000,000 plus the assumption of certain

**TRUMP TAJ MAHAL ASSOCIATES LIMITED PARTNERSHIP AND TRUMP TAJ MAHAL FUNDING, INC.**

**NOTES TO COMBINED BALANCE SHEETS—(Continued)**

liabilities including a fixed adjustment of $43,000,000, estimated acquisition costs of $10,000,000 and estimated closing adjustments of $17,100,000. In addition, the Partnership will assign to two of Donald J. Trump's affiliates the right to acquire certain property and equipment with an estimated appraised value of approximately $12,000,000. The total purchase price payable to Resorts for such assigned assets will be paid directly by such affiliates of Donald J. Trump. In contemplation of the pending transaction, acquisition and offering costs of $5,000,000 and $2,450,000 have been incurred through October 31, 1988.

Building and building improvements and furniture, fixtures and equipment will be depreciated on the straight-line method based on their estimated useful lives commencing in the period in which the Taj Mahal is completed and ready for operations.

As part of the Agreement, the Partnership will enter into various agreements with Resorts, whereby certain property will be leased back to Resorts under short-term operating leases. These leases cover the use of certain administrative offices and parking spaces presently under construction.

**(3) Proposed mortgage bonds:**

The Partnership intends to refinance a portion of the cost of the acquisition and to complete the construction of the Taj Mahal with the proceeds from $675,000,000 aggregate principal amount of First Mortgage Bonds (the "Bonds") to be issued by the Company. The Bonds will be secured by a first mortgage on the Taj Mahal and certain other assets of the Partnership. The collateral for the Bonds will not include cash and Permitted Investments, as defined, of the Partnership, including any net proceeds from the sale of the Bonds held by the Partnership until expended. The Bonds will be non-recourse to the Partners of the Partnership and cannot be subordinated with respect to any other future borrowings of the Partnership or the Company.

The guaranty to be issued by the Partnership will be a guaranty of the payment of the principal of, premium, if any, and interest on the Bonds. In the event of a default, holders of the Bonds may look only to the assets of the Partnership, except cash which may be distributed pursuant to the Indenture (regardless of whether such cash has been distributed). Donald J. Trump will guarantee that the Taj Mahal will be substantially completed in accordance with the plans and specifications by March 1, 1991, subject to extension by reason of Force Majeure Delays (as defined).

The Bonds will bear interest at a rate to be determined, payable semiannually, and the then unpaid principal thereof will be due in full on November 15, 1998. The Bonds will be redeemable at any time on or after November 15, 1993 at the option of the Company, in whole or in part, at a premium scaling down to par at November 15, 1997.

The Partnership will enter into a management agreement with Trump Hotel Management Corp. ("THC"), a New Jersey corporation controlled by Donald J. Trump, for the payment of a management fee in consideration of services to be provided. The management fee will be 1¾% of the gross revenues, as defined, of the Partnership and payment of the management fee will be subordinated to the payment of interest and principal of the Bonds. In addition, the Partnership has agreed to pay THC $10,000,000 for construction supervisory services payable within 10 days after (but not prior to) the opening of the Taj Mahal and 3% of the Construction Cost (as defined) of any Future Project (as defined).

The proposed bond indenture limits the amounts of additional debt that may be incurred by the Partnership, and the amount of restricted payments, as defined, that may be made to the Partners. The Partnership may make quarterly restricted payments, as defined, to its Partners of any or all of its available

cash flow, as defined, if it has maintained a coverage ratio of consolidated net income before interest, depreciation, amortization and taxes to total interest expense of at least 1.5 for the prior four fiscal quarters and 50% of available cash flow, as defined, if such coverage ratio is between 1.0 and 1.5.

The Partnership may also make one restricted payment, as defined, in each fiscal quarter after the opening date of the Taj Mahal equal to the excess of (1) all available cash flow, as defined, from the opening date to the end of the most recently completed fiscal quarter minus the amount of all restricted payments, as defined, previously made by the Partnership over (2) $67,500,000, provided that (a) the coverage ratio for the most recently completed four fiscal quarters is not less than 1.5 and (b) the Partnership will have both working capital, as defined, and cash, including short term marketable securities, immediately after the restricted payment, as defined, of at least $67,500,000.

If the coverage ratio for any fiscal year in which a restricted payment was made is less than 1.0, then the Partners are required to return to the Partnership all restricted payments received during that fiscal year.

ction o

No dealer, salesman or any other person has been authorized to give any information or to make any representation in connection with this offering other than those contained in this Prospectus and, if given or made, such information or representation must not be relied upon as having been authorized by the Company, the Partnership or the Underwriter. This Prospectus does not constitute an offer to sell or a solicitation of an offer to buy any of these securities in any jurisdiction to any person to whom it is unlawful to make such offer or solicitation in such jurisdiction. Neither the delivery of this Prospectus nor any sale made hereunder shall, under any circumstances, create any implication that the information herein is correct as of any time subsequent to its date.

TABLE OF CONTENTS


| | Page |
|---|---|
| Prospectus Summary | 3 |
| Summary Historical and Pro Forma Financial Information | 7 |
| Special Considerations | 8 |
| The Company | 17 |
| The Partnership | 17 |
| The Acquisition | 18 |
| The Financing | 24 |
| Use of Proceeds | 25 |
| Capitalization | 26 |
| Selected Historical and Pro Forma Financial Data | 27 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations of the Partnership and the Company | 28 |
| Combined Pro Forma Balance Sheet | 29 |
| Business of the Partnership | 31 |
| Properties of the Partnership | 37 |
| Management | 43 |
| Description of the Bonds | 45 |
| Trump Completion Guaranty and Line of Credit | 67 |
| Management Agreement | 74 |
| Certain United States Tax Considerations | 76 |
| Underwriting | 79 |
| Legal Matters | 80 |
| Experts | 80 |
| Glossary | 81 |
| Index to Financial Statements | F-1 |


Until December 4, 1988 (25 days after the date of this Prospectus), all dealers effecting transactions in the securities registered hereby, whether or not participating in this distribution, may be required to deliver a Prospectus. This delivery requirement is in addition to the obligation of dealers to deliver a Prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

**$675,000,000**

# TRUMP TAJ MAHAL FUNDING, INC.

**14% First Mortgage Bonds, Series A, due 1998**

**Guaranty of Payment by**

## Trump Taj Mahal Associates Limited Partnership




## PROSPECTUS

**Merrill Lynch Capital Markets**

**November 9, 1988**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: | CIVIL ACTION |
| DONALD J. TRUMP CASINO SECURITIES LITIGATION | MDL DOCKET NO. 864 |
| This Document Relates to: Taj Mahal Litigation | CLASS ACTION |

CONSOLIDATED AMENDED COMPLAINT

Plaintiffs, by and through their attorneys, hereby complain against defendants Donald J. Trump ("Donald"), Robert S. Trump ("Robert") Harvey S. Freeman ("Freeman"), The Trump Organization, Inc. ("Trump Organization"), Trump Taj Mahal Funding, Inc. ("Taj Funding"), Trump Taj Mahal, Inc. ("Taj Inc."), Trump Taj Mahal Associates Limited Partnership ("Taj Associates"), and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), as follows:

JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331; Section 22 of the Securities Act of 1933, as amended (the "Securities Act") 15 U.S.C. § 77v; Section 27 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), 15 U.S.C. § 78aa; and principles of pendent jurisdiction.

2. Venue is proper in this judicial district because many of the acts and injuries alleged herein occurred within this district and many of the defendants have principal places of business within this district.

3. In connection with the acts and conduct alleged herein, the defendants, directly or indirectly, used the mails, instrumentalities of interstate commerce, and/or the facilities of national securities markets, including the American Stock Exchange ("AMEX") where the securities at issue herein were traded.

PARTIES

4. Plaintiffs, Joanne Gollomp, Susan Cagan, Eric Cagan, David E. Dougherty, Jean Curcio, Robert and Helen Kloss, Fred Glosser, Herman Krangel, Sidney Kaufman, and Jerome Schwartz, are holders of 14% First Mortgage Bonds, Series A, due 1998, of Taj Funding (the "Taj Bonds"), having purchased such bonds during the Class Period as hereinafter alleged and presently holding such bonds.

5. Donald is a resident of the State of New York with his principal place of business at 725 Fifth Avenue, New York, New York 10022. Donald also maintains a business address at 1000 Boardwalk, Atlantic City, New Jersey 08401. Donald is the sole general partner of Taj Associates.

6. Robert is a resident of the State of New York with his principal place of business at 725 Fifth Avenue, New York, New York 10022. Robert is the brother of Donald.

7. Freeman is a resident of the State of New York with his principal place of business at 725 Fifth Avenue, New York, New York 10022.

8. Taj Associates is a New Jersey limited partnership with its principal place of business at 1000 Boardwalk, Atlantic City, New Jersey 08401. Taj Associates was formed by Donald on or about June 23, 1988, to acquire, construct, own, and operate Trump Taj Mahal Hotel & Casino, located at 1000 Boardwalk, Atlantic City, New Jersey 08401.

9. Taj Funding is a New Jersey corporation with its principal place of business at 1000 Boardwalk, Atlantic City, New Jersey 08401. Taj Funding was formed by Donald on or about June 3, 1988, to finance the completion and operation of the Taj Mahal through the issuance of securities. Taj Funding conducts no business of its own.

10. Taj Inc. is a New Jersey corporation with its principal place of business at 1000 Boardwalk, Atlantic City, New

Jersey 08401. Taj Inc. was formed by Donald on or about June 3, 1988, and is the corporate general partner of Taj Associates.

11. Trump Organization is a New York corporation with its principal place of business at 725 Fifth Avenue, New York, New York 10022.

12. Merrill Lynch is a Delaware corporation with its principal place of business at 250 Vesey Street, New York, New York. Merrill Lynch was the underwriter of the public offering of Taj Bonds as described below.

## CLASS ALLEGATIONS

13. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a) on behalf of all persons, other than defendants and their affiliates, directors, officers, and members of their immediate families, who: (a) purchased Taj Bonds on or after November 22, 1988 (the "Purchaser Class"), or (b) owned Taj Bonds as of this date and their successors in interest who are being or will be deprived of their interest in the Taj Bonds by reason of a proposed prepackaged Plan of Reorganization under the Bankruptcy Code to be filed by or on behalf of the Taj Mahal entities which fails adequately to protect or compensate the holders of the Taj Bonds and provides no adequate compensation for

those members of the Purchaser Class who sold the Taj Bonds at a loss (the "Holder Class").

14. The Classes of persons described above are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at the present time, Taj Funding has approximately $675 million of bonds outstanding. It is believed that hundreds of persons purchased the Taj Bonds or presently hold them. The exact number of class members can be readily determined from the books and records of Taj Funding or its respective transfer agent.

15. Plaintiffs' claims are typical of the claims of the Classes because plaintiffs and all other Class members sustained damages which arise out of defendants' willful conduct in violation of federal and state laws as complained of herein and/or will be damaged if the proposed exchange offer takes place.

16. Plaintiffs will fairly and adequately protect the interest of the Classes. Plaintiffs have retained competent counsel experienced in the prosecution of Class Actions under the federal securities laws and otherwise.

17. Questions of law and fact common to the members of the Classes predominate over any questions affecting only

individual members of the Classes. Among the predominating common questions of law and fact are the following:

(a) whether the federal securities laws were violated by the defendants;

(b) whether the Registration Statement identified below and other documents issued and or disseminated publicly by the defendants contained misstatements of material fact or omitted or failed to state material facts concerning the business, operations, or financial condition of Donald, Trump Organization, Taj Associates, Taj Funding, and/or Taj Inc.;

(c) whether the individual defendants, or any one or more of them, made statements or disseminated information that contained misstatements of material fact or omitted or failed to state material facts concerning the business, operations, or financial condition of Donald, Trump Organization, Taj Associates, Taj Funding, and/or Taj Inc.;

(d) whether the defendants acted willfully, recklessly, or negligently in misstating and/or omitting to state material facts, or in aiding or abetting the making of such misstatements or omissions;

(e) whether the defendants have failed to abide by the terms and conditions specified on the Taj Bonds and/or in other documents issued or disseminated publicly by the defendants in connection with such securities;

(f) whether the defendants have engaged in unfair and deceptive trade practices and/or false advertising; and

(g) whether the members of the Classes have sustained damages and, if so, the proper measure of damages.

18. A Class Action is superior to other available methods for the fair and efficient adjudication of this controversy.

RELATIONSHIPS AMONG DEFENDANTS

19. At all times relevant hereto, Donald has owned, directly or by virtue of his 100% ownership of Taj Inc., all of the issued and outstanding stock of Taj Funding. At all times relevant hereto, Donald has been Chairman, President and Treasurer of Taj Funding.

20. At all times relevant hereto, Donald has owned, directly or by virtue of his 100% ownership of Taj Inc., all of the partnership interests of Taj Associates.

21. By reason of his beneficial ownership of all of the partnership interests thereof, Donald is a controlling person of Taj Associates within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act and exercised the power to cause, and did cause such entity to engage in the unlawful conduct complained of herein. Donald is sued in his individual capacity and as a controlling person of Taj Associates.

22. By reason of his beneficial ownership of all of the stock thereof and his position as director and senior officer, Donald is a controlling person of Taj Funding within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act and exercised the power to cause, and did cause such entity to engage in the unlawful conduct complained of herein. Donald is sued in his individual capacity and as a controlling person of Taj Funding.

23. The affairs of Taj Associates are entrusted to an Executive Committee comprised of the following individual defendants:

(a) Donald - Chief Operating Officer, President and Treasurer;

(b) Robert - Chief Operating Officer and Secretary; and

(c) Freeman - Executive Vice President.

24. By reason of their positions on the Executive Committee, Robert and Freeman are controlling persons of Taj Associates and Taj Funding within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act. Robert and Freeman are each sued in their individual capacities and as controlling persons of Taj Associates and Taj Funding.

25. Taj Associates, Taj Funding, Taj Inc. and Trump Organization, and their affiliates are subject to regulation by the New Jersey Casino Control Commission ("CCC"), which authorizes the establishment of casinos in Atlantic City, provides for licensing, regulation, and taxation of casinos, and created the CCC and the Division of Gaming Enforcement. These bodies administer the Casino Control Act. In general, the provisions of the Casino Control Act concern the ability, character, and financial stability and integrity of casino operators, their officers, directors, employees, and others financially interested in a casino; the nature and suitability of hotel/casino facilities, operating methods, and conditions; and financial accounting practices. In this regard, if the Taj Mahal entities, or the two other casinos controlled by Donald -- Trump's Castle and Trump Plaza -- fail to

meet obligations under their debt securities, the casino licenses for Donald, Taj Associates, Taj Funding, Taj Inc., and Trump Organization could be revoked.

FACTUAL BACKGROUND

26. On or about June 23, 1988, Taj Funding registered the Taj Bonds with the Securities and Exchange Commission ("SEC") by filing a Form S-1 Registration Statement and Prospectus (the "Taj Bond Prospectus") in accordance with Section 12(b) of the Securities Act, 15 U.S.C. § 77l(b). In Amendment No. 4 to the Taj Bond Prospectus, defendants stated, "Donald J. Trump has advised the Partnership and the Company that he has sufficient financial resources to perform his obligations under the Trump Completion Guaranty. He has further advised the Partnership and the Company that his net worth, determined in accordance with generally accepted accounting principles applicable to personal financial statements, is at least $500,000,000."

27. The Taj Bond Prospectus was declared effective on November 10, 1988. The Taj Bonds, in an aggregate principal amount of $675 million, were issued on November 22, 1988, at the stated principal amount and were sold to the public and on the AMEX following the issuance of the bonds on November 22, 1988.

28. Through the issuance of the Taj Bonds, Taj Funding raised gross proceeds in the amount of $675 million, which were immediately loaned by Taj Funding to Taj Associates. To evidence the loan, Taj Associates issued to Taj Funding a promissory note ("Note") in the aggregate principal amount of $675 million, which Note is secured by a Mortgage on the Taj Mahal and ancillary properties ("Mortgage"). The Note and Mortgage were assigned by Taj Funding to Bankers Trust Company, as Trustee under the Taj Bond Indenture, for the benefit of holders of Taj Bonds.

29. Taj Mahal is comprised of a 42-story hotel and a contiguous low-rise structure, together occupying 17 acres of land, constituting the largest casino/hotel complex in Atlantic City, New Jersey. Taj Mahal contains approximately 1,250 guest rooms; 155,000 square feet of meeting, ballroom, convention, and exhibition space; a 120,000 square foot casino; a variety of restaurants, cocktail lounges, entertainment areas, and shops; and parking for approximately 4,600 cars and bus transportation facilities.

30. According to the Prospectus and other marketing material relating to the Taj Bonds, the completion costs of the Taj Mahal, including the payment of interest on the Bonds for 15 months, was estimated at $805 million. This financing was to come from three sources: (a) the Taj Bonds (whose face value was $675 million); (b) Donald's capital contribution, of $75 million; and

(c) other investments and a personal credit line provided by Donald in the amount of $25 million.

31. The Taj Mahal needs to earn approximately $1,300,000 per day to service all of the debt of Taj Funding and to otherwise cover its costs of doing business. Donald has repeatedly and falsely proclaimed to the investing public that a daily win of that size could be achieved on a continuing basis and that, by implication, the holders of the Taj Bonds could be satisfied. For example, in March, 1990, Marvin Roffman, then a casino analyst for January Montgomery Scott, predicted that the Taj Mahal could not generate enough revenues to do so, Donald emphatically denied the prediction, called Roffman a "totally mediocre guy with no talent," and demanded that he be fired.

32. In Management's Discussion and Analysis of Financial Condition and Results of Operations of the Partnership and the Company, which must be prepared in accordance with the requirements of Item 303 of Regulation S-K promulgated by the SEC, the Prospectus stated:

> After the completion and opening of Taj Mahal, the Partnership will rely on cash generated from the Taj Mahal's operations to service its debt and provide for anticipated capital requirements. <u>The Partnership believes that funds generated from the operation of the Taj Mahal will be sufficient to cover all of its debt service</u>

(interest and principal). [Emphasis added.]

33. The above statement was false and misleading in at least the following respects:

(a) the Prospectus failed to disclose that the Taj Mahal would require an unprecedented "casino win" of approximately $1.3 million per day on a continuing basis to meet its enormous debtload. Further, the Prospectus failed to disclose that as early as May 1987, a leading analyst of the casino industry, and others, had warned Donald that the "numbers did not add up" and that there was little or no chance that the Taj Mahal could meet its debt service;

(b) the Prospectus omitted to state that a "casino win" of approximately $1.3 million per day was approximately five times the average casino win for other casinos in Atlantic City for the period ended December 31, 1987;

(c) there was no reasonable basis for the statement in the Prospectus that Taj Associates believed it could generate sufficient funds to cover the debt service;

(d) the Prospectus omitted and failed sufficiently to warn investors of the high likelihood that the debt service

required to keep Taj Mahal operating would put it in financial jeopardy;

(e) the Prospectus omitted to state, as required by Item 303 of Regulation S-K, that there existed "known ... uncertainties" regarding whether operation of the Taj Mahal would generate sufficient funds to cover all of its debt service; and

(f) the Prospectus failed to disclose that defendants had no basis to make any statement or representation about the amount of funds generated by the operation of the Taj Mahal or the sufficiency of those funds to service the Taj Bonds.

34. The Prospectus also failed to disclose that Donald had embarked upon a course of conduct of personally guaranteeing hundreds of millions of dollars in bank loans for properties other than the Taj Mahal. These personal guaranties ultimately included $135 million on the Trump Shuttle, $125 million on the Plaza Hotel in New York, $60 million on a construction loan for the Trump Palace condominiums in New York, over $100 million on a personal loan from Bankers Trust, $10 million on a loan from Boston Safe Deposit & Trust Co. to buy Donald's yacht and various personal lines of credit. Donald is also understood to have personally guaranteed a $75 million loan to First Fidelity Bancorp on the Taj Mahal. Indeed, not only was this course of conduct of personal guarantees not disclosed in the Prospectus, but it is contrary to

Donald's repeated representations to the investing public that he never used his own money to purchase his properties. These omissions in the Prospectus were material because the existence of such guarantees made Donald's financial condition precarious, thereby decreasing the likelihood that he would have sufficient cash and resources to satisfy obligations benefitting members of the Purchaser Class, including but not limited to Donald's $25 million contingent line of credit. Donald's guarantee of a $75 million loan on the Taj Mahal also indicated greater leverage on the Taj Mahal than investors and the Purchaser Class were led to expect from the Prospectus. As a result of the existence of these guarantees, the Taj Bonds entailed a higher degree of risk than was disclosed in the Prospectus. Further, the statement in the Prospectus that Donald's personal net worth was at least $500,000,000 was false and misleading, was based upon artificially inflated appraisals, and his financial statements as referred to in paragraph 26 hereof were not prepared in accordance with generally accepted accounting principles.

35. Donald's precarious financial condition, as described in the preceding paragraph, created the undisclosed risk that Donald's financial empire would unravel or deteriorate precipitously (as a result of Donald's personal guarantees and obligations in unrelated transactions) to the grave harm of plaintiffs and the other members of the Classes. The success of the Taj Mahal depended on the strength of Donald's name, financial

position, personal liquidity, and business reputation, as well as his ability to provide the funds which he had personally committed. The Prospectus failed to disclose that if Donald's name, financial position, personal liquidity and business reputation were tarnished or devalued, then, among other reasons, the Taj Mahal would not be able to achieve its projected revenues and earnings due to grave marketing problems (e.g. the glamour and aura of success of the Taj Mahal would be greatly diminished) and pervasive operational problems (e.g. the Taj Mahal would be unable to pay its vendors to hire and retain top quality management, its operating performance impeded by the need to focus on debt management, etc.).

36. The Prospectus also failed to disclose that construction and operation of the Taj Mahal involved an excessive, unwarranted, and unprecedented debt component relative to total capitalization. Out of the $805 million total projected cost for acquisition, construction, initial financing and related costs, no more than $75 million (or only nine percent) represented capital contributions. The Prospectus failed to disclose that no other Atlantic City casino project was so thinly capitalized and, therefore, so vulnerable to downturns in the industry and economic downturns generally.

37. The Prospectus stated, without adequate basis, that the appraised value of the Taj Mahal as of its opening date in

late 1989 or early 1990 was $1.1 billion. This appraisal was based primarily on "the capitalization of income approach," even though at the time of the Prospectus it was impossible to make any reasonable estimate of the Taj Mahal's future income.

38. The Prospectus stated:

> The Partnership believes that the opening of the Taj Mahal in the proximity of the Showboat and Resorts Casino Hotel will attract an increased volume of patrons to the vicinity of the Taj Mahal.

This statement omitted to address the fact that drawing gambling dollars from one casino to another would fail to materially increase the casino win for Taj Mahal on average. In fact, it would cost more money to attract gamblers from one casino to another than would be earned by any increase in business, thereby not increasing the casino win, but rather decreasing it. The failure to disclose the unlikelihood of drawing away business from a competitor in sufficient amount to produce a casino win at the Taj Mahal sufficient to service its debt was material and, in light of the circumstances under which the above statement was made, was materially misleading. The above statement was also materially misleading, because it failed to disclose the material fact that the opening of the Taj Mahal in the proximity of the Showboat, Trump Castle, Trump Plaza, and Resorts Casino Hotel would materially increase the risk that either the Castle, the

Plaza or the Taj Mahal would fail or be unable to service its debt. Such failure or inability to service debt would tarnish Donald's name and business reputation, which could cause the Taj Mahal to suffer serious decline in revenues and earnings due to grave marketing problems (e.g. the glamour and aura of success of the Taj Mahal would be greatly diminished) and pervasive operational problems (e.g. the Taj Mahal would be unable to pay its vendors, hire and retain top quality management, its operating performance impeded by the need to focus on debt management, etc.).

39. The Prospectus also omitted to disclose the likely effect of the already weakened economy in the Northeast and the potential for competition from casinos located in Las Vegas, Nevada, principally the Mirage, then under construction. The Prospectus in general de-emphasized the business risks involved in operating the Taj Mahal.

40. The Taj Mahal was opened for business in April 1990.

41. During the period prior to and following the issuance of the Taj Bonds, Donald made numerous public statements trumpeting his financial strength and resources, all of which were intended to and did create a perception in the investing community

that Donald and his financial empire were healthy and prospering, including the following:

(a) In the November 27, 1989, issue of Business Week, Donald bragged that the Taj Mahal was "going to be a tremendous success";

(b) On April 8, 1990, Donald told the New York Times, "I hate to put it publicly, because then it's sort of a guarantee. But if you want me to say it, the answer is absolutely 'Yes'" when asked if he would back the Taj Bonds with his own assets;

(c) In April, 1990, Donald told The Wall Street Journal he wanted to become the "king of cash";

(d) In the May 14, 1990, issue of Newsweek, Donald denied that he was experiencing any cash flow problems and bragged, "I think the people with a lot of cash -- and I have a lot of cash -- are going to be able to make beautiful deals in the next few years";

(e) In the May 14, 1990, issue of Forbes magazine, Donald estimated his net worth to be "four or five billion dollars";

(f) On June 4, 1990, The Wall Street Journal reported: "Mr. Trump was so adamant in denying the existence of any financial troubles that he threatened to sue the newspaper if it reported that he had cash flow problems"; and

(g) At a public press conference on June 7, 1990, one of defendants' agents, Edward Tracy, assured the media and the public that the debt service on the Taj Bonds could be met and that Donald's casinos, including the Taj Mahal, were generating an "avalanche" of cash.

42. The statements described above were false and misleading in that at the time they were made defendants knew or recklessly disregarded that Donald's net worth was not as high as stated, that defendants lacked the ability to raise or generate sufficient funds to maintain Donald's financial empire, and that defendants did not have the ability to service the Taj Bonds.

43. Beginning in June, 1990, Trump Organization, of which Taj Associates and Taj Funding are a part, began to acknowledge to its lenders severe financial difficulties which were revealed and well-documented thereafter in numerous sources of public information such as the national print media and television networks.

44. As more accurate information about defendants' true financial condition and inability to make debt payments on the Taj Bonds came to light, the market prices of Taj Bonds fell from their previously artificially maintained levels.

45. In August, 1990, Donald and Trump Organization entered into a work-out agreement with the major lenders to Trump Organization which placed severe restraints and limitations upon Donald's financial dealings and the day-to-day operations of Trump Organization and its various subsidiaries and affiliates.

46. As part of the financial restructuring of Trump Organization during the summer of 1990, Donald announced a plan to exchange the Taj Bonds for shares of common stock in Taj Funding ("Taj Stock").

47. The announcement was made pursuant to a plan and scheme entered into some time prior to such date (the exact date which is not known to plaintiffs), through which defendants intended, inter alia, to reduce the long-term debt of Taj Funding in order that Donald might retain most of the control of and equity in Taj Funding and, indirectly, the Taj Mahal.

48. In furtherance of their plan and scheme, defendants have proposed a Plan of Reorganization pursuant to a so-called "pre-packaged bankruptcy" without adequately protecting or

compensating the holders of the Taj Bonds and without adequately compensating those who sold the Taj Bonds at a loss.

COUNT I

VIOLATIONS OF SECTIONS 11, 12(a) and 15 OF THE SECURITIES ACT

49. Paragraphs 1 through 48 are incorporated by reference as if set forth herein at length.

50. At the time the Registration Statement and Prospectus became effective, they contained untrue statements of material facts and omitted to state material facts required to be stated therein which were necessary to make the statements therein not misleading, as set forth above, in violation of Sections 11 and 12(2) of the Securities Act.

51. Plaintiffs and the other members of the Purchaser Class were damaged as a proximate result of defendants' violations of Sections 11 and 12 of the Securities Act.

52. Pursuant to Sections 11 and 12 of the Securities Act, plaintiffs and the other members of the Purchaser Class are entitled to recover damages jointly, severally, or individually from defendants as follows:

(a) Taj Funding and Taj Associates, the issuers and registrants of the Taj Bonds;

(b) Donald, as the signatory to the Registration Statement and as a controlling person of the issuer within the meaning of Section 15 of the Securities Act.

(c) Merrill Lynch, as underwriter of the Bond Offering within the meaning of the Securities Act; and

(d) the other defendants, as controlling persons of the issuer within the meaning of Sections 15 of the Securities Act.

53. None of the defendants named in this Complaint made a reasonable investigation and none possessed reasonable grounds for belief concerning the accuracy of the Registration Statement and Prospectus' or the misstatements and omissions therefrom.

54. Neither plaintiffs at the time of their respective purchases, knew, or by the exercise of reasonable care, could have known, of the aforesaid misstatements and omissions.

55. This action was commenced within one year from the time when the plaintiffs discovered or should have discovered the

misstatements and omissions alleged herein, and within three years of the effective date of the initial public offering of Taj Bonds.

56. By reason of the foregoing, defendants herein have violated Sections 11 and 12 of the Securities Act and are liable to the plaintiffs and the members of the Purchaser Class.

57. Plaintiffs and the Class, to the extent they not already disposed of them, hereby tender their Taj Bonds in exchange for the consideration paid by them.

## COUNT II

## VIOLATION OF SECTIONS 10(b) and 20(b) OF THE EXCHANGE ACT and RULE 10b-5

58. Paragraphs 1 through 57 above are incorporated by reference as if set forth herein at length.

59. Pursuant to Section 10(b) of the Exchange Act, plaintiffs and the other members of the Purchaser Class are entitled to receive damages jointly, severally, or individually from defendants as follows:

(a) all defendants as direct participants, conspirators, and aiders and abettors in the fraudulent scheme alleged; and

(b) Donald, Robert, Freeman, Trump Organization and Taj Inc. as controlling persons of the issuer within the meaning of Sections 10(b) and 20(c) of the Exchange Act.

60. Defendants caused or permitted Taj Funding to issue and disseminate the Prospectus and other statements (written and oral) to the investing public.

61. The purpose and effect of the dissemination of the aforesaid information was to manipulate unlawfully the prices of Taj Bonds in violation of Section 10(b) of the Exchange Act and Rule 10b-5 of the SEC promulgated thereunder. As a result, plaintiffs and each member of the Purchaser Class have been, and will continue to be, damaged.

62. Defendants, acting alone or in concert, caused the dissemination of false and misleading information to be made despite the fact that their statements (written and oral) misstated material facts and omitted to state other material facts necessary to make the statements made, in light of the circumstance under which they were made, not misleading to plaintiffs and the other members of the Purchaser Class as more fully set forth above.

63. The practices and devices utilized by defendants in order to effectuate the aforesaid course of action consisted of misrepresentations by defendants in the name of Taj Funding and in their own names, knowing them to be false when made or recklessly disregarding their falsity and/or intentionally concealing or failing to disclose omitted material facts as more set forth above.

64. As a result of the foregoing activities which are in violation of Section 10(b) of the Exchange Act and Rule 10b-5, plaintiffs and the other members of the Purchaser Class have been or will be damaged in an amount which cannot presently be determined.

## COUNT III

## BREACH OF FIDUCIARY DUTY

65. Paragraphs 1 through 64 above are incorporated by reference as if set forth herein at length.

66. Donald is the only defendant in this Count, which is asserted by plaintiffs and members of the Holder Class.

67. Donald, by virtue of his control, directly or indirectly, of Taj Funding, owes fiduciary duties of loyalty and fairness to plaintiffs and the other members of the Holder Class.

68. Donald has forced or will force the terms and conditions of the proposed Plan of Reorganization upon plaintiffs and the other members of Holder Class in order to accomplish the financial survival and restructuring of Trump Organization and of his personal finances.

69. Donald desires to effectuate the proposed Plan of Reorganization for his own individual gain or for the benefit of other constituent parts of Trump Organization, including:

(a) the elimination of a portion of long-term debt of the Taj Mahal;

(b) compliance with the terms, conditions, and restrictions of the bank work-out arranged between Donald, Trump Organization, and their major lenders;

(c) the perpetuation of Donald's control over Trump Organization and all its constituent parts, including Taj Funding and Taj Associates; and

(d) the avoidance of insolvency or bankruptcy of Trump Organization and/or Donald.

70. Donald has violated his fiduciary duty owed to plaintiffs and the other members of the Holder Class by, *inter alia*, not appropriately evaluating the true worth of the Taj Bonds and by forcing the proposed Plan of Reorganization upon plaintiffs and the other members of the Holder Class, seeking his own gain and benefit to the exclusion of plaintiffs and the other members of the Holder Class.

71. As a result of such breaches of fiduciary duty, Donald has injured and will continue to injure plaintiffs and the other members of the Holder Class in an amount which cannot presently be determined.

72. Plaintiffs and the other members of the Holder Class will suffer irreparable harm if the proposed Plan of Reorganization is effectuated in the manner presently proposed.

## COUNT IV

## COMMON LAW FALSE ADVERTISING

73. Paragraphs 1 through 72 above are incorporated by reference as if set forth herein at length.

74. Defendants and others presently unknown to plaintiffs, including among others public relations and media consultants and advertising agents, acting alone or in combination on conspiracy, at all relevant times falsely portrayed a carefully created and maintained public image that Donald and his financial empire, including the Taj Mahal, were financially invincible, that Donald was the "king of cash" with net worth of several billion dollars, and that they were financially sound in all respect when, in fact, Donald and his financial empire is and was unsound, deteriorating, and otherwise not as portrayed.

75. The image described above, which was portrayed, among other means by advertisements and promotional materials for the Taj Mahal, including information disclosed to the investing public about the Taj Bonds, was intended to convey the appearance of success, opulence, strength, and stability necessary for any successful operation of the Taj Mahal.

76. Defendants intentionally, recklessly, or negligently, overstated and misrepresented the financial and operating condition and prospects of Donald and his empire, including the Taj Mahal, intending to deceive, inter alia, the investing public, including plaintiffs and the other members of the Class who were in fact deceived thereby.

77. Plaintiffs and the other members of the Class have been damaged by defendants' unfair competition and false advertising as described above in an amount which cannot presently be determined.

PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment against defendants jointly and severally as follows:

(a) declaring this action to be a Class Action;

(b) awarding plaintiffs and the other members of the Class rescission and/or such other damages, with interest, as may have been sustained;

(c) awarding to plaintiffs the costs and disbursements of this action, including a reasonable allowance for plaintiffs' counsel and experts' fees; and

(d) granting such other and further relief as the Court may deem just and proper.

DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of this Action.

DATED: February 6th, 1991

GREENFIELD & CHIMICLES

BY: [signature]

Richard D. Greenfield - RG-4046
Mark C. Rifkin - MR-0904
One Haverford Centre
Haverford, PA 191041
(215) 642-8500

WECHSLER SKIRNICK HARWOOD HALEBIAN & FEFFER
Stuart D. Wechsler
Robert J. Ryan
555 Madison Avenue
New York, NY 10022
(212) 935-7400

Lead Counsel for Plaintiffs and the Classes

CARL D. POPLAR, ESQUIRE
1010 Kings Highway S.
Cherry Hill, NJ 08034
(609) 795-5800

Liaison Counsel

BARRACK, RODOS & BACINE
Gerald Jay Rodos
Suite 2100
1845 Walnut Street
Philadelphia, PA 19103
(215) 963-0600

BERGER & MONTAGUE
Stanley R. Wolfe
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

ZWERLING, SCHACHTER & ZWERLING
Robert S. Schachter
800 Third Avenue
New York, NY 10017
(212) 223-3900

Executive Committee of Plaintiffs' Counsel

GARWIN BRONZAFT
GERSTEIN & FISHER
Bruce E. Gerstein
1501 Broadway, 14th Floor
New York, NY 10036

MARTIN VAN de WALLE
GUARINO & DONOHUE
Charles V. Van de Walle
17 Barstow Road
Great Neck, New York 11021

JOSEPH J. TABACCO, JR.
555 Madison Avenue
New York, NY 10022

LAW OFFICES OF JOSEPH H. WEISS
Joseph H. Weiss
319 Fifth Avenue
New York, NY 10016

COHAN & ECKHAUS
Michael A. Cohan
21 Ernston Road
P.O. Box 200
Parlin, NJ 08859

SPECTER LAW OFFICES, P.C.
Howard A. Specter
2230 Grant Building
Pittsburgh, PA 15219

ROBERT B. MATUSOFF, ESQUIRE
3133 Burnett Avenue
Cincinnati, OH 45229

Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing notice of motion was served upon the following attorneys in the manner indicated:

BY EXPRESS MAIL

Richard D. Greenfield, Esq.
Mark C. Rifkin, Esq.
One Haverford Centre
Haverford, PA 19104

Carl D. Poplar, Esq.
1010 Kings Highway S.
Cherry Hill, NJ 08034

Leonard Barrack, Esq.
Gerald J. Rodos, Esq.
Barrack, Rodos & Bacine
1845 Walnut Street
Suite 2100
Philadelphia, PA 19103

Robert S. Schachter, Esq.
Zwerling Schachter & Zwerling
800 Third Avenue
New York, NY 10022

Todd A. Collins, Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103

BY HAND

Stuart D. Wechsler, Esq.
Wechsler Skirnick Harwood
Halebian & Feffer
555 Madison Avenue
New York, NY 10022

Stuart J. Baskin, Esq.
Shearman & Sterling
One Citicorp Center
153 E. 53rd Street
New York, NY 10022

Richard L. Posen