Exhibit

B

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | |
| | MDL Docket No. 834 |
| AMERICAN CONTINENTAL CORPORATION/ | |
| LINCOLN SAVINGS AND LOAN SECURITIES | |
| LITIGATION. | |
| | |
| SARAH B. SHIELDS, et al., | CIV 90-566 PHX-RMB |
| | CIV 90-567 PHX-RMB |
| Plaintiff, | CIV 90-568 PHX-RMB |
| | CIV 90-569 PHX-RMB |
| v. | CIV 90-570 PHX-RMB |
| | CIV 90-574 PHX-RMB |
| CHARLES H. KEATING, JR., et al., | |
| | |
| Defendant. | |
| | |
| CHARLES ROBLE, et al., | |
| | NO. CIV 90-1270 PHX-RMB |
| Plaintiffs, | |
| | |
| v. | MEMORANDUM OPINION |
| | |
| ARTHUR YOUNG & CO., et al., | & |
| | |
| Defendants. | ORDER |

Defendants seek decertification of the plaintiff class in these consolidated federal and state actions. Class plaintiffs purchased securities issued by American Continental Corporation ("ACC"), parent company to Lincoln Savings and Loan Association ("Lincoln"). The failure of the ACC/Lincoln enterprise precipitated the present actions against chairman Charles H. Keating, Jr., ACC/Lincoln directors and officers, lawyers, accountants and others. These Motions to Decertify were initially brought by the accountant

AO 72

1 and lawyer Defendants, and other Defendants join in.

2  In general, Plaintiffs allege that a multifarious scheme
3 to defraud was perpetrated by the directors and officers of
4 ACC/Lincoln and assisted in numerous respects by accountants,
5 lawyers, and others. The alleged scheme involves a far-reaching
6 plait of deceit, including: (1) sham transactions in which
7 ACC/Lincoln recorded phantom profits that fundamentally inflated the
8 apparent strength of ACC/Lincoln and its securities; (2) violations
9 of federal banking regulations governing direct investments and
10 affiliated transactions, (3) truculent dealings with federal
11 regulators, in which Defendants made material misrepresentations
12 about ACC/Lincoln's operations and financial condition; (4)
13 materially false and misleading public statements, such as press
14 releases, registration statements, prospectuses, and other filings
15 with the Securities and Exchange Commission ("SEC"); and (5) a scheme
16 to upstream dollars from Lincoln to ACC through an illegal tax
17 sharing agreement. In addition, Plaintiffs allege that Defendants
18 contrived a scheme to sell stock and bonds by misrepresenting and
19 omitting information concerning the soundness of ACC's financial
20 condition.

21  As a result of Defendants' acts, Plaintiffs contend that
22 Defendants violated Section 10(b) of the Securities Exchange Act of
23 1934, Sections 11 and 12 of the Securities Act of 1933, Sections 1962
24 (c) and (d) of the Racketeer Influenced and Corrupt Organizations Act
25 ("RICO"), California Corporations Code §§1507 and 25401, common law

26

2

1   doctrines of fraud and misrepresentation, and breach of fiduciary
2   duty.

3          These consolidated actions originated in federal and state
4   courts in California. In the federal action, Judge Stephen V. Wilson
5   of the United States District Court for the Central District of
6   California certified a single class comprising purchasers (with
7   certain exceptions) of ACC securities from January 1, 1986 to April
8   14, 1989. Order Re Class Certification, No. CV 89-2052 SVW (Dec. 27,
9   1989). In the state action, the Plaintiff class was certified by
10  Judge David G. Sills in the Superior Court of the State of California
11  for the County of Orange. Minute Order, No. 58 93 02 (May 3, 1990).

12                                    I.

13         In both the state and federal actions, class certification
14  is appropriate only if the prerequisites of Federal Rule of Civil
15  Procedure 23(a) are met:

16              (1) the class is so numerous that joinder of all
                members is impracticable, (2) there are
17              questions of law or fact common to the class,
                (3) the claims or defenses of the representative
18              parties are typical of the claims or defenses of
                the class, and (4) the representative parties
19              will fairly and adequately protect the interests
                of the class.

20  In addition, the evidence must sustain the conclusion that "the
21  questions of law or fact common to the class predominate over
22  questions affecting only individual members, and that a class action
23  is superior to other methods for the fair and efficient adjudication
24  of the controversy." Fed. R. Civ. P. 23(b)(3). Class certification
25  may be upheld only "if the trial court is satisfied, after rigorous
26

3

1   analysis, that the prerequisites of Rule 23(a) have been satisfied."

2   General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982).

3        Defendants' motions are directed at those class members

4   who, in purchasing debentures, allegedly relied upon oral sales

5   presentations or receipt of a prospectus.[1]  Defendants contend the

6   record establishes that the presentations were not uniform, and thus,

7   questions of individual reliance predominate over those common to all

8   Plaintiffs. In addition, Defendants contend that those class members

9   who received prospectuses are not entitled to a presumption of

10  reliance arising out of the "fraud-on-the-regulatory-process" theory

11  or any related doctrine, and must therefore demonstrate reliance

12  individually.  Defendants further argue that decertification of the

13  state plaintiff class is inappropriate because California law does

14  not support class treatment for Plaintiffs' claims.   Finally,

15  Defendants contend that the ACC employee stock ownership plan

16  ("ESOP") is not an appropriate class member because the plan

17  participants are not class members, and furthermore may be entitled

18  to differing allocations of any class recovery. Therefore, the

19  central issue in this case is whether, in light of the evidence

20  before the court, common issues predominate over those particular to

21

22

23

24     [1] Defendants do not challenge Judge Wilson's ruling that class
members who purchased ACC stock may invoke a presumption of reliance

25  based on the "fraud-on-the-market" theory.  Basic Incorporated v.
Levinson, 485 U. S. 224, 108 S.Ct. 978 (1988); Blackie v. Barrack,

26  524 F.2d 891 (9th Cir. 1975), cert. denied, 429 U.S. 816 (1976).

4

the individual class members.[2]

II.

Rule 10b-5, implementing Section 10(b) of the Securities Exchange Act of 1934, provides in relevant part:

It shall be unlawful for any person directly or indirectly . . .

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Thus, to succeed under Section 10(b) and Rule 10b-5, Plaintiffs carry the burden of proving that, in connection with the sale of securities, Defendants committed (or aided and abetted): (1) a misrepresentation or omission of a material fact; or (2) a scheme or artifice to defraud; or (3) a practice or course of conduct which operated as a fraud or deceit. Plaintiffs must further demonstrate that Defendants committed these acts with scienter, and that Plaintiffs justifiably relied and were thereby damaged. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375 (1976); Basic Incorporated v. Levinson, 485 U.S. 224, 108 S.Ct. 978 (1988).

---

[2] For purposes of this motion, the parties do not dispute the remaining requirements of Federal Rule of Civil Procedure 23(a) and (b).

5

1       Significantly, Plaintiffs' case is not predicated

2 exclusively or even predominantly on Rule 10b-5(b). The central

3 issue is whether Defendants orchestrated and/or aided and abetted a

4 far-reaching scheme to inflate the apparent worth and prospects of

5 ACC/Lincoln, while simultaneously concealing its latent but material

6 weaknesses. These allegations are consonant with §10b-5(a) and (c).

> Rule 10b-5 liability is not restricted solely to
> isolated misrepresentations or omissions; it may
> also be predicated on a "practice, or course of
> business which operates as a fraud . . . ."
> Under that section class members may well be
> united in establishing liability for
> fraudulently creating an illusion of prosperity
> and false expectations.

<u>Blackie</u>, 524 F.2d at 903, n.19. Additionally, Plaintiffs' RICO

claims are predicated primarily on fraud in the sale of securities.

The proof requirements under this claim parallel those of Rule 10b-5,

and therefore "the vast majority of factual and legal issues will be

common to the class." Order re Class Certification at 14.

    A.   The Principles of <u>Basic v. Levinson</u>

      The outcome of these motions is controlled by principles

articulated in <u>Basic v. Levinson</u>, <u>supra</u>, where the United States

Supreme Court clarified the reliance and materiality standards of §

10(b) and Rule 10b-5. In <u>Basic</u>, the Court reasoned that reliance is

an ingredient of a Rule 10b-5 cause of action because it "provides

the requisite causal connection between a defendant's

misrepresentation and a plaintiff's injury." <u>Basic</u>, 108 S.Ct. at

990. Causation and its principal indicator, reliance, are the

products of an equation in which common sense and probability are the

6

1   fundamental givens, and materiality the multiplier.  Id. at 991.

2         Direct and individualized proof of reliance, however, is

3   not the only way to demonstrate that a defendant's misrepresentation

4   caused a plaintiff's harm.   "[T]he same causal nexus can be

5   adequately established indirectly, by proof of materiality coupled

6   with the common sense that a stock purchaser does not ordinarily seek

7   to purchase a loss."  Id. at 990 (citing Blackie, 524 F.2d at 908).

8   In Basic, the Court therefore found a presumption of reliance

9   appropriate in certain cases in light of fairness, public policy,

10  probability, and the interests of judicial economy.  Basic, 108 S.Ct.

11  at 992.[3]  This concept of indirect proof is labelled the "fraud on

12  the market theory:"

13            The fraud on the market theory is based on the
              hypothesis that, in an open and developed
14            securities market, the price of a company's
              stock is determined by the available material
15            information regarding the company and its
              business . . . . Misleading statements will
16            therefore defraud purchasers of stock even if
              the purchasers do not directly rely on the
17            misstatements . . . . The causal connection
              between the defendants' fraud and the
18            plaintiffs' purchase of stock in such a case is
              no less significant than in a case of direct
19            reliance on misrepresentations.

20  Id. at 988 (emphasis added).

21        Thus, materiality is a critical ingredient in the court's

22
    ─────────────────────────────────────

23      [3]  Basic also held that defendants may attempt to rebut the
    presumption by offering proof which severs the causal link between
24  a defendant's course of conduct and a plaintiff's investment
    decision.  On the facts of Basic, this would involve a showing that
25  the misrepresentation did not affect market price, or that the
    purchaser did not rely on the integrity of the market price.  Basic,
26  108 S.Ct. at 992.

7

AO 72
(Rev. 8/82)

formula.   In _Basic_, the Court defined the materiality standard, stating that "'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Id. at 983 (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

In addition, the Court observed that modern securities markets differ significantly "from the face-to-face transactions contemplated by early fraud cases." Id. at 990.   Flexibility is therefore necessary if the law is to fulfill the fundamental purposes of the securities laws.   Defendants urge that this conviction delimits the _Basic_ decision to transactions on the open securities market, and that a presumption is inappropriate here.   This court disagrees.   The principles of _Basic_ apply equally to the type of securities fraud alleged here.   Moreover, the proof problems associated with a fraudulent scheme to register and sell subordinated debentures out of the offices of a savings and loan institution are comparable to those facing purchasers of open market securities.

In light of the analysis below, this court finds that Plaintiffs have made sufficient showing of materiality and reliance to support class certification.

B.   Uniform Sales Presentation As Common Question and Basis for Presumed Reliance

Class actions are appropriately utilized in situations where a "standardized sales pitch" is employed.   _See Grainger v. State Sec. Life Ins. Co._, 547 F.2d 303, 307-08 (5th Cir. 1977). Under

8

AO 72
(Rev 8/82)

1  this theory, a showing that the sales presentations were uniformly
2  patterned on a known model provides certitude that material
3  misrepresentations were a causative factor in each plaintiffs'
4  decision. Thus, a class action may be maintained where plaintiffs
5  can establish that the sales agents' representations did not vary in
6  material respects. Id. at 307.

7  Defendants urge a talismanic rule that a class action may
8  not be maintained where a fraud is consummated principally through
9  oral misrepresentations, unless those representations are all but
10  identical. Such a view overlooks, however, the design and intent of
11  both Fed. R. Civ. P. Rule 23(b) and Section 10(b). "The fact is that
12  Congress, by authorizing and approving Rule 23(b)(3), created a
13  vehicle to put small claimants in an economically feasible litigating
14  posture." Blackie, 524 F.2d at 899. Equally important is the
15  essential purpose of the federal securities laws--to protect
16  investors against dishonest practices. Basic, 108 S. Ct. at 982.
17  In fact, "the ultimate effectiveness of [the security anti-fraud
18  laws] may depend on the applicability of the class action device."
19  Blackie, 524 F.2d at 903 (quotations omitted)(brackets in original).

20  Although the representations made to the bond purchasers
21  in this case were not identical, they were sufficiently uniform to
22  warrant class treatment. The evidence paints a classic picture of
23  indirect reliance--material representations made to bond
24  representatives with the intent and knowledge that they would be
25  communicated to the ultimate buyers. The testimony of both bond
26

9

salespersons and bond representatives comprise a showing that a common sales approach was conceived by ACC/Lincoln management and communicated to ACC/Lincoln bond sales representatives with the expectation that it would be conveyed by them to prospective bond purchasers. This alleged strategy involved these principal cornerstones: (1) use of Lincoln Savings as a drawing card to attract potential purchasers, thereby exploiting their trust and confidence; (2) compliance with the letter of the law by, for example, handing out requisite prospectuses and informing potential purchasers that the bonds were not federally insured; (3) de-emphasis or rationalization of risks or negative publicity associated with ACC/Lincoln and the bonds; (4) omission of information about defects in ACC/Lincoln's economic prospects; (5) utilization of a crew of earnest apostles to proclaim ACC/Lincoln's virtues; (6) repeated stress on ACC/Lincoln's size, diversity, and invincible financial strength; and, (7) emphasis on ACC's status as parent of Lincoln Savings.

This centrally orchestrated strategy is evident throughout the testimony of bond representatives, who were both recipients and purveyors of information. The testimony of bond purchasers reveals that they were consistently informed that the bonds were backed by ACC, a sound multibillion dollar company and parent of Lincoln. Conspicuously absent from the record is testimony that these bond purchasers were told of precariousness, or real and present risk, in connection with ACC/Lincoln's financial condition or relationship

10

with regulators. As a result of these sales, both out of and in
association with Lincoln Savings and Loan Association, the message
was communicated to purchasers that the bonds had the benefit of the
federal regulation and protection appurtenant to a savings and loan.

> Confronted with a class of purchasers allegedly
> defrauded over a period of time by similar
> misrepresentations, courts have taken the common
> sense approach that the class is united by a
> common interest in determining whether a
> defendant's course of conduct is in its broad
> outlines actionable, which is not defeated by
> slight differences in class members' positions,
> and that the issue may profitably be tried in
> one suit.

Blackie, 524 F.2d at 902. The court finds the class at issue is
united by a common interest in determining whether Defendants' course
of conduct is actionable, and therefore, finds decertification
inappropriate.

Plaintiffs' claims and the record before this court differ
from those found in cases relied upon by Defendants. See generally
Clark v. Watchie, 513 F.2d 994 (9th Cir.), cert. denied, 423 U.S. 841
(1975); Blakely v. Lisac, 357 F.Supp 267 (D.Or. 1972); McHan v.
Grandbouche, 99 F.R.D. 260 (D.Kan. 1983); Simon v. Merrill, Lynch,
Pierce, Fenner & Smith, Inc., 482 F.2d 880 (5th Cir.) reh'g denied,
485 F.2d 687 (5th Cir. 1973); Graham v. Security Savings & Loan, 125
F.R.D. 687 (N.D.Ind. 1989); aff'd, 914 F.2d 909 (7th Cir. 1990);
Seiler v. E.F. Hutton, 102 F.R.D. 880 (D.N.J. 1984); Moscarelli v.
Stamm, 288 F.Supp. 453 (E.D.N.Y. 1968); Soper v. Valone, 110 F.R.D.
8 (W.D.N.Y. 1985); Glick v. E.F. Hutton & Co., 106 F.R.D. 446 (E.D.
Pa. 1985). In the present action, the breadth and magnitude of the

11

AO 72
(Rev. 8/82)

1  fraud alleged and the size of the plaintiff class are far greater.
2  The center of gravity of the fraud transcends the specific details
3  of oral communications.  Furthermore, the alleged fraud was not
4  conceived or perpetrated by the bond representatives themselves.
5  Rather, they were merely conduits of information communicated to them
6  by or with the help of Defendants.

7       Moreover, the gravamen of the alleged fraud is not limited
8  to the specific misrepresentations made to bond purchasers.  The
9  allegation is of a whole roster of deception designed to contrive a
10  false image of ACC/Lincoln.  Defendants allegedly represented the
11  integrity of their operations to Plaintiffs through Lincoln offices,
12  using regulatory documents such as prospectuses and registration
13  statements, brochures, and pictures of impressive holdings.  Sham
14  accounting allegedly enabled Defendants to mask ACC/Lincoln's
15  weaknesses,    while    substantially    skewing    its    worth.
16  Misrepresentations to regulators allegedly effected and perpetuated
17  ACC's very license to own and operate Lincoln Savings.  The exact
18  wording of the oral misrepresentations, therefore, is not the
19  predominant issue.  It is the underlying scheme which demands
20  attention.  Each plaintiff is similarly situated with respect to it,
21  and it would be folly to force each bond purchaser to prove the
22  nucleus of the alleged fraud again and again.

23       Defendants commend to the court a decision by the Middle
24  District    of    Florida,    Kaser v. Swann,    Fed. Sec. L. Rep.
25  (CCH) § 96,187, at 90,999 (M.D. Fla. 1991), a case which bears some

26

12

factual resemblance to the case at bar, but is not controlling. Plaintiffs there purchased subordinated notes in the lobbies of American Pioneer Savings Bank branches. Plaintiffs alleged that American Pioneer, which was ultimately placed in RTC conservatorship, misled the public about its financial condition by "falsely characterizing the loan losses of the bank as 'investments' and 'joint ventures' and by overstating American's net worth." Id. at 91,000. The court found the oral statements were not sufficiently uniform to support class certification, observing that "no proof appears in the deposition testimony to demonstrate that all the bank employees used a standardized sales pitch." Id. at 91,001. By contrast, a showing has been made in this record that ACC/Lincoln repeatedly emphasized predominant interrelated themes, which originated from management, and were sustained by ACC/Lincoln's far-reaching, and allegedly fraudulent, course of conduct.

C. Fraud on the Offering

The "fraud in the offering" doctrine evolved from principles analogous to those affirmed in Basic v. Levinson, supra, and was employed in a series of cases upon which Plaintiffs rely. See Shores v. Sklar, 647 F.2d 462 (5th Cir. 1981), cert. denied, 459 U.S. 1102 (1983); Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718 (11th Cir. 1987), cert. denied, 485 U.S. 959 (1988); T.J. Raney & Sons, Inc. v. Ft. Cobb, Oklahoma Irrig. Fuel Auth., 717 F.2d 1330 (10th Cir. 1983), cert. denied, 465 U.S. 1026 (1984).

In the Shores decision, the plaintiffs claimed fraud

AO 72
(Rev.8/82)

1  arising out of a course of conduct prohibited by Rule 10b-5(a) and

2  (c). Unlike Basic, which turned primarily on misrepresentation of

3  a single material fact, the Shores defendants were accused of a

4  "pervasive scheme" by which they "fabricated a materially misleading

5  Offering Circular in order to induce the Industrial Development Board

6  to issue, and the public to buy, fraudulently marketed bonds." Id.

7  at 464. The court held:

8          The concept of this scheme to defraud satisfies
           the requirement of "transaction causation." It
9          has as its core objective that the potential
           victim engage in the transaction for which the
10         scheme was conceived. The requisite element of
           causation in fact would be established if
11         [plaintiff] proved the scheme was intended to
           and did bring the Bonds onto the market
12         fraudulently and proved he relied on the
           integrity of the offerings of the securities
13         market. His lack of reliance on the Offering
           Circular, only one component of the overall
14         scheme, is not determinative.

15  Id. at 469 (citing Blackie, supra). Observing that the securities

16  laws "reach complex fraudulent schemes as well as lesser

17  misrepresentations or omissions," Id. at 470, the court ruled:

18         The theory is not that he bought inferior bonds,
           but that the Bonds he bought were fraudulently
19         marketed. The securities laws allow an investor
           to rely on the integrity of the market to the
20         extent that the securities it offers to him for
           purchase are entitled to be in the marketplace.

21

22  Id. at 471. Subsequently, the Fifth Circuit reiterated the Shores

23  reasoning:

24  / / /

25  / / /

26
                              14

> In fraud claims asserted under Rules 10b-5(1) and (3), the reliance element of Rule 10b-5 may be satisfied by proof that the plaintiff relied on the integrity of the market rather than on specific representations by the defendants.
>
> The issue of reliance on an open market thus turns on a matter of degree - the price of the security - and not, as in Shores, the absolute question of whether the security was worthy of being issued.

Kirkpatrick, 827 F.2d at 722. Similarly, in T.J. Raney the Fifth Circuit concluded:

> [T]he materiality element has been satisfied here by the claim of conspiracy to bring unlawful issuances to market. Here the causation element is fulfilled by proof that but for the conspiracy and the acts committed pursuant to it, the securities could not have been issued. Securities laws must be interpreted flexibly and progressively, not technically nor grudgingly, to fairly effectuate their remedial purpose.

T.J. Raney, 717 F.2d at 1333.

Defendants contend that this entire line of reasoning has been discredited by subsequent developments in Shores,[4] by Basic, supra, and by Abell v. Potomac Insurance Company, 858 F.2d 1104 (5th Cir. 1988), vacated and remanded on other grds, 492 U.S. 914 (1989). This court disagrees because the justification for this authority is consistent with the materiality and reliance principles endorsed by

---

[4] The original Shores reasoning was reaffirmed by the Eleventh Circuit in Shores II, 844 F.2d 1485 (11th Cir. 1985), but the opinion was vacated on other grounds, and in Shores III, 885 F.2d 760 (11th Cir. 1989), the five-member majority declined to reach the fundamental class certification issue, while the four concurring judges intimated the continued viability of the Shores II opinion. Shores III, 885 F.2d at 766.

15

1   **Basic.**   If an enterprise is so laden with fraud that its entire

2   public image is distorted, it is sensible to presume that reasonable

3   investors relied on many material misrepresentations which, in

4   aggregate, created a false image. In this situation, the offending

5   misrepresentations are not merely presumed to compete successfully

6   for the investor's attention amidst a mix of material, undistorted

7   facts. Rather, the entire picture of the company's economic health

8   and lawful character is skewed.   In **Basic,** the Supreme Court

9   acknowledged that the materiality standard may not always "admit

10   straightforward application."   **Basic,** 108 S.Ct. at 983.   But there

11   is virtually nothing more material to a decision to invest in the

12   subordinated debt of a company than a reliable, undistorted picture

13   of its financial integrity. Even in the face of high interest rates,

14   no reasonable investor would "knowingly roll the dice in a crooked

15   crap game."   **Basic,** 108 S.Ct. at 991 (citation omitted).

16         Moreover, even if **Abell** is construed as limiting the scope

17   of **Shores** and its progeny, its holding does not reach the facts of

18   this case.   In **Abell,** the court was presented with a handful of

19   material misrepresentations which occurred early in what proved to

20   be an ongoing concern. Although the court was satisfied that the

21   misrepresentations were material, and were factors in the company's

22   ultimate failure, the court was not convinced that all of the

23   purchasers had actually relied on the nondisclosure. The court held

24   that a fraud-on-the-market presumption of reliance is available in

25   a limited market only "where the promoters knew that the subject

26

16

1  enterprise was worthless when the securities were issued, and
2  successfully issued the securities only because of defendants'
3  fraudulent scheme." _Abell_, 858 F.2d at 1122-23.

4          This court declines to adopt _Abell_'s holding in a literal
5  sense for three reasons.  First, a promoter's knowledge is not
6  determinative of plaintiffs' reliance under _Basic_.  Rather, presumed
7  reliance is a function of materiality coupled with the common sense
8  and probability that investors will behave reasonably.  _Basic_, _supra_.
9  Second, as the Fifth Circuit acknowledged, worthlessness is not the
10 key since "saleable assets may bless even the most worthless
11 enterprise." _Abell_, 858 F.2d at 1122.  Finally, a scheme to create
12 a worthless enterprise may well be less lucrative than a scheme to
13 defraud investors over the course of an ongoing business.  A rule
14 based entirely on worthlessness, therefore, could render the most
15 sophisticated fraud beyond reach.  The court holds that Plaintiffs
16 are entitled to the benefit of a presumption of reliance here because
17 the alleged scheme to defraud is of such pervasive materiality as to
18 generally and fundamentally distort the public representations
19 concerning the company.

20          Finally, in _Abell_, the court was presented with a record
21 where "neither side introduced _any_ evidence to demonstrate or refute
22 whether most of the class members decided to buy [the bonds] in
23 reliance upon what the defendants said or failed to say." _Id._ at
24 1118 (emphasis in original).  By contrast, in the present case,
25 Plaintiffs have made a showing sufficient to support an inference

26

17

AO 72
(Rev.8/82)

1   that they are stationed similarly with respect to the alleged scheme
2   to defraud, and did, in fact, rely on information communicated to
3   them indirectly by ACC/Lincoln management.

4                    D. Fraud on the Regulatory Process

5          Judge Wilson held that those Plaintiffs who received
6   prospectuses are entitled to a presumption of reliance based on the
7   integrity of the regulatory process underlying the prospectus.  Order
8   re Class Certification, at 10.  This court finds that Judge Wilson's
9   ruling should now be extended beyond those Plaintiffs who received
10  a prospectus.

11         The Ninth Circuit ratified the fraud on the regulatory
12  process doctrine in Arthur Young & Co. v. United States District
13  Court, 549 F.2d 686 (9th Cir.) cert. denied 434 U.S. 829 (1977).  The
14  court held, and Judge Wilson reiterated:

15              Just as the open market purchaser relies on the
                integrity of the market and the price of the
16              security traded on the open market to reflect
                the true value of securities in which he
17              invests, so the purchaser of an original issue
                security relies, at least indirectly, on the
18              integrity of the regulatory process and the
                truth of any representations made to the
19              appropriate agencies and the investors at the
                time of the original issue.

20  Arthur Young, 549 F.2d at 695; Order re: Class Certification, at 9-
21  10.  Defendants argue that the viability of this doctrine is in
22  doubt, citing Basic, 108 S.Ct. at 993, n.2 (White, J., concurring).[5]

23

24      [5] In his concurring and dissenting opinion, Justice White
25  expressed the view that the majority opinion "rejects the version of
    that theory, heretofore adopted by some courts, which equates
26  'causation' with 'reliance,' and permits recovery by a plaintiff who

                                   18

1   Defendants further maintain that the doctrine is unsupportable
2   because, for example, the SEC does not necessarily review
3   prospectuses, and therefore Plaintiffs could not rely on the
4   regulators to ensure the truth of information contained therein.
5   Moreover, Plaintiffs cannot prove that the regulators relied on the
6   misrepresentations, in light of the deliberative process privilege,
7   which protects regulatory decision making from scrutiny.  The court
8   rejects these arguments as inapplicable to this case.

9       Plaintiffs' claims are premised on Rule 10b-5(a) and (c).
10  The regulatory fraud they allege was designed to prevent regulators
11  from stepping in to protect the public interest.   Considering once
12  again the synthesis of materiality, common sense, and probability,
13  it is highly likely that such fundamental deceit, if true, would be
14  a material factor in an investor's decision.  For reasons entwined
15  with those underpinning the closely related "fraud in the offering
16  doctrine," Plaintiffs here are entitled to a presumption of reliance
17  if a network of misrepresentations or omissions to the Federal Home
18  Loan Bank Board or other federal and state regulators enabled the
19  bond sales to go forward.  This does not run counter to Justice
20  White's concerns because, under these circumstances, a plaintiff
21  would not have been harmed merely by a misrepresentation which

22

23  claims merely to have been harmed by a material misrepresentation
24  which altered a market price, notwithstanding proof that the
    plaintiff did not in any way rely on that price." Basic, 108 S.Ct.
25  at 993 (White, J., concurring) (emphasis in original). Arthur Young
    was among the cases cited without additional comment in a footnote.

26

19

AO 72
(Rev.8/82)

1   regulators did not pick up and which may or may not have been a
2   determinant in an investment decision. Rather, an investor would
3   have been harmed by the regulators' failure to step in at all. Such
4   an investor would have in all likelihood relied on the integrity of
5   the regulatory process to ensure that at a fundamental level the
6   securities were entitled to be marketed. ,

7           Furthermore, the record supports an inference that the bond
8   purchasers did, in fact, rely. A unifying theme throughout is that
9   the purchasers may have been heavily influenced by the way the bonds
10   were marketed by and through Lincoln Savings. The evidence raises
11   an inference that debenture purchasers relied, in both direct and
12   subtle ways, on ACC's authority to own and operate a federally-
13   insured institution, as an indicator of its financial integrity and
14   veracity.

15                         **E. California Law**

16           For the same reasons described heretofore, the wrongs
17   alleged and evidence adduced also support class treatment under the
18   law of the state of California. <u>Occidental Land, Inc. v. Superior</u>
19   <u>Court or Orange County</u>, 18 Cal. 3d 355, 134 Cal. Rptr. 388, 556 P.
20   2d 750 (1976); <u>Vasquez v. Superior Court of San Joaquin County</u>, 4
21   Cal. 3d 800, 94 Cal. Rptr. 796, 484 P.2d 964 (1971).

22           The allegations and evidence in this case are consistent
23   with California's indirect reliance doctrine and therefore, form an
24   acceptable basis for class certification under California law.
25   Defendants concede that California's indirect reliance doctrine

26

                            20

1   derives from <u>Restatement (Second) of Torts</u>, § 533 (1977), which

2   provides in pertinent part:

3           The maker of a fraudulent misrepresentation is
            subject to liability . . . to another who acts

4           in justifiable reliance upon it if the
            misrepresentation, although not made directly to

5           the other, is made to a third person and the
            maker intends or has reason to expect that its

6           terms will be repeated or its substance
            communicated to the other, and that it will

7           influence his conduct in the transaction . . .

8   "The requirement that reliance must be justified in order to support

9   recovery may also be shown on a class basis. If the court finds that

10  a   reasonable   man   would   have   relied   upon   the   alleged

11  misrepresentations, an inference of justifiable reliance by each

12  class member would arise." <u>Vasquez</u>, 94 Cal.Rptr. at 805.

13          Plaintiffs are entitled to attempt to prove that centrally

14  orchestrated misrepresentations and omissions about the company's

15  strength and stability were handed down from management and

16  communicated through Lincoln's bond sales staff to Plaintiffs. <u>See</u>

17  <u>Varwig v. Anderson-Behel Porsche/Audi, Inc.</u>, 74 Cal. App. 3d 578,

18  580-81, 141 Cal. Rptr. 539 (1st Dist. 1977). <u>Comm. on Children's</u>

19  <u>Television, Inc. v. Gen. Foods Corp.</u>, 35 Cal. 3d 197, 219, 197 Cal.

20  Rptr. 783, 673 P.2d 660 (1983).

21                          F. ACC ESOP

22          Defendants further contend that the ACC employee stock

23  ownership plan ("ESOP") is not an appropriate class member.

24  Defendants argue that the plan participants are not class members,

25  and may be entitled to differing allocations of the class recovery.

26

                                21

AO 72
(Rev.8/82)

1   This court holds that the ACC ESOP is situated similarly to other
2   members of the Plaintiffs class with respect to the broad contours
3   of the wrongdoing alleged. Specific allocations of any proceeds due
4   non-insider plan participants as a result of recovery by the ESOP
5   itself is secondary to the predominate issue of Defendants'
6   culpability to securities purchasers as described above.

7                                    III.

8          When determining the appropriateness of class
9   certification, this court does not determine the merits of the
10  claims. Nevertheless, the court must make a rigorous analysis of the
11  evidence presented to ensure that common issues predominate.   On
12  these motions for class decertification, the court has reviewed the
13  testimony and evidence concerning communications by bond
14  representatives to bond purchasers, and has found sufficient evidence
15  to support class treatment. The discussion below is a portion of the
16  evidence relied upon by this court, and is not to be construed as a
17  listing of the evidence in its entirety.

18                  Examples of Bond Representative Testimony

19      1.      Numerous bond representatives testified that they
                told bond purchasers the bonds were not insured.
20              Victoria Adriano Bayona Tr. 5/6/91 at 33; Mark
                Johnson Tr. 6/12/91 at 43; Crystal D'Amico Tr.
21              5/15/91 at 43; Douglas J. Lagerstrom Tr. 1/23/91 at
                133; Amy Hirshfield Staley Tr. 6/18/91 at 49.

22      2.      Numerous bond representatives testified that they
                were instructed to and did give bond purchasers a
23              prospectus.   Many testified that they provided a
                packet of written materials including the annual
24              report, bond prospectus, and/or registration
                statement. Laura Powers Tr. 3/6/91 at 40; Michael
25              Mefzger Tr. 3/4/91 at 22; Ronald Sjoberg, Tr.

26
                                    22

6/14/91 at 33; Ana Patricia Dak Tr. 3/13/91 at 26; Beverly Figeira Tr. 1/9/91 at 22;  Douglas Perry Kempt Tr. 3/12/91 at 18; Lagerstrom Tr. 1/23/91 at 134; Gus Martin Tr. 7/24/91 at 24, Hirshfield Staley Tr. 6/18/91 at 50; Scott White Tr. 9/12/91 at 43; Lito Navarra Tr. 9/13/91 at 52; Christine Fujioka Tr. 7/26/91 at 103; Bayona Tr. 5/6/91 at 39;  Christine Turner Tr. 9/11/91 at 47; Margaret Youngblood Tr. 9/12/91 at 124.

3. Bond representatives used whatever they had been given by management to sell the bonds - the prospectus, annual reports, Forbes magazine articles. D'amico Tr. 5/15/91 at 203; Kilmarx Tr. at 60.

Testimony such as the following was typical:

4. "I don't recall making specific qualifications about the investment. I recall making stipulations about the company. I can recall saying things like the bond's as safe as the company, its backed by the assets of the company, and here's how safe the company is, da-de-da-de-da . . . I can remember saying that the earning power of Lincoln Savings' assets backed up the investment they had, but I don't recall saying that the assets of Lincoln backed up the bond."  Lagerstrom Tr. 1/23/91 at 179.

5. "[I]f I had a spiel, the one part I do remember was:   'These are backed by the full faith and credit of American Continental Corporation.'" White Tr. 9/12/91 at 56.

6. "[T]here's a few facts we all were just grilled on about American Continental Corporation, you know, diversified financial holdings, so much in assets, and they had this number of subsidiaries."  Brian Cianfichi Tr. 7/30/91 at 38.

7. Julie Bovay was asked whether she had been taught to recite a "canned sales pitch."  She answered: "Well, I view a canned sales presentation as something that you memorize, maybe practice in front of a mirror or try out on your friends and your mom, whatever, which I did not have. I viewed it from the aspect of a conversation.  If a prospective bond customer or an existing bond customer or anyone were to come up to me and ask me

23

1      about American Continental bonds, it would depend
       on his or her interests and questions how I would
2      respond and what I would say. Now, in the sense of
       my responses, they were pretty much very consistent
3      and almost programmed, because there were only so
       many answers to the questions, and there were also
4      only so many questions that were asked." Bovay Tr.
       9/13/90 at 137 - 138.

5
           Bond representatives attended frequent meetings which were
6
    scheduled as issues arose. Newspaper and magazine articles were the
7
    focus of bond representative meetings. Bond representatives
8
    testified that they were told to focus on the strength of ACC's asset
9
    holdings.
10
11     8.     "I attended office meetings where I was told that
              the way of getting around the negative aspects of
12            buying the bonds, such as not being insured, was to
              advise prospective investors that the bonds are
13            backed by over $5 billion in assets from their
              parent company, American Continental, and that this
              company had never defaulted on any previous
14            security that it had sold in the past." Johnson
              Tr. 6/12/91 at 49 (quoting Declaration for
15            California Department of Corporations).

16     9.     The bonds were "backed by the full faith and credit
              of ACC." D'Amico Tr. 5/15/91 at 118; Youngblood
17            Tr. 9/12/91 at 123.

18     10.    Robyn Wilder was not told at bond representative
              meetings that the risk should be left unmentioned,
19            but rather that it "should be played down or
              diminished." She was led to believe that ACC was
20            "very financially sound" and told prospective
              buyers the bonds were "backed by the ability of
21            American Continental to repay a debt and that the
              assets of American Continental were very strong."
22            Wilder Tr. 9/17/91 at 110. "I did tell customers
              they were safe, relatively safe, that it was not a
23            high risk investment." Wilder Tr. 9/17/91 at 111.

24     11.    "We just tell the customer how strong ACC is at the
              time. The company is really strong at the time.
25            We tell them like figures like how much assets ACC
              has." Bayona Tr. 5/6/91 at 32.

26
                                24

12. Theresa Ventimiglia was told at bond representative meetings that ACC was in a strong financial position. Ventimiglia Tr. 9/16/91 at 35.

13. "We were told [the bonds] were backed by the strength of the company. We felt that the company was extremely strong." Fujioka Tr. 7/26/91 at 62.

14. The bonds "were backed by the assets of American Continental." Peter Kilmarx Tr. at 59.

15. "The policy at Lincoln had always been to provide a lot of financial information and to discuss articles that came out in the papers, whether they were favorable or unfavorable, and bring up any questions and answer them. . . . Virtually anything that came out, whether it was an Orange County Register article or a magazine piece would be discussed in meetings." Debra Millard-Schwartz Tr. 9/16/91 at 89, 91.

16. Sharon Aragon, a financial services representative, testified: "[T]hey gave us little cheat sheets that had just the assets. . . . Just for example, one was that they owned a billion dollars worth of land, which made them the largest private land owner in Arizona. That was just one of the things on there, or 6.1 billion in assets." Aragon Tr. 7/22/91 at 69 - 70.

17. "We were told to focus on the positives; focus on the strength of the company as far as the asset size, the hotels, the land, the insurance companies." Aragon Tr. 7/22/91 at 35.

18. In January 1989 the bond representatives were flown to Phoenix. "It was at the time of all the bad press . . . and they wanted us to see the products of American Continental as far as their hotels and just some of the land, and just go up there and see the Phoenician. So it would be more of a motivational meeting for us so when we came back we could tell the customers we saw this. This is, you know, just more sell it on what we'd actually seen." Aragon Tr. 7/22/91 at 49; See also Rocio Escobar Tr. 3/11/91 at 90; Figeira Tr. 1/9/91 at 140 - 142.

19. "I felt we were, we always were given an answer from corporate, that level of communication was

25

1  open, and any time there was anything in the paper,
   they contacted us so we would be able to better
2  sell the product. So we were told exactly what to
   say at that point. So as far as anything that's
3  said, it was said to me, and it was reiterated
   through what was said to me." Aragon Tr. 7/22/91
4  at 156.

5  20.  "Q.  Did you understand that there was at least
        some risk that the bondholders might lose their
6       money?
        A. Never.  I deposited $12,000 in one of these
7       bonds.
        Q. When you deposited the $12,000 in one of the
8       bonds, did you feel that there was absolutely no
        risk?
9       A.   Absolutely no risk.  I would never have
        deposited a penny if I thought there was.  And we
10      certainly wouldn't have sold them if we thought
        there was any risk." Diana Walker Tr. 7/25/91 at 43
11      - 44.

12      Bond  representatives  testified  that  former  Lincoln

13  employees were used as sales representatives, and that Lincoln's

14  goodwill was a factor in the sales.  For example:

15  22.  "[A] lot of customers trusted me already because
        they know me already."
16      Q.   "They knew you from your performance of your
        teller duties as a Lincoln employee?"  A. "Yes."
17      Bayona Tr. 5/6/91 at 60.

18  23.  "Most of the customers believed in Lincoln, and if,
        you know, they felt that if Lincoln -- if American
19      Continental was the owner of Lincoln Savings, that
        they were a good company."
20      Q.   "Did customers tell you that?"  A.   "Yes, they
        did." Dak Tr. 3/13/91 at 196.

21  24.  Scott White was asked, "Did you feel that the fact
        that they were believers in Lincoln Savings helped
22      you to sell the bonds?"  He said, "Yes, I believe
        so.  I didn't have to spend a lot more time talking
23      about Lincoln Savings." White Tr. 9/12/91 at 56.

24  25.  "We would call customers whose certificates of
        deposit were maturing or write them letters."
25      Bovay Tr. 9/13/91 at 21.

26
                                  26

AO 72
(Rev.8/82)

Examples of Bond Purchaser Testimony

    The evidence demonstrates that bond purchasers relied on the selling point that ACC was the parent of Lincoln, that ACC and/or Lincoln would stand behind the bonds, and that their investments would be safe.

26. "I made up my mind after they told me that it was backed by Lincoln and that it was insured by Lincoln, and that I had nothing to worry about, that it was an excellent investment." Leah F. Kane Tr. 11/7/89 at 106.

27. "She said, well, if this company went broke that I would lose that money. But she says, this, like the other guy said: This is a big conglomerate and we own this and we own that and we own this, so I did not have no worries or I did not think I did." Ronald E. Kusel Tr. 7/18/91 at 104.

28. "She -- it was very forceful really in telling me that I had no worries and that there were plenty of assets and how it was all part of one." Ruth Harvey Tr. 3/5/91 at 219.

29. "I believe the way it was put was that because they were backed by American Continental, there was no risk; that they were as good as gold." Walker Tr. 7/25/91 at 49.

30. "All the holdings that ACC had, got the Phoenician Hotel, lands and everything. They never went -- they were never going to go in bankruptcy." Cesar Martinez Tr. 11/15/91 at 35.

31. "It was part of her sales presentation that, 'We're dealing with a multibillion dollar company; you're sitting here in our office here, we're part of this company; we're all just one big happy family.'" Don Allan Maxfield Tr. 8/8/91 at 91.

32. "It was implied that it was all Lincoln. . . . She showed me this beautiful picture of the spa, and this is what Lincoln was investing in, this beautiful place near Phoenix, Arizona." Bertha Roble Tr. 11/8/89 at 49.

27

33.  "I figured because of that sign on that door that anything that transpired in there was government insured."  Grace Marie Young Tr. 5/1/90 at 435.

34.  "[Y]ou buy something from a bank, you feel that it's safe."  Mary Haupt Tr. 9/24/91 at 27.

35.  Hazel Tramel believed Lincoln backed the bonds.  "I don't know what he said in so many words, but we were led to think that they were, by it all being set up there and by it all coming, all information coming from there."  Hazel Tramel Tr. 2/19/91 at 53.

36.  "I just thought she was an employee of Lincoln Savings."  Agnes Mary Malfatti Tr. 8/7/91 at 54.

37.  "The bank was quite close to where we lived . . . I always go into the bank when a CD of mine matures."  Neva Iverson Tr. 2/20/91 at 211 - 212.

38.  Emma Devault was asked why she requested information about the bonds.  She said, "there were signs all over the bank" and she was told that "Mr. Keating owned 28 Lincoln banks and I shouldn't, there was no risk."  Emma Devault Tr. 6/7/91 at 21.

39.  "I asked him about the risk and he said to me not to worry about it because American Continental was a very strong company."  Paul Bergmann Tr. 8/5/91 at 68.

40.  "[E]verything was strength.  He never mentioned anything about weakness."  Maxfield Tr. 8/8/91 at 91.

41.  "He just mentioned that American Continental was a good, sound organization, paid interest, and see, I had dealt with Lincoln so much that I guess I'm the type of person, I just trusted that would be in their organization."  Marguerite Maire Tr. 11/14/89 at 94.

42.  "I said who, who are you.  He said we are the Lincoln bank, they are the parents.  I said what, what they have?  He said they have billions and they have hotels and lots of land . . . "  Esther Bonan Tr. 6/3/91 at 15.

28

43. "[M]y wife immediately got a little edgy and said, 'Is this FSLIC? Is it insured by the government?' And they said, 'No, but this is indeed even better than a CD, because American Continental has its own insurance companies that will back it up,' and that the government would go broke before it would." John David Keables Brunner Tr. 5/31/91 at 89. "We have our own insurance company and that's American Founders Life . . . I remember his words very distinctly, and this was said several times later. 'The government will go broke before American Continental or Lincoln will ever go broke.'" Brunner Tr. at 120-121.

44. "We asked [the Lincoln teller] how reliable the American Continental Corporation was, and if there was any truth to the rumors that we heard about American -- or Lincoln and American Continental having a problem with the California banking -- whatever the outfit is that controls banking in California. And their answer would always be that there was a vendetta against Charles Keating; and that Lincoln had twice the amount of capitalization that was required . . ." Ronald Wright Tr. 6/10/91 at 66.

45. "He said: we own Lincoln Savings and he peeled off four or five other names that I don't remember that they owned. And he says: This is great. He said: This is a great company." Kusel Tr. 7/18/91 at 78.

46. "We knew they were not insured, but we wanted to know that they were safe. He assured us they were safe." Wanda Wright Tr. 6/10/91 at 36.

47. "He told me it was a good deal, it was secure, it was safe, I would have no problem." Annette Cote Tr. 2/21/91 at 46. "I thought you could trust a bank. Can't even trust a bank." Cote Tr. 2/21/91 at 54.

48. "Well, he explained to me that Lincoln was so secure and had so much money. And I remember the one remark that he made was that they actually had more money than the federal depository. He made an analogy as if everybody in the country pulled all their money out of all the banks, the federal depository could not pay it off and Lincoln could pay all the depositors off at one time and not have

29

to take any money from any other sources." Linda
Corso de Roo Tr. 6/4/91 at 92.

49. "Q: What I want to know is: what was it that led
you to invest in what you later found out to be the
ACC bond?
A. I kept thinking back that how safe these people
told me if I stay with Lincoln Saving Association;
that there's nothing to worry about, Lincoln Saving
Association -- " Alfrad Nabeta Tr. 6/11/91 at 106.

50. "You have nothing to worry about . . . because
American Continental is worth $2 billion. It's a
real estate developer in Arizona, and they are the
parent company of Lincoln Savings, which is worth
$500 billion, so you have the backup of Uncle Sam
and Lincoln Savings and the real estate backup on
American Continental." Cesar Gil Tr. 5/29/91 at
147.

51. "I asked her how -- whether it was absolutely safe,
and she said yes. And told me that it was backed
by the bank and American Continental." Hymen
Kublin Tr. 5/17/91 at 86.

52. "What I understood was that he said that it was
recommended by both Lincoln and American
Continental, and that it was backed by American
Continental and Lincoln, and that they were both
strong financial institutions." Iverson Tr.
2/20/91 at 81.

53. "I went to the teller there to deposit my money and
open an account at Lincoln Savings. . . . They
were just telling us how much American Continental
had and what they were doing with it and how much
money they were making of it and things like this."
Lydia Littleford Tr. 5/10/91 at 155.

54. "He just kept on telling me how strong American
Continental was, all the holdings that they had.
. [I understood that the bonds were being offered]
by Lincoln, by both Lincoln and American
Continental, because they were selling them at
Lincoln. And I thought they were all part of the
family. . . . He didn't mention anything about
insurance. He kept saying that it was just like a
CD. I needn't worry about anything. . . He kept
telling me how strong they were, over and over
again. . . . Both Lincoln and Continental about

30

how strong that they both were."  Linda Martinez Tr. 11/15/89 at 41, 49, 50.

55.  "Yeah, both people, and going back to the first visit, you know, certainly implicated that the bank was very solid, it was a major institution, billions of dollars in assets, huge revenue." Raymond Parks Tr. 11/17/89 at 124.

56.  "Q. Can you recall any information that the person sitting at the desk gave to you or your husband? A. Only that the bonds were secured by Lincoln and they were a $7 billion firm."  Ruth Perelman Tr. 7/15/91 at 67.

57.  "And I was talking to the girl in there at the teller's window and a conversation went that we -- I asked her about the American Continental, and she says, oh, yes, that's a very, that's a very good company . . . that American Continental was the mother company of Lincoln and that -- then she introduced me to the young man that was selling. I sat down and talked to him and he give me -- he told me how strong the company was. . . .  I asked if they were insured, and he said not by the United States government but we have the protection of American Continental Company which is the owner of Lincoln Savings.  It sounded pretty good to me." Ralph H. Rankin Tr. 11/14/89 at 36.

58.  Wanda Lee Bean was asked what was the most important factor in deciding to purchase the bonds. "If it was a good investment, and the interest was good, and she sold me on it because she says it was such a good investment, a new type of investment, Lincoln only, backed and insured by Lincoln Savings.  She says -- and then she says it's like investing in Lincoln Savings, like owning a piece of Lincoln. And that's her words." Wanda Lee Bean Tr. 1/22/91 at 156.

59.  "[W]e were just sent over to the teller across the way. . . she had said that we would have a better place for our money over there . . . it did not occur to us that there was anything different than the rest of the bank." Pat Potter Beck Tr. 7/17/91 at 25.

60.  "[H]e was very gung-ho about the bonds.  And upon my question who would guarantee the bonds, if these

31

bonds were guaranteed by Lincoln Savings and Loan,
he says no, sir, they are not, but it is better
because it is guaranteed by American Continental
and they own Lincoln Savings and Loan." Bergmann
Tr. 8/5/91 at 32.

61.   "I said they are insured, by whom? He said by us.
The lady was still there . . . she said well, by
us.   I said by you?  Who, I wanted to make sure
that she tell me.  She said Lincoln Bank, they are
the parents of Lincoln, and you have nothing to, to
worry, they are 10 years strong and they have a
very good reputation and -- " Bonan Tr. 6/3/91 at
29.

62.   "Yes, we discussed it in June, whether they were
insured by the government, and he said, 'No, they
weren't,' that they were insured, but by American
Continental backing the name up with their own
insurance company.  That they were stronger than
the government would be at that time." Brunner Tr.
5/31/91 at 149.

### Examples of Evidentiary Exhibits

The following exhibits were part of this court's record.
This court finds the following evidence to be relevant and persuasive
in its decision to deny decertification.

63.   Bond representatives were given answer sheets to
most frequently asked questions.  For example,
Exhibit 31149 is entitled "Who is ACC?" The first
two answers:   "1. Lincoln Savings parent.   2.
Phoneix [sic] based, diversified financial holding
company with $5 billion in assets."

64.   Exhibit 30855 is entitled "Exactly Who is ACC?"
Again, the first two answers: "1. Lincoln Savings
Parent Company, 2. Phoneix [sic] based, diversified
financial holding company with 5 BILLION IN
ASSETS!"

65.   Exhibit III-70015 is entitled "How to overcome the
questions: Are these Bonds Insured? and What's the
Risk?"

66.   The record contains material such as a "Bond
Seminar Script," "Bond Selling Tips," and a slide

32

presentation outline which similarly emphasized the strength of ACC's assets and described its posture as parent of Lincoln Savings. These materials were used prepare bond representatives. *E.g.* Figeira Tr. 1/9/91 at 26, 154; Bovay Tr. 9/13/91 at 111-113; Todd L. Storkensen Tr. 1/25/91 at 27-28, 48-50; Dak Tr. 3/13/91 at 104; Lagerstrom Tr. 1/23/91 at 185.

## IV.

The court holds that the Plaintiff class has an overriding common interest in attempting to prove that Defendants devised and implemented, or aided and abetted, a scheme which was the source of representations made to them.  Members of the class are similarly situated with respect to Defendants' alleged conduct.  The evidence confirms that class treatment of Plaintiffs' claims is superior to any other available method for the fair and efficient adjudication of these claims.

In denying class decertification, the court does not implicate the ultimate determination of any Defendant's culpability. This holding does not enhance the Defendants' liability because it in no way relieves Plaintiffs of their burden to establish the requisites, including scienter, under the securities or racketeering statutes.

Accordingly, IT IS HEREBY ORDERED that Defendants' Motions for Class Decertification based on the "canned sales pitch theory," the "fraud on the regulatory process doctrine," the Roble claims, and with respect to the ACC ESOP, are DENIED. IT IS FURTHER ORDERED that claims based on Section 10(b) of the Securities Exchange Act of 1934, Sections 11 and 12 of the Securities Act of 1933, RICO, and the state

33

AO 72
(Rev.8/82)

1  claims set forth in <u>Roble</u>, are certified for class treatment
2  consistent with this opinion.
3
4
5
6
7
8  DATED: <u>December 31, 1991</u>

   Richard M. Bilby
9  United States District Judge
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

                                        34

AO 72
(Rev.8/82)