IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE:                                    CIVIL ACTION

DONALD TRUMP CASINO                       MDL DOCKET NO. 864
SECURITIES LITIGATION

This Document Relates to:                 CLASS ACTION
Taj Mahal Litigation

AFFIDAVIT OF PETER R. TYSON

Commonwealth of Pennsylvania    :
                                :    SS:
County of Philadelphia          :

Exhibit D

1.      For over 20 years, I have been exclusively engaged in the business of consulting to the hospitality industry. Prior to 1979, I was employed by the accounting firm of Laventhol & Horwath and, from 1979 until 1991, I was a Partner and Certified Public Accountant with Laventhol. In that capacity, I was in charge of Laventhol's leisure industry consulting for Pennsylvania, Delaware and southern New Jersey, including Atlantic City. The leisure industry includes hotels, resorts, casinos and restaurants.

2.      While at Laventhol, I first performed work for Donald Trump or his affiliates in or around 1976 in connection with the Grand Hyatt Hotel in New York City. Thereafter, I and through me Laventhol performed work on behalf of Mr. Trump or his affiliates

in connection with the Trump Plaza and the Trump Regency in Atlantic City, as well as other properties.

3.      During the 1970's and the 1980's, I and through me Laventhol performed approximately thirty projects in connection with the Atlantic City casino industry, some involving multiple assignments. Casino-hotel projects on which we performed work included the Playboy/Atlantis, Harrah's, Resorts International, Casino-By-The-Sea, the Cavanaugh Communities project, the Shelbourne, the Brighton/Greate Bay/Sands, Caesars, the Claridge, Bally's Park Place, Trop World, the Dunes, the Ritz and numerous others.

4.      During this time, Laventhol was the premier financial consultant to the gaming industry, with particular emphasis on Atlantic City, and we developed methodologies for predicting or projecting future financial results of casino-hotels. Laventhol was the only professional accounting or consulting firm that conducted annual symposia and published an annual survey relating to the gaming industry. Hundreds of top analysts, professionals, lenders and casino industry executives attended these symposia each year.

5.      In 1987, I and Laventhol were engaged to perform an analysis (the "Laventhol Report") of projected financial results for various ownership and operational scenarios relating to the

2

Resorts International Casino-Hotel ("RICH") and the Taj Mahal Hotel and Casino ("Taj Mahal"). At this time, both the RICH and the Taj Mahal were owned by Resorts International.

6.      I understood that Resorts International management commissioned the Laventhol Report because they were mapping corporate strategy. Management needed realistic cash flow projections in order to make important decisions regarding plans for the RICH and the Taj Mahal. This was not a situation in which management stated or implied that it desired optimistic projections in order to support a loan application or to encourage investors to purchase securities.

7.      The Laventhol Report, which was prepared under my personal direction and dated September, 1987, examined, among other things, projected cash flow from operations before management fees, reserve for replacement of fixed assets, debt service and taxes on income ("Operating Cash Flow") for the Taj Mahal under three different scenarios. These three different scenarios included one in which the RICH continued to operate but its casino was closed, a second in which Resorts operated both properties as casino-hotels, and a third in which the RICH was sold and continued to operate as a casino-hotel competitor to the Taj Mahal. This third scenario (the "Third Scenario"), in which the Taj Mahal and the RICH competed as separately-owned and -operated casinos, is essentially the scenario that developed in 1988, when Mr. Trump and

3

his affiliates acquired the Taj Mahal, with the expressed intention of completing the Taj Mahal and then opening it as a hotel and casino, while the RICH continued to operate as a hotel and casino under Resorts' ownership. Thus, only the ownership roles were reversed between the theoretical Third Scenario, wherein Resorts would operate the Taj Mahal and a competitor the RICH, and reality, wherein Resorts continues to own and operate the RICH and a competitor owns and operates the Taj Mahal.

8.      In projecting Operating Cash Flows for the Taj Mahal for the Laventhol Report, we conducted extensive analysis. Our report assumed that the Taj Mahal would be completed and its first full year of operations would be the year 1989.

9.      In the Laventhol Report, we projected in the Third Scenario that the Taj Mahal's Operating Cash Flow (assuming the RICH would continue to operate as a casino and would thus compete with the Taj Mahal) would be as follows:

|  | Year | Operating Cash Flow | Adjusted Operating Cash Flow[1] |
|---|---|---|---|
| First Year  - | 1989: | $ 78,496,000 | $62,496,000 |
| Second Year - | 1990: | $ 90,770,000 | 73,315,000 |
| Third Year  - | 1991: | $105,475,000 | 86,594,000 |
| Fourth Year - | 1992: | $115,359,000 | 93,751,000 |

---

[1] In computing cash flow available for debt service (Adjusted Operating Cash Flow), I assume it is necessary to deduct management fees of 1.75% of revenues and replacement reserves of 2% of revenues from the Operating Cash Flow.

4

10.     On the basis of the Laventhol Report, projected cash flow available for debt service for the Taj Mahal for the initial years of operation is less than cash flow required to pay the debt service on the Trump Taj Mahal Funding, Inc. Bonds (the "Bonds"), issued in 1988, assuming aggregate Bond principal of $675,000,000, and interest at 14% per annum, or annual interest on those Bonds of $94,500,000.

11.     In preparing the Laventhol Report, we took into account the Atlantic City gaming "win" from the first seven months of 1987, as well as 1986 and prior years, as indicated on page 19 of the Laventhol Report.

12.     In preparing the Laventhol Report, we assumed the Taj Mahal's first full year of operation would be 1989. If its first year of operation were shifted to 1990, it would not have been reasonable to assume automatically that the Taj Mahal's Operating Cash Flow in that year necessarily would amount to $90,770,000, as indicated in paragraph 9 above; nor would it have been reasonable to assume automatically that Operating Cash Flow necessarily would be $105,475,000 in 1991 or $115,359,000 in 1992. This is because the levels of citywide win projected would have changed; the Taj Mahal's percentages of fair share could have changed for competitive reasons; and casino-hotel profit percentages continued

5

to decline from 28.2% of casino win in 1986, to 26.8% in 1987, and to 25.0% in 1988.

13. In projecting the Operating Cash Flow set forth in paragraph 9 above, one of the important assumptions we made was the extent to which the Atlantic City casino market would grow in future years. We assumed that growth in this market (based on citywide "win") would be as follows:[2]

| Year | Amount of Citywide Win (000) | Percent Increase |
|---|---|---|
| 1987 | $2,465,392 | 8.1%[3] |
| 1988 | 2,626,294 | 6.5 |
| 1989 | 2,919,734 | 11.2 |
| 1990 | 3,094,918 | 6.0 |
| 1991 | 3,280,613 | 6.0 |
| 1992 | 3,477,450 | 6.0 |

Actual results for 1987 and the first 10 months of 1988 did not vary materially from these projections. In 1987, the citywide win increased 9.4% (not 8.1% as we had projected). During the first 10 months of 1988, the citywide win increased 9.1% (not 6.5% as we projected for 1988 as a whole).

---

[2] These assumptions were on the basis that the RICH casino would continue to operate, which is in fact what occurred. Our assumptions for market growth were slightly lower where we assumed the closing of the RICH casino.

[3] Based on actual 1986 win of $2,281,000.

6

14. If, in preparing the Laventhol Report, we had been clairvoyant, and thus able to know the precise amount of increase in the citywide win from August 1987 through October 1988, and also that the Taj Mahal would open in early 1990 rather than early 1989, then in that event, using the methodology contained in our report, the projected cash flow from operations initially still would have been insufficient to cover debt service on the Bonds, management fees and replacement reserves.

15. I have been informed that it has been alleged in this litigation that Resorts International prepared projections as of March 24, 1988 (the "1988 Projections"), when Resorts still owned the Taj, that projected operating profit of $186 million for 1990 and $202 million for 1991. I assume that the 1988 Projections were prepared on the expectation that the RICH was closed on March 31, 1989. The 1988 Projections, therefore, do not apply to the situation that actually developed by the fall of 1988, when Trump interests acquired the Taj Mahal from Resorts International, and it became clear that the Taj Mahal and the RICH casinos would both be open and compete with each other as hotel-casinos. In the Laventhol Report, we concluded that closing the RICH casino would increase the Operating Cash Flow of the Taj Mahal 79% in the first year of operations, 78% in the second year, 75% in the third year, and 74% in the fourth year.

16.     The Laventhol Report was submitted to Resorts International in late September or early October 1987. I understood that at that time Donald Trump was a member of the Resorts International Board of Directors.

17.     Subsequent to the submission of the Laventhol Report on or about September 25, 1987, I have no knowledge or information relating to any further request by Resorts International, by Mr. Trump or any of his affiliates, or by any other person with regard to any additional assignments for Laventhol regarding the Taj Mahal. Specifically, to my knowledge, neither I nor Laventhol was contacted by Mr. Trump or his affiliates, Trump Taj Mahal Funding, Inc., and/or Merrill Lynch Capital Markets in connection with the 1988 offering of Bonds in the principal amount of $675,000,000.

18.     If given the opportunity in November 1988 to review the appraisal of the Appraisal Group International ("AGI"), as contained in an exhibit to the Registration Statement for the offering of the Bonds, I would have concluded that the amount of cash flow available for debt service projected by AGI was unreasonably optimistic by a material amount.  I would have concluded further that this projection was based upon materially unrealistic growth rates and other assumptions (such as the assumption that the Atlantic City casino win would grow by 15% per year in 1989, 1990 and 1991 and by 8% per year in 1992-1996).

8

_____
Peter R. Tyson

SWORN TO AND SUBSCRIBED BEFORE

ME THIS 28th DAY OF OCTOBER, 1991

_____
Notary Public

NOTARIAL SEAL
JOHN C KERNS, NOTARY PUBLIC
WARMINSTER TOWNSHIP, BUCKS COUNTY
MY COMMISSION EXPIRES MARCH 16, 1992
Member, Pennsylvania Association of Notaries

docs/tsc.dir/tyson.aff/1846.wp

9