```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF NEW JERSEY
 2
   - - - - - - - - - - - - - - - - - - - - -   CIVIL ACTION NO.
 3                                             1-90-MC-919

 4 IN RE:

 5 DONALD J. TRUMP CASINO
   SECURITIES LITIGATION
 6
                                      ORAL DEPOSITION OF
 7
                                      DAVID WEBB
 8 - - - - - - - - - - - - - - - - - - - - -

 9                    *  *  *  *  *
                 TUESDAY, SEPTEMBER 17, 1991
10                    *  *  *  *  *

11            TRANSCRIPT IN THE ABOVE MATTER TAKEN
   AT THE OFFICES OF SHEARMIN & STERLING, ESQUIRES,
12 CITICORP BUILDING, NEW YORK, NEW YORK COMMENCING
   AT 9:00 A.M.
13
   A P P E A R A N C E S:
14
        BERGER & MONTAGUE, ESQUIRES
15      BY:  TODD COLLINS, ESQUIRE
        ATTORNEYS FOR THE PLAINTIFFS
16
        THE SHIDLER GROUP
17      BY:  CLAY W. HAMLIN, III, ESQUIRE
        ATTORNEYS FOR THE PLAINTIFFS
18
        SHEARMAN & STERLING, ESQUIRES
19      BY:  STUART BASKIN, ESQUIRE
             -AND-
20      DAVID BRADFORD, ESQUIRE
        ATTORNEYS FOR MERRILL LYNCH
21

22      CERTIFIED SHORTHAND REPORTING SERVICES
                  ARRANGED THROUGH
23         MASTROIANNI & FORMAROLI, INC.
              104 WHITE HORSE PIKE
24      HADDON HEIGHTS, NEW JERSEY 08035
                  (609) 546-1100
25
```

Exhibit
G

1   A P P E A R A N C E S: (CONTINUED)

2          WILLKIE, FARR & GALLAGHER, ESQUIRES
           BY:  IRENE KOCH, ESQUIRE
3          ATTORNEYS FOR THE TAJ MAHAL HOTEL AND CASINO

4
                   W I T N E S S    I N D E X
5
    EXAMINATION OF MR. WEBB BY MR. COLLINS:
6          PAGE 3

7

8                     E X H I B I T S

9   EXHIBIT WEBB-1
          PAGE 8:       SUMMARY DUE DILIGENCE MEMORANDUM
10
    EXHIBIT WEBB-2
11        PAGE 27:      PROSPECTUS

12  EXHIBIT WEBB-3
          PAGE 33:      BATES STAMP NUMBER M9790
13
    EXHIBIT WEBB-4
14        PAGE 34:      BATES STAMP NUMBER M7633

15  EXHIBIT WEBB-5
          PAGE 35:      BATES STAMP NUMBER M9682
16
    EXHIBIT WEBB-6
17        PAGE 57:      BATES STAMP NUMBER M9828

18  EXHIBIT WEBB-7
          PAGE 60:      BATES STAMP NUMBER M003409
19
    EXHIBIT WEBB-8
20        PAGE 70:      BATES STAMP NUMBER N8710

21  EXHIBIT WEBB-9
          PAGE 107:     BATES STAMP NUMBER M8433
22

23

24

25

1  (DAVID WEBB, HAVING BEEN DULY SWORN, WAS EXAMINED

2  AND TESTIFIED AS FOLLOWS:)

3  (EXAMINATION OF MR. WEBB BY MR. COLLINS:)

4  Q.   MR. WEBB, THANK YOU FOR COMING TODAY.  MY

5  NAME IS TODD COLLINS.

6          MR. BASKIN:  WHATEVER PROCEDURES YOU

7  AGREED TO YESTERDAY AS FAR AS FORM OF THE

8  QUESTIONS AND THE LIKE WOULD BE FINE FOR OUR

9  PURPOSES.  I DON'T FRANKLY KNOW WHAT WAS AGREED TO

10  YESTERDAY, DO YOU?

11          MR. COLLINS:  NO, IT MAKES ME A

12  LITTLE UNCOMFORTABLE TO AGREE TO SOMETHING I'M NOT

13  AWARE OF.

14          MR. BASKIN:  CERTAINLY OBJECTIONS TO

15  THE FORM CAN BE RESERVED AS WELL AS OBJECTIONS TO

16  SUBSTANCE CAN BE RESERVED AND PRESUMABLY THE

17  SUBJECT TO WHATEVER STAGE OF CONFIDENTIALITY WE'VE

18  AGREED TO PREVIOUSLY AND I TAKE IT HE CAN SWEAR TO

19  IN FRONT OF ANY OATH GIVER AND SIGN THE NORMAL

20  DEPOSITION PROTOCOL IN THAT RESPECT AS TO

21  FORMALITIES.

22          MR. COLLINS:  YES TO ALL THAT.

23  BY MR. COLLINS:

24  Q.   MY NAME IS TODD COLLINS AND I AND MR. CLAY

25  HAMLIN, WE ARE GOING TO DEPOSE YOU IF WE MAY.  YOU

1   ARE CURRENTLY EMPLOYED BY MERRILL LYNCH?

2   A.    YES.

3   Q.    AND WHAT IS YOUR POSITION CURRENTLY WITH

4   MERRILL LYNCH?

5   A.    MANAGING DIRECTOR AND INVESTMENT BANKING

6   DIVISION.

7   Q.    AND YOU HAVE BEEN DEPOSED BEFORE?

8   A.    NO.

9   Q.    NEVER BEFORE?

10  A.    NO.

11  Q.    IF I ASK A QUESTION AND YOU DON'T UNDERSTAND

12  IT, WOULD YOU BE GOOD ENOUGH TO TELL ME THAT YOU

13  DON'T UNDERSTAND, PLEASE?

14  A.    YES.

15  Q.    I'LL BE ASKING YOU A SERIES OF QUESTIONS.

16  THE COURT REPORTER WILL BE TAKING THEM DOWN.  YOU

17  KNOW THAT YOU ARE SWORN.

18        ARE YOU AWARE THAT THIS DEPOSITION IS BEING

19  TAKEN IN CONNECTION WITH THE TAJ MAHAL BOND HOLDER

20  JUNK SECURITIES LITIGATION?

21  A.    YES.

22  Q.    HAVE YOU READ THE COMPLAINT IN THIS ACTION?

23  A.    YES.

24  Q.    HAVE YOU REVIEWED ANY DOCUMENTS IN

25  PREPARATION FOR THIS DEPOSITION?

1    A.    YES.

2    Q.    WHAT DID YOU REVIEW, PLEASE, TO THE EXTENT

3    THAT YOU CAN RECALL?

4    A.    IT WAS, I COVERED A NUMBER OF DOCUMENTS.   IT

5    INCLUDED THE COMPLAINT, THE PROSPECTUS AND THERE

6    WERE DOZENS OF THINGS.

7    Q.    DID YOU LOOK AT ANY, DID YOU LOOK AT THE

8    SUMMARY DUE DILIGENCE MEMORANDUM?

9    A.    YES, I DID.

10   Q.    NOW, DID YOU LOOK AT ANY PROJECTIONS THAT

11   WERE IN EXISTENCE AT THE TIME OF THE OFFERING?

12   A.    YES.

13   Q.    AND DID YOU LOOK AT ANY APPRAISALS?

14   A.    I DIDN'T REVIEW THE SPECIFIC APPRAISAL.   TO

15   BE CLEAR, I DID AT THE TIME OF THE OFFERING, BUT I

16   DIDN'T REVIEW THEM IN ADVANCE OF THIS.

17   Q.    NOW, IN CONNECTION WITH -- THE OFFERING WAS

18   UNDERWRITTEN BY MERRILL LYNCH; IS THAT CORRECT?

19   A.    YES.

20   Q.    DID YOU PERSONALLY HAVE A ROLE IN CONNECTION

21   WITH MERRILL LYNCH'S WORK ON THE OFFERING?

22   A.    YES.

23   Q.    WHAT WAS THAT ROLE, PLEASE?

24   A.    I WAS RESPONSIBLE FOR THE FIRM'S

25   RELATIONSHIP WITH DONALD TRUMP.   I LED THE

6

1    SOLICITATIONS OF THE BUSINESS FROM HIM AND I WAS

2    THE SENIOR MEMBER OF THE MERRILL LYNCH TEAM THAT

3    EXECUTED THE FINANCING.

4    Q.    WHEN YOU SAY YOU WERE THE SENIOR MEMBER OF

5    THE MERRILL LYNCH TEAM THAT EXECUTED THE

6    FINANCING, WHAT DOES THAT MEAN?

7    A.    I WAS THE TEAM LEADER, AS IT WERE.

8    Q.    AS TEAM LEADER, DID YOU DIRECT THE DUE

9    DILIGENCE ACTIVITIES UNDERTAKEN BY MERRILL LYNCH?

10   A.    I WAS INVOLVED IN MUCH OF THE DUE DILIGENCE.

11   Q.    WHO, IF ANYONE, DETERMINED WHAT DUE

12   DILIGENCE WOULD BE UNDERTAKEN?

13   A.    IT WAS A COLLABORATIVE EFFORT AMONGST THE

14   TEAM MEMBERS AND OUR COUNSEL AS TO DEFINITE THINGS

15   WE WISHED TO INVESTIGATE AS PART OF THE PROCESS.

16   Q.    NOW, PRIOR TO THIS OFFERING, YOU HAD THEN, I

17   PRESUME, BEEN INVOLVED IN OTHER OFFERINGS AT

18   MERRILL LYNCH?

19   A.    YES.

20   Q.    AND IN CONNECTION WITH THOSE OTHER

21   OFFERINGS, HAD YOU BEEN INVOLVED WITH DUE

22   DILIGENCE ACTIVITIES IN THOSE OFFERINGS?

23   A.    YES.

24   Q.    HAD YOU BEEN INVOLVED IN AT LEAST FIVE

25   OFFERINGS PRIOR TO THIS PARTICULAR OFFERING WHILE

1   AT MERRILL LYNCH?

2   A.    IF I MAY ASK, WHAT SPECIFICALLY DO YOU MEAN

3   BY OFFERING?

4   Q.    LET ME NARROW THAT, IF I MAY, TO OFFERINGS

5   OF PUBLIC OFFERINGS OF BONDS, SPECIFICALLY HIGH

6   YIELD JUNK BONDS.

7   A.    IN THAT CASE, THE ANSWER WOULD BE NO.

8   Q.    WAS THIS THE FIRST JUNK BOND -- IS IT FAIR

9   TO CHARACTERIZE THE BONDS THAT ARE THE SUBJECT OF

10  THIS LITIGATION AS JUNK BONDS?  IS HIGH YIELD

11  BONDS A BETTER TERM?

12  A.    THE BONDS HAD BOTH REAL ESTATE

13  CHARACTERISTICS AND HIGH YIELD BOND

14  CHARACTERISTICS.  BUT YES, THEY DEFINITELY HAD A

15  HIGH YIELD.

16  Q.    WAS THIS THE FIRST HIGH YIELD BOND OFFER IN

17  WHICH YOU HAD BEEN INVOLVED AT MERRILL LYNCH?

18          MR. BASKIN:  INVOLVED?  THAT'S A

19  PRETTY BROAD TERM.  YOU'RE NOT TALKING AS TEAM

20  LEADER NOW?

21          MR. COLLINS:  NO, I MEANT AS MEMBER

22  OF THE TEAM, EITHER A LEADER OR SOMEONE ELSE.

23          THE WITNESS:  NO, I WANT TO BE,

24  RESPONSIVE TO YOUR QUESTION.  I CERTAINLY HAD BEEN

25  CONSULTED ON CERTAIN REAL ESTATE ASPECTS THAT MAY

1  HAVE BEEN INVOLVED IN OTHER OFFERINGS.

2  BY MR. COLLINS:

3  Q.   HAD YOU BEEN TEAM LEADER PRIOR TO THIS

4  OFFERING OF ANY HIGH YIELD BOND OFFERING?

5  A.   NO.

6  Q.   HAD YOU BEEN TEAM LEADER PRIOR TO THIS

7  OFFERING OF ANY SECURITIES OFFERING OTHER THAN A

8  HIGH YIELD BOND OFFERING?

9  A.   ONCE AGAIN, COULD YOU BE MORE SPECIFIC ABOUT

10  SECURITIES OFFERING?

11  Q.   I'M REFERRING TO AN OFFERING OF EITHER

12  EQUITY OR DEBT IN A PUBLIC OFFERING.

13  A.   IN A PUBLIC OFFERING?

14  Q.   YES.

15  A.   I DON'T BELIEVE SO.

16          MR. COLLINS:  I'M GOING TO MARK, IF I

17  MAY, A DOCUMENT THAT'S BATES STAMPED M NINE EIGHT

18  SIX ONE THROUGH NINE EIGHT SIX FIVE AS PLAINTIFF'S

19  EXHIBIT, AS WEBB EXHIBIT ONE, IF I MAY.

20          (EXHIBIT WEBB-1, SUMMARY DUE

21  DILIGENCE MEMORANDUM, IS MARKED FOR

22  IDENTIFICATION)

23  BY MR. COLLINS:

24  Q.   IF YOU WOULD TAKE A LOOK AT THIS DOCUMENT

25  AND TELL ME, IF YOU WOULD, WHETHER YOU'VE SEEN IT

1   DIRECTOR AT THAT TIME.

2   Q.    WHAT WAS HIS FUNCTION IN THE OFFERING?

3   A.    PRIMARILY REAL ESTATE RELATED ISSUES.

4   Q.    HOW DID YOU DIVIDE THE RESPONSIBILITIES FOR

5   THE REAL ESTATE AREA BETWEEN YOURSELF AND SALSMAN?

6   A.    I WOULD SAY THAT WE WERE SUBSTANTIALLY

7   INTERCHANGEABLE.  ALTHOUGH HE DOES REPORT TO ME.

8   Q.    AT MERRILL LYNCH AT THE TIME OF THE

9   OFFERING, WHAT WAS THE NEXT STEP DOWN IN THE

10  HIERARCHY FROM MANAGING DIRECTOR?

11  A.    WE NOW HAVE A TITLE CALLED DIRECTOR.  THAT

12  TITLE MAY HAVE BEEN IN EFFECT.

13  Q.    DO YOU KNOW WHETHER THERE WAS ANY DIRECTOR

14  WHO WORKED DIRECTLY ON THE OFFERING?

15  A.    DAIFOTIS MAY HAVE BEEN A DIRECTOR.

16  Q.    WHAT WAS MR. DAIFOTIS' FUNCTION IN

17  CONNECTION WITH THE OFFERING?

18  A.    DAIFOTIS WAS THE SENIOR MOST HIGH YIELD

19  SPECIALIST DIRECTLY INVOLVED WITH THE TRANSACTION.

20  Q.    WAS THERE ANYONE AT MERRILL LYNCH WHO HAD

21  RESPONSIBILITY FOR THE CASINO INDUSTRY OR THE

22  GAMING ASPECTS OF THE TRANSACTION?

23  A.    THE FIRM DOESN'T HAVE A SPECIALIST CASINO

24  DEPARTMENT.

25  Q.    DID YOU PERSONALLY, PRIOR TO THIS OFFERING,

1   HAVE EXPERIENCE IN THE CASINO INDUSTRY?

2   A.    YES.

3   Q.    DO YOU KNOW WHETHER MANELLA OR DAIFOTIS OR

4   SALSMAN HAD SUCH EXPERIENCE PRIOR TO THE OFFERING?

5   A.    I DON'T KNOW SPECIFICALLY.

6   Q.    WHAT WAS YOUR EXPERIENCE, PRIOR TO THE

7   OFFERING, IN THE CASINO INDUSTRY, PLEASE?

8   A.    I WAS ON THE TEAM OF THE FIRM THAT

9   REPRESENTED THE ESTATE OF JAMES CROSBY IN THE

10  DISPOSITION OF THEIR RESORTS INTERNATIONAL SHARES.

11  Q.    WHEN DID THAT DISPOSITION TAKE PLACE?

12  A.    MY BEST RECOLLECTION WAS THAT IT WAS EITHER

13  LATE '86 OR '87, BUT, THAT'S MY BEST RECOLLECTION.

14  Q.    NOW, APART FROM YOUR WORK IN CONNECTION WITH

15  THAT DISPOSITION OF THE RESORTS SHARES IN THE

16  CROSBY ESTATE, DID YOU HAVE OTHER PRIOR EXPERIENCE

17  IN THE CASINO INDUSTRY?

18  A.    WHEN YOU SAY PRIOR EXPERIENCE, CAN I ASK YOU

19  TO ELABORATE, PLEASE?

20  Q.    I'LL BE GLAD TO TRY.  PRIOR TO THE OFFERING

21  THAT'S THE SUBJECT OF THIS LITIGATION, DID YOU

22  WORK AS A MEMBER OF A MERRILL LYNCH TEAM IN

23  CONNECTION WITH AN UNDERWRITING IN THE CASINO

24  INDUSTRY?

25  A.    NO.

1    Q.    THE SUMMARY THAT YOU SAW, THAT YOU JUST

2    TESTIFIED TO, WAS A SUMMARY THAT YOU LOOKED AT IN

3    CONNECTION WITH YOUR PREPARATION FOR THIS

4    DEPOSITION; IS THAT CORRECT?

5    A.    YES.

6    Q.    AT ANY TIME, WAS THERE ANY OTHER DOCUMENT

7    APART FROM THAT SUMMARY, WAS THERE ANY DOCUMENT

8    THAT AT ANY TIME YOU LOOKED AT, INCLUDING AT THE

9    TIME OF THE OFFERING, THAT REVEALED TO YOU A LOWER

10   NET REVENUE NUMBER PREPARED BY LAVENTHOL AND

11   HORWATH?

12              MR. BASKIN:  AGAIN, WE ARE TALKING

13   FOR PURPOSES OF THE DEPOSITION?  AT ANY TIME IN

14   THE PAST, INCLUDING 1988?

15              MR. COLLINS:  YES.

16              THE WITNESS:  I DON'T REMEMBER IF I

17   SAW THIS OR ANY REFERENCES TO IT BEFORE.

18   BY MR. COLLINS:

19   Q.    AND BY THIS, SIR, ARE YOU REFERRING TO PAGE

20   THREE FOUR FIVE FOUR OF EXHIBIT SEVEN?

21   A.    I'M REFERRING TO THIS ENTIRE DOCUMENT.

22              MR. BASKIN:  EXHIBIT SEVEN.

23              MR. COLLINS:  FINE, THANK YOU.

24   BY MR. COLLINS:

25   Q.    DO YOU KNOW WHETHER, AS OF NOVEMBER 9, 1988,

1 YOU HAD ANY KNOWLEDGE THAT LAVENTHOL AND HORWATH

2 HAD EVER DONE ANY WORK IN CONNECTION WITH THE

3 TAJ?

4           MR. BASKIN:  YOU MEAN DAVID

5 PERSONALLY?

6           MR. COLLINS:  YES.

7           THE WITNESS:  I SIMPLY DON'T REMEMBER

8 WHETHER I SAW THIS BEFORE, KNEW THEY HAD DONE WORK

9 BEFORE, I'M AFRAID I DON'T RECALL.

10 BY MR. COLLINS:

11 Q.   I DON'T MEAN TO BE PEDANTIC OR MORE PEDANTIC

12 THAN I HAVE BEEN, BUT WHEN YOU SAY YOU DON'T

13 RECALL, IS IT ACCURATE THAT YOU DON'T RECALL

14 WHETHER AS OF NOVEMBER 9, 1988, YOU WERE AWARE

15 THAT LAVENTHOL AND HORWATH HAD PERFORMED WORK IN

16 CONNECTION WITH THE TAJ?

17           MR. BASKIN:  YOU BEING CLARIFIED

18 AGAIN BY DAVID PERSONALLY?

19           MR. COLLINS:  YES.

20           THE WITNESS:  I SIMPLY DON'T REMEMBER

21 WHETHER I KNEW THEY HAD DONE WORK, WHETHER OR NOT

22 THEY HAD DONE WORK.  AND I DON'T RECALL OBVIOUSLY

23 IF I CAN'T REMEMBER WHETHER OR NOT THEY DID WORK,

24 IF I REVIEWED THIS.

25 BY MR. COLLINS:

1   Q.   AND YOUR LAST ANSWER, WHEN YOU SAID "THIS",

2   YOU MEANT EXHIBIT SEVEN?

3   A.   YES.

4   Q.   DO YOU RECALL WHETHER, AS OF NOVEMBER 9,

5   1988, YOU KNEW WHETHER LAVENTHOL AND HORWATH HAD

6   EVER PERFORMED ANY WORK FOR RESORTS INTERNATIONAL?

7   A.   NO, I DON'T.  I DON'T RECALL.

8   Q.   YOU'RE FAMILIAR WITH THE APPRAISER GROUP

9   INTERNATIONAL?

10  A.   YES.

11  Q.   AND YOU'RE FAMILIAR WITH MARTIN GROSS

12  ASSOCIATES?

13  A.   RIGHT.

14  Q.   AND ARE YOU AWARE OF THE FACT THAT THOSE TWO

15  ORGANIZATIONS PERFORMED WORK DURING 1988 IN

16  CONNECTION WITH THE TAJ?

17  A.   YES.

18  Q.   DID YOU REVIEW SOME OF THE WORK THEY

19  PERFORMED?  LET ME START AGAIN.  DURING 1988, DID

20  YOU REVIEW ANY WRITTEN DOCUMENTS THEY PREPARED?

21  A.   YES.

22  Q.   AND WHY DID YOU -- WHAT WRITTEN DOCUMENTS

23  DID THEY PREPARE, IF YOU RECALL?

24  A.   WELL, THE ULTIMATE WORK PRODUCT FROM EACH OF

25  THOSE TWO FIRMS WAS AN APPRAISAL, WHICH I REVIEWED

1   EACH OF THEIR APPRAISALS.

2   Q.     AND WHEN YOU SAY YOU REVIEWED, YOU MEAN YOU

3   PERSONALLY READ THE APPRAISALS?

4   A.     I DEFINITELY LOOKED THROUGH THEM.  I WOULD

5   HESITATE TO SAY THAT I READ EVERY SINGLE WORD AND

6   NUMBER.

7   Q.     WAS THAT PART OF YOUR UNDERSTANDING OF YOUR

8   RESPONSIBILITY AS THE SENIOR MEMBER OF THE TEAM,

9   TO READ THE OR LOOK THROUGH THE APPRAISALS

10  PERFORMED BY A.G.I. AND M.G.A.?

11  A.     YES.

12  Q.     AND WHY WAS THAT PART OF YOUR

13  RESPONSIBILITY?

14  A.     BECAUSE 1 FELT A DUTY TO BE PERSONALLY

15  COMFORTABLE WITH THE TRANSACTION.  AND I BELIEVED

16  THAT THESE APPRAISALS COULD FORM A USEFUL INPUT.

17  Q.     DO YOU KNOW WHETHER MR. MANELLA, IN 1988,

18  READ OR LOOKED THROUGH THESE TWO APPRAISALS?

19  A.     I DON'T KNOW.

20  Q.     DID YOU HAVE AN OPINION AS TO WHETHER, IN

21  1988, THAT LOOKING THROUGH THOSE APPRAISALS WAS

22  PART OF HIS DUTY IN CONNECTION WITH THIS OFFERING?

23  A.     I WOULDN'T HAVE AN OPINION.

24  Q.     DO YOU KNOW WHETHER SALSMAN OR DAIFOTIS

25  LOOKED THROUGH OR READ THE APPRAISALS IN 1988?

1   A.G.I. APPRAISAL, BUT WE TALKED THROUGH BOTH WITH

2   STEVE HYDE AND WITH OTHER MEMBERS, WHAT THEY

3   GENUINELY EXPECTED TO ACHIEVE.  AND THEY WERE

4   HOPEFUL OF A PERFORMANCE THAT EXCEEDED WHAT WAS

5   SET FORTH IN THE ROAD SHOW.

6   Q.    PLEASE TURN TO PAGE EIGHT NINE ONE FIVE OF

7   EXHIBIT EIGHT.

8   A.    THAT'S THE MOST RECENT EXHIBIT?

9   Q.    YES, SIR.  I BELIEVE YOU'LL SEE ON THIS PAGE

10  THERE'S A PROJECTION OF ATLANTIC CITY TOTAL WIN

11  FOR SEVERAL YEARS AND THAT INCLUDES AN INCREASE IN

12  THE WIN FOR ATLANTIC CITY OF FIFTEEN PERCENT IN

13  1990, FIFTEEN PERCENT IN 1991, EIGHT PERCENT IN

14  1992 AND EIGHT PERCENT IN 1993.  AM I READING THAT

15  CORRECTLY?

16  A.    UM-HUM.

17  Q.    DID YOU, AT ANY TIME, COME TO A CONCLUSION

18  AS TO WHETHER THOSE PROJECTIONS WERE REASONABLE OR

19  UNREASONABLE?

20  A.    OUR OWN ASSESSMENT WAS THAT A MORE MODEST

21  GROWTH PROJECTION WOULD BE APPROPRIATE, IS MY

22  RECOLLECTION.

23  Q.    AND BY OUR OWN, YOU MEAN MERRILL LYNCH'S

24  ASSESSMENTS?

25  A.    YES, IN REVIEWING ALL OF THE VARIOUS INPUT,

1   WE HAD A BIAS TOWARD MORE CONSERVATIVE PROJECTIONS

2   THAN SOME OTHERS DID.

3   Q.    INCLUDING A.G.I.

4   A.    PARDON ME?

5   Q.    INCLUDING A.G.I. AS EXPRESSED ON PAGE EIGHT

6   ONE NINE FIVE?

7   A.    YES.

8   Q.    DO YOU RECALL WHAT MERRILL LYNCH'S ESTIMATE

9   OR PROJECTION FOR THE INCREASE IN 1990 WAS?

10  A.    I DON'T.

11  Q.    DO YOU KNOW WHETHER IT WAS ABOVE OR BELOW

12  TEN PERCENT?

13  A.    I DON'T RECALL.

14  Q.    DO YOU RECALL WHAT IT WAS FOR ANY OF THE

15  YEARS 1990 THROUGH 1993?

16  A.    NO, I DON'T.

17  Q.    DO YOU RECALL THAT THAT ESTIMATE OR

18  PROJECTION BY MERRILL LYNCH WAS LOWER THAN EACH OF

19  THE NUMBERS SET FORTH ON PAGE EIGHT NINE ONE

20  FIVE?

21          MR. BASKIN:   LOWER THAN EIGHT POINT

22  ONE TWO, YOU MEAN.

23          THE WITNESS:   I DON'T RECALL

24  PRECISELY WHAT OUR PROJECTIONS WERE SO I COULDN'T

25  DETERMINE WHETHER IT WAS HIGHER OR LOWER THAN

1   SOMETHING ELSE, BECAUSE I DON'T REMEMBER WHAT IT

2   WAS.

3             MR. COLLINS:   I NEED TO GO BACK A

4   STEP AND MAKE THE RECORD MORE CLEAR.

5   BY MR. COLLINS:

6   Q.   DO YOU RECALL WHETHER IN ANY YEAR, 1990

7   THROUGH 1993, MERRILL LYNCH'S ESTIMATE OR

8   PROJECTION OF THE INCREASE IN ATLANTIC CITY WIN

9   WAS AS MUCH AS THE INCREASE INDICATED ON PAGE

10  EIGHT NINE ONE FIVE?

11            MR. BASKIN:   I'M NOT SURE I

12  UNDERSTAND THE QUESTION.

13            THE WITNESS:   I'M HAVING DIFFICULTY,

14  TOO.

15  BY MR. COLLINS:

16  Q.   DID I UNDERSTAND THAT IN GENERAL YOU BELIEVE

17  THAT MERRILL LYNCH'S ESTIMATE OF THE INCREASE WAS

18  LESS THAN THE FIFTEEN PERCENT FOR 1990 INDICATED;

19  IS THAT CORRECT?

20  A.   I BELIEVE THAT TO BE THE CASE.

21  Q.   DO YOU RECALL THAT MERRILL LYNCH'S ESTIMATE

22  WAS LESS THAN THE FIFTEEN PERCENT FOR THE 1991

23  INDICATED?

24  A.   I'M SORRY, I DON'T REMEMBER.

25  Q.   DO YOU RECALL WHETHER MERRILL LYNCH'S

1   ESTIMATE WAS LESS THAN WHAT THE EIGHT PERCENT FOR

2   1992 INDICATED?

3   A.    I DON'T RECALL.

4   Q.    AND DO YOU RECALL WHETHER MERRILL LYNCH'S

5   ESTIMATE WAS LESS THAN THE EIGHT PERCENT FOR 1993?

6   A.    I DON'T RECALL.

7   Q.    IN THE LAST SERIES OF QUESTIONS, WHEN YOU'VE

8   TESTIFIED AS TO MERRILL LYNCH'S ESTIMATES, IS IT

9   ACCURATE THAT MERRILL LYNCH HAD ONE ESTIMATE OR IS

10   IT INSTEAD POSSIBLE THAT THE REAL ESTATE SIDE HAD

11   ONE ESTIMATE AND THE INVESTMENT HIGH YIELD

12   INVESTMENT SIDE HAD ANOTHER ESTIMATE?

13   A.    I THINK THAT WOULD BE UNLIKELY IN THAT WE

14   WERE WORKING TOGETHER ON A TEAM.  AND WE WERE

15   REVIEWING THE INPUTS FROM A.G.I. AND OTHERS,

16   TRUMP, IN FORMING AN ASSESSMENT OF WHAT WE WOULD

17   BE COMFORTABLE WITH.  AND AS I'VE SAID, ONE OF THE

18   CENTRAL ELEMENTS TO US BECOMING COMFORTABLE ON AN

19   OVERALL BASIS, AS OPPOSED TO STATISTIC BY

20   STATISTIC WAS THE VERY SUBSTANTIAL CASH FLOW

21   COVERAGE THAT COULD BE PRODUCED BY THE PROJECT.

22   Q.    AS INDICATED BY THE PROJECTIONS CONTAINED ON

23   THE PAGE EIGHT NINE THREE O, WHICH IS THE EARLIER

24   PAGE YOU LOOKED AT FROM EXHIBIT EIGHT OR AS

25   INDICATED BY THE ROAD SHOW PROJECTIONS ON EXHIBIT

1    FIVE; IS THAT CORRECT?

2              MR. BASKIN:   I DON'T UNDERSTAND THAT

3    QUESTION, EITHER.

4              MR. COLLINS:   LET ME START AGAIN.

5    BY MR. COLLINS:

6    Q.    IF THE -- GOING BACK TO PAGE EIGHT NINE

7    THREE O, IF I MAY, IF YOU COULD KEEP YOUR THUMB AT

8    PAGE EIGHT NINE ONE FIVE, DO YOU SEE FOR 1990 THE

9    EFFECTIVE TOTAL REVENUE NUMBER OF APPROXIMATELY

10   FIVE HUNDRED THIRTY-FIVE MILLION?

11   A.    YES.

12   Q.    IS ONE OF THE ASSUMPTIONS THAT GOES INTO THE

13   CREATION OF THAT PROJECTION AN ASSUMPTION RELATING

14   TO THE TOTAL WIN IN ATLANTIC CITY FOR 1990?

15   A.    I BELIEVE SO.

16   Q.    SO IF THE, HYPOTHETICALLY NOW, IF THE

17   ASSUMPTION AS TO TOTAL WIN IS TOO HIGH,

18   HYPOTHETICALLY, THAT NUMBER OF FIVE HUNDRED

19   THIRTY-FIVE, THAT PROJECTION WOULD BE AN

20   UNREASONABLE PROJECTION; IS THAT CORRECT?

21   A.    NOT NECESSARILY AT ALL.

22   Q.    WHY NOT?

23   A.    WELL, THE FIVE HUNDRED AND THIRTY-FIVE IS A

24   NUMBER THAT HAS THE FOLLOWING INPUT AMONG OTHERS.

25   IT HAS THE TOTAL MARKET, THE SHARE OF MARKET, THE

1  COMPOSITION BETWEEN THE CASINO REVENUE BEVERAGE

2  AMONG OTHERS.   THERE ARE A NUMBER OF DIFFERENT

3  INPUTS THAT GO INTO CALCULATING THE TOTAL REVENUE.

4  Q.    I THINK YOU'RE RIGHT.   I THINK I PICKED THE

5  WRONG ONE.   LET'S SKIP DOWN TO CASINO REVENUES.

6  HYPOTHETICALLY, IF THE TOTAL, IF THE PROJECTION

7  FOR 1990 FOR TOTAL WIN WAS TEN PERCENT TOO HIGH,

8  DOES THAT MEAN THAT THE PROJECTION OF FOUR HUNDRED

9  EIGHTY MILLION FOR CASINO REVENUES WAS TEN PERCENT

10 TOO HIGH?

11 A.    NOT NECESSARILY.   IF YOUR SHARE OF MARKET

12 WERE HIGHER.

13 Q.    ALL OTHER THINGS STAYING THE SAME INCLUDING

14 MARKET SHARE, IF THE PROJECTION FOR TOTAL ATLANTIC

15 CITY WIN, IF THAT PROJECTION WAS TEN PERCENT TOO

16 HIGH, DOES THAT MEAN THAT THE PROJECTION OF CASINO

17 REVENUES WAS TEN PERCENT TOO HIGH

18 HYPOTHETICALLY?

19         MR. BASKIN:   IF WE HOLD ALL THE

20 VARIABLES EQUAL AND IF WE ASSUME THIS NUMBER WAS

21 DERIVED IN PART BY TOTAL ATLANTIC CITY WIN AND IF

22 WE LOWERED, HYPOTHETICALLY THE ASSESSMENT OF TOTAL

23 ATLANTIC CITY WIN, WOULD THAT NUMBER GO DOWN?

24         MR. COLLINS:   I PREFER IT THE WAY I

25 ASKED IT.

```
 1   A P P E A R A N C E S:  (CONTINUED)

 2        WILLKIE, FARR & GALLAGHER, ESQUIRES
          BY:  IRENE KOCH, ESQUIRE
 3        ATTORNEYS FOR THE TAJ MAHAL HOTEL AND CASINO

 4
                W I T N E S S   I N D E X
 5
     EXAMINATION OF MR. WEBB BY MR. COLLINS:
 6        PAGE 3

 7

 8                   E X H I B I T S

 9   EXHIBIT WEBB-1
          PAGE 8:    SUMMARY DUE DILIGENCE MEMORANDUM
10
     EXHIBIT WEBB-2
11        PAGE 27:   PROSPECTUS

12   EXHIBIT WEBB-3
          PAGE 33:   BATES STAMP NUMBER M9790
13
     EXHIBIT WEBB-4
14        PAGE 34:   BATES STAMP NUMBER M7633

15   EXHIBIT WEBB-5
          PAGE 35:   BATES STAMP NUMBER M9682
16
     EXHIBIT WEBB-6
17        PAGE 57:   BATES STAMP NUMBER M9828

18   EXHIBIT WEBB-7
          PAGE 60:   BATES STAMP NUMBER M003409
19
     EXHIBIT WEBB-8
20        PAGE 70:   BATES STAMP NUMBER N8710

21   EXHIBIT WEBB-9
          PAGE 107:  BATES STAMP NUMBER M8433
22

23

24

25
```

1   (DAVID WEBB, HAVING BEEN DULY SWORN, WAS EXAMINED

2   AND TESTIFIED AS FOLLOWS:)

3   (EXAMINATION OF MR. WEBB BY MR. COLLINS:)

4   Q.    MR. WEBB, THANK YOU FOR COMING TODAY.  MY

5   NAME IS TODD COLLINS.

6           MR. BASKIN:  WHATEVER PROCEDURES YOU

7   AGREED TO YESTERDAY AS FAR AS FORM OF THE

8   QUESTIONS AND THE LIKE WOULD BE FINE FOR OUR

9   PURPOSES.  I DON'T FRANKLY KNOW WHAT WAS AGREED TO

10  YESTERDAY, DO YOU?

11          MR. COLLINS:  NO, IT MAKES ME A

12  LITTLE UNCOMFORTABLE TO AGREE TO SOMETHING I'M NOT

13  AWARE OF.

14          MR. BASKIN:  CERTAINLY OBJECTIONS TO

15  THE FORM CAN BE RESERVED AS WELL AS OBJECTIONS TO

16  SUBSTANCE CAN BE RESERVED AND PRESUMABLY THE

17  SUBJECT TO WHATEVER STAGE OF CONFIDENTIALITY WE'VE

18  AGREED TO PREVIOUSLY AND I TAKE IT HE CAN SWEAR TO

19  IN FRONT OF ANY OATH GIVER AND SIGN THE NORMAL

20  DEPOSITION PROTOCOL IN THAT RESPECT AS TO

21  FORMALITIES.

22          MR. COLLINS:  YES TO ALL THAT.

23  BY MR. COLLINS:

24  Q.    MY NAME IS TODD COLLINS AND I AND MR. CLAY

25  HAMLIN, WE ARE GOING TO DEPOSE YOU IF WE MAY.  YOU

```
 1   ARE CURRENTLY EMPLOYED BY MERRILL LYNCH?

 2   A.    YES.

 3   Q.    AND WHAT IS YOUR POSITION CURRENTLY WITH

 4   MERRILL LYNCH?

 5   A.    MANAGING DIRECTOR AND INVESTMENT BANKING

 6   DIVISION.

 7   Q.    AND YOU HAVE BEEN DEPOSED BEFORE?

 8   A.    NO.

 9   Q.    NEVER BEFORE?

10   A.    NO.

11   Q.    IF I ASK A QUESTION AND YOU DON'T UNDERSTAND

12   IT, WOULD YOU BE GOOD ENOUGH TO TELL ME THAT YOU

13   DON'T UNDERSTAND, PLEASE?

14   A.    YES.

15   Q.    I'LL BE ASKING YOU A SERIES OF QUESTIONS.

16   THE COURT REPORTER WILL BE TAKING THEM DOWN.   YOU

17   KNOW THAT YOU ARE SWORN.

18         ARE YOU AWARE THAT THIS DEPOSITION IS BEING

19   TAKEN IN CONNECTION WITH THE TAJ MAHAL BOND HOLDER

20   JUNK SECURITIES LITIGATION?

21   A.    YES.

22   Q.    HAVE YOU READ THE COMPLAINT IN THIS ACTION?

23   A.    YES.

24   Q.    HAVE YOU REVIEWED ANY DOCUMENTS IN

25   PREPARATION FOR THIS DEPOSITION?
```

1   A.    YES.

2   Q.    WHAT DID YOU REVIEW, PLEASE, TO THE EXTENT

3   THAT YOU CAN RECALL?

4   A.    IT WAS, I COVERED A NUMBER OF DOCUMENTS.  IT

5   INCLUDED THE COMPLAINT, THE PROSPECTUS AND THERE

6   WERE DOZENS OF THINGS.

7   Q.    DID YOU LOOK AT ANY, DID YOU LOOK AT THE

8   SUMMARY DUE DILIGENCE MEMORANDUM?

9   A.    YES, I DID.

10  Q.    NOW, DID YOU LOOK AT ANY PROJECTIONS THAT

11  WERE IN EXISTENCE AT THE TIME OF THE OFFERING?

12  A.    YES.

13  Q.    AND DID YOU LOOK AT ANY APPRAISALS?

14  A.    I DIDN'T REVIEW THE SPECIFIC APPRAISAL.  TO

15  BE CLEAR, I DID AT THE TIME OF THE OFFERING, BUT I

16  DIDN'T REVIEW THEM IN ADVANCE OF THIS.

17  Q.    NOW, IN CONNECTION WITH -- THE OFFERING WAS

18  UNDERWRITTEN BY MERRILL LYNCH; IS THAT CORRECT?

19  A.    YES.

20  Q.    DID YOU PERSONALLY HAVE A ROLE IN CONNECTION

21  WITH MERRILL LYNCH'S WORK ON THE OFFERING?

22  A.    YES.

23  Q.    WHAT WAS THAT ROLE, PLEASE?

24  A.    I WAS RESPONSIBLE FOR THE FIRM'S

25  RELATIONSHIP WITH DONALD TRUMP.  I LED THE

1  SOLICITATIONS OF THE BUSINESS FROM HIM AND I WAS

2  THE SENIOR MEMBER OF THE MERRILL LYNCH TEAM THAT

3  EXECUTED THE FINANCING.

4  Q.    WHEN YOU SAY YOU WERE THE SENIOR MEMBER OF

5  THE MERRILL LYNCH TEAM THAT EXECUTED THE

6  FINANCING, WHAT DOES THAT MEAN?

7  A.    I WAS THE TEAM LEADER, AS IT WERE.

8  Q.    AS TEAM LEADER, DID YOU DIRECT THE DUE

9  DILIGENCE ACTIVITIES UNDERTAKEN BY MERRILL LYNCH?

10  A.    I WAS INVOLVED IN MUCH OF THE DUE DILIGENCE.

11  Q.    WHO, IF ANYONE, DETERMINED WHAT DUE

12  DILIGENCE WOULD BE UNDERTAKEN?

13  A.    IT WAS A COLLABORATIVE EFFORT AMONGST THE

14  TEAM MEMBERS AND OUR COUNSEL AS TO DEFINITE THINGS

15  WE WISHED TO INVESTIGATE AS PART OF THE PROCESS.

16  Q.    NOW, PRIOR TO THIS OFFERING, YOU HAD THEN, I

17  PRESUME, BEEN INVOLVED IN OTHER OFFERINGS AT

18  MERRILL LYNCH?

19  A.    YES.

20  Q.    AND IN CONNECTION WITH THOSE OTHER

21  OFFERINGS, HAD YOU BEEN INVOLVED WITH DUE

22  DILIGENCE ACTIVITIES IN THOSE OFFERINGS?

23  A.    YES.

24  Q.    HAD YOU BEEN INVOLVED IN AT LEAST FIVE

25  OFFERINGS PRIOR TO THIS PARTICULAR OFFERING WHILE

1  AT MERRILL LYNCH?

2  A.    IF I MAY ASK, WHAT SPECIFICALLY DO YOU MEAN

3  BY OFFERING?

4  Q.    LET ME NARROW THAT, IF I MAY, TO OFFERINGS

5  OF PUBLIC OFFERINGS OF BONDS, SPECIFICALLY HIGH

6  YIELD JUNK BONDS.

7  A.    IN THAT CASE, THE ANSWER WOULD BE NO.

8  Q.    WAS THIS THE FIRST JUNK BOND -- IS IT FAIR

9  TO CHARACTERIZE THE BONDS THAT ARE THE SUBJECT OF

10  THIS LITIGATION AS JUNK BONDS?  IS HIGH YIELD

11  BONDS A BETTER TERM?

12  A.    THE BONDS HAD BOTH REAL ESTATE

13  CHARACTERISTICS AND HIGH YIELD BOND

14  CHARACTERISTICS.  BUT YES, THEY DEFINITELY HAD A

15  HIGH YIELD.

16  Q.    WAS THIS THE FIRST HIGH YIELD BOND OFFER IN

17  WHICH YOU HAD BEEN INVOLVED AT MERRILL LYNCH?

18            MR. BASKIN:  INVOLVED?  THAT'S A

19  PRETTY BROAD TERM.  YOU'RE NOT TALKING AS TEAM

20  LEADER NOW?

21            MR. COLLINS:  NO, I MEANT AS MEMBER

22  OF THE TEAM, EITHER A LEADER OR SOMEONE ELSE.

23            THE WITNESS:  NO, I WANT TO BE

24  RESPONSIVE TO YOUR QUESTION.  I CERTAINLY HAD BEEN

25  CONSULTED ON CERTAIN REAL ESTATE ASPECTS THAT MAY

1  HAVE BEEN INVOLVED IN OTHER OFFERINGS.

2  BY MR. COLLINS:

3  Q.    HAD YOU BEEN TEAM LEADER PRIOR TO THIS

4  OFFERING OF ANY HIGH YIELD BOND OFFERING?

5  A.    NO.

6  Q.    HAD YOU BEEN TEAM LEADER PRIOR TO THIS

7  OFFERING OF ANY SECURITIES OFFERING OTHER THAN A

8  HIGH YIELD BOND OFFERING?

9  A.    ONCE AGAIN, COULD YOU BE MORE SPECIFIC ABOUT

10  SECURITIES OFFERING?

11  Q.    I'M REFERRING TO AN OFFERING OF EITHER

12  EQUITY OR DEBT IN A PUBLIC OFFERING.

13  A.    IN A PUBLIC OFFERING?

14  Q.    YES.

15  A.    I DON'T BELIEVE SO.

16          MR. COLLINS:  I'M GOING TO MARK, IF 1

17  MAY, A DOCUMENT THAT'S BATES STAMPED M NINE EIGHT

18  SIX ONE THROUGH NINE EIGHT SIX FIVE AS PLAINTIFF'S

19  EXHIBIT, AS WEBB EXHIBIT ONE, IF I MAY.

20          (EXHIBIT WEBB-1, SUMMARY DUE

21  DILIGENCE MEMORANDUM, IS MARKED FOR

22  IDENTIFICATION)

23  BY MR. COLLINS:

24  Q.    IF YOU WOULD TAKE A LOOK AT THIS DOCUMENT

25  AND TELL ME, IF YOU WOULD, WHETHER YOU'VE SEEN IT

1  DIRECTOR AT THAT TIME.

2  Q.    WHAT WAS HIS FUNCTION IN THE OFFERING?

3  A.    PRIMARILY REAL ESTATE RELATED ISSUES.

4  Q.    HOW DID YOU DIVIDE THE RESPONSIBILITIES FOR

5  THE REAL ESTATE AREA BETWEEN YOURSELF AND SALSMAN?

6  A.    I WOULD SAY THAT WE WERE SUBSTANTIALLY

7  INTERCHANGEABLE.   ALTHOUGH HE DOES REPORT TO ME.

8  Q.    AT MERRILL LYNCH AT THE TIME OF THE

9  OFFERING, WHAT WAS THE NEXT STEP DOWN IN THE

10 HIERARCHY FROM MANAGING DIRECTOR?

11 A.    WE NOW HAVE A TITLE CALLED DIRECTOR.   THAT

12 TITLE MAY HAVE BEEN IN EFFECT.

13 Q.    DO YOU KNOW WHETHER THERE WAS ANY DIRECTOR

14 WHO WORKED DIRECTLY ON THE OFFERING?

15 A.    DAIFOTIS MAY HAVE BEEN A DIRECTOR.

16 Q.    WHAT WAS MR. DAIFOTIS' FUNCTION IN

17 CONNECTION WITH THE OFFERING?

18 A.    DAIFOTIS WAS THE SENIOR MOST HIGH YIELD

19 SPECIALIST DIRECTLY INVOLVED WITH THE TRANSACTION.

20 Q.    WAS THERE ANYONE AT MERRILL LYNCH WHO HAD

21 RESPONSIBILITY FOR THE CASINO INDUSTRY OR THE

22 GAMING ASPECTS OF THE TRANSACTION?

23 A.    THE FIRM DOESN'T HAVE A SPECIALIST CASINO

24 DEPARTMENT.

25 Q.    DID YOU PERSONALLY, PRIOR TO THIS OFFERING,

1  HAVE EXPERIENCE IN THE CASINO INDUSTRY?

2  A.    YES.

3  Q.    DO YOU KNOW WHETHER MANELLA OR DAIFOTIS OR

4  SALSMAN HAD SUCH EXPERIENCE PRIOR TO THE OFFERING?

5  A.    I DON'T KNOW SPECIFICALLY.

6  Q.    WHAT WAS YOUR EXPERIENCE, PRIOR TO THE

7  OFFERING, IN THE CASINO INDUSTRY, PLEASE?

8  A.    I WAS ON THE TEAM OF THE FIRM THAT

9  REPRESENTED THE ESTATE OF JAMES CROSBY IN THE

10  DISPOSITION OF THEIR RESORTS INTERNATIONAL SHARES.

11  Q.    WHEN DID THAT DISPOSITION TAKE PLACE?

12  A.    MY BEST RECOLLECTION WAS THAT IT WAS EITHER

13  LATE '86 OR '87, BUT, THAT'S MY BEST RECOLLECTION.

14  Q.    NOW, APART FROM YOUR WORK IN CONNECTION WITH

15  THAT DISPOSITION OF THE RESORTS SHARES IN THE

16  CROSBY ESTATE, DID YOU HAVE OTHER PRIOR EXPERIENCE

17  IN THE CASINO INDUSTRY?

18  A.    WHEN YOU SAY PRIOR EXPERIENCE, CAN I ASK YOU

19  TO ELABORATE, PLEASE?

20  Q.    I'LL BE GLAD TO TRY.  PRIOR TO THE OFFERING

21  THAT'S THE SUBJECT OF THIS LITIGATION, DID YOU

22  WORK AS A MEMBER OF A MERRILL LYNCH TEAM IN

23  CONNECTION WITH AN UNDERWRITING IN THE CASINO

24  INDUSTRY?

25  A.    NO.

1    Q.    THE SUMMARY THAT YOU SAW, THAT YOU JUST

2    TESTIFIED TO, WAS A SUMMARY THAT YOU LOOKED AT IN

3    CONNECTION WITH YOUR PREPARATION FOR THIS

4    DEPOSITION; IS THAT CORRECT?

5    A.    YES.

6    Q.    AT ANY TIME, WAS THERE ANY OTHER DOCUMENT

7    APART FROM THAT SUMMARY, WAS THERE ANY DOCUMENT

8    THAT AT ANY TIME YOU LOOKED AT, INCLUDING AT THE

9    TIME OF THE OFFERING, THAT REVEALED TO YOU A LOWER

10   NET REVENUE NUMBER PREPARED BY LAVENTHOL AND

11   HORWATH?

12              MR. BASKIN:   AGAIN, WE ARE TALKING

13   FOR PURPOSES OF THE DEPOSITION?   AT ANY TIME IN

14   THE PAST, INCLUDING 1988?

15              MR. COLLINS:   YES.

16              THE WITNESS:   I DON'T REMEMBER IF I

17   SAW THIS OR ANY REFERENCES TO IT BEFORE.

18   BY MR. COLLINS:

19   Q.    AND BY THIS, SIR, ARE YOU REFERRING TO PAGE

20   THREE FOUR FIVE FOUR OF EXHIBIT SEVEN?

21   A.    I'M REFERRING TO THIS ENTIRE DOCUMENT.

22              MR. BASKIN:   EXHIBIT SEVEN.

23              MR. COLLINS:   FINE, THANK YOU.

24   BY MR. COLLINS:

25   Q.    DO YOU KNOW WHETHER, AS OF NOVEMBER 9, 1988,

1    YOU HAD ANY KNOWLEDGE THAT LAVENTHOL AND HORWATH

2    HAD EVER DONE ANY WORK IN CONNECTION WITH THE

3    TAJ?

4              MR. BASKIN:  YOU MEAN DAVID

5    PERSONALLY?

6              MR. COLLINS:  YES.

7              THE WITNESS:  I SIMPLY DON'T REMEMBER

8    WHETHER I SAW THIS BEFORE, KNEW THEY HAD DONE WORK

9    BEFORE, I'M AFRAID I DON'T RECALL.

10   BY MR. COLLINS:

11   Q.   I DON'T MEAN TO BE PEDANTIC OR MORE PEDANTIC

12   THAN I HAVE BEEN, BUT WHEN YOU SAY YOU DON'T

13   RECALL, IS IT ACCURATE THAT YOU DON'T RECALL

14   WHETHER AS OF NOVEMBER 9, 1988, YOU WERE AWARE

15   THAT LAVENTHOL AND HORWATH HAD PERFORMED WORK IN

16   CONNECTION WITH THE TAJ?

17             MR. BASKIN:  YOU BEING CLARIFIED

18   AGAIN BY DAVID PERSONALLY?

19             MR. COLLINS:  YES.

20             THE WITNESS:  I SIMPLY DON'T REMEMBER

21   WHETHER I KNEW THEY HAD DONE WORK, WHETHER OR NOT

22   THEY HAD DONE WORK.  AND I DON'T RECALL OBVIOUSLY

23   IF I CAN'T REMEMBER WHETHER OR NOT THEY DID WORK,

24   IF I REVIEWED THIS.

25   BY MR. COLLINS:

1   Q.     AND YOUR LAST ANSWER, WHEN YOU SAID "THIS",

2   YOU MEANT EXHIBIT SEVEN?

3   A.     YES.

4   Q.     DO YOU RECALL WHETHER, AS OF NOVEMBER 9,

5   1988, YOU KNEW WHETHER LAVENTHOL AND HORWATH HAD

6   EVER PERFORMED ANY WORK FOR RESORTS INTERNATIONAL?

7   A.     NO, I DON'T.  I DON'T RECALL.

8   Q.     YOU'RE FAMILIAR WITH THE APPRAISER GROUP

9   INTERNATIONAL?

10  A.     YES.

11  Q.     AND YOU'RE FAMILIAR WITH MARTIN GROSS

12  ASSOCIATES?

13  A.     RIGHT.

14  Q.     AND ARE YOU AWARE OF THE FACT THAT THOSE TWO

15  ORGANIZATIONS PERFORMED WORK DURING 1988 IN

16  CONNECTION WITH THE TAJ?

17  A.     YES.

18  Q.     DID YOU REVIEW SOME OF THE WORK THEY

19  PERFORMED?  LET ME START AGAIN.  DURING 1988, DID

20  YOU REVIEW ANY WRITTEN DOCUMENTS THEY PREPARED?

21  A.     YES.

22  Q.     AND WHY DID YOU -- WHAT WRITTEN DOCUMENTS

23  DID THEY PREPARE, IF YOU RECALL?

24  A.     WELL, THE ULTIMATE WORK PRODUCT FROM EACH OF

25  THOSE TWO FIRMS WAS AN APPRAISAL, WHICH I REVIEWED

1   EACH OF THEIR APPRAISALS.

2   Q.    AND WHEN YOU SAY YOU REVIEWED, YOU MEAN YOU

3   PERSONALLY READ THE APPRAISALS?

4   A.    I DEFINITELY LOOKED THROUGH THEM.  I WOULD

5   HESITATE TO SAY THAT I READ EVERY SINGLE WORD AND

6   NUMBER.

7   Q.    WAS THAT PART OF YOUR UNDERSTANDING OF YOUR

8   RESPONSIBILITY AS THE SENIOR MEMBER OF THE TEAM,

9   TO READ THE OR LOOK THROUGH THE APPRAISALS

10  PERFORMED BY A.G.I. AND M.G.A.?

11  A.    YES.

12  Q.    AND WHY WAS THAT PART OF YOUR

13  RESPONSIBILITY?

14  A.    BECAUSE I FELT A DUTY TO BE PERSONALLY

15  COMFORTABLE WITH THE TRANSACTION.  AND I BELIEVED

16  THAT THESE APPRAISALS COULD FORM A USEFUL INPUT.

17  Q.    DO YOU KNOW WHETHER MR. MANELLA, IN 1988,

18  READ OR LOOKED THROUGH THESE TWO APPRAISALS?

19  A.    I DON'T KNOW.

20  Q.    DID YOU HAVE AN OPINION AS TO WHETHER, IN

21  1988, THAT LOOKING THROUGH THOSE APPRAISALS WAS

22  PART OF HIS DUTY IN CONNECTION WITH THIS OFFERING?

23  A.    I WOULDN'T HAVE AN OPINION.

24  Q.    DO YOU KNOW WHETHER SALSMAN OR DAIFOTIS

25  LOOKED THROUGH OR READ THE APPRAISALS IN 1988?

1   A.G.I. APPRAISAL, BUT WE TALKED THROUGH BOTH WITH

2   STEVE HYDE AND WITH OTHER MEMBERS, WHAT THEY

3   GENUINELY EXPECTED TO ACHIEVE.  AND THEY WERE

4   HOPEFUL OF A PERFORMANCE THAT EXCEEDED WHAT WAS

5   SET FORTH IN THE ROAD SHOW.

6   Q.     PLEASE TURN TO PAGE EIGHT NINE ONE FIVE OF

7   EXHIBIT EIGHT.

8   A.     THAT'S THE MOST RECENT EXHIBIT?

9   Q.     YES, SIR.  I BELIEVE YOU'LL SEE ON THIS PAGE

10  THERE'S A PROJECTION OF ATLANTIC CITY TOTAL WIN

11  FOR SEVERAL YEARS AND THAT INCLUDES AN INCREASE IN

12  THE WIN FOR ATLANTIC CITY OF FIFTEEN PERCENT IN

13  1990, FIFTEEN PERCENT IN 1991, EIGHT PERCENT IN

14  1992 AND EIGHT PERCENT IN 1993.  AM I READING THAT

15  CORRECTLY?

16  A.     UM-HUM.

17  Q.     DID YOU, AT ANY TIME, COME TO A CONCLUSION

18  AS TO WHETHER THOSE PROJECTIONS WERE REASONABLE OR

19  UNREASONABLE?

20  A.     OUR OWN ASSESSMENT WAS THAT A MORE MODEST

21  GROWTH PROJECTION WOULD BE APPROPRIATE, IS MY

22  RECOLLECTION.

23  Q.     AND BY OUR OWN, YOU MEAN MERRILL LYNCH'S

24  ASSESSMENTS?

25  A.     YES, IN REVIEWING ALL OF THE VARIOUS INPUT,

MASTROIANNI & FORMAROLI, INC.
Professionals Serving Professionals

```
 1   WE HAD A BIAS TOWARD MORE CONSERVATIVE PROJECTIONS

 2   THAN SOME OTHERS DID.

 3   Q.    INCLUDING A.G.I.

 4   A.    PARDON ME?

 5   Q.    INCLUDING A.G.I. AS EXPRESSED ON PAGE EIGHT

 6   ONE NINE FIVE?

 7   A.    YES.

 8   Q.    DO YOU RECALL WHAT MERRILL LYNCH'S ESTIMATE

 9   OR PROJECTION FOR THE INCREASE IN 1990 WAS?

10   A.    I DON'T.

11   Q.    DO YOU KNOW WHETHER IT WAS ABOVE OR BELOW

12   TEN PERCENT?

13   A.    I DON'T RECALL.

14   Q.    DO YOU RECALL WHAT IT WAS FOR ANY OF THE

15   YEARS 1990 THROUGH 1993?

16   A.    NO, I DON'T.

17   Q.    DO YOU RECALL THAT THAT ESTIMATE OR

18   PROJECTION BY MERRILL LYNCH WAS LOWER THAN EACH OF

19   THE NUMBERS SET FORTH ON PAGE EIGHT NINE ONE

20   FIVE?

21            MR. BASKIN:   LOWER THAN EIGHT POINT

22   ONE TWO, YOU MEAN.

23            THE WITNESS:   I DON'T RECALL

24   PRECISELY WHAT OUR PROJECTIONS WERE SO I COULDN'T

25   DETERMINE WHETHER IT WAS HIGHER OR LOWER THAN
```

1   SOMETHING ELSE, BECAUSE I DON'T REMEMBER WHAT IT

2   WAS.

3            MR. COLLINS:   I NEED TO GO BACK A

4   STEP AND MAKE THE RECORD MORE CLEAR.

5   BY MR. COLLINS:

6   Q.    DO YOU RECALL WHETHER IN ANY YEAR, 1990

7   THROUGH 1993, MERRILL LYNCH'S ESTIMATE OR

8   PROJECTION OF THE INCREASE IN ATLANTIC CITY WIN

9   WAS AS MUCH AS THE INCREASE INDICATED ON PAGE

10  EIGHT NINE ONE FIVE?

11           MR. BASKIN:   I'M NOT SURE I

12  UNDERSTAND THE QUESTION.

13           THE WITNESS:   I'M HAVING DIFFICULTY,

14  TOO.

15  BY MR. COLLINS:

16  Q.    DID I UNDERSTAND THAT IN GENERAL YOU BELIEVE

17  THAT MERRILL LYNCH'S ESTIMATE OF THE INCREASE WAS

18  LESS THAN THE FIFTEEN PERCENT FOR 1990 INDICATED;

19  IS THAT CORRECT?

20  A.    I BELIEVE THAT TO BE THE CASE.

21  Q.    DO YOU RECALL THAT MERRILL LYNCH'S ESTIMATE

22  WAS LESS THAN THE FIFTEEN PERCENT FOR THE 1991

23  INDICATED?

24  A.    I'M SORRY, I DON'T REMEMBER.

25  Q.    DO YOU RECALL WHETHER MERRILL LYNCH'S

1  ESTIMATE WAS LESS THAN WHAT THE EIGHT PERCENT FOR

2  1992 INDICATED?

3  A.    I DON'T RECALL.

4  Q.    AND DO YOU RECALL WHETHER MERRILL LYNCH'S

5  ESTIMATE WAS LESS THAN THE EIGHT PERCENT FOR 1993?

6  A.    I DON'T RECALL.

7  Q.    IN THE LAST SERIES OF QUESTIONS, WHEN YOU'VE

8  TESTIFIED AS TO MERRILL LYNCH'S ESTIMATES, IS IT

9  ACCURATE THAT MERRILL LYNCH HAD ONE ESTIMATE OR IS

10 IT INSTEAD POSSIBLE THAT THE REAL ESTATE SIDE HAD

11 ONE ESTIMATE AND THE INVESTMENT HIGH YIELD

12 INVESTMENT SIDE HAD ANOTHER ESTIMATE?

13 A.    I THINK THAT WOULD BE UNLIKELY IN THAT WE

14 WERE WORKING TOGETHER ON A TEAM.  AND WE WERE

15 REVIEWING THE INPUTS FROM A.G.I. AND OTHERS,

16 TRUMP, IN FORMING AN ASSESSMENT OF WHAT WE WOULD

17 BE COMFORTABLE WITH.  AND AS I'VE SAID, ONE OF THE

18 CENTRAL ELEMENTS TO US BECOMING COMFORTABLE ON AN

19 OVERALL BASIS, AS OPPOSED TO STATISTIC BY

20 STATISTIC WAS THE VERY SUBSTANTIAL CASH FLOW

21 COVERAGE THAT COULD BE PRODUCED BY THE PROJECT.

22 Q.    AS INDICATED BY THE PROJECTIONS CONTAINED ON

23 THE PAGE EIGHT NINE THREE O, WHICH IS THE EARLIER

24 PAGE YOU LOOKED AT FROM EXHIBIT EIGHT OR AS

25 INDICATED BY THE ROAD SHOW PROJECTIONS ON EXHIBIT

78

```
 1   FIVE; IS THAT CORRECT?

 2              MR. BASKIN:   I DON'T UNDERSTAND THAT

 3   QUESTION, EITHER.

 4              MR. COLLINS:   LET ME START AGAIN.

 5   BY MR. COLLINS:

 6   Q.    IF THE -- GOING BACK TO PAGE EIGHT NINE

 7   THREE O, IF I MAY, IF YOU COULD KEEP YOUR THUMB AT

 8   PAGE EIGHT NINE ONE FIVE, DO YOU SEE FOR 1990 THE

 9   EFFECTIVE TOTAL REVENUE NUMBER OF APPROXIMATELY

10   FIVE HUNDRED THIRTY-FIVE MILLION?

11   A.    YES.

12   Q.    IS ONE OF THE ASSUMPTIONS THAT GOES INTO THE

13   CREATION OF THAT PROJECTION AN ASSUMPTION RELATING

14   TO THE TOTAL WIN IN ATLANTIC CITY FOR 1990?

15   A.    I BELIEVE SO.

16   Q.    SO IF THE, HYPOTHETICALLY NOW, IF THE

17   ASSUMPTION AS TO TOTAL WIN IS TOO HIGH,

18   HYPOTHETICALLY, THAT NUMBER OF FIVE HUNDRED

19   THIRTY-FIVE, THAT PROJECTION WOULD BE AN

20   UNREASONABLE PROJECTION; IS THAT CORRECT?

21   A.    NOT NECESSARILY AT ALL.

22   Q.    WHY NOT?

23   A.    WELL, THE FIVE HUNDRED AND THIRTY-FIVE IS A

24   NUMBER THAT HAS THE FOLLOWING INPUT AMONG OTHERS.

25   IT HAS THE TOTAL MARKET, THE SHARE OF MARKET, THE
```

1  COMPOSITION BETWEEN THE CASINO REVENUE BEVERAGE

2  AMONG OTHERS.  THERE ARE A NUMBER OF DIFFERENT

3  INPUTS THAT GO INTO CALCULATING THE TOTAL REVENUE.

4  Q.   I THINK YOU'RE RIGHT.  I THINK I PICKED THE

5  WRONG ONE.  LET'S SKIP DOWN TO CASINO REVENUES.

6  HYPOTHETICALLY, IF THE TOTAL, IF THE PROJECTION

7  FOR 1990 FOR TOTAL WIN WAS TEN PERCENT TOO HIGH,

8  DOES THAT MEAN THAT THE PROJECTION OF FOUR HUNDRED

9  EIGHTY MILLION FOR CASINO REVENUES WAS TEN PERCENT

10 TOO HIGH?

11 A.   NOT NECESSARILY.  IF YOUR SHARE OF MARKET

12 WERE HIGHER.

13 Q.   ALL OTHER THINGS STAYING THE SAME INCLUDING

14 MARKET SHARE, IF THE PROJECTION FOR TOTAL ATLANTIC

15 CITY WIN, IF THAT PROJECTION WAS TEN PERCENT TOO

16 HIGH, DOES THAT MEAN THAT THE PROJECTION OF CASINO

17 REVENUES WAS TEN PERCENT TOO HIGH

18 HYPOTHETICALLY?

19           MR. BASKIN:  IF WE HOLD ALL THE

20 VARIABLES EQUAL AND IF WE ASSUME THIS NUMBER WAS

21 DERIVED IN PART BY TOTAL ATLANTIC CITY WIN AND IF

22 WE LOWERED, HYPOTHETICALLY THE ASSESSMENT OF TOTAL

23 ATLANTIC CITY WIN, WOULD THAT NUMBER GO DOWN?

24           MR. COLLINS:  I PREFER IT THE WAY I

25 ASKED IT.