IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | *Exhibit H* | CIVIL ACTION |
| DONALD TRUMP CASINO SECURITIES LITIGATION | | MDL DOCKET NO. 864 |
| This Document Relates to: Taj Mahal Litigation | | CLASS ACTION |

State of New York
County of New York:                                              SS:

### AFFIDAVIT OF DAVID E. DOUGHERTY

I, David E. Dougherty, being duly sworn, hereby depose and say:

1.      I am a plaintiff in the above matter and reside at 7 Gramercy Park, New York, New York.  The purpose of this affidavit is (i) to state why I am opposed to the offer to settle the Taj Mahal Litigation as outlined in the Memorandum of Understanding ("MOU"), and (ii) to respond to certain allegations and statements made by counsel for defendants respecting my motivations in this litigation.

2.      I received a degree from Georgetown University in 1971.  I received my juris doctor degree from Temple University Law School in 1979.  From 1973 to 1980, I was employed at Kidder Peabody in Philadelphia.  By the time of my resignation, I had attained the position of Vice President, Investment Banker in the Municipal Bond Department.

3.      Thereafter, from 1980 to 1989 I was employed as a Vice President, Senior Vice President and a Managing Director at Bankers Trust Company in New York.  From 1980 to 1985, I was the lead Investment Banker and Managing Director in charge of Bankers Trust Company's municipal finance business.  After 1985, I was Managing Director in charge of the firm's mergers and acquisitions business.  During that period, I oversaw the growth of that business as its revenues grew tenfold.  While at Bankers Trust, I supervised and closed over 500 separate transactions.  Since 1990, I have been engaged in a private consulting business.

4.      During my tenure at Bankers Trust Company, I served on the Corporate Finance Management Committee of the firm and was intimately familiar with the internal procedures followed by Bankers Trust Company and other major Wall Street firms with respect to underwriting methodology, evaluating and

1

approving a wide variety of prospective transactions, due diligence analysis and employment of outside experts. I also served on the firm's Commitment Committee for Corporate Finance.

5.      In 1988, I began to hold my investment accounts at Merrill Lynch in New York. I made many investments recommended by Merrill Lynch and generally had confidence in that firm and its analysts.

6.      On April 13, 1989, I purchased $50,000 worth of the 14 1/2% First Mortgage Bonds isssued by Trump Taj Mahal Funding, Inc. and Trump Taj Mahal Associates Limited Partnership and underwritten by Merrill Lynch. Despite the potential construction and operating risks, I decided to purchase the bonds for several reasons. Among these reasons, first, I understood from the Prospectus that the bonds were collateralized by a first mortgage on the Taj Mahal Hotel & Casino ("Taj"), and that the appraised value of the Taj, when completed, was $1.1 billion. The Prospectus thus indicated that for the $675 million of first mortgage bonds, there was a 61% loan-to-value, or , stated differently, $425 million in excess value before bond principal was impaired. Second, the Prospectus stated that it was anticipated that operating cash flow would cover debt service. Third, Merrill Lynch was recommending the bonds, and I had long had confidence in Merrill Lynch's underwriting and due diligence abilities going all the way back to a tax-exempt bond offering with Merrill Lynch as the lead underwriter for $302,000,000 to finance the New Jersey Sports and Exposition Authority (Meadowlands project) in 1974, the largest "high risk" bond financed transaction of its era, with which I was intimately familiar.

7.      I believed that Merrill Lynch would not put its name on the bond offering without expert and conservative analysis.

8.      After my purchase, I began to suspect important statements in the Prospectus were false and misleading.

9.      After reviewing the matter with my attorney, I decided to seek redress for my loss on my bonds by commencing litigation. Since then, I have continued to keep abreast of developments in the litigation.

10.      I understand that discovery was conducted following the execution of the MOU. Based on my review of the highlights of that discovery, I have learned that:

   (a)   Merrill Lynch, in its zeal to complete the deal and collect its fees, did little substantive due diligence. Merrill Lynch merely accepted the financial analysis of Donald J. Trump ("Trump") and his agents (such as the appraiser, Appraisal Group International ["AGI"]), failed to seek or obtain expert, independent financial analyses, did not possess hotel or casino investment banking expertise in house, did not hire any independent experts who specialized in the casino industry, ignored

2

unfavorable opinion of knowledgeable analysts and violated standard Wall Street formal Commitment Committee procedures in approving the transaction; and

(b) Trump and Merrill Lynch withheld and concealed information from a study by Laventhol & Horwath, a firm Trump had employed in the past and in 1988 the leading and best recognized firm in the country on the Atlantic City casino and hotel business. This study, prepared for the Taj's prior owner, Resorts International, Inc. and dated September 1987, showed that the Taj's cash flow available for debt service was one-half of what Trump and AGI had projected and that the cash flow available from the Taj was significantly less than the amount required for debt service on the Taj bonds in the initial years of operation.

11.    Merrill Lynch's failure in its due diligence on this transaction is, in my opinion, shocking and inexplicable. To my knowledge, it is unprecedented on Wall Street for a transaction of this size to be approved without a formal meeting of the firm's Commitment Committee, accompanied by written submissions to the Committee by proponents of the transaction.

12.    Based upon my 17 years experience as an investment banker, it is my opinion that it is standard operating procedure that, in any public offering, the approval of the underwriting firm's Commitment Committee is an integral precondition. The Commitment Committee in an investment banking firm such as Merrill Lynch is typically comprised of senior executives of the firm who review all transactions by means of a formal underwriting proposal submitted in writing by the person in charge of the transaction. This process is equivalent to a loan committee of a bank reviewing a transaction proposed by a loan officer. It is the firm's internal procedure to insure proper and complete due diligence was done by the partner in charge prior to putting the firm's name on any deal going to the market. Detailed written documentation (including financial projections) is normally provided in advance so that the members of the Commitment Committee can review the transaction in detail prior to a discussion and determine whether proper due diligence was done by the partner in charge. The Commitment Committee is supposed to include members whose compensation is not tied to the deal being reviewed.

13.    Finally, I would like to respond to a gratuitous remark made about me and my wife in Defendant's Memorandum of Law in Support of Their Motion to Solicit Approval by The Class of The Proposed Settlement, page 21 footnote 6, to the effect that I am pursuing "a private agenda" because my wife, who formerly worked for Merrill Lynch, lost an arbitration.

14.    I commenced this litigation only to seek redress for the large loss sustained. I have no "private agenda". My wife, the former Jadeane Ing, was my account executive at Merrill Lynch. We were not married when I purchased the bonds. My wife left that firm after accepting an offer for a more senior, better position at Shearson, Lehman Brothers. Litigation ensued over my wife's client

3

lists.  Merrill Lynch prevailed in an arbitration.  Shearson fully indemnified my wife and paid all litigation expenses, as well as the award to Merrill Lynch.  Neither I nor my wife suffered any financial loss as a result of the arbitration.   To this day, I continue to keep substantial funds in my investment account at Merrill Lynch in New York.  Indeed, I have had in the past a high opinion of Merrill Lynch, which has caused me all the more to be shocked by Merrill Lynch's gross violations of its duties as underwriter in connection with the offering of the Taj bonds.

_____
David E. Dougherty

Sworn to and subscribed before me this _1st_
day of November, 1991

_____
Notary Public
HILLARY SOBEL
Notary Public, State of New York
No. 31-4975548
Qualified in New York County
Commission Expires December 10, 1992

4