56

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE:                              CIVIL ACTION

DONALD J. TRUMP CASINO              MDL DOCKET NO. 864
SECURITIES LITIGATION

This Document Relates to:           CLASS ACTION
All Trump Castle Cases

**ORIGINAL FILED**

SECOND AMENDED CONSOLIDATED COMPLAINT

MAR 6 - 1992.

WILLIAM T. WALSH

Plaintiffs, by and through their attorneys,
complain against the defendants herein and allege the
following:

## PARTIES

1.      Plaintiff Peter Stuyvesant, Ltd., purchased
the following bonds (collectively the "Castle Bonds") issued
by defendant Trump's Castle Funding, Inc. ("Castle
Funding"):

(a)     13-3/4% First Mortgage Bonds, Series
A-1, due 1997; and

(b)     7% First Mortgage Bonds Series A-2, due
1999.

2.      Plaintiff Sidney L. Kaufman purchased the
Castle Bonds issued by Castle Funding.

3.      Plaintiffs Peter Stuyvesant, Ltd. and Sidney
L. Kaufman are hereinafter referred to as the "plaintiffs."



MAR 1 2 1992

4. Defendant Trump's Castle Associates Limited Partnership ("Castle Associates") is a New Jersey limited partnership with its principal place of business at Brigantine Boulevard and Huron Avenue, Atlantic City, New Jersey 08401. Castle Associates owns and operates the Trump's Castle Hotel & Casino and its ancillary facilities ("Trump's Castle"), a luxury hotel/casino located in the Marina Area of Atlantic City, New Jersey.

5. Defendant Castle Funding is a New Jersey corporation with its principal place of business at Brigantine Boulevard and Huron Avenue, Atlantic City, New Jersey 08401. Castle Funding was formed solely to serve as a financing corporation to raise funds for the benefit of Castle Associates through the issuance of the Castle Bonds.

6. Defendant Donald J. Trump ("Donald") is an individual and a resident of the State of New York with his principal place of business at The Trump Organization, Inc., Trump Tower, 26th Floor, 725 Fifth Avenue, New York, New York 10022. Donald also maintains a business address at 1000 Boardwalk, Atlantic City, New Jersey 08401.

7. Defendant Robert S. Trump ("Robert") is an individual and a resident of the State of New York with his principal place of business at The Trump Organization, Inc., Trump Tower, 26th Floor, 725 Fifth Avenue, New York, New York 10022. Robert is the brother of Donald.

- 2 -

8.    Defendant Harvey I. Freeman ("Freeman") is an individual and a resident of the State of New York with his principal place of business at The Trump Organization, Inc., Trump Tower, 26th Floor, 725 Fifth Avenue, New York, New York 10022.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934, as amended ("the 1934 Act"), 15 U.S.C. § 78aa.  This Court has pendent jurisdiction over plaintiffs' ancillary non-federal law claims.

10.    Plaintiffs bring this action for violations of Section 10(b) of the 1934 Act, 15 U.S.C. § 78j, and Rule 10b-5 of the Securities and Exchange Commission ("SEC") promulgated thereunder, 17 C.F.R. 240.10b-5, and pursuant to the common law.

11.    Venue is proper in this judicial district because many of the principal acts and injuries alleged herein occurred within this district, and many of the defendants have principal places of business within this district.

12.    In connection with the acts and conduct alleged herein, the defendants, directly or indirectly, used the mails, instrumentalities of interstate commerce, and/or the facilities of national securities markets.

- 3 -

13.  The securities at issue in this action were registered with the SEC pursuant to a Registration Statement (including a Prospectus) which was declared effective on September 20, 1985.

## CLASS ALLEGATIONS

14.  Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of three Classes consisting of:

(a)  with respect to Counts I, III, IV, VI and VII:

(i)  all persons who purchased Castle Bonds issued pursuant to the Castle Prospectus between March 31, 1989, and June 4, 1990 (the "First Class Period"), and who sustained damaged as a result of such purchases (the "Securities I Class"); and

(ii)  all persons who acquired the Castle Bonds issued pursuant to the Castle Prospectus and who sold the bonds at a loss or presently hold the bonds at a loss (the "Contract Class").

(b)  With respect to Counts II and V, all persons who purchased Castle Bonds issued pursuant to the Castle Prospectus between January 1, 1990 and June 4, 1990 (the "Second Class Period"), who sustained damages as a result of such purchases (the "Securities II Class").

- 4 -

The above referred Classes are sometimes hereinafter collec-
tively referred to as the "Classes."

15.   The Classes of persons described herein are
so numerous that joinder of all members is impracticable.
While the exact number of members of the Classes is unknown
to plaintiffs at the present time, Castle Funding has
approximately $351.8 million of debt securities outstanding.
It is believed that hundreds of persons purchased the debt
securities during the relevant Class Periods.   The exact
number of members of the Classes can be readily determined
from the books and records of Castle Funding or its transfer
agent.

16.   Plaintiffs' claims are typical of the claims
of the Classes because they and all of the Class Members
sustained damages which arise out of the defendants' wrong-
ful conduct, in violation of the federal and state laws as
complained of herein.

17.   Plaintiffs will fairly and adequately protect
the interests of the Class Members.   Plaintiffs have
retained competent counsel experienced in the prosecution of
class action litigation under the federal securities laws.

18.   Questions of law and fact common to the
members of the Classes predominate over any questions
affecting only individual members of the Classes.   Among the
predominating common questions of law and fact are the
following:

(a) whether the federal securities laws were violated by the defendants;

(b) whether the documents issued and/or disseminated publicly by the defendants contained misstatements of material fact or omitted or failed to state material facts concerning the business, operations, or financial condition of Castle Associates, Castle Funding or Donald;

(c) whether the individual defendants, or any one or more of them, made statements or disseminated information that contained misstatements of material fact or omitted or failed to state material facts concerning the business, operations, or financial condition of the Castle Associates, Castle Funding or Donald;

(d) whether the defendants acted willfully, recklessly, or negligently in misstating and/or omitting to state material facts, or in aiding or abetting the making of such misstatements or omissions;

(e) whether the defendants have failed to abide by the terms and conditions specified in the Prospectus and other documents issued or disseminated publicly by the defendants in connection with the securities; and

(f) whether the Class Members have sustained damages and, if so, the proper measure of damages.

19.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### RELATIONSHIPS BETWEEN THE DEFENDANTS

20.   At all times relevant hereto, Donald has owned, directly or by virtue of his 100 percent ownership of Trump's Castle Hotel & Casino, Inc. ("Hotel Inc."), all of the issued and outstanding stock of Castle Funding.

21.   At all times relevant hereto, Donald has owned, directly or by virtue of his 100 percent ownership of Hotel Inc., all of the partnership interests of Castle Associates.

22.   At all times relevant hereto, the business of Castle Associates was controlled by the executive committee of the partnership, whose members were:

(a)   Donald -- Chairman;

(b)   Robert; and

(c)   Freeman.

23.   At all times relevant hereto, the members of the executive committee of Castle Associates were appointed by and served at the pleasure of Donald.

24.   By reason of his position on the executive committees of the partnerships and his beneficial ownership of all of the partnership interests therein, Donald was a controlling person of Castle Associates within the meaning

- 7 -

of Section 20 of the 1934 Act and exercised the power to cause, and caused, that entity to engage in the unlawful conduct complained of herein. Donald is sued in his individual capacity and as a controlling person of Castle Associates.

25. By reason of his beneficial ownership of all of the issued and outstanding stock therein, Donald was a controlling person of Castle Funding within the meaning of Section 20 of the 1934 Act and exercised the power to cause, and caused that entity to engage in the unlawful conduct complained of herein. Donald is sued in his individual capacity and as a controlling person of Castle Funding.

26. By reason of their positions on the executive committee of the partnership, Robert and Freeman were controlling persons of Castle Associates within the meaning of Section 20 of the 1934 Act and each exercised the power to cause, and caused, that entity to engage in the unlawful conduct complained of herein. Robert and Freeman are each sued in their respective individual capacities and as controlling persons of Castle Associates.

## FACTUAL BACKGROUND

### Issuance of the Castle Bonds

27. On July 19, 1985, Castle Funding registered the Castle Bonds with the SEC by filing a Form S-1 Registra-

- 8 -

tion Statement and Prospectus (the "Castle Prospectus") in accordance with section 12(b) of the Securities Act of 1933, as amended (the "1933 Act"), 15 U.S.C. § 77*l*(b).  Exhibit 4.3 to the Castle Prospectus was an Indenture dated as of June 27, 1985 (the "Castle Indenture"), pursuant to which the bonds were issued.

28.  The Series A-1 Castle Bonds in an aggregate principal amount of $226,800,000 were issued on July 27, 1985, at the stated principal amount and were sold to United States-domiciled accredited institutional investors under an exemption from registration under the 1933 Act for a sale of securities not involving a public offering.

29.  The Series A-2 Castle Bonds in an aggregate principal amount of $125 million were issued on July 27, 1985, at a 41.44 percent discount from the stated principal amount and were also sold to United States-domiciled accredited institutional investors under an exemption from registration under the 1933 Act for a sale of securities not involving a public offering.

30.  The Castle Bonds have been listed and traded on the AMEX in the aftermarket following their issuance on July 27, 1985.

31.  On June 8, 1987, Castle Funding filed a Form S-1 Registration Statement and Prospectus (the "Second Castle Prospectus") with the SEC pursuant to which certain

- 9 -

of the accredited investors sold $1 million in aggregate principal amount of the Series A-1 Castle Bonds and $50 million in aggregate principal amount of the Series A-2 Castle Bonds to the public.

32.   Through the issuance of the Castle Bonds, Castle Funding raised gross proceeds in the amount of $300 million, which were immediately loaned by Castle Funding to Castle Associates.  To evidence the loan, Castle Associates issued to Castle Funding promissory notes in the aggregate principal amount of $351,800,000, which bear interest in an amount necessary to service the Castle Bonds.  The notes are secured by a mortgage upon Trump Castle and substantially all of its assets and its ancillary properties.  The notes and mortgage were assigned by Castle Funding to First Fidelity Bank, National Association, New Jersey ("First Fidelity"), as trustee under the Castle Indenture as security for the Castle Bonds.

33.   On or about June 16, 1990, it was reported that:   (a) First Fidelity not only served as trustee for the Castle Bonds, but that it also was one of Donald's creditors engaged in the negotiations referred to in ¶ 60, infra; and (b) to "avoid the appearance of any conflict," First Fidelity would resign as trustee when a successor trustee was named.  To date, no successor trustee for the Castle Bonds has been named.

## Trump's Castle, Trump Plaza and the Taj Mahal

34.  Trump's Castle is comprised of 703 guest rooms (including 186 suites); a 60,000 square foot casino gaming floor; 53,000 square feet of convention, ballroom, and meeting space; 91,314 square feet of lobby and similar public space; nine restaurants; two cocktail lounges; a 460-seat cabaret theater; sports and health club facilities; and attached parking to accommodate 3,000 cars.  Trump's Castle has facilities for helicopter service and is attached to a 600 slip marina.

35.  Castle Associates and Castle Funding have, in documents filed with the SEC under the 1933 Act and 1934 Act as well as in advertisements, public statements, and press releases, promoted Trump's Castle as catering to high-level wagerers from the United States and the Middle East, with expanded convention business as a market priority.  Castle Associates and Castle Funding have stated that Trump's Castle is able to attract and retain repeat business from an affluent clientele by providing complementary transportation, rooms, food, beverage, and gifts.

36.  The ability of Castle Funding to meet its obligations under the Castle Bonds is entirely dependent on the performance by Castle Associates and its obligations under the promissory notes which the partnership issued to the corporation.

37.  Trump Castle operates in the intensely competitive casino gambling market in Atlantic City. Certain experts have expressed general concern over the saturation and increased competitive pressures to the existing Atlantic City gambling market from other legalized gambling centers domestically and abroad.

38.  In March of 1987, Donald acquired, directly or through other entities which he owned or controlled, the controlling share of Resorts International, Inc. ("Resorts"), which owned, inter alia, Resorts International Hotel & Casino ("Resorts Casino"), two amusement piers, a helicopter company, a Bahamas hotel/casino, and a luxury hotel/casino (the "Taj Mahal") then under construction at 1000 Boardwalk in Atlantic City, New Jersey.

39.  Thereafter, certain shareholders of Resorts sought out Merv Griffin ("Griffin") to acquire Resorts. In 1988, Donald and Griffin agreed to split up Resorts' holdings, with Donald acquiring one of the amusement piers, the helicopter company, and the Taj Mahal.

40.  On November 16, 1988, Trump Taj Mahal Associates ("Taj Associates") purchased the Taj Mahal from Resorts for $299,700,000.  Taj Associates is a New Jersey limited partnership in which Donald owns, directly or by virtue of his 100 percent ownership of Trump Taj Mahal, Inc. ("Taj Inc."), all of the partnership interests.

41.   Taj Associates owns and operates the Taj Mahal, presently comprised of 1,250 guest rooms (including luxury suites); a 130,000 square foot casino gaming floor; 175,000 square feet of convention, ballroom, and meeting space; twelve restaurants; two cocktail lounges; a 5,200-seat arena; retail shopping and food courts; and parking to accommodate 6,000 cars and 250 buses daily.   Taj Associates plans to open a 1,175-seat cabaret theater and possibly an enclosed theme park in 1991.   Donald has proclaimed the Taj Mahal to be the "eighth wonder of the world."

42.   At all times relevant hereto, Donald has owned, directly or by virtue of his 100 percent ownership of Taj Inc., all of the issued and outstanding stock of Trump Taj Mahal Funding, Inc. ("Taj Funding").   Taj Funding was formed solely to serve as a financing corporation to raise funds for the benefit of Taj Associates through the issuance of its 14% First Mortgage Bonds, Series A, due 1998 (the "Taj Bonds") pursuant to a Registration Statement and Prospectus dated June 29, 1988 (the "Taj prospectus").

43.   The Taj Bonds, in an aggregate principal amount of $675 million, were issued on November 22, 1988, at the stated principal amount and were sold to United States-domiciled accredited institutional investors under an exemption from registration under the 1933 Act for a sale of securities not involving a public offering.

44.  The Taj Bonds have been listed and traded on the AMEX in the aftermarket following their issuance on November 22, 1988.

45.  Through the issuance of the Taj Bonds, Taj Funding raised gross proceeds in the amount of $675 million, which were immediately loaned by Taj Funding to Taj Associates.  To evidence the loan, Taj Associates issued to Taj Funding a $675 million promissory note which bears interest in an amount necessary to service the Taj Bonds.  The note is secured by a mortgage upon the Taj Mahal and certain ancillary properties.

46.  To acquire and complete construction of the Taj Mahal, Taj Associates required between $868 million and $1.1 billion.  In addition to the proceeds from the sale of the Taj Bonds, Donald contributed $75 million to Taj Associates and extended a $25 million line of credit to the partnership.  Taj Associates also borrowed an additional $50 million for furniture, fixtures, and equipment.

47.  Expert analysts have publicly stated their opinion that the Taj Mahal will need to earn between $1,000,000 and $1,300,000 per day to service all of the debt of Taj Funding.  A daily win of that size on a continuing basis has never been achieved in any casino.

48.  Since Donald acquired his interest in Resorts in March of 1987, he has been obsessed with opening and operating the largest hotel and casino resort in the world.

He has opposed all those who have criticized him for pur-
chasing and completing the Taj Mahal and has ignored all
those who have expressed any opinion that the Atlantic City
casino gambling market could not sustain the additional
gaming capacity represented by the Taj Mahal, roughly equal
to an 18 percent increase over existing casino floor space.

49.  Donald has consistently and repeatedly touted
the Taj Mahal as capable of bringing renewed vigor to the
sagging Atlantic City casino gambling market, predicting
that the opening of the Taj Mahal could bring as much as 20
to 25 percent more business to all of the city's casinos,
including Trump's Castle and Trump Plaza.

Failures to Disclose the Liquidity Problems
of Donald, Castle Funding and Castle Associates

50.  As hereinafter set forth, in the first five
months of 1990, Donald and persons acting on behalf of
Castle Funding issued or caused to be issued false and
misleading press releases, public statements and filings
described below which represented that Donald and Castle
Funding were in excellent financial condition and did not
have any cash flow problems.  Such statements were made for
the following purposes:  (a) to artificially support the
market price of Castle Bonds and to prevent further decline
in the market, and (b) to permit Donald and the affiliated
companies to continue to obtain credit from institutions and

- 15 -

the public on favorable terms, and (c) to allow Donald to sell his assets at non-distress prices.

51. Donald and Castle Funding: (i) did not have a reasonable basis to make these statements; (ii) knew that they were false and misleading; and (iii) were aware of undisclosed facts which seriously undermined the accuracy of these statements.

52. Specifically, during the Securities II Class period, Donald sought to publicize his purported enormous amount of debt-free assets, which as indicated below, he represented he would use, if necessary, to cover the obliga-tions of Castle Bonds. For example, in the February 7, 1990 The Wall Street Journal, Donald, in connection with the opening of the Taj Mahal, was reported as stating:

> I don't have much debt relative to the
> cash . . . and I have no personal debt.
> (Emphasis added.)

53. Similarly, in the March 20, 1990 The Wall Street Journal, Donald was reported as stating that he had little potential financial liability in connection with the Taj Mahal and "[e]xcept for finishing the construction, I didn't guarantee anything."

54. The statements made by Donald referred to in ¶¶ 52 and 53, supra, were false and misleading. As indi-cated in greater detail in ¶ 60 below, at the time Donald made these statements: (a) he had already personally bor-rowed at least tens of millions of dollars; (b) he had or

- 16 -

was then in the process of personally guaranteeing hundreds
of millions of dollars of loans made to him and certain of
his properties; and (c) he was then seeking to sell or
refinance virtually all of his major assets because he was
already suffering a severe cash flow and was unable to meet
the huge amount of interest payments coming due on, *inter
alia*, the Castle Bonds.

     55.  During the Securities II Class period, Donald
also issued a series of misleading statements designed to
counter any suggestion that he, or any of his affiliated
companies, including Castle Funding, were experiencing cash
flow problems or that his financial empire was deteriorat-
ing.  For example, in a March 25, 1990, Washington Post
article, it was reported that Trump "scoff[ed]" at a Fortune
Magazine article that suggested he seemed "overextended."
Instead, Donald Trump asserted that he had "a tremendous
amount of cash."

     56.  Donald adopted a similar approach in connec-
tion with Castle Funding's Form 10-K for the year ending
December 31, 1989 and filed on or about April 2, 1990 (the
"Castle Funding 10-K").  The Castle Funding 10-K stated that
Castle Funding suffered a loss in 1989, and did not "expect
cash flow from operations to exceed its financing and capi-
tal requirements."  However, it was further represented on
page 25 that Castle Associates and Castle Funding did not
anticipate any liquidity problems in 1990 since:

- 17 -

> [Castle Associates] currently antici-
> pates receiving additional [contribu-
> tions from Donald and Hotel Inc.] and/or
> loans to satisfy expected cash require-
> ment shortfalls in 1990.

In view of Donald's repeated assertions that he had an enor-
mous amount of debt free assets (see ¶¶ 52-53, 55, supra),
which assets were available to pay the interest costs of
Castle Funding, the investing public, including Securities
II Class members, reasonably anticipated that Castle Funding
would have no material liquidity problems in 1990.

57.  Moreover, Donald sought to counter any doubt
regarding Castle Funding's ability to meet its debt obliga-
tions during the course of an interview reported in the
April 27, 1990 The Wall Street Journal.  There, Donald again
sought to portray his financial empire in positive terms and
"vehemently and angrily denied" any suggestion that his
"empire face[d] even a hint of a cash problem."  Donald
stated that his 1989 cash flow was $157 million, and he
projected his 1990 cash flow to be $171 million.  Although
he acknowledged that he had retained Merrill Lynch & Co. to
sell the Trump Shuttle, and was considering selling or refi-
nancing other assets (including the Trump Tower and the
Grand Hyatt), Donald maintained that these efforts were
designed to generate sufficient cash so he could "go and
bargain hunt. . . .  I want to be the king of cash."  Donald
further contended . . . "[t]here's nobody that has the cash
flow that I have."  He was so "adamant" about his cash flow

- 18 -

situation that he "threatened a libel suit [against The Wall Street Journal] if any problem was suggested."

58. Donald also strongly reacted to certain critical remarks made by Marvin Roffman, a veteran securities analyst for the securities firm of Janney Montgomery Scott ("Janney Montgomery"). Donald had previously been "very laudatory" (March 27, 1990 edition of the Washington Post) about Roffman when he expressed negative views about a Trump competitor, the Mirage Casino. However, in response to Roffman's critical remarks made in March, 1990 regarding the prospects of the Taj Mahal, Donald threatened to sue Janney Montgomery if (a) Roffman did not retract his statement or (b) Janney Montgomery did not fire him. After Roffman refused to retract his statement, he was fired. In response, Donald publicly commended Janney Montgomery for a "wise decision," adding:

> I didn't consider [Roffman] to be a good analyst, and obviously the firm agreed with me.

59. The statements made by Donald referred to in ¶¶ 55 through 58, supra, were misleading since, inter alia:

(a) Donald did not then have "a tremendous amount of cash" (see ¶ 55, supra), but in fact was "over-extended" (Id.) and was in the process of borrowing and/or guaranteeing hundreds of millions of dollars of loans;

(b) because Donald was facing his own cash flow problems and had borrowed and personally guaranteed

substantial amounts of money, there was no reasonable basis
for the statement in the Castle Funding 10-K that Donald
could contribute his own funds to cover operating expenses
of Castle Funding (see ¶ 54, supra);

(c) by virtue of his borrowing and guar-
antees, Donald did in fact have a severe "cash problem" (see
¶ 57, supra), and his efforts to refinance or sell virtually
all of his assets were not an attempt to become the "king of
cash", but rather a desperate effort to raise funds to meet
the huge 1990 interest obligations of Castle Funding and
other Donald entities;

(d) there was no reasonable basis for
Donald's financial projections of $171 million of cash flow
for 1990 (see ¶ 57, supra), and he, in fact, then knew, but
failed to disclose, that he would be unable to meet all the
1990 interest payments and other obligations of Castle Fund-
ing and other Donald entities;

(e) Donald's threats to the Wall Street
Journal and Janney Montgomery (see ¶¶ 57 and 58, supra) were
designed to prevent the disclosure of the truth with respect
to the materially adverse financial situation then confront-
ing Donald and entities which he controlled. The threats
were designed: (a) to artificially maintain the market
price of the Castle Bonds; and (b) to allow Donald to sell
or refinance his assets at higher prices than could be

realized if the market were aware of his serious cash flow problems.

60. In a June 4, 1990 Wall Street Journal article, Donald's (and as a result Castle Funding's) true cash flow position was finally disclosed. In this and related subsequent articles, it was reported for the first time that notwithstanding Donald's public statement referred to in ¶¶ 52-53 and 55-58, supra:

(a) Donald and his related entities, including Trump Castle, Castle Associates, Castle Funding, Trump Associates, and Trump Funding, were experiencing severe cash flow problems, and Donald and his related entities were unable to make timely interest payments due in 1990 on the Castle Bonds and other debts of Donald and his affiliated companies;

(b) Donald had little, if any, cash available to make interest payments on the Castle Bonds since he had (i) personally taken out loans, including a $135 million personal loan in connection with the Trump Shuttle; and (ii) personally guaranteed approximately $500 million of loans, including $135 million on the Trump Shuttle referred to above; $125 million on the Plaza Hotel; $60 million of a construction loan for the Trump Palace; a $100 million personal loan from Banker's Trust; a $75 million loan from First Fidelity Bancorp on the Taj Mahal Casino; and a $10 million loan to buy his yacht;

- 21 -

(c)   the existence of these personal loans and guarantees limited or eliminated Donald's ability to contribute additional funds to Castle Funding in the manner described in the Castle Funding 10-K (see ¶¶ 56, supra), and therefore absent an extraordinary refinancing, Castle Funding would be unable to timely meet its debt obligations;

(d)   Donald's publicized efforts to refinance or sell assets (see ¶ 57, supra) were not designed to make him the "king of cash," but were a final effort to sell or further leverage his assets to avoid a default on, inter alia, the Castle Bonds;

(e)   the efforts to refinance debt or sell assets referred to in ¶ 55 supra had been unsuccessful in that, inter alia, Donald was unable to: (i) refinance the $75 million mortgage at the Trump Tower; (ii) refinance the Grand Hyatt for $200 million; or (iii) sell the Trump Princess yacht for $115 million; and

(f)   Donald had been in intense negotiations with his major creditors since May, 1990 in an effort to resolve his cash flow crisis.

## Misappropriation of
## Confidential Information

61.   Section 12.13 of the Castle Indenture prohibits Castle Associates and Castle Funding, from engaging in any transactions with its partners or shareholders or the

partners or shareholders of its affiliates "except on terms comparable to those generally available on an arm's length basis in equivalent transactions with third parties."

62.   Section 12.06 of the Castle Indenture prohibits Castle Associates from engaging in any business activities not necessary or appropriate for operating Trump Castle.

63.   In documents filed with the SEC, including Annual Reports on Form 10-K for the years 1988 and 1989, Castle Funding declared that none of the partnerships or corporations had engaged in any prohibited transactions or business activities.

64.   None of the defendants otherwise disclosed that any of the partnerships or corporations had engaged in any prohibited transactions or business activities.

65.   In mid-1990, it was disclosed through the news media that Donald caused or permitted Castle Associates to provide confidential and proprietary business information, including lists of high-level gamblers and affluent clientele, to Taj Associates without compensation.

66.   Taj Associates may be depriving Trump Castle of other business opportunities and advantages by engaging in other prohibited transactions with Castle Associates which have not yet come to light but which will be disclosed to plaintiffs through discovery in this action.

**The Market Prices Of The Castle
Bonds Drop Precipitously After
Disclosure Of Withheld Information**

67.   The price of Castle 13.75% Bonds as a per-
centage of face value declined from approximately 103 per-
cent in March 1989 to approximately 60 percent as of June 4,
1990.

68.   The price of Castle 7% Bonds as a percentage
of face value declined from approximately 66% in March 1989
to approximately 39% as of June 4, 1990.

### COUNT I

<u>VIOLATION OF 1934 ACT</u>
(On Behalf Of The Securities I
Class Against All Defendants)

69.   Plaintiffs incorporate by reference para-
graphs 1 through 68 above as if set forth herein at length.

70.   The defendants have violated Section 10(b) of
the 1934 Act, 15 U.S.C. 78j, and Rule 10b-5 of the SEC prom-
ulgated thereunder, 17 C.F.R. 240.10b-5.

71.   The Prospectuses and Annual Statements filed
with the SEC contained untrue statements of material fact
and omitted to state material facts required to be stated
therein or necessary to make the statements therein not
misleading in light of the circumstances under which they
were made by, <u>inter alia</u>, misstating that the partnerships
and the corporations had not engaged in prohibited transac-

- 24 -

tions or business activities, not disclosing that the part-
nerships and corporations had engaged in prohibited transac-
tions or activities, or not disclosing that the partnerships
and corporations were contemplating engaging in prohibited
transactions or activities.  To the extent such documents
were false and misleading, they remained so and were
uncorrected since their issuance and initial public
dissemination.

72.  By reason of the false and misleading con-
tents of and omissions of material information from the
Prospectuses and the other documents or statements referred
to herein, plaintiffs and the members of the Securities I
Class have been injured in connection with their purchases
of Castle Bonds.

73.  The defendants, with knowledge or in reckless
disregard of the misstatements or omissions, caused to be
issued, or participated in, or aided and abetted the issu-
ance of, materially false and misleading statements in the
name of Castle Funding which were contained in publicly
disseminated documents or otherwise made known to the
investing public during the Securities I Class Period
relating to Castle Funding, Castle Associates, including but
not limited to the Castle Prospectus, and the Annual
Reports, which failed to disclose the facts set forth above.

74. By reason of the conduct herein alleged, the defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

75. The false and misleading nature of the statements of the defendants was not known to plaintiffs or the members of the Securities I Class at the time they acquired the Castle Bonds.

76. As a direct and proximate result of the defendants' unlawful conduct described above, the prices paid by plaintiffs and the members of the Securities I Class were artificially inflated at the time of their purchases and plaintiffs and the members of the Securities I Class have suffered damages in connection with the decline in the value of their investments.

77. The defendants' misrepresentations and omissions alleged herein constitute a device, scheme, or artifice to defraud plaintiffs and the members of the Securities I Class and constituted acts, practices, and a course of business which operated as a fraud and deceit upon plaintiffs and the members of the Securities I Class in violation of Section 10(b) of the 1934 Act and Rule 10b-5. The purpose and effect of the said misrepresentations and omissions were to induce plaintiffs and the members of the Securities I Class to purchase Castle Bonds and to artificially maintain the market prices of such securities so as

- 26 -

to facilitate future sales of Castle Bonds, Taj Bonds and other potential offerings by Donald and his affiliates.

78.  In ignorance of the misrepresentations and omissions alleged herein, plaintiffs and the members of the Securities I Class purchased Castle Bonds in the aftermarket relying on the statements made by the defendants and the integrity of the market for such debt securities.

79.  The defendants, by the acts and transactions set forth herein, have used the means and instrumentalities of interstate commerce and the mails to engage in acts, practices, and a course of business and manipulative and deceptive and contrivances, all constituting and operating as a fraud on the Securities I Class in violation of Section 10(b) of the 1934 Act and Rule 10b-5.

80.  By reason of the defendants' misrepresenta- tions and omissions alleged herein, plaintiffs and the mem- bers of the Securities I Class have been injured in connection with their purchases of Castle Bonds in an amount which cannot presently be calculated.

<u>COUNT II</u>

<u>VIOLATION OF 1934 ACT</u>
(On Behalf Of The Securities II
Class Against Defendants Donald
and Castle Funding)

81.  Plaintiffs incorporate by reference paragraphs 1 through 68 above as if set forth herein at length.

82. Defendants Donald and Castle Funding have violated Section 10(b) of the 1934 Act, 15 U.S.C. 78j, and Rule 10b-5 of the SEC promulgated thereunder, 17 C.F.R. 240.10b-5.

83. The statements and public filings referred to in ¶¶ 52-53, 55-57, supra, contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which they were made by, inter alia, misstating and not disclosing facts as described in ¶¶ 54, 59-60, supra.

84. By reason of the false and misleading contents of and omissions of material information from the documents or statements referred to herein, plaintiffs and the members of the Securities II Class have been injured in connection with their purchases of Castle Bonds.

85. The defendants, with knowledge or in reckless disregard of the misstatements or omissions, caused to be issued, or participated in or aided and abetted the issuance of, materially false and misleading statements in the name of and on behalf of Castle Funding which were contained in publicly disseminated documents and statements or otherwise made known to the investing public during the Securities II Class Period relating to Castle Funding, Castle Associates and Donald, including but not limited to the statements and documents referred to above which misrepresented and failed

- 28 -

to disclose the facts set forth above. Defendants' scienter is supported by the fact that, as described in ¶¶ 57-58, supra, Donald sought at all costs (i.e., threatening to sue the Wall Street Journal, causing the firing of a veteran securities analyst who publicly questioned the projected success of the Taj Mahal) to prevent or counteract the dissemination of any information suggesting that he, or Castle Funding, had cash flow problems.

86. By reason of the conduct herein alleged, the defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

87. The false and misleading nature of the statements of the defendants was not known to plaintiffs or the members of the Securities II Class at the time they acquired the Castle Bonds.

88. As a direct and proximate result of the defendants' unlawful conduct described above, the prices paid by plaintiffs and the members of the Securities II Class were artificially inflated and/or maintained at the time of their purchases and plaintiffs and the members of the Securities II Class have suffered damages in connection with the decline in the value of their investments.

89. The defendants' misrepresentations and omissions alleged herein constitute a device, scheme, or artifice to defraud plaintiffs and the members of the Securities II Class and constituted acts, practices, and a course of

- 29 -

tion with their purchases of Castle Bonds in an amount which cannot presently be calculated.

## COUNT III

### BREACH OF CONTRACT
(On Behalf Of The Contract
Class Against All Defendants)

93.  Plaintiffs incorporate by reference paragraphs 1 through 68 above as if set forth herein at length.

94.  The defendants have breached, or caused, permitted, or aided or abetted the breach of, the Castle Indenture by engaging in prohibited transactions and business activities among themselves and affiliates, including Taj Associates and the partners, officers, employees, or agents thereof.

95.  As a direct, proximate, and reasonably foreseeable result of the defendants' breach of the Castle Indenture alleged herein, plaintiffs and the members of the Contract Class have suffered a loss in the value of their investments, in that the Castle Bonds are no longer worth the prices paid by plaintiffs and the members of the Contract Class for them and the security of the bonds has been eroded and impaired by the loss of confidential and proprietary business information and business opportunities of Trump Castle without compensation.

96.  By reason of the defendants' breach of the Castle Indenture alleged herein, plaintiffs and the members of the Contract Class have been injured in connection with their purchases and ownership of Castle Bonds in an amount which cannot presently be calculated.

### COUNT IV

**COMMON LAW FRAUD**
(On Behalf Of The Securities I
Class Against All Defendants)

97.  Plaintiffs incorporate by reference paragraphs 1 through 68 above as if set forth herein at length.

98.  The Prospectuses and Annual Statements referred to above were false and misleading because they contained untrue statements of material fact and omitted to state material facts necessary to make the statements therein not misleading in light of the circumstances under which they were made by, inter alia, misstating that the partnerships and the corporations had not engaged in prohibited transactions or business activities, not disclosing that the partnerships and corporations had engaged in prohibited transactions or activities, or not disclosing that the partnerships and corporations were contemplating engaging in prohibited transactions or activities. To the extent such documents were false and misleading, they remained so

- 32 -

business which operated as a fraud and deceit upon plaintiffs and the members of the Securities II Class in violation of Section 10(b) of the 1934 Act and Rule 10b-5. The purpose and effect of the said misrepresentations and omissions were to induce plaintiffs and the members of the Securities II Class to purchase Castle Bonds at artificially inflated or maintained prices; facilitate the sale of Donald's assets at non-distressed prices; and to facilitate future sales of Castle Bonds, Taj Bonds and other potential offerings by Donald and his affiliates.

90.   In ignorance of the misrepresentations and omissions alleged herein, plaintiffs and the members of the Securities II Class purchased Castle Bonds in the after-market relying on the statements made by the defendants and the integrity of the market for such debt securities.

91.   The defendants, by the acts and transactions set forth herein, have used the means and instrumentalities of interstate commerce and the mails to engage in acts, practices, and a course of business and manipulative and deceptive and contrivances, all constituting and operating as a fraud on the Securities II Class in violation of Section 10(b) of the 1934 Act and Rule 10b-5.

92.   By reason of the defendants' misrepresentations and omissions alleged herein, plaintiffs and the members of the Securities II Class have been injured in connec-

and were uncorrected since their issuance and initial public dissemination.

99. The defendants intended or reasonably should have known that plaintiffs and the members of the Securities I Class would rely upon the false and misleading statements.

100. In ignorance of the misrepresentations and omissions alleged herein, plaintiffs and the members of the Securities I Class reasonably relied, directly and/or indirectly, upon the false and misleading statements in purchasing and holding the Castle Bonds.

101. The false and misleading nature of the statements of the defendants was not known to plaintiffs or the members of the Securities I Class at all times relevant hereto.

102. As a direct and proximate result of the defendants' fraud upon plaintiffs and the members of the Securities I Class described above, the prices paid by plaintiffs and the members of the Securities I Class were artificially inflated at the time of their purchases and plaintiffs and the members of the Securities I Class have suffered damages in connection with the decline in the market value of their investments.

103. By reason of the defendants' fraud alleged herein, plaintiffs and the members of the Securities I Class have been injured in connection with their purchases of

Castle Bonds Bonds in an amount which cannot presently be calculated.

### COUNT V

**COMMON LAW FRAUD**
(On Behalf Of The Securities II
Class Against Donald and Castle Funding)

104.    Plaintiffs incorporate by reference para-graphs 1 through 68 above as if set forth herein at length.

105.    The statements and public filings referred to in ¶¶ 49-53, 55-58, _supra_, were false and misleading because they contained untrue statements of material fact and omit-ted to state material facts necessary to make the statements therein not misleading in light of the circumstances under which they were made by, _inter alia_, misstating or failing to disclose the information referred to in ¶¶ 54, 59-60, _supra_.

106.    Defendants Trump and Castle Funding intended or reasonably should have known that plaintiffs and the members of the Securities II Class would rely upon the false and misleading statements.

107.    In ignorance of the misrepresentations and omissions alleged herein, plaintiffs and the members of the Securities II Class reasonably relied, directly and/or indi-rectly, upon the false and misleading statements in purchas-ing and holding the Castle Bonds.

108.  The false and misleading nature of the state-
ments of the defendants was not known to plaintiffs or the
members of the Securities II Class at all times relevant
hereto.

109.  As a direct and proximate result of the
defendants' fraud upon plaintiffs and the members of the
Securities II Class described above, the prices paid by
plaintiffs and the members of the Securities II Class were
artificially inflated at the time of their purchases and
plaintiffs and the members of the Securities II Class have
suffered damages in connection with the decline in the
market value of their investments.

110.  By reason of the defendants' fraud alleged
herein, plaintiffs and the members of the Securities II
Class have been injured in connection with their purchases
of Castle Bonds in an amount which cannot presently be
calculated.

## COUNT VI

### BREACH OF FIDUCIARY DUTY
(On Behalf Of The Contract
Class Against All Defendants)

111.  Plaintiffs incorporate by reference para-
graphs 1 through 68 as if set forth herein at length.

112.  Plaintiffs and the members of the Contract
Class purchased Castle Bonds as a result of the highly

visible and careful promotion of Donald and the vast
holdings which he has amassed and controls through numerous
entities which he beneficially owns, all of which has
created and fostered a public image and perception of Donald
and the Trump empire in a uniquely positive light.

113. As the beneficial owner of all of the part-
nership interests of Castle Associates and all of the stock
of Castle Funding, as the Chairman of the executive
committees of the partnerships and the sole director and
Chief Executive Officer of the corporations, and as head of
the entire Trump empire, Donald owed a special fiduciary
duty of loyalty and care to plaintiffs and the members of
the Contract Class.

114. Donald breached his special fiduciary duty of
loyalty and care to plaintiffs by engaging in the conduct
alleged herein, utilizing confidential and proprietary busi-
ness information and business opportunities of Trump Castle
and promoting the success of the Taj Mahal at the expense
and to the exclusion of his other hotel/casinos.   In an
effort to insure the success of the Taj Mahal and silence
his critics and detractors, Donald has even promoted the Taj
Mahal in connection with adjoining hotels and casinos owned
and operated by persons or entities not affiliated with the
Trump empire.

115. By reason of Donald's breach of his special
fiduciary duty of loyalty and care alleged herein,

- 36 -

plaintiffs and the members of the Contract Class have been
injured in connection with their purchases of Castle Bonds
in an amount which cannot presently be calculated.

## COUNT VII

### COMMON LAW FALSE ADVERTISING

(On Behalf of The Contract
Class Against All Defendants)

116.   Plaintiffs incorporate by reference paragraph
1 through 68 as if set forth herein at length.

117.   Defendants and others presently unknown to
plaintiffs, including among others public relations and
media consultants and advertising agents, acting alone or in
combination on conspiracy, at all relevant times falsely
portrayed a carefully created and maintained public image
that, as described in ¶¶ 43-44, 46-49, supra, Donald and the
Trump empire were financially invincible, that Donald was
the "king of cash" with net worth of several billion
dollars, and that they were financially sound in all respect
when, in fact, Donald and his financial empire is and was
unsound, deteriorating, and otherwise not as portrayed.

118.   The image described above, which was por-
trayed, among other means by advertisements and promotional
materials for the Trump Castle, including information dis-
closed to the investing public about the Castle Bonds, and
intended to convey the appearance of success, opulence,

- 37 -

strength, and stability necessary for any successful
operation of the Trump Castle.

119. Defendants intentionally, recklessly, or
negligently, overstated and misrepresented the financial and
operating condition and prospects of Donald and his empire,
intending to deceive, _inter_ _alia,_ the investing public,
including plaintiffs and the other members of the Contract
Class who were in fact deceived thereby.

120. By reason of defendants' unfair competition
and false advertising as alleged herein plaintiffs and
members of the Contract Class have been injured in connec-
tion with their purchases of Castle Bonds in an amount which
cannot presently be calculated.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment against the
defendants as follows:

A. determining that this is a proper class
action under Rules 23(a) and (b)(3);

B. determining that plaintiffs are adequate
representatives of the Securities I and II Classes and
the Contract Class;

C. awarding plaintiffs and the members of
the Securities I and II Classes and Contract Class
compensatory damages and rescission to the extent that
they still hold Castle Bonds;

- 38 -

D. enjoining the defendants from improperly utilizing confidential and proprietary information and other assets belonging to Trump Castle to benefit the Taj Mahal and/or other affiliates of Donald, prohibiting Donald and the other defendants from availing themselves of corporate opportunities properly belonging to Trump Castle and, should the defendants fail to comply therewith, requiring Donald to divest himself of control of the Trump Castle.

E. awarding plaintiffs costs and disbursements of this action, including reasonable attorneys' fees and experts' fees; and

F. awarding such other additional and further relief as this Court may deem just and proper.

- 39 -

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all
Counts of the Second Amended Consolidated Complaint.

DATED: March 4, 1992

GOODKIND LABATON RUDOFF
& SUCHAROW

By: _____
  Edward Labaton (EL-2947)
122 East 42nd Street
New York, New York 10168
(212) 490-2332

Lead Counsel for Plaintiffs

SPECTER LAW OFFICES, P.C.
Howard A. Specter
2230 Grant Building
Pittsburgh, Pennsylvania 15219

Counsel for Plaintiff
Sidney L. Kaufman